Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (*pro hac vice admission pending*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, PAYMENTS OF PREPETITION (I) WAGES, SALARIES, AND OTHER COMPENSATION; (II) REIMBURSABLE EMPLOYEE EXPENSES; AND (III) EMPLOYEE MEDICAL AND SIMILAR BENEFITS**

Cengage Learning, Inc. ("***Cengage***") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"), respectfully represent:

## Background[1]

1. The Debtors are a leading global provider of high-quality content, innovative print and digital teaching and learning solutions, software, and associated educational services for the higher-education, research, school, career, professional, and international markets. The Debtors are the second largest publisher of course materials in U.S. higher education, with strong positions across all major disciplines, and are a leading global provider of library reference materials, with a vast collection of primary source content.

2. On the date hereof (the "***Petition Date***"), each of the Debtors filed a petition with the United States Bankruptcy Court for the Eastern District of New York (the "***Court***") under chapter 11 of title 11 of the United Sates Code (the "***Bankruptcy Code***"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. Concurrently with the filing of this motion, the Debtors requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"). No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

## Jurisdiction

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4. Venue is proper in this District pursuant to 28 U.S.C. § 1408.

[1] A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases, the relief sought from the Court to allow for a smooth transition into chapter 11, and the facts and circumstances supporting this motion are set forth in the *Declaration of Dean D. Durbin, Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***"), filed contemporaneously herewith.

5. The bases for the relief requested herein are sections 105(a), 363, 503(c), 507(a)(4)-(5), 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rule 6003, and Rule 9013-1 of the Local Bankruptcy Rules for the Eastern District of New York (the "***E.D.N.Y. Local Bankruptcy Rules***").

**Relief Requested**

6. By this motion, the Debtors request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "***Interim Order***" and the "***Final Order***," respectively), (a) authorizing the Debtors to (i) pay prepetition wages, salaries, sales incentives, commissions, other compensation, reimbursable employee expenses, severance obligations, and unpaid deductions and payroll taxes and (ii) continue various employee benefits programs; (b) authorizing financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition employee obligations (collectively, and as described herein, the "***Employee Obligations***"),[2] provided that there are sufficient good funds standing to the Debtors' credit with such financial institutions; and (c) scheduling a final hearing (the "***Final Hearing***") to consider entry of a Final Order.

7. Although the Debtors believe that all Employee Obligations are vital to the Debtors' businesses, pursuant to the Interim Order the Debtors seek authority to maintain and make payments on account of those Employee Obligations that the Debtors believe are necessary to prevent immediate and irreparable harm to the Debtors' businesses during the first 21 days of

---

2 The summary of the Debtors' various Employee Obligations provided herein is qualified entirely by the Debtors' official policies or other practices, programs, or agreements, whether written or unwritten, evidencing an arrangement among the Debtors and their Employees (as defined herein) (each, an "***Official Policy***"). In the event of any inconsistency or ambiguity between the summary contained in this motion and an Official Policy, the terms of such Official Policy shall govern.

these chapter 11 cases. Notably, the Debtors will seek the authority, solely upon entry of the Final Order, to honor, pay, satisfy, or remit all claims and prepetition obligations related to the following Employee Obligations (each as defined and discussed herein): (a) Unpaid Independent Sales Commissions; (b) Unpaid Sales Incentives; (c) Unpaid Prepetition Severance; (d) Fringe Benefit Programs; and (e) Postpetition Non-Employee Director Obligations.

8. Additionally, for the majority of their Employees, the Debtors do not seek the authority to pay amounts exceeding $12,475, which is the priority cap set forth in section 507(a)(4) of the Bankruptcy Code (the "***Priority Cap***"). That said, based on the nature, structure, and timing of their compensation, certain Employees are owed amounts in excess of the Priority Cap, primarily related to commissions and sales incentives that accrue over time and are paid in arrears. Accordingly, the Debtors request authority to pay and honor the following prepetition Employee Obligations (each as defined and discussed herein) in excess of $12,475 in the ordinary course, including, but not limited to, the following obligations, which are described in greater detail below: (a) the Unpaid Independent Contractor Compensation; (b) the Unpaid Independent Sales Commissions; (c) the Unpaid Sales Incentives; and (d) the Unpaid Prepetition Severance[3] (collectively, the "***Excess Unpaid Employee Compensation***") pursuant to entry of the Final Order. For the avoidance of doubt, the Debtors seek to pay the Excess Unpaid Employee Compensation solely pursuant to entry of the Final Order.

9. The Debtors also request the right to modify, change, and discontinue any of the Employee Obligations, and policies related thereto, and implement any new Employee Obligations in the ordinary course of business during the chapter 11 cases in their sole discretion without the need for further court approval.

[3] For the avoidance of doubt, the Debtors do not seek to make any payments to Insiders under the Severance Program above the cap set forth in section 503(c)(2) of the Bankruptcy Code.

## Basis for Relief

### I. The Debtors' Workforce and Wage and Benefit Obligations

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| Unpaid Wages | $7,900,000 | $7,900,000 |
| Unpaid Payroll Fees | $67,000 | $67,000 |
| Unpaid Sales Commissions | $250,000 | $250,000 |
| Unpaid Sales Incentives | $0 | $30,600,000[4] |
| Unpaid Independent Contractor Compensation | $7,165,000 | $11,600,000 |
| Unpaid Independent Sales Commissions | $0 | $2,000,000 |
| Unpaid Reimbursable Expenses | $935,000 | $1,535,000 |
| Unpaid Empyrean Fees | $64,000 | $64,000 |
| Unpaid Health Benefit Plans | $1,200,000[5] | $1,200,000 |
| Unremitted Flexible Spending | $42,000 | $42,000 |
| Unremitted Prepetition Severance | $0 | $7,300,000 |
| Fringe Benefit Programs | $0 | $383,500 |
| Unpaid 401(k) Match | $450,000 | $450,000 |
| Unremitted 401(k) Contributions | $950,000 | $950,000 |
| Workers' Compensation | $13,000 | $13,000 |
| Unremitted Deductions | $35,000 | $35,000 |
| Unremitted Payroll Taxes | $1,700,000 | $1,700,000 |
| **TOTAL** | $20,771,000 | $66,089,500 |

### II. Overview of the Debtors' Workforce

10. As of the Petition Date, the Debtors employ approximately 4,235 employees in the United States (collectively, the "***U.S. Employees***") and approximately 1,036 employees in other countries around the world (the "***International Employees***," and together with the U.S.

---

4 While a small portion of Unpaid September Sales Plans will be attributable to such employees from prepetition periods, a significant amount of which will be earned during the postpetition period due to the seasonality of the Debtors' businesses.

5 For the avoidance of doubt, this is inclusive of the amounts the Debtors seek to pay, pursuant to the Interim Order, on account of Unpaid Health Benefit Plans with respect to former employees severed prepetition.

Employees, the "***Employees***").[6] Approximately 5,194 of the Employees are full-time employees and approximately 77 of the Employees are part-time employees. The Debtors pay approximately 2,693 employees (63.6%) on a salaried basis and approximately 1,542 employees (36.4%) on an hourly basis.

11. In addition to their Employees, the Debtors supplement their workforce by utilizing approximately 4,800 independent contractors (the "***Independent Contractors***") annually that are vital to the creative content of the Debtors' businesses.[7]

12. The Debtors' Employees, Independent Contractors and Temporary Employees (collectively, the "***Debtors' Workforce***") perform a variety of critical functions, including: purchasing and sales, software and product development, distribution and shipping, marketing, customer service and support, accounting, management, legal, technical services, and other related tasks. The Debtors' Workforce provides valuable skill sets, institutional knowledge, and an understanding of the Debtors' operations and customer relations, making the Debtors' Workforce essential to the success of these chapter 11 cases.

13. Further, just as the Debtors depend on their workforce to operate the Debtors' businesses, the vast majority of the Debtors' Workforce relies exclusively on their compensation and benefits to pay their daily living expenses and will be exposed to significant financial difficulties if the Debtors are not permitted to continue paying compensation, providing benefits, and maintaining certain programs benefiting the Debtors' Workforce. To minimize the personal hardship that the Debtors' Workforce would suffer if prepetition Employee-related obligations

---

[6] Because all of the Debtors are organized under the laws of the various states in the United States, and because none of the foreign affiliates are parties to these chapter 11 cases, unless otherwise noted herein, the Debtors have limited the description of their work force and benefits programs to their domestic operations.

[7] The Debtors also utilize temporary employees (the "***Temporary Employees***") on an ad hoc basis to fulfill administrative, legal, and other functions outside of the creative content context. The Temporary Employees, for the most part, are included within the Independent Contractors group.

are not paid when due or as expected and to maintain morale and stability in the Debtors' Workforce during this critical time, the Debtors seek the authority to pay and honor the Employee Obligations, as described herein, in the normal course of business.

## III. Employee Wages, Commissions, and Other Compensation

14. In the ordinary course of business, the Debtors pay Employees wages, salaries, commissions, sales incentives, and other compensation (collectively, the "***Employee Compensation***").

### A. Wages

15. The Debtors pay their Employees' wage and salary obligations (the "***Wages***") on either a salaried or hourly basis. The Employees are paid bi-weekly, one week in arrears. The Debtors' average bi-weekly gross payroll for all of its Employees' Wages is approximately $11.8 million.

16. The Debtors utilize Ceridian, a third-party payroll service, to process its payroll. The Debtors' payroll is paid either by direct deposit through electronic funds transfer to the Employees' bank accounts or by physical check, at the Employee's election. In the ordinary course of business, approximately three days before each payroll issuance, the Debtors advance funds to Ceridian along with payment schedules outlining the payments to be made to the Employees. On each applicable pay day, Ceridian makes direct deposit disbursements and issues payroll checks to the Employees. The Debtors pay Ceridian approximately $59,000 per month for its services and payroll processing fees (the "***Payroll Fees***"). As of the Petition Date, the Debtors estimate that they owe Ceridian approximately $67,000 on account of the Payroll Fees (the "***Unpaid Payroll Fees***").

17. Although the Debtors have paid their Wages in accordance with their payroll schedule, as of the Petition Date, certain prepetition wage obligations have accrued and remain

outstanding (the "***Unpaid Wages***"). More specifically, the Debtors estimate that approximately $7.9 million in Unpaid Wages have accrued, but are not yet due and owing because of (a) the timing of the payroll schedule and the Petition Date, (b) discrepancies existing as to amounts paid and the amounts that should have been paid, and (c) some payroll checks being issued prior to the Petition Date that have not yet been presented for payment. As a result, the Debtors seek the authority to pay and honor any prepetition Unpaid Wages on a postpetition basis in the ordinary course of business. Additionally, the Debtors seek to pay the Unpaid Payroll Fees outstanding as of the Petition Date and continue administering payroll in the ordinary course of business. The Debtors do not believe that Employees are owed Unpaid Wages in excess of the $12,475 Priority Cap, but out of an abundance of caution are requesting authority pursuant to this Motion to pay any such excess amounts pursuant only to entry of the Final Order.

**B. Sales Commission Payments**

18. The Debtors pay approximately 172 of their sales representatives primarily through sales commission programs, at rates based on a percentage of sales, subscriptions secured, and revenue generated (the "***Sales Commissions***"). Like Wages, the Sales Commissions are the primary source of income for certain of the Debtors' sales representatives. Moreover, the Sales Commissions align incentives with those of the Debtors and encourage the sales representatives to maximize sales, benefitting the business as a whole. Therefore, it is vital that the Debtors be able to continue paying such Sales Commissions in the ordinary course of business. Historically, the Debtors spend on average approximately $237,500 per month on Sales Commissions. While the majority of the Debtors' obligations relating to the Sales Commissions will not arise until after the Petition Date, as of the Petition Date, the Debtors owe approximately $250,000 based on Sales Commissions relating to prepetition periods (the "***Unpaid Sales Commissions***"). The Debtors seek the authority to pay and honor any

prepetition Unpaid Sales Commissions on a postpetition basis in the ordinary course of business. The Debtors do not believe that Employees are owed Unpaid Sales Commissions in excess of the $12,475 Priority Cap, but out of an abundance of caution are requesting authority pursuant to this Motion to pay any such excess amounts pursuant to only entry of the Final Order.

**C. Sales Incentive Plans**

19. The sales incentive plans (the "***Sales Incentive Plans***") provide for various award payments to the Debtors' full-time sales Employees, based on employment position within the sales force for the following sales periods, as determined by the applicable Sales Incentive Plan: July 1, 2012 through June 30, 3013 (the "***June Sales Plans***") and February 1, 2013 through September 30, 2013 or October 1, 2012 through September 30, 2013 (the "***September Sales Plans***"). The applicable sales period varies depending upon which of the Debtors' products is being sold and the sales cycle in the given product market. The Debtors utilize the Sales Incentive Plans to motivate the sales Employees to: (a) achieve and surpass annual territory revenue, (b) sustain high performance year over year, and (c) appropriately recognize and reward high performance to foster employee retention and recruitment of high potential employment candidates. The Sales Incentive Plans are an integral part of compensation for the Debtors' sales Employees, accounting for, on average, 25-35 percent of each sales employee's annual compensation. The award payments under the Sales Incentive Plans are determined based upon various sales revenue metrics set for specific positions within the Debtors' sales force. Historically, in the aggregate, the Sales Incentive Plans cost the Debtors approximately $32.0 million per year, which are critical in helping generate over $1.6 billion in annual revenue for the Debtors. If sales performance metrics are met, the Debtors anticipate that the next payments under the Sales Incentive Plans will be made on July 26, 2013 and September 6, 2013 (with

respect to the June Sales Plans) and December 31, 2013 (with respect to the September Sales Plans).

20. As of the Petition Date, the Debtors estimate that they owe approximately $3.3 million on account of the June Sales Plans (the "***Unpaid June Sales Plans***"). The Debtors' unpaid prepetition obligations on account of the September Sales Plans, however, are much more difficult to quantify with absolute certainty. Specifically, approximately 42-54% of the sales under the September Sales Plans are made between July and September, and as such, it is difficult to determine at this time how many, and to what extent, employees under the September Sales Plan will meet their sales goals. Based on historical data, the Debtors estimate that as of the Petition Date they will owe approximately $27.3 million on account of the September Sales Plans (the "***Unpaid September Sales Plans***," and together with the Unpaid June Sales Plans, the "***Unpaid Sales Incentives***"). While a small portion of Unpaid September Sales Plans will be attributable to such employees from prepetition periods, a significant amount of will be earned during the postpetition period due to the seasonality of the Debtors' business. Pursuant only to the Final Order, with respect to non-Insiders only, the Debtors seek the authority to continue to maintain the Sales Incentive Plans on a postpetition basis and to pay prepetition amounts related thereto. For the avoidance of doubt, the Debtors seek to pay the Unpaid Sales Incentives and continue the Sales Incentive Plans solely pursuant to entry of the Final Order.

## IV. Supplemental Workforce Obligations

### A. Independent Contractor Compensation

21. The Debtors rely heavily on supplementing their workforce through Independent Contractors. The Independent Contractors are vital to the creative content of the Debtors' businesses and include individuals who perform creative services on a freelance basis with respect to the creation of the Debtors' products, including, content and academic contributors,

software developers, product developers, editors, and artists. The Independent Contractors are, for the most part, hired on a project-by-project basis, which provides not only a strategic, but also a financial advantage to the Debtors by enabling them to obtain the services of individuals with valuable qualifications while controlling costs by doing so on a limited, as-needed basis.

22. The Debtors directly employ approximately 4,400 Independent Contractors (the "***Direct Independent Contractors***") and employ approximately 390 Independent Contractors (the "***Sourced Independent Contractors***") through the use of approximately 50 staff augmentation agencies (the "***Independent Contractor Staffing Agencies***").

23. The Debtors generally have contracts relating to the employment of all Independent Contractors through: (a) individual contracts with the Direct Independent Contractors or (b) contracts with the Independent Contractor Staffing Agencies for the services provided by each Sourced Independent Contractor. Payment of the Direct Independent Contractors is generally based on a project-by-project basis and dependent on reaching certain milestones contained in each particular contract. Payment with respect to the Sourced Independent Contractors is generally calculated at an hourly rate on a project-by-project basis. The function provided is the same, however, regardless of whether the Debtors secure the Independent Contractor directly or through an Independent Contractor Staffing Agency — the Independent Contractors provide essential services to the Debtors, without which their businesses would be negatively impacted to a significant extent.

24. The Debtors remit payments to the Direct Independent Contractors as they come due through their accounts payable system. Due to the nature of the project-by-project, milestone-based employment arrangements with the Direct Independent Contractors, it is difficult to determine the exact amounts due at any given time as such payments are not due until

such milestones are achieved. With respect to the Sourced Independent Contractors, the Debtors remit payment to the Independent Contractor Staffing Agencies, which then remit payments owed to the Sourced Independent Contractors. Historically, the Debtors spend on average approximately $7.2 million per month, and over $68 million annually on account of the Independent Contractors. As of the Petition Date, the Debtors estimate that approximately $11.6 million is owed relating to prepetition periods on account of the Independent Contractors (the "***Unpaid Independent Contractor Compensation***"), approximately 230 of which are owed in excess of the $12,475 Priority Cap. Because continued performance and contributions by the Independent Contractors are so vital to the Debtors' operations and reorganization efforts, the Debtors request authority to pay, in their sole discretion, Unpaid Independent Contractor Compensation up to the $12,475 Priority Cap per Independent Contractor in the ordinary course of business and consistent with past practice pursuant to the Interim Order. The Debtors request the additional authority to pay, in their sole discretion, Unpaid Independent Contractor Compensation over the $12,475 Priority Cap pursuant to entry of the Final Order. For the avoidance of doubt, the Debtors seek to pay the Unpaid Independent Contractor Compensation above the Priority Cap solely pursuant to entry of the Final Order.

**B. Independent Sales Commission Plan**

25. The Debtors utilize approximately 55 Direct Independent Contractors that act as independent sales representatives (the "***Independent Sales Representatives***") and are critical to the Debtors' National Geographic, Gale, and Heinle product line sales performance. As a critical component of their compensation, the Debtors offer the Independent Sales Representatives a commission plan (the "***Independent Sales Commission Plan***"), which provides for various award payments based on market allocation and achievement of monthly and annual sales goals. The Debtors utilize the Independent Sales Commission Plan to motivate the sales Independent

Sales Representatives to achieve maximum sales and to assist in covering the costs of district meetings, conferences, and travel expenses. The award payments under the Independent Sales Commission Plan are determined based upon various sales metrics set at the beginning of each fiscal year. Historically, in the aggregate, the Independent Sales Commission Plan cost the Debtors approximately $9.1 million per year. As of the Petition Date, the Debtors estimate that approximately $2.0 million in payments under the Independent Sales Commission Plan are outstanding (the "***Unpaid Independent Sales Commissions***"). If sales performance metrics are met, the next payments under the Independent Sales Commission Plan will come due at the end of July 2013. The Debtors seek to pay the Unpaid Sales Commissions and continue the Independent Sales Commission Plan solely pursuant to entry of the Final Order.

**V. Reimbursable Expenses**

26. As described below, in the ordinary course of business, the Debtors reimburse certain Employees for approved, reasonable, and customary expenses incurred on behalf of the Debtors in the scope of their employment (the "***Reimbursable Expenses***").

**A. Travel and Entertainment Expenses**

27. Certain Employees incur business-related travel and entertainment expenses in the scope of their employment including, air travel, rental car, dining, parking, automobile mileage, and other business-related expenses (the "***Travel and Entertainment Expenses***"). Employees must enter their Travel and Entertainment Expenses as they are incurred into the Debtors' Concur software system and are reimbursed directly through electronic funds transfers in accordance with the Debtors' global travel and entertainment policy. Although the Debtors request that reimbursement requests be submitted promptly, not all of the Employees do so. Thus, the Debtors are unable to provide a complete detailed listing of unpaid prepetition Travel and Entertainment Expenses outstanding as of the Petition Date because it is likely that

Employees will submit requests for expenses incurred prepetition after the Petition Date. Based on historical practice, the Debtors estimate they owe their Employees approximately $110,000 on account of prepetition Travel and Entertainment Expenses (the "***Unpaid Travel and Entertainment Expenses***").

### B. Corporate Card Programs

28. To efficiently manage expenses for certain of the Debtors' Employees, the Debtors maintain various accounts with American Express Corporate Services for business, travel, entertainment, and meeting expenses (the "***Corporate Card Programs***").

a. Travel Cards. The Debtors issue corporate credit cards through American Express for those Employees that incur in excess of $1,500 in travel and entertainment expenses annually (the "***Travel Cards***"). Approximately 1,800 Employees hold Travel Cards, and the Debtors remit weekly payments directly to American Express based on approved expense reports submitted by Employees. The Debtors and applicable Employees are jointly liable on the Travel Cards. As of the Petition Date, the Debtors estimate they owe approximately $825,000 on account of the Travel Cards (the "***Unpaid Travel Card Expenses***").

b. Purchase Cards. The Debtors issue corporate credit cards through American Express to approximately 100 Employees for the purchase of miscellaneous office-related business expenses (the "***Purchase Cards***"). The Debtors receive a statement from American Express once a month and pay American Express directly for any such purchases. As of the Petition Date, the Debtors estimate they owe approximately $100,000 on account of the Purchase Cards (the "***Unpaid Purchase Card Expenses***").[8]

c. Meeting Cards. The Debtors issue corporate credit cards through American Express to approximately 30 Employees for the purchase of miscellaneous expenses related to internal and customer office conferences (the "***Meeting Cards***"). The Debtors receive a statement from American

[8] The Debtors also maintain a $1 million letter of credit as collateral securing the payments under the Purchase Cards.

> Express once a month and pay American Express directly for any such purchases. As of the Petition Date, the Debtors estimate they owe approximately $500,000 on account of the Meeting Cards (the "***Unpaid Meeting Card Expenses***").

29. The Employees incurred the Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that the Debtors would reimburse the Employees. Failure to pay for these expenses will disrupt the Debtors' business operations and cause Employees to be concerned about personal liability for business-related charges, which would distract the Employees from devoting their full attention to the Debtors' businesses and the orderly administration of these chapter 11 cases.

30. Accordingly, to avoid harming Employees who incurred the Reimbursable Expenses and who may become personally liable for such expenses reasonably incurred at the Debtors' direction, the Debtors request authority to pay the Unpaid Travel and Entertainment Expenses and the Unpaid Travel Card Expenses pursuant to the Interim Order in accordance with prepetition practices and in the ordinary course of business. Although the Debtors used their best efforts to estimate the Unpaid Travel and Entertainment Expenses and the Unpaid Travel Card Expenses as of the Petition Date, it is possible that certain Employees may have incurred prepetition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date. The Debtors therefore seek authority to pay all prepetition obligations with respect to the Travel and Entertainment Expenses and Travel Card Expenses, including those submitted postpetition, and to otherwise continue their Reimbursable Expense policy and Corporate Card Programs in the ordinary course of business. The Debtors request the additional authority to pay, in their sole discretion, Unpaid Purchase Card Expenses and Unpaid Meeting Card Expenses (collectively, with the Unpaid Travel and Entertainment Expenses and the Unpaid Travel Card Expenses, the "***Unpaid Reimbursable***

***Expenses***") pursuant to entry of the Final Order in accordance with prepetition practices and in the ordinary course of business.

**VI. Employee Paid Time Off and Leaves of Absence**

31. The Debtors provide vacation time ("***Vacation Time***"), sick time ("***Sick Time***"), and floating holidays ("***Floating Holidays***") to their Employees working 20 hours or more a week as a paid time off benefit (collectively, the "***Paid Time Off***"). The amount of Paid Time Off available to a particular Employee and the rate at which such Paid Time Off accrues is generally determined by the Employee's length of employment. Ordinarily, when an Employee elects to take Paid Time Off, such Employee is paid his or her regular hourly or salaried rate. Employees are required to use their Sick Time and Floating Holidays during the year in which they earn it and may not carry unused days into the next year. With respect to Vacation Time, Employees may accrue and carryover up to a maximum of one year's Vacation Time based upon the Employee's current rate of accrual.[9] If an Employee ceases to be employed by the Debtors, the Employee's final paycheck will not include any accrued unused Paid Time Off, except where required by state law. The Debtors estimate that approximately $18.6 million of earned but unused Paid Time Off has accrued as of the Petition Date. This amount, however, is not a current cash payment obligation, as only certain Employees are entitled under state law to a cash payment for accrued and unused Paid Time Off in the event the Employee ceases to be employed by the Debtors.[10]

---

[9] The Debtors permit Employees to carryover annual Vacation Time and Sick Time as required pursuant to applicable state and local law.

[10] Approximately $4.7 million of the $18.6 million of earned but unused Paid Time Off would represent a cash obligation under state and local laws in the event such Employees ceased to be employed by the Debtors.

32. By this Motion, the Debtors request that they be authorized, but not directed, to continue to honor their Paid Time Off policy in the ordinary course of business and to honor and pay any prepetition amounts related thereto. Moreover, the Debtors anticipate that their Employees will utilize any accrued Paid Time Off in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

33. The Debtors also allow Employees to take certain other leaves of absence for personal reasons, many of which are required by law (collectively, the "***Leaves of Absence***"). Leaves of Absence include family medical leaves, parental leaves, military leaves, bereavement leaves, jury duty, voting time, personal leaves, and disability leaves. By this Motion, the Debtors request that they be authorized, but not directed, to continue to honor their Leaves of Absence in the ordinary course of business and to honor and pay any prepetition amounts related thereto.

## VII. Employee Benefit Programs

34. The Debtors offer their Employees working more than 30 hours a week (collectively, the "***Eligible Employees***") the opportunity to participate in a number of insurance and benefit programs, including, among other things, medical, dental, and vision plans, participation in flexible spending accounts, life insurance, short and long-term disability insurance, severance, and other fringe benefit plans as described below (collectively, the "***Employee Benefits***"). To ease the administrative burden, the Debtors utilize the services of Empyrean to administer the Employee Benefits. On account of administrative fees for coordinating the Employee Benefits, the Debtors historically spend $300,000 annually and estimate that, as of the Petition Date, they owe Empyrean approximately $64,000 relating to prepetition periods (the "***Unpaid Empyrean Fees***").

**A. Health Benefit Plan**

35. The Debtors offer Eligible Employees and their eligible dependents (collectively, the "***Dependents***") the opportunity to participate in a number of health benefit plans, including medical, prescription, dental, and vision plans (collectively, the "***Health Benefit Plans***").

a. Medical, Dental, and Prescription Plan. Cigna administers the Debtors' self-insured medical, dental, and prescription drug coverage plans for approximately 4,045 Eligible Employees (the "***Medical, Dental, and Prescription Plan***"). In practice, Cigna pays the amount of the claims on the Debtors' behalf and deducts the actual claim amounts from the Debtors' bank account on a weekly basis. The Debtors pay Cigna a monthly administrative fee for their services. Because the amount of actual claims can differ dramatically from month to month, it is difficult for the Debtors to determine the exact amount due and owing under the Medical, Dental, and Prescription Plan at any given time. Historically, the Debtors' pay approximately $3.1 million in July to administer the Medical, Dental, and Prescription Plan. As of the Petition Date, the Debtors estimate that they owe approximately $1.2 million of prepetition obligations under the Medical Plan. Additionally, to supplement the self-insured Medical, Dental, and Prescription Plan, the Debtors have a policy with HM Insurance Group ("***HM Life***") for stop-loss insurance for claims over $325,000. As of the Petition Date, the Debtors do not owe any amounts to HM Life on account of stop-loss insurance coverage.

b. Vision Plan. VSP administers the Debtors' vision benefits plan for approximately 2,603 Eligible Employees (the "***Vision Plan***"). The Vision Plan is completely funded by the participating Eligible Employees. The Debtors serve as a conduit through which Eligible Employee payments are made to the Vision Plan administrator.

36. The Debtors estimate that, as of the Petition Date, they owe approximately $1.2 million on account of the Health Benefit Plans which is inclusive of amounts collected from Employees but not yet remitted to the appropriate third-party health providers on behalf of the Employees (collectively, the "***Unpaid Health Benefits***"). The Debtors request authority to (a) to

remit the Unpaid Health Benefits; (b) continue the Health Benefit Plans for Eligible Employees and former Employees as applicable; (c) continue making the above-described contributions to such Health Benefit Plans; and (d) pay any amounts related thereto, including premiums, claim amounts, and administration fees, to the extent that they remain unpaid as of the Petition Date, in the ordinary course of business.

**B. Flexible Spending Accounts**

37. The Debtors also offer Eligible Employees the opportunity to contribute a portion of their pre-tax compensation to flexible spending accounts up to $2,500 for eligible out-of-pocket health care and up to $5,000 for dependent day care expenses per year as per the federal annual limit (the "***Flexible Spending Plan***"). The Flexible Spending Plan is administered by WageWorks, for which the Debtors pay an administrative fee. As of the Petition Date, the Debtors do not owe any amounts on account of prepetition administrative fees to WageWorks. Approximately 1,049 Eligible Employees participate in the Flexible Spending Plan, which is fully funded by Employee contributions. The Debtors then withhold these contributions from the applicable Employees' paychecks and remit those contributions to the applicable third parties as necessary. Thus, amounts contributed pursuant to the Flexible Spending Plan are not assets of the Debtors' estates; rather, these amounts are held in trust for the participating Employees. As of the Petition Date, the Debtors hold approximately $42,000 in Employee contributions under the Flexible Spending Plan (the "***Unremitted Flexible Spending Obligations***"). The Debtors request the authority to pay the Flexible Spending Admin Fee, forward the Unremitted Flexible Spending Obligations if and when they become due and continue offering the Flexible Spending Plan in the ordinary course of business.

**C. Life, Accidental Death, and Dismemberment Insurance**

38. The Debtors provide Eligible Employees and their Dependents with basic life insurance and accidental death and dismemberment insurance (the "***Life and AD&D Insurance***") through Reliance Standard Life Insurance Company ("***Reliance***") at no cost to the Employees. The coverage provided by these policies costs the Debtors approximately $17,000 per month. As of the Petition Date, the Debtors do not owe any amounts on account of Life and AD&D Insurance coverage. The Debtors seek authority to continue providing Life and AD&D Insurance to the Eligible Employees in the ordinary course of business.

39. In addition, Eligible Employees and their Dependents have the option to purchase supplemental life insurance, accidental death and dismemberment insurance, and long-term disability insurance through Reliance (the "***Supplemental Insurance***"). The Supplemental Insurance is wholly paid by participating Employees and approximately $86,000 in premiums are withheld from Employees' paychecks each month. As of the Petition Date, the Debtors do not owe any amounts on account of the Supplemental Insurance. The Debtors seek authority to continue providing the Supplemental Insurance to the Eligible Employees and to remit any Unremitted Supplemental Insurance payments to third parties as necessary in the ordinary course of business.

**D. Short- and Long-Term Disability Plan**

40. The Debtors provide all Employees with short and long-term disability benefits administered by Unum Provident and Reliance Standard/Matrix (the "***Disability Benefits***"). On average, the Disability Benefits cost the Debtors approximately $72,000 per month. As of the Petition Date, the Debtors do not believe they owe any amounts on account of Disability

Benefits. The Debtors seek authority to continue providing the Disability Benefits and to honor any prepetition obligations that are related thereto.

**E. Severance**

41. In the ordinary course of business, the Debtors maintain a policy of offering severance payments to certain Employees who have been involuntarily terminated in connection with a business decision or other restructuring initiative (the "***Severance Program***"). There is no formal severance policy, but according to established practice, severance is paid as salary continuation, and severance payments are based on an Employee's level of seniority and length of service. Certain policies under the Health Benefits Plan and the Flexible Spending Plan are also continued as a payroll deduction at the active Employee rate until the end of the month of the applicable severance period, or until the Debtors are notified that alternative coverage has been secured. Following termination of the severance period, the Employee and his or her enrolled dependents have the right to continue (as defined by law) participation in these plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("***COBRA***") for approximately eighteen months following termination of employment.

42. In the months leading up to the Petition Date, the Debtors implemented various reductions in force, resulting in approximately 167 Employees being severed from the Debtors' employ. As a result, the Debtors incurred approximately $9.7 million in prepetition severance obligations, approximately $7.3 million of which remain outstanding as of the Petition Date (the "***Unpaid Prepetition Severance***"). The Debtors estimate that approximately 118 Employees are owed Unpaid Prepetition Severance in excess of the Priority Cap. The Debtors believe that the Severance Program is critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term

success. Permitting the Debtors to pay the Unpaid Prepetition Severance will help minimize the adverse effects of the commencement of the chapter 11 cases on their ongoing business operations. Additionally, implementing such a program is not without tangible benefits. As a condition to receiving a severance payment, each employee must execute a release agreement, whereby the employee releases any claims held against the Debtors and agrees, among other things, to not disclose confidential information, solicit the Debtors' employees for a certain period of time, or disparage the Debtors. The Debtors believe that the Severance Program will help reduce the time and expense that could arise in the absence of a severance program to defend the assertion of claims by employees.

43. The Debtors seek the authority, but not direction, to pay the Unpaid Prepetition Severance, pursuant to the Final Order, and to continue to maintain the Severance Program on a postpetition basis pursuant to the Final Order, in the ordinary course of business for any Employees that may be severed following the Petition Date.[11] Additionally, pursuant to the Interim Order, the Debtors seek the authority to continue providing applicable Health Benefit Plans to former employees severed prior to the Petition Date. Moreover, the Debtors will file a supplemental declaration in support of the relief sought relating to the Unpaid Prepetition Severance and the Severance Program following the Petition Date and prior to the final hearing at which this matter will be heard. For the avoidance of doubt, the Debtors seek the authority to pay Unpaid Prepetition Severance and continue the Severance Program on a postpetition basis in the ordinary course of business solely pursuant to the Final Order.

[11] For the avoidance of doubt, the Debtors do not seek to make any payments to Insiders under the Severance Program above the cap set forth in section 503(c)(2) of the Bankruptcy Code.

**F. Fringe Benefit Program**

44. The Debtors offer various other benefit programs (collectively, the "***Fringe Benefit Programs***") as part of the overall compensation package for its Employees. The Fringe Benefit Programs include: Relocation Benefits, Tuition Reimbursement, the Scholarship Program, Adoption Assistance, Immigration Assistance, the Matching Gifts Program, and Anniversary Awards (each as defined herein). By this Motion, the Debtors request the authorization to continue the Fringe Benefit Programs and pay unpaid costs relating to the Fringe Benefit Programs in the ordinary course of business on a postpetition basis pursuant to the Final Order. For the avoidance of doubt, the Debtors seek to pay any unpaid costs relating to the Fringe Benefit Programs and continue the Fringe Benefit Programs postpetition solely pursuant to entry of the Final Order.

i. Relocation Benefits

45. The Debtors make available certain relocation benefits to eligible Employees who are required to relocate to a new job location (the "***Relocation Benefits***"). The Relocation Benefits are determined on a case by case basis, depending on the needs of the individual Employee and his or her circumstances, and may include closing costs on new homes, costs associated with the sale of existing homes, moving costs, costs of living adjustments, temporary housing costs, reimbursement of travel expenses, the cost of shipping Employees' vehicles to a new location, home-finding costs, and certain tax allowances. The Debtors pay or reimburse Employees for the Relocation Benefits through a third-party administrator, Altair Global Relocation ("***Altair***"). Specifically, Altair provides relocation services to the Employees directly and reimburses the Employees for the applicable Relocation Benefits provided by other parties. Altair bills the Debtors for such expenses on a weekly basis. On average, the Debtors typically pay Altair $20,000 per month for Relocation Benefits. As of the Petition Date, the Debtors

believe that Altair is owed approximately $50,000 on account of Relocation Benefits. Subject to the Final Order, the Debtors request authorization to continue the Relocation benefits and to pay all amounts owed to Altair in the ordinary course of business on a postpetition basis.

ii. Tuition Reimbursement

46. In the ordinary course of business, the Debtors maintain a tuition reimbursement program for undergraduate, graduate, and postgraduate studies established to aid and encourage Employee self-development and to assist in the advancement of Employees and development of future leaders (the "***Tuition Reimbursement Program***"). Under the Tuition Reimbursement Program, the Debtors reimburse Employees for degree programs or career-related courses up to an annual limit of $5,250. Tuition reimbursements are paid directly to the participating Employee after proper documentation is submitted. Currently, 123 Employees are receiving tuition reimbursements, and, as of the Petition Date, the Debtors estimate that they owe approximately $285,000 under the Tuition Reimbursement Program (the "***Unpaid Tuition Reimbursement***"). Subject to the Final Order, the Debtors request authorization to continue the Tuition Reimbursement Program and to pay all Unpaid Tuition Reimbursements in the ordinary course of business on a postpetition basis.

iii. Scholarship Program

47. The Debtors provide a scholarship program (the "***Scholarship Program***") to dependents of Employees who plan to start and/or continue education in college or vocational school programs. The Scholarship Program grants eighteen $1,500 scholarships per year, which are generally billed in May and paid to the designated schools in August. The Scholarship Program awards scholarships for undergraduate programs only and may be renewed for up to three additional years or until a bachelor's degree is earned, whichever occurs first. On average,

the Debtors typically pay $105,000 per year on account of the Scholarship Program. No amounts are due under the Scholarship Program as of the Petition Date.

iv. Adoption Assistance

48. The Debtors provide adoption assistance to Employees for up to $5,000 per adoption for eligible adoption expenses (the "***Adoption Assistance Expenses***"). Additionally, the Debtors provide for adoptive parental leave and adoption resources and referral services. On average, the Debtors typically pay approximately $5,000 annually in Adoption Assistance Expenses. As of the Petition Date, the Debtors do not owe anything on account of Adoption Assistance Expenses.

v. Group Legal

49. Debtors offer eligible Employees the ability to contribute a portion of their pre-tax compensation in bi-weekly premium payments to group legal accounts for access to a network of attorneys who provide covered legal services at no additional charge (the "***Group Legal Plan***"). Approximately 420 Eligible Employees participate in the Group Legal Plan, which is fully funded by Employee contributions. The Debtors then withhold these contributions from the applicable Employees' paychecks and remit those contributions to the applicable third parties as necessary. As of the Petition Date, the Debtors do not owe anything on account of the Group Legal Plan. The Debtors request the authority to forward the Unremitted Group Legal Obligations if and when they become due and continue offering the Group Legal Plan in the ordinary course of business.

vi. Immigration Assistance

50. Debtors maintain an immigration assistance program (the "***Immigration Assistance Program***"), whereby the Debtors assist Employees in obtaining an appropriate temporary (nonimmigrant) visa and nonimmigrant status authorizing employment with the

Debtors. Additionally, the Debtors may also assist the Employee in seeking permanent residence through available legal immigration options. The Debtors will generally pay all legal fees, filing fees, and costs associated with a nonimmigrant petition for the Employee and his or her spouse and dependent children, with the exception of expenses for accommodations, incidentals, and travel related to the application. As of the Petition Date, the Debtors estimate that prepetition obligations under the Immigration Assistance Program total approximately $30,000. Subject to the Final Order, the Debtors request authorization to continue the Immigration Assistance Program and to pay all unpaid amounts on account of the Immigration Assistance Program in the ordinary course of business on a postpetition basis.

vii. Matching Gifts Program

51. The Debtors administer a matching gifts program which provides for a dollar-for-dollar match for Employees' cash donations to non-profit groups or educational institutions (the "***Matching Gifts Program***"). To qualify under the Matching Gifts Program, gifts must be tax deductible donations of $25 or more, and the maximum amount matched per fiscal year is $500 per employee. On average, the Debtors typically pay $7,100 per month under the Matching Gifts Program. As of the Petition Date, the Debtors estimate that they owe approximately $1,500 on account of the Matching Gifts Program. Subject to the Final Order, the Debtors request authorization to continue the Matching Gifts Program and to pay all amounts owed on account of the Matching Gifts Program in the ordinary course of business on a postpetition basis.

viii. Anniversary Awards

52. The Debtors provide certain anniversary gift awards (the "***Anniversary Awards***") to Employees when they reach certain anniversary milestones. The Anniversary Awards consist of non-cash gifts. On average, the Debtors typically pay $220,000 annually in Anniversary Awards. As of the Petition Date, the Debtors believe they owe approximately $17,000 on account of Anniversary Awards. Subject to the Final Order, the Debtors request authorization to continue the Anniversary Awards and to pay all amounts owed on account of Anniversary Awards in the ordinary course of business on a postpetition basis.

**VIII. The 401(k) Retirement Savings Plan**

53. The Debtors participate in a qualified 401(k) retirement savings plan administered by Fidelity (the "***401(k) Plan***") for full-time[12] and part-time[13] Employees (collectively, the "***401(k) Eligible Employees***"). The Debtors auto-enroll the 401(k) Eligible Employees after 30 days of satisfying the applicable service requirements and, as a result, approximately 3,674 Employees participate in the 401(k) Plan.

54. The 401(k) Plan is funded by Employees, and the Debtors provide a company match equal to 100% of the Employees' contributions (the "***401(k) Match Contributions***"), subject to a maximum of 4% of the respective Employee's salary. The 401(k) Match Contributions has a four-year cliff vesting period. The amount of 401(k) Match Contributions for 2013 continues to accrue as Employees contribute to their 401(k) plans throughout the year. The Debtors seek authority to continue the 401(k) Plan on a postpetition basis in the ordinary course of business. The Debtors estimate that they owe approximately $450,000 in 401(k)

---

12 Full-time Employees are eligible to participate in the 401(k) Plan immediately upon commencing employment.

13 Part-time Employees are eligible to participate in the 401(k) Plan upon completion of 1,000 hours of service during the 12-month consecutive period commencing on their first day of work.

Match Contributions as of the Petition Date (the "***Unpaid 401(k) Match***"). The Debtors seek authority to pay the Unpaid 401(k) Match on a postpetition basis in the ordinary course of business.

55. Additionally, the Debtors withhold approximately $2.1 million, in the aggregate, each month from Employees' paychecks on account of their 401(k) contributions and 401(k) loan deductions. As of the Petition Date, the Debtors estimate there are approximately $950,000 in unremitted Employee 401(k) Plan contributions and loan deductions outstanding (the "***Unremitted 401(k) Contributions***"). The Debtors seek authority to remit the Unremitted 401(k) Contributions on a postpetition basis in the ordinary course of business.

**IX. Workers' Compensation**

56. The Debtors provide workers' compensation insurance for their Employees at the statutorily required levels (the "***Workers' Compensation Program***"). The Debtors maintain a self-insured retention policy of $250,000 per claim with respect to workers' compensation claims (the "***Self-Insured Policy***"). The Debtors maintain a $742,000 letter of credit and have posted $35,000 in cash as collateral for the Self-Insured Policy.[14]

57. To ease the Debtors' administrative burden, the Debtors' Workers' Compensation Program is administered by Chubb Group of Insurance ("***Chubb***"). The Debtors pay Chubb monthly in arrears for the paid losses under the Self-Insured Policy (the "***Self-Insured Paid Losses***"). The Debtors' average amount of Self-Insured Paid Losses each month is approximately $13,000. In addition to administering the Workers' Compensation Program,

[14] The Debtors post this letter of credit as collateral for both their Self-Insured Policies and for automobile coverage, as more fully discussed in the *Debtors' Motion For Entry Of An Order Authorizing The Debtors To Continue Their Insurance Programs, Surety Bonds, And Related Practices*. Additionally, the Debtors post a letter of credit as collateral to ACE Insurance Company, their legacy provider, in the amount of $380,215 for prior workers' compensation and automobile policies and hold a cash deposit of $5,461.

Chubb pays any excess workers' compensation liability over $250,000 and up to $1 million, for which the Debtors pay Chubb an annual premium which was last paid in April of 2013 in the amount of $205,500.[15]

58. In addition, in Ohio, in accordance with applicable state law, the Debtors make certain payments to provide workers' compensation coverage to their Employees pursuant to state administered workers' compensation programs.[16] The Debtors pay the Bureau of Workers Compensation for Ohio $51,000, on average, twice a year in semi-annual premiums based upon the employee classification rate and earnings for the semi-annual period for the provision of workers' compensation coverage. The Debtors use Sheakley Unicomp and Sheakley Uniservice (collectively, "***Sheakley***") to provide services as a third-party claims administrator and as a managed care organization. For provision of these services, the Debtors pay Sheakley approximately $1,500 during the month of July. As of the Petition Date, the Debtors do not believe they owe any prepetition amounts. Out of an abundance of caution, the Debtors request authority to pay any prepetition amounts that may be outstanding.

**X. Postpetition Non-Employee Director Obligations**

59. The Debtors maintain a board of directors comprised of various Employees and equity holders and one independent director (the "***Independent Director***"). The Independent Director is compensated approximately $90,000 annually, paid in cash on a quarterly basis in arrears, and is entitled to expense reimbursement for reasonable out-of-pocket expenses in

---

15 Additionally, the Debtors maintain umbrella and excess liability insurance policies which cover claims in excess of $1 million and up to $50 million, as more fully described in the *Debtors' Motion For Entry Of An Order Authorizing The Debtors To Continue Their Insurance Programs, Surety Bonds, And Related Practices.*

16 While the Debtors do not maintain a physical presence in North Dakota, Washington, or Wyoming, they do have some Employees in these locations. Additionally, the Debtors maintain a small office in Puerto Rico. In the event a workers' compensation claim arises in these states or in Puerto Rico, the claim will be covered by a state-administered workers' compensation program as required by applicable state law. The Debtors pay de minimis annual premiums in these states.

connection with his Independent Director duties and a per diem fee of $2,500 per day devoted to board-related activities (collectively, the "***Postpetition Non-Employee Director Obligations***").

60. As of the Petition Date, the Debtors are current with respect to their non-Employee Director Compensation and do not expect any amount to become due within 21 days of the Petition Date. Out of an abundance of caution, however, the Debtors request the authority, solely pursuant to the Final Order, to pay Postpetition Non-Employee Director Obligations as they come due in the ordinary course of business.

**XI. Payroll Taxes and Deductions**

61. During each applicable payroll period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, garnishments, child support, and similar deductions (the "***Deductions***").[17] On average, the Debtors remit to third-party recipients approximately $70,000 per month on account of Deductions. As of the Petition Date, the Debtors estimate that approximately $35,000 has been collected but not yet remitted to the appropriate third-party recipients (the "***Unremitted Deductions***").

62. Additionally, the Debtors routinely deduct certain amounts from Employees' paychecks related to federal, state, and local income taxes, Social Security, and Medicare (collectively, the "***Employee Payroll Taxes***") for remittance to the appropriate federal, state, or local taxing authority. The Debtors are also required by applicable statutory authority to pay from their own funds Social Security and Medicare taxes, and based on a percentage of gross payroll, additional amounts for federal and state unemployment and short-term disability insurance (the "***Employer Payroll Taxes***" and, together with the Employee Payroll Taxes,

[17] The Debtors also routinely deduct amounts related to certain benefits paid for either in whole or in part through Employee contributions, including the Health Benefit Plans, the Supplemental Insurance Payments, the Flexible Spending Plan, and the 401(k) Plan. The amount of such deductions outstanding as of the Petition Date, if any, is reflected in the separate discussion of each of these programs in the Motion.

the "***Payroll Taxes***"). On average, the Debtors remit approximately $8.6 million per month for Payroll Taxes. As of the Petition Date, the Debtors estimate that that approximately $1.7 million of Payroll Taxes has accrued and remain unpaid (the "***Unremitted Payroll Taxes***").

63. The Debtors believe that because the Unremitted Deductions and Payroll Taxes are held for payment to third-parties, they are properly deemed to be held in trust, and thus, do not constitute property of the Debtors' estates. Out of an abundance of caution, however, the Debtors seek the authority to remit the Unremitted Deductions and Payroll Taxes and to continue collecting and remitting the Unremitted Deductions and Payroll Taxes in the ordinary course of business on a postpetition basis.

## **Supporting Authority**

### I. Certain of the Employee Obligations are Entitled to Priority Treatment

64. Pursuant to sections 507(a)(4) and (a)(5) of the Bankruptcy Code, certain of the unpaid prepetition Employee Obligations — including certain Employee compensation such as wages and commissions — are entitled to priority treatment in an amount up to $12,475 for each individual Employee. To the extent such claims are afforded priority status, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(b) (requiring payment of certain allowed unsecured claims for (a) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan).

65. In addition, and as noted above, the Debtors are not seeking authority to pay unpaid compensation in amounts that exceed $12,475 per Employee with regard to the majority of the Debtors' Employees. Accordingly, granting the relief sought with respect to compensation only affects the timing of payments to Employees, and does not have any material negative impact on recoveries for general unsecured creditors. Indeed, the Debtors submit that

payment of compensation up to $12,475 per individual will enhance value for the benefit of all stakeholders because it will help ensure that the Employees — the lifeblood of the Debtors' business operations — continue to provide vital services to the Debtors at this critical juncture.

66. The Debtors believe that finding and attracting qualified talent would be extremely difficult, and most likely would require higher salaries, guaranteed bonuses, and overall higher cost compensation packages than are currently provided to the Debtors' Employees, should the Debtors be unable to honor the Employee Obligations when due and payable.

**II. Payment of Certain of the Employee Wages and Benefits Is Required by Law**

67. The Debtors also seek authority to pay Deductions and Payroll Taxes to the appropriate entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from Employees' paychecks. Indeed, certain Deductions, including Employee contributions to the Employee Benefit Plans, are not property of the Debtors' estates because they have been withheld from Employees' paychecks on another party's behalf. *See* 11 U.S.C. § 541(b). Further, federal and state laws require the Debtors and their officers to make certain tax payments that have been withheld from their Employees' paychecks. *See* 26 U.S.C. § 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *DuCharmes & Co., Inc. v. State of Mich.* (*In re DuCharmes & Co.*), 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the Deductions and Payroll Taxes are not property of the Debtors' estates, the

Debtors request that this Court authorize them to transmit the Deductions and Payroll Taxes to the proper parties in the ordinary course of business.

### III. Obligations Under the Sales Commissions, Independent Sales Commission Plan, and Severance Program are Not Limited by the Requirements of Section 503(c) of the Bankruptcy Code

68. Section 503(c)(1) of the Bankruptcy Code restricts retention payments to insiders. See 11 U.S.C § 503(c)(1) and (2) (prohibiting transfers or obligations made to an insider for the purpose of severance or inducing such person to remain with the debtor's business, absent certain explicit findings by the court). However, section 503(c)(1) and (2) does not apply for a number of reasons. *First*, the Sales Commissions and Independent Sales Commissions are ordinary wage compensation, not bonus or incentive payments. *Second*, while the Severance Program may apply to some Insiders, the Debtors do not seek to make Unpaid Prepetition Severance payments to Insiders over the statutory cap set forth in section 503(c)(2) of the Bankruptcy Code. Additionally, the Severance Program does not result in transfers or obligations for the purpose of inducing an individual to remain at the Debtors' business as the Severance Program only applies upon an Employee's departure. Accordingly, section 503(c)(1) and (2) of the Bankruptcy Code does not apply to these obligations, and the Debtors are not required to meet any burden thereunder (e.g., that the programs are not severance or retention programs and/or satisfy the requirements of sub-sections 503(c)(1)(A)-(C) and (2) of the Bankruptcy Code).

69. Moreover, Section 503(c)(3) of the Bankruptcy Code states that "there shall be neither allowed, nor paid — other transfers or obligations outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers (or) managers . . . ." *See* 11 U.S.C. § 503(c)(3). The Debtors believe that payments under the Sales Commissions, Independent Sales

Commissions, and Severance Program are not outside the ordinary course of business. To the extent, however, that the Sales Commissions, Independent Sales Commissions, and Severance Program are subject to section 503(c)(3)'s restrictions, the transfers contemplated thereunder are justified by the facts and circumstances of these cases.

70. Without the Employees' hard work and dedication, the Debtors do not believe that they can accomplish a successful restructuring in these chapter 11 cases in a manner that maximizes the value of these estates. Accordingly, any payments contemplated under the Sales Commissions, and Independent Sales Commissions reward Employees for performance tied directly to critical, value-relevant goals for the purpose of enhancing the Debtors' assets that will be distributable to their creditors.

**IV. Ample Authority Exists to Authorize the Debtors to Honor Employee Obligations**

71. Courts generally acknowledge that it is appropriate to authorize the payment (or other special treatment) of prepetition obligations in appropriate circumstances. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (granting authority to pay prepetition wages); *see also Armstrong World Indus., Inc. v. James A. Phillips, Inc.,* (*In re James A. Phillips, Inc.*), 29 B.R. 391, 398 (Bankr. S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants). As set forth herein, in authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 1107(a), 1108, 363(b), and 105(a) of the Bankruptcy Code.

72. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors in possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002). Implicit in the fiduciary duties of any debtor in possession is the obligation to "protect and preserve the estate, including an operating business's

going-concern value." *Id.* Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.* The *CoServ* court specifically noted that the preplan satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate . . . ." *Id.*

73. Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., Ionosphere Clubs*, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) of the Bankruptcy Code; relief appropriate where payment was needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees, and maintain positive employee morale."); *see also Armstrong*, 29 B.R. at 397 (relying on section 363 of the Bankruptcy Code to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors). Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors." *Ionosphere Clubs*, 98 B.R. at 175.[18]

[18] Courts have also authorized payment of prepetition claims in appropriate circumstances pursuant to section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may permit preplan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan. *See In re UNR Indus.*, 143 B.R. 506, 520 (Bankr. N.D. Ill. 1992) (permitting the debtor to pay prepetition claims of suppliers or employees whose continued cooperation is essential to the debtors' successful reorganization); *Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

74. The "doctrine of necessity" or the "necessity of payment" rule originated in railway cases and was first articulated in *Miltenberger v. Logansport, C. & S.W.R. Co.*, 106 U.S. 286 (1882). The doctrine was expanded to non-railroad debtors in the mid-century, *see Dudley v. Mealey*, 147 F.2d 268, 271 (2d Cir. 1945) (holding, in a hotel reorganization case, that the court was not "helpless" to apply the rule to supply creditors of non-railroad debtors where the alternative was the cessation of operations) and has long been recognized as precedent within the Second Circuit. *See Ionosphere Clubs*, 98 B.R. at 175-76.

75. Today, the rationale for the necessity of payment rule — the rehabilitation of a debtor in reorganization cases — is "the paramount policy and goal of Chapter 11." *Id*.; *see also Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp.* (*In re Chateaugay Corp.*), 80 B.R. 279, 287 (Bankr. S.D.N.Y. 1987) (authorizing payment of prepetition worker's compensation claims on grounds that the fundamental purpose of reorganization and equity powers of bankruptcy courts "is to create a flexible mechanism that will permit the greatest likelihood of survival of the debtor and payment of creditors in full or at least proportionately"); *In re Just For Feet*, 242 B.R. 821, 826 (Bankr. D. Del 1999) (finding that payment of prepetition claims to certain trade vendors was "essential to the survival of the debtor during the chapter 11 reorganization"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed … where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment"); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of tool makers as "necessary to avert a

serious threat to the Chapter 11 process"); *Burchinal v. Cent. Wash. Bank* (*In re Adams Apple, Inc.*), 829 F.2d 1484, 1490 (9th Cir. 1987) (recognizing that allowance of "unequal treatment of pre-petition debts when necessary for rehabilitation …" is appropriate); Collier on Bankruptcy P 105.02[4][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) (discussing cases in which courts have relied on the "doctrine of necessity" or the "necessity of payment" rule to pay prepetition claims immediately).

76. Here, the relief requested will benefit the Debtors' estates and creditors by allowing the Debtors' business operations to continue without interruption. As stated previously, the Debtors believe that the vast majority of its Employee Obligations constitute priority claims. The Debtors submit, however, that to the extent any Employee is owed more than $12,475 for Employee Obligations, payment of those amounts is necessary and appropriate and is authorized under sections 363(b) and 105(a) of the Bankruptcy Code. The only Employees receiving more than $12,475 are those certain employees owed Excess Unpaid Employee Compensation.

77. In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, hinder the Debtors' ability to meet its customer obligations, and likely diminish creditors' confidence in the Debtors. Moreover, the loss of valuable individuals and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtors should be focusing on stabilizing their operation.

78. Courts in this jurisdiction have regularly granted relief similar to that requested herein. *See, e.g.*, *In re The Brown Publ'g Co.*, Case No. 10-73295 (DTE) (Bankr. E.D.N.Y. July 23, 2010); *In re Caritas Health Care, Inc.*, Case No. 09-40901 (CEC) (Bankr. E.D.N.Y.

Feb. 10, 2009); *In re The Brooklyn Hosp. Ctr.*, Case No. 05-26990 (CEC) (Bankr. E.D.N.Y. Sept. 30, 2005); *In re Victory Mem'l Hosp.*, Case No. 06-44387 (CEC) (Bankr. E.D.N.Y. Nov. 16, 2006). In addition, courts in this circuit have previously granted payments in excess of the statutory cap. *See, e.g.*, *In re AMR Corp.*, Case No. 11-15463 (Bankr. S.D.N.Y. Nov. 29, 2011); *In re Delta Air Lines, Inc.*, Case No. 05-17923 (Bankr. S.D.N.Y. Sept. 16, 2005); *In re Nw. Airlines Corp.*, Case No. 05-17930 (Bankr. S.D.N.Y. Sept. 15, 2005). Moreover, courts in this district and others have authorized the payment of severance programs, recognizing the value of such programs to incentivize and reassure a debtor's employees. *See, e.g.*, *In re Quebecor World (USA) Inc.*, Case No. 08-10152 (Bankr. S.D.N.Y. May 22, 2008) (approval of severance program for critical employees); *In re Calpine Corp.*, Case No. 05-60200 (Bankr. S.D.N.Y. Mar. 1, 2006) (approval of severance payments ranging from two weeks of salary for each year of service to thirty-nine weeks of salary); *In re Flying J, Inc.*, Case No. 08-13384 (Bankr. D. Del. Feb. 18, 2009) (approval of severance payments ranging from two to five weeks of salary plus one additional week of salary for each year of service over one year); *In re Ascendia Brands, Inc.*, No. 08-11787 (Bankr. D. Del. Nov. 20, 2008) (approval of severance and incentive compensation to wind-down personnel); *In re Linens Holding Co.*, Case No. 08-10832 (Bankr. D. Del. Aug. 28, 2008) (approval of severance payments ranging from one to twenty-six weeks salary for all hourly and salaried employees); *In re Mervyn's Holdings, LLC*, Case No. 08-11586 (Bankr. D. Del. Aug. 26, 2008) (approval of severance payments ranging from two to twenty-six weeks of salary); *In re Aegis Mortgage Corp.*, Case No. 07-11119 (Bankr. D. Del. Apr. 15, 2008).[19]

[19] Because of the voluminous nature of the orders cited herein, these orders are not attached to the motion. Copies of these orders, however, are available on request from the Debtors' proposed counsel.

**V. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers**

79. The Debtors have sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. Also, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment made to Employees or on account of Employee Obligations. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently and that this Court should authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested herein.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

80. Pursuant to Bankruptcy Rule 6003, this Court may grant relief regarding a motion to pay all or part of a prepetition claim within 21 days after the Petition Date if the relief is necessary to avoid immediate and irreparable harm. Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)); *see also* Fed. R. Bankr. P. 6003, Committee Notes (noting that cases applying Bankruptcy Rule 4001(b)(2) and (c)(2) may "provide guidance" for relief under Bankruptcy Rule 6003).

81. As described above, the Debtors' Employees are integral to their operations. Failure to satisfy the Employee Obligations in the ordinary course will jeopardize Employee loyalty and trust, possibly causing Employees to leave the Debtors' employ and thereby disrupt

the Debtors' operations to the detriment of all parties in interest. Moreover, the Debtors' Employees rely on the Debtors' timely payment of their compensation and provision of benefits. Accordingly, the Debtors respectfully submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003(b) to support granting the relief requested herein.

**Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order**

82. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), 7062, 9014, or otherwise.

**Motion Practice**

83. This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion. Moreover, in addition to all entities otherwise entitled to receive notice, the Debtors have given notice of this motion to all entities believed to have or be claiming an interest in the subject matter of the proposed order or who, it is believed, otherwise would be affected by the proposed order. Accordingly, the Debtors submit that this motion satisfies E.D.N.Y. LBR 9013-1.

**The Debtors' Reservation of Rights**

84. Nothing contained herein is intended or should be construed as an admission as to the validity or priority of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim or an approval or assumption of any agreement, agreement, contract, or lease under section 365 of the Bankruptcy Code. The Debtors expressly reserve their rights to contest any claim. Likewise, if this Court grants the relief sought herein, any payment made pursuant to the

Court's order is not intended and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

85. The Debtors have provided notice of this motion to: (a) the United States Trustee for Region 2; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent under the Debtors' prepetition senior secured credit facility; (d) the indenture trustees under the Debtors' prepetition secured first lien notes, secured second lien notes, senior unsecured notes, senior PIK notes, and senior subordinated discount notes; (e) counsel to the ad hoc group of holders of certain first lien claims; (f) the United States Attorney for the Eastern District of New York; and (g) the Internal Revenue Service. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

**No Prior Request**

86. No prior request for the relief sought in the motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein and the First Day Declaration, the Debtors respectfully request entry of the Interim Order and Final Order granting the relief requested herein and such other relief as may be appropriate under the circumstances.

Brooklyn, New York
Dated: July 2, 2013

*/s/ Jonathan S. Henes*

Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (*pro hac vice admission pending*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER AUTHORIZING,**
**BUT NOT DIRECTING, PAYMENTS OF**
**PREPETITION (I) WAGES, SALARIES, AND**
**OTHER COMPENSATION; (II) REIMBURSABLE EMPLOYEE**
**EXPENSES; AND (III) EMPLOYEE MEDICAL AND SIMILAR BENEFITS**

Upon the motion (the "***Motion***")[1] of the Debtors for entry of an interim order (this "***Order***") pursuant to sections 105(a), 363, 503(c), 507(a)(4)-(5), 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rule 6003, and E.D.N.Y. LBR 9013-1, (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, reimbursable employee expenses, severance obligations (to the extent requested herein), and unpaid deductions and payroll taxes (ii) continue various employee benefits programs, (b) authorizing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to the foregoing, and (c) scheduling a Final Hearing to consider entry of the Final Order to the extent a hearing is necessary, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being

[1] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

proper in this District pursuant to 28 U.S.C. § 1408; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and a hearing having been held to consider the relief requested in the Motion (the "***Hearing***"); and upon consideration of the First Day Declaration, the record of the Hearing, and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1. The Motion is granted on an interim basis to the extent set forth herein.

2. The Debtors are authorized, in their discretion, to pay and remit in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, prepetition amounts outstanding on account of the following Employee Obligations: (a) Unpaid Wages, Unpaid Sales Commissions, and Unpaid Independent Contractor Compensation in an amount not to exceed $12,475 per individual Employee; (b) Unpaid Payroll Fees; (c) Unpaid Travel and Entertainment Expenses and Unpaid Travel Card Expenses; (d) Unpaid Empyrean Fees; (e) Unpaid Health Benefit Plan, including with respect to former employees severed prepetition, as applicable; (f) Unremitted Flexible Spending Obligations; (g) Unpaid 401(k) Match; and (h) Unremitted 401(k) Contributions. Additionally, the Debtors shall remit, if required by law, in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, prepetition amounts outstanding on account of: (a) Workers' Compensation; (b) Unremitted Deductions; and (c) Unremitted Payroll Taxes.

3. The Debtors are authorized, in their discretion, to continue in the ordinary course of business and in accordance with the Debtors' prepetition policies the following Employee Obligations and Employee Benefit Plans on a postpetition basis: (a) Employee Wages and Sales Commissions; (b) Independent Contractor Compensation; (c) Reimbursable Expenses; (d) Health Benefit Plans; (e) Flexible Spending Plan; (f) Life and AD&D Insurance; (g) Supplemental Insurance; (h) Disability Benefits; and (i) 401(k) Plan and 401(k) Match Contributions. Additionally, the Debtors shall continue, if required by law: (a) Workers' Compensation Program; (b) Deductions; and (c) Payroll Taxes in the ordinary course of business and in accordance with their prepetition policies

4. The Debtors are authorized, but not directed, to pay all postpetition costs and expenses incidental to payment of the Employee Obligations described in paragraph 2 herein, including all administrative and processing costs.

5. Notwithstanding the authority requested above, pending entry of the Final Order, the Debtors are not authorized to remit, pay, satisfy, or honor prepetition obligations that have accrued on account of the following Employee Obligations: (a) Excess Unpaid Employee Compensation; (b) Unpaid Independent Sales Commissions; (c) Unpaid Sales Incentives; (d) Unpaid Prepetition Severance; (e) Fringe Benefit Programs; and (f) Postpetition Non-Employee Director Obligations.

6. To the extent necessary, the Final Hearing on the Motion shall be held on _________________, 2013 at ___:____ a.m./p.m. prevailing Eastern Time. Any objections to the relief requested in the Motion on a final basis must be filed no later than ______________, 2013 at ___:___ a.m./p.m. (Eastern Time) (the "***Objection Deadline***").

7. If an objection is timely filed and served so as to be received on or before the Objection Deadline, such objection shall be set for the Final Hearing on ______________, 2013 at __:__ a.m./p.m. (Eastern Time). This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an objection.

8. Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in this Order or any payment made pursuant to this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or the assumption or adoption of any agreement, contract or lease under section 365 of the Bankruptcy Code.

9. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, to the extent the Debtors have sufficient good funds standing to their credit with such banks and financial institutions, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as being approved by this Order, without any duty of further inquiry and without any liability for relying on such designation or following the Debtors' instruction.

10. The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion or otherwise deemed waived.

11. Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder, shall be subject to the requirements imposed on the Debtors under the *Interim Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* (as such order may

be amended, modified, supplemented, or granted on a final basis, in each case on a consensual basis).

12. The Debtors shall not make any payments to any Insider outside of the Debtors' ordinary course of business generally consistent with past practice (without limiting in any way the application of section 503(c) of the Bankruptcy Code). No provision of this Order shall be construed as granting authority to make any payment that would contravene section 503(c) of the Bankruptcy Code, including with respect to Insiders.

13. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of the E.D.N.Y. Local Bankruptcy Rules are satisfied by such notice.

14. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

15. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

16. This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**Exhibit B**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| | ) | Case No. 13-________ (___) |
| Debtors. | ) | (Joint Administration Requested) |

**FINAL ORDER AUTHORIZING, BUT NOT DIRECTING, PAYMENTS OF PREPETITION (I) WAGES, SALARIES, AND OTHER COMPENSATION; (II) REIMBURSABLE EMPLOYEE EXPENSES; AND (III) EMPLOYEE MEDICAL AND SIMILAR BENEFITS**

Upon the motion (the "***Motion***")[1] of the Debtors for entry of a final order (this "***Order***") pursuant to sections 105(a), 363, 539(c), 507(a)(4)-(5), 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rule 6003, and E.D.N.Y. LBR 9013-1, (a) authorizing the Debtors to (i) pay prepetition wages, salaries, other compensation, reimbursable employee expenses, severance obligations (to the extent requested herein), and unpaid deductions and payroll taxes and (ii) continue various employee benefits programs and (b) authorizing financial institutions to receive, process, honor, and pay all checks presented for payment and electronic payment requests related to the foregoing, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. § 1408; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and the Court having entered the *Interim Order Authorizing the*

[1] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

*Debtors to (I) Pay Certain Prepetition Wages, Other Compensation, and Reimbursable Employee Expenses and (II) Continue Employee Benefits Programs* [Docket No. ___] (the "***Interim Order***"); and a hearing having been held to consider the relief requested in the Motion (the "***Hearing***"); and upon consideration of the First Day Declaration, the record of the Hearing and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1. The Motion is granted on a final basis to the extent set forth herein.

2. The relief provided in the Interim Order is approved on a final basis except as modified herein.

3. In addition to the relief provided in the Interim Order, the Debtors are authorized, in their discretion, to honor, pay, remit, or satisfy prepetition obligations related to or arising from: (a) Excess Unpaid Employee Compensation; (b) Unpaid Independent Sales Commissions; (c) Unpaid Sales Incentives; (d) all Unpaid Reimbursable Expenses; (d) Unpaid Prepetition Severance; and (e) Fringe Benefit Programs.

4. Additionally, the Debtors are authorized, in their discretion to continue in the ordinary course of business and in accordance with the Debtors' prepetition policies the following: (a) Independent Sales Commission Plan; (b) Sales Incentive Plans; (c) Severance Program; (d) Fringe Benefit Programs; and (e) Postpetition Non-Employee Director Obligations.

5. The Debtors are authorized to pay all postpetition costs and expenses incidental to payment of the Employee Obligations, including all administrative and processing costs.

6. Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in this Order or any payment made pursuant to this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or the assumption or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

7. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, to the extent the Debtors have sufficient good funds standing to their credit with such banks and financial institutions, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as being approved by this Order, without any duty of further inquiry and without any liability for relying on such designation or following the Debtors' instructions.

8. Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder, shall be subject to the requirements imposed on the Debtors under the *Interim Order (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* (as such order may be amended, modified, supplemented, or granted on a final basis, in each case on a consensual basis).

9. The Debtors shall not make any payments to any Insider outside of the Debtors' ordinary course of business generally consistent with past practice (without limiting in any way

the application of section 503(c) of the Bankruptcy Code). No provision of this Order shall be construed as granting authority to make any payment that would contravene section 503(c) of the Bankruptcy Code, including with respect to Insiders.

10. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of the E.D.N.Y. Local Bankruptcy Rules are satisfied by such notice.

11. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

13. This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.