Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (*pro hac vice admission pending*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING
(A) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM,
(B) MAINTENANCE OF EXISTING BANK ACCOUNTS, (C) CONTINUED
USE OF EXISTING BUSINESS FORMS, AND (D) CONTINUED
USE OF EXISTING INVESTMENT PRACTICES; AND (II)(A) GRANTING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION
INTERCOMPANY CLAIMS, AND (B) AUTHORIZING CONTINUED PERFORMANCE
UNDER CERTAIN INTERCOMPANY ARRANGEMENTS AND HISTORICAL
PRACTICES**

Cengage Learning, Inc. ("***Cengage***") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"), respectfully represent:

### Background[1]

1.      The Debtors are a leading global provider of high-quality content, innovative print and digital teaching and learning solutions, software, and associated educational services for the higher-education, research, school, career, professional, and international markets.  The Debtors are the second largest publisher of course materials in U.S. higher education, with strong positions across all major disciplines, and are a leading global provider of library reference materials, with a vast collection of primary source content.

2.      On the date hereof (the "***Petition Date***"), each of the Debtors filed a petition with the United States Bankruptcy Court for the Eastern District of New York (the "***Court***") under chapter 11 of title 11 of the United Sates Code (the "***Bankruptcy Code***").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this motion, the Debtors requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

---

[1]   A description of the Debtors' businesses, the reasons for commencing these chapter 11 cases, the relief sought from the Court to allow for a smooth transition into chapter 11, and the facts and circumstances supporting this motion are set forth in the *Declaration of Dean D. Durbin, Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Motions* (the "***First Day Declaration***"), filed contemporaneously herewith.

**Jurisdiction**

3.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1408.

5.      The bases for the relief requested herein are sections 345, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rule 6003, and Rule 9013-1 of the Local Bankruptcy Rules for the Eastern District of New York (the "***E.D.N.Y. Local Bankruptcy Rules***").  Certain of the relief requested herein constitutes "Extraordinary Relief" within the meaning of the Court's Administrative Order No. 565.

**Relief Requested**

6.      The Debtors operate a complex system to manage their cash and transfers thereof. The Debtors use their cash management system (the "***Cash Management System***") to collect, transfer, and disburse funds generated from their operations, to facilitate cash monitoring, forecasting and reporting, and to enable the Debtors to maintain control over the bank accounts (collectively, the "***Bank Accounts***") located at the various banks where the Debtors maintain accounts (collectively, the "***Banks***").

7.      By this Motion, the Debtors hereby seek the entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "***Interim Order***" and "***Final Order***"):

      a.      authorizing the Debtors to continue to utilize the (i) Cash Management System, (ii) Bank Accounts (as well as authorizing the Debtors to open and close bank accounts), and (iii) business forms;

      b.      authorizing the Debtors to continue to maintain the Investments (as defined below) in accordance with the Investment Practices (as defined below);

c.     authorizing the Debtors to grant superpriority administrative expense status for intercompany claims and continue to perform certain intercompany arrangements and historical practices;

d.     authorizing the Debtors' and their non-debtor affiliates' Banks (as defined below) to (i) continue to maintain, service, and administer the Bank Accounts and (ii) debit the Bank Accounts in the ordinary course of business on account of:  (x) all checks or other items drawn on the Bank Accounts and cashed at the Banks' counters or exchanged for cashier's checks by the payees thereof before the Petition Date; (y) all checks or other items deposited in one of the Debtors' Bank Accounts before the Petition Date that have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent that the Debtors were responsible for such items before the Petition Date; and (z) undisputed prepetition amounts outstanding as of the date hereof, if any, owed to the Banks for Banking Fees (as defined below); and

e.     in the case of each of (a)–(d) above, solely to the extent permitted under the *Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final Hearing* (as such order may be amended, modified, supplemented, or granted on a final basis, in each case on a consensual basis, the "***Cash Collateral Order***").

8.     In addition, the Debtors request that the Court schedule a final hearing within approximately 30 days after the Petition Date to consider approval of this Motion on a final basis.

## Basis for Relief

**I.     The Debtors' Cash Management System and Business Forms**

9.     In the ordinary course of business, the Debtors and their non-Debtor affiliates maintain an integrated Cash Management System, which provides well-established mechanisms for the collection, concentration, management, disbursement, and investment of funds from their operations.  The Cash Management System has been maintained in substantially the same form since 2007, centralizing the majority of deposits, disbursements, and investments at BMO Harris Bank, N.A. ("***BMO***").   In addition, the Debtors maintain certain accounts with other banks, including Bank of America, N.A. ("***BofA***"), JP Morgan Chase Bank, N.A. ("***JPMorgan***"), Fifth

Third Bancorp ("**Fifth Third**"), Royal Bank of Canada ("**RBC**"), and National Westminster Bank plc ("**Natwest**").

10.     The Cash Management System consists of 24 Bank Accounts maintained by the Debtors and their non-Debtor affiliate The Hampton-Brown Company LLC ("**Hampton Brown**").   The Cash Management System is used to receive incoming electronic payments, deposit checks, and make disbursements by check, automatic clearing house payment ("**ACH Payments**"),[2] or wire transfer in the ordinary course of business.  Each of the Bank Accounts the Debtors and Hampton Brown maintain is listed on **Exhibit C** attached hereto.[3]

11.     The principal components of the Cash Management System, including the Debtors' concentration accounts, investment portfolio, depository accounts, disbursement accounts, payroll accounts, and taxes and benefits accounts, as well as the flow of funds among the various Bank Accounts, are described below.  Further, a diagram detailing the flow of cash through the Cash Management System is attached hereto as **Exhibit D**.

12.     The Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.   Indeed, large, multiple-entity businesses use such systems because of the benefits they provide, including the abilities to (a) quickly create status reports on the location and amount of funds, thereby allowing management to track and control corporate funds, (b) ensure cash availability, (c) redeploy funds within the system to where they are needed, and (d) reduce administrative expenses by

---

[2]    ACH Payments are electronic fund transfers through a system run by a third-party administrator, the National Automated Clearing House Association, and are generally used as a substitute for checks and to make electronic payments of a repetitive nature at a reduced cost as compared to wire transfers.

[3]    As of the Petition Date, 18 of the Bank Accounts are located in banks other than those designated as authorized depositories (the "**Authorized Depositories**") by the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**") pursuant to the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* applicable in the Eastern District of New York (the "**U.S. Trustee Guidelines**").

facilitating the movement of funds.  These controls are particularly important in light of the aggregate cash flows encompassed in the Cash Management System, including approximately $1.6 billion in receipts and $2.0 billion in disbursements (approximately $700 million of which represents debt-related payments) in the twelve-month period ending May 31, 2013.

**A.      The Bank Accounts**

**(i)      Operating Concentration Accounts**

13.     The Debtors maintain three concentration accounts at BMO in connection with their U.S. operations.  One concentration account (the "***Cengage Concentration Account***") is used for most of the Debtors' U.S. operations.  Another concentration account is used primarily for the operations of The Gale Group, one of the Debtors' operating divisions (the "***Gale Concentration Account***," and together with the Cengage Concentration Account, the "***Operating Concentration Accounts***").[4]   The third concentration account maintained at BMO is the Acquisitions Top Concentration Account, which is defined and described further below.

14.     The Operating Concentration Accounts are zero balance accounts ("***Zero Balance Accounts***"), which means that the net position of the account at the end of the day is zeroed out and any funds in the account are automatically transferred to another account in the Cash Management System, in this case to the Acquisitions Top Concentration Account.  The vast majority of the Debtors' other Bank Accounts are also Zero Balance Accounts.

15.     Funds accumulated in the Operating Concentration Accounts typically (a) are transferred to the Acquisitions Top Concentration Account for investment and to make payments on account of the Debtors' funded debt obligations and to satisfy other corporate expenses,

---

[4]    As described more fully in the First Day Declaration, the Debtors consolidated the entities previously comprising The Gale Group (Gale Holdings I Inc. and The Gale Group Inc.) into Cengage Learning Acquisitions, Inc. and Cengage Learning, Inc., respectively.  As of the Petition Date, the Bank Accounts previously associated with The Gale Group remain in the names of the since-consolidated entities.

(b) are transferred to the Debtors' Disbursement Accounts (as defined below) to pay operating expenses by check or ACH Payment, or (c) have wires drawn from them for payment of certain of the Debtors' expenses.    As of June 21, 2013, the Operating Concentration Accounts held $0.

<div align="center">

**(ii)    Acquisitions Top Concentration Account**

</div>

16.    The Debtors' primary cash concentration account (the "***Acquisitions Top Concentration Account***") is maintained at BMO in the name of Debtor Cengage Learning Acquisitions, Inc.  At the close of each business day, any available positive balance in the Operating Concentration Accounts is transferred automatically into the Acquisitions Top Concentration Account.  As needed, funds in the Acquisitions Top Concentration Account are automatically transferred back to the Operating Concentration Accounts.

17.    The transfers between the Acquisitions Top Concentration Account and the Operating Concentration Accounts are made pursuant to a revolving credit line between Cengage Learning Acquisitions, Inc. and Cengage Learning, Inc.  Any transfers of positive daily balances from the Operating Concentration Accounts to the Acquisitions Top Concentration Account increase the outstanding amount of credit owed by Cengage Learning Acquisitions, Inc. under the revolving credit line.  Transfers from the Acquisitions Top Concentration Account into the Operating Concentration Accounts, on the other hand, decrease the outstanding amount of credit owed by Cengage Learning Acquisitions, Inc. under the revolving credit line.  The amounts owed under the revolving credit line accrue interest at a rate of LIBOR plus 2.5 percent.  As of June 21, 2013, the revolving credit line had a net balance of approximately $55.1 million.

18.    Any available positive balance in the Acquisitions Top Concentration Account is swept into a BMO-managed notional account for deployment to the Investment Portfolio (as defined below) the next business day.  If the available balance in the Acquisitions Top Concentration Account is negative, BMO provisionally credits the Acquisitions Top

<div align="center">

7

</div>

Concentration Account and then redeems a portion of the Investment Portfolio to cover such credit.   As of June 21, 2013, the Acquisitions Top Concentration Account had a balance of approximately $1.8 million, which represents deposits received but not yet cleared.

19.    The Debtors currently maintain an investment portfolio (the "***Investment Portfolio***") consisting of shares in a fund operated by Federated Investors, Inc. ("***Federated***").[5] Excess funds in the Acquisitions Top Concentration Account are used to purchase shares of Federated's Government Obligations Fund Institutional Shares (money market fund #5, ticker: GOIXX, the "***GOIXX Fund***").   The Debtors' investment objectives with respect to the Investment Portfolio are to preserve capital and maintain liquidity, as funds invested via the Investment Portfolio may need to be returned to the Acquisitions Top Concentration Account as necessary to finance the Debtors' normal business operations.   The Investment Portfolio is a liquid investment, as shares in the GOIXX Fund can be sold readily.   The GOIXX Fund invests primarily in a portfolio of short-term U.S. Treasury securities and related repurchase agreements. Credit quality was the most important factor in choosing the GOIXX Fund, as this fund is rated AAAm and Aaa-mf from Standard & Poor's and Moody's, respectively.   As of June 21, 2013, the amount of funds invested via the Investment Portfolio was approximately $23.7 million.

20.    On March 20, 2013, Cengage Learning Acquisitions, Inc. drew approximately $430 million on its revolving credit facilities under that certain Credit Agreement, dated as of July 5, 2007 and as amended, among certain of the Debtors, JPMorgan as administrative agent, and other lenders party thereto.   Of the $430 million, $130 million was deposited in the

---

[5]    Prior to April 1, 2013, the available cash in the Acquisitions Top Concentration Account was invested in the BMO Nassau Eurodollar fund.  On April 1, 2013, the Debtors moved their investment to the GOIXX Fund, and as of the Petition Date, no cash remains with the BMO Nassau Eurodollar fund.

Acquisitions Top Concentration Account and automatically swept on March 20, 2013 with approximately $43.8 million in other available funds to the Investment Portfolio.

21.     The remaining $300 million of those drawn funds was invested directly in Federated's Treasury Obligations Fund Institutional Shares (money market fund #68, ticker: TOIXX, the "***TOIXX Fund***"), which shares are held separately and distinctly from the Investment Portfolio (the TOIXX Fund shares, collectively with the Investment Portfolio, the "***Investments***").   Interest from the TOIXX Fund is earned daily, credited monthly, and automatically reinvested.   The investment strategy behind choosing the TOIXX Fund was principal protection and liquidity, as this fund invests primarily in a portfolio of short-term U.S. Treasury securities.   Credit quality was the primary criterion in choosing the TOIXX Fund: this fund is rated AAAm and Aaa-mf by Standard & Poor's and Moody's, respectively.   On March 31, 2013, the annualized yield was 0.01%.   As of June 28, 2013, the total market value of Cengage Learning Acquisitions, Inc.'s investment in the TOIXX Fund's institutional shares was approximately $265.0 million.

22.     The Debtors request authority to continue to maintain the Investments in accordance with the prepetition investment practices described above (the "***Investment Practices***").

### (iii)     Depository Accounts

23.     The Debtors maintain several depository accounts (the "***Depository Accounts***") associated with their operations.   Specifically, the Debtors maintain:  (a) one Depository Account at BMO in the name of Cengage Learning, Inc. (the "***Cengage Depository Account***"); (b) four Depository Accounts at BMO in the name of The Gale Group (the "***Gale Group Depository Accounts***"); (c) two Depository Accounts at BofA in the name of Hampton Brown (the "***HB Depository Accounts***"); and (d) one Depository Account at JPMorgan in the name of Gale

Holdings I Inc. (the "*Gale Holdings Depository Account*").  These Depository Accounts are used for depositing checks, ACH Payments, credit card payments, and other receipts.

24.      The Cengage Depository Account and the Gale Group Depository Accounts are set up as Zero Balance Accounts, with the funds from each being automatically transferred into the Operating Concentration Accounts.  In addition, one of the HB Depository Accounts is a Zero Balance Account, the funds from which are automatically transferred to the second HB Depository Account and then periodically transferred by wire to the Cengage Concentration Account.  Finally, funds in the Gale Holdings Depository Account are transferred periodically by wire to the Acquisitions Top Concentration Account.

25.      As of June 21, 2013, the balances in the Depository Accounts were as follows:

- approximately $0 in the Cengage Depository Account;

- approximately $0 in the Gale Group Depository Accounts;

- approximately $61,000 in the HB Depository Accounts; and

- approximately $8,000 in the Gale Holdings Depository Account.

**(iv)      Disbursement Accounts**

26.      The Debtors also maintain five disbursement accounts (the "*Disbursement Accounts*") for their various operations.  Two of the Disbursement Accounts are at BMO (the "*BMO Disbursement Accounts*"), which are used for payment of certain vendor invoices and other expenses of Cengage Learning, Inc. and The Gale Group.  The BMO Disbursement Accounts are set up as controlled disbursement accounts whereby cashed checks are presented for settlement by the applicable clearing bank at the start of each business day.  In addition, one Disbursement Account is kept at each of BofA, RBC, and Natwest.  The Disbursement Account at BofA is used to fund payments of certain expenses for Hampton Brown and is a Zero Balance Account.  The Disbursement Account at RBC and the Disbursement Account at Natwest are

used to fund certain vendor payments made in foreign currencies, as required by certain of the Debtors' vendors, and are maintained with small balances by wire transfers on an as-needed basis.

27.     As of June 21, 2013, the balances in the Disbursement Accounts and the amount of outstanding checks issued against them were as follows:

- $0 in the BMO Disbursement Accounts, with approximately $13.2 million in outstanding checks;[6]

- $0 in the Disbursement Account at BofA, with approximately $26,000 in outstanding checks;[7]

- approximately $204,000 in the Disbursement Account at RBC, with approximately $158,000 in outstanding checks; and

- approximately $210,000 in the Disbursement Account at Natwest, with approximately $162,000 in outstanding checks.

**(v)     Payroll Accounts**

28.     The Debtors also maintain two accounts (the "***Payroll Accounts***") at BMO for the payment of employee net pay—one for Cengage Learning, Inc. and one for The Gale Group.[8] Funds necessary for payroll are automatically transferred from the appropriate Operating Concentration Account to the Payroll Accounts.  Ceridian Corporation, the Debtors' payroll service provider, then issues a reverse wire to the Payroll Accounts in the amount of the Debtors' payroll liabilities for direct deposits and for checks as cleared.  As of June 21, 2013, the Payroll Accounts held approximately $0, with approximately $176,000 in outstanding checks.

---

[6]    With respect to the BMO Disbursement Accounts, the funds to cover outstanding checks are automatically transferred to the applicable Disbursement Account when such checks are presented for payment.

[7]    With respect to the Disbursement Account at BofA, the funds to cover outstanding checks are automatically transferred to the Disbursement Account when such checks are presented for payment.

[8]    The Payroll Account associated with The Gale Group is no longer regularly used.

### (vi)    Taxes and Benefits Accounts

29.    The Debtors also maintain two accounts for the payment of taxes and certain employee benefits (the "***Taxes and Benefits Accounts***") and one account solely for employee medical benefits (the "***Medical Benefits Account***").    The Taxes and Benefits Accounts are maintained at BMO and are used to fund employer and employee tax payments and the payment of employee benefits claims other than for medical and dental benefits.    As of June 21, 2013, the Taxes and Benefits Accounts had an aggregate balance of approximately $0.

30.    The Medical Benefits Account is at JPMorgan, and it is used to fund medical and dental employee benefits claims on behalf of the Debtors.    Cigna Corporation ("***Cigna***") manages the Medical Benefits Account on the Debtors' behalf.    Pursuant to the Debtors' agreement with Cigna, the Medical Benefits Account maintains a target balance of $1 million, funded weekly by wire to maintain that balance.    As of June 21, 2013, the Medical Benefits Account had a balance of approximately $34,000.

### (vii)    Other Accounts

31.    The Debtors maintain three additional accounts on a local basis (the "***Local Accounts***") for miscellaneous purposes, including converting checks to petty cash, issuing cashier's checks, and depositing cash from sales made at conventions.    Two of the Local Accounts are maintained at Fifth Third, and one Local Account is maintained at BofA.    As of June 21, 2013, the Local Accounts held approximately $54,000.

32.    The Debtors also are party to escrow agreements related to two escrow accounts (the "***Escrow Accounts***") at JPMorgan.    The Escrow Accounts were created in connection with the sale of CompuTaught and Net Learning, two of the Debtors' non-core businesses, to cover any breaches of representations and warranties in the applicable agreements.    The amounts in the Escrow Account for the CompuTaught sale will be released on September 9, 2013, and the

amounts in the Escrow Account for the Net Learning sale will be released on May 30, 2014, if all terms of their respective agreements are met.  As of June 21, 2013, the Escrow Account relating to CompuTaught held approximately $500,000, and the Escrow Account relating to Net Learning held approximately $3.6 million.

33.     The Debtors also hold petty cash accounts on a local basis.  As of June 21, 2013, the Debtors held approximately $3,500 in petty cash.

**B.      The Debtors' Existing Business Forms and Checks**

34.     In the ordinary course of business, the Debtors use a number of checks and other business forms.  To minimize expenses for their estates, the Debtors would like to continue to use all correspondence and business forms as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—until the Debtors, in their reasonable best efforts, are able to change their business forms to reflect such status.  The Debtors also believe it will minimize expense to their estates if they are permitted to use their existing forms in this manner.

35.     By virtue of the nature and scope of the Debtors' business operations and the customers and vendors with whom the Debtors transact on a regular basis, it is important the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change, except as requested herein.

**C.      Banking Fees**

36.     In connection with their ordinary course use of the Cash Management System, the Debtors pay, honor, or allow the deduction from the applicable account of certain service charges and other fees, costs, and expenses required by the Banks (collectively, the "***Banking Fees***").  Payment of the Banking Fees is necessary to ensure uninterrupted use of the Cash Management

System, and thus the Debtors request that the Court authorize the Banks to continue to charge the Banking Fees to the Debtors.

## II.     The Debtors' Intercompany Obligations

37.     In the ordinary course of business, various Debtors and their non-Debtor affiliates maintain business relationships with each other, resulting in intercompany receivables and payables (the "***Intercompany Claims***").  Indeed, in connection with the daily operation of the Cash Management System (including transactions by subsidiaries without their own bank accounts), at any given time there may be Intercompany Claims owing between Debtors or between a Debtor and a non-Debtor affiliate in connection with the receipt and disbursement of funds and there may be recognitions of offsets between Debtors or between a Debtor and a non-Debtor affiliate (collectively, the "***Intercompany Transactions***").[9]  The Intercompany Transactions are critical to ensuring that liquidity is available where and when needed by the Debtors and their non-Debtor affiliates.

38.     With respect to their international affiliates, the Debtors track all fund transfers electronically in their accounting system and can ascertain, trace, and account for Intercompany Transactions.  The Debtors' Intercompany Transactions with non-Debtor Hampton Brown are largely integrated within the Cash Management System and are periodically estimated rather than electronically tracked.  If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

---

[9]    Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval.  Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.  The continued performance of the ordinary course Intercompany Transactions is integral to ensuring the Debtors' ability to operate their businesses.

1me

39.     To ensure each individual Debtor will not permanently fund the operations of any affiliate, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against any Debtor arising after the Petition Date as a result of ordinary course Intercompany Transactions be accorded superpriority administrative expense status.  If Intercompany Claims are given superpriority administrative expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for its ordinary course Intercompany Transactions, reducing the risk that these transactions would jeopardize the recoveries available to the Debtors' creditors.  Moreover, the Debtors request the authority to fund the postpetition payment of obligations to non-Debtor affiliates in a manner consistent with the requirements imposed on the Debtors under the Cash Collateral Order.

## Supporting Authority

I.      **The Court Should Approve the Debtors' Continued Use of the Cash Management System**

A.      **The Cash Management System Is Essential to the Debtors' Ongoing Operations and Restructuring Efforts**

40.     The Debtors' businesses and financial affairs are exceedingly complex, requiring the collection, disbursement, and movement of funds through numerous accounts.  Thus, to ensure the seamless operation of their international enterprise, the Debtors should be allowed to continue their well-managed Cash Management System rather than opening new bank accounts.

41.     The U.S. Trustee has established the U.S. Trustee Guidelines that, unless otherwise ordered by the Court, require a debtor to, among other things:  (a) establish one debtor-in-possession account for all estate monies required for the payment of taxes (including payroll taxes); (b) close all existing bank accounts and open new debtor-in-possession accounts; (c) maintain a separate debtor-in-possession account for cash collateral; (d) obtain checks that

bear the designation "debtor in possession;" and (e) reference the bankruptcy case number and the type of account on such checks.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and help protect against the inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the petition date.  Strict enforcement of those guidelines in these chapter 11 cases, however, would severely disrupt the ordinary financial operations of the Debtors by reducing efficiencies and causing unnecessary expenses.

42.    Bankruptcy courts treat requests for authority to continue utilizing existing cash management systems as a relatively "simple matter."  *In re Baldwin-United Corp.*, 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987).  This is particularly true where, as here, a chapter 11 case involves affiliated debtors with complex financial affairs.  In *In re Charter Co.*, for example, a bankruptcy court entered an order authorizing the debtor and 43 of its subsidiaries "to continue to consolidate the management of their cash as has been usual and customary in the past, and to transfer monies from affiliated entity to entity, including operating entities that are not debtors." 778 F.2d 617, 620 (11th Cir. 1985).  The Eleventh Circuit Court of Appeals then affirmed a subsequent district court decision denying a creditor's motion for leave to appeal the bankruptcy court's cash management order, holding that authorizing the debtors to utilize their prepetition "routine cash management system" was "entirely consistent" with applicable provisions of the Bankruptcy Code.  *Id.* at 621.

43.    Likewise, the bankruptcy court in the *Columbia Gas* chapter 11 case explained that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del.

1993), *aff'd in part and rev'd in part*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom*, *Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp.*, 510 U.S. 1110 (1994); *see also In re US Airways, Inc.*, Case No. 04-13819 (Bankr. E.D. Va. Sept. 14, 2004); *In re NTELOS, Inc.*, Case No. 03-32094 (Bankr. E.D. Va. March 4, 2003).   As a result, courts have concluded that the requirement to maintain all accounts separately "would be a huge administrative burden and economically inefficient."  *Columbia Gas*, 997 F.2d at 1061; *see also In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

44.    In other large, complex, or well-publicized chapter 11 cases, such as this, courts in this and other districts routinely waive certain U.S. Trustee Guideline requirements and allow the continued use of cash management systems and prepetition bank accounts employed in the ordinary course of a debtor's prepetition business.  *See, e.g.*, *In re Metro Fuel Oil Corp.*, Case No. 12-46913 (ESS) (Bankr. E.D.N.Y. Oct. 24, 2012); *In re Global Aviation Holdings Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 8, 2012); *In re Int'l Tobacco Partners, Ltd.*, Case No. 10-74894 (AST) (Bankr. E.D.N.Y. July 7, 2010); *In re The Brown Publ'g Co.*, Case No. 10-73295 (DTE) (Bankr. E.D.N.Y. May 7, 2010); *see also In re RDA Holding Co.*, Case No. 13-22233 (Bankr. S.D.N.Y. March 25, 2013); *In re Dex One Corp.*, No. 13-10533 (Bankr. D. Del. March 19, 2013); *In re Houghton Mifflin Harcourt Publ'g Co.*, Case No. 12-12171 (Bankr. S.D.N.Y. June 21, 2012).[10]   The courts recognize that when applied in complex chapter 11 cases, the U.S. Trustee Guidelines are often impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts. Thus it is

---

[10]    Because of the voluminous nature of the orders cited herein, these orders are not attached to the motion.  Copies of these orders, however, are available on request from the Debtors' proposed counsel.

common to replace the U.S. Trustee Guidelines with an alternative procedure that provides the same protection.

     **B.**     **Opening New Accounts Will Cause Substantial Disruption to the Debtors' Businesses**

     45.     Given the complex nature of the Debtors' businesses, the Debtors' objective of successfully reorganizing while preserving and enhancing their value as a going concern simply cannot be achieved if the Debtors' Cash Management System is disrupted and their Bank Accounts are closed.

     46.     If the Debtors were required to open new accounts as debtors in possession and modify the Cash Management System, the Debtors would be forced to reconstruct their Cash Management System.  Thus, the Debtors' treasury, accounting, and bookkeeping employees would need to focus their efforts on immediately opening new bank accounts and ensuring proper controls are in place for cash to properly flow through all operations, thereby diverting daily responsibilities during this critical juncture of these chapter 11 cases.  The opening of new bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash management procedures, and instructing customers to redirect payments would negatively impact the Debtors' ability to operate their businesses while pursuing these arrangements.

     47.     Additionally, the Debtors would be subject to significant administrative burdens and expenses because they would need to execute new signatory cards and depository agreements and create an entirely new manual system for issuing checks and paying postpetition obligations, all as generally would be required by the U.S. Trustee Guidelines.

      **C.**      **Maintaining the Existing Cash Management System Will Facilitate a Smooth Transition into These Chapter 11 Cases and Will Not Harm Parties in Interest**

48.     The Debtors' continued use of the Cash Management System will greatly facilitate their transition into these chapter 11 cases by, among other things, avoiding administrative inefficiencies and expenses and minimizing delays in the payment of postpetition debts.  The Cash Management System provides the Debtors with the ability to:  (a) quickly create status reports on the location and amount of funds, which, in turn, allow management to track and control such funds; (b) ensure cash availability; and (c) reduce administrative costs through a centralized method of coordinating the collection and movement of funds.

49.     Moreover, the Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing Cash Management System, including their Bank Accounts.  Specifically, with the assistance of their professionals, the Debtors have implemented internal protocols that prohibit payments on account of prepetition debts, including prepetition accounts payable payments and prepetition intercompany debts, without the prior approval of their treasury department and this Court.  In light of such protective measures, the Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

**II.**      **The Debtors Should Be Granted Authority to Use Existing Business Forms and Checks Until They Are Depleted**

50.     To minimize administrative costs, the Debtors request authority to continue to use all correspondence and business forms (including letterhead, purchase orders, invoices, and the like) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  The Debtors also request authorization to continue to use all existing business forms, including checks, that do not contain the designation

"debtor-in-possession" until the Debtors' existing stock of business forms, including checks, has been depleted; *provided, however*, that the Debtors will use their best reasonable efforts to reflect the Debtors' status as debtor-in-possession on existing business forms, including checks, and when reordering these business forms, the Debtors shall include the designation "Debtor-in-Possession" and the corresponding bankruptcy number on all such business forms, including checks.

51.     By virtue of the nature and scope of the Debtors' business operations and the large number of vendors with whom the Debtors transact on a daily basis, it is important that the Debtors be permitted to continue to use their existing checks and other business forms without alteration or change, except as requested herein.  Indeed, because parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicized nature of these chapter 11 cases and the communications and notice of commencement the Debtors are distributing to such parties, changing business forms is unnecessary and unduly burdensome.

52.     In other large, complex, or well-publicized cases, bankruptcy courts regularly permit debtors to use their prepetition forms without the "debtor in possession" label, at least until the debtors' existing stock was depleted.  *See, e.g.*, *In re Metro Fuel Oil Corp.*, Case No. 12-46913 (ESS) (Bankr. E.D.N.Y. Oct. 24, 2012); *In re Global Aviation Holdings Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 8, 2012); *In re Int'l Tobacco Partners, Ltd.*, Case No. 10-74894 (AST) (Bankr. E.D.N.Y. July 7, 2010); *see also In re RDA Holding Co.*, Case No. 13-22233 (Bankr. S.D.N.Y. March 25, 2013); *In re Dex One Corp.*, No. 13-10533 (Bankr. D. Del. March 19, 2013); *In re Hawker Beechcraft, Inc.*, Case No. 12-11783 (Bankr. S.D.N.Y. May 30, 2012); *In re Sbarro, Inc.*, Case No. 11-11527 (Bankr. S.D.N.Y. April 5, 2011).

### III.    The Debtors Should Be Authorized to Continue Using Debit, Wire, and Foreign Transfer Agents

53.    The Debtors request further relief from the U.S. Trustee Guidelines' requirement that all disbursements of estate funds be made by check and include a notation representing the reason for the disbursement.  Considering the complexity of the Debtors' operations, the Debtors need to conduct transactions by debit, wire, ACH Payment, and other similar methods, as discussed above.  If the Debtors are denied the opportunity to conduct transactions by debit, wire, ACH Payment, or other similar methods, the Debtors would likely have difficulty performing on their contracts and the Debtors' business operations would be disrupted unnecessarily, burdening the Debtors and their creditors with additional costs.

### IV.    The Debtors Should Be Authorized to Continue Performing Under the Intercompany Transactions

54.    At any given time, there may be balances due and owing between and among Debtors and non-Debtor affiliates.  These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System.  Thus, the Debtors respectfully request the authority, in their sole discretion, to continue performing under the Intercompany Transactions, as described herein, in the ordinary course of business without need for further Court order.

55.    Courts have routinely provided authority in other complex multi-debtor chapter 11 cases to continue ordinary course intercompany transactions.  *See, e.g.*, *In re Metro Fuel Oil Corp.*, Case No. 12-46913 (ESS) (Bankr. E.D.N.Y. Oct. 24, 2012); *In re Global Aviation Holdings Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 8, 2012); *see also In re RDA Holding Co.*, Case No. 13-22233 (Bankr. S.D.N.Y. March 25, 2013); *In re Dex One Corp.*, No. 13-10533 (Bankr. D. Del. March 19, 2013); *In re Houghton Mifflin Harcourt Publ'g Co.*, Case No. 12-12171 (Bankr. S.D.N.Y. June 21, 2012); *In re Hawker Beechcraft, Inc.*, Case

No. 12-11783 (Bankr. S.D.N.Y. May 30, 2012). For the reasons discussed herein, the Debtors

submit that this Court should authorize them to continue to perform under the Intercompany

Transactions.

**V.    Granting Superpriority Administrative Priority Status to Postpetition Intercompany Claims Is Necessary to Protect the Debtors' Claims**

56.    The Debtors' funds are commingled in the Cash Management System with that of

other Debtors and non-Debtors. If the Intercompany Transactions that permit use of the Cash

Management System were to be discontinued, that system and related administrative controls

would be disrupted to the Debtors' detriment. On the other hand, preserving the "business as

usual" atmosphere and avoiding the unnecessary distractions that inevitably would be associated

with any substantial disruption in the Cash Management System will facilitate the Debtors'

reorganization efforts.

57.    To ensure each individual Debtor will not fund, at the expense of its creditors, the

operations of another entity, out of an abundance of caution the Debtors respectfully request that

all Intercompany Claims against a Debtor by another Debtor or non-Debtor arising after the

Petition Date, as a result of ordinary course Intercompany Transactions through the Cash

Management System, be accorded superpriority administrative expense status pursuant to

sections 503(b)(1) and 364(b) of the Bankruptcy Code. If Intercompany Claims are accorded

superpriority administrative expense status, each entity utilizing funds flowing through the Cash

Management System should continue to bear ultimate repayment responsibility for such ordinary

course transactions.

58.    Superpriority administrative expense treatment for intercompany transactions, as

requested herein, has been granted in chapter 11 cases comparable to the Debtors'. *See, e.g.*, *In*

*re Edison Mission Energy*, Case No. 12-49219 (Bankr. N.D. Ill. May 15, 2013); *In re Amicus*

*Wind Down Corp. (f/k/a Friendly's Ice Cream Corp.)*, Case No. 11-13167 (Bankr. D. Del. Oct. 6, 2011); *In re InSight Health Serv's Holdings Corp.*, Case No. 10-16564 (Bankr. S.D.N.Y. Jan. 4, 2011). Further, administrative expense treatment for intercompany transactions has been granted in many other similar chapter 11 cases in this district and others. *See, e.g.*, *In re Metro Fuel Oil Corp.*, Case No. 12-46913 (ESS) (Bankr. E.D.N.Y. Oct. 24, 2012); *In re Global Aviation Holdings Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 8, 2012); *see also In re RDA Holding Co.*, Case No. 13-22233 (Bankr. S.D.N.Y. March 25, 2013); *In re Houghton Mifflin Harcourt Publ'g Co.*, Case No. 12-12171 (Bankr. S.D.N.Y. June 21, 2012); *In re Hawker Beechcraft, Inc.*, Case No. 12-11783 (Bankr. S.D.N.Y. May 30, 2012); *In re Sbarro, Inc.*, Case No. 11-11527 (Bankr. S.D.N.Y. April 5, 2011); *In re Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (Bankr. S.D.N.Y. Dec. 13, 2010).

**VI.    Cause Exists for Waiving the Investment and Deposit Guidelines of Section 345 of the Bankruptcy Code.**

59.    Before the Petition Date, the Debtors have invested excess funds not needed for the operations in the Investments in accordance with the Investment Practices. The Debtors request authority to maintain the Investments and to continue to invest such cash according to the Investment Practices. As noted above, funds are moved periodically to maximize income, which movement and investment is an integral component of the Cash Management System.

60.    Section 345(a) of the Bankruptcy Code authorizes deposit or investment of money of estates, such as cash, as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). Although section 345(b) of the Bankruptcy Code generally requires that, with respect to investments other than those "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States,"

the estate must require a bond in favor of the United States secured by the undertaking of a U.S. Trustee-approved corporate surety, it allows the court to dispense with this limitation "for cause." 11 U.S.C. § 345(b).

61.     The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) of the Bankruptcy Code "for cause" arises from the 1994 amendments to the Bankruptcy Code.  The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates.  The purpose is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate.  Under current law, all investments are required to be FDIC insured, collateralized or bonded.  While this requirement is wise in the case of smaller debtors with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors.  This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling *In re Columbia Gas Systems, Inc.*, 33 F.3d 294 (3d Cir. 1994).

*In re Service Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994)).

62.     In determining whether the "for cause" standard has been met, the Court should consider a "totality of the circumstances," utilizing the following factors:

(a)     the sophistication of the debtor's business;

(b)     the size of the debtor's business operations;

(c)     the amount of the investments involved;

(d)     the bank ratings (Moody's and Standard and Poor's) of the financial institutions where the debtor in possession funds are held;

(e)     the complexity of the case;

(f)     the safeguards in place within the debtor's own business of insuring the safety of the funds;

    (g)      the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

    (h)      the benefit to the debtor;

    (i)      the harm, if any, to the estate; and

    (j)      the reasonableness of the debtor's request for relief from section 345(b) requirements in light of the overall circumstances of the case.

*Service Merch.*, 240 B.R. at 896.

63.　　The Debtors submit that cause exists in the chapter 11 cases for the Court to allow the Debtors to maintain the Investments and to continue to invest their excess funds in accordance with their Investment Practices.  The Debtors further request that the applicable institutions be authorized, on an interim basis pending a final hearing, to accept and hold or invest such funds in accordance with the Investment Practices, without the need for any additional agreements not otherwise utilized before the Petition Date.

64.　　As discussed above, the Debtors invest their cash with the primary goal of protecting principal and the secondary goal of maximizing yield and liquidity before the Petition Date.  The Debtors submit that the Investments and the Investment Practices provide sufficient protection for their cash and that it would be in the best interest of their estates and creditors for the Debtors to continue to follow this practice for investment of cash.

65.　　After considering transaction costs and fees, the yield on the Investments is likely to be greater than mandatory investment in government securities.  Therefore, this strategy could result in greater returns for the Debtors' estates over time.  Moreover, a bond secured by undertaking of a corporate surety would likely be unduly expensive, assuming such a bond were available, and could offset much of the financial gain derived from the Investments.  The Debtors submit that their assets will be invested in a manner that preserves capital, provides liquidity, and generates returns relative to prevailing market conditions.

66.    In addition, the Debtors submit that any risk to the funds does not require strict adherence to the requirements of section 345(b) of the Bankruptcy Code.  If the Debtors are granted a waiver, the Debtors will not be burdened with the significant administrative difficulties and expenses relating to opening new accounts in a manner that ensures all of their funds are fully insured or invested strictly in accordance with the restrictions established by section 345 of the Bankruptcy Code.

67.    In other large, complex, or well-publicized chapter 11 cases, courts in this and other districts have liberally construed the requirement of section 345(b) of the Bankruptcy Code that the debtor in possession obtain a bond from any entity with which their money is deposited or invested.  In those instances, courts have waived the requirements of section 345(b) of the Bankruptcy Code and replaced them with alternative procedures.  *See, e.g.*, *In re Global Aviation Holdings Inc.*, Case No. 12-40783 (CEC) (Bankr. E.D.N.Y. March 8, 2012); *In re Eastman Kodak Co.*, Case No. 12-10202 (Bankr. S.D.N.Y. Jan. 19, 2012); *In re Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (Bankr. S.D.N.Y. Feb. 7, 2011); *In re Reader's Digest Ass'n, Inc.*, Case No. 09-23529 (Bankr. S.D.N.Y. Nov. 20, 2009)*; In re ION Media Networks, Inc.*, Case No. 09-13125 (Bankr. S.D.N.Y May 21, 2009)*; In re Charter Commc'ns, Inc.*, Case No. 09-11435 (Bankr. S.D.N.Y. April 1, 2009) (interim order)*; In re Tronox Inc.*, Case No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009).  Cause exists for a similar waiver in these cases.

### The Requirements of Bankruptcy Rule 6003 Are Satisfied

68.    Under Bankruptcy Rule 6003, the Court may authorize the Debtors to continue using the Cash Management System because such relief is necessary to avoid immediate and irreparable harm.  Immediate and irreparable harm exists where the absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990) (discussing the elements

of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001(c)(2)); *see also* Fed. R. Bankr. P. 6003, Committee Notes (noting that cases applying Bankruptcy Rule 4001(b)(2) and (c)(2) may "provide guidance" for relief under Bankruptcy Rule 6003).

69.     The Cash Management System is crucial to the Debtors' continued operations. Without the Cash Management System, payments may not be made in a timely manner and the Debtors would be unable to track receipts and disbursements efficiently.  Late payments may cause the Debtors to face vendors unwilling to provide necessary goods and services.  Moreover, the lack of an integrated cash management system would make the tracking of cash movement and balances much more difficult, potentially causing the Debtors to lack critical information on current liquidity.  Such situations could cause a diminution in the value of the Debtors' estates to the detriment of all parties in interest.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rules Regarding Notice and Stay of an Order

70.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rules 6004(h), 7062, 9014, or otherwise.

## Motion Practice

71.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion.  Moreover, in addition to all entities otherwise entitled to receive notice, the Debtors have given notice of this motion to all entities believed to have or be claiming an interest in the subject matter of the proposed Interim and Final Orders or who, it is believed, otherwise would

be affected by the proposed Interim and Final Orders.  Accordingly, the Debtors submit that this motion satisfies E.D.N.Y. LBR 9013-1.

### The Debtors' Reservation of Rights

72.    Nothing contained herein is intended or should be construed as an admission as to the validity or priority of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their rights to contest any claim.  Likewise, if this Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity or priority of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### Notice

73.    The Debtors have provided notice of this motion to:  (a) the U.S. Trustee; (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent under the Debtors' prepetition senior secured credit facility; (d) the indenture trustees under the Debtors' prepetition secured first lien notes, secured second lien notes, senior unsecured notes, senior PIK notes, and senior subordinated discount notes; (e) counsel to the ad hoc group of holders of certain first lien claims; (f) the United States Attorney for the Eastern District of New York; (g) the Internal Revenue Service; and (h) the Banks.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

### No Prior Request

74.    No prior request for the relief sought in the motion has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, for the reasons set forth herein and in the First Day Declaration, the Debtors respectfully request entry of Interim and Final Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively, granting the relief requested herein and such other relief as may be appropriate under the circumstances.

Brooklyn, New York
Dated:  July 2, 2013

/s/ Jonathan S. Henes
Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (*pro hac vice admission pending*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**<u>Exhibit A</u>**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**INTERIM ORDER (I) AUTHORIZING (A) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTENANCE OF EXISTING BANK ACCOUNTS, (C) CONTINUED USE OF EXISTING BUSINESS FORMS, AND (D) CONTINUED USE OF EXISTING INVESTMENT PRACTICES; AND (II)(A) GRANTING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION INTERCOMPANY CLAIMS, AND (B) AUTHORIZING CONTINUED PERFORMANCE UNDER CERTAIN INTERCOMPANY ARRANGEMENTS AND HISTORICAL PRACTICES**

Upon the motion (the "***Motion***")[1] of the Debtors for entry of an interim order (this "***Order***") pursuant to sections 345, 363, 364, 503 and 507 of the Bankruptcy Code and Rule 6003 of the Bankruptcy Rules, (i) authorizing the Debtors to (a) continue using their existing cash management system and honor certain prepetition obligations related thereto, (b) maintain their existing bank accounts, (c) continue using their existing business forms, and (d) maintain their investments and continue their existing investment practices, (ii) provide postpetition intercompany claims superpriority administrative expense status and authorize the Debtors to continue performing under certain intercompany arrangements, and (iii) scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order to the extent a hearing is necessary, all as more fully described in the Motion; and the Court having jurisdiction to

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C.

§ 1408; and due and proper notice of the Motion being adequate and appropriate under the

particular circumstances; and a hearing having been held to consider the relief requested in the

Motion (the "*Hearing*"); and upon consideration of the First Day Declaration, the record of the

Hearing and all proceedings had before the Court; and the Court having found and determined

that the relief sought in the Motion, as modified herein, is in the best interests of the Debtors'

estates, their creditors, and other parties in interest, and that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and any objections to the

requested relief having been withdrawn or overruled on the merits; and after due deliberation and

sufficient cause appearing therefor, it is hereby ORDERED:

1.      The Motion is granted on an interim basis to the extent set forth herein.

2.      The Debtors are authorized to continue using their integrated cash management

system in the ordinary course of business and generally consistent with past practice, as

described in the Motion (the "*Cash Management System*") and as modified herein, but solely to

the extent permitted under the *Interim Order (I) Authorizing the Use of Cash Collateral, (II)*

*Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final*

*Hearing* (as such order may be amended, modified, supplemented, or granted on a final basis, in

each case on a consensual basis, the "*Cash Collateral Order*").

3.      The Debtors are authorized to: (a) continue to use, with the same account

numbers, all of the bank accounts in existence as of the Petition Date, including, without

limitation, those accounts identified on **Exhibit C** to the Motion (the "*Bank Accounts*"); (b) treat

the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; *provided, howeve*r, with respect to the Bank Accounts are not maintained with Authorized Depositories in the Eastern District of New York, the Debtors shall either (i) close the Bank Account, (ii) enter into a Uniform Depository Agreement ("*UDA*") with the U.S. Trustee or (iii) obtain a waiver from the Court of the requirements of Section 345 of the Bankruptcy Code within 35 days of the date of this Order; and (c) the Debtors may continue to use all existing business forms, including checks, that do not contain the designation "debtor-in-possession" until the Debtors' existing stock of business forms, including checks, has been used; *provided, however*, that the Debtors will use their best reasonable efforts to reflect the Debtors' status as debtor-in-possession on existing business forms, including checks, and when reordering these business forms, the Debtors shall include the designation "Debtor in Possession" and the corresponding bankruptcy number on all such business forms, including checks; *provided, however*, that the Debtors shall include the designation "Debtor in Possession" on all electronic business forms, including checks, as soon as practicable.

4.      Except as otherwise expressly provided in this Order, the Banks are authorized to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor and pay any and all checks, drafts, wires, and ACH Payments issued and drawn on the Bank Accounts before or after the Petition Date by the holders or makers thereof to the extent the Debtors have good funds standing to their credit with such Bank, as the case may be and all such Banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as being approved by this Order and have no duty to inquire as to whether such payments are authorized by an order of this Court; *provided,*

*however*, the Banks shall not be liable to any party on account of (a) following the Debtors' representations, instructions, or presentations as to any order of this Court, (b) any prepetition checks, drafts, wires, or ACH Payment honored in a good faith belief or upon a representation by the Debtor that this Court has authorized such prepetition check, draft, wire, or ACH Payment, or (c) an innocent mistake made despite implementation of reasonable handling procedures.

5.      The Banks are authorized to charge and the Debtors are authorized to pay or honor both prepetition and postpetition Banking Fees to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with Debtors.  The Debtors shall reimburse the Banks for any claim arising before or after the Petition Date in connection with any returned items to the Bank Accounts in the normal course of business.  Further, the Banks are authorized to "charge back" to the Debtors' accounts any amounts incurred by the Bank resulting from returned checks or other returned items.

6.      The Debtors are authorized to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided, however*, that the Debtors will (i) provide notice to the U.S. Trustee, the agent for the Debtors' prepetition secured credit facility (the "***Prepetition Agent***"), the ad hoc group of holders of certain first lien claims, and any official committee appointed in these chapter 11 cases of the opening and closing of any bank accounts by the Debtors and (ii) obtain the prior written consent of the Prepetition Agent and the ad hoc group of holders of certain first lien claims to all requests to close any bank account or open any new bank account maintained by the Debtors (other than the Adequate Assurance Account, as defined in the *Debtors' Motion for Entry of Order Determining Adequate Assurance of Payment for Future Utility Services*), such consent not to be

unreasonably withheld; *provided*, *further*, that any new bank accounts opened by the Debtors shall be opened and maintained with Authorized Depositories.

7.      The Debtors are authorized to direct the Banks, and the Banks are authorized to pay obligations in accordance with this or any separate order of this Court; *provided*, *however*, that the Banks have no duty to inquire as to whether such payments are authorized by an order of this Court, and each Bank has no duty to make payments in respect thereto unless the Debtors have good funds standing to their credit with such Bank.

8.      Any payment from a Bank Account at the request of the Debtors made by any of the Banks prior to the Petition Date (including any ACH Payment such Bank is or becomes obligated to settle), or any instruments issued by any of the Banks on behalf of any Debtor pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from such Bank Account prepetition.

9.      Any and all accounts opened by the Debtors on or after the Petition Date at any bank shall be subject to the rights and obligations of this Order as "Bank Accounts."

10.     Nothing contained herein shall prevent the Banks from modifying or terminating any Bank Accounts or related services in accordance with the agreements governing such accounts or services.

11.     Except as otherwise provided in this Order or in a separate order of this Court, all Banks provided with notice of this Order maintaining any of the Bank Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts or otherwise issued before the Petition Date.

12.    The Debtors are authorized, to the extent permitted under the Cash Collateral Order, to continue investing excess funds not needed for the Debtors' operations in the Investments in accordance with the Investment Practices.

13.    As soon as practicable after entry of this Order, the Debtors shall serve a copy of this Order on each Bank and financial institution at which the Bank Accounts are maintained.

14.    The Debtors are authorized, to the extent permitted under the Cash Collateral Order, to continue performing Intercompany Transactions in the ordinary course of business.  All Intercompany Claims arising after the Petition Date shall be accorded superpriority administrative expense status in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, provided that (a) the First Lien Secured Parties (as defined in the Cash Collateral Order) shall continue to have liens on such Intercompany Claims and (b) such Intercompany Claims shall be junior to all claims of the First Lien Secured Parties, including but not limited to any 507(b) administrative claim granted under the Cash Collateral Order (in the case of (a) and (b), as provided by and subject in all respects to the terms of the Cash Collateral Order).  The Debtors shall (a) continue to track Intercompany Transactions electronically through their accounting system in accordance with their prepetition practices and (b) provide reasonable access to such records and procedures to the Prepetition Agent, the ad hoc group of holders of certain first lien claims, and any official committee appointed in these chapter 11 cases.

15.    To the extent necessary, the Final Hearing on the Motion shall be held on _____, 2013 at ___:____ a.m./p.m. prevailing [_____] Time.  Any objections to the relief requested in the Motion on a final basis must be filed no later than _____, 2013 at ___:___ a.m./p.m. (Eastern Time) (the "***Objection Deadline***").

16.     If an objection is timely filed and served so as to be received on or before the Objection Deadline, such objection shall be set for the Final Hearing on _____, 2013 at __:__ a.m./p.m. (Eastern Time).  This Order, and all acts taken in furtherance of or reliance upon this Order, shall be effective notwithstanding the filing of an objection.

17.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in this Order or any payment made pursuant to this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or the assumption, reaffirmation, or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

18.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion or otherwise deemed waived.

19.     Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder, shall be subject to the requirements imposed on the Debtors under the Cash Collateral Order.

20.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of the E.D.N.Y. Local Bankruptcy Rules are satisfied by such notice.

21.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

22.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

23.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**<u>Exhibit B</u>**

**Proposed Final Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

|                                                   |   |                                   |
|---------------------------------------------------|---|-----------------------------------|
|                                                   | ) |                                   |
| In re:                                            | ) | Chapter 11                        |
|                                                   | ) |                                   |
| CENGAGE LEARNING, INC., *et al.*,                 | ) | Case No. 13-_____ (___)         |
|                                                   | ) | Case No. 13-_____ (___)         |
|                                                   | ) | Case No. 13-_____ (___)         |
|                                                   | ) | Case No. 13-_____ (___)         |
|                                                   | ) |                                   |
|                              Debtors.             | ) | (Joint Administration Requested)  |
|                                                   | ) |                                   |

**FINAL ORDER (I) AUTHORIZING (A) CONTINUED USE OF EXISTING CASH
MANAGEMENT SYSTEM, (B) MAINTENANCE OF EXISTING BANK ACCOUNTS,
(C) CONTINUED USE OF EXISTING BUSINESS FORMS, AND (D) CONTINUED
USE OF EXISTING INVESTMENT PRACTICES; AND (II)(A) GRANTING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS TO POSTPETITION
INTERCOMPANY CLAIMS, AND (B) AUTHORIZING CONTINUED PERFORMANCE
UNDER CERTAIN INTERCOMPANY ARRANGEMENTS AND HISTORICAL
PRACTICES**

Upon the motion (the "***Motion***")[1] of the Debtors for entry of an interim order

(this "***Order***") pursuant to sections 345, 363, 364, 503, and 507 of the Bankruptcy Code and Rule

6003 of the Bankruptcy Rules (i) authorizing the Debtors to (a) continue using their existing cash

management system and honor certain prepetition obligations related thereto, (b) maintain their

existing bank accounts, (c) continue using their existing business forms, and (d) maintain their

investments and continue their existing investment practices, and (ii) provide postpetition

intercompany claims superpriority administrative expense status and authorize the Debtors to

continue performing under certain intercompany arrangements, all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. § 1408; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and the Court having entered an order granting the relief requested in the Motion on an interim basis [Docket No. ___] (the "***Interim Order***"); and a hearing having been held to consider the relief requested in the Motion (the "***Hearing***"); and upon consideration of the First Day Declaration, the record of the Hearing and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion, as modified herein, is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any objections to the requested relief having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.      The Motion is granted on a final basis to the extent set forth herein.

2.      The relief provided in the Interim Order is approved on a final basis except as modified herein.

3.      The Debtors are authorized to continue using their integrated cash management system in the ordinary course of business and generally consistent with past practice, as described in the Motion (the "***Cash Management System***") and as modified herein, but solely to the extent permitted under the *Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, and (III) Scheduling a Final Hearing* (as such order may be amended, modified, supplemented, or granted on a final basis, in each case on a consensual basis, the "***Cash Collateral Order***").

4.    The Debtors are authorized to: (a) continue to use, with the same account numbers, all of the bank accounts in existence as of the Petition Date, including those accounts identified on **Exhibit C** to the Motion (the "***Bank Accounts***"); (b) treat the Bank Accounts for all purposes as accounts of the Debtors as debtors in possession; *provided, howeve*r, that with respect to the Bank Accounts that are (x) not maintained with Authorized Depositories in the Eastern District of New York and have not been closed or (y) are not the subject of a Uniform Depository Agreement ("***UDA***") between the Debtors and the U.S. Trustee, the requirements under section 345 of the Bankruptcy Code are waived with respect to such Bank Accounts; and (c) the Debtors may continue to use all existing business forms, including checks, that do not contain the designation "debtor-in-possession" until the Debtors' existing stock of business forms, including checks, has been used; *provided, however*, that the Debtors will use their best reasonable efforts to reflect the Debtors' status as debtor-in-possession on existing business forms, including checks, and when reordering these business forms, the Debtors shall include the designation "Debtor in Possession" and the corresponding bankruptcy number on all such business forms, including checks; *provided, however*, that the Debtors shall include the designation "Debtor in Possession" on all electronic business forms, including checks, as soon as practicable.

5.    Except as otherwise expressly provided in this Order, the Banks are authorized to continue to service and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course, and to receive, process, honor, and pay any and all checks, drafts, wires, and ACH Payments issued and drawn on the Bank Accounts before or after the Petition Date by the holders or makers thereof to the extent the Debtors have good funds standing to their credit with such Bank, as the case may be and all such

3

Banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as being approved by this Order and have no duty to inquire as to whether such payments are authorized by an order of this Court; *provided*, *however*, the Banks shall not be liable to any party on account of (a) following the Debtors' representations, instructions, or presentations as to any order of this Court, (b) the honoring of any prepetition checks, drafts, wires, or ACH Payments in a good faith belief or upon a representation by the Debtors that this Court has authorized such prepetition check, draft, wire, or ACH Payment or (c) an innocent mistake made despite implementation of reasonable handling procedures.

6.      The Banks are authorized to charge and the Debtors are authorized to pay or honor both prepetition and postpetition service and other fees, costs, charges, and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with Debtors.  The Debtors shall reimburse the Banks for any claim arising before or after the Petition Date in connection with any returned items to the Bank Accounts in the normal course of business.  Further, the Banks are authorized to "charge back" to the Debtors' accounts any amounts incurred by the Bank resulting from returned checks or other returned items.

7.      The Debtors are authorized to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided, however*, that the Debtors will (i) provide notice to the U.S. Trustee, the agent for the Debtors' prepetition secured credit facility (the "***Prepetition Agent***"), the ad hoc group of holders of certain first lien claims, and any official committee appointed in these chapter 11 cases of the opening and closing of any bank accounts by the Debtors and (ii) obtain the prior written consent

4

of the Prepetition Agent and the ad hoc group of holders of certain first lien claims to all requests to close any bank account or open any new bank account maintained by the Debtors (other than the Adequate Assurance Deposit, as defined in the *Debtors' Motion for Entry of Order Determining Adequate Assurance of Payment for Future Utility Services*), such consent not to be unreasonably withheld; *provided*, *further*, that any new bank accounts opened by the Debtors shall be opened and maintained with Authorized Depositories.

8.      The Debtors are authorized to direct the Banks, and the Banks are authorized to pay obligations in accordance with this or any separate order of this Court; *provided*, *however*, that the Banks have no duty to inquire as to whether such payments are authorized by an order of this Court, and each Bank has no duty to make payments in respect thereto unless the Debtors have good funds standing to their credit with such Bank.

9.      Any payment from a Bank Account at the request of the Debtors made by any of the Banks prior to the Petition Date (including any ACH Payment such Bank is or becomes obligated to settle), or any instruments issued by any of the Banks on behalf of any Debtor pursuant to a "midnight deadline" or otherwise, shall be deemed to be paid prepetition, whether or not actually debited from such Bank Account prepetition.

10.     Any and all accounts opened by the Debtors on or after the Petition Date at any bank shall be subject to the rights and obligations of this Order as "Bank Accounts."

11.     Nothing contained herein shall prevent the Banks from modifying or terminating any Bank Accounts or related services in accordance with the agreements governing such accounts or services.

12.     Except as otherwise provided in this Order or in a separate order of this Court, all Banks provided with notice of this Order maintaining any of the Bank Accounts shall not honor

5

or pay any bank payments drawn on the listed Bank Accounts or otherwise issued before the Petition Date.

13.     The Debtors are authorized, to the extent permitted under the Cash Collateral Order, to continue investing excess funds not needed for the Debtors' operations in the Investments in accordance with the Investment Practices.

14.     As soon as practicable after entry of this Order, the Debtors shall serve a copy of this Order on each Bank and financial institution at which the Bank Accounts are maintained.

15.     The Debtors are authorized, to the extent permitted under the Cash Collateral Order, to continue performing Intercompany Transactions in the ordinary course of business.  All Intercompany Claims arising after the Petition Date shall be accorded superpriority administrative expense status in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code, provided that (a) the First Lien Secured Parties (as defined in the Cash Collateral Order) shall continue to have liens on such Intercompany Claims and (b) such Intercompany Claims shall be junior to all claims of the First Lien Secured Parties, including but not limited to any 507(b) administrative claim granted under the Cash Collateral Order (in the case of (a) and (b), as provided by and subject in all respects to the terms of the Cash Collateral Order).   The Debtors shall (a) continue to track Intercompany Transactions electronically through their accounting system in accordance with their prepetition practices and (b) provide reasonable access to such records and procedures to the Prepetition Agent, the ad hoc group of holders of certain first lien claims, and any official committee appointed in these chapter 11 cases.

16.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17.    Notwithstanding the relief granted herein and any actions taken hereunder, nothing contained in this Order or any payment made pursuant to this Order shall constitute, nor is it intended to constitute, an admission as to the validity or priority of any claim against the Debtors, a waiver of the Debtors' rights to subsequently dispute such claim or the assumption, reaffirmation, or adoption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

18.    Notwithstanding anything to the contrary contained herein, any payment to be made, or authorization contained hereunder, shall be subject to the requirements imposed on the Debtors under the Cash Collateral Order.

19.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such motion and the requirements of the E.D.N.Y. Local Bankruptcy Rules are satisfied by such notice.

20.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

21.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

22.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**Exhibit C**

**List of Bank Accounts**

| Bank Name | Address of Account | Account Holder | Account Description | Account # |
|---|---|---|---|---|
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | Cengage Learning Acquisitions, Inc. | Acquisitions Top Concentration Account | x0735 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | Cengage Learning, Inc. | Cengage Operating Concentration Account | x5528 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | Cengage Learning, Inc. | Cengage Depository Account | x9010 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | Cengage Learning, Inc. | Cengage Disbursement Account | x8919 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | Cengage Learning, Inc. | Cengage Payroll Account | x8927 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | Cengage Learning, Inc. | Cengage Taxes & Benefits Account | x9988 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | The Gale Group Inc. | Gale Operating Concentration Account | x0000 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | The Gale Group Inc. | Gale Depository Account | x8870 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | The Gale Group Inc. | Gale Depository Account | x9209 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | The Gale Group Inc. | Gale Depository Account | x5303 |

| Bank Name | Address of Account | Account Holder | Account Description | Account # |
|---|---|---|---|---|
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | The Gale Group Inc. | Gale Disbursement Account | x8442 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | The Gale Group Inc. | Gale Payroll Account | x8699 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | The Gale Group Inc. | Gale Taxes & Benefits Account | x9556 |
| BMO Harris Bank, N.A. | 111 W. Monroe St. Chicago, IL 60603 | The Gale Group Inc. | Gale Credit Card Depository Account | x5992 |
| JP Morgan Chase, N.A. | 5801 E. Taft Rd. Syracuse, NY 13212 | Cengage Learning, Inc. | Cengage Medical Benefits Account | x8454 |
| JP Morgan Chase, N.A. | P.O. Box 659754 San Antonio, TX 78265 | Gale Holdings I Inc. | Gale Credit Card Depository Account | x9152 |
| Fifth Third Bancorp | P.O. Box 630900 Cincinnati, OH 45263 | Cengage Learning, Inc. | Cengage Local Account | x0557 |
| Fifth Third Bancorp | P.O. Box 630900 Cincinnati, OH 45263 | Cengage Learning, Inc. | Cengage Local Account | x8152 |
| Bank of America, N.A. | P.O. Box 25118 Tampa, FL 33622 | Cengage Learning, Inc. | Cengage Local Account | x5797 |
| Bank of America, N.A. | P.O. Box 27025 Richmond, VA 23261 | The Hampton Brown Company LLC | Hampton Brown Depository Account | x6046 |
| Bank of America, N.A. | P.O. Box 27025 Richmond, VA 23261 | The Hampton Brown Company LLC | Hampton Brown Disbursement Account | x5995 |
| Bank of America, N.A. | P.O. Box 27025 Richmond, VA 23261 | The Hampton Brown Company LLC | Hampton Brown Credit Card Depository Account | x1304 |

| Bank Name | Address of Account | Account Holder | Account Description | Account # |
|---|---|---|---|---|
| Royal Bank of Canada | P.O. Box 4047 Terminal Toronto, ON M5W 1L5 | The Gale Group Inc. | Gale Canadian Dollar Disbursement Account | x1566 |
| National Westminster Bank plc | 15 Bishopsgate London, UK EC2N 3NW | The Gale Group Inc. | Gale Pound Disbursement Account | x0141 |
| JP Morgan Chase Bank, N.A. | P.O. Box 659754 San Antonio, TX 78265 | JPMorgan (as escrow agent) | CompuTaught Sale Escrow Account | x1992 |
| JP Morgan Chase Bank, N.A. | P.O. Box 659754 San Antonio, TX 78265 | JPMorgan (as escrow agent) | Net Learning Sale Escrow Account | x7718 |

# Exhibit D

## Cash Flow Diagram

* The Gale Group Inc. and Gale Holdings I Inc. were merged into Cengage Learning, Inc. and Cengage Learning Acquisitions, Inc., respectively, on February 28, 2013. As reflected above, some of the Debtors' bank accounts are still maintained in the name of these entities.

