Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-44106 (ESS) |
| | ) | Case No. 13-44107 (ESS) |
| | ) | Case No. 13-44105 (ESS) |
| | ) | Case No. 13-44108 (ESS) |
| Debtors. | ) | (Jointly Administered) |

**DECLARATION OF DEAN D. DURBIN,
CHIEF FINANCIAL OFFICER, IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS AUTHORIZING, BUT NOT DIRECTING, PAYMENTS OF PREPETITION (I) WAGES, SALARIES, AND OTHER COMPENSATION; (II) REIMBURSABLE EMPLOYEE EXPENSES; AND (III) EMPLOYEE MEDICAL AND SIMILAR BENEFITS**

Pursuant to 28 U.S.C. § 1746, I, Dean D. Durbin, hereby submit this declaration (the "***Severance Declaration***") under penalty of perjury:

1. I am Chief Financial Officer of Cengage Learning GP I LLC, a limited liability company organized under the laws of the State of Delaware and parent company of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***"). I have served in this role since July 2009. In my capacity as Chief Financial Officer, I am intimately familiar with the Debtors' businesses and their financial affairs as well as with certain key aspects of the Debtors' day-to-day operations.

2. I am authorized to execute this Declaration on behalf of the Debtors in support of the *Debtors' Motion for Entry of Interim and Final Orders Authorizing but Not Directing, Payments of Prepetition (I) Wages, Salaries, and Other Compensation; (II) Reimbursable Employee Expenses; and (III) Employee Medical and Similar Benefits* (the "***Motion***"),[1] to seek approval of the continuation of the Debtors' prepetition severance practices and to make certain prepetition payments related thereto.

3. This Declaration addresses, in three separate sections, (a) the severance program for which Debtors seek approval, (b) the Debtors' business justifications for continuing the severance program and making certain payments related thereto, and (c) a summary of the Eligible Employees (as defined herein) receiving prepetition payments pursuant to the severance program.

**I. The Debtors' Severance Practices**

4. The Debtors maintain a generally applicable policy of offering severance payments to all regular part-time and full-time employees (the "***Eligible Employees***") who have been involuntarily terminated in connection with a business decision or other restructuring initiative (the "***Severance Practices***"). The Debtors do not have a formal severance policy.

[1] All capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

Instead, according to established practice, severance is paid as salary continuation. Severance payments are based on an Eligible Employee's level of seniority and length of service.[2] Specifically, the Debtors offer Eligible Employees the following severance payments:

| **Employee Level** | **Annual Service Increase** | **Minimum Payout** | **Maximum Payout** |
|---|---|---|---|
| Basic | 2 weeks per full year of service | 6 weeks | 52 weeks |
| Manager Level | 2 weeks per full year of service | 13 weeks | 52 weeks |
| Director Level | 2 weeks per full year of service | 26 weeks | 52 weeks |
| Vice President or Above | 2 weeks per full year of service | 39 weeks | 52 weeks |
| Executive Committee | N/A | 52 weeks | 52 weeks |

5. The Debtors also continue certain policies under the Health Benefits Plan and the Flexible Spending Plan at the active employee rate until the end of the month of the applicable severance period, or until the Debtors are notified that alternative coverage has been secured. Following termination of the severance period, Eligible Employees and their enrolled dependents have the right to continue (as required by applicable law) participation in these plans pursuant to the Consolidated Omnibus Budget Reconciliation Act of 1985 ("***COBRA***") for approximately eighteen months following termination of employment.

6. As of the Petition Date, the Debtors employed approximately 5,200 employees worldwide. In the months leading up to the Petition Date, the Debtors implemented various reductions in force, resulting in approximately 170 Eligible Employees (approximately 3% of the Debtors' employees) being severed from the Debtors' employ. As a result, the Debtors incurred

---

[2] In addition to the severance payments made pursuant to the Debtors' regular payroll schedule, pursuant to their Severance Practices the Debtors continue to honor any Sales Commissions and payments under the Sales Incentives Plans earned prior to any Eligible Employee's termination date. As of the Petition Date, $710,000 of the $30.6 million in Unpaid Sales Incentive Plans is estimated to be related to 27 Eligible Employees that were severed prior to the Petition Date, and $1,600 of the $250,000 in Unpaid Sales Commissions is estimated to be related to 5 Eligible Employees that were severed prior to the Petition Date.

approximately $9.7 million in prepetition severance obligations, approximately $6.8 million of which remained outstanding as of the Petition Date.[3]

## II. Continuing the Severance Practices and Paying Prepetition Amounts Related Thereto is in the Best Interests of the Debtors

7. I firmly believe that the payment of prepetition amounts owed pursuant to the Severance Practices and the continuation of the Severance Practices on a postpetition basis is in the best interests of the Debtors' estates and the interests of all stakeholders in these chapter 11 cases. The commencement of these chapter 11 cases, unsurprisingly, has caused uncertainty and concern among certain employees as to whether the company will have positions for all of its employees going forward. Moreover, as stated previously, in an effort to realize cost savings and improve financial performance in the period leading up to the chapter 11 cases, the Debtors implemented various reductions in force. In my opinion, these events have increased uncertainty and concern among certain of the Debtors' employees.

8. In light of this volatile transition period during these chapter 11 cases and the fact that we are in a critical time period for revenue generation in the Debtors' fiscal year, I believe that the payment of prepetition amounts relating to the Severance Practices and the continuation of the Severance Practices on a postpetition basis are critical to maintaining Employee morale and loyalty. I believe that the employees' support for the Debtors' reorganization efforts is critical to the success of the current bankruptcy proceedings and operation of the Debtors' businesses. Moreover, the Debtors operate in a highly competitive market where employees easily can seek alternative employment. I believe that increased instability in the Debtors'

[3] The Unpaid Prepetition Severance initially included in the Motion was estimated at $7.3 million. This obligation has been updated to reflect the Debtors most recent calculation of Unpaid Prepetition Severance based on updated data and discontinuation of severance payments to certain employees that have since found other positions within the Debtors.

workforce will undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. In my opinion, permitting the Debtors to pay the prepetition amounts related to the Severance Practices and continue the Severance Practices in the ordinary course of business will help minimize the adverse effects of the commencement of the chapter 11 cases on their ongoing business operations.

9. Moreover, honoring the prepetition severance obligations and continuing the Severance Practices on a postpetition basis provide additional tangible benefits. For example, as a condition to receiving a severance payment, each Eligible Employee must execute a release agreement, whereby the employee releases any claims held against the Debtors and agrees, among other things, not to disclose confidential information, solicit the Debtors' employees for a certain period of time, or disparage the Debtors. I believe that the Severance Practices will help reduce the time and expense to defend claims asserted by former employees that could arise in the absence of a severance program.

10. Accordingly, I firmly believe that continuing the Severance Practices and paying prepetition amounts related thereto is a sound exercise of the Debtors' business judgment and that approval of the Severance Practices is in the best interests of the Debtors' stakeholders because it will ensure workforce stability and employee morale as well as provide the tangible benefits described above.

## III. The Eligible Employees Receiving Payments Pursuant to the Severance Practices

### A. The Non-Insider Eligible Employees

11. It is my understanding that none of the Eligible Employees owed amounts under the Severance Practices that the Debtors seek to honor are Insiders. The majority of the Eligible Employees severed prior to the Petition Date were "rank and file" employees that were part of

the Debtors' sales force team, including sales representatives, regional, district, and program managers, account managers, product managers, and operational support specialists. Some of the Eligible Employees' business titles include terms such as "Executive Vice President," "Senior Vice President," "Vice President," and "Director." However, as discussed in more detail below, I do not believe that, based on these employees' roles and responsibilities, such employees are Insiders as I understand that term is used under the Bankruptcy Code. The Debtors do not seek to make any prepetition severance payments to any Insider, and will seek further Court approval before making any postpetition severance payments to any Insider.

**i. The Eligible Employees Receiving Payments Pursuant to the Severance Practices were Not Directors of the Debtors**

12. It is my understanding that the term "director" generally means an individual who sits on the board of directors of a corporation or holds the legal rights that a typical corporate director would hold. None of the Eligible Employees receiving payments pursuant to the Severance Practices that the Debtors seek to honor sat on the Debtors' Board of Directors. Moreover, these Eligible Employees did not partake in Board meetings, implement corporate policy, or engage in corporate governance. Instead, they were generally "rank and file" sales employees that implemented the Debtors' sales initiatives set out by the Debtors' management team. Moreover, while some of the severed employees may have held the title "Director," these employees did not have decision-making authority akin to an executive, and were required to follow top-down direction from their superiors. Because the Eligible Employees receiving payments pursuant to the Severance Practices that the Debtors seek to honor were not members of the Board and did not hold any legal rights akin to a corporate director, I do not believe that the Eligible Employees were directors as such term is used with respect to the term Insider.

**ii. The Eligible Employees Receiving Payments Pursuant to the Severance Practices were Not Officers of the Debtors**

13. It is my further understanding that the term "officer" generally means a person elected or appointed by the board of directors to manage the daily operations of a corporation. None of the Eligible Employees receiving payments pursuant to the Severance Practices that the Debtors seek to honor were elected by the Debtors' Board of Directors. Additionally, as described in greater detail above, none of these Eligible Employees managed the daily operations of the Debtors' businesses, and all of these Eligible Employees were required to follow directives from management personnel. Additionally, I do not believe that those employees that held more senior positions, such as Executive Vice Presidents, Senior Vice Presidents, and Vice Presidents were akin to an officer as they did not have the ability to manage the daily operations of the corporation. While each of these respective employees did have more responsibility than "rank and file" employees in their respective divisions, they were not in charge of managing, nor did they consult with the executive management team, in the daily operations of the overall corporation. As such, I do not believe that the Eligible Employees were officers of the Debtors.

**iii. The Eligible Employees Receiving Payments Pursuant to the Severance Practices were Not Persons in Control of the Debtors**

14. Lastly, the Eligible Employees receiving payments pursuant to the Severance Practices that the Debtors seek to honor were not "persons in control" of the Debtors. Specifically, these Eligible Employees did not have sufficient authority over the Debtors so as to unqualifiably dictate corporate policy and the disposition of corporate assets. Except with respect to certain of the Executive Vice Presidents, none of these Eligible Employees held any discretionary control over budgetary amounts, nor did they oversee the Debtors' strategic plan or determine the disposition of corporate funds with respect to strategic investing or financing

activities. The Executive Vice Presidents were given limited discretionary control over corporate assets for their respective divisions subject to a budget, which was required to first be approved by the Debtors' Chief Financial Officer and then the Debtors' Board. Once approved, the Executive Vice Presidents had discretion to dispose of such funds within the approved budget. However, further approval from the Chief Financial Officer and Board was required to dispose of funds outside of the approved budget. Moreover, the Executive Vice Presidents did not oversee the Debtors' strategic plan or determine the disposition of corporate funds with respect to strategic investing or financing activities. Lastly, the Eligible Employees, including the Executive Vice Presidents, the Senior Vice Presidents and the Vice Presidents, did not report to the Board or the Debtors' Chief Executive Officer, nor were they granted significant decision-making authority akin to an executive. Indeed, each of the Executive Vice Presidents, the Senior Vice Presidents, and the Vice Presidents were at least two levels removed from reporting to the Board or the Debtors' Chief Executive Officer, and in the case of the remaining Eligible Employees, up to seven levels removed from the Board or the Debtors' Chief Executive Officer. These Eligible Employees are largely mid-ranking employees in charge of specific sales aspects of the Debtors' businesses. As a result, I do not believe that the Eligible Employees are persons in control of the Debtors, and therefore are not Insiders of the Debtors.

**Conclusion**

15. As set forth above, I believe that the continuation of the Severance Practices on a postpetition basis and payment of prepetition amounts relating thereto will serve to improve focus and morale, and engender continuing loyalty, among the employees. I therefore believe that it is in the best interests of the Debtors and their estates to continue the Severance Practices

and pay prepetition amounts related thereto as it will motivate the Debtors current employees to maximize the value of the estates by enhancing financial and operating results.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Brooklyn, New York
Dated: July 23, 2013

*/s/ Dean D. Durbin*
Dean D. Durbin
Chief Financial Officer
Cengage Learning GP I LLC