**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| In re: | Chapter 11 |
| CENGAGE LEARNING, INC., *et al.*, | Case No. 13-44106 (ESS) |
| | Case No. 13-44105 (ESS) |
| | Case No. 13-44107 (ESS) |
| | Case No. 13-44108 (ESS) |
| Debtors. | (Jointly Administered) |

_____

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN**
**OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**
_____

---

### <u>Important Dates</u>

- Date by which Ballots must be received by the Balloting Agent: [November 1], 2013
- Date by which objections to the Plan must be filed and served: [November 1], 2013

---

Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

# TABLE OF CONTENTS

Page

I.    EXECUTIVE SUMMARY ......................................................................................................1

II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ..................................8

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN ...........................................................................................................................10

        A.    What is chapter 11?.............................................................................................10

        B.    Why are the Debtors sending me this Disclosure Statement?............................10

        C.    Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is
               consummated?....................................................................................................11

        D.    What happens to my recovery if the Plan is not confirmed, or does not go effective? ..................13

        E.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
               Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective
               Date" and "Consummation?"................................................................................13

        F.    Will the Debtors have sufficient cash and/or other consideration to fund the distributions
               required under the Plan? ....................................................................................13

        G.    Will the Reorganized Debtors be obligated to continue to pay statutory fees after the
               Effective Date?...................................................................................................13

        H.    When will the Plan Supplement be filed and what will it include?....................13

        I.    What are the terms of the Exit Revolver Facility and the New Debt Facility? ..............14

        J.    Are there risks to owning an Interest in Reorganized Cengage upon emergence from
               chapter 11?.........................................................................................................14

        K.    Is there potential litigation related to the Plan?.................................................14

        L.    What is the Management Incentive Plan and how will it affect the distribution I receive
               under the Plan?...................................................................................................15

        M.    Will there be releases granted to parties in interest as part of the Plan? .........................15

        N.    What is the deadline to vote on the Plan? ..........................................................15

        O.    How do I vote for or against the Plan?................................................................15

        P.    Why is the Bankruptcy Court holding a Confirmation Hearing?.......................16

        Q.    When is the Confirmation Hearing set to occur? ...............................................17

        R.    What is the purpose of the Confirmation Hearing?............................................17

        S.    What is the effect of the Plan on the Debtors' ongoing business? .....................17

        T.    Does Cengage recommend voting in favor of the Plan? ....................................17

IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, BUSINESS OVERVIEW, AND
        OTHER BACKGROUND ........................................................................................................17

        A.    The Debtors' Corporate History and Capital Structure......................................17

        B.    Summary of Prepetition Capital Structure .........................................................18

               (i)    The First Lien Credit Facility ................................................................19

|  | (ii) | First Lien Notes | 19 |
|  | (iii) | First Lien Swap Confirmations | 20 |
|  | (iv) | Second Lien Notes | 20 |
|  | (v) | Unsecured Notes | 20 |
| C. | Overview of the Debtors' Business and Operations | | 20 |
|  | (i) | Domestic | 21 |
|  | (ii) | International | 22 |
|  | (iii) | Joint Ventures | 22 |
| D. | Discussion of Disputed Assets | | 23 |
|  | (i) | Disputed Cash | 23 |
|  | (ii) | Equity Interests in Foreign Subsidiaries | 24 |
|  | (iii) | Equity Interests in Hampton Brown and CourseSmart | 24 |
|  | (iv) | Copyright Assets | 24 |
| E. | Intercreditor Agreements | | 25 |
| F. | APAX Issues | | 25 |
|  | (i) | Investigation of Prepetition Debt Purchases | 25 |
|  | (ii) | 2007 Leveraged Buyout ("LBO") | 26 |
| G. | Intercompany Obligations | | 26 |
| H. | Common Stock | | 27 |

**V.** **EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES** ... **27**

| A. | Fundamental Changes in the Educational Publishing Industry and Their Effect on the Debtors | 27 |
| B. | Strategic Responses and Prepetition Restructuring Efforts | 28 |
| C. | Negotiations with Stakeholders and the Execution of the Restructuring Support Agreement | 29 |

**VI.** **EVENTS DURING THE CHAPTER 11 CASES** ... **29**

| A. | Overview of Chapter 11 | | 29 |
| B. | First Day Pleadings and Other Case Matters | | 30 |
|  | (i) | First and Second Day Pleadings | 30 |
|  | (ii) | Procedural and Administrative Motions | 31 |
|  | (iii) | Retention of Chapter 11 Professionals | 31 |
|  | (iv) | Cash to Fund Operations | 31 |
|  | (v) | Appointment of the Creditors' Committee Members and Advisors for Such Committee | 32 |
| C. | Creditors' Committee Motion to Terminate Apax Investigation | | 32 |
| D. | Creditors' Committee Discovery Requests | | 32 |
| E. | Exclusivity | | 33 |
| F. | Pending Litigation Proceedings and the Automatic Stay | | 33 |
| G. | Directors and Officers of Reorganized Cengage and the Other Reorganized Debtors | | 34 |
|  | (i) | The New Board | 34 |
|  | (ii) | Senior Management and Management Employment Agreements | 34 |
|  | (iii) | Management Incentive Plan | 34 |

H.      Claims Bar Date ............................................................................................34

I.      NOL Motion...................................................................................................34

**VII.    PROJECTED FINANCIAL INFORMATION**...............................................................**35**

**VIII.   VALUATION OF THE DEBTORS**...........................................................................................**35**

**IX.     RISK FACTORS**..................................................................................................................**35**

A.      Risks Relating to Bankruptcy.......................................................................35

(i)     The Debtors may be subject to protracted litigation regarding the Disputed
        Assets and other issues. .........................................................................35

(ii)    Parties in interest may object to the Plan's classification of claims and interests............35

(iii)   The Debtors may fail to satisfy vote requirements. .................................35

(iv)    Failure to confirm the Plan within the Milestones contained in the RSA may
        give rise to Termination of the RSA. ....................................................36

(v)     The Debtors may not be able to obtain Confirmation of the Plan...................36

(vi)    The Debtors may be unable to obtain consensual Confirmation. ...................36

(vii)   The Debtors may object to the amount or classification of a Claim. ..............36

(viii)  Risk of non-occurrence of the Effective Date.........................................37

(ix)    Contingencies could affect votes of impaired classes to accept or reject the Plan............37

(x)     The Debtors may not be able to achieve their projected financial results......................37

(xi)    Certain tax implications of the Debtors' chapter 11 cases................................37

(xii)   The Debtors' emergence from chapter 11 is not assured.................................37

B.      Risks Related to the Debtors' and Reorganized Debtors' Business........................37

(i)     Operational-Related Risks Due to the Pending Chapter 11 Cases...................38

(ii)    General Business and Financial Risk Factors .............................................38

C.      Risks Associated with Forward Looking Statements .........................................41

(i)     Financial information is based on the Debtors' books and records and, unless
        otherwise stated, no audit was performed.................................................41

(ii)    Financial projections and other forward looking statements are not assured, are
        subject to inherent uncertainty due to the numerous assumptions upon which
        they are based and, as a result, actual results may vary. ...............................41

D.      Disclosure Statement Disclaimer ......................................................................41

(i)     The information contained herein is for soliciting votes. .............................41

(ii)    This Disclosure Statement was not approved by the United States Securities and
        Exchange Commission. ...........................................................................41

(iii)   Reliance on exemptions from registration under the Bankruptcy Code or
        Securities Act.......................................................................................41

(iv)    No legal or tax advice is provided to you by this Disclosure Statement.................42

(v)     No admissions have been made by this Disclosure Statement...............................42

(vi)    The failure to identify litigation claims or projected objection should not be
        relied upon. ...........................................................................................42

(vii)   No waiver of right to object or right to recover transfers and assets....................42

(viii)  Information was provided by the Debtors and was relied upon by the Debtors'
        advisors. ................................................................................................43

(ix)    Potential exists for inaccuracies, and the Debtors have no duty to update. ...............43

(x)     No representations outside this Disclosure Statement are authorized..........................43

(xi)    Liquidation under Chapter 7 of the Bankruptcy Code.....................................43

**X.      RELEASE, INJUNCTIVE AND RELATED PROVISIONS** ................................................ 43

    A.      Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies ................................................................ 43

    B.      Subordinated Claims ............................................................................................ 44

    C.      Releases by the Debtors ....................................................................................... 44

    D.      Third-Party Releases ............................................................................................ 45

    E.      Exculpation .......................................................................................................... 45

    F.      Injunction ............................................................................................................. 46

    G.      Setoffs .................................................................................................................. 46

    H.      Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications ............................................................................................ 46

**XI.     SOLICITATION AND VOTING PROCEDURES** ...................................................... 46

**XII.    CONFIRMATION OF THE PLAN** .............................................................................. 47

    A.      Requirements for Confirmation of the Plan ......................................................... 47

    B.      Best Interests of Creditors/Liquidation Analysis ................................................ 47

    C.      Feasibility ............................................................................................................ 47

    D.      Acceptance by Impaired Classes ......................................................................... 47

    E.      Confirmation Without Acceptance by All Impaired Classes ............................... 48

        (i)      No Unfair Discrimination ....................................................................... 48
        (ii)     Fair and Equitable Test ........................................................................... 48

    F.      Valuation of the Debtors ...................................................................................... 48

**XIII.   CERTAIN SECURITIES LAW MATTERS** ............................................................... 48

    A.      Plan Securities ..................................................................................................... 48

    B.      Issuance and Resale of New Equity of the Reorganized Debtors under the Plan ......... 49

        (i)      Offer and Sale of New Equity: Bankruptcy Code Exemption .......................... 49
        (ii)     Subsequent Transfers of New Equity ..................................................... 49
        (iii)    No Registration or Listing of New Equity .............................................. 50

**XIV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ..................................................................................................................... 50

    A.      Introduction .......................................................................................................... 50

    B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors ............................................................................................. 51

        (i)      Cancellation of Debt and Reduction of Tax Attributes .................................... 52
        (ii)     Limitation of NOL Carryforwards and Other Tax Attributes .......................... 52
        (iii)    Alternative Minimum Tax ....................................................................... 53

    C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims .................................................................................................................. 54

        (i)      Consequences to Holders of Allowed First Lien Claims (Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29 and Class 30) ................................ 54

         (ii)      Consequences to Holders of Allowed Second Lien Claims (Class 5, Class 14, Class 23, Class 31)..................................................................................................58

         (iii)     Consequences to Holders of Allowed Senior Notes Claims (Class 6, Class 15, Class 24, Class 32)..................................................................................................59

         (iv)     Consequences to Holders of Allowed General Unsecured Claims Against CLAI (Class 26)..............................................................................................................60

         (v)      Consequences to Holders of Allowed General Unsecured Claims Against CLI (Class 34)..............................................................................................................61

   D.      Limitations on Use of Capital Losses ...........................................................................63

   E.      Withholding and Reporting............................................................................................63

**XV.**     **RECOMMENDATION** ....................................................................................................**64**

EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Declaration of Dean D. Durbin, Chief Financial Officer of Cengage Learning GP I LLC, in Support of First Day Pleadings

EXHIBIT C    Disclosure Statement Order

EXHIBIT D    Financial Projections [TO COME]

EXHIBIT E    Valuation Analysis [TO COME]

EXHIBIT F    Liquidation Analysis [TO COME]

---

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

---

## I.    EXECUTIVE SUMMARY

Cengage Learning, Inc. ("***Cengage***") and certain of its affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the Plan dated August [16], 2013.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for each Debtor unless otherwise explained in the Plan itself.

As described in the first day declaration of Dean D. Durbin, the Debtors' Chief Financial Officer, to appropriately restructure, the Debtors are seeking to implement a new business plan that provides for developments and improvements to both the Debtors' operations and capital structure.  In light of the industry's transition from print media to digital content, the Debtors' comprehensive new business plan centers on combining the best of innovative and complementary digital and print products with expert product support to provide whole-course packaged products covering individual courses from every angle.  The Debtors are currently developing new digital platforms and have plans for further new digital development.  Additionally, the Debtors are using new sales strategies to target particular markets that present greater growth opportunities.  In order to attain the liquidity and flexibility needed to implement management's strategic vision, the Debtors must substantially deleverage their capital structure.  The Debtors believe the Plan provides the Debtors with the appropriate means to achieve their objectives.

Beginning in April 2013, the Debtors, the First Lien Credit Facility Administrative Agent, an ad hoc group of holders of the Debtors' First Lien Claims, other non-first lien creditors, and their respective advisors held multiple meetings to exchange information, facilitate diligence, answer questions, and discuss various restructuring issues.  After considerable arm's-length negotiations, the Debtors and holders of over $2 billion of First Lien Claims (the "***Consenting Holders***") reached an agreement on a restructuring support agreement outlining a restructuring process and post-reorganization capital structure that is designed to de-lever the Debtors' balance sheet and provide for an expedient emergence from chapter 11 .  The Debtors and the Consenting Holders memorialized their agreement by entering into a restructuring support agreement (the "***RSA***") and the three RSA Term Sheets: one regarding the principal terms of the Plan, one regarding the principal terms of the exit financing to be obtained, and/or entered into, in connection with the Plan, and one regarding the principal terms of certain post-reorganization governance and shareholders' rights.

The Plan will implement the restructuring transactions contemplated by the Restructuring Support Agreement and Restructuring Term Sheet.  As a result, over 50 percent (excluding the Debtors' Insiders) of the Debtors' largest secured and unsecured creditor constituency supports the Plan and the Debtors' expeditious emergence from chapter 11.  Among other things, the Plan contemplates the following:

- An approximate $4,300 million reduction of funded debt;

- A de-leveraged post-reorganization capital structure consisting of (i) a new first-out revolving credit facility of no less than $250 million and up to $400 million to be raised from third-parties on market terms and (ii) $1.5 billion first lien term loan facility (subject to the terms of the RSA);

- Holders of First Lien Secured Claims will receive their pro rata share of (1) 100% of the equity in the reorganized Debtors less any amount of New Equity that is part of the Unsecured CLAI Recovery or the Unsecured CLI Recovery (and subject to dilution on account of the Management Incentive Plan), (2) the New Debt Facility Consideration, and (3) the Excess Cash;

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

- Unsecured creditors (including the holders of first lien deficiency claims) (1) against CLAI will receive a distribution on account of that portion of the Disputed Cash determined by Final Order to be unencumbered and the CLA C.V. 35% Equity, which shall be in the form of either: (a) Cash and/or New Equity in an amount to be determined by the Bankruptcy Court, which will be distributed on the Effective Date or adequately reserved for pursuant to a Final Order of the Bankruptcy Court or (b) interests in a Trust established on the Effective Date holding (i) Cash and/or New Equity in an amount to be determined by the Bankruptcy Court or (ii) the CLA C.V. 35% Equity and Disputed Cash and (2) against CLI will receive a distribution on account of that portion of Disputed Copyrights determined by Final Order to be unencumbered and the Non-Wholly Owned Subsidiaries, which shall be in the form of either: (a) Cash and/or New Equity in an amount to be determined by the Bankruptcy Court, which will be distributed on the Effective Date or adequately reserved for pursuant to a Final Order of the Bankruptcy Court or (b) interests in a Trust established on the Effective Date holding (i) Cash and/or New Equity in an amount to be determined by the Bankruptcy Court or (ii) the Disputed Copyrights and the Non-Wholly Owned Subsidiaries, which distribution shall be made in accordance with a priority waterfall that shall take into account all applicable priority principles of the Bankruptcy Code and other applicable law, including but not limited to subordination provisions and provisions in intercreditor agreements;

- The terms of certain post-reorganization governance rights applicable to the holders of new equity (including rights to nominate directors);

- The cancellation of existing equity interests other than to the extent necessary to preserve the general corporate structure of the Debtors; and

- Certain other customary terms and provisions.

During the RSA negotiations, the Debtors and their advisors — together with their independent director, Rick Feintuch, a former partner at Wachtell, Lipton, Rosen & Katz with more than 20 years of restructuring experience — took extreme care to advance and protect the interest of unsecured creditors in these chapter 11 cases, including seeking to protect three primary sources of potential recoveries for unsecured creditors (such potential sources of recovery are subject to dispute by the Consenting Holders and the First Lien Agent and any recovery may be substantially diminished in the event that the Consenting Holders and the First Lien Agent prevail) and providing unsecured creditors with appropriate time to conduct diligence on, and discuss their conclusions regarding, among other things, the value of these sources of potential recoveries. Notably, disputes remain with respect to these potential sources of recovery, including their ultimate value. Accordingly, such sources of recovery may not yield meaningful distributions to unsecured creditors.

The Debtors intend to continue to negotiate with their other major stakeholders in the time leading up to the approval of this Disclosure Statement and in advance of any hearing to consider confirmation of the Plan. To that end, the Debtors have been in dialogue with the advisors for the Creditors' Committee as well as the advisors for the CSC Trust Company of Delaware as successor indenture trustee with respect to certain Second Lien Notes (the "**Second Lien Trustee**") and Centerbridge Partners, L.P. ("**Centerbridge**"), a holder of the Debtors' Senior Notes. The Debtors seek to foster dialogue with all parties in interest in order to be able to achieve a fully consensual Plan prior to the Confirmation Hearing. To the extent that the Debtors cannot reach full consensus, however, the Debtors believe that they already have the requisite creditor support necessary to confirm the Plan and intend to proceed on a path to confirmation of the Plan in an expeditious manner.

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[2]**

| SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | Holders of Allowed Other Priority Claims shall be paid in full in Cash on (i) the Effective Date or as soon as practicable thereafter, (ii) if after the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) such other date as may be ordered by the Bankruptcy Court. | 100% |
| 2 | Other Secured Claims | Holders of Allowed Other Secured Claims shall be paid in full in Cash on (i) the Effective Date or as soon as practicable thereafter, (ii) if after the Effective Date, the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) such other date as may be ordered by the Bankruptcy Court. | 100% |
| 3 | First Lien Secured Claims against CL Holdings | Holders of First Lien Secured Claims against CL Holdings shall be entitled to receive the assets of CL Holdings, if any, on account of such Claims. | [__]% |
| 4 | First Lien Deficiency Claims against CL Holdings | Holders of First Lien Deficiency Claims against CL Holdings shall not receive any distribution on account of such Claims, and First Lien Deficiency Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |

---

[2]  The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions. "Allowed" means with respect to Claims: (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided, that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time, as may be extended by the Bankruptcy Court from time to time, fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. "Allow" and "Allowing" shall have correlative meanings.

| 5 | Second Lien Claims against CL Holdings s | Holders of Second Lien Claims against CL Holdings shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date, provided that any distributions to Holders of Second Lien Claims against CL Holdings shall be subject to the turnover provisions of the Second Lien Intercreditor Agreement. | 0% |
|---|---|---|---|
| 6 | Senior Notes Claims against CL Holdings | Holders of Senior Notes Claims against CL Holdings shall not receive any distribution on account of such Claims, and Senior Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 7 | PIK Notes Claims against CL Holdings | Holders of PIK Notes Claims against CL Holdings shall not receive any distribution on account of such Claims, and PIK Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 8 | Subordinated Notes Claims against CL Holdings | Holders of Subordinated Notes Claims against CL Holdings shall not receive any distribution on account of such Claims, and Subordinated Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 9 | General Unsecured Claims against CL Holdings | Holders of General Unsecured Claims against CL Holdings shall not receive any distribution on account of such Claims, and General Unsecured Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 10 | Section 510(b) Claims | Holders of Section 510(b) Claims against CL Holdings shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 11 | CL Holdings Interests | Holders of CL Holdings Interests will not receive any distribution on account of such CL Holdings Interests, and CL Holdings Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect. | 0% |
| 12 | First Lien Secured Claims against CL Holdco | Holders of First Lien Secured Claims against CL Holdco are entitled to receive the assets of CL Holdco, if any, on account of such Claims. | [__]% |
| 13 | First Lien Deficiency Claims against CL Holdco | Holders of First Lien Deficiency Claims against CL Holdco shall not receive any distribution on account of such Claims, and First Lien Deficiency Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 14 | Second Lien Claims against CL Holdco | Holders of Second Lien Claims against CL Holdco shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date, provided that any distributions to Holders of Second Lien Claims against CL Holdco shall be subject to the turnover provisions of the Second Lien Intercreditor Agreement. | 0% |
| 15 | Senior Notices Claims against CL Holdco | Holders of Senior Notes Claims against CL Holdco shall not receive any distribution on account of such Claims, and Senior Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |

| 16 | PIK Notes Claims against CL Holdco | Holders of PIK Notes Claims against CL Holdco shall not receive any distribution on account of such Claims, and PIK Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
|---|---|---|---|
| 17 | Subordinated Notes Claims against CL Holdco | Holders of Subordinated Notes Claims against CL Holdco shall not receive any distribution on account of such Claims, and Subordinated Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 18 | General Unsecured Claims against CL Holdco | Holders of General Unsecured Claims against CL Holdco shall not receive any distribution on account of such Claims, and General Unsecured Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 19 | Section 510(b) Claims against CL Holdco | Holders of Section 510(b) Claims against CL Holdco shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 20 | CL Holdco Interests | To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CL Holdco Interests shall be reinstated on the Effective Date. | 100% |
| 21 | First Lien Secured Claims against CLAI | Except to the extent that a Holder of an Allowed First Lien Secured Claim against CLAI agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CLAI, each Holder of an Allowed First Lien Secured Claim against CLAI shall receive its Pro Rata share of (i) the First Lien Secured Claim Distribution, (ii) any amount of the Unsecured CLAI Recovery that is allocable to value that is determined to by Final Order to be subject to the non-avoidable Liens of the Holders of the First Lien Claims, and (iii) the distribution received by CLAI under the Plan, if any, on account of intercompany obligations owed by CLI to CLAI that were pledged under the First Lien Documents. Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Claims held by such Holder against CLAI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | [__]% |
| 22 | First Lien Deficiency Claims against CLAI | Except to the extent that a Holder of an Allowed First Lien Deficiency Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Deficiency Claims against CLAI, each Holder of an Allowed First Lien Deficiency Claim against CLAI shall receive on the Effective Date its Pro Rata share of the Unsecured CLAI Recovery. Distributions received under the Plan by Holders of Allowed First Lien Deficiency Claims on account of First Lien Note Claims held by such Holder against CLAI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | [__]% |

| 23 | Second Lien Claims against CLAI | Except to the extent that a Holder of an Allowed Second Lien Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Claim against CLAI, each Holder of an Allowed Second Lien Claim against CLAI shall receive on the Effective Date its Pro Rata share of the Unsecured CLAI Recovery that is not otherwise subject to the turnover provisions of the Second Lien Intercreditor Agreement. Any distribution subject to the turnover provisions of the Second Lien Intercreditor Agreement shall be distributed on a ratable basis directly to the Holders of Allowed First Lien Deficiency Claims in accordance with the terms and conditions of the Second Lien Intercreditor Agreement. Distributions received under the Plan by Holders of Allowed Second Lien Claims against CLAI shall be subject to the application of the Charging Lien of the Second Lien Indenture Trustee for payment of unpaid fees and costs of the Second Lien Indenture Trustee | [__]% |
| 24 | Senior Notes Claims against CLAI | Except to the extent that a Holder of an Allowed Senior Notes Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim against CLAI, each Holder of an Allowed Senior Notes Claim against CLAI shall receive on the Effective Date its Pro Rata share of the Unsecured CLAI Recovery. Distributions received under the Plan by Holders of Allowed Senior Notes Claims against CLAI shall be subject to the application of the Charging Lien of the Senior Notes Indenture Trustee for payment of unpaid fees and costs of the Senior Notes Indenture Trustee | [__]% |
| 25 | Subordinated Notes Claims against CLAI | After giving effect to the subordination and turnover provisions of the Subordinated Notes Indenture, the Pro Rata share of the Unsecured CLAI Recovery shall be distributed on a ratable basis directly to Holders of First Lien Deficiency Claims, Second Lien Claims, and Senior Notes Claims in accordance with the terms and conditions of the Subordinated Notes Indenture. | 0% |
| 26 | General Unsecured Claims against CLAI | Except to the extent that a Holder of an Allowed Class 26 General Unsecured Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed General Unsecured Claim against CLAI, each Holder of an Allowed General Unsecured Claim against CLAI shall receive on the Effective Date its Pro Rata share of the Unsecured CLAI Recovery. | [__]% |
| 27 | Section 510(b) Claims against CLAI | Holders of Section 510(b) Claims against CLAI shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CLAI shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 28 | CLAI Interests | To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CLAI Interests shall be reinstated on the Effective Date. | 100% |

| 29 | First Lien Secured Claims against CLI | Except to the extent that a Holder of an Allowed First Lien Secured Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CLI, each Holder of an Allowed First Lien Secured Claim against CLI shall receive its Pro Rata share of (i) the First Lien Secured Claim Distribution, (ii) any amount of the Unsecured CLI Recovery that is allocable to value that is determined to by Final Order to be subject to the non-avoidable Liens of the Holders of the First Lien Claims, and (iii) the distribution received by CLI under the Plan, if any, on account of intercompany obligations owed by CLAI to CLI that were pledged under the First Lien Documents.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Note Claims against CLI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | [__]% |
| 30 | First Lien Deficiency Claims against CLI | Except to the extent that a Holder of an Allowed First Lien Deficiency Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Deficiency Claim against CLI, each Holder of an Allowed First Lien Deficiency Claim against CLI on the Effective Date shall receive its Pro Rata share of the Unsecured CLI Recovery.  Distributions received under the Plan by Holders of Allowed First Lien Deficiency Claims on account of the First Lien Note Claims against CLI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | [__]% |
| 31 | Second Lien Claims against CL Holdings | Except to the extent that a Holder of an Allowed Second Lien Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Claim against CLI, each Holder of an Allowed Second Lien Claim against CLI shall receive on the Effective Date its Pro Rata of the Unsecured CLI Recovery; provided that, after giving effect to the provisions of the Second Lien Intercreditor Agreement, distributions of the Unsecured CLI Recovery on account of the Disputed Copyrights that otherwise would have been made to Holders of Second Lien Claims against CLI shall be distributed on a ratable basis directly to the Holders of Allowed First Lien Deficiency Claims in accordance with the terms and conditions of the Second Lien Intercreditor Agreement.  Distributions received under the Plan by Holders of Allowed Second Lien Claims against CLI shall be subject to the application of the Charging Lien of the Second Lien Indenture Trustee for payment of unpaid fees and costs of the Second Lien Indenture Trustee. | [__]% |

| 32 | Senior Notes Claims against CLI | Except to the extent that a Holder of an Allowed Senior Notes Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim against CLI, each Holder of an Allowed Senior Notes Claim against CLI shall receive on the Effective Date its Pro Rata share of the Unsecured CLI Recovery. Distributions received under the Plan by Holders of Allowed Senior Notes Claims against CLI shall be subject to the application of the Charging Lien of the Senior Notes Indenture Trustee for payment of unpaid fees and costs of the Senior Notes Indenture Trustee. | [__]% |
| 33 | Subordinated Notes Claims against CLI | After giving effect to the subordination and turnover provisions of the Subordinated Notes Indenture, the Pro Rata share of the Unsecured CLI Recovery that otherwise would have been distributed to each Holder of an Allowed Subordinated Notes Claim against CLI shall be distributed on a ratable basis directly to Holders of First Lien Deficiency Claims, Second Lien Claims, and Senior Notes Claims in accordance with the terms and conditions of the Subordinated Notes Indenture. | 0% |
| 34 | General Unsecured Claims against CLI | Except to the extent that a Holder of an Allowed Class 34 General Unsecured Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Class 34 General Unsecured Claim against CLI, each Holder of an Allowed Class 34 General Unsecured Claim against CLI shall receive on the Effective Date its Pro Rata share of the Unsecured CLI Recovery. | [__]% |
| 35 | Section 510(b) Claims against CLI | Holders of Section 510(b) Claims against CLI shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CLI shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0% |
| 36 | CLI Interests | To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CLI Interests shall be reinstated on the Effective Date. | 100% |

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the chapter 11 plan of reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court. The Debtors believe that the Plan is in the best interests of all creditors and urge all holders of claims entitled to vote to vote in favor of the Plan.

Unless the context requires otherwise, reference to "*we*," "*our*" and "*us*" are to the Debtors.

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "*SEC*") or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933 (as amended, the "*Securities Act*"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration, other than section 1145 of the Bankruptcy Court, apply such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;
- projected dividends;
- financing plans;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs;

- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing services;
- projected general market conditions;
- benefits from new technology; and
- effect of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There

are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- customer response to the Chapter 11 Cases;

- inability to have claims discharged/settled during the chapter 11 proceedings;

- the costs for fees and other expenses associated with the Chapter 11 Cases;

- general economic, business and market conditions;

- interest rate fluctuations;

- inability to obtain sufficient exit financing;

- exposure to litigation;

- the Debtors' ability to implement and execute their business plan and financial restructuring;

- the Debtors' ability to attract and retain talented authors and develop long-term, collaborative relationships with them;

- highly competitive market with significant established competitors;

- ability to recruit retain qualified, skilled employees;

- adverse effects on foreign business operations;

- exposure to risks relating to intellectual property rights; and

- the Debtors' ability to effectuate transactions with strategic alliance, acquisition, or co-production program candidates on commercially reasonable terms, or at all.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

**C.** **Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold. In general, a holder of a Claim or an Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the plan and (iii) the holder of such Claim or Interest will receive or retain property under the plan on account of such Claim or Interest.

In general, if a Claim or an Interest is Unimpaired under a plan of reorganization, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted such plan, and thus the holders of Claims in such Unimpaired Classes are not entitled to vote on such plan.

In general, if the holder of an Impaired Claim or Impaired Interest will not receive any distribution under a plan of reorganization in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the holder of such Claim or Interest to have rejected such plan, and thus the holders of Claims in such Classes are not entitled to vote on such plan.

A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in **Article III** of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "*Class*") and their respective voting statuses and anticipated recoveries are set forth below.

The following chart is a summary of the classification and treatment of Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation and meet the conditions to consummate the Plan.

| Class | Claim | Status | Voting Rights | Estimated Recovery |
|-------|-------|--------|---------------|-------------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept | 100% |
| 3 | First Lien Secured Claims against CL Holdings | Impaired | Entitled to Vote | [__]% |
| 4 | First Lien Deficiency Claims against CL Holdings | Impaired | Deemed to Reject | 0% |
| 5 | Second Lien Claims against CL Holdings | Impaired | Deemed to Reject | 0% |
| 6 | Senior Notes Claims against CL Holdings | Impaired | Deemed to Reject | 0% |
| 7 | PIK Notes Claims against CL Holdings | Impaired | Deemed to Reject | 0% |
| 8 | Subordinated Notes Claims against CL Holdings | Impaired | Deemed to Reject | 0% |
| 9 | General Unsecured Claims against CL Holdings | Impaired | Deemed to Reject | 0% |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject | 0% |
| 11 | CL Holdings Interests | Impaired | Deemed to Reject | 0% |
| 12 | First Lien Secured Claims against CL Holdco | Impaired | Entitled to Vote | [__]% |
| 13 | First Lien Deficiency Claims | Impaired | Deemed to Reject | 0% |

| Class | Claim | Status | Voting Rights | Estimated Recovery |
|-------|-------|--------|---------------|-------------------|
| | against CL Holdco | | | |
| 14 | Second Lien Claims against CL Holdco | Impaired | Deemed to Reject | 0% |
| 15 | Senior Notes Claims against CL Holdco | Impaired | Deemed to Reject | 0% |
| 16 | PIK Notes Claims against CL Holdco | Impaired | Deemed to Reject | 0% |
| 17 | Subordinated Notes Claims against CL Holdco | Impaired | Deemed to Reject | 0% |
| 18 | General Unsecured Claims against CL Holdco | Impaired | Deemed to Reject | 0% |
| 19 | Section 510(b) Claims against CL Holdco | Impaired | Deemed to Reject | 0% |
| 20 | CL Holdco Interests | Unimpaired | Presumed to Accept | 100% |
| 21 | First Lien Secured Claims against CLAI | Impaired | Entitled to Vote | [__] |
| 22 | First Lien Deficiency Claims against CLAI | Impaired | Entitled to Vote | [__] |
| 23 | Second Lien Claims against CLAI | Impaired | Entitled to Vote | [__] |
| 24 | Senior Notes Claims against CLAI | Impaired | Entitled to Vote | [__] |
| 25 | Subordinated Notes Claims against CLAI | Impaired | Deemed to Reject | 0% |
| 26 | General Unsecured Claims against CLAI | Impaired | Entitled to Vote | [__] |
| 27 | Section 510(b) Claims against CLAI | Impaired | Deemed to Reject | 0% |
| 28 | CLAI Interests | Unimpaired | Presumed to Accept | 100% |
| 29 | First Lien Secured Claims against CLI | Impaired | Entitled to Vote | [__] |
| 30 | First Lien Deficiency Claims against CLI | Impaired | Entitled to Vote | [__] |
| 31 | Second Lien Claims against CLI | Impaired | Entitled to Vote | [__] |
| 32 | Senior Notes Claims against CLI | Impaired | Entitled to Vote | [__] |
| 33 | Subordinated Notes Claims against CLI | Impaired | Deemed to Reject | 0% |
| 34 | General Unsecured Claims against CLI | Impaired | Entitled to Vote | [__] |

| Class | Claim | Status | Voting Rights | Estimated Recovery |
|-------|-------|--------|---------------|--------------------|
| 35 | Section 510(b) Claims against CLI | Impaired | Deemed to Reject | 0% |
| 36 | CLI Interests | Unimpaired | Presumed to Accept | 100% |

**D.    What happens to my recovery if the Plan is not confirmed, or does not go effective?**

In the event that the Plan is not confirmed, there is no assurance that the Debtors will be able to reorganize their businesses. For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis" beginning on page 47 and the Liquidation Analysis attached as **Exhibit F** to this Disclosure Statement.

**E.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. Initial distributions to Holders of Allowed Claims will only be made on the Effective Date as soon as practicable thereafter. *See* "Confirmation of the Plan," which begins on page 47, for a discussion of the conditions to consummation of the Plan.

**F.    Will the Debtors have sufficient cash and/or other consideration to fund the distributions required under the Plan?**

In order to fund distributions under the Plan, as of December 31, 2013 (the "***Assumed Effective Date***"), the Debtors project to have approximately $[__] million of cash on hand, net of all cash payments to be made pursuant to the Plan. The amount of cash actually on hand on the Effective Date, net of cash payments made pursuant to the Plan, could be different to the extent the Debtors' actual receipts and disbursements are different from the amounts set forth in the Projections. *See* Article [_] of this Disclosure Statement for additional information.

In addition, on the effective date, the Debtors will use commercially reasonable efforts to enter into a new first-out revolving credit agreement in the amount of $250 to $400 million pursuant to the Exit Revolver Facility Agreement (the "***Exit Revolver Facility***") and a new debt rollover facility or the new debt alternative facility, as applicable, (the "***New Debt Facility***") which may be used to, among other things, fund obligations under that Plan.

**G.    Will the Reorganized Debtors be obligated to continue to pay statutory fees after the Effective Date?**

Yes. On the Effective Date the Debtors will be required to pay in Cash any fees due and owing to the U.S. Trustee at the time of Confirmation. Additionally, on and after the Confirmation Date, the Reorganized Debtors must pay all statutory fees due and payable, under 28 U.S.C. § 1930(a)(6), plus accrued interest under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements inside and outside of the ordinary course of business until the entry of a final decree, dismissal or conversion of the cases to chapter 7. The Reorganized Debtors will also be required to comply with reporting requirements, such as filing quarterly post-Confirmation reports and schedule quarterly post-Confirmation status conferences until the entry of a final decree, dismissal or conversion of the cases to chapter 7.

**H.    When will the Plan Supplement be filed and what will it include?**

The Plan Supplement will be Filed 10 days prior to the Voting Deadline, or as soon as reasonably practicable thereafter but in no event later than five days prior to the Confirmation Hearing, including:  (a) the

identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the form of the Exit Revolver Facility Documents; (e) the form of the New Debt Facility Documents; (f) the applicable New Corporate Governance Documents; (g) a list of retained Causes of Action; (h) the management employment agreements, as amended; (i) the Management Incentive Plan; (j) the Trust Documents (if applicable); and (k) the Description of Transaction Steps. The detailed terms of the documents to be contained in the Plan Supplement have yet to be finalized and will continue to be negotiated by the Debtors between now and the filing of the Plan Supplement.

**I.        What are the terms of the Exit Revolver Facility and the New Debt Facility?**

The New Loans will consist of the Exit Revolver Facility and the New Debt Facility. The Exit Revolver Facility shall be a new revolving credit facility in an amount between $250 million and up to $400 million to be entered into by the Debtors pursuant to the Exit Revolver Facility Agreement, including any Exit Revolver Facility Documents, each of which shall be in form and substance acceptable to the Debtors, the Exit Revolver Facility Agent, the Exit Revolver Facility Arrangers, and the lenders and the Required Consenting Lenders and shall be on terms consistent with the Restructuring Support Agreement and RSA Term Sheets in all respects and otherwise acceptable to the Required Consenting Lenders.

The New Debt Facility shall be the New Debt Rollover Facility or the New Debt Alternative Facility, as applicable. The New Debt Alternative Facility means, collectively, all related agreements, documents, or instruments to be executed or delivered in connection with the New Debt Alternative Facility, the material terms of which shall be included as an exhibit to the Plan Supplement and shall be in form and substance consistent with the Restructuring Support Agreement and RSA Term Sheets, and in each case, the material terms of which shall be as set forth in an exhibit to the Plan Supplement. If the Reorganized Debtors do not enter into the New Debt Alternative Facility, the New Debt Facility shall be the New Debt Rollover Facility which is a term loan facility in the amount of $1,500 million to be entered into by the Reorganized Debtors as of and subject to the occurrence of the Effective Date in form and substance consistent with the Restructuring Support Agreement and RSA Term Sheets.

The Debtors are still in the process of marketing the New Debt Alternative Facility and, as a result, have yet to finalize many of the specific terms. The Debtors requests to potential lenders require that the New Debt Alternative Facility have an availability of $[1,750] million. Lazard has been leading the Debtors' search for the New Debt Alternative Facility. The Debtors will include the terms of the New Debt Alternative Facility or New Debt Rollover Facility, as applicable, in their Plan Supplement.

**J.        Are there risks to owning an Interest in Reorganized Cengage upon emergence from chapter 11?**

Yes. *See* "Risk Factors," which begins on page 35.

**K.        Is there potential litigation related to the Plan?**

Yes. In the event it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* "Risk Factors," Article IX — The Debtors may not be able to obtain Confirmation of the Plan."

Additionally, there is a risk of potential protracted litigation regarding the Disputed Assets, including, but not limited to, disputes regarding the value of the Disputed Assets and whether certain of the Disputed Assets are encumbered and therefore unavailable as a source of recovery for unsecured creditors. Parties-in-interest, namely the Creditors' Committee may seek to bring potentially time-consuming litigation regarding, among other things, the

Disputed Assets, and Apax related claims. Any such litigation could impact the recovery for unsecured creditors and may delay confirmation of the Plan.

The Debtors believe the Plan proposes a mechanism to deal with potential litigation in a manner that will not preclude confirmation of the Plan on the timeline set forth in the RSA, but the risk still remains that protracted litigation may significantly delay the path towards confirmation of the Plan and the Debtors' successful emergence from chapter 11.

**L.     What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

As soon as practicable after the Effective Date, the New Board of Reorganized Cengage shall adopt the Management Incentive Plan, which is attached as Exhibit A to the Plan; provided that any changes to such plan shall require the consent of the Debtors, the Debtors' management, and the Required Consenting Lenders.

**M.     Will there be releases granted to parties in interest as part of the Plan?**

Yes, see "Article X Release, Injunction and Related Provisions."

**N.     What is the deadline to vote on the Plan?**

[__] [a.m./p.m.] (prevailing Eastern Time) on [November 1], 2013.

**O.     How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a Holder of one or more Claims in the following Class, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided:

- **Class 3 (First Lien Secured Claims against CL Holdings)**

- **Class 12 (First Lien Secured Claims against CL Holdco)**

- **Class 21 (First Lien Secured Claims against CLAI)**

- **Class 22 (First Lien Deficiency Claims against CLAI)**

- **Class 23 (Second Lien Claims against CLAI)**

- **Class 24 (Senior Notes Claims against CLAI)**

- **Class 26 (General Unsecured Claims against CLAI)**

- **Class 29 (First Lien Secured Claims against CLI)**

- **Class 30 (First Lien Deficiency Claims against CLI)**

- **Class 31 (Second Lien Claims against CLI)**

- **Class 32 (Senior Notes Claims against CLI)**

- **Class 34 (General Unsecured Claims against CLI)**

The Debtors, [with the approval of the Bankruptcy Court], have engaged Donlin, Recano & Company, Inc. 419 Park Avenue South, New York, NY 10016, to serve as the voting agent for all Claims and generally oversee the voting process (the "*Notice, Claims, and Solicitation Agent*").  The Notice, Claims, and Solicitation Agent will process and tabulate ballots for Classes 3, 12, 21-24, 26, 29-32, and 34Claims.

The deadline to vote on the Plan is [___] [a.m./p.m.] (prevailing Eastern Time), on [November 1], 2013.

---

**BALLOTS**

Ballots and Master Ballots must be actually received by the Balloting Agent by the voting deadline of [____] [a.m./p.m.] (prevailing Eastern Time) on **[November 1], 2013** at the following address:

**Donlin, Recano & Company, Inc.**
**Voting and Claims Agent for Cengage Learning, Inc., et al**
**Attn: Cengage Learning, Inc. Ballot Processing**
**P.O. Box 899 Madison Square Station**
**New York, New York 10010**

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a master ballot before the voting deadline.

If you have any questions on the procedure for voting on the Plan, please call the Balloting Agent at the following telephone number:

**(800) 654-4131** (within the U.S.)

**(646) 378-4198** (outside the U.S.)

---

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed, signed and received by **[___] [a.m./p.m.] (prevailing Eastern Time), on [November 1], 2013**.

Any Ballot that is properly executed by a Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one Ballot per each Claim held.  By signing and returning a Ballot, each Holder of a Claim in Classes 3, 12, 21-24, 26, 29-32, and 34 will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other ballots have been cast with respect to such Claims, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes.  It is important to follow the specific instructions provided on each ballot.  For information regarding voting by Nominees, see "Solicitation and Voting Procedures" which begins on page 43.

**P.       Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and any party in interest may object to confirmation of the Plan.

**Q.      When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **[November 8], 2013 at [__] [a.m./p.m.] (prevailing Eastern Time).** The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [November 1], 2013 at [__] [a.m./p.m.] (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

[The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The New York Times* to provide notification to those persons who may not receive notice by mail.]

**R.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**S.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11.  As a result, Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business.  The Debtors will continue to operate their businesses going forward using cash from operations, which will be utilized to implement the Reorganized Debtors' business plan.

**T.      Does Cengage recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all creditors.  Any other alternative does not in any way realize or recognize the value inherent under the Plan.

**IV.      THE DEBTORS' CORPORATE HISTORY, STRUCTURE, BUSINESS OVERVIEW, AND OTHER BACKGROUND**

**A.      The Debtors' Corporate History and Capital Structure**

Prior to 2007, the Company's businesses were known as Thomson Learning and Thomson Nelson Learning, divisions of Thomson Corporation, and as The Gale Group Inc.  On July 5, 2007, investment funds associated with or designated by Apax Partners, L.P. (collectively, "*Apax*") acquired 97 percent of the Company's equity (the balance of the equity was purchased by Funds associated with or designated by OMERS Private Equity (collectively, "*OMERS*," and together with Apax, the "*Sponsors*") from Thomson Corporation and certain of its affiliates for $7.75 billion.  Shortly thereafter, the Company was rebranded as "Cengage Learning," a name chosen to reflect the Company's focus on being the "center of engagement" for students, researchers, instructors, and institutions across the globe.  The July 2007 purchase was funded in part with the proceeds of approximately $5.6 billion in new debt financing, with the remainder of the purchase price funded by equity contributions from the Sponsors.

A chart generally depicting the Debtors' prepetition organizational structure is provided below.



### B. Summary of Prepetition Capital Structure

As described in greater detail below, as of the Petition Date, the Debtors had outstanding funded debt in the aggregate principal and accrued interest amount of approximately $5,902.3 million, consisting of: (a) $3,880.7 million of obligations under the First Lien Credit Facility, including (i) $222.5 million outstanding under the Unextended Revolver, (ii) $293.2 million outstanding under the Extended Revolver, (iii) $1,522.7 million outstanding under the Unextended Term Loan, (iv) $549.5 million outstanding under the Incremental Term Loan; and (v) $1,292.8 million outstanding under the Extended Term Loan; (b) $742.6 million outstanding under the First Lien Notes; (c) $13.3 million outstanding under the First Lien Swaps; (d) $752.7 million outstanding under the Second Lien Notes; (e) $305.4 million outstanding under the Senior Notes; (f) $67.6 million outstanding under the PIK Notes; and (g) $140.0 million outstanding under the Subordinated Notes. The equity interests in Cengage Learning Holdings II, L.P., the direct or indirect owner of all of the Debtors' subsidiaries, are held almost entirely by the Sponsors, with the remainder owned by certain existing and former members of the Debtors' management. The Prepetition Debt Obligations are summarized in the chart below and are described in greater detail herein

| Debt Obligation | Approximate Amount as of Petition Date | Interest Rate | Maturity Date |
|---|---|---|---|
| **Secured Debt** | | | |
| Unextended Revolver | $222.5 million | LIBOR+2.75% | 7/5/13 |
| Extended Revolver | $293.2 million | LIBOR+4.50% | 4/10/17[3] |
| Unextended Term Loan | $1,522.7 million | LIBOR+2.25% | 7/5/14 |
| Incremental Term Loan | $549.5 million | LIBOR+3.75%[4] | 7/5/14 |
| Extended Term Loan | $1,292.8 million | LIBOR+5.50% | 7/5/17[5] |
| Swaps | $13.3 million | | 6/30/12 |
| First Lien Notes | $742.6 million | 11.50% | 4/15/20 |
| Second Lien Notes | $752.7 million | 12.00% | 6/30/19 |
| **Unsecured Debt** | | | |
| Senior Notes | $305.4 million | 10.50% | 1/15/15 |
| PIK Notes | $67.6 million | 13.25% | 7/15/15 |
| Subordinated Notes | $140.0 million | 13.75% | 7/15/15 |

(i)      *The First Lien Credit Facility*

In connection with the Acquisition, the Debtors entered into the First Lien Credit Facility.  The Debtors have concluded that the First Lien Credit Facility is secured by a first-priority lien on substantially all of the Debtors' assets subject to certain exceptions discussed below.  The First Lien Loans are guaranteed by each of the Debtors other than Cengage Learning Acquisitions, Inc. ("**CLAI**"), which is the borrower under the First Lien Loans.  The First Lien Credit Facility Agreement also provides for certain customary covenants, including with respect to financial reporting and the Debtors' leverage ratio.

(ii)      *First Lien Notes*

The First Lien Notes mature April 15, 2020, and the First Lien Notes Indenture provides for certain customary covenants, including with respect to financial reporting.  The First Lien Notes are secured with a *pari passu* first priority security interest in the same collateral package as the obligations arising under the First Lien Credit Facility.  The First Lien Notes are guaranteed by each of the Debtors other than CLAI, which is the issuer under the First Lien Notes Indenture.

---

[3]      The maturity date for the Extended Revolver Facility is subject to springing conditions.  In general, these conditions provide that:  (a) if specified principal amounts of certain of the Debtors' other debt remain outstanding as of a specified date, the Extended Revolver Facility matures on the specified date; or (b) if any of the Debtors' other debt is refinanced and matures before July 9, 2017, the Extended Revolver Facility will mature 91 days before the maturity of the refinanced debt.  Under these springing maturity provisions, the Extended Revolver Facility could mature as early as April 5, 2014.

[4]      The interest rate on the Incremental Term Loan is subject to a 3.75% LIBOR floor.

[5]      The maturity date the Extended Term Loan Facility is subject to springing conditions.  In general, these conditions provide that:  (a) if specified principal amounts of certain of the Debtors' other debt remain outstanding as of a specified date, the the Extended Term Loan Facility matures on the specified date; or (b) if any of the Debtors' other debt is refinanced and matures before October 3, 2017, the Extended Term Loan will mature 91 days before the maturity of the refinanced debt.  Under these springing maturity provisions, the Extended Term Loan Facility could mature as early as April 5, 2014.

### (iii)    *First Lien Swap Confirmations*

The Debtors are party to six First Lien Swaps, all of which are interest rate swaps that help the Debtors manage interest rate exposure by achieving a desirable proportion of variable and fixed rate debt. The counterparties to the First Lien Swaps have the same collateral package as and rank *pari passu* with the lenders under the First Lien Credit Facility and holders of the First Lien Notes. The notional amounts, counterparty, and other information regarding the First Lien Swaps are as follows:

- $250 million subject to a swap between CLAI and Citibank N.A., dated as of April 21, 2010;

- $250 million subject to a swap between CLAI and Goldman Sachs Bank USA, guaranteed by The Goldman Sachs Group, Inc., dated as of April 16, 2010;

- $300 million subject to a swap between CLAI and UBS AG, London Branch, dated as of March 5, 2010;

- $300 million subject to a swap between CLAI and The Royal Bank of Scotland plc, dated as of March 1, 2010;

- $500 million subject to a swap between CLAI and UBS AG, London Branch, dated as of February 17, 2010; and

- $500 million subject to a swap between CLAI and Morgan Stanley Capital Services Inc., dated as of March 19, 2010.

### (iv)    *Second Lien Notes*

The Second Lien Notes mature June 30, 2019, and the Second Lien Indenture provides for certain customary covenants, including with respect to financial reporting. The Second Lien Notes are secured with a second priority security interest in the same collateral package as the First Lien Credit Facility, First Lien Notes, and First Lien Swaps, and are guaranteed by each of the Debtors except for CLAI, which is the issuer under the Second Lien Indenture.

### (v)    *Unsecured Notes*

The Debtors also have outstanding indebtedness in the form of three series of unsecured notes: the Senior Notes, the PIK Notes, and the Subordinated Notes (collectively, the "***Unsecured Notes***"). The Senior Notes mature January 15, 2015; the PIK Notes mature July 15, 2015; and the Subordinated Notes mature July 15, 2015.

The Subordinated Notes are contractually subordinated to the Debtors' secured and senior indebtedness, including the First Lien Credit Facility, the First Lien Notes, the Second Lien Notes, and the Senior Notes. The PIK Notes were issued by CL Holdco and guaranteed by its parent company, Cengage Learning Holdings II, L.P. The Senior Notes were issued by CL Holdco's subsidiary, CLAI, making the PIK Notes structurally subordinate to the Senior Notes.

### C.    Overview of the Debtors' Business and Operations

The Debtors, with their affiliates, are leading global providers of high-quality content, innovative print and digital teaching and learning solutions, software, and associated educational services for the higher-education, research, school, career, professional, and international markets. The Debtors are the second largest publisher of course materials in U.S. higher education, with strong positions across all major disciplines, and are leading global providers of library reference materials with a vast collection of primary source content. The Debtors manage their operations from various locations throughout the United States and internationally, with headquarters located in Stamford, Connecticut.

The Debtors divide their operations into two main segments: domestic and international. For the nine months ended March 31, 2013, the domestic segment accounted for approximately 85 percent of the Debtors' revenues, and the international segment accounted for the remaining approximately 15 percent of the Debtors' revenues. The Debtors' customers include, among others, students, bookstores, academic libraries, major public libraries, and high schools across the country and around the world.

As discussed further below, the Debtors also have two non-wholly owned joint ventures—The Hampton Brown Company LLC ("*Hampton Brown*") and CourseSmart LLC ("*CourseSmart*")

### (i)    *Domestic*

In the U.S., the Debtors operate in five principal markets: two- and four-year college, research, K–12 school, career, and professional.

(a)    Two- and Four- Year College

The Debtors offer an array of print and digital materials and associated services to the two- and four-year college market, which is comprised of students, professors, and institutions of higher education (primarily colleges and universities). The higher education system in the U.S. is the largest in the world with over 20 million students and 4,500 institutions, figures which have expanded over the last decade. Many of the most well-known publishers compete with the Debtors in this space, including, for example, Pearson Education, Inc., McGraw-Hill Education, Inc., John Wiley & Sons, Inc., and Macmillan Publishers Ltd.

In print, the Debtors publish textbooks for all major academic disciplines and maintains leading positions in many major disciplines. For example, the Debtors have leading market positions in the United States in many of the largest academic disciplines, including the number one position in each of anthropology, business, computer training, criminal justice, health, history, paralegal studies, philosophy, and social work, and the number two position in each of accounting, chemistry, education, foreign language, linguistics, mathematics, and psychology.

In digital format, the Debtors provide homework solutions with high quality content and interactive learning solutions and fully customized online course programs. The Debtors are also developing a full suite of digital learning solutions called MindTap, designed to engage students and offer instructors choice and flexibility.

The Debtors employ two sales teams to target the college market. The first sales team focuses on securing adoptions—that is, selections by course instructors to use a particular publisher's materials. The second sales team seeks out institutional sales opportunities, which are more complicated and time consuming, but often offer greater volume and value to the Debtors.

Particularly, with respect to the college market, the educational publishing market is highly seasonal. As with most publishers of educational materials, the Debtors receive an out-sized proportion of their earnings during the academic year. This seasonality affects the Debtors' working capital requirements and overall financing needs such that they earn a cash surplus during the academic year but typically incur a net cash deficit from operating activities outside the academic year.

(b)    Research

Over time, the Debtors have aggregated the world's largest online collection of magazines, journals, and newspapers, and now maintains one of the largest archives of unique primary-source special collections in the world. In North America, substantially all of the reference collections of academic and public libraries contain one or more of the Debtors' research products, which include the world's largest collection of periodicals and one of the largest archives of primary source materials.

Generally, research providers like the Debtors aim to sell specialized reference materials such as encyclopedias, directories, periodical databases, and primary-source collections. The Debtors, however, also integrate this reference content in their academic products, making them the only producer of learning materials with access to proprietary content of this kind. The Debtors sell directly to academic, corporate, and government libraries

and indirectly via distributers, bookstores, wholesalers, and retailers worldwide, with most relationships managed via local or regional offices.

(c)      K-12 School

The domestic K–12 school market consists of approximately 55 million students. Publishers in this market, including Pearson Education, Inc., McGraw-Hill Education, Inc., and Houghton Mifflin Harcourt Publishing Company, aim primarily for state and local school district to adopt their materials. In the U.S. K–12 school market, the Debtors focus on disciplines with the most attractive growth fundamentals, in particular advanced placement and ELT, where the Debtors occupy strong market positions. Consistent with that focus, in August 2011, the Debtors acquired Hampton Brown, the National Geographic Society's digital and print school publishing unit, including its ELT products, elementary school level science curriculum, literacy and content publishing brand, National Geographic Explorer! Magazines, and the National Geographic Science series.

(d)      Career

The career market is comprised primarily of students and colleges in the career-oriented education system. Career institutions typically purchase course materials directly and distribute them to all students, unlike the college market where individual professors choose and students purchase their own materials. In the career market, the Debtors offer some of the most comprehensive collections of print, digital, and hybrid learning solutions for career studies across major disciplines. In connection with these various products, the Debtors employ designated sales teams to focus on sales to the for-profit career colleges that make up the bulk of the market.

Over the last twenty years, growth in the career market generally has outpaced that in the two- and four-year college market. As with the college market, the Debtors' main competitors in the career market are Pearson Education, Inc., McGraw-Hill Education, Inc., and John Wiley & Sons, Inc.

(e)      Professional

Providers in the professional market typically seek to sell learning materials to students seeking job training, certification, or continuing professional education in schools or other programs. This market encompasses a wide range of vocations, and the key players generally vary across different study areas. The Debtors compete in a wide range of professional study disciplines, offering products like customized materials for employers to train their employees. To assist in these efforts, the Debtors employ a direct sales force focused on employers, training programs, and professionals seeking additional training.

*(ii)      International*

The second main segment of the Debtors' operations is the international segment. The needs and demands of various international markets can differ dramatically, but the general trend across the globe is expanding demand for learning products driven by population growth and rising living standards. The Debtors, through certain non-Debtor international affiliates, serve higher education, vocational, K–12, reference, and English language teaching ("**ELT**") markets in select geographic areas throughout the world, with operations generally divided between the regions of Asia, Australia, Latin America, and Europe, Middle East, and Africa. For example, the Debtors, through a licensee, are the leading foreign educational publisher in China with a strong position in the Chinese ELT market. To best tap these markets, the Debtors' international businesses differ in their strategic focus based on prevailing local market demand for the Debtors' products, and they employs a sales force located in 25 regional offices around the globe to take advantage of international growth dynamics.

*(iii)      Joint Ventures*

The Debtors own equity interests in two domestic joint ventures: Hampton Brown and CourseSmart. *First*, on August 1, 2011, the Debtors acquired 100-percent of the controlling economic equity interests (*i.e.*, 100 percent of the Class B units) in Hampton Brown from The National Geographic Society ("**NGS**"). As part of the sale transaction, NGS negotiated to retain 10 Class A units, which units do not entitle NGS to any control over the affairs of Hampton Brown and entitle NGS to distributions only upon dissolution of Hampton Brown (which

distribution is capped at $8 million). The 10 Class A units owned by NGS are subject to a call right exercisable by the Debtors and a put right exercisable by NGS, the terms of which are set forth in the purchase agreement. Pursuant to the purchase agreement, (a) the Debtors may exercise their call right to purchase the remaining interest for $8 million plus 10-percent annual compounding interest accruing from August 1, 2012 and (b) the seller may exercise its put right to sell the remaining interest at $6.5 million, with such right becoming exercisable August 1, 2013. For the Debtors' fiscal 2012, Hampton Brown contributed $74.4 million in revenue, or approximately 4 percent of the Debtors' total revenues.

Since February 28, 2007, the Debtors have been an equity holder in CourseSmart, a joint venture supported by the leading publishers in North American higher education for distribution of digital course materials. The Debtors own a 33.4-percent equity interest in CourseSmart, with equivalent voting control. CourseSmart historically has relied on contributions from its members to fund its operations and does not represent a material portion of the Company's revenues or earnings.

### D.    Discussion of Disputed Assets

Following review and analysis by the Debtors and their advisors, the Debtors believe there are three primary sources of potential recovery for unsecured creditors, including the Holders of the First Lien claims who also hold significant deficiency claims against each Debtor.

### (i)    *Disputed Cash*

As of the Petition Date, the Debtors held approximately $265.0 million of cash in an investment account that the Debtors assert is not part of the secured lenders, swap counterparties, and secured noteholders' (collectively, the "**Prepetition Secured Parties**") respective collateral packages under the First Lien Credit Facility Agreement, First Lien Notes Indenture, First Lien Swap Confirmations, and Second Lien Indenture. On March 20, 2013, the Debtors drew down substantially all of the remaining availability under their first lien revolving credit facilities, $430 million, and invested $300.0 million in a Federated money market fund that invests in treasury securities (the "**Federated Fund**").[6] The Federated Fund is publicly traded on the NASDAQ exchange (ticker: TOIXX). Technically, the Debtors' investment involved the purchase of uncertificated securities in the Federated Fund. The Debtors continue to hold the shares that they held on the Petition Date today.

The "**Disputed Cash**" is the amount of cash of the Debtors, if any, remaining on the Effective Date in the Debtors' investment in the Federated Fund that has not otherwise been determined by Final Order to be subject to the non-avoidable Liens of the Holders of the First Lien Claims.

The Debtors believe that their investment in the Federated Fund is not part of the Prepetition Secured Parties' collateral package, and the Disputed Cash or the value associated therewith is available for distribution to unsecured creditors under the Plan. Due to the issues surrounding the Disputed Cash, the Plan contemplates placing the Disputed Cash, or the value associated therewith, in a reserve on the Effective Date.

The Holders of First Lien Claims contend that the Disputed Cash is encumbered and therefore, not available for distribution to unsecured creditors. Even if the Disputed Cash is determined to be unencumbered, the Holders of First Lien Claims are entitled to well in excess of the majority of any recovery associated therewith on account of the deficiency claim.

---

[6]    The Debtors' total draw on March 20, 2013 was approximately $430.0 million. The remaining $130.0 million was swept that day from the Debtors' primary cash concentration account and invested in shares of a different Federated money market fund, the Government Obligations Fund Institutional Shares (money market fund #5, ticker: GOIXX), in accordance with the Debtors' ordinary course cash management procedures and utilized for various purposes associated with the operation of the Debtors' businesses.

(ii)        *Equity Interests in Foreign Subsidiaries*

Although the Debtors generally pledged all of the equity interests in their subsidiaries as collateral to the Prepetition Secured Parties, only 65 percent of the equity of their first-tier foreign subsidiary, Cengage Learning Acquisitions C.V. ("***CLA C.V.***"), is pledged to the Prepetition Secured Parties, leaving 35 percent of the equity interests in their foreign affiliates unencumbered.

Because 35 percent of the equity interests in CLA C.V. was not pledged as collateral to the Prepetition Secured Parties, those interests are unencumbered and available for distribution to unsecured creditors, including Holders of First Lien Claims on account of their deficiency claims.

There are three intercompany loans from CLAI to CLA C.V. in the aggregate amount of approximately $776 million that were pledged as debt under the First Lien Documents. These intercompany claims could significantly reduce, or eliminate, CLA C.V.'s equity value.

(iii)        *Equity Interests in Hampton Brown and CourseSmart*

Further, the Debtors believe that the equity interests in their non-wholly owned subsidiaries, whether foreign or domestic are not pledged as collateral to any of the Prepetition Secured Parties. This category includes Hampton Brown and CourseSmart, the joint ventures discussed above.

Accordingly, the Debtors believe that the value attributable to their equity interests in the non-wholly owned subsidiaries, Hampton Brown and CourseSmart, is available for distribution to unsecured creditors, including the Holders of First Lien Claims on account of their deficiency claims..

(iv)        *Copyright Assets*

In the course of conducting a collateral and perfection review, the Debtors' advisors discovered that the Prepetition Secured Parties may not have recorded with the U.S. Copyright Office their interests in a pool of copyrights the Debtors registered during roughly the last year. The Debtors believe that The Bank of New York Mellon last recorded liens for the benefit of holders of the First Lien Notes on May 7, 2012, and for the benefit of the holders of the Second Lien Notes on July 5, 2012. The Debtors further believe that Royal Bank of Scotland, as former agent for the lenders under the First Lien Credit Facility Agreement, last recorded on March 23, 2012. Since the time of the last recordings made on behalf of the Prepetition Secured parties, the Debtors have registered approximately 1,500 additional copyrights. Within the 90 days before the Petition Date, the Company understands that the First Lien Credit Facility Administrative Agent and the First Lien Notes Indenture Trustee and the Second Lien Indenture Trustee filed recordings against these copyrights (the "***Recently Registered Copyrights***"). There also are approximately 14,000 copyrights[7] that the First Lien Notes Indenture Trustee and the Second Lien Notes Indenture Trustee had recorded against in 2012, but that the First Lien Credit Facility Administrative Agent did not record against until on or about May 22, 2013 (such copyrights, together with the Recently Registered Copyrights, the "***Disputed Copyrights***").

**Because the Prepetition Secured Parties may not have recorded against the Recently Registered Copyrights prior to the 90 day period before the Debtors' chapter 11 filing and because of the facts and circumstances surrounding the Recently Registered Copyrights, the Debtors believe that Recently Registered Copyrights may be subject to valid avoidance causes of action under section 547 of the Bankruptcy Code. The Debtors intend to pursue such causes of action. Additionally, because the the First Lien Credit Facility Administrative Agent recorded against the Disputed Copyrights during the 90 day period before the Debtors' chapter 11 filing and because of the facts and circumstances surrounding the Disputed Copyrights, the Debtors believe that the Disputed Copyrights may be subject to valid avoidance causes of action under section 547 of the Bankruptcy Code and the Debtors intend to pursue such causes of action.**

---

[7]        These 14,000 copyrights were registered by the Company prior to July 2007.

E.        **Intercreditor Agreements**

Certain of the Debtors, the collateral agent under the First Lien Credit Facility Agreement, and representatives of the First Lien Holders are parties to that certain First Lien Intercreditor Agreement, dated as of April 10, 2012 (the "***First Lien Intercreditor Agreement***").  The First Lien Intercreditor Agreement governs certain of the respective rights and interests of the First Lien Holders relating to, among other things, their rights and the exercise of remedies in connection with an Event of Default (as defined in the First Lien Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement provisions.

In addition, certain of the Debtors, representatives of the First Lien Holders, and the representative of the holders of the Second Lien Notes are parties to that certain Second Lien Intercreditor Agreement, dated as of July 5, 2012 (the "***Second Lien Intercreditor Agreement***").  The Second Lien Intercreditor Agreement governs certain of the respective rights and interests of the First Lien Holders and the holders of the Second Lien Notes relating to, among other things, their rights and the exercise of remedies in connection with an Event of Default (as defined in the Second Lien Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement provisions.  Additionally, the Second Lien Intercreditor Agreement requires turnover of distributions on account of shared collateral.  The relevant turnover provision is as follows:

- "Unless and until the Discharge of Senior Obligations has occurred, any Shared Collateral or Proceeds thereof received by any Second Priority Representative or any Second Priority Debt Party in connection with the exercise of any right or remedy (including setoff or recoupment) relating to the shared collateral shall be segregated and held in trust for the benefit of and forwith paid over to the Designated Senior Representative for the benefit of the secured parties…" Second Lien Intercreditor Agreement, Section 4.02.

F.        **APAX Issues**

As previously discussed, on July 5, 2007, investment funds associated with or designated by Apax acquired 97 percent of equity of Thomson Learning and Thomson Nelson Learning (the balance of the equity was purchased by Funds associated with or designated by OMERS) from Thomson Corporation and certain of its affiliates for $7.75 billion.  Through their ownership, Apax appointed a majority of the Debtors' boards of directors and determined corporate strategy, management, and policies.

*(i)        **Investigation of Prepetition Debt Purchases***

Prior to the Commencement Date, Apax purchased various debt instruments throughout the Debtors' capital structure on the open market (the "***Prepetition Debt Purchases***").  Periodic disclosures of the Prepetition Debt Purchases and potential additional Apax purchases were made, disclosing that Apax either was or could be an investor anywhere in the Debtors' capital structure.

On February 12, 2013, the Debtors engaged Richard D. Feintuch as an independent director.  Mr. Feintuch had no prior connection to the Debtors or Apax, the Debtors' majority equity holder.  At the time of Mr. Feintuch's appointment, the Debtors were exploring various restructuring alternatives to address their debt burden, with Mr. Feintuch heavily involved in discussing and analyzing all potential transactions.  During this process, Mr. Feintuch was advised that Apax had made the Prepetition Debt Purchases.

It became clear that the Prepetition Debt Purchases would be a focal point of all constituencies involved in the potential chapter 11 cases.  After discussions with counsel, Mr. Feintuch determined that the Prepetition Debt Purchases should be investigated so that the Debtors could determine whether there are any viable causes of action against Apax that could be pursued for the benefit of the Debtors' estates.  On or about May 23, 2013, and upon the request of Mr. Feintuch, the Debtors retained Willkie Farr & Gallagher LLP ("***Willkie***") as Mr. Feintuch's independent counsel to assist in an valuation and analysis of the Prepetition Debt Purchases (the "***Apax Investigation***").  On August 7, 2013, the scope of Willkie's engagement was expanded to include the Company's debt purchase.

Willkie has indicated that the Apax Investigation is nearly complete.  Upon completion of the Apax Investigation, Willkie will release a report of their findings to Mr. Feintuch for additional comments and discussion

(the "**Willkie Report**").  Upon finalization of the Willkie Report by Mr. Feintuch, the Willkie Report will be produced to the Committee and certain other major stakeholders.

    *(ii)*       *2007 Leveraged Buyout ("LBO")*

       As previously discussed, prior to 2007, the Company's businesses were known as Thomson Learning and Thomson Nelson Learning, divisions of Thomson Corporation, and as The Gale Group Inc.  On July 5, 2007, investment funds associated with or designated by Apax acquired 97 percent of the Company's equity (the balance of the equity was purchased by Funds associated with or designated by OMERS (together with Apax, the "**Sponsors**") from Thomson Corporation and certain of its affiliates for $7.75 billion.

       The Debtors and their advisors are currently performing an analysis of the 2007 LBO, and, at this time, the Debtors do not believe there are viable claims to pursue on behalf of their estates, as any cause of action is likely barred by the applicable statute of limitations.

    **G.**       **Intercompany Obligations**

       (a)       The Foreign Loans

       At the time of the 2007 Apax acquisition of Cengage, CLA C.V., as borrower, and CLAI, as lender, entered into an $800 million interest-bearing loan (the "**Initial Foreign Loan**") to finance the purchase of Thomson (now Cengage) Learning Holdings B.V. ("**Cengage B.V.**"), the top-tier holding company of Thomson Learning's international business.  The 2007 acquisition of Cengage by Apax included the purchase of multiple businesses.  The Initial Foreign Loan reflected the allocation of the overall purchase price to the specific business of Thomson Learning's international business and provided CLA C.V. the funds necessary to purchase Cengage B.V.  The Initial Foreign Loan was accompanied by a formal loan document, with a fixed maturity date, interest payment schedule, and remedies in the event of default.

       In June 2008, CLAI recognized that CLA C.V. did not have the cash available to satisfy the interest payments under the Initial Foreign Loan.  Accordingly, CLAI paid off interest on the loan to the extent CLA C.V. had cash available, capitalized the rest of the interest, and divided the loan into two new loans:  a $310 million interest-bearing loan (the "**Foreign Interest Loan**") and a $520 million non-interest bearing loan (the "**First Foreign Non-Interest Loan**").  The Interest Loan and First Foreign Non-Interest Loan were accompanied by new loan documents, dated June 24, 2008.  Shortly after converting the Initial Foreign Loan into the Interest Loan and First Foreign Non-Interest Loan, intercompany loans were issued from Acquisitions C.V. to Cengage Learning UK Holdings Ltd. ("**Cengage U.K.**") and Cengage Australia Holdings II Pty Ltd. ("**Cengage Australia**"), Cengage's British and Australian operating subsidiaries, respectively.

       In January 2009, a $29 million portion of the Foreign Interest Loan was converted to a new non-interest bearing loan (the "**Second Foreign Non-Interest Loan**").  Since January 2009, CLA C.V. has remained current on interest payments on the Foreign Interest Loan, all of which have been reflected by book/journal entry.  There have been no repayments on account of the First Foreign Non-Interest Loan and the Second Foreign Non-Interest Loan.  As of March 31, 2013, the balance of the Foreign Interest Loan was approximately $245.6 million, the balance of the First Foreign Non-Interest Loan was approximately $520.1 million, and the balance of the Second Foreign Non-Interest Loan was approximately $10.9 million.

       (b)       The Domestic Loans

       The Domestic Loans are comprised of four separate loans between CLAI, as lender, and CLI, as borrower, in the original amounts of $625 million (the "**$625 Million Domestic Intercompany Loan**"), $115 million (the "**$115 Million Domestic Intercompany Loan**"), $3.4 billion (the "**$3.4 Billion Domestic Intercompany Loan**"), and $72 million (the "**$72 Million Domestic Intercompany Loan**").

       On May 30, 2008, CLAI, as lender, and CLI, as borrower, entered into the $625 Million Domestic Intercompany Loan agreement and the $115 Million Domestic Intercompany Loan agreement (the "**Houghton Mifflin Loans**") to fund the purchase of certain assets of Houghton Mifflin Company.  The $625 Million Domestic Intercompany Loan and the $115 Million Domestic Intercompany Loan were documented separately due to the

original source of funding for each loan. The funds to make the $625 Million Domestic Intercompany Loan were obtained from cash on hand of CLAI. The funds to make the $115 Million Domestic Intercompany Loan were obtained by equity contributions from Apax and OMERS to CLAI's indirect parent company, which were then contributed downstream to CLAI for the purchase of the Houghton Mifflin assets. The Houghton Mifflin Loans bear interest and include a principal amortization schedule. To date, CLI has stayed current on its interest and principal amortization payments on account of the Houghton Mifflin Loans. As of March 31, 2013, the balance of the Houghton Mifflin Loans was approximately $595.3 million.

In 2007, CLAI borrowed money under the 2007 Credit Agreement to fund the purchase of CLI. On June 24, 2008, CLAI and CLI entered into the documentation related to the $3.4 Billion Domestic Intercompany Loan. The $3.4 Billion Domestic Intercompany Loan bears interest and includes a principal amortization schedule. To date, CLI has stayed current on its interest and principal amortization payments on account of the $3.4 Billion Domestic Intercompany Loan. As of March 31, 2013, the balance of the Houghton Mifflin Loans was approximately $2.8 billion.

On August 1, 2011, CLAI loaned money to CLI pursuant to the $72 Million Domestic Intercompany Loan to fund CLI's purchase of interests in the Hampton Brown Company LLC. The $72 Million Domestic Intercompany Loan does not include a principal amortization schedule. The $72 Million Domestic Intercompany Loan bears interest, and to date, CLI is current on its interest payments. As of March 31, 2013, the balance of the Houghton Mifflin Loans was approximately $72.0 million.

(c)    The CLAI Revolving Loan

On July 5, 2007, the CLAI Revolving Loan was issued by CLAI to CLI. As of March 31, 2013, the balance of the Houghton Mifflin Loans was approximately $81.0 million. The CLAI Revolving Loan is the result of Cengage's domestic cash management system, which involves the daily sweep of cash to or from CLI's accounts to or from a concentration account at CLAI. Almost all cash generated by Cengage is transferred to the concentration account where it is used in part to pay interest, principal amortization, or certain corporate expenses owed by CLAI, transferred back to CLI's account for disbursements, or otherwise invested by CLAI. The account bears interest and is periodically cleared by offsetting the balance of the concentration account against the amounts owed by CLI to CLAI under the Domestic Loans.

(d)    The PIK Loans

CLAI issued 26 non-interest bearing intercompany loans to Cengage Holdco to (1) fund the buyback of the PIK Notes, (2) make interest payments on account of the PIK Notes, and (3) fund the refinancing costs incurred on the Company's original bridge loans to convert the original PIK Bridge Loan to a note and other operating costs. The PIK Loans were issued between July 2008 and January 2013 and range in amount from approximately $130,000 to $95 million. As of March 31, 2013, the aggregate balance of the PIK Loans was approximately $378.4 million.

**H.    Common Stock**

Non-Debtor Cengage Learning Holdings I, L.P. is the limited partner of Debtor Cengage Learning Holdings II, L.P., which directly or indirectly owns each of the other Debtors. Cengage Learning Holdings I, L.P. is owned approximately 97 percent by Apax, approximately 3 percent by OMERS, and less than 1 percent by current and former management employees and certain directors.

**V.    EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES**

**A.    Fundamental Changes in the Educational Publishing Industry and Their Effect on the Debtors**

In the past, the Debtors and their peers in the educational materials market produced only traditional print products. From kindergarten to higher education to career training, students, instructors, and institutions depended on printed goods, typically as an accompaniment to live classroom teaching. The publishers in this market provided

textbooks, workbooks, and other instructional materials and relied heavily on their profits from selling new print products.

Now, the educational publishing market has entered the early stages of a major transition from print business models to a greater focus on digital products, with digital market share growing as quickly as 20 percent annually over recent years.  The move to digital began with the simple substitution of electronic versions of textbooks for the printed forms.  Over time, digital products such as homework programs and interactive learning software have increasingly been paired and integrated with print materials.  And in some cases, digital products are becoming a favored medium for learning materials in the classroom.  As much as 15 percent of learning materials sold today are sold in digital format, including course materials, homework programs, and interactive and online learning platforms.  All indications are that digital will continue to grow in importance in this market.

In addition to this digital transition, recent market trends have considerably altered the landscape of the educational materials business.  One such trend is a consistent decline over the last decade in demand for new printed materials, which traditionally was the primary driver of profitability in the Debtors' industry.  Consumers are increasingly opting to rent new materials, purchase electronic books, and, most significantly, purchase or rent used books.  Approximately 40 percent of all consumer transactions in the learning materials market in 2012 were used book sales or rentals.  Of course, each of these transactions is less profitable—or not at all profitable—to the publisher.

Additionally, since the recent recession began in 2007, the dramatic decrease and persistent volatility in the availability of government funding have weakened demand significantly in several of the Debtors' businesses, particularly in the research and K–12 markets.  These markets are driven by the spending of state and local governments, which were especially hard-hit by the recession.

Finally, publishers have also come under pressure from unconventional or even illegal activities that allow consumers to purchase products outside the normal distribution chain.  Piracy, despite being illegal, has become easier as the technology for copying content has improved.  Additionally, a recent Supreme Court decision permitting the practice of importing textbooks from foreign markets (where they are often discounted to reflect lower demand and relative standards of living) into the U.S. for resale is likely to increase the incentives for doing so and may put further pressure on domestic pricing.[8]

The combined force of these trends has hindered the Debtors' financial performance.  For the nine months ended March 31, 2013, the Debtors' revenues were $1,298.6 million, compared to $1,458.3 million for the same period ended March 31, 2012, representing a revenue decline of approximately 11 percent.  Unlevered free cash flow over the same periods fell from $568.6 million to $360.2 million.  Simultaneously, the weight of the Debtors' funded debt burden has grown, with debt service payments increasing from $353.0 million for the nine months ended March 31, 2012, to $376.3 million for the same period ended March 31, 2013.

**B.      Strategic Responses and Prepetition Restructuring Efforts**

In late 2012 and early 2013, the Debtors overhauled their senior management team by hiring a world-class team, led by a new chief executive officer, Michael Hansen, and a new chief product officer, chief technology officer, and chief sales and marketing officer.  Mr. Hansen previously served as chief executive for Harcourt Assessment, the educational materials division of Reed Elsevier (a publisher and information provider operating in the science, medical, legal, risk, and business sectors), where he led a successful turnaround and sale of that business.  With a new management team in place, the Debtors have developed and started to implement a comprehensive new business plan.

In light of the industry's transition to digital, this comprehensive new business plan centers on combining the best of innovative and complementary digital and print products with expert product support to provide whole-course packaged products covering individual courses from every angle.  Currently, the Debtors are developing the

---

[8]    *See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013).

MindTap platform, a full suite of digital learning solutions designed to engage students and offer instructors choice and flexibility. MindTap is just the first step in enhancing product innovation in digital formats, and it continues the Debtors' efforts to set the standard for excellence in the learning materials market. Indeed, in fiscal year 2012, the proportion of the Debtors' revenues from digital product sales versus stand-alone print product sales increased 17.5 percent from 31.9 to 37.5 percent.

In addition to the revamped focus on positioning itself to capitalize on the digital transition and implementing the new product offerings described above, the Debtors are using new sales strategies to target particular markets that present greater growth opportunities. Furthermore, the Debtors intend to pursue growth in their research and ELT businesses across the globe—two areas with high growth potential. The synergies of new management, new products, and new sales strategies set a strong foundation for achieving the Debtors' envisioned transformation.

Although the Debtors worked diligently to stay apace with these sea changes from an operational standpoint, the Debtors also realized the need for a financial restructuring of its capital structure. The Debtors engaged Lazard Freres & Co. LLC as investment banker ("Lazard"), Alvarez & Marsal North America, LLC as restructuring advisor ("A&M"), and Kirkland & Ellis LLP as counsel ("K&E") to advise on their contemplated restructuring.

## C.    Negotiations with Stakeholders and the Execution of the Restructuring Support Agreement

In April 2013, the Debtors requested that certain holders of the Debtors' First Lien Claims organize and form an ad hoc group. The Ad Hoc First Lien Group is advised by Houlihan Lokey Capital Inc., as financial advisor, and Milbank, Tweed, Hadley & McCloy LLP, as counsel (collectively, the "*First Lien Advisors*"). In addition, JPMorgan Chase Bank, N.A., administrative agent under the First Lien Credit Facility Agreement, engaged Davis Polk & Wardwell LLP and Blackstone Advisory Partners LP and commenced discussions with the Debtors. Other non-first lien creditors also commenced discussions with the Debtors and their advisors. To permit frank and transparent discussions to the greatest extent possible, the members of the Ad Hoc First Lien Group and certain other non-first lien creditors entered into non-disclosure agreements with the Debtors. In the period leading up to the Petition Date, the parties and their advisors held multiple meetings to exchange information, facilitate diligence, answer questions, and discuss various restructuring issues. In addition to information on the Debtors' revised business plan and financial information, the Debtors began the process of providing creditors and their advisors with information regarding the Debtors' assets so that each group could perform diligence and assess valuations.

After considerable arm's-length negotiations, the Debtors' Consenting Holders reached a restructuring support agreement outlining a restructuring process and post-reorganization capital structure that is designed to de-lever the Debtors' balance sheet and provide for an expedient emergence from chapter 11. At the same time, it provides unsecured creditors with appropriate time to conduct diligence on, and discuss their conclusions regarding, among other things, the value of the three primary sources of potential recoveries for unsecured creditors (such potential sources of recovery are subject to dispute by the Consenting Holders and the First Lien Credit Facility Administrative Agent and the amount of any recovery will depend on the outcome of these disputes). The Debtors and the Consenting Holders memorialized their agreement by entering into a Restructuring Support Agreement and the three RSA Term Sheets.

## VI.    EVENTS DURING THE CHAPTER 11 CASES

On July 2, 2013 (the "*Commencement Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the bankruptcy Code. The following is a general summary of the chapter 11 cases, including, without limitation, a discussion of the Debtors' restructuring and business initiatives since the commencement of the chapter 11 cases.

## A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor can reorganize its business for the benefit of itself, its Creditors and its interest holders. Chapter 11 also

promotes equality of treatment for similarly situated Creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

**B.      First Day Pleadings and Other Case Matters**

*(i)      First and Second Day Pleadings*

To facilitate the chapter 11 cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Commencement Date or immediately thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value. The first and second day pleadings resulted in the following orders[9]:

- Authors and Content Sources.  On July 24, 2013, the Bankruptcy Court entered an interim order (a) authorizing the Debtors' payment of claims of certain authors and other content sources, (b) directing financial institutions to honor and process related checks and transfers, and (c) granting related relief [Docket No. 148].  The bankruptcy court entered a final order granting the relief requested on August 2, 2013 [Docket No. 216].

- Cash Management.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to use their existing cash management system, existing bank accounts, existing business forms, and certain existing investment guidelines [Docket No. 39].  The Bankruptcy Court entered a final order granting the relief requested on [August ___, 2013] [Docket No. ____].

- Taxes.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to pay certain Taxes and Fees and similar charges in the ordinary course of business [Docket No. 37]. The Bankruptcy Court entered a final order granting the relief requested on August 2, 2013 [Docket No. 219].

- Insurance.  On August 2, 2013, the Bankruptcy Court entered a final order authorizing the Debtors to (a) maintain prepetition insurance policies, brokerage agreements, and surety bonds and (b) obtain new insurance policies, brokerage agreements, and surety bonds [Docket No. 215].

- Customer Programs.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the debtors to honor certain prepetition obligations to customers and otherwise continue certain customer programs and practices in the ordinary course of business [Docket No. 35].  The Bankruptcy Court entered a final order granting the relief requested on August 2, 2013 [Docket No. 223].

- Shippers and Warehousemen.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the debtors to (a) honor certain prepetition obligations to shippers, warehousemen, and other lien claimants and (b) continue to satisfy obligations to such claimants in the ordinary course [Docket No. 34].  The Bankruptcy Court entered a final order granting the relief requested on [August 2, 2013] [Docket No. 220].

---

[9]    Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the respective First Day Pleadings.

- **Employee Wages and Benefits.**  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay certain prepetition wages, salaries, and reimbursable employee expenses, (b) pay and honor certain employee medical and other benefits, and (c) continue employee wages and benefits programs [Docket No. 36].  On July 24, 2013, the Bankruptcy Court entered a second interim order authorizing the relief requested [Docket No. 153].  The Bankruptcy Court entered a final order granting the relief requested on August 2, 2013 [Docket No. 217].

### (ii)    Procedural and Administrative Motions

To facilitate the efficient administration of the chapter 11 cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions including orders:

- authorizing the joint administration of the chapter 11 cases;

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code;

- authorizing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 30 largest creditors;

- authorizing the Debtors to retain and compensate certain professionals utilized in the ordinary course of business; determining the amount and nature of the adequate assurance payment for future utility service;

- approving the case management procedures for these Chapter 11 Cases; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in these Chapter 11 Cases.

### (iii)    Retention of Chapter 11 Professionals

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these Chapter 11 Cases.  These professionals include: (a) K&E, as counsel to the Debtors; (b) Lazard as investment banker to the Debtors; (c) A&M as restructuring advisor to the Debtors; (d) Donlin, Recano & Company, Inc., as the Notice and Claims Agent for the Debtors; and (e) Willkie as special counsel to the Debtors.

### (iv)    Cash to Fund Operations

Prior to commencing these chapter 11 cases, the Debtors engaged in extensive negotiations with the First Lien Secured Parties to secure use of Cash Collateral on a consensual basis, to ensure a smooth transition into chapter 11.  As noted, the Debtors are at a critical time in their fiscal year and ensuring adequate cash to fund operations was a priority.  Thus, the Debtors focused their efforts on obtaining the use of Cash Collateral on a consensual basis, while taking great care to protect the rights of unsecured creditors and other parties in interest by preserving Disputed Cash and other assets.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to utilize cash collateral [Docket No. 40] (the "*Interim Cash Collateral Order*").  These funds were critical to the Debtors' ability to satisfy their ordinary course obligations incurred to run the business during the Chapter 11 Cases.

Following entry of the Interim Cash Collateral Order, the Debtors engaged with the First Lien Secured Parties, the Creditors' Committee, various second lien representatives, and other parties in interest to reach a final order regarding the use of Cash Collateral.  On August 2, 2013, the Bankruptcy Court entered, on consent, a text order amending the Interim Cash Collateral Order to extend the deadline for obtaining a final order.

*(v)*        ***Appointment of the Creditors' Committee Members and Advisors for Such Committee***

On July 10, 2013, the United States Trustee for Region 2 (the "***U.S. Trustee***") appointed the following individuals to the Creditors' Committee:  (a) Wilmington Trust National Association; (b) Wells Fargo Bank National Association; (c) The Booksource; (d) Benneit Management Corporation; (e) RR Donnelley & Sons Company; (f) Gary B. Shelly; (g) Carl S. Warren; (h) BOKF, NA d/b/a Bank of Oklahoma; and (i) Central National-Gottesman Inc. [Docket No. 68].  On August 9, 2013, the Creditors' Committee filed an application to retain Arent Fox LLP as counsel to the Creditors' Committee [Docket No. 247].  On August 15, 2013, the Creditors' Committee file applications to retain FTI Consulting, Inc. as its financial advisor [Docket No. 274] and Moelis & Company ("***Moelis***") as its investment banker [Docket No. 275].

Since the formation of the Creditors' Committee, the Debtors have consulted with the Creditors' Committee concerning the administration of the chapter 11 cases. The Debtors have kept the Creditors' Committee informed of, and have conferred with the Creditors' Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Creditors' Committee to the extent its constituency would be affected by proposed actions and transactions outside of the ordinary course of the Debtors' businesses. The Creditors' Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

### C.        Creditors' Committee Motion to Terminate Apax Investigation

As described above, the Debtors commenced the Apax Investigation, prior to the Commencement Date, to analyze the events and conduct surrounding certain prepetition transactions involving Apax.  On July 26, 2013, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Terminating or, in the Alternative, Suspending the Debtors' Prepetition Investigation into Certain Conduct of Apax Partners, L.P. and its Affiliates* [Docket No. 164] (the "***Apax Investigation Termination Motion***").  The Committee asserted that the Apax Investigation would potentially usurp, impair or, impede their right to conduct an independent investigation and/or request that an examiner conduct one.  The Debtors' filed an objection to the Apax Investigation Termination Motion on July 30, 2013 [Docket No. 180].  At the hearing on August 1, 2013, the Debtors and the Creditors' Committee agreed to discuss a potential timeline whereby the Apax Investigation would continue and the Debtors would agree to certain terms and conditions ensuring proper disclosure of the Apax Investigation results and protecting the Creditors' Committee's right to seek further investigation or request an examiner.

As previously discussed, Willkie has indicated that the Apax Investigation is nearly complete.  Upon completion of the Apax Investigation, Willkie will release the Willkie Report.  Upon finalization of the Willkie Report, the Debtors will produce the Willkie Report to the Creditors' Committee.

### D.        Creditors' Committee Discovery Requests

Throughout these chapter 11 cases, the Debtors have received discovery requests from several parties and have been open, responsive, and cooperative as reasonably possible.  Since the Debtors initiated these chapter 11 cases on July 2, 2013, the Debtors have taken the following steps to ensure full transparency among all parties:

- On July 11, the morning after the Creditors' Committee was appointed, the Debtors contacted the Creditors' Committee to facilitate the prompt exchange of information, and provided the Creditors' Committee with electronic access and credentials to the more than 1,200 documents in Debtors' confidential data room.  Data room records indicate that multiple Committee members accessed the data room the same day;

- On July 12, the Creditors' Committee requested that Debtors provide additional advisors access to the data room.  Again, the Debtors promptly responded, granting same-day access to the requested advisors; and

- Within five days after the Creditors' Committee was appointed, the Debtors had granted access to the data room for at least 13 Committee lawyers from Arent Fox, LLP, and nine advisors from

FTI Consulting.[10]  Of the 1,200 documents in the data room, at least one Creditors' Committee advisor has accessed more than 1,100 of them.

The Debtors also have cooperated in responding to discovery requests from the Creditors' Committee and certain unaffiliated holders of the Second Lien Notes (the "**Second Lien Group**") and have made affirmative efforts to include Creditors' Committee advisors in their meet and confers with the Second Lien Group, including the following:

- On July 15, the Second Lien Group served its initial discovery requests.  In response, the Creditors' Committee requested that they receive a copy of any documents produced to the Second Lien Group.  The Debtors immediately responded and arranged for any productions to be delivered simultaneously to the Creditors' Committee[11];

- On July 22, Creditors' Committee advisors attended the Debtors' telephonic meet and conferred with the Second Lien Group;

- On July 24, Creditors' Committee advisors also attended the Debtors' meet and confer with the Second Lien Group at the Courthouse;

- On July 25, the Debtors further conferred with the Creditors' Committee with respect to 54 requests that the Creditors' Committee had sent the Debtors informally on July 20.  During that call, the Creditors' Committee identified 30 of those requests that they considered to be priority requests.  To the extent not already covered by the discovery propounded by the Second Lien Group, the Debtors agreed to provide the requested priority information to the Creditors' Committee on an expedited basis.

In response to the Second Lien Group's discovery and the Creditors' Committee's priority requests, the Debtors have worked tirelessly to complete seven productions of documents in as many days beginning on July 23. Through this production, the Creditors' Committee received, among other things, thousands of pages of emails among advisors for the first lien creditors and the Debtors' advisors related to the restructuring support agreement and other issues.  In total, Debtors have produced nearly 3,500 documents consisting of over 25,000 pages of material.

### E.    Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief, which period may be extended by the bankruptcy court for a period of up to 18 months after the petition date.

During this period, no other party in interest may file a competing chapter 11 plan or plans; however, the Bankruptcy Court may modify the exclusive period upon request of a party in interest and "for cause."  The Debtors have filed the Plan and Disclosure Statement within the exclusivity period and reserve the right to seek extensions of their exclusive right to file a plan or plans and solicit votes thereon if necessary and appropriate.

### F.    Pending Litigation Proceedings and the Automatic Stay

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their business.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal

---

[10]   The Committee advisors from Moelis were timely granted access upon request.

[11]   Two days later, on July 20, the Committee sent an e-mail to the Debtors' counsel (i) conveying appreciation for Debtors' responsiveness and cooperativeness throughout the proceedings and (ii) requesting the production of 54 categories of documents.

proceedings, and claims. Nevertheless, they do not believe the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their business, financial condition, or results of operations.

With certain exceptions, the filing of these Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of these Chapter 11 Cases is subject to compromise, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation claims against the Debtors may be subject to compromise in connection with these Chapter 11 Cases.

### G.    Directors and Officers of Reorganized Cengage and the Other Reorganized Debtors

#### (i)    *The New Board*

The New Board of Reorganized Cengage shall consist of seven directors or managers, as applicable, and the New Board of the other Reorganized Debtors shall consist of the number of directors or managers, as applicable, provided for such Reorganized Debtor in its New Corporate Governance Documents in each case selected in accordance with the Restructuring Term Sheet, the Equity Term Sheet, and the applicable New Corporate Governance Documents.

On the Effective Date, all managers, directors, and other members of the existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the applicable New Board. Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the identity of the members of the New Board will be disclosed in the Plan Supplement.

#### (ii)    *Senior Management and Management Employment Agreements*

The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the applicable New Board to remove or replace them in accordance with the New Corporate Governance Documents and any applicable employment agreements that are assumed, or assumed as amended, by the Reorganized Debtors pursuant to the Plan consistent with the Restructuring Support Agreement and RSA Term Sheets in all respects.

#### (iii)    *Management Incentive Plan*

On or as soon as practicable following the Effective Date, the New Board of Reorganized Cengage shall adopt the Management Incentive Plan.

### H.    Claims Bar Date

On August 16, 2013, the Debtors filed their schedules and statements with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code. The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case. Any creditor whose Claim is not scheduled in the Debtors' schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a proof of claim.

### I.    NOL Motion

As of the Commencement Date, the Debtors' total net operating losses ("**NOLs**") and certain other tax attributes were estimated to be approximately $735 million. Under the Internal Revenue Code, and subject to certain limitations, NOLs that accumulate prior to emergence from bankruptcy (reduced by any taxable income recognized or tax attribute reduction suffered during bankruptcy or pursuant to the restructuring, including pursuant to any cancellation of indebtedness income) may be used to offset post-emergence taxable income. Under the applicable federal tax laws, however, the Debtors would lose the ability to utilize a significant portion of their NOLs if an "ownership change" were to occur prior to completion of the chapter 11 cases. Consequently, on the Petition Date, the Debtors filed the Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures

for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities and for Related Relief [Docket No. 11] (the "*NOL Motion*"), pursuant to which the Debtors sought, on an interim and final basis, to restrict (i) trading of their equity securities during the pendency of the chapter 11 cases by shareholders who beneficially or constructively own (as determined under applicable federal income tax rules), or would beneficially or constructively own after giving effect to such trades, at least 4.5% of the equity securities of CL Holdings, and (ii) the ability of shareholders that beneficially or constructively own or have owned 50% or more -- as measured under the applicable federal income tax rules -- of the equity securities of CL Holdings  to claim a federal income tax deduction for worthlessness for a taxable period ending before emergence.  The Bankruptcy Court entered an interim order granting the NOL Motion July 3, 2013 [Docket No. 38] and a final order on July 25, 2013 [Docket No. 152].

## VII.    PROJECTED FINANCIAL INFORMATION

The Debtors' projected financial information will be provided in **Exhibit D** attached hereto.  The Debtors intend to supplement this Disclosure Statement with such information in advance of the hearing to approve the Disclosure Statement.

## VIII.    VALUATION OF THE DEBTORS

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors.  Lazard has estimated that the Debtors' enterprise value is approximately $2.8 billion.  A more fulsome analysis (the "*Valuation Analysis*") will be provided in **Exhibit E** attached hereto.  The Debtors intend to supplement this Disclosure Statement with such information in advance of the hearing to approve the Disclosure Statement.

## IX.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Risks Relating to Bankruptcy

*(i)    The Debtors may be subject to protracted litigation regarding the Disputed Assets and other issues.*

There is a risk of potential protracted litigation regarding the Disputed Assets, including, but not limited to, disputes regarding the value of the Disputed Assets and whether the Disputed Assets are encumbered and therefore unavailable as a source of recovery for unsecured creditors.  Parties-in-interest may bring potentially time-consuming litigation regarding the status of the Disputed Assets, subordination of claims, Allowance of Claims, and Apax Issues.

*(ii)    Parties in interest may object to the Plan's classification of claims and interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*(iii)    The Debtors may fail to satisfy vote requirements.*

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the

event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

> ### (iv)    *Failure to confirm the Plan within the Milestones contained in the RSA may give rise to Termination of the RSA.*

If the Debtors do not secure confirmation of the Plan within the milestones currently contemplated by the Restructuring Support Agreement, which require, among other things, that the Effective Date occur on or before November 14, 2013, unless extended, the Restructuring Support Agreement may terminate prior to the Confirmation of the Plan, which could result in the loss of support for the Plan by the Debtors' largest secured and unsecured creditor constituencies. Any such loss of support could adversely affect the Debtors' ability to reorganize and confirm and consummate the Plan.

> ### (v)    *The Debtors may not be able to obtain Confirmation of the Plan.*

With regard to any proposed plan of reorganization, the debtor seeking confirmation of a plan may not receive the requisite acceptances to confirm such plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances of the Plan are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one impaired class (which cannot be an "insider" class) has accepted the Plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the balloting may be invalid. If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses; (b) the distributions that holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

> ### (vi)    *The Debtors may be unable to obtain consensual Confirmation.*

In the event that any impaired class of claims does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, with respect to the Plan, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of the entities' commitments to provide support for the Plan, financially or otherwise.

> ### (vii)    *The Debtors may object to the amount or classification of a Claim.*

Except as specifically provided in the Plan, the Debtors reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by

any Holder of a Claim where such Claim is or may be subject to an objection. Any Holder of a Claim that is or may be subject to an objection, thus, may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(viii)    *Risk of non-occurrence of the Effective Date.*

There can be no assurance as to the timing or as to whether the Effective Date will, in fact, occur. The Debtors will pursue and believe that the Effective Date may occur quickly after the Confirmation Date with respect to the Plan, however, there can be no assurance as to such timing or as to whether such an Effective Date will, in fact, occur. In addition, the Plan will be null and void in all respects if the Effective Date does not occur on or before November 14, 2013 (under the Restructuring Support Agreement), unless otherwise agreed by the Debtors and the Required Consenting Lenders.

(ix)    *Contingencies could affect votes of impaired classes to accept or reject the Plan.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

(x)    *The Debtors may not be able to achieve their projected financial results.*

The financial projections set forth on **Exhibit D** to this Disclosure Statement represent the Debtor's management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular. The Debtors' actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, the trading prices of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

(xi)    *Certain tax implications of the Debtors' chapter 11 cases.*

Holders of Allowed Claims should carefully review Article XIII herein, "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these chapter 11 cases may adversely affect the Reorganized Debtors.

(xii)    *The Debtors' emergence from chapter 11 is not assured.*

While the Debtors expect to emerge from chapter 11, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining confirmation of the Plan.

**B.    Risks Related to the Debtors' and Reorganized Debtors' Business**

The Debtors are subject to a number of risks, including (1) bankruptcy-related risk factors and (2) general business and financial risk factors. Any or all such factors, which are enumerated below, could have a materially adverse effect on the business, financial condition, or results of operations of the Debtors and the Reorganized Debtors. Additional risks and uncertainties not currently known to the Debtors or that the Debtors currently deem to be immaterial at this time may also materially adversely affect the Debtors' business, financial condition, or results of operations. Any of the following risks could materially adversely affect the Debtors' business, financial condition, or results of operations.

### (i)    *Operational-Related Risks Due to the Pending Chapter 11 Cases*

For the duration of these Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- The Chapter 11 Cases may adversely affect the Debtors' business prospects and their ability to operate.

- The Chapter 11 Cases and the attendant difficulties of operating the Debtors' business while attempting to reorganize the business in bankruptcy may make it more difficult to maintain and promote the Debtors' goods and services and attract customers to their business.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for fees and other expenses associated with these Chapter 11 Cases.

- The Chapter 11 Cases may prevent the Debtors from continuing to grow their business and may restrict their ability to pursue other business strategies. Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell, or otherwise dispose of assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. The Debtors may not be able to obtain Bankruptcy Court approval or such approval may be delayed with respect to actions they seek to undertake during the pendency of these Chapter 11 Cases.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and the Debtors may have difficulty attracting new employees. In addition, so long as these Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

- There can be no assurance as to the Debtors' ability to maintain sufficient financing sources to fund their business and meet future obligations. The Debtors currently are financing their operations during their reorganization using their cash collateral pursuant to the Final Cash Collateral Order.

In addition, the uncertainty regarding the eventual outcome of the Debtors' restructuring, and the effect of other unknown adverse factors could threaten the Debtors' existence as a going-concern. Continuing on a going-concern basis of the Debtors' business is dependent upon, among other things, obtaining Bankruptcy Court approval of a chapter 11 plan, maintaining the support of key vendors and customers, and retaining key personnel, along with financial, business, and other factors, many of which are beyond the Debtors' control. Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise in accordance with the Bankruptcy Code, distributions from the estate for prepetition liabilities and postpetition liabilities must comply with section 1129 of the Bankruptcy Code. The ultimate recovery to Holders of Claims or Interests, if any, will not be determined until Confirmation of the Plan or an alternative to a chapter 11 plan. No assurance can be given as to what values, if any, will be ascribed in these Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they will receive.

### (ii)    *General Business and Financial Risk Factors*

The Debtors are subject to various business and financial risks, including the following:

(a)    General Economic Conditions

In the financial projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years. The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism, and many other factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Debtors. There is no guarantee that economic conditions will improve in the near term.

(b)     Exit Financing

The Debtors' ability to emerge from bankruptcy is dependent on obtaining certain exit financing.

(c)     Implementation of the Business Plan

The Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring. However, there are risks that the goals of the Debtors' going-forward business plan and financial restructuring strategy will not be achieved. In such event, the Debtors may be unable to refinance maturing debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein, or become subject to further insolvency proceedings.

(d)     Enforcement of Intellectual Property and Proprietary Rights

The Debtors' products are largely comprised of intellectual property content delivered through a variety of media, including books and digital web-based media. The Debtors rely on copyright, trademark, and other intellectual property laws to establish and protect our proprietary rights in these products. However, the Debtors cannot be certain that their proprietary rights will not be challenged, invalidated, or circumvented. The Debtors conduct business in other countries where the extent of effective legal protections for intellectual property rights is uncertain, and this uncertainty could affect future growth. Moreover, despite the existence of copyright and trademark protection under applicable laws, third parties may nonetheless violate the Debtors' intellectual property rights, and the Debtors to remedy such violations, particularly in foreign countries, may be limited. Additionally, the copying and distribution of content over the Internet creates additional challenges for the Debtors in protecting their proprietary rights. If the Debtors are unable to adequately protect and enforce their intellectual property rights, their competitive position may be harmed and business and financial results adversely affected.

(e)     Authors and Copyrights

The Debtors rely on their ability to attract and retain talented authors and develop long-term, collaborative relationships with them. The Debtors operate in a number of highly visible markets where there is intense competition for successful, published authors. The Debtors' rights to exclusively offer authors' content are dependent on the authors' transfer of copyrights to the Debtors. The United States Copyright Act of 1976, as amended, allows an author (or his or her heirs or estate), during a 5-year window, to terminate the copyright transfer and thereby regain certain United States rights to their works. An author that terminates the grant of rights to his or her work could seek to terminate all rights in their works transferred to the Debtors or else negotiate more favorable economic or other terms. The Debtors' inability to attract new authors, the loss of certain high profile authors, increased costs incurred in attracting or retaining authors or changes in the Debtors' rights to their authors' works could harm the Debtors' business, results of operations, and financial condition.

(f)     Competition

The Debtors operate in highly competitive markets with significant established competitors. The Debtors compete primarily on the basis of the quality of their content and author reputation, the effectiveness of their digital solutions, customers' familiarity with their products and, to a lesser extent, price. Many of the Debtors' competitors have substantial financial resources, recognized brands, technological expertise, and market experience. Our competitors are also continuously enhancing their products and services, developing new products and services and investing in technology. Some of the Debtors' competitors are acquiring additional businesses in key sectors that will allow them to offer a broader array of products and services than either they or the Debtors currently provide. Some of the Debtors' competitors have greater resources than us, and therefore, may be able to adapt more quickly

to new or emerging technologies and changes in customer requirements, or devote greater resources to the development, promotion and sale of their products than the Debtors can.

The Debtors may also face competition from businesses that have not traditionally participated in their markets, such as Internet service companies and search providers, providers of learning management systems, and distributors, that could pose a threat to some of the Debtors' businesses by providing more in-depth offerings, adapting their products and services to meet the demands of their customers or combining with one of their traditional competitors to enhance their products and services.

The Debtors may not be able to compete successfully with their current and future competitors. Competition may require the Debtors to reduce the price of our products and services or make additional capital investments that would adversely affect their profit margins. If they are unable or unwilling to do so, the Debtors may lose market share and their business, financial condition, and results of operations may be materially adversely affected.

(g)     Employees

The Debtors may not be able to recruit and retain qualified, skilled employees necessary to successfully implement their business plan.  The Debtors operate in an industry that is not only highly competitive in terms of market share but also highly competitive in terms of recruiting and retaining employees.  The Debtors need to recruit and retain skilled employees to effectuate their new business plan and position themselves for future stability and success.

(h)     Business and Customers in Foreign Countries

To take advantage of international growth opportunities and to reduce the Debtors' reliance on the Debtors' core U.S. market, the Debtors are increasing investments in foreign countries, some of which are inherently more risky than investments in the U.S. markets.  Political, economic, currency, reputational, and corporate risks as well as unmanaged expansion are all factors which could limit returns on investments made in foreign markets.

(i)     Litigation

The Debtors are defendants in a number of litigation matters and are subject to various other claims, demands and investigations.  These matters may divert financial and management resources that would otherwise be used to benefit their operations.  No assurances can be given that the results of these matters will be favorable to the Debtors.  An adverse resolution or outcome of any of these lawsuits, claims, demands or investigations could have a negative impact on the Debtors' business, financial condition, results of operations, and liquidity.

(j)     Future Business Combinations, Acquisitions, Mergers or Joint Ventures

The Debtors actively consider strategic transactions from time to time.  The Debtors evaluate acquisitions, joint ventures, alliances, or co-production programs as opportunities arise, and the Debtors may be engaged in varying levels of negotiations with potential competitors at any time.  The Debtors may not be able to effect transactions with strategic alliance, acquisition, or co-production program candidates on commercially reasonable terms or at all.  The integration of companies that have previously been operated separately involves a number of risks; as such, if the Debtors enter into these transactions, the Debtors also may not realize the benefits the Debtors anticipate and the Debtors may subject themselves to unforeseen contingent liabilities.  Consummating any acquisitions, joint ventures, alliances, or co-production programs could result in the incurrence of additional debt and related interest expense.  In addition, the Debtors may not be able to obtain additional financing for these transactions.

C.      **Risks Associated with Forward Looking Statements**

(i)      *Financial information is based on the Debtors' books and records and, unless otherwise stated, no audit was performed.*

<u>**The financial information contained in this Disclosure Statement has not been audited**</u>.  In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained herein and attached hereto is without inaccuracies.

(ii)      *Financial projections and other forward looking statements are not assured, are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary.*

This Disclosure Statement contains various projections concerning the financial results of the Debtors' operations, including the financial projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates.  Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections.  The financial projections do not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Effective Date of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including the ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Debtors' ability to maintain market strength.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes.  While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

D.      **Disclosure Statement Disclaimer**

(i)      *The information contained herein is for soliciting votes.*

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose..

(ii)      *This Disclosure Statement was not approved by the United States Securities and Exchange Commission.*

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws.  Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein.

(iii)      *Reliance on exemptions from registration under the Bankruptcy Code or Securities Act.*

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar

laws.  The offer of and sale of New Equity to certain Holders of Allowed Claims has not been registered under the Securities Act or similar state securities or "blue sky" laws.

New Equity and other consideration to be issued to certain Holders of Allowed Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 1145(a)(1) of the Bankruptcy Code or section 4(2) of the Securities Act or Regulation D promulgated thereunder.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering is exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities."  As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law.  Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

### (iv)     *No legal or tax advice is provided to you by this Disclosure Statement.*

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

### (v)     *No admissions have been made by this Disclosure Statement.*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

### (vi)     *The failure to identify litigation claims or projected objection should not be relied upon.*

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

### (vii)     *No waiver of right to object or right to recover transfers and assets.*

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors or the Reorganized Debtors (or any entity, as the case may be)

to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified herein.

###### (viii)    *Information was provided by the Debtors and was relied upon by the Debtors' advisors.*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

###### (ix)    *Potential exists for inaccuracies, and the Debtors have no duty to update.*

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified herein, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

###### (x)    *No representations outside this Disclosure Statement are authorized.*

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the United States Trustee for the Eastern District of New York, and counsel to the Committee.

###### (xi)    *Liquidation under Chapter 7 of the Bankruptcy Code.*

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims or Interests and the Debtors' liquidation analysis is set forth in Article XII.B herein, "Statutory Requirements for Confirmation of the Plan" and the Liquidation Analysis attached hereto as **Exhibit C**.

## X.    RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.    Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all debt (as such term is defined in section 101 of the Bankruptcy Code) that arose before the Confirmation Date, any debts of any kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, and the rights and Interests of any Holders of Interests whether or not:  (1) a Proof of Claim based on such debt or Interest is Filed; (2) a Claim or Interest based upon such debt is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and equity Interests subject to the Effective Date occurring, except as provided for under section 1141(d)(6) of the Bankruptcy Code.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

### B.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Notwithstanding anything herein to the contrary, and as provided in Article III of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

### C.    Releases by the Debtors

**Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, the adequacy of which is hereby confirmed, each of the Debtors, the Reorganized Debtors, and the Debtors' Estates conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release and shall be deemed to have provided a full discharge and release to each Releasee (and each such Releasee so released shall be deemed fully released and discharged by the Debtors, the Reorganized Debtors, and the Debtors' Estates) and their respective property from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or which could be asserted on behalf of the Debtors and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, these Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasee, the restructuring of Claims and Interests prior to or in these Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement, the RSA Term Sheets, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; _provided_, that the foregoing "Debtor Release" shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages remedies, Causes of Action, and liabilities of any Debtor:  (1) arising under the Exit Revolver Facility Documents or any other agreements entered into pursuant to the Plan, or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents.  For the avoidance of doubt, none of Apax, any Apax Director, any Affiliated Lender, or any Affiliated Institutional Lender shall be deemed a Releasee or otherwise benefit from the releases granted in Article VIII.C of the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, _and further_, shall constitute the Bankruptcy Court's finding that the Debtor**

Release is: (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

D.      **Third-Party Releases**

Notwithstanding anything contained herein to the contrary, on the Confirmation Date and effective as of the Effective Date, a Releasing Party that elects on its Ballot to grant the Third-Party Release contained in Article VIII.D of the Plan shall, to the maximum extent permitted by applicable law, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each Entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Releasees and their respective property from any and all Claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, these Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasee, the restructuring of Claims and Interests prior to or in these Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement, the RSA Term Sheets, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; _provided_, that the foregoing "Third-Party Release" shall not operate to waive or Release any Claims, obligations, debts, rights, suits, damages, remedies, causes of action, and liabilities of any Releasing Party:  (1) against a Releasee arising under the Exit Revolver Facility Agreement or any other agreements entered into pursuant to the Plan; (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents; (3) with respect to Professionals' final fee applications or Accrued Professional Compensation Claims in these Chapter 11 Cases; or (4) solely arising out of or relating to acts or omissions occurring after the Confirmation Date; _provided_ _further_, that any Holder of a Claim that is entitled to vote on the Plan and does not elect to opt in to the Third-Party Release shall not receive the benefit of the Third-Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, **and**, **further**, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

E.      **Exculpation**

Notwithstanding anything contained herein to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, or consummating the Plan, the transactions contemplated by Restructuring Support Agreement, the RSA Term Sheets, the Disclosure Statement, the New Corporate Governance Documents, the Restructuring Transactions, the issuance, distribution, and/or sale of any shares of the New Equity or any other security offered, issued, or distributed in connection with the Plan, these Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; _provided_, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties

pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that the foregoing "Exculpation" shall have no effect on the liability of any Entity for acts or omissions occurring after the Effective Date.

### F.    Injunction

**Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, Interests, causes of action, or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to Article IX.C hereof; (3) have been released pursuant to Article IX.D hereof; (4) are subject to Exculpation pursuant to Article IX.E hereof (but only to the extent of the Exculpation provided in Article IX.E); or (5) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner any action or other proceeding, including on account of any Claims, Interests, causes of action, or liabilities that have been compromised or settled against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, causes of action, or liabilities.**

### G.    Setoffs

Except as otherwise provided herein and subject to applicable law, the Debtors pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim or Interest (which setoff shall be made against the Allowed Claim or Interest, not against any distributions to be made under the Plan with respect to such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a Holder is entitled under the Plan shall be made on account of the Claim or Interest, as reduced after application of the setoff described above.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors unless such Holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors and a Holder of a Claim or Interest; provided, that, where there is no written agreement between the Debtors and a holder of a claim authorizing such setoff, nothing herein shall prejudice or be deemed to have prejudiced the Debtors' rights to assert that any Holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.

### H.    Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications

For the avoidance of doubt, the foregoing Debtor Release and Third-Party Release shall not waive, affect, limit, restrict, or otherwise modify the right of any party in interest to object to any Accrued Professional Compensation Claim or final fee application Filed by any Professional in these Chapter 11 Cases.

## XI.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in Class 3.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

## XII.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) is feasible; and (3) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

The Debtors will supplement this Disclosure Statement with a liquidation analysis. Such analysis will be set forth as **Exhibit G**, attached hereto, prior to the hearing to approve this Disclosure Statement.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors will prepare the Projections, as set forth on **Exhibit D**. The Debtors will supplement this Disclosure Statement with such information in advance of the hearing to approve this Disclosure Statement.

### D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[12]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that _actually_ voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

---

[12]    A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

E.    **Confirmation Without Acceptance by All Impaired Classes**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

*(i)*    *No Unfair Discrimination*

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

*(ii)*    *Fair and Equitable Test*

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

F.    **Valuation of the Debtors**

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post confirmation going concern value of the Debtors.  Such analysis (the "*Valuation Analysis*") will be set forth in **Exhibit E** attached hereto.

# XIII.    CERTAIN SECURITIES LAW MATTERS

A.    **Plan Securities**

The Plan provides that, on the Effective Date, certain Holders of Allowed Claims will receive New Equity of the Reorganized Debtors.  On or prior to the Effective Date, the Reorganized Debtors will reserve for issuance the New Equity required to be issued pursuant to the Plan.

**B.      Issuance and Resale of New Equity of the Reorganized Debtors under the Plan**

*(i)      Offer and Sale of New Equity: Bankruptcy Code Exemption*

Pursuant to the Plan, certain Holders of Allowed Claims will receive shares of New Equity. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property. In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan, of the New Equity to certain Holders of Allowed Claims will be exempt from registration under the Securities Act and state securities laws with respect to any Holder of Allowed Claims who is not deemed to be an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption. Accordingly, subject to compliance with the New Corporate Governance Documents, New Equity generally may be resold (a) without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined under the Bankruptcy Code and (b) without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states. However, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

*(ii)      Subsequent Transfers of New Equity*

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is: (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

The term "issuer" is defined in Section 2(a)(4) of the Securities Act; however, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Ownership of a significant amount of voting securities of a reorganized debtor could also result in a person being considered to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Equity pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New Equity, unless such sale of New Equity was registered under the Securities Act or made pursuant to an exemption from such registration requirements. Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code, at

a future time and under certain conditions may be able to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Equity to be issued pursuant to the Plan, or an "affiliate" of the issuer, would depend upon various facts and circumstances applicable to that person. Accordingly, we express no view as to whether any such person would be such an "underwriter" or "affiliate."

**PERSONS WHO RECEIVE NEW EQUITY UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW EQUITY OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW EQUITY.**

       (iii)     ***No Registration or Listing of New Equity***

The issuer of the New Equity of the Reorganized Debtors will not be required to file periodic reports under the Securities Exchange Act and will not seek to list the New Equity of the Reorganized Debtors for trading on a national securities exchange. Consequently, there will not be "current public information" (as such term is defined in Rule 144) regarding the issuer of the New Equity of the Reorganized Debtors.

## XIV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

This section remains subject to further review and may result in changes to the disclosures herein. The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "***IRC***"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "***IRS***") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This summary does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated

investment companies and those holding, or who will hold, Claims, the New Debt Rollover Facility, the New Debt Alternative Facility or New Equity, as part of a hedge, straddle, conversion or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**

The U.S. federal income tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions are structured as a taxable sale of the Debtors' assets and/or stock (such a structure, a "***Taxable Transaction***"). The Debtors have not yet determined whether or not they intend to structure the Restructuring Transactions as a Taxable Transaction, whether in whole or part.

If the transaction undertaken pursuant to the Plan is structured as a Taxable Transaction with respect to the assets of any Debtor, the Debtors would recognize taxable gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets sold and the applicable Debtor's tax basis in such assets. Thus the amount of gain or loss recognized upon a Taxable Transaction will depend on the value of the assets treated as sold at the time the Taxable Transaction is effected, which cannot be known with certainty until the date the transaction is effected. It is possible the Debtors will recognize a substantial amount of taxable income or gain in connection with a Taxable Transaction and may not have sufficient NOLs or other tax attributes to apply to fully offset the amount of gain recognized, in which case the Debtors will be required to pay cash income Taxes (federal and state) with respect the net amount of income (and the Debtors' ability to apply NOLs to reduce any such taxable income is also subject to the discussion of the Alternative Minimum Tax, below).

If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, it will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock of an entity treated as a corporation for income tax purposes, the Debtor whose stock is transferred would retain its basis in its assets (unless the seller of such stock and the Reorganized Debtor of such stock make an election under IRC section 338(h)(10) to treat the transaction as a taxable sale of the underlying assets), subject to reduction due to COD Income, as described below.

As of March 1, 2013, the Debtors estimated their current consolidated NOLs for U.S. federal income tax purposes to be approximately $735 million. Certain of these losses may be subject to limitations on their ability to offset income or gains recognized by the Debtors, including pursuant to the "separate return limitation year" tax rules. Additionally, the amount of NOL carryforwards currently available to the Debtors depends in part on the tax treatment of material transactions engaged in by the Debtors and their equity owners during the fiscal and tax year ending June 30, 2013, the treatment of which will not be finalized until the Debtors file their fiscal year 2013 consolidated federal income tax return.

As discussed further below, whether or not the Restructuring Transactions are effected (in whole or in part) as a Taxable Transaction, the Debtors expect that most, if not all, of Debtors' NOLs and tax credits will be eliminated upon implementation of the Plan.

### (i)    Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (y) the amount of Cash paid and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC.  In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits.  A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC.  The reduction in tax attributes occurs only after the taxable income (or loss) for the year of the debt discharge has been determined.  Aggregate tax basis in assets (determined on a consolidated basis) is not required to be reduced below the total amount of the Reorganized Debtors' indebtedness immediately after the cancellation of debt giving rise to COD Income (the "**asset tax basis floor**").  Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income.  The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction.  Generally, if the Plan is structured as a Taxable Transaction, the tax basis of any assets deemed to be purchased by the Reorganized Debtors will not be subject to reduction based on the amount of any COD Income recognized by the Debtors (instead, the attribute reduction described above, including reduction in the tax basis of assets, will apply solely to tax attributes retained by the Debtors).  The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan.  Regardless of the implemented structure, the Debtors expect, however, that the amount of such COD Income will be sufficient to eliminate all of their remaining NOLs allocable to periods prior to the Effective Date.  In addition, if the Plan is not structured as a Taxable Transaction, the Debtors expect that the tax basis in their assets will be fully reduced to the asset tax basis floor, which amount will depend on the total indebtedness of the Reorganized Debtors immediately following the Restructuring Transactions.

### (ii)    Limitation of NOL Carryforwards and Other Tax Attributes

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence may be subject to certain limitations under the IRC.  Generally, if the Plan is not consummated as a Taxable Transaction, the Reorganized Debtors will succeed to the Debtors' tax attributes (including NOLs and tax credits) and tax accounting methods (such as current depreciation and amortization schedules) after giving effect to any reduction pursuant to excluded COD Income.  If, however, the Plan is structured as a Taxable Transaction, the Reorganized Debtors would not generally succeed to any of the Debtors' tax attributes, would generally take a fair market value tax basis in their assets, and would be required to use new depreciation and amortization schedules for such assets starting on the date of purchase, and the Reorganized Debtors would not generally be subject to the limitations described below.

If the Plan is not consummated as a Taxable Transaction, following consummation of the Plan, the Debtors anticipate that their remaining NOLs (if any) may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "***Pre-Change Losses***") that may be utilized to offset future taxable income generally is subject to an annual limitation.  As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Equity pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

(a)    General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "***Section 382 Limitation***."  In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently **[approximately 3%]**).  The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Equity, along with the cancellation of existing CL Holdings Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective Date.  As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date.  This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "***382(l)(6) Exception***").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

*(iii)    Alternative Minimum Tax*

In general, an alternative minimum tax ("***AMT***") is imposed on a corporation's alternative minimum taxable income ("***AMTI***") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax

for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Debtors or the Reorganized Debtors.

## C.    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims

The expected federal income tax consequences of the Plan to the Holders of Allowed Claims entitled to vote depend on a number of considerations that cannot be known at this time, including without limitation the following: (1) the classification (for U.S. federal income tax purposes) of the primary obligor or borrower with respect to each Class of Allowed Claims, (2) whether or not the Restructuring Transactions are structured (in whole or part) as a Taxable Transaction, (3) whether the Reorganized Debtors enter into the New Debt Alternative Facility or the New Debt Rollover Facility, (4) if the Reorganized Debtors enter the New Debt Rollover Facility, (a) whether the New Debt Rollover Facility is treated as a "security" within the meaning of applicable tax rules and (b) whether or not the entity treated as the borrower of the New Debt Rollover Facility for tax purposes is the same entity and/or the successor (for tax purposes) to the entity treated as the borrower for tax purposes with respect to the First Lien Claims for which it is exchanged and (5) whether the issuer of the New Equity is treated as the same entity or successor entity (for tax purposes) as the borrower with respect to the First Lien Loan Claims for which it is exchanged.

The Debtors expect to take the position, and this discussion assumes, that each of the First Lien Credit Facility Claims, First Lien Notes Claims, First Lien Swap Claims, Second Lien Claims and Subordinated Notes Claims consist of claims with respect to debt for which solely CLAI is treated as the borrower or debtor for federal income tax purposes. The Debtors expect to take the position, and this discussion assumes, that all Claims of a Holder with respect to the First Lien Credit Facility (e.g., Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29 and Class 30 Claims of a Holder arising from an interest in the First Lien Credit Facility) are treated as arising from a single debt of CLAI for federal income tax purposes. Likewise, all Claims of a Holder against the Debtors with respect to each of the First Lien Notes, the First Lien Swaps, the Second Lien Notes and the Senior Notes are treated, in each case, as arising from a single debt of CLAI for federal income tax purposes.

### (i)    Consequences to Holders of Allowed First Lien Claims (Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29 and Class 30)

Pursuant to the Plan, each Holder of an allowed First Lien Secured Claim (A) against CL Holdings shall receive such Holder's *pro rata* share of the assets of CL Holdings, if any, on account of such Claims; (B) against CL Holdco shall receive such Holder's pro rata share of the assets of CL Holdco, if any, on account of such Claims; (C) against CLAI shall receive its Pro Rata share of (i) 100% of the New Equity less any amount of New Equity that is part of the Unsecured CLAI Recovery or Unsecured CLI Recovery (subject to dilution for the Management Incentive Plan), (ii) the New Debt Facility Consideration, (iii) the Excess Cash, in each case (i)-(iii) as such Pro Rata shares are multiplied by a fraction equal to the amount of the First Lien Secured Claims against CLAI divided by the aggregate amount of First Lien Secured Claims against CLAI plus First Lien Secured Claims against CLI, (iv) any amount of the Unsecured CLAI Recovery that is allocable to value that is determined to by Final Order to be subject to the non-avoidable Liens of the Holders of the First Lien Claims, and (v) the distribution received by CLAI under the Plan, if any, on account of intercompany obligations owed by CLI to CLAI that were pledged under the First Lien Documents; and (D) against CLI shall receive its Pro Rata share of (i) 100% of the New Equity less any amount of New Equity that is part of the Unsecured CLAI Recovery or Unsecured CLI Recovery (subject to dilution for the Management Incentive Plan), (ii) the New Debt Facility Consideration, (iii) the Excess Cash, in each case (i)-(iii) as such Pro Rata shares are multiplied by a fraction equal to the amount of the First Lien Secured Claims against CLI divided by the aggregate amount of First Lien Secured Claims against CLAI plus First Lien Secured Claims against CLI, (iv) any amount of the Unsecured CLI Recovery that is allocable to value that is determined to by Final

Order to be subject to the non-avoidable Liens of the Holders of the First Lien Claims, and (v) the distribution received by CLI under the Plan, if any, on account of intercompany obligations owed by CLAI to CLI that were pledged under the First Lien Documents. Thus, each such Holder primarily will receive a combination of New Equity, Cash and, if the Reorganized Debtors do not enter into the New Debt Alternative Facility, an interest in the New Debt Rollover Facility. Pursuant to the Plan, each Holder of an allowed First Lien Deficiency Claim shall receive its Pro Rata Share of the Unsecured CLAI Recovery and the Unsecured CLI Recovery, and any amounts of such Unsecured CLAI Recovery and the Unsecured CLI Recovery that it receives pursuant to the turnover provisions or the Second Lien Intercreditor Agreement.

Whether a Holder of an allowed First Lien Claim recognizes gain or loss as a result of the exchange of its claim for the New Debt Facility or New Equity or both depends, in part, on (x) if an interest in the New Debt Rollover Facility is received, whether such interest constitutes a "significant modification" of the Holder's current Claim under applicable tax principles and (y) whether the exchange qualifies as a tax-free recapitalization, which in turn depends on (1) whether the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes), (2) whether the New Rollover Facility is treated as a primary obligation of CLAI (or CLAI's successor for U.S. federal income tax purposes) and (3) whether the debt underlying the allowed First Lien Claim surrendered and the New Debt Facility (with respect to receipt of the New Debt Facility) are treated as "securities" for the reorganization provisions of the IRC.

(a)        Treatment of Exchange as Significant Modification

The exchange of existing First Lien Claims for an interest in the New Debt Rollover Facility (plus Cash and New Equity) is analyzed as if the exchange were simply a modification of the debt underlying the First Lien Claims. Under general principles of U.S. federal income tax law, the modification of a debt instrument can give rise to a deemed exchange under section 1001 of the Code upon which gain or loss is realized if the modified debt instrument differs materially either in kind or in extent from the original debt instrument. In this regard, governing Treasury regulations (the "Modification Regulations") provide that, as a general rule, a deemed exchange occurs when, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant (a "significant modification"). The Modification Regulations state that they can apply to any modification of a debt instrument, regardless of the form of the modification, including an exchange of a new debt instrument for an existing debt instrument. Therefore, the Modification Regulations are relevant in determining the consequences of an exchange of First Lien Claims for and interest in the New Debt Rollover Facility (plus Cash and New Equity).

Under the Modification Regulations, a change in yield of a debt instrument (including the receipt of additional consideration) is a significant modification if the yield of the modified debt instrument varies from the yield on the unmodified instrument (determined as of the date of the modification) by more than the greater of (i) 25 basis points or (ii) 5 percent of the annual yield on the unmodified instrument. For this purpose, the yield of the modified debt instrument is the annual yield of a debt instrument with (i) an issue price equal to the adjusted issue price of the unmodified debt instrument on the date of the modification, increased by any accrued but unpaid interest, and decreased to reflect payments made to the holders as consideration for the modification and (ii) payments equal to the payments on the modified debt instrument from the date of the modification. The Modification Regulations further provide that a change in the timing of payments due under a debt instrument is a significant modification if it results in the material deferral of scheduled payments, which depends on all the facts and circumstances. The Modification Regulations provide in this respect a safe harbor under which a deferral of one or more scheduled payments within the safe harbor period, which is the lesser of 5 years or 50 percent of the original term of the instrument, is not a material deferral if the deferred payments are unconditionally payable no later than the end of the safe harbor period. A change in the obligor of a debt instrument also generally results in a significant modification under the Modification Regulations. Finally, the Modification Regulations provide that a modification of a debt instrument that results in a instrument or property right that is not debt for federal income tax purposes is a significant modification.

The Debtors expect, and this discussion assumes, that the exchange of First Lien Claims for an interest in the New Debt Rollover Facility (plus Cash and New Equity) will be treated as a "significant modification" of debt underlying the First Lien Claims because it is likely that the New Debt Rollover Facility will have terms that cause it

to fail one or more of the tests described above (e.g., more than de minimis change in yield, change in identity of obligor, material deferral of scheduled payments).  However, it cannot be known with certainty whether each such exchange will constitute a significant modification until the terms of the New Debt Rollover Facility (if ultimately issued) are finalized.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.  The Debtors expect to take the position that the debt underlying the First Lien Secured Claims against CLAI are not "Securities."

(b)      Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes.  These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

The First Lien Credit Facility Agreement had an initial term of seven years for the unextended term loans and six years for the unextended revolver.  The incremental term loan issued under the First Lien Credit Facility had an initial term of more than six years.  In April 2012, a portion of the term loans and revolver debt under the First Lien Credit Facility had its maturity extended by three years (or to about five years and three months from the date of modification).  The term of the First Lien Notes is just over 8 years.  The Debtors expect to take the position that the Claims arising under the First Lien Credit Facility Agreement and the First Lien Notes against CLAI constitute "securities."  The First Lien Swaps had a maximum initial term of approximately two years.  Additionally, obligations under swap agreements are normally classified as "notional principal contracts" under applicable tax law, rather than debt instruments.  Thus, the Debtors expect to take the position that the Claims with respect to the First Lien Swaps are not securities.  The New Debt Rollover Facility has a proposed term of six years.  Thus, the Debtors expect to take the position that the New Debt Rollover Facility is treated as a security.

(c)      Treatment of a Holder of an Allowed First Lien Claim if the Exchange of its Claim is not Treated as a Recapitalization

If either (x) the Restructuring Transactions are effected as a Taxable Transaction, (y) a surrendered allowed First Lien Claim is not treated as a "security" for U.S. federal income tax purposes or (z) both the New Equity and (if issued) the New Debt Rollover Facility are treated as issued by an entity other than CLAI or CLAI's successor for federal income tax purposes, then a Holder of such a claim should be treated as exchanging its allowed First Lien Claim for the New Debt Facility and New Equity in a fully taxable exchange.  While the terms of the New Rollover Debt Facility provide that Reorganized CLAI will be the borrower, depending on the structure of the Restructuring Transactions, Reorganized CLAI may or may not be treated as the successor to CLAI for income tax purposes (and will not be so treated in the event of a Taxable Transaction).

A Holder of an allowed First Lien Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of (x) issue price (as determined under the applicable Treasury

regulations -- see below under "Issue Price and Original Issue Discount with respect to the New Debt Rollover Facility") of the New Debt Rollover Facility (if issued), (y) the fair market value of the New Equity and (z) the total amount of cash received by such Holder in the exchange, in each case that is not allocable to accrued but untaxed interest, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed First Lien Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in the New Debt Rollover Facility received on the Effective Date should equal its issue price and a Holder's tax basis in the New Equity should equal its fair market value. A Holder's holding period for the New Debt Facility and New Equity received on the Effective Date should begin on the day following the Effective Date.

> (d)    Treatment of a Holder of an Allowed First Lien Secured Claim if the Exchange of its Claim Is Treated as a Recapitalization

If a debt instrument constituting a surrendered allowed First Lien Claim is a security and either (x) the New Equity is treated as issued by CLAI (or CLAI's successor for U.S. federal income tax purposes) or (y) the New Debt Rollover Facility is issued by CLAI (or CLAI's successor for U.S. federal income tax purposes) and is treated as a "security" for U.S. federal income tax purposes, the exchange of a Holder's allowed First Lien Secured Claim against CLAI for the New Debt Rollover Facility and New Equity should be treated as a recapitalization, and therefore a reorganization, under the IRC. If the exchange is treated as a recapitalization, there are three potential scenarios: (1) the New Equity is treated as issued by CLAI (or its successor), and the New Debt Rollover Facility (if issued) is not treated as a security or it is treated as not issued by CLAI (or by CLAI's successor); (2) the New Equity is not treated as issued by CLAI (or its successor) and the New Debt Rollover Facility is treated as issued by CLAI (or its successor) and is treated as a security; or (3) both the New Debt Rollover Facility and New Equity are treated as issued by CLAI (or its successor) and the New Debt Rollover Facility is treated as a security.

If the New Equity is treated as issued by CLAI (or its successor), but the New Debt Rollover Facility is either (i) not issued, (ii) not treated as a security or (iii) is not treated as issued by CLAI (or CLAI's successor), a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of Cash and the issue price of the interest in the New Debt Rollover Facility received. A Holder who is subject to this treatment will take a tax basis in the interest in the New Debt Rollover received equal to its issue price. The Holder will take a tax basis in the New Equity equal to the Holder's tax basis of the surrendered First Lien Claim *increased* by the amount of gain recognized in the exchange but *reduced* by the amount of cash and the issue price of the interest received in the New Debt Rollover Facility (if any). A Holder's holding period for its interest in the New Debt Rollover Facility (if any) received (and any property received attributable to accrued but untaxed interest) should begin on the day following the Effective Date. A Holder's holding period for the New Equity received should include the holding period for the obligation constituting the surrendered allowed First Lien Claim exchanged for such property.

If the New Equity is not treated as issued by CLAI (or its successor), and the New Debt Rollover Facility is both treated as a security and treated as issued by CLAI (or CLAI's successor), a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of Cash and the fair market value of the New Equity received. A Holder who is subject to this treatment will take a tax basis in the New Equity received equal to its fair market value. The Holder will take a tax basis in its interest in the New Debt Rollover Facility received equal to the Holder's tax basis of the surrendered First Lien Claim *increased* by the amount of gain recognized in the exchange but *reduced* by the amount of cash and the fair market value of the New Equity received. A Holder's holding period for its interest in the New Equity received (and any property received attributable to accrued but untaxed interest) should begin on the day following the Effective Date. A Holder's holding period for its interest in the New Debt Rollover Facility received should include the holding period for the obligation constituting the surrendered allowed First Lien Claim exchanged for such property.

If the New Equity is treated as issued by CLAI (or its successor) and the New Debt Rollover Facility is both treated as a security and treated as issued by CLAI (or CLAI's successor), a Holder should not recognize loss

with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of Cash received. A Holder who is subject to this treatment will take an aggregate tax basis in the New Equity and its interest in the New Debt Rollover Facility received equal to the Holder's tax basis in the surrendered First Lien Claim *increased* by the amount of gain recognized in the exchange and *reduced* by the amount of cash received. Such aggregate tax basis will be allocated between the New Equity and the interest in the New Debt Rollover Facility received on the basis of their relative fair market value. A Holder's holding period for the New Equity and its interest in the New Debt Rollover Facility received (except, in each case, to the extent attributable to accrued but untaxed interest) should each include the holding period for the obligation constituting the surrendered allowed First Lien Claim exchanged for such property.

**The tax consequences of the Plan and to the Holders of allowed First Lien Claims against CLAI are highly uncertain. Holders of allowed First Lien Secured Claims against CLAI should consult their tax advisors regarding whether such Claims, the New Debt Facility could be treated as a "security" for U.S. federal income tax purposes.**

### (ii)    Consequences to Holders of Allowed Second Lien Claims (Class 5, Class 14, Class 23, Class 31)

Pursuant to the Plan, each Holder of an Allowed Second Lien Claim against CL Holdings and CL Holdco shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdings and CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date, provided that any distributions to the Holder of Second Lien Claims against CL Holdings or CL Holdco shall be subject to the turnover provisions of the Second Lien Intercreditor Agreement. Pursuant to the Plan, each Holder of an Allowed Second Lien Claim against CLAI shall receive its Pro Rata Share of the Unsecured CLAI Recovery that is not otherwise subject to the turnover provisions of the Second Lien Intercreditor Agreement. Pursuant to the Plan, each Holder of an allowed Second Lien Claim against CLI shall receive on the Effective Date its Pro Rata Share of the Unsecured CLI Recovery; provided that, after giving effect to the provisions of the Second Lien Intercreditor Agreement, distributions of the Unsecured CLI Recovery on account of the Disputed Copyrights that otherwise would have been made to Holders of Second Lien Claims against CLI shall be distributed on a ratable basis directly to the Holders of Allowed First Lien Deficiency Claims in accordance with the terms and conditions of the Second Lien Intercreditor Agreement.

Treatment of Holders of Allowed Second Lien Claims will depend in part on (x) whether or not the Unsecured CLAI Recovery includes New Equity, and if so (y) whether the exchange qualifies as a tax-free recapitalization, which in turn depends on (1) whether the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and (2) whether the debt instruments underlying the allowed Second Lien Claim surrendered are treated as "securities" for the reorganization provisions of the IRC.

If the Unsecured CLAI Recovery does not include New Equity then a Holder of an allowed Second Lien Claim should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below) and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed Second Lien Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for the any assets received on the Effective Date should begin on the day following the Effective Date.

If the Unsecured CLAI Recovery does include New Equity, but either (a) the Restructuring Transactions are effected as a Taxable Transaction, (b) the New Equity is not treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) or (c) debt instruments underlying the allowed Second Lien Claim surrendered are treated as "securities" for the purposes reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder of an allowed Second Lien Claim should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets or New Equity received by such Holder in the exchange (except to the extent allocable to accrued but untaxed

interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed Second Lien Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets or New Equity received should equal their fair market value. A Holder's holding period for the any assets or New Equity received on the Effective Date should begin on the day following the Effective Date.

If the Unsecured CLAI Recovery does include New Equity, the Restructuring Transactions are not effected as a Taxable Transaction, the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) <u>and</u> the debt instruments underlying the allowed Second Lien Claim surrendered are treated as "securities" for the purposes reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of the amount of Cash and the fair market value of an assets (other than the New Equity) received. A Holder who is subject to this treatment will take a tax basis in the New Equity received equal to the Holder's tax basis in the surrendered Second Lien Claim *increased* by the amount of gain recognized in the exchange and *reduced* by the amount of cash received. A Holder's holding period for the New Equity received (except to the extent attributable to accrued but untaxed interest) should each include the holding period for the obligation constituting the surrendered allowed Second Lien Claim exchanged for such property. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for the any assets received on the Effective Date should begin on the day following the Effective Date.

*(iii)*    ***Consequences to Holders of Allowed Senior Notes Claims (Class 6, Class 15, Class 24, Class 32)***

Pursuant to the Plan, each Holder of an allowed Senior Notes Claim shall receive such Holder's *pro rata* share of: (i) the Unsecured CLAI Recovery and (ii) the Unsecured CLI Recovery. Treatment of Holders of Allowed Senior Notes Claims will depend in part on (x) whether or not the Unsecured CLAI Recovery or the Unsecured CLI Recovery includes New Equity, and if so (y) whether the exchange qualifies as a tax-free recapitalization, which in turn depends on (1) whether the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and (2) whether the Senior Secured Notes surrendered are treated as "securities" for the reorganization provisions of the IRC.

If neither the Unsecured CLAI Recovery nor the Unsecured CLI Recovery includes New Equity then a Holder of an allowed Senior Notes Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed Senior Notes Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for the any assets received on the Effective Date should begin on the day following the Effective Date.

If either the Unsecured CLAI Recovery <u>or the Unsecured CLI Recovery</u> includes New Equity, but either (a) the Restructuring Transactions are effected as a Taxable Transaction, (b) the New Equity is not treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) or (c) the Senior Notes surrendered are treated as "securities" for the purposes reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder of an allowed Senior notes Claim should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets or New Equity received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the surrendered Senior Notes Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of

factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of accrued interest and market discount below.  A Holder's tax basis in any assets or New Equity received should equal their fair market value.  A Holder's holding period for the any assets or New Equity received on the Effective Date should begin on the day following the Effective Date.

If either the Unsecured CLAI Recovery or the Unsecured CLI Recovery includes New Equity, the Restructuring Transactions are not effected as a Taxable Transaction, the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and the Senior Notes surrendered are treated as "securities" for the purposes reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of the amount of cash and the fair market value of an assets (other than the New Equity) received.  A Holder who is subject to this treatment will take a tax basis in the New Equity received equal to the Holder's tax basis in the surrendered Senior Notes Claim *increased* by the amount of gain recognized in the exchange and *reduced* by the amount of cash received.  A Holder's holding period for the New Equity received (except to the extent attributable to accrued but untaxed interest) should each include the holding period for the Senior Notes exchanged for such property.  A Holder's tax basis in any assets received should equal their fair market value.  A Holder's holding period for the any assets received on the Effective Date should begin on the day following the Effective Date.

### *(iv)    Consequences to Holders of Allowed General Unsecured Claims Against CLAI (Class 26)*

Pursuant to the Plan, each Holder of an allowed General Unsecured Claim against CLAI shall receive such Holder's *pro rata* share of the Unsecured CLAI Recovery.  Treatment of Holders of Allowed General Unsecured Claims against CLAI will depend in part on (x) whether or not the Unsecured CLAI Recovery includes New Equity, and if so (y) whether the exchange qualifies as a tax-free recapitalization, which in turn depends on (1) whether the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and  (2) whether the General Unsecured Claims surrendered are treated as "securities" for the reorganization provisions of the IRC.

If the Unsecured CLAI Recovery does not include New Equity then a Holder of an allowed General Unsecured Claim Against CLAI who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash and fair market value of any assets received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed General Unsecured Claim against CLAI.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets received should equal their fair market value.  A Holder's holding period for the any assets received on the Effective Date should begin on the day following the Effective Date.

If the Unsecured CLAI Recovery does include New Equity, but either (a) the Restructuring Transactions are effected as a Taxable Transaction, (b) the New Equity is not treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) or (c) the General Unsecured Claims surrendered are treated as "securities" for the purposes reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets or New Equity received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the surrendered General Unsecured Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets or New Equity received should equal their fair market

value. A Holder's holding period for the any assets or New Equity received on the Effective Date should begin on the day following the Effective Date.

If the Unsecured CLAI Recovery does include New Equity, the Restructuring Transactions are not effected as a Taxable Transaction, the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and the General Unsecured Claims surrendered are treated as "securities" for the purposes reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of the amount of cash and the fair market value of an assets (other than the New Equity) received. A Holder who is subject to this treatment will take a tax basis in the New Equity received equal to the Holder's tax basis in the surrendered General Unsecured Claim *increased* by the amount of gain recognized in the exchange and *reduced* by the amount of cash received. A Holder's holding period for the New Equity received (except to the extent attributable to accrued but untaxed interest) should each include the holding period for the Senior Notes exchanged for such property. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for the any assets received on the Effective Date should begin on the day following the Effective Date

### (v)        *Consequences to Holders of Allowed General Unsecured Claims Against CLI (Class 34)*

Pursuant to the Plan, each Holder of an allowed General Unsecured Claim against CLI shall receive such Holder's *pro rata* share of the Unsecured CLI Recovery. A Holder of an allowed General Unsecured Claim Against CLI who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash  plus the fair market value of any assets (including any New Equity)  received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed General Unsecured Claim against CLI. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets or New Equity received should equal their fair market value. A Holder's holding period for the any assets or New Equity received on the Effective Date should begin on the day following the Effective Date.

### (a)        Issue Price and Original Issue Discount with respect to New Debt Rollover Facility

A debt instrument, such as the New Debt Rollover Facility, is treated as issued with original issue discount ("*OID*") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest is "qualified stated interest" if it is payable in cash at least annually.

The issue price of the New Debt Rollover Facility will depend on whether a substantial amount of either the New Debt Rollover Facility or the First Lien Claims for which it is exchanged is considered to be "traded on an established market." In general, a debt instrument such as the New Debt Rollover Facility will be treated as traded on an established market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property and the quoted price is substantially the same as the price for which the person receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property.

If the New Debt Rollover Facility is *not* traded on an established market and the First Lien Claims *are* traded on an established market at the time of the exchange, the issue price of the new Debt Rollover Facility will be determined applying the "investment unit" rules and treating the New Debt Rollover Facility as part of an investment unit (including the New Equity) issued in exchange for the existing notes. Generally, the issue price of an investment unit is determined by applying the issue price rules applicable to debt instruments, and the debt

instrument's issue price is its allocable portion of the issue price of the investment unit, based on the relative fair market value of the debt instrument and the other property right (i.e., the New Equity). Thus, if the First Lien Claims are traded on an established market, the issue price of the investment unit would be equal to the fair market value of the First Lien Claims on the date the New Debt Rollover Facility is issued (reduced by the amount of cash received by Holders in the exchange), and the issue price of the New Debt Rollover Facility will equal the allocable portion of such investment unit's issue price determined by multiplying the investment unit's issue price by the fraction obtained by dividing the fair market value of the New Debt Rollover Facility by the sum of the fair market value of the New Debt Rollover Facility and the fair market value of the New Equity. If neither the New Debt Rollover Facility nor the First Lien Claims are traded on an established market at the time of the exchange, the issue price of the New Debt Rollover Facility will generally equal its stated principal amount.

A Holder receiving an interest in the New Debt Rollover Facility, if it is issued with OID, will generally be required to include any OID in income over the term of such shares of the loans in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on its interest in the New Second Lien Facility (other than cash attributable to qualified stated interest, which is includible in income in accordance with the Holder's normal method of tax accounting). Accordingly, a Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a Holder includes in income will increase the tax basis of the Holder in its interest in the New Debt Rollover Facility. A Holder of an interest in the New Debt Rollover Facility will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such loans by the amount of such payments.

(b)    Accrued Interest

To the extent that any amount received by a Holder of a surrendered allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered allowed claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which the consideration received by a Holder of a surrendered allowed Claim will be attributable to accrued interest on the debts constituting the surrendered allowed claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of allowed Claims shall be allocated first to the principal amount of such Claims (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

(c)    Market Discount

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

## D.    Limitations on Use of Capital Losses

A Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

## E.    Withholding and Reporting

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**[Remainder of page intentionally left blank.]**

## XV.    Recommendation

In the opinion of Cengage and each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  August 16, 2012

Respectfully submitted,

Cengage Learning, Inc.
(on behalf of itself and each of the Debtors)

By: *Dean D. Durbin*
    Dean D. Durbin
    Chief Financial Officer
    Cengage Learning Holdings II, L.P.

Prepared by:

*Jonathan S. Henes*
Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

-and-

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Plan of Reorganization**

[Filed as Docket No. ___]

## Exhibit B

**Declaration of Dean D. Durbin, Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Motions**

[Filed as Docket No. 15]

<u>**Exhibit C**</u>

**Disclosure Statement Order**

**<u>Exhibit D</u>**

**Financial Projections**

**[TO COME]**

## **Exhibit E**

**Valuation Analysis**

**[TO COME]**

**<u>Exhibit F</u>**

**Liquidation Analysis**

**[TO COME]**