HAHN & HESSEN LLP
488 Madison Avenue
New York, NY 10022
(212) 478-7200
(212) 478-7400 (Facsimile)
Mark T. Power, Esq.
Alison M. Ladd, Esq.

*Counsel for Manuel Guzman and Richard Foley*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| | : | Case No. 13-44106 (ESS) |
| CENGAGE LEARNING, INC., *et al.* | : | Case No. 13-44105 (ESS) |
| | : | Case No. 13-44107 (ESS) |
| | : | Case No. 13-44108 (ESS) |
| Debtors. | : | |
| | : | (Jointly Administered) |

**MOTION OF MANUEL GUZMAN AND RICHARD FOLEY SEEKING ENTRY OF AN ORDER DEEMING THEM NON-INSIDERS ENTITLED TO RECEIVE SEVERANCE BENEFITS PURSUANT TO THE FINAL SEVERANCE ORDER**

Manuel Guzman ("Guzman") and Richard Foley ("Foley", and together, the "Movants"), former Executive Vice Presidents of Learning and Research Solutions/International and Sales, respectively, of Cengage Learning, Inc. ("Cengage"), the primary operating debtor of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby file this motion (the "Motion") pursuant to 11 U.S.C. §§ 105 and 503(c) for the entry of an order deeming them non-insiders entitled to receive severance benefits pursuant to the terms of the Final Order Authorizing, But Not Directing, Payments of Prepetition (I) Wages, Salaries and Other Compensation; (II) Reimbursable Employee Expenses; and (III) Employee Medical and Similar Benefits [D.I. 217] (the "Final

Severance Order"). In support of the Motion, Movants submit the "Guzman Declaration" and "Foley Declaration", copies of which are attached hereto as **Exhibit A** and **Exhibit B** respectively, and are incorporated herein by reference, and respectfully represent as follows[1]:

## GENERAL BACKGROUND

1. The Debtors are a large multi-national company, which provides on a global level content, innovative print and digital teaching and learning solutions, software, and associated educational services for the higher-education, research, school, career, professional, and international markets. The Debtors manage their operations from various locations throughout the United States and internationally, with their headquarters office located in Stamford, Connecticut.

2. On July 2, 2013 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

## RELEVANT BACKGROUND

### a. Movants' Employment Duties and Separation Agreements

3. Prior to the Petition Date, Guzman and Foley served as the Debtors' Executive Vice Presidents ("EVPs") of Learning and Research Solutions/International and

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Separation Agreements, the Foley and Guzman Declarations, the Employee Benefits Motion or the Final Severance Order.

Sales, respectively. Guzman served as EVP of Learning and Research Solutions/International from July 2010 to February 2013, while Foley served as EVP of Sales from 2010 to January 2013.

4. As of the Petition Date, the Debtors employed approximately 5,200 employees worldwide. In the months leading up to the Petition Date, the Debtors implemented various reductions in force, resulting in approximately 170 Eligible Employees being severed from the Debtors' employ. Guzman and Foley were two of the 170 employees included in the Debtors' reductions in force.

5. During Guzman's tenure as EVP of Learning and Research Solutions/International, and as more fully set forth in the Guzman Declaration, he was responsible for one aspect of the Debtors' business involving the Debtors' academic, professional and library markets product development programs, as well as their international businesses. Specifically, he was focused on accelerating growth of the Debtors through a fully integrated and aligned global product development process. His specific focus was on sales growth. In his role as EVP of Learning and Research Solutions and International, he reported to the Debtors' Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") on significant matters pertaining to the Debtors' product development programs and international businesses, who in turn reported to the Debtors' Board of Directors (the "Board").

6. During Foley's tenure as EVP of Sales, he was responsible for one aspect of the Debtors' business involving the Debtors' Sales division. Specifically, he was responsible for organizing, staffing, training and managing sales functions to achieve the Debtors' objectives of growth, profitability and visibility while ensuring a sales position consistent

with the corporate direction established by the CEO and Board. In his role as EVP of Sales, Foley reported to the Debtors' CEO and CFO on significant matters pertaining to the Debtors' sales, who in turn reported to the Board.

7. Movants did not have discretionary control over substantial budgetary amounts. Instead, they were responsible for creating draft budgets for their respective divisions, which were then submitted to the CFO for review and approval. While the approved budgets afforded Movants limited discretion on certain expenditures, any large expenditures or deviations from the approved budgets required CFO, CEO or Board approval.

8. Movants duties as EVPs did not include setting corporate policy nor did they have the unilateral authority to make any company-wide strategic decisions. Instead, their primary objective as EVPs was to oversee a part of the Debtors' complex, global businesses and implement the corporate policies for their respective divisions as established by the Debtors' senior management and the Board. Thus, any corporate actions Movants took as EVPs were within the parameters established by senior management and the Board, and any significant deviation therefrom required CEO or CFO authorization.

9. On February 8, 2013, Guzman and Cengage entered into the Guzman Separation Agreement (as defined in the Guzman Declaration). Similarly, in late 2012, Foley entered into the Foley Separation Agreement (as defined in the Foley Declaration, and together, the "Separation Agreements"). Pursuant to the Separation Agreements, the Debtors agreed, *inter alia*, to pay Movants (1) their current base salary (less withholdings), commencing on the day immediately following the Effective Date of their respective agreements and continuing for fifty-two weeks (the "Severance Period") and (2) an incentive

bonus, provided they successfully completed the transition of their key roles and responsibilities to their successors. These payments were to be made as consideration for Movants' agreement to expansive non-compete clauses which severely restrict their ability to seek employment in the print and digital information services industry for the educational and library reference markets during the Severance Period.

10. Upon information and belief, Movants severance arrangements as set forth in the Separation Agreements are substantially similar to and consistent with the Debtors' prepetition Severance Program offered to the Debtors' non-insider employees who were terminated prior to the Petition Date and included in the Final Severance Order.

**b. Employee-Related Relief in the Chapter 11 Cases**

11. On the Petition Date, the Debtors filed the Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, Payments of Prepetition (I) Wages, Salaries, and Other Compensation, (II) Reimbursable Employee Expenses; and (II) Employee Medical and Similar Benefits [D.I. 9] (the "Employee Benefits Motion"). By the Employee Benefits Motion, the Debtors sought authorization to pay certain prepetition employee obligations—including wages, severance obligations, and employee benefits programs—which the Debtors argued were vital to their businesses and necessary to prevent immediate and irreparable harm in these chapter 11 cases.

12. With respect to the Debtors' prepetition severance obligations, the Debtors represented that:

> There is no formal severance policy, but according to established practice, severance is paid as salary continuation, and severance payments are based on an Employee's level of seniority and length of service. Certain policies under the Health Benefits Plan and Flexible Spending Plan are also continued as a payroll deduction at the active Employee rate until the end of the month

> of the applicable severance period, or until the Debtors are notified that alternative coverage has been secured… .
>
> In the months leading up to the Petition Date, the Debtors implemented various reductions in force, resulting in approximately 167 Employees being severed from the Debtors' employ. As a result, the Debtors incurred approximately $9.7 million in prepetition severance obligations, approximately $7.3 million of which remain outstanding as of the Petition Date (the "Unpaid Prepetition Severance"). The Debtors estimate that approximately 118 Employees are owed Unpaid Prepetition Severance in excess of the Priority Cap.

Employee Benefits Motion, ¶¶ 41, 42.

13. The Debtors argued that the "Severance Program is critical to maintaining Employee morale and loyalty…[and] implementing such a program is not without tangible benefits." Employee Benefits Motion, ¶ 42. Specifically, "[a]s a condition to receiving a severance payment, each employee must execute a release agreement, whereby the employee releases any claims held against the Debtors and agrees, among other things, to not disclose confidential information, solicit the Debtors' employees for a period of time, or disparage the Debtors." Id. The Debtors included a footnote which stated that they were not seeking to make any payments to "Insiders" under the Severance Program above the cap set forth in section 503(c)(2) of the Bankruptcy Code. Employee Benefits Motion, FN 11.

14. In support of the Unpaid Prepetition Severance portion of the Employee Benefits Motion, on July 23, 2013, the Debtors filed the Declaration of Dean D. Durbin, Chief Final Officer, In Support of the Employee Benefits Motion [D.I. 130] (the "Durbin Declaration")[2]. The Durbin Declaration states that none of the Eligible Employees owed amounts under the Severance Practices the Debtors seek to honor are "Insiders", despite the

[2] Capitalized terms used in this section of the Motion and not defined herein shall have the meanings ascribed to them in the Durbin Declaration.

fact that some of the Eligible Employees' business titles include terms such as, *inter alia*, "Executive Vice President". Durban Declaration, ¶ 11. The Durban Declaration further explains that even the Eligible Employees that held more senior positions are still entitled to receive payments pursuant to the Severance Practices because they were not directors, officers or persons in control of the Debtors. See Durban Declaration at ¶ ¶ 12, 13, 14.

15. On July 3, 2013, the Court entered the Interim Order Authorizing the Debtors to (I) Pay Certain Prepetition Wages, Other Compensation, and Reimbursable Employee Expenses and (II) Continue Employee Benefits Programs [D.I. 36], and on July 24, 2013, the Court entered the Second Interim Order Authorizing the Debtors to (I) Pay Certain Prepetition Wages, Other Compensation, and Reimbursable Employee Expenses and (II) Continue Employee Benefits Programs [D.I. 153].

16. On August 2, 2013, the Court entered the Final Severance Order whereby the Debtors were authorized, *inter alia*, to pay any and all remaining prepetition obligations related to or arising from Unpaid Prepetition Severance and to continue its Severance Program on a postpetition basis, subject to certain limitations set forth therein. The Final Severance Order specifically provides that no payments on account of the Debtors' prepetition Severance Program shall be made to "Insiders." Final Severance Order, ¶ 4.

17. Concurrently with the filing of the Employee Benefits Motion, Movants were informed by the Debtors that they would not be eligible to receive the unpaid severance benefits set forth in their respective Separation Agreements because of the Debtors' unilateral determination that they are former insiders of the Debtors. Upon information and belief, Movants are the only two severed employees excluded from the Final Severance

Order, even though a number of other Executive Vice Presidents have or will receive Unpaid Prepetition Severance pursuant to the Final Severance Order.

## JURISDICTION

18. The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

19. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105 and 503(c).

## RELIEF REQUESTED

20. The Movants believe that the Debtors' unilateral determination that they are insiders, ineligible to receive their prepetition severance benefits under the Final Severance Order is incorrect. Accordingly, Movants seek an order deeming them non-insiders entitled to receive their bargained for prepetition severance benefits pursuant to the terms of the Final Severance Order.

## BASIS FOR RELIEF

21. Movants are non-insiders of the Debtors, and thus entitled to receive their Unpaid Prepetition Severance pursuant to the Final Severance Order. The Final Severance Order authorizes the Debtors to pay Unpaid Prepetition Severance to non-insiders.[3] See Final Severance Order at ¶ 4. With respect to a corporate debtor, the Bankruptcy Code defines insider as, among other things, (i) a director of the debtor, (ii) an officer of the debtor

[3] Section 503(c) of the Bankruptcy Code was implemented as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") in order to limit the scope of KERPs and other incentive programs for employees in chapter 11 cases. Section 503(c)(2) specifically prohibits severance payments to an insider unless (A) the payment is part of a program that is generally applicable to all full-time employees, and (B) the amount of the payment does not exceed 10 times the amount of the mean severance pay given to non-management employees during the calendar year in which the payment is made.

and (iii) a person in control of the debtor. See 11 U.S.C. §101(31)(B). Neither "officer" nor "director" is defined in the Bankruptcy Code; however, courts have relied on the dictionary definitions of these terms. In re Borders Group, Inc., 453 B.R. 459, 468 (Bankr. S.D.N.Y. 2011). A director is "an individual who sits on the board of directors…[and an officer is] a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as the CEO, president, secretary or treasurer." Id. at 148 (internal citations omitted). However, the fact that an employee has the word "director" or "vice president" in their title is not determinative if that employee does not have decision making authority akin to an executive. See In re Global Aviation Holdings, Inc., 478 B.R. 142,148 (Bankr. E.D.N.Y. 2012).

22. Additionally, an employee can be considered an insider even if that person does not hold a position enumerated in Section 101(31)(B). Id. The statutory definition of insider "is merely illustrative and the term insider should be flexibly applied on a case by case basis." Id. (quoting In re 9281 Shore Road Owners Corp., 187 B.R. 837, 853 (E.D.N.Y. 1995)). Accordingly, such determination should be made "on a case by-case basis based on the totality of the circumstances, including the degree of an individual's involvement in a debtor's affairs." Borders Group, 453 B.R. at 469. In Borders Group, the court held that, for a person not listed in § 101(31)(B) to be an insider, that person must have "at least a controlling interest in the debtor or exercise sufficient authority of the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets." 453 B.R. 469.

23. In Global Aviation, Judge Craig was presented with the question of whether certain employees of the debtor were insiders, thus making them ineligible to receive certain

payments under the debtor's proposed KERP under Section 503(c) of the Bankruptcy Code. Citing to the Southern District's decision in Borders Group, Judge Craig determined that the employees in question were not insiders as defined in Section 101(31)(B) of the Bankruptcy Code. 478 B.R. at 149. As an initial matter, none of the employees were members of the board of directors, participated in corporate governance, or were officers appointed by the board to manage the day-to-day operations of the corporation. Id. Additionally, based on the totality of the circumstances, none of the employees had the requisite controlling interest in the debtor or exercised sufficient authority of the debtor so as to dictate corporate policy and/or the disposition of corporate assets. Id. at 150. Specifically, the employees in question were:

- at least two levels down from senior management (e.g., four of the five employees in question reported to the COO, who, in-turn, reported to senior management (including the CEO, President, CCO, CFO and general counsel));

- none of the employees had discretionary control over substantial budgetary amounts (at most, one employee had discretion to approve expenditures for day-to-day maintenance, but supervisory approval was required for larger expenditures);

- the work being done by the employees did not constitute setting any corporate policy for the company, and instead reflected responsibility for the day-to-day operations of the airline "consistent with the status of mid-ranking non-insider employees." Id. at 149.

24. Applying the Court's reasoning in Global Aviation, Movants were clearly not "insiders" of the Debtors. As an initial matter, Movants were not officers or directors of the Debtors as those terms are used in 11 U.S.C. 101(31)(B) since they did not sit on the Board nor were they appointed by the Board to manage the daily operations of the corporation (such as the CEO, CFO or COO). Moreover, while Movants were EVPs of the

Debtors, this title is not determinative of their status as insiders. Global Aviation, 478 B.R. at 148.

25. First, other EVPs were included in the Employee Benefits Motion as non-insiders and are entitled to receive Unpaid Prepetition Severance under the Final Severance Order. More significantly, while important to the Debtors' business, neither Movant had any significant controlling interest in the Debtors nor did they exercise sufficient authority of the Debtors so as to unilaterally dictate corporate policy or the disposition of corporate assets. Borders Group, 478 B.R. at 149. They did not oversee the Debtors' strategic planning nor did they have any authority or responsibility with respect to strategic investing or financial activities. Their employment responsibilities were limited to sales growth activities. To that end, Movants (i) did not report directly to the Board, (ii) did not have any discretionary control over substantial budgetary amounts, and (iii) did not have the unilateral authority to make any company-wide strategic decisions. Instead, Movants primary objective as EVPs was to oversee the sales growth parts of the Debtors' businesses and not to set the Debtors' corporate policy. Accordingly, Movants should not be prohibited from receiving their Unpaid Prepetition Severance pursuant to the Final Severance Order as the payment of such benefits would not thwart the purpose and tenor of Section 503(c) of the Bankruptcy Code—enacted to prohibit the board and senior management (i.e., those who dictate corporate policy) from awarding themselves handsome severance packages in chapter 11.

**WHEREFORE**, the Movants respectfully request that the Court enter an order deeming them non-insiders entitled to receive Unpaid Prepetition Severance pursuant to the terms of the Final Severance Order.

Dated: August 27, 2013
Brooklyn, New York

Respectfully submitted,

**HAHN & HESSEN LLP**

_/s/ Mark T. Power___________
Mark T. Power
Alison M. Ladd
488 Madison Avenue
New York, New York 10022
(212) 478-7200

*Counsel for Manuel Guzman and Richard Foley*