**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| In re: | Chapter 11 |
| CENGAGE LEARNING, INC., *et al.*, | Case No. 13-44106 (ESS) |
| | Case No. 13-44105 (ESS) |
| | Case No. 13-44107 (ESS) |
| | Case No. 13-44108 (ESS) |
| Debtors. | (Jointly Administered) |

**DISCLOSURE STATEMENT FOR DEBTORS' JOINT PLAN**
**OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

## <u>Important Dates</u>

- Date by which Ballots must be received by the Notice, Claims, and Solicitation Agent: [____], 2013
- Date by which objections to the Plan must be filed and served: [____], 2013

---

Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.    THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.    THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

# TABLE OF CONTENTS

Page

I.      EXECUTIVE SUMMARY ...........................................................................................1

II.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ..................................10

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE PLAN .........................................................................................................12

        A.      What is chapter 11?.............................................................................12

        B.      Why are the Debtors sending me this Disclosure Statement?........................................12

        C.      Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is
                consummated?.......................................................................................13

        D.      What happens to my recovery if the Plan is not confirmed, or does not go effective? ..................14

        E.      If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
                Plan goes effective?  What do you mean when you refer to "Confirmation," "Effective
                Date" and "Consummation?".......................................................................15

        F.      Will the Debtors have sufficient cash and/or other consideration to fund the distributions
                required under the Plan? ...........................................................................15

        G.      Will the Reorganized Debtors be obligated to continue to pay statutory fees after the
                Effective Date?......................................................................................15

        H.      When will the Plan Supplement be filed and what will it include?...................................15

        I.      What is the purpose of the trust structure?  How will the trusts be established?.....................16

        J.      What are the terms of the Exit Revolver Facility and the New Debt Facility? ..........................17

        K.      Are there risks to owning an Interest in Reorganized Cengage upon emergence from
                chapter 11?..........................................................................................18

        L.      Is there potential litigation related to the Plan?...................................................18

        M.      What is the Management Incentive Plan and how will it affect the distribution I receive
                under the Plan?......................................................................................18

        N.      Will there be releases granted to parties in interest as part of the Plan? ..........................18

        O.      What is the deadline to vote on the Plan? ..........................................................18

        P.      How do I vote for or against the Plan?..............................................................19

        Q.      Why is the Bankruptcy Court holding a Confirmation Hearing? ........................................20

        R.      When is the Confirmation Hearing set to occur? ....................................................20

        S.      What is the purpose of the Confirmation Hearing?...................................................21

        T.      What is the effect of the Plan on the Debtors' ongoing business? ...................................21

        U.      Does Cengage recommend voting in favor of the Plan? ..............................................21

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, BUSINESS OVERVIEW, AND
        OTHER BACKGROUND ...............................................................................................21

        A.      Overview of the Debtors' Business and Operations...................................................21

                (i)      Domestic .................................................................................22

i

|  | (ii) | International | 23 |
|  | (iii) | Joint Ventures | 23 |
| B. | | The Debtors' Corporate History and Capital Structure | 24 |
| C. | | Summary of Prepetition Capital Structure | 25 |
|  | (i) | First Lien Claims | 26 |
|  | (ii) | Second Lien Notes | 27 |
|  | (iii) | Unsecured Notes | 27 |
|  | (iv) | Intercreditor Agreement | 28 |
| D. | | Primary Confirmation Issues | 28 |
|  | (i) | Total Enterprise Value | 28 |
|  | (ii) | Amounts of Claims Against Multiple Debtors | 28 |
|  | (iii) | Substantive Consolidation | 30 |
| E. | | Other Disputed Issues | 31 |
|  | (i) | The Disputed Assets | 31 |
|  | (ii) | Intercompany Obligations | 35 |
| F. | | Appointment of a Mediator | 40 |
| G. | | Apax Issues | 41 |
|  | (i) | Prepetition Debt Purchases | 41 |
|  | (ii) | 2007 Leveraged Buy-Out ("LBO") | 42 |
|  | (iii) | The Apax Complaint | 43 |

| V. | | EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES | 43 |
| A. | | Fundamental Changes in the Educational Publishing Industry and Their Effect on the Debtors | 43 |
| B. | | Strategic Responses and Prepetition Restructuring Efforts | 44 |
| C. | | Negotiations with Stakeholders and the Execution of the Restructuring Support Agreement | 45 |

| VI. | | SUMMARY OF THE PLAN | 45 |
| A. | | Description of the CLAI Trust, the CLI Trust, & Resolution of the Trust Asset Disputes | 45 |
|  | (i) | Establishment of the Trust | 45 |
|  | (ii) | Trust Assets | 46 |
|  | (iii) | Reorganized Debtors' Right to Use the Trust Assets | 46 |
|  | (iv) | Trust Asset Election | 46 |
|  | (v) | Trust Agreements | 46 |
|  | (vi) | Administration of the Trust | 47 |
|  | (vii) | Trust Asset Dispute Resolution | 47 |
|  | (viii) | Standing of the Post-Effective Date Unsecured Creditors' Representatives Committee, First Lien Credit Facility Administrative Agent, First Lien Indenture Trustee, the Ad Hoc First Lien Group, and Apax | 47 |
|  | (ix) | CLAI Trust Causes of Action and CLI Trust Causes of Action | 48 |
|  | (x) | Payment of Post-Effective Date Fees & Expenses | 48 |
|  | (xi) | Costs and Expenses of the Trusts | 48 |
|  | (xii) | Compensation of the Trustees | 48 |
|  | (xiii) | Retention of Professionals/Employees by the Trustees | 48 |
|  | (xiv) | Successor Trustee | 48 |
|  | (xv) | Transferability of the Trust Interests | 48 |

(xvi)    Cash ..................................................................................................... 48
(xvii)   Tax Treatment of Trusts ....................................................................... 49
(xviii)  Distribution of Trust Assets/Disputed General Unsecured Claims Reserve ................... 49
(xix)   Certain Tax Considerations .................................................................. 50
(xx)    Indemnification of Trustees .................................................................. 51
(xxi)   Privileges ............................................................................................. 51

**VII.    EVENTS DURING THE CHAPTER 11 CASES** ......................................................... **51**

    A.    Overview of Chapter 11 ................................................................................... 51

    B.    First Day Pleadings and Other Case Matters ................................................... 52

        (i)     First and Second Day Pleadings ............................................................ 52
        (ii)    Procedural and Administrative Motions ................................................. 53
        (iii)   Retention of Chapter 11 Professionals .................................................. 53
        (iv)   Cash to Fund Operations ....................................................................... 53
        (v)    Appointment of the Committee Members and Advisors for Such Committee ................. 54

    C.    The Committee's Motion to Terminate Apax Investigation ............................... 54

    D.    Creditors' Committee Discovery Requests ...................................................... 55

    E.    Exclusivity ...................................................................................................... 55

    F.    Pending Litigation Proceedings and the Automatic Stay .................................. 55

    G.    Directors and Officers of Reorganized Cengage and the Other Reorganized Debtors ................... 55

        (i)     The New Board ...................................................................................... 55
        (ii)    Senior Management and Management Employment Agreements ................... 56
        (iii)   Management Incentive Plan .................................................................... 56

    H.    Claims Bar Date .............................................................................................. 56

    I.    NOL Motion .................................................................................................... 56

**VIII.  PROJECTED FINANCIAL INFORMATION** ............................................................... **57**

**IX.    VALUATION OF THE DEBTORS** ............................................................................... **57**

**X.    RISK FACTORS** .............................................................................................................. **57**

    A.    Risks Relating to Bankruptcy .......................................................................... 57

        (i)     The Debtors may be subject to protracted litigation regarding the Disputed Assets and other issues. ................................................................. 57
        (ii)    Parties in interest may object to the Plan's classification of claims and interests. ............ 57
        (iii)   The Debtors may fail to satisfy vote requirements. ............................... 57
        (iv)   Failure to confirm the Plan within the Milestones contained in the Restructuring Support Agreement may give rise to Termination of the Restructuring Support Agreement. ................................................................. 57
        (v)    The Debtors may not be able to obtain Confirmation of the Plan. .......... 58
        (vi)   The Debtors may be unable to obtain consensual Confirmation. ............ 58
        (vii)   The Debtors may object to the amount or classification of a Claim. ...... 58
        (viii)  Risk of non-occurrence of the Effective Date. ..................................... 58
        (ix)   Contingencies could affect votes of impaired classes to accept or reject the Plan. ........... 59
        (x)    The Debtors may not be able to achieve their projected financial results. ................. 59
        (xi)   Certain tax implications of the Debtors' chapter 11 cases. ................... 59
        (xii)   The Debtors' emergence from chapter 11 is not assured. ...................... 59

    B.    Risks Related to the Debtors' and Reorganized Debtors' Business ................. 59

|  |  | (i) | Operational-Related Risks Due to the Pending Chapter 11 Cases | 59 |
|  |  | (ii) | General Business and Financial Risk Factors | 60 |
|  | C. | | Risks Associated with Forward Looking Statements | 62 |
|  |  | (i) | Financial information is based on the Debtors' books and records and, unless otherwise stated, no audit was performed. | 62 |
|  |  | (ii) | Financial projections and other forward looking statements are not assured, are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary. | 63 |
|  | D. | | Disclosure Statement Disclaimer | 63 |
|  |  | (i) | The information contained herein is for soliciting votes. | 63 |
|  |  | (ii) | This Disclosure Statement was not approved by the United States Securities and Exchange Commission. | 63 |
|  |  | (iii) | Reliance on exemptions from registration under the Bankruptcy Code or Securities Act. | 63 |
|  |  | (iv) | No legal or tax advice is provided to you by this Disclosure Statement. | 64 |
|  |  | (v) | No admissions have been made by this Disclosure Statement. | 64 |
|  |  | (vi) | The failure to identify litigation claims or projected objection should not be relied upon. | 64 |
|  |  | (vii) | No waiver of right to object or right to recover transfers and assets. | 64 |
|  |  | (viii) | Information was provided by the Debtors and was relied upon by the Debtors' advisors. | 64 |
|  |  | (ix) | Potential exists for inaccuracies, and the Debtors have no duty to update. | 65 |
|  |  | (x) | No representations outside this Disclosure Statement are authorized | 65 |
|  |  | (xi) | Liquidation under Chapter 7 of the Bankruptcy Code. | 65 |
| XI. | | | **RELEASE, INJUNCTIVE AND RELATED PROVISIONS** | **65** |
|  | A. | | Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies | 65 |
|  | B. | | Subordinated Claims | 66 |
|  | C. | | Debtor Release | 66 |
|  | D. | | Third-Party Release | 66 |
|  | E. | | Exculpation | 67 |
|  | F. | | Injunction | 67 |
|  | G. | | Setoffs | 68 |
|  | H. | | Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications | 68 |
| XII. | | | **SOLICITATION AND VOTING PROCEDURES** | **68** |
| XIII. | | | **CONFIRMATION OF THE PLAN.** | **68** |
|  | A. | | Requirements for Confirmation of the Plan | 68 |
|  | B. | | Best Interests of Creditors/Liquidation Analysis | 68 |
|  | C. | | Feasibility | 69 |
|  | D. | | Acceptance by Impaired Classes | 69 |
|  | E. | | Confirmation Without Acceptance by All Impaired Classes | 69 |
|  |  | (i) | No Unfair Discrimination | 69 |

iv

  (ii)  Fair and Equitable Test ...................................................................... 70

F. Valuation of the Debtors ...................................................................................... 70

**XIV. CERTAIN SECURITIES LAW MATTERS** ...................................................**70**

A. Plan Securities .................................................................................................... 70

B. Issuance and Resale of New Equity of the Reorganized Debtors under the Plan ........................ 70

  (i)  Offer and Sale of New Equity: Bankruptcy Code Exemption ......................... 70
  (ii)  Subsequent Transfers of New Equity ........................................................ 71
  (iii) No Registration or Listing of New Equity ............................................... 72

**XV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** .............................................................................................................**72**

A. Introduction ........................................................................................................ 72

B. Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors ......................................................................................... 73

  (i)  Cancellation of Debt and Reduction of Tax Attributes ................................. 73
  (ii)  Limitation of NOL Carryforwards and Other Tax Attributes ........................ 74
  (iii) Alternative Minimum Tax .................................................................... 75
  (iv) CLAI Trust and CLI Trust .................................................................... 75

C. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims ................................................................................................................ 76

  (i)  Consequences to Holders of Allowed First Lien Claims (Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29 and Class 30) .............................. 76
  (ii)  Consequences to Holders of Allowed Second Lien Claims (Class 5, Class 14, Class 23, Class 31) ............................................................................... 80
  (iii) Consequences to Holders of Allowed Senior Notes Claims (Class 6, Class 15, Class 24, Class 32) ............................................................................... 81
  (iv) Consequences to Holders of Allowed General Unsecured Claims Against CLAI (Class 26) ........................................................................................... 82
  (v)  Consequences to Holders of Allowed General Unsecured Claims Against CLI (Class 34) ........................................................................................... 83
  (vi) Issue Price and Original Issue Discount with respect to New Debt Rollover Facility ............................................................................................... 83
  (vii) Accrued Interest .................................................................................. 84
  (viii) Market Discount .................................................................................. 84
  (ix) Post Effectivee Date Distributions .......................................................... 85

D. Limitations on Use of Capital Losses .................................................................. 85

E. Withholding and Reporting ................................................................................. 85

**XVI. RECOMMENDATION** ...............................................................................**87**

EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Declaration of Dean D. Durbin, Chief Financial Officer of Cengage Learning GP I LLC, in Support of First Day Pleadings

EXHIBIT C    Disclosure Statement Order [TO COME]

EXHIBIT D    Financial Projections

EXHIBIT E-1 Enterprise Valuation Analysis

EXHIBIT E-2 Disputed Assets Valuation Analysis

EXHIBIT E-3 Disputed Copyrights Analysis

EXHIBIT F    Liquidation Analysis

EXHIBIT G    Willkie Report

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

## I.    EXECUTIVE SUMMARY

Cengage Learning, Inc. ("*Cengage*") and certain of its affiliates, as debtors and debtors in possession (collectively, the "*Debtors*"), submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the Plan dated September October 3, 2013.[1]   A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.   The Plan constitutes a separate chapter 11 plan for each Debtor unless otherwise explained in the Plan itself.

As described in the first day declaration of Dean D. Durbin, the Debtors' Chief Financial Officer, to appropriately restructure, the Debtors are seeking to implement a new business plan that provides for developments and improvements to both the Debtors' operations and capital structure.   In light of the industry's transition from print media to digital content, the Debtors' comprehensive new business plan centers on combining the best of innovative and complementary digital and print products with expert product support to provide whole-course packaged products covering individual courses from every angle.   The Debtors are currently developing new digital platforms and have plans for further new digital development.   Additionally, the Debtors are using new sales strategies to target particular markets that present greater growth opportunities.   In order to attain the liquidity and flexibility needed to implement management's strategic vision, the Debtors must substantially deleverage their capital structure.   The Debtors believe the Plan provides the Debtors with the appropriate means to achieve their objectives.

Beginning in April 2013, the Debtors, the First Lien Credit Facility Administrative Agent, the Ad Hoc First Lien Group (together with the First Lien Credit Facility Administrative Agent the "*First Lien Secured Parties*"), and their respective advisors held multiple meetings to exchange information, facilitate diligence, answer questions, and discuss various restructuring issues.   After considerable arm's-length negotiations, the Debtors and holders of over $2 billion of First Lien Claims (the "*Consenting Holders*") reached an agreement on a restructuring support agreement outlining a restructuring process and post-reorganization capital structure that is designed to de-lever the Debtors' balance sheet and provide for an expedient emergence from chapter 11.   The Debtors and the Consenting Holders memorialized their agreement by entering into the Restructuring Support Agreement and the three RSA Term Sheets: one regarding the principal terms of the Plan, one regarding the principal terms of the exit financing to be obtained, and/or entered into, in connection with the Plan, and one regarding the principal terms of certain post-reorganization governance and shareholders' rights.

The Plan will implement the restructuring transactions contemplated by the Restructuring Support Agreement and RSA Term Sheets.   As a result of the Consenting Holders' support, greater than 50 percent[2] of the Debtors' largest secured and unsecured creditor constituencies (due to the Consenting Holders' unsecured deficiency claims) support the Plan and the Debtors' expeditious emergence from chapter 11.   Among other things, the Plan contemplates the following:

- An approximate $4.3 billion reduction of funded debt;

- A post-reorganization capital structure consisting of (i) a new first-out revolving credit facility of no less than $250 million and up to $400 million to be raised from third-parties on market terms and (ii) no less than $1.5 billion first lien term loan facility (subject to the terms of the Restructuring Support Agreement);

---

[1]   Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.   The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.   In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

[2]   Excluding the claims of the Debtors' insiders.

- Holders of First Lien Secured Claims will receive their pro rata share of (1) 100% of the New Equity in the Reorganized Debtors less any equity distributed to unsecured creditors on account of the value of any unencumbered assets of CLAI and CLI (subject to dilution for the Management Incentive Plan); (2) a new term loan facility described in the Rollover Facility Term Sheet or the cash proceeds obtained from the Debtors' entry into a new term loan facility from a third-party (as applicable); and (3) cash on the Debtors' balance sheets as of the Effective Date (other than the Disputed Cash) after funding all payments and reserves required under the Plan, less $50 million (subject to certain working capital adjustments);

- Generally, unsecured creditors of CLAI and CLI (including the Holders of First Lien Deficiency Claims) will receive their Pro Rata share of the value of the Disputed Cash and Disputed Copyrights, respectively, to the extent determined to be unencumbered by valid liens or security interests, and the value, if any, of 35% of the Debtors' international operations, the value of the Debtors' non-wholly owned subsidiaries (Hampton Brown and CourseSmart), and the value of a certain piece of unencumbered real estate;

- The establishment of a trust to hold and maintain (a) the value attributable to unencumbered or potentially unencumbered assets of CLAI and CLI or (b) the actual unencumbered or potentially unencumbered assets, in each case pending the resolution of disputes regarding the valuation of such assets and/or the validity of the liens on such assets;

- The terms of certain post-reorganization governance rights applicable to the Holders of New Equity (including rights to nominate directors);

- The cancellation of existing equity interests other than to the extent necessary to preserve the general corporate structure of the Debtors; and

- Certain other customary terms and provisions.

During the Restructuring Support Agreement negotiations, the Debtors and their advisors — together with their independent director, Richard D. Feintuch, a former partner at Wachtell, Lipton, Rosen & Katz with more than 20 years of restructuring experience — took extreme care to advance and protect the interest of unsecured creditors in these chapter 11 cases, including seeking to protect four primary sources of potential recoveries for unsecured creditors and providing unsecured creditors with appropriate time to conduct diligence on, and discuss their conclusions regarding, among other things, the value of these sources of potential recoveries. Disputes exist with respect to these potential sources of recovery, including their ultimate value. Accordingly, such sources of recovery may not yield meaningful distributions to unsecured creditors.

The Debtors will continue to negotiate with their other major stakeholders in the time leading up to the approval of this Disclosure Statement and in advance of any hearing to consider confirmation of the Plan. To that end, the Debtors have been in dialogue with the advisors for the Creditors' Committee as well as the advisors for the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, the First Lien Indenture Trustee, the Second Lien Indenture Trustee, and Centerbridge Partners, L.P. ("*Centerbridge*"), a holder of the Debtors' Senior Notes. Additionally, the Debtors and their major stakeholders have been continuing negotiations on outstanding issues with the assistance of the Honorable Robert D. Drain through formal mediation proceedings.

The Debtors seek to foster dialogue with all parties in interest in order to be able to achieve a fully consensual Plan prior to the Confirmation Hearing. To the extent that the Debtors cannot reach full consensus, however, the Debtors believe that they already have the requisite creditor support necessary to confirm the Plan and intend to proceed on a path to confirmation of the Plan in an expeditious manner.

The following table provides a summary of the classification and treatment of Claims and Equity Interests and the potential distributions to Holders of Allowed Claims under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. THE PROJECTED RECOVERIES SET FORTH IN THIS DISCLOSURE STATEMENT ASSUME, AMONG OTHER THINGS, THAT THE DEBTORS' POSITION ON THE LIKELY OUTCOMES OF EACH OF THE DISPUTED ISSUES (INCLUDING VALUATIONS OF CERTAIN ASSETS) DESCRIBED IN ARTICLE IV OF THIS DISCLOSURE STATEMENT ULTIMATELY ARE APPROVED OR OTHERWISE NOT CONTRADICTED BY THE BANKRUPTCY COURT OR THE CONFIRMATION ORDER. TO THE EXTENT ANY OF THESE DISPUTED ISSUES ARE SETTLED OR RESOLVED IN A MANNER DIFFERENT THAT DESCRIBED IN AND ASSUMED BY THIS DISCLOSURE STATEMENT, ACTUAL RECOVERIES WILL DEVIATE FROM PROJECTED RECOVERIES, POTENTIALLY MATERIALLY. A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS, TREATMENT OF CLAIMS AND EQUITY INTERESTS, AND THE DEBTORS' POSITIONS ON THE LIKELY OUTCOME OF THE VARIOUS DISPUTED ISSUES ARE FOUND IN THE ENTIRE PLAN AND DISCLOSURE STATEMENT.[3]**

| | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on (i) the Effective Date or as soon as practicable thereafter, (ii) if after the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) such other date as may be ordered by the Bankruptcy Court. | 100.0% |

---

[3]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions. "Allowed" means with respect to Claims: (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a Proof of Claim is not or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided, that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time, as may be extended by the Bankruptcy Court from time to time, fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Except for any Claim Allowed pursuant to the Plan, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it is determined to owe such Debtor or Reorganized Debtor, as applicable, pursuant to a Final Order or an agreement between such Entity and such Debtor or Reorganized Debtor. "Allow" and "Allowing" shall have correlative meanings.

| | | | |
|---|---|---|---|
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall be paid in full in Cash on (i) the Effective Date or as soon as practicable thereafter, (ii) if after the Effective Date, the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) such other date as may be ordered by the Bankruptcy Court. | 100.0% |
| 3 | First Lien Secured Claims against CL Holdings | Except to the extent that a Holder of an Allowed First Lien Secured Claim against CL Holdings agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CL Holdings, each Holder of an Allowed First Lien Secured Claim against CL Holdings shall receive its Pro Rata share of the First Lien Secured Claim Distribution allocable to CL Holdings.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Claims held by such Holder against CL Holdings shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | 0.0%[4] |
| 4 | First Lien Deficiency Claims against CL Holdings | Holders of First Lien Deficiency Claims against CL Holdings shall not receive any distribution on account of such Claims, and First Lien Deficiency Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 5 | Second Lien Claims against CL Holdings s | Holders of Second Lien Claims against CL Holdings shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date, provided that any distributions to Holders of Second Lien Claims against CL Holdings shall be subject to the turnover provisions of the Second Lien Intercreditor Agreement. | 0.0% |
| 6 | Senior Notes Claims against CL Holdings | Holders of Senior Notes Claims against CL Holdings shall not receive any distribution on account of such Claims, and Senior Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 7 | PIK Notes Claims against CL Holdings | Holders of PIK Notes Claims against CL Holdings shall not receive any distribution on account of such Claims, and PIK Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 8 | Subordinated Notes Claims against CL Holdings | Holders of Subordinated Notes Claims against CL Holdings shall not receive any distribution on account of such Claims, and Subordinated Notes Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |

---

[4]   Recovery percentage of 0.0042% not visible with rounding.

| 9 | General Unsecured Claims against CL Holdings | Holders of General Unsecured Claims against CL Holdings shall not receive any distribution on account of such Claims, and General Unsecured Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
|---|---|---|---|
| 10 | Section 510(b) Claims | Holders of Section 510(b) Claims against CL Holdings shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CL Holdings shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 11 | CL Holdings Interests | Holders of CL Holdings Interests shall not receive any distribution on account of such CL Holdings Interests, and CL Holdings Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date, and shall be of no further force or effect. | 0.0% |
| 12 | First Lien Secured Claims against CL Holdco[5] | Except to the extent that a Holder of an Allowed First Lien Secured Claim against CL Holdco agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CL Holdco, each Holder of an Allowed First Lien Secured Claim against CL Holdco shall receive its Pro Rata share of the First Lien Secured Claim Distribution allocable to CL Holdco. Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Claims held by such Holder against CL Holdco shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | 0.0% |
| 13 | First Lien Deficiency Claims against CL Holdco | Holders of First Lien Deficiency Claims against CL Holdco shall not receive any distribution on account of such Claims, and First Lien Deficiency Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 14 | Second Lien Claims against CL Holdco | Holders of Second Lien Claims against CL Holdco shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date, provided that any distributions to Holders of Second Lien Claims against CL Holdco shall be subject to the turnover provisions of the Second Lien Intercreditor Agreement. | 0.0% |
| 15 | Senior Notes Claims against CL Holdco | Holders of Senior Notes Claims against CL Holdco shall not receive any distribution on account of such Claims, and Senior Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 16 | PIK Notes Claims against CL Holdco | Holders of PIK Notes Claims against CL Holdco shall not receive any distribution on account of such Claims, and PIK Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |

---

[5]    The Debtors are unaware of any assets at CL Holdco.

| 17 | Subordinated Notes Claims against CL Holdco | Holders of Subordinated Notes Claims against CL Holdco shall not receive any distribution on account of such Claims, and Subordinated Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
|----|----|----|----|
| 18 | General Unsecured Claims against CL Holdco | Holders of General Unsecured Claims against CL Holdco shall not receive any distribution on account of such Claims, and General Unsecured Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 19 | Section 510(b) Claims against CL Holdco | Holders of Section 510(b) Claims against CL Holdco shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 20 | CL Holdco Interests | To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CL Holdco Interests shall be reinstated on the Effective Date. | 100% |
| 21 | First Lien Secured Claims against CLAI | Except to the extent that a Holder of an Allowed First Lien Secured Claim against CLAI agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CLAI, each Holder of an Allowed First Lien Secured Claim against CLAI shall receive its Pro Rata share of (i) the First Lien Secured Claim Distribution allocable to CLAI and (ii) the Senior CLAI Recovery determined to be allocable to Holders of First Lien Secured Claims against CLAI. Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Claims held by such Holder against CLAI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | 6.7% |
| 22 | First Lien Deficiency Claims against CLAI | Except to the extent that a Holder of an Allowed First Lien Deficiency Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Deficiency Claims against CLAI, each Holder of an Allowed First Lien Deficiency Claim against CLAI shall receive on the Effective Date its Pro Rata share of the Senior CLAI Recovery determined to be allocable to Holders of First Lien Deficiency Claims against CLAI. Distributions received under the Plan by Holders of Allowed First Lien Deficiency Claims on account of First Lien Note Claims held by such Holder against CLAI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | 4.9% |

| 23 | Second Lien Claims against CLAI | Except to the extent that a Holder of an Allowed Second Lien Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Claim against CLAI, each Holder of an Allowed Second Lien Claim against CLAI shall receive on the Effective Date its Pro Rata share of the Junior CLAI Recovery that is not otherwise subject to the turnover provisions of the Second Lien Intercreditor Agreement. Any distribution subject to the turnover provisions of the Second Lien Intercreditor Agreement shall be distributed on a ratable basis directly to the Holders of Allowed First Lien Deficiency Claims in accordance with the terms and conditions of the Second Lien Intercreditor Agreement. Distributions received under the Plan by Holders of Allowed Second Lien Claims against CLAI shall be subject to the application of the Charging Lien of the Second Lien Indenture Trustee for payment of unpaid fees and costs of the Second Lien Indenture Trustee | 4.9% |
| 24 | Senior Notes Claims against CLAI | Except to the extent that a Holder of an Allowed Senior Notes Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim against CLAI, each Holder of an Allowed Senior Notes Claim against CLAI shall receive on the Effective Date its Pro Rata share of the Junior CLAI Recovery. Distributions received under the Plan by Holders of Allowed Senior Notes Claims against CLAI shall be subject to the application of the Charging Lien of the Senior Notes Indenture Trustee for payment of unpaid fees and costs of the Senior Notes Indenture Trustee | 4.9% |
| 25 | Subordinated Notes Claims against CLAI | After giving effect to the subordination and turnover provisions of the Subordinated Notes Indenture, the Pro Rata share of the Junior CLAI Recovery shall be distributed on a ratable basis directly to Holders of First Lien Deficiency Claims, Second Lien Claims, and Senior Notes Claims in accordance with the terms and conditions of the Subordinated Notes Indenture. | 0.0% |
| 26 | General Unsecured Claims against CLAI | Except to the extent that a Holder of an Allowed Class 26 General Unsecured Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed General Unsecured Claim against CLAI, each Holder of an Allowed General Unsecured Claim against CLAI shall receive on the Effective Date its Pro Rata share of the Junior CLAI Recovery. | 4.8% |
| 27 | Section 510(b) Claims against CLAI | Holders of Section 510(b) Claims against CLAI shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CLAI shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 28 | CLAI Interests | To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CLAI Interests shall be reinstated on the Effective Date. | 100.0% |

| 29 | First Lien Secured Claims against CLI | Except to the extent that a Holder of an Allowed First Lien Secured Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CLI, each Holder of an Allowed First Lien Secured Claim against CLI shall receive its Pro Rata share of (i) the First Lien Secured Claim Distribution allocable to CLI and (ii) the Senior CLI Recovery determined to be allocable to Holders of First Lien Secured Claims against CLAI.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Note Claims against CLI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | 60.0% |
| 30 | First Lien Deficiency Claims against CLI | Except to the extent that a Holder of an Allowed First Lien Deficiency Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Deficiency Claim against CLI, each Holder of an Allowed First Lien Deficiency Claim against CLI on the Effective Date shall receive its Pro Rata share of the Senior CLI Recovery determined to be allocable to Holders of First Lien Deficiency Claims against CLI. Distributions received under the Plan by Holders of Allowed First Lien Deficiency Claims on account of the First Lien Note Claims against CLI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | 4.3% |
| 31 | Second Lien Claims against CL Holdings | Except to the extent that a Holder of an Allowed Second Lien Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Claim against CLI, each Holder of an Allowed Second Lien Claim against CLI shall receive on the Effective Date its Pro Rata of the Junior CLI Recovery; provided that, after giving effect to the provisions of the Second Lien Intercreditor Agreement, distributions on account of the Disputed Copyrights or any other assets subject to the applicable provisions of the Second Lien Intercreditor Agreement that otherwise would have been made to Holders of Second Lien Claims against CLI shall be distributed on a ratable basis directly to the Holders of Allowed First Lien Deficiency Claims in accordance with the terms and conditions of the Second Lien Intercreditor Agreement.  Distributions received under the Plan by Holders of Allowed Second Lien Claims against CLI shall be subject to the application of the Charging Lien of the Second Lien Indenture Trustee for payment of unpaid fees and costs of the Second Lien Indenture Trustee. | 0.6% |

| 32 | Senior Notes Claims against CLI | Except to the extent that a Holder of an Allowed Senior Notes Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim against CLI, each Holder of an Allowed Senior Notes Claim against CLI shall receive on the Effective Date its Pro Rata share of the Junior CLI Recovery.  Distributions received under the Plan by Holders of Allowed Senior Notes Claims against CLI shall be subject to the application of the Charging Lien of the Senior Notes Indenture Trustee for payment of unpaid fees and costs of the Senior Notes Indenture Trustee. | 3.1% |
| 33 | Subordinated Notes Claims against CLI | After giving effect to the subordination and turnover provisions of the Subordinated Notes Indenture, the Pro Rata share of the Junior CLI Recovery that otherwise would have been distributed to each Holder of an Allowed Subordinated Notes Claim against CLI shall be distributed on a ratable basis directly to Holders of First Lien Deficiency Claims, Second Lien Claims, and Senior Notes Claims in accordance with the terms and conditions of the Subordinated Notes Indenture. | 0.0% |
| 34 | General Unsecured Claims against CLI | Except to the extent that a Holder of an Allowed Class 34 General Unsecured Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Class 34 General Unsecured Claim against CLI, each Holder of an Allowed Class 34 General Unsecured Claim against CLI shall receive on the Effective Date its Pro Rata share of the Junior CLI Recovery. | 3.1% |
| 35 | Section 510(b) Claims against CLI | Holders of Section 510(b) Claims against CLI shall not receive any distribution on account of such Claims, and Section 510(b) Claims against CLI shall be discharged, cancelled, released, and extinguished as of the Effective Date. | 0.0% |
| 36 | CLI Interests | To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CLI Interests shall be reinstated on the Effective Date. | 100.0% |

| SUMMARY OF ESTIMATED VALUE AVAILABLE TO HOLDERS OF FIRST LIEN CLAIMS[6] | | | |
|---|---|---|---|
| Class | Claim | Recovery Amount ($ in millions) | Recovery Percentage |
| 3 | First Lien Secured Claims against CL Holdings | $0.2 | 0.0% |
| 21 | First Lien Secured Claims against CLAI | $308.4 | 6.7% |
| 22 | First Lien Deficiency Claims against CLAI | $212.6 | 4.9% |
| 29 | First Lien Secured Claims against CLI | $2,779.8 | 60.0% |
| 30 | First Lien Deficiency Claims against CLI | $79.5 | 4.3% |

---

[6]    Note: There is no value available to Holders of First Lien Claims against CL Holdco.

| Total First Lien Claims Recoveries | $3,380.4 | 72.9% |
|---|---|---|
| •     As a Percentage of Estimated Total Distributable Value | 98.0% | |

| Total First Lien Secured Claim Recovery | $3,088.4 | 66.6% |
|---|---|---|
| Total First Lien Deficiency Claim Recovery | $292.0 | 6.3% |

| SUMMARY OF ESTIMATED VALUE AVAILABLE TO HOLDERS OF OTHER UNSECURED CLAIMS[7] | | | |
|---|---|---|---|
| Class | Claim | Recovery Amount ($ in millions) | Recovery Percentage |
| 23 | Second Lien Claims against CLAI | $36.9 | 4.9% |
| 31 | Second Lien Claims against CLI | $4.3 | 0.6% |
| **Total Second Lien Recoveries** | | **$41.2** | **5.5%** |
| 24 | Senior Notes Claims against CLAI | $15.0 | 4.9% |
| 32 | Senior Notes Claims against CLI | $9.6 | 3.1% |
| **Total Senior Notes Recoveries** | | **$24.5** | **8.0%** |
| 25 | Subordinated Notes Claims against CLAI | $0.0 | 0.0% |
| 33 | Subordinated Notes Claims against CLI | $0.0 | 0.0% |
| **Total Subordinated Notes Recoveries** | | **$0.0** | **0.0%** |
| 26 | General Unsecured Claims against CLAI | $0.5 | 4.8% |
| 34 | General Unsecured Claims against CLI | $2.0 | 3.1% |
| **Total General Unsecured Claims Recoveries** | | **$2.5** | **3.3%** |

| Total Other Unsecured Claims Recoveries | $68.3 | 5.4% |
|---|---|---|
| •     As a Percentage of Total Distributable Value | 2.0% | |

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the chapter 11 plan of reorganization that the Debtors are seeking to have confirmed by the Bankruptcy Court.  The Debtors believe that the Plan is in the best interests of all creditors and urge all holders of claims entitled to vote to vote in favor of the Plan.

Unless the context requires otherwise, reference to "*we*," "*our*" and "*us*" are to the Debtors.

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

---

[7]    Note: There is no value available to Holders of Other Unsecured Claims against CL Holdings and no value available to Holders of Other Unsecured Claims against CL Holdco.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**") or any similar federal, state, local, or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon confirmation of the Plan, certain of the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933 (as amended, the "**Securities Act**"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration, other than section 1145 of the Bankruptcy Court, apply such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' expected future financial position, liquidity, results of operations, profitability and cash flows;
- projected dividends;
- financing plans;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;

- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing services;
- projected general market conditions;
- benefits from new technology; and
- effect of changes in accounting due to recently

- projected and estimated liability costs;          issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement. These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the Debtors' ability to reduce their overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- customer response to the Chapter 11 Cases;

- inability to have claims discharged/settled during the chapter 11 proceedings;

- the costs for fees and other expenses associated with the Chapter 11 Cases;

- general economic, business and market conditions;

- interest rate fluctuations;

- inability to obtain sufficient exit financing;

- exposure to litigation;

- the Debtors' ability to implement and execute their business plan and financial restructuring;

- the Debtors' ability to attract and retain talented authors and develop long-term, collaborative relationships with them;

- highly competitive market with significant established competitors;

- ability to recruit and retain qualified, skilled employees;

- adverse effects on foreign business operations;

- exposure to risks relating to intellectual property rights; and

- the Debtors' ability to effectuate transactions with strategic alliance, acquisition, or co-production program candidates on commercially reasonable terms, or at all.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an

informed judgment regarding acceptance of the Plan.  This Disclosure Statement is being submitted in accordance with such requirements.

### C.    Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold.  In general, a holder of a Claim or an Interest may vote to accept or reject a plan of reorganization if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the plan and (iii) the holder of such Claim or Interest will receive or retain property under the plan on account of such Claim or Interest.

In general, if a Claim or an Interest is Unimpaired under a plan of reorganization, section 1126(f) of the Bankruptcy Code deems the holder of such Claim or Interest to have accepted such plan, and thus the holders of Claims in such Unimpaired Classes are not entitled to vote on such plan.

In general, if the holder of an Impaired Claim or Impaired Interest will not receive any distribution under a plan of reorganization in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the holder of such Claim or Interest to have rejected such plan, and thus the holders of Claims in such Classes are not entitled to vote on such plan.

A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in **Article III** of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "***Class***") and their respective voting statuses and anticipated recoveries are set forth below.

The following chart is a summary of the classification and treatment of Claims and Interests under the Plan. Any estimates of Claims in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain confirmation and meet the conditions to consummate the Plan.

| Class | Claim | Status | Voting Rights | Estimated Recovery |
|:---:|---|:---:|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept | 100.0% |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept | 100.0% |
| 3 | First Lien Secured Claims against CL Holdings | Impaired | Entitled to Vote | 0.0%[8] |
| 4 | First Lien Deficiency Claims against CL Holdings | Impaired | Deemed to Reject | 0.0% |
| 5 | Second Lien Claims against CL Holdings | Impaired | Deemed to Reject | 0.0% |
| 6 | Senior Notes Claims against CL Holdings | Impaired | Deemed to Reject | 0.0% |
| 7 | PIK Notes Claims against CL Holdings | Impaired | Deemed to Reject | 0.0% |
| 8 | Subordinated Notes Claims against CL Holdings | Impaired | Deemed to Reject | 0.0% |
| 9 | General Unsecured Claims against CL Holdings | Impaired | Deemed to Reject | 0.0% |
| 10 | Section 510(b) Claims | Impaired | Deemed to Reject | 0.0% |

---

[8]    Recovery percentage of 0.0042% not visible with rounding.

| Class | Claim | Status | Voting Rights | Estimated Recovery |
|---|---|---|---|---|
| 11 | CL Holdings Interests | Impaired | Deemed to Reject | 0.0% |
| 12 | First Lien Secured Claims against CL Holdco[9] | Impaired | Entitled to Vote | 0.0% |
| 13 | First Lien Deficiency Claims against CL Holdco | Impaired | Deemed to Reject | 0.0% |
| 14 | Second Lien Claims against CL Holdco | Impaired | Deemed to Reject | 0.0% |
| 15 | Senior Notes Claims against CL Holdco | Impaired | Deemed to Reject | 0.0% |
| 16 | PIK Notes Claims against CL Holdco | Impaired | Deemed to Reject | 0.0% |
| 17 | Subordinated Notes Claims against CL Holdco | Impaired | Deemed to Reject | 0.0% |
| 18 | General Unsecured Claims against CL Holdco | Impaired | Deemed to Reject | 0.0% |
| 19 | Section 510(b) Claims against CL Holdco | Impaired | Deemed to Reject | 0.0% |
| 20 | CL Holdco Interests | Unimpaired | Presumed to Accept | 100.0% |
| 21 | First Lien Secured Claims against CLAI | Impaired | Entitled to Vote | 6.7% |
| 22 | First Lien Deficiency Claims against CLAI | Impaired | Entitled to Vote | 4.9% |
| 23 | Second Lien Claims against CLAI | Impaired | Entitled to Vote | 4.9% |
| 24 | Senior Notes Claims against CLAI | Impaired | Entitled to Vote | 4.9% |
| 25 | Subordinated Notes Claims against CLAI | Impaired | Deemed to Reject | 0.0% |
| 26 | General Unsecured Claims against CLAI | Impaired | Entitled to Vote | 4.8% |
| 27 | Section 510(b) Claims against CLAI | Impaired | Deemed to Reject | 0.0% |
| 28 | CLAI Interests | Unimpaired | Presumed to Accept | 100.0% |
| 29 | First Lien Secured Claims against CLI | Impaired | Entitled to Vote | 60.0% |
| 30 | First Lien Deficiency Claims against CLI | Impaired | Entitled to Vote | 4.3% |
| 31 | Second Lien Claims against CLI | Impaired | Entitled to Vote | 0.6% |
| 32 | Senior Notes Claims against CLI | Impaired | Entitled to Vote | 3.1% |
| 33 | Subordinated Notes Claims against CLI | Impaired | Deemed to Reject | 0.0% |
| 34 | General Unsecured Claims against CLI | Impaired | Entitled to Vote | 3.1% |
| 35 | Section 510(b) Claims against CLI | Impaired | Deemed to Reject | 0.0% |
| 36 | CLI Interests | Unimpaired | Presumed to Accept | 100.0% |

#### D.        What happens to my recovery if the Plan is not confirmed, or does not go effective?

If the Plan is not confirmed, the Debtors will make efforts to reorganize their business by amending the Plan or negotiating a new plan of reorganization.  For a more detailed description of the consequences of an

---

[9]     The Debtors are unaware of any assets at CL Holdco.

extended chapter 11 proceeding, or of a liquidation scenario, *see* "Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis" beginning on page 68 and the Liquidation Analysis attached as **Exhibit F** to this Disclosure Statement.

> **E.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective?  What do you mean when you refer to "Confirmation," "Effective Date" and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective.  Initial distributions to Holders of Allowed Claims will only be made on the Effective Date as soon as practicable thereafter.  *See* "Confirmation of the Plan," which begins on page 68, for a discussion of the conditions to consummation of the Plan.

> **F.    Will the Debtors have sufficient cash and/or other consideration to fund the distributions required under the Plan?**

To fund distributions under the Plan, as of February 28, 2014 (the "***Assumed Effective Date***"), the Debtors project to have approximately $682.4 million of cash on hand (including cash of foreign non-Debtor affiliates).  The amount of cash actually on hand on the Effective Date could be different to the extent the Debtors' actual receipts and disbursements are different from the amounts set forth in the Projections.  *See* Article VIII of this Disclosure Statement for additional information.

In addition, on the Effective Date, the Debtors will use commercially reasonable efforts to enter into the Exit Revolver Facility, a new first-out revolving credit agreement in the amount of no less than $250 million and up to $400 million pursuant to the Exit Revolver Facility Agreement and the New Debt Facility, meaning the New Debt Rollover Facility or the New Debt Alternative Facility, as applicable, which may be used to, among other things, fund obligations under that Plan.

> **G.    Will the Reorganized Debtors be obligated to continue to pay statutory fees after the Effective Date?**

Yes.  On the Effective Date the Debtors will be required to pay in Cash any fees due and owing to the U.S. Trustee at the time of Confirmation.  Additionally, on and after the Confirmation Date, the Reorganized Debtors must pay all statutory fees due and payable, under 28 U.S.C. § 1930(a)(6), plus accrued interest under 31 U.S.C. § 3717, on all disbursements, including plan payments and disbursements inside and outside of the ordinary course of business until the entry of a final decree, dismissal or conversion of the cases to chapter 7.  The Reorganized Debtors will also be required to comply with reporting requirements, such as filing quarterly post-Confirmation reports and schedule quarterly post-Confirmation status conferences until the entry of a final decree, dismissal or conversion of the cases to chapter 7.

> **H.    When will the Plan Supplement be filed and what will it include?**

The Plan Supplement, the compilation of documents and forms of documents, schedules, and exhibits to the Plan, all materially consistent with the Restructuring Support Agreement, the Restructuring Term Sheet, and the Equity Term Sheet, to the extent not already filed, will be filed 10 days prior to the Voting Deadline, or as soon as reasonably practicable thereafter but in no event later than five days prior to the Confirmation Hearing.  The Plan Supplement will include:  (a) the identity of the members of the New Board and the nature and compensation for any member of the New Board who is an "insider" under section 101(31) of the Bankruptcy Code; (b) the Schedule of Assumed Executory Contracts and Unexpired Leases; (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the form of the Exit Revolver Facility Documents; (e) the form of the New Debt Facility Documents; (f) the applicable New Corporate Governance Documents; (g) a list of retained Causes of Action; (h) the management employment agreements, as amended; (i) the Management Incentive Plan; (j) the Trust Documents (if applicable); and (k) the Description of Transaction Steps.

I.    **What is the purpose of the trust structure?  How will the trusts be established?**

The purpose of the CLAI Trust and the CLI Trust is to hold and maintain certain unencumbered or potentially unencumbered assets of CLAI and CLI (or the value attributable to such unencumbered or potentially unencumbered assets) pending the resolution of disputes regarding the valuation of such assets and the extent to which the assets are subject to the liens of the Holders of First Lien Claims.  To the extent the valuation and lien validity disputes are not entirely resolved in connection with confirmation of the Plan, the Plan provides for the creation of the CLAI Trust and the CLI Trust, which will permit the Debtors to emerge from chapter 11 notwithstanding certain ongoing litigation or disputes regarding:  (a) the extent, if any, of the Holders of the First Lien Claims' Liens on and security interests in the Disputed Cash; (b) the extent and priority of the Holders of the First Lien Claims' Liens on and security interests in the Disputed Copyrights, and the value of the Disputed Copyrights; (c) the validity and extent of any Claims between a Debtor and another Debtor or between a Debtor and a non-Debtor foreign affiliate; (d) the value, if any, of the CLA C.V. 35% Equity; (e) the value, if any, of the Non-Wholly Owned Subsidiaries Interests; and (f) the value, if any, of the Unencumbered Real Estate (collectively, the "***Trust Asset Disputes***").

Except for the case where a given Trust Asset Dispute is resolved on or prior to the Effective Date, the Debtors shall transfer to the Trusts all of the Disputed Copyrights, the Non-Wholly Owned Subsidiaries Interests, the Unencumbered Real Estate, any recovery on account of any Claims held by CLI against any Debtor or non-Debtor subsidiary, and any recovery on account of the CLI Trust Causes of Action (collectively, the "***CLI Trust Assets***") and the Disputed Cash, the CLA C.V. 35% Equity, any recovery on account of any Claims held by CLAI against any Debtor or non-Debtor subsidiary, and any recovery on account of the CLAI Trust Causes of Action (collectively, the "***CLAI Trust Assets***," and together with the CLI Trust Assets, the "***Trust Assets***").

Senior interests in the Trusts will be issued to Holders of First Lien Claims, (which consists of both the First Lien Secured Claims and the First Lien Deficiency Claims), that will entitle them to distributions from the Trusts to the extent any Trust Asset Dispute is resolved in a manner that allocates value to Holders of First Lien Claims (*e.g.*, the Disputed Cash is determined to be subject to the valid liens of the Holders of First Lien Secured Claims or the value of the Non-Wholly Owned Subsidiaries Interests is determined, in which case a percentage of such determined value will be distributed to Holders of First Lien Deficiency Claims).  Further, the senior interests would be entitled to the Net Licensing Fees, if any, associated with the use of the Trust Assets by the Reorganized Debtors to the extent such Net Licensing Fees are determined to be allocable to the Holders of First Lien Claims.

Junior interests in the Trusts will be issued to Holders of Other Unsecured Claims, which will entitle them to distributions from the Trusts to the extent any Trust Asset Dispute is resolved in a manner that allocates value to Holders of Other Unsecured Claims (*e.g.*, the Disputed Copyrights or the Disputed Cash is determined to not be subject to the valid liens of the Holders of First Lien Secured Claims or the value of the Non-Wholly Owned Subsidiaries Interests is determined, in which case a percentage of such determined value will be distributed to Holders of Other Unsecured Claims).  Further, the junior interests may be entitled to the Net Licensing Fees, if any, associated with the use of the Trust Assets by the Reorganized Debtors to the extent such Net Licensing Fees are determined to be allocable to  Holders of Other Unsecured Claims.

Initial recipients of the senior and junior trust interests will be permitted to transfer such trust interests and such trust interests shall be fully transferable and assignable.  In accordance with the terms of the Trust Agreement, holders of trust interests shall provide the applicable Trustee with notice of any transfer and/or assignment and any transferee or assignee shall automatically be deemed to be a beneficiary of the Trusts and subject to the terms of the Trust Agreement.

The Trusts will be managed by Trustees who will be responsible solely for (a) holding, managing, and distributing the Trust Assets and consideration received by the Trust from the Reorganized Debtors, (b) monitoring that Net Licensing Fees, if any, are paid by the Reorganized Debtors, (c) overseeing the investment of the Trusts' cash assets, (d) using, selling, or leasing any Trust Assets, subject to and in accordance with the applicable Trust Agreement, to the extent the Reorganized Debtors do not elect to purchase such Trust Assets from the Trusts by the date that is 30 days after the resolution of any Trust Asset Dispute (the "***Trust Asset Determination Date***"); (e) filing all tax and regulatory forms, returns, reports, and other documents required with respect to the Trusts; and (f) any other role set forth in the Trust Agreements.  The Trustees, however, will not have a role in prosecuting or

resolving issues related to the Trust Asset Disputes. The Estates shall be charged with the sole authority to commence and prosecute any of the Trust Asset Disputes; provided that the Post-Effective Date Unsecured Creditor Representatives Committee (a body comprised of three members selected by the Committee), the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee shall have standing and power to participate in the Trust Asset Disputes. The reasonable and documented fees and expenses of these entities' participation in the Trust Asset Disputes shall be paid out of the Trust Assets allocable to the junior trust interests (with respect to the Post-Effective Date Unsecured Creditor Representatives Committee) or the senior trust interests (with respect to the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee).

The Trustees shall be selected in accordance with the Trust Agreements and approved by the Bankruptcy Court. The Trustees may retain and compensate attorneys, other professionals, and employees to assist in their duties as Trustees on such terms as the Trustees deems appropriate without Bankruptcy Court approval. The expenses of the Trusts will be funded first from any cash placed into the Trust (e.g., the Disputed Cash) and from any Cash received on account of the Net Licensing Fees, if any, and second from any of the Trust Assets.

To the extent the Disputed Copyrights or the Non-Wholly Owned Subsidiaries Interests are transferred to the Trusts, the Trusts shall be deemed to grant to the Reorganized Debtors an exclusive license to use, operate, license, and sublicense any of the Disputed Copyrights and any of the assets of the Non-Wholly Owned Subsidiaries. Any such exclusive license shall be freely transferable and assignable, and the Reorganized Debtors shall have full authority to transfer, assign, hypothecate, or sub-license such exclusive licenses. In exchange for such exclusive licenses, the Reorganized Debtors shall provide the Trusts with a monthly licensing fee payment on account of the Disputed Copyrights and a monthly licensing fee payment on account of any assets of the Non-Wholly Owned Subsidiaries (collectively, the "*Net Licensing Fees*"), which Net Licensing Fees will be approved by the Confirmation Order.

On or before the Trust Asset Determination Date, the Reorganized Debtors shall either (a) elect to acquire a particular asset placed into the Trusts at the value as determined by the Court in exchange for Cash or New Equity equal to such value or (b) determine to abandon such asset for liquidation by the Trustees. The Trustees may not sell, assign, transfer, hypothecate, or liquidate any of the Trust Assets any earlier than the Trust Asset Determination Date or the date on which the Reorganized Debtors either make the Trust Asset Election with respect to such Trust Asset or determine to abandon such Trust Asset for liquidation by the applicable Trustee and distribution to the Holders of the Trust Interests.

The Plan provides for a reserve mechanism that will permit the Trustees to make interim distributions to holders of senior and junior trust interests notwithstanding the fact that not all Trust Asset Disputes have been resolved.

Additional details regarding the Trusts (including certain tax considerations) are set forth in the Plan, elsewhere in this Disclosure Statement, and in the Trust Agreements, which will be filed as part of the Plan Supplement.

**J.        What are the terms of the Exit Revolver Facility and the New Debt Facility?**

The New Loans will consist of the Exit Revolver Facility and the New Debt Facility. The Exit Revolver Facility shall be a new revolving credit facility in an amount between $250 million and up to $400 million to be entered into by the Debtors pursuant to the Exit Revolver Facility Agreement, including any Exit Revolver Facility Documents, each of which shall be in form and substance acceptable to the Debtors, the Exit Revolver Facility Agent, the Exit Revolver Facility Arrangers, the lenders party thereto, and shall be on terms consistent with the Restructuring Support Agreement and RSA Term Sheets in all respects and otherwise acceptable to the Required Consenting Lenders.

The New Debt Facility shall be the New Debt Rollover Facility or the New Debt Alternative Facility, as applicable. The New Debt Alternative Facility Documents means, collectively, all related agreements, documents, or instruments to be executed or delivered in connection with the New Debt Alternative Facility, the form of which shall be included as an exhibit to the Plan Supplement and shall be in form and substance consistent with the Restructuring Support Agreement and RSA Term Sheets in all respects and otherwise acceptable to the Required

Consenting Lenders, and in each case, the forms of which shall be as set forth in an exhibit to the Plan Supplement. If the Reorganized Debtors do not enter into the New Debt Alternative Facility, the New Debt Facility shall be the New Debt Rollover Facility which is a term loan facility in the amount of $1,500 million to be entered into by the Reorganized Debtors as of or subject to the occurrence of the Effective Date in form and substance consistent with the Restructuring Support Agreement and RSA Term Sheets.

The Debtors are still in the process of marketing the New Debt Alternative Facility and, as a result, have yet to finalize many of the specific terms. The Debtors requests to potential lenders require that the New Debt Alternative Facility have an availability of $1,500 million to $1,750 million. Lazard has been leading the Debtors' search for the New Debt Alternative Facility. The Debtors will include the form of the New Debt Alternative Facility or New Debt Rollover Facility, as applicable, in their Plan Supplement.

**K.      Are there risks to owning an Interest in Reorganized Cengage upon emergence from chapter 11?**

Yes. *See* "Risk Factors," which begins on page 57.

**L.      Is there potential litigation related to the Plan?**

Yes. For example, there may be litigation over the Disputed Assets, which are discussed beginning on page 31, or with respect to the other disputed issues discussed beginning on page 28. In the event it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code. *See* "Risk Factors," Article X — The Debtors may not be able to obtain Confirmation of the Plan."

Additionally, there is a risk of potential protracted litigation regarding the Disputed Assets (as defined below), including, but not limited to, disputes regarding the value of the Disputed Assets and whether certain of the Disputed Assets are encumbered and therefore unavailable as a source of recovery for Holders of unsecured Claims. Parties-in-interest may seek to bring potentially time-consuming litigation regarding, among other things, the Disputed Assets, and Apax-related claims. Any such litigation could impact the recovery for Holders of Unsecured Claims and may delay confirmation of the Plan.

The Debtors believe the Plan proposes a mechanism to deal with potential litigation in a manner that will not preclude confirmation of the Plan on the timeline set forth herein, but the risk still remains that protracted litigation may significantly delay the path towards confirmation of the Plan and the Debtors' successful emergence from chapter 11.

**M.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

As soon as practicable after the Effective Date, the New Board of Reorganized Cengage shall adopt the Management Incentive Plan, which is attached as Exhibit A to the Plan; provided that any changes to such plan shall require the consent of the Debtors, the Debtors' management, and the Required Consenting Lenders.

**N.      Will there be releases granted to parties in interest as part of the Plan?**

Yes, see "Article XI Release, Injunction and Related Provisions" of this Disclosure Statement. Holders of Claims will be entitled to opt out of the Third Party Release on their Ballot by marking the appropriate box on the Ballot.

**O.      What is the deadline to vote on the Plan?**

[__] [a.m./p.m.] (prevailing Eastern Time) on [DATE].

      **P.**       **How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan. If you are a Holder of one or more Claims in the following Class, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided:

- **Class 3 (First Lien Secured Claims against CL Holdings)**

- **Class 12 (First Lien Secured Claims against CL Holdco)**

- **Class 21 (First Lien Secured Claims against CLAI)**

- **Class 22 (First Lien Deficiency Claims against CLAI)**

- **Class 23 (Second Lien Claims against CLAI)**

- **Class 24 (Senior Notes Claims against CLAI)**

- **Class 26 (General Unsecured Claims against CLAI)**

- **Class 29 (First Lien Secured Claims against CLI)**

- **Class 30 (First Lien Deficiency Claims against CLI)**

- **Class 31 (Second Lien Claims against CLI)**

- **Class 32 (Senior Notes Claims against CLI)**

- **Class 34 (General Unsecured Claims against CLI)**

The Debtors, with the approval of the Bankruptcy Court, have engaged Donlin, Recano & Company, Inc. 419 Park Avenue South, New York, NY 10016, to serve as the voting agent for all Claims and generally oversee the voting process (the "***Notice, Claims, and Solicitation Agent***"). The Notice, Claims, and Solicitation Agent will process and tabulate ballots for Classes 3, 12, 21-24, 26, 29-32, and 34.

The deadline to vote on the Plan is [___] [a.m./p.m.] (prevailing Eastern Time), on [DATE].

---

**BALLOTS**

Ballots and Master Ballots must be actually received by the Notice, Claims, and Solicitation Agent by the voting deadline of [____] [a.m./p.m.] (prevailing Eastern Time) on [DATE] at the following address:

**Donlin, Recano & Company, Inc.**
**Notice, Claims, and Solicitation Agent for Cengage Learning, Inc., et al**
**Attn: Cengage Learning, Inc. Ballot Processing**
**P.O. Box 899 Madison Square Station**
**New York, New York 10010**

If you received an envelope addressed to your nominee, please allow enough time when you return your ballot for your nominee to cast your vote on a master ballot before the voting deadline.

If you have any questions on the procedure for voting on the Plan, please call the Notice, Claims, and Solicitation Agent at the following telephone number:

**(800) 654-4131** (within the U.S.)

**(646) 378-4198** (outside the U.S.)

---

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed and received by **[___] [a.m./p.m.] (prevailing Eastern Time), on [DATE]**.

Any Ballot that is properly executed by a Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each Holder of a Claim may cast only one Ballot per each Claim held. By signing and returning a Ballot, each Holder of a Claim in Classes 3, 12, 21-24, 26, 29-32, and 34 will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other ballots have been cast with respect to such Claims, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot. For information regarding voting by Nominees, see "Solicitation and Voting Procedures" which begins on page 68.

**Q.    Why is the Bankruptcy Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and any party in interest may object to confirmation of the Plan.

**R.    When is the Confirmation Hearing set to occur?**

The Bankruptcy Court has scheduled the Confirmation Hearing for **[February 24], 2014 at [___] [a.m./p.m.] (prevailing Eastern Time).** The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [DATE] at [__] [a.m./p.m.] (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of *The New York Times* to provide notification to those persons who may not receive notice by mail.

**S.      What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**T.      What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11.  As a result, Confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business.  The Debtors will continue to operate their businesses going forward using cash from operations, which will be utilized to implement the Reorganized Debtors' business plan.

**U.      Does Cengage recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all creditors.  Any other alternative does not in any way realize or recognize the value inherent under the Plan.

**IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, BUSINESS OVERVIEW, AND OTHER BACKGROUND**

**A.      Overview of the Debtors' Business and Operations**

The Debtors, with their affiliates, are leading global providers of high-quality content, innovative print and digital teaching and learning solutions, software, and associated educational services for the higher-education, research, school, career, professional, and international markets.  The Debtors are the second largest publisher of course materials in U.S. higher education, with strong positions across all major disciplines, and are leading global providers of library reference materials with a vast collection of primary source content.  The Debtors manage their operations from various locations throughout the United States and internationally, with headquarters located in Stamford, Connecticut.

The Debtors divide their operations into two main segments:  domestic and international.  For the nine months ended March 31, 2013, the domestic segment accounted for approximately 85 percent of the Debtors' revenues, and the international segment accounted for the remaining approximately 15 percent of the Debtors' revenues.  The Debtors' customers include, among others, students, bookstores, academic libraries, major public libraries, and high schools across the country and around the world.

As discussed further below, the Debtors also have two non-wholly owned joint ventures—The Hampton Brown Company LLC ("**Hampton Brown**") and CourseSmart LLC ("**CourseSmart**").

*(i)*       ***Domestic***

In the U.S., the Debtors operate in five principal markets: two- and four-year college, research, K–12 school, career, and professional.

(a)       Two- and Four- Year College

The Debtors offer an array of print and digital materials and associated services to the two- and four-year college market, which is comprised of students, professors, and institutions of higher education (primarily colleges and universities). The higher education system in the U.S. is the largest in the world with over 20 million students and 4,500 institutions, figures which have expanded over the last decade. Many of the most well-known publishers compete with the Debtors in this space, including, for example, Pearson Education, Inc., McGraw-Hill Education, Inc., John Wiley & Sons, Inc., and Macmillan Publishers Ltd.

In print, the Debtors publish textbooks for all major academic disciplines and maintains leading positions in many major disciplines. For example, the Debtors have leading market positions in the United States in many of the largest academic disciplines, including the number one position in each of anthropology, business, computer training, criminal justice, health, history, paralegal studies, philosophy, and social work, and the number two position in each of accounting, chemistry, education, foreign language, linguistics, mathematics, and psychology.

In digital format, the Debtors provide homework solutions with high quality content and interactive learning solutions and fully customized online course programs. The Debtors are also developing a full suite of digital learning solutions called MindTap, designed to engage students and offer instructors choice and flexibility.

The Debtors employ two sales teams to target the college market. The first sales team focuses on securing adoptions—that is, selections by course instructors to use a particular publisher's materials. The second sales team seeks out institutional sales opportunities, which are more complicated and time consuming, but often offer greater volume and value to the Debtors.

Particularly, with respect to the college market, the educational publishing market is highly seasonal. As with most publishers of educational materials, the Debtors receive an out-sized proportion of their earnings during the academic year. This seasonality affects the Debtors' working capital requirements and overall financing needs such that they earn a cash surplus during the academic year but typically incur a net cash deficit from operating activities outside the academic year.

(b)       Research

Over time, the Debtors have aggregated the world's largest online collection of magazines, journals, and newspapers, and now maintains one of the largest archives of unique primary-source special collections in the world. In North America, substantially all of the reference collections of academic and public libraries contain one or more of the Debtors' research products, which include the world's largest collection of periodicals and one of the largest archives of primary source materials.

Generally, research providers like the Debtors aim to sell specialized reference materials such as encyclopedias, directories, periodical databases, and primary-source collections. The Debtors, however, also integrate this reference content in their academic products, making them the only producer of learning materials with access to proprietary content of this kind. The Debtors sell directly to academic, corporate, and government libraries and indirectly via distributers, bookstores, wholesalers, and retailers worldwide, with most relationships managed via local or regional offices.

(c)       K-12 School

The domestic K–12 school market consists of approximately 55 million students. Publishers in this market, including Pearson Education, Inc., McGraw-Hill Education, Inc., and Houghton Mifflin Harcourt Publishing Company, aim primarily for state and local school district to adopt their materials. In the U.S. K–12 school market, the Debtors focus on disciplines with the most attractive growth fundamentals, in particular advanced placement and ELT, where the Debtors occupy strong market positions. Consistent with that focus, in August 2011, the Debtors

acquired Hampton Brown, the National Geographic Society's digital and print school publishing unit, including its ELT products, elementary school level science curriculum, literacy and content publishing brand, National Geographic Explorer! Magazines, and the National Geographic Science series.

(d)     Career

The career market is comprised primarily of students and colleges in the career-oriented education system. Career institutions typically purchase course materials directly and distribute them to all students, unlike the college market where individual professors choose and students purchase their own materials.  In the career market, the Debtors offer some of the most comprehensive collections of print, digital, and hybrid learning solutions for career studies across major disciplines.  In connection with these various products, the Debtors employ designated sales teams to focus on sales to the for-profit career colleges that make up the bulk of the market.

Over the last twenty years, growth in the career market generally has outpaced that in the two- and four-year college market.  As with the college market, the Debtors' main competitors in the career market are Pearson Education, Inc., McGraw-Hill Education, Inc., and John Wiley & Sons, Inc.

(e)     Professional

Providers in the professional market typically seek to sell learning materials to students seeking job training, certification, or continuing professional education in schools or other programs.  This market encompasses a wide range of vocations, and the key players generally vary across different study areas.  The Debtors compete in a wide range of professional study disciplines, offering products like customized materials for employers to train their employees.  To assist in these efforts, the Debtors employ a direct sales force focused on employers, training programs, and professionals seeking additional training.

*(ii)*     *International*

The second main segment of the Debtors' operations is the international segment.  The needs and demands of various international markets can differ dramatically, but the general trend across the globe is expanding demand for learning products driven by population growth and rising living standards.  The Debtors, through certain non-Debtor international affiliates, serve higher education, vocational, K–12, reference, and English language teaching ("*ELT*") markets in select geographic areas throughout the world, with operations generally divided between the regions of Asia, Australia, Latin America, and Europe, Middle East, and Africa.  For example, the Debtors, through a licensee, are the leading foreign educational publisher in China with a strong position in the Chinese ELT market.  To best tap these markets, the Debtors' international businesses differ in their strategic focus based on prevailing local market demand for the Debtors' products, and they employ a sales force located in 25 regional offices around the globe to take advantage of international growth dynamics.

*(iii)*     *Joint Ventures*

The Debtors own equity interests in two domestic joint ventures:  Hampton Brown and CourseSmart.

(a)     **Hampton Brown**

On August 1, 2011, the Debtors acquired 100-percent of the controlling economic equity interests (*i.e.*, 100 percent of the Class B units) in Hampton Brown from The National Geographic Society ("*NGS*").  As part of the sale transaction, NGS negotiated to retain 10 Class A units, which units do not entitle NGS to any control over the affairs of Hampton Brown and entitle NGS to distributions only upon dissolution of Hampton Brown (which distribution is capped at $8 million plus 10 percent annual compounding interest accruing from August 1, 2012.  The ten Class A units owned by NGS are subject to a call right exercisable by the Debtors and a put right exercisable by NGS, the terms of which are set forth in the purchase agreement.  Pursuant to the purchase agreement, (a) the Debtors may exercise their call right to purchase the remaining interest for $8 million plus 10-percent annual compounding interest accruing from August 1, 2012 and (b) NGS may exercise its put right to sell the remaining interest at approximately $6.5 million, with such right becoming exercisable August 1, 2013.

After the acquisition, the Debtors incorporated Hampton Brown's legacy operations into the newly created National Geographic School Publishing ("**NGSP**") business unit.  NGSP is not a legal entity, but rather a business unit capturing operations at both CLI, the Debtors' main operating company, and Hampton Brown.[10]  The vast majority of the operations at Hampton Brown at the time of the acquisition have been migrated to CLI since August 2011.  This migration has included contracting with principally all NGSP counterparties through CLI, as well as managing NGSP working capital and overhead at CLI.  As a result of this process, as of the Petition Date, Hampton Brown held only two material assets:  (a) a collection of approximately 1,850 copyrights registered by (or in the process of being registered by) Hampton Brown at the time of the acquisition in 2011 and (b) an educational magazine business, the National Geographic Explorer! Magazine (the "**Magazine Business**") (including a small amount of associated working capital, principally receivables), which has not been entirely migrated and whose value is potentially unencumbered.  A significant amount of activities of the Magazine Business is executed by CLI.  For example, CLI salespeople are responsible for soliciting purchases of the magazine and CLI is the party that has contracted with third-parties to provide services related to the Magazine Business's invoicing, receipt collection, production, and order fulfillment.  Sales agreements with customers for the Magazine Business are done though a trade name for Hampton Brown and revenues received from the third party responsible for collecting on Magazine Business invoices go directly into a Hampton Brown bank account before being transferred to a CLI bank account on a monthly basis.  Recovery projections in this Disclosure Statement assume that the value of the Magazine Business is unencumbered.

### (b)    CourseSmart

Since February 28, 2007, the Debtors have been an equity holder in CourseSmart, a joint venture supported by the leading publishers in North American higher education for distribution of digital course materials.  The Debtors own a 33.4-percent equity interest in CourseSmart, with equivalent voting control.  CourseSmart historically has relied on contributions from its members to fund its operations and does not represent a material portion of the Company's revenues or earnings. During 2013, CourseSmart considered preliminary term sheets for purchase offers from unaffiliated third parties, although none of these transactions were consummated.

### B.    The Debtors' Corporate History and Capital Structure

Prior to 2007, the Company's businesses were comprised of wholly-owned indirect subsidiaries and divisions of Thomson Reuters Corporation (formerly The Thomson Corporation) managed together by a single management team.  On July 5, 2007, investment funds associated with or designated by Apax acquired 97 percent of the Company's equity (the balance of the equity was purchased by Funds associated with or designated by OMERS Private Equity (collectively, "**OMERS**," and together with Apax, the "**Sponsors**") from Thomson Corporation and certain of its affiliates for $7.11 billion.  Shortly thereafter, the Company was rebranded as "Cengage Learning," a name chosen to reflect the Company's focus on being the "center of engagement" for students, researchers, instructors, and institutions across the globe.  The July 2007 purchase was funded in part with the proceeds of approximately $5.6 billion in new debt financing, with the remainder of the purchase price funded by equity contributions from the Sponsors.

The Debtors and their advisors are currently performing an analysis of the 2007 LBO, and, at this time, the Debtors do not believe there are any viable claims to pursue on behalf of their estates.  In particular, the Debtors believe that any claims related to the 2007 LBO are barred pursuant to the applicable statute of limitations.

A chart generally depicting the Debtors' prepetition organizational structure is provided below.

---

[10]    The NGSP business is presently expected to substantially underperform the Company's projections for the business at the time of the Hampton Brown acquisition.  For example, NGSP's fiscal year 2013 revenues were only 62% of the Company's projections for Hampton Brown at the time of the acquisition.



### C.    Summary of Prepetition Capital Structure

As described in greater detail below, as of the Petition Date, the Debtors had outstanding funded debt in the aggregate principal and accrued interest amount of approximately $5,905.3 million, consisting of: (a) $3,882.3 million of obligations under the First Lien Credit Facility, including (i) $220.5 million outstanding under the Unextended Revolver, (ii) $294.1 million outstanding under the Extended Revolver, (iii) $1,522.7 million outstanding under the Unextended Term Loan, (iv) $552.0 million outstanding under the Incremental Term Loan; and (v) $1,293.0 million outstanding under the Extended Term Loan; (b) $742.8 million outstanding under the First Lien Notes; (c) $13.3 million outstanding under the First Lien Swaps; (d) $752.8 million outstanding under the Second Lien Notes; (e) $306.3 million outstanding under the Senior Notes; (f) $67.7 million outstanding under the PIK Notes; and (g) $140.1 million outstanding under the Subordinated Notes.  The equity interests in Cengage Learning Holdings II, L.P., the direct or indirect owner of all of the Debtors' subsidiaries, are held almost entirely by the Sponsors, with the remainder owned by certain existing and former members of the Debtors' management.  The Prepetition Debt Obligations are summarized in the chart below and are described in greater detail herein

| Debt Obligation | Approximate Amount as of Petition Date[11] | Interest Rate | Maturity Date |
|---|---|---|---|
| *Secured Debt* | | | |
| Unextended Revolver | $220.5 million | LIBOR+2.25% | 7/5/13 |
| Extended Revolver | $294.1 million | LIBOR+4.50% | 4/10/17[12] |
| Unextended Term Loan | $1,522.7 million | LIBOR+2.50% | 7/3/14 |
| Incremental Term Loan | $552.0 million | LIBOR+3.75%[13] | 7/3/14 |
| Extended Term Loan | $1,293.0 million | LIBOR+5.50% | 7/5/17[14] |
| Swaps | $13.3 million | | 6/28/13 |
| First Lien Notes | $742.8 million | 11.50% | 4/15/20 |
| Second Lien Notes | $752.8 million | 12.00% | 6/30/19 |
| *Unsecured Debt* | | | |
| Senior Notes | $306.3 million | 10.50% | 1/15/15 |
| PIK Notes | $67.7 million | 13.75% | 7/15/15 |
| Subordinated Notes | $140.1 million | 13.25% | 7/15/15 |

**(i)**     ***First Lien Claims***

Pursuant to the Plan, the First Lien Claims for principal, interest, and swap transaction obligations under the First Lien Docments (consisting of the First Lien Secured Claims and the First Lien Deficiency Claims) shall be deemed Allowed Claims in their entirety in the aggregate amount of $4,636,224,560.81 against each of CL Holdings, CL Holdco, CLAI, and CLI.

(a)     The First Lien Credit Facility

In connection with the July 2007 purchase by Apax and OMERS, the Debtors entered into the First Lien Credit Facility.  The Debtors have concluded that the First Lien Credit Facility is secured by a first-priority lien on substantially all of the Debtors' assets subject to certain exceptions discussed below.  The First Lien Loans are guaranteed by each of the Debtors other than CLAI, which is the borrower under the First Lien Loans.  The First Lien Credit Facility Agreement also provides for certain customary covenants, including with respect to financial reporting and the Debtors' leverage ratio.

---

[11]   Amounts exclude issued but undrawn letters of credit and represent principal amounts and accrued interest.

[12]   The maturity date for the Extended Revolver Facility is subject to springing conditions.  In general, these conditions provide that:  (a) if specified principal amounts of certain of the Debtors' other debt remain outstanding as of a specified date, the Extended Revolver Facility matures on the specified date; or (b) if any of the Debtors' other debt is refinanced and matures before July 9, 2017, the Extended Revolver Facility will mature 91 days before the maturity of the refinanced debt.  Under these springing maturity provisions, the Extended Revolver Facility could mature as early as April 5, 2014.

[13]   The interest rate on the Incremental Term Loan is subject to a 3.75% LIBOR floor.

[14]   The maturity date the Extended Term Loan Facility is subject to springing conditions.  In general, these conditions provide that:  (a) if specified principal amounts of certain of the Debtors' other debt remain outstanding as of a specified date, the the Extended Term Loan Facility matures on the specified date; or (b) if any of the Debtors' other debt is refinanced and matures before October 3, 2017, the Extended Term Loan will mature 91 days before the maturity of the refinanced debt.  Under these springing maturity provisions, the Extended Term Loan Facility could mature as early as April 5, 2014.

(b)    First Lien Notes

The First Lien Notes mature April 15, 2020, and the First Lien Notes Indenture provides for certain customary covenants, including with respect to financial reporting. The First Lien Notes are secured with a *pari passu* first priority security interest in the same collateral package as the obligations arising under the First Lien Credit Facility. The First Lien Notes are guaranteed by each of the Debtors other than CLAI, which is the issuer under the First Lien Notes Indenture.

(c)    First Lien Swap Confirmations

The Debtors are party to six First Lien Swaps, all of which are interest rate swaps that help the Debtors manage interest rate exposure by achieving a desirable proportion of variable and fixed rate debt. The counterparties to the First Lien Swaps have the same collateral package as and rank *pari passu* with the lenders under the First Lien Credit Facility and holders of the First Lien Notes. The notional amounts, counterparty, and other information regarding the First Lien Swaps are as follows:

- $250 million subject to a swap between CLAI and Citibank N.A., dated as of April 21, 2010;

- $250 million subject to a swap between CLAI and Goldman Sachs Bank USA, guaranteed by The Goldman Sachs Group, Inc., dated as of April 16, 2010;

- $300 million subject to a swap between CLAI and UBS AG, London Branch, dated as of March 5, 2010;

- $300 million subject to a swap between CLAI and The Royal Bank of Scotland plc, dated as of March 1, 2010;

- $500 million subject to a swap between CLAI and UBS AG, London Branch, dated as of February 17, 2010; and

- $500 million subject to a swap between CLAI and Morgan Stanley Capital Services Inc., dated as of March 19, 2010.

*(ii)    Second Lien Notes*

The Second Lien Notes mature June 30, 2019, and the Second Lien Indenture provides for certain customary covenants, including with respect to financial reporting. The Second Lien Notes are secured with a second priority security interest in the same collateral package as the First Lien Credit Facility, First Lien Notes, and First Lien Swaps, and are guaranteed by each of the Debtors except for CLAI, which is the issuer under the Second Lien Indenture. The Second Lien Notes are subject to the Second Lien Intercreditor Agreement (as defined below) that sets forth certain sharing and subordination provisions vis a vis the Holders First Lien Claims.

*(iii)    Unsecured Notes*

The Debtors also have outstanding indebtedness in the form of three series of unsecured notes: the Senior Notes, the PIK Notes, and the Subordinated Notes (collectively, the "*Unsecured Notes*"). The Senior Notes mature January 15, 2015; the PIK Notes mature July 15, 2015; and the Subordinated Notes mature July 15, 2015.

The Subordinated Notes are contractually subordinated to the Debtors' secured and senior indebtedness, including the First Lien Credit Facility, the First Lien Notes, the Second Lien Notes, and the Senior Notes. The PIK Notes were issued by CL Holdco and guaranteed by its parent company, Cengage Learning Holdings II, L.P., making the PIK Notes structurally subordinate to the First Lien Credit Facility, the First Lien Notes, the Second Lien Notes, the Senior Notes, the Subordinated Notes, and all General Unsecured Claims at CLAI and CLI.

(iv)     *Intercreditor Agreement*

Each of the Debtors, the collateral agent under the First Lien Credit Facility Agreement, and representatives of the Holders of First Lien Claims are parties to that certain First Lien Intercreditor Agreement, dated as of April 10, 2012 (the "***First Lien Intercreditor Agreement***").  The First Lien Intercreditor Agreement governs certain of the respective rights and interests of the Holders of First Lien Claims relating to, among other things, their rights and the exercise of remedies in connection with an Event of Default (as defined in the First Lien Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement provisions.

In addition, each of the Debtors, representatives of the Holders of First Lien Claims, and the representative of the Holders of Second Lien Notes are parties to that certain Second Lien Intercreditor Agreement, dated as of July 5, 2012 (the "***Second Lien Intercreditor Agreement***").  The Second Lien Intercreditor Agreement governs certain of the respective rights and interests of the Holders of First Lien Claims and the Holders of the Second Lien Notes relating to, among other things, their rights and the exercise of remedies in connection with an Event of Default (as defined in the Second Lien Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement provisions.  Additionally, the Second Lien Intercreditor Agreement requires turnover of distributions made to the Holders of Second Lien Claims on account of Shared Collateral (as that term is defined in the Second Lien Intercreditor Agreement) to the Holders of First Lien Claims.

**D.     Primary Confirmation Issues**

The Debtors and other parties in interest have identified certain key issues in these chapter 11 cases which must be resolved prior to Confirmation by the parties in interest or pursuant to a determination by the Court at Confirmation (collectively, the "***Primary Confirmation Issues***").  Specifically, the Primary Confirmation Issues include:  (1) the Debtors' total enterprise value, (2) issues related to the amount of the claims of the First Lien Lenders against each Debtor; (3) issues related to substantive consolidation, and (4) issues related to the 2007 leveraged buy-out.  The Debtors believe that other issues that are not Primary Confirmation Issues can be resolved after the company emerges from bankruptcy pursuant to the trust structure contemplated by the Plan.

The First Lien Secured Parties do not agree with certain of the Debtors' contentions and arguments set forth in Articles IV.D and IV.E hereof and have reserved all of their rights and defenses with respect to the legal and equitable issues implicated by, and the economic impact of such arguments.

(i)     *Total Enterprise Value*

As part of confirmation, parties in interest may object to the total enterprise value of the Debtors as determined by the Debtors and their advisors.  Information regarding the Debtors' methodology and conclusions regarding their total enterprise value is provided in Article IX of this Disclosure Statement and **Exhibit E-1** attached hereto.

(ii)     *Amounts of Claims Against Multiple Debtors*

The Debtors believe that holders of First Lien Claims, Second Lien Claims, Senior Notes Claims, Subordinated Notes Claims, and PIK Notes Claims (each of which exist against multiple Debtor entities due to guarantees) are entitled to assert the full amount that they are owed under the respective financing documents against each of the Debtors without having to reduce such Claims for recoveries received from other Debtors so long as their aggregate recovery does not exceed the full amount that they are owed.  Article III.D of the Plan expressly provides for this.

Generally, a creditor with a claim against multiple debtors is entitled to assert the full amount of its claim against each debtor until it is paid in full, regardless of any partial amounts collected from other debtors.  *See Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243, 246 (1935) ("***Ivanhoe***") (holding that a secured creditor may prove the full amount of the debt owed to it, notwithstanding that the creditor previously realized value on some collateral from a non-debtor co-obligor); *Feder v. John Engelhorn & Sons*, 202 F.2d 411, 412 (2d Cir. 1953) ("[I]f the security is property of someone other than the bankrupt, then the creditor . . . may prove his claim in full in the bankruptcy proceeding."); *In re Realty Assocs. Securities Corp.*, 66 F. Supp. 416 (E.D.N.Y. 1946).

In *Ivanhoe*, a pre-Bankruptcy Code United States Supreme Court decision, a secured lender foreclosed on a non-recourse mortgage and sold the property. The lender then asserted the entire amount of the loan, without reducing the claim by the amount collected through the sale, as an unsecured claim against the debtor-guarantor. The Supreme Court held that the creditor did not need to reduce its unsecured claim against the debtor. *Id.* 245–46. The Supreme Court further noted that the mortgagee was limited in its recovery by the "single satisfaction rule" which limits the distribution from the bankrupt's estate to only that amount that will make the mortgagee whole, considering amounts already paid through the foreclosure. *Id.* at 246. Thus, *Ivanhoe* stands generally for the proposition that a creditor may assert the full value of its claim against a debtor regardless of any prior, less-than-complete recovery.

Similarly, in *Realty Associates*, a pre-Bankruptcy Code decision of the Eastern District of New York, bondholders were seeking to recover dividends under rights reserved to collect from the now-dissolved guarantor should additional funds accrue to the guarantor's trustee. In finding that the bondholders could recover, the *Realty Associates* court stated, without referencing *Ivanhoe*: "[I]t has been conclusively settled that . . . the holder of a claim upon which several parties are liable may prove its entire claim against the estate of any who become bankrupt and recover dividends calculated on the basis of such entire claim as it existed when the petition was filed, without regard to partial payments made by other obligors until from all sources it has been paid in full." *Id.* at 424. The reasoning of *Ivanhoe* and *Realty Associates* has been subsequently endorsed by various courts post-enactment of the Bankruptcy Code.[15]

The recent Fourth Circuit case of *Nat'l Energy & Gas Transmission, Inc. v. Liberty Elec. Power, LLC (In re Nat'l Energy & Gas Transmission, Inc.)*, 492 F.3d 297 (4th Cir. 2007) notes a potential limitation on the conclusion of *Ivanhoe* by providing that if applicable *state* law would reduce the outstanding debt on account of a payment by a co-obligor, the claim amount that a creditor could assert against a co-obligor debtor would be similarly reduced. Like the debtor's agreement in Nat'l Energy, the First Lien Credit Facility Documents are governed by New York law and New York statute provides:

> the amount or value of any consideration received by the obligee from one or more of several obligors, . . . in whole or in partial satisfaction of their obligations, shall be credited to the extent of the amount received on the obligations of all co-obligors to whom the obligor or obligors giving the consideration did not stand in the relation of a surety.

N.Y. GEN. OBLIG. L. § 15-103. Thus, under New York law whether a payment by a co-debtor is credited against the debt owed by the other accordingly turns on whether their relationship is one of "co-obligation" or one of "suretyship." "Suretyship" arises under New York law "[w]hen a secondary obligor is bound to pay for the debt or answer for the default of the principal obligor to the obligee." *See Chemical Bank v. Meltzer*, 93 N.Y.2d 296, 303–04 (1999). Applying New York law to contractual language very similar to CLI's guaranty of CLAI's borrowings under the First Lien Credit Facility Documents, the *Nat'l Energy* court concluded that the relationship between the two relevant entities was one of surety and not of co-obligation, and the court affirmed the bankruptcy court's ruling

---

15  *See In re Gessin*, 668 F.2d 1105, 1107 (9th Cir. 1982) ("It has long been established that a creditor is entitled to pursue his claims against others liable on the same debt to the full extent of the amount owed on that debt"); *In re Washington Bancorporation*, 1996 WL 148533 at *18 (D.D.C. 1996) (applying the principle that "a bankruptcy claim is not reduced or impaired by subsequent payments received from third party obligors until such claim has been satisfied in full"); *In re F.W.D.C., Inc.*, 158 B.R. 523, 528 (Bankr. S.D.Fla. 1993) (finding that a creditor is allowed to "prove the total amount of an indebtedness against a guarantor-debtor without deducting the amount of collateral received from a third party"); *In re Northeast Dairy Co-op. Federation, Inc.*, 88 B.R. 21 (Bankr. N.D.N.Y. 1988) (permitting creditor to assert the full amount of its claim against each debtor that is jointly and severally liable on the claim and finding that the joint and several nature of the debtors' obligation does not affect the total amount due on the claim); *In re Coastland Chrysler Plymouth, Inc.*, 76 B.R. 212, 213 (Bankr. S.D.Fla. 1987) (finding that a creditor's claim should not be reduced unless and until it has been paid in full).

that the claim against the debtor should *not* be reduced by amounts received from another party. *Id.* at 301. By inference, however, if the entities had been co-obligors and not in a surety relationship, the 4th Circuit would have concluded that reducing the amount of the claim was appropriate notwithstanding *Ivanhoe*. If a court did follow the Fourth Circuit's reasoning and looked past *Ivanhoe* and its progeny to applicable state law to determine whether a claim can be asserted in the full amount against multiple entities, given the similarity to the nature of the relationship in *Nat'l Energy* to the relationship between the Debtors and the similarity in the language of the guarantees at issue in *Nat'l Energy* to the language of the Debtors' guarantees, it is likely that the court would characterize CLI as a surety rather than a co-obligor (leading to the conclusion that the Holders of First Lien Claims can still assert the full amount of their claim against both CLI and CLAI, which is the same result as under *Ivanhoe*).

**Therefore, the Debtors believe that holders of the First Lien Claims, Second Lien Claims, Senior Notes Claims, and Subordinated Notes Claims[16] may assert the full amount of their claims against all four of the Debtors, regardless of any distributions received from any particular Debtor, so long as the Holders of First Lien Claims do not receive more than the full amount they are owed under the First Lien Documents.**

> *(iii)*    *Substantive Consolidation*

Following an appropriate review of the Debtors' operations and organizational structure, the Debtors have determined that these chapter 11 cases should not be substantively consolidated. In the Second Circuit, a proponent of substantive consolidation must prove either (a) that prepetition "creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit" or (b) that postpetition the debtors' affairs "are so entangled that consolidation will benefit all creditors." *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988). In the Second Circuit, substantive consolidation requires a fact-intensive inquiry by the court. *See FDIC v. Colonial Realty Co*., 966 F.2d 57, 61 (2d Cir. 1992). Thus, a number of factors may be relevant to determine whether substantive consolidation is appropriate, including:

- the presence (or absence) of consolidated financial statements filed by jointly administered debtors;

- the unity of interest and ownership among debtor affiliates;

- the degree of difficulty in ascertaining individual assets and liabilities among debtors;

- the observance of corporate formalities among debtors;

- the commingling of assets or liabilities among debtors; and

- the sharing of corporate overhead, management, accounting, and other related expenses among affiliated entities. *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 764 (Bankr. S.D.N.Y. 1992) (identifying fifteen factors "that Courts consider in ascertaining whether the interrelationship between the entities warrant consolidation"); *see also In re WorldCom, Inc.*, 2003 WL 23861928, *35 (Bankr. S.D.N.Y. Oct. 31, 2003) (identifying multiple factors relevant to substantial consolidation analysis); *In re Verestar, Inc.*, 343 B.R. 444, 462 (Bankr. S.D.N.Y. 2006) (same).

Despite overlap in the Debtors' boards and officers, the Debtors have refrained from undocumented intercompany transfers, maintained segregated assets and liabilities, and generally observed legal formalities with respect to each entity. Additionally, the Debtors' lenders and noteholders understood the separateness of the Debtor entities, given the distinctions made between borrowers and guarantors under the Debtors' credit documents. As to trade creditors, the Debtors' do not believe there is any basis for trade creditors or contract counterparties to assert reliance on parent holding companies. The Debtors' typical contracts name CLI. **Accordingly, the Debtors do not believe that a basis for substantive consolidation exists and thus, Article III.C of the Plan expressly states that**

---

16    Holders of PIK Notes Claims may assert the full amount of their Claims against CL Holdco and CL Holdings in accordance with the PIK Notes Indenture.

"[a]lthough the Plan is presented as a joint plan of reorganization, this Plan does not provide for the substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for any reason."

The Committee has indicated its desire to investigate whether substantive consolidation of the Debtors' Estates is appropriate. However, as explained above, the Debtors believe no basis for substantive consolidation exists.

**E.    Other Disputed Issues**

*(i)    The Disputed Assets*

The Debtors believe there are four primary categories of assets (the "***Disputed Assets***") that may not be subject to the liens of the Prepetition Secured Parties. Such assets, if unencumbered and of value, may provide a recovery to the Holders of Unsecured Claims, including the Holders of the First Lien Claims who hold significant unsecured deficiency claims against each Debtor.

**(a)    Copyright Assets**

In the course of conducting a collateral and perfection review, the Debtors' advisors discovered that the First Lien Credit Facility Administrative Agent, First Lien Indenture Trustee, and Second Lien Notes Indenture Trustee had not recorded with the U.S. Copyright Office their security interests in a pool of copyrights the Debtors had registered with the U.S. Copyright Office during roughly the year before the Petition Date. Other than within the 90-day period before the Petition Date (the "***Preference Period***"), the Debtors believe that The Bank of New York Mellon last recorded security interests with the U.S. Copyright Office for the benefit of holders of the First Lien Notes on or around June 5, 2012, and for the benefit of the holders of the Second Lien Notes on or around July 24, 2012. Other than within the Preference Period, the Debtors believe that JPMorgan Chase Bank, N.A., as successor agent for the lenders under the First Lien Credit Facility Agreement, last recorded security interests with the U.S. Copyright Office on or around June 5, 2012. There are 270 copyrights that the Debtors registered with the U.S. Copyright Office during roughly the year before the Petition Date and prior to the time of the last recordings made on behalf of the Prepetition Secured Parties, but that the Prepetition Secured Parties did not record with the U.S. Copyright Office their security interests until the Preference Period, if at all. Additionally, since the time of the last recordings made on behalf of the Prepetition Secured Parties, the Debtors have registered 1,805 additional copyrights. Within the Preference Period, the Company understands that the First Lien Credit Facility Administrative Agent, First Lien Indenture Trustee, and Second Lien Indenture Trustee (or their predecessors, as applicable) each recorded their interests in nearly all of these copyrights with the U.S. Copyright Office (the "***Recently Recorded Copyrights***"). There are 54 of the Debtors' registered copyrights in which the First Lien Indenture Trustee and Second Lien Indenture Trustee recorded an interest with the U.S. Copyright Office, but that the First Lien Credit Facility Administrative Agent did not (the "***Notes-Only Recorded Copyrights***"). There are also 118 of the Debtors' registered copyrights in which none of the First Lien Credit Facility Administrative Agent, First Lien Indenture Trustee, or Second Lien Indenture Trustee recorded an interest with the U.S. Copyright Office (the "***Non-Recorded Copyrights***").

In addition, there also are 13,657 copyrights[17] in which (a) the First Lien Indenture Trustee and the Second Lien Indenture Trustee (or their predecessors, as applicable) had recorded a security interest in 2012, but that the First Lien Credit Facility Administrative Agent did not record a security interest until within the Preference Period or (b) the Second Lien Indenture Trustee (or its predecessor) had recorded a security interest in 2012, but that the First Lien Credit Facility Administrative Agent and First Lien Indenture Trustee did not record a security interest until within the Preference Period (collectively, the "***Recently Recorded Credit Facility Copyrights***," and together with the Recently Recorded Copyrights, the Notes-Only Recorded Copyrights, and the Non-Recorded Copyrights, the "***Disputed Copyrights***"). The recordings by the First Lien Indenture Trustee and the Second Lien Indenture

---

[17]    Approximately 13,000 of these copyrights were registered by the Company prior to July 2007.

Trustee referenced (but did not attach) the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement, respectively. The First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement identify the first lien secured parties as holding a security interest in the Disputed Copyrights.

Because (1) the First Lien Credit Facility Administrative Agent, the First Lien Indenture Trustee, and the Second Lien Indenture Trustee (or their predecessors, as applicable) recorded their security interests in the Recently Recorded Copyrights with the U.S. Copyright Office during the Preference Period, (2) the First Lien Credit Facility Administrative Agent did not record a security interest in the Notes-Only Recorded Copyrights with the U.S. Copyright Office before the Petition Date, (3) no party recorded a security interest in the Non-Recorded Copyrights with the U.S. Copyright Office before the Petition Date, and (4) the First Lien Credit Facility Administrative Agent and, in certain instances, the First Lien Indenture Trustee, recorded its security interests in the Recently Recorded Credit Facility Copyrights with the U.S. Copyright Office during the Preference Period, the Debtors filed a complaint under sections 544, 547 550, and 551 of the Bankruptcy Code seeking to avoid the liens in the Disputed Copyrights and the liens in the inventory, revenues, and other documents pertaining to such copyrights, and preserving such liens for the benefit of the Debtors' Estates [Docket No.[__]] (the "*Copyright Adversary Proceeding*").

The Debtors believe that any interests in the Disputed Copyrights and the inventory, revenues, and other documents pertaining to such Disputed Copyrights avoided pursuant to section 547 of the Bankruptcy Code and preserved for the benefit of the Debtors' Estates pursuant to section 551 of the Bankruptcy Code have a priority superior to any interest the Prepetition Secured Parties may have in such Disputed Copyrights and the inventory, revenues, and other documents pertaining to such Disputed Copyrights. The Debtors also believe, and have filed a declaratory judgment action seeking a determination by final order of the Court, that the Debtors' Estates are not subject to the obligations under any intercreditor agreement or other agreement to which the Prepetition Secured Parties were party to with respect to any recovery received on account of any Disputed Copyrights avoidance actions. Accordingly, the Copyright Adversary Proceeding seeks declaratory judgments from the Bankruptcy Court on both of these points.

**The Debtors have been advised by Ocean Tomo with respect to valuations regarding the Disputed Copyrights. Information regarding the value of the Disputed Copyrights is contained on the Disputed Copyrights Analysis attached hereto as Exhibit E-3.**

### (b) Disputed Cash

As of the Petition Date, the Debtors held approximately $265.0 million of cash in an investment account that the Debtors assert is not part of the secured lenders, swap counterparties, and secured noteholders' (collectively, the "*Prepetition Secured Parties*") respective collateral packages under the First Lien Credit Facility Agreement, First Lien Notes Indenture, First Lien Swap Confirmations, and Second Lien Indenture.

On March 20, 2013, the Debtors drew down substantially all of the remaining availability under their first lien revolving credit facilities, $430.0 million. Of that amount, $300.0 million was used to purchase shares in a Federated money market fund that invests in treasury securities (ticker: TOIXX) (the "*Treasury Federated Fund*"). The remaining $130.0 million was received too late in the day to be directly invested in the Federated Fund and was placed into the Debtors' primary concentration deposit account maintained with BMO Harris Bank and was subsequently used to buy shares in a Nassau Euro Money Fund (the "*Nassau Fund*").[18] Following this purchase, the Debtors' holdings in the Nassau Fund were worth approximately $175.0 million. Subsequently, the Debtors continued to manage their business and use funds from the Nassau Fund and BMO Harris Bank concentration account for general corporate purposes and the ordinary course operation of their business as the Debtors had before the March 20, 2013 draw on the revolver. Between March 20, 2013 and March 31, 2013, the Debtors continued to receive funds from the normal operations of their business and concentrate them in the BMO Harris Bank concentration account and the Nassau Fund. At the end of March 2013, the Nassau Fund holdings were worth

---

[18]   At the end of each business day, as part of their ordinary course cash management system, funds in the BMO Harris Bank concentration account in excess of $100,000 were used to buy shares in the Nassau Fund.

approximately $133.0 million.  At the end of March 2013, the holdings in the Nassau Fund were transferred to a different Federated money market fund, the Government Obligations Fund Institutional Shares (ticker: GOIXX) (the "***Government Federated Fund***").  Through the Petition Date, the Debtors continued to use funds from the Government Federated Fund and the BMO Harris Bank concentration account for general corporate purposes and the ordinary course operation of their business.  Prior to the Petition Date, the Debtors also transferred approximately $35.0 million of the original $300.0 million used to purchase shares in the Treasury Federated Fund to the Government Federated Fund and the BMO Harris Bank concentration account, which transferred funds were utilized for general corporate purposes and the ordinary course operation of the Debtors' business.  A detailed account of the transfers out of the BMO Harris Bank, Government Federated Fund, and Treasury Federated Fund for the 90 days prior to the Petition Date is contained in the Debtors' schedules of assets and liabilities and statements of financial affairs, which were filed with the Bankruptcy Court.

The Treasury Federated Fund is publicly traded on the NASDAQ exchange (ticker: TOIXX).  Technically, the Debtors' investment involved the purchase of uncertificated securities in the Treasury Federated Fund.  The Debtors continue to hold the shares that they held on the Petition Date today.  As of the Petition Date, the balance of the Treasury Federated Fund was approximately $265.0 million.  Pursuant to the terms of the Cash Collateral Order, on or about August 23, 2013, the Debtors transferred an additional $8,883,986.42 to the Treasury Federated Fund, which amount reflects the prepetition principal payments made by the Debtors on June 28, 2013 under the First Lien Credit Facility Agreement.  As a result, the balance of the Federated Fund, as of September 30, 2013, is $273,899,152.43.

Pursuant to the terms of the Cash Collateral Order, professional fees of the Committee and professional fees incurred by the Debtors with respect to any investigation, negotiation, or litigation relating to Disputed Collateral (as defined in the Cash Collateral Order) will be satisfied by the Treasury Federated Fund.

The "***Disputed Cash***" is the amount of cash of the Debtors, if any, remaining on the Effective Date in the Debtors' investment in the Treasury Federated Fund that has not otherwise been determined by Final Order to be subject to the non-avoidable Liens of the Holders of the First Lien Claims.

**The Debtors believe that their investment in the Treasury Federated Fund is not part of the Prepetition Secured Parties' collateral package and the Disputed Cash or the value associated therewith is available for distribution to unsecured creditors under the Plan.  The Debtors believe that the applicable security agreements are unambiguous and plainly exclude from the Prepetition Secured Parties' collateral package all equity investments in entities other than wholly-owned subsidiaries of the Company, such as the Treasury Federated Fund.  Accordingly, the Debtors have filed a declaratory judgment action seeking a determination by final order of the Court that the Disputed Cash is not part of the Prepetition Secured Parties' collateral package and that no Prepetition Secured Party or entity acting as their agent has a security interest in the Disputed Cash.  [Adversary Case 1-13-0146, Docket No. 500].**

### (c) Equity Interests in Foreign Subsidiaries

The Debtors pledged all of the equity interests in their domestic wholly-owned subsidiaries as collateral to the Prepetition Secured Parties.  With respect to the Debtors' foreign subsidiaries, only 65% of the equity of their first-tier foreign subsidiary, CLA C.V., is pledged to the Prepetition Secured Parties, leaving the CLA C.V. 35% Equity unencumbered.  By pledging only 65% of the equity, the Debtors avoided triggering Section 956 of the Internal Revenue Code, which, if triggered, results in the accumulated earnings and profits of foreign subsidiaries being deemed to have been distributed as a dividend to a U.S. borrower for U.S. Federal income tax purposes.

Because 35% of the equity interests in CLA C.V. was not pledged as collateral to the Prepetition Secured Parties, 35% of the equity value of the foreign subsidiaries is unencumbered.  Accordingly, such value, if any, would be available for distribution to unsecured creditors, including Holders of First Lien Claims on account of their deficiency claims.

As discussed in greater detail below, however, there are three intercompany obligations from CLAI to CLA C.V. in the aggregate amount of approximately $777.9 million and an approximately $6.8 million revolving loan owed by CLH B.V. (as defined herein) to CLAI that were pledged as debt under the First Lien Documents.  These

intercompany obligations could significantly reduce, or eliminate, CLA C.V.'s equity value and any distribution to unsecured creditors.

**Taking into consideration the likely characterization of the intercompany obligations owed by CLA C.V. set forth below in Article** Error! Reference source not found. **of the Disclosure Statement, the Debtors believe that the value of the CLA C.V. 35% Equity Value is $17.2 million. Additional information regarding the CLA C.V. 35% Equity Value, including detail regarding the Debtors' valuation of their consolidated international operations and the excess cash held by the Debtors' international subsidiaries, is contained on the Disputed Assets Valuation Analysis attached hereto as Exhibit E-2.**

(d)    **Hampton Brown Disputed Assets and Equity Interests in CourseSmart**

The equity interests in the Debtors' non-wholly owned subsidiaries, Hampton Brown and CourseSmart (the joint ventures discussed above) are not pledged as collateral to any of the Prepetition Secured Parties. Accordingly, the Debtors believe that the value attributable to their equity interests in Hampton Brown and CourseSmart is available for distribution to unsecured creditors, including the Holders of First Lien Claims on account of their deficiency claims. .

As more fully described in Section IV.A (iii).(1), as of the Petition Date, Hampton Brown's principal assets include the National Geographic Explorer! Magazine (including a small amount of associated working capital, principally receivables) and a collection of approximately 1,850 copyrights registered by (or in the process of being registered by) Hampton Brown at the time of its acquisition by CLI in 2011. Together, the value of these assets reflects the value of CLI's Class B units in Hampton Brown.

In addition to assets held by Hampton Brown, there is a pool of approximately 400 copyrights registered with the U.S. Copyright Office by CLI, but related to the NGSP business and arising after CLI's 2011 acquisition of Hampton Brown, in which no party had recorded a security interest until the 90 days period prior to the Petition Date.[19] To the extent that these approximately 400 copyrights would constitute collateral under applicable security agreements, because these security interests were registered within the Preference Period, the Debtors believe that these approximately 400 copyrights will be found unencumbered by the Bankruptcy Court upon the filing of an appropriate complaint under sections 544, 547 550, and 551 of the Bankruptcy Code seeking to avoid the applicable liens.

As a result, the Disputed Assets include three groups of Hampton Brown-related assets that are likely unencumbered by Prepetition Secured Parties' liens (together, the "***Hampton Brown Disputed Assets***"):

- National Geographic Explorer! Magazine (including associated receivables),

- Approximately 1,850 Hampton Brown-registered copyrights, and

- Approximately 400 Hampton Brown-related copyrights registered by CLI.

**The Debtors believe that the value of their interest in Hampton Brown is $13.7 million and CourseSmart is $5.0 million. Additional information regarding the value of Hampton Brown and CourseSmart is contained on the Disputed Assets Valuation Analysis attached hereto as Exhibit E-2. Information regarding the value of the Hampton Brown-registered copyrights and the approximately 400 Hampton Brown-related copyrights registered by CLI is contained on the Disputed Copyrights Analysis attached hereto as Exhibit E-3.**

(e)    **Unencumbered Real Estate**

---

[19]    None of these approximately 400 copyrights are valued as part of the valuation of the Disputed Copyrights.

**The Disclosure Statement assumes that the value of the Unencumbered Real Estate is $515,000, which is the price set forth in a purchase agreement that is currently under negotiation by the Debtors.**

(ii)     *Intercompany Obligations*

There are various intercompany obligations owed between two Debtors or between a Debtor and a non-Debtor affiliate (collectively, the "***Intercompany Obligations***").  The Intercompany Obligations include:

- three intercompany obligations in the aggregate amount of approximately $777.9 million owed by Cengage Learning Acquisitions C.V. ("***CLA C.V.***"), the top-tier foreign holding company that owns the interests in the Debtors' foreign operations, to Cengage Learning Acquisitions, Inc. ("***CLAI***") (the "***Foreign Loans***")

- four intercompany obligations in the aggregate amount of approximately $3.6 billion owed by CLI to CLAI  (collectively, the "***Domestic Loans***");

- an approximately $10.3 million domestic cash management loan owed by CLAI to CLI (the "***CLAI Revolving Loan***");

- an approximately $6.6 million international cash management loan owed by CLH B.V. (as defined below) to CLAI (the "***International Revolving Loan***");

- twenty-six different intercompany obligations in the aggregate amount of approximately $378.4 million owed by Cengage Learning Holdco, Inc. to CLAI (collectively, the "***Holdco Loans***");

- an approximately $4.0 million obligation owed by CLAI to CL Holdings and an approximately $0.3 million obligation owed by CL Holdings to CLI related to the purchase of Class B interests in CL Holdings Interests by certain current and former employees and/or directors of the Debtors (the "***CL Holdings Obligation***");

- approximately $10.8 million in international intercompany trade balances owed by CLAI's foreign indirect subsidiaries to CLI (the "***International Intercompany Trade Balances***"); and

- approximately $3.0 million in domestic intercompany trade balances owed by CLI to CLAI (the "***Domestic Intercompany Trade Balances***").

| Intercompany Obligation | Lender | Borrower | Balance as of July 2, 2013 |
|---|---|---|---|
| Foreign Interest Loan | CLAI | CLA C.V. | $246.9 million |
| First Foreign Non-Interest Loan | CLAI | CLA C.V. | $520.1 million |
| Second Foreign Non-Interest Loan | CLAI | CLA C.V. | $10.9 million |
| International Revolving Loan | CLAI | CLH B.V. | $6.6 million |
| HM Intercompany Loan A | CLAI | CLI | $594.0 million |
| HM Intercompany Loan B | CLAI | CLI | $109.7 million |
| 2008 Intercompany Loan | CLAI | CLI | $2,804.6 million |
| HB Intercompany Loan | CLAI | CLI | $75.5 million |
| CLAI Revolving Loan | CLI | CLAI | $10.3 million |
| Holdco Loans | CLAI | CL Holdco | $378.4 million |
| CL Holdings Obligation | CL Holdings | CLAI | $4.0 million |
|  | CLI | CL Holdings | $0.3 million |
| International Intercompany Trade Balances | CLI | Foreign subsidiaries of CLAI | $10.8 million |
| Domestic Intercompany Trade | CLAI | CLI | $3.0 million |

| Intercompany Obligation | Lender | Borrower | Balance as of July 2, 2013 |
|---|---|---|---|
| Balances | | | |

Each of the Intercompany Obligations are pledged as collateral to the First Lien Lenders and Second Lien Lenders and, as a result, any recovery under a plan by a Debtor on account of any Intercompany Obligations would be allocated directly to such lenders. Parties, however, may challenge the validity, classification, and/or allowance of the Intercompany Obligations. Due to the size of the Intercompany Obligations and the pledged nature of the Intercompany Obligations, the ultimate resolution of any of these challenges will have an impact on the allocation of creditor recoveries under the Plan. Whether any given Intercompany Obligation would be recharacterized as something other than valid debt if a party challenged such Intercompany Obligation depends on the consideration of a number of relevant factors.

Below is a summary of each of the Intercompany Obligations and the Debtors' conclusions regarding whether the Intercompany Obligations would be recharacterized as anything other than valid debt if a party challenged such Intercompany Obligation.

(a)    The Foreign Loans

At the time of the 2007 Apax acquisition of Cengage, CLA C.V., as borrower, and CLAI, as lender, entered into an $800 million interest-bearing loan (the "*Initial Foreign Loan*") to finance CLA C.V.'s purchase of Cengage Learning Holdings B.V. (f/k/a Thomson Learning Holdings B.V.) ("*CLH B.V.*"), the top-tier holding company of Thomson's international learning business. The Initial Foreign Loan was recorded on the books and records of CLA C.V. and CLAI simultaneously with CLAI's transfer of funds to Thomson in exchange for the shares of CLH B.V. The Initial Foreign Loan reflected the contractually-agreed allocation of the overall purchase price to the international business and provided CLA C.V. with the funds necessary to purchase shares of CLH B.V.. The Initial Foreign Loan was accompanied by a formal loan document, with a fixed maturity date, interest payment schedule, and remedies in the event of default. At the time of the Initial Foreign Loan (on or around July 5, 2007), CLAI recognized that a portion of the Initial Foreign Loan would need to be converted to equity in order to create the proper capital structure for CLA C.V. and CLAI's tax advisors advised that post-closing structural changes would be required.

In June 2008, CLA C.V. did not have the cash available to satisfy the entire amount of the interest payments required under the Initial Foreign Loan (approximately $55.2 million). Accordingly, CLA C.V. paid off approximately $24.8 million of interest on the loan, and CLAI capitalized the rest of the interest owed (approximately $30.4 million), and divided the loan into two new loans: a $310.0 million interest-bearing loan (the "*Foreign Interest Loan*") and a $520.1 million non-interest bearing loan (the "*First Foreign Non-Interest Loan*"). The Foreign Interest Loan and First Foreign Non-Interest Loan were accompanied by new loan documents, dated June 24, 2008. At the same time as the Initial Foreign Loan was converted into the Foreign Interest Loan and First Foreign Non-Interest Loan, intercompany loans were issued from CLA C.V. to Cengage Learning UK Holdings Ltd. ("*Cengage U.K.*") and Cengage Australia Holdings II Pty Ltd. ("*Cengage Australia*"), Cengage's UK and Australian holding companies, respectively. The projected cash flows moving up from Cengage UK and Cengage Australia to CLA C.V. from interest payments due on their intercompany obligations were intended to fund the interest payments from CLA C.V. to CLAI under the Foreign Interest Loan.

In January 2009, a portion of the international cash management system was settled resulting in a new non-interest bearing loan owed to CLAI by CLA C.V. (the "*Second Foreign Non-Interest Loan,*" and together with the Initial Foreign Loan, the Foreign Interest Loan, and the First Foreign Non-Interest Loan, the "*Foreign Loans*"). The Second Foreign Non-Interest Loan was in the original amount of $29.7 million. CLA C.V. in turn contributed the funds obtained from the Second Foreign Non-Interest Loan down the legal entity chain to CLH B.V. as equity. CLH B.V. used the Second Foreign Non-Interest Loan to repay its International Revolving Loan balance with CLAI at the time so as to reduce its overall exposure to currency movements. Since June 2008, CLA C.V. has remained current on interest payments on the Foreign Interest Loan, all of which have been reflected by book/journal entry. There have been no repayments on account of the First Foreign Non-Interest Loan. There have been principal repayments on account of the Second Foreign Non-Interest Loan.

As of July 2, 2013, the balance of the Foreign Interest Loan was approximately $246.9 million (including accrued interest), the balance of the First Foreign Non-Interest Loan was approximately $520.1 million, and the balance of the Second Foreign Non-Interest Loan was approximately $10.9 million.

**Based on the totality of the circumstances, the Debtors believe that, if litigated, the Foreign Interest Loan most likely would be characterized as valid debt.** Among the factors weighing in favor of treating the Foreign Interest Loan as valid debt are the existence of formal documentation, the terms of which generally mirror those of the term loans under the First Lien Credit Facility, a true third-party arm's-length transaction, a contractual interest rate, a fixed maturity date, a history of on time interest payments, and the recording of the Foreign Interest Loan as debt on the Debtors' books and records. While the previous conversions of interest bearing loans into non-interest bearing loans potentially weigh in favor of treatment as non-debt, the Debtors believe that the presence of this factor is relatively outweighed by the previously mentioned factors supporting the conclusion that the Foreign Interest Loan is most likely to be treated as valid debt.

**Based on the totality of the circumstances, the Debtors believe that, if litigated, the First Foreign Non-Interest Loan and the Second Foreign Non-Interest Loan are most likely to be recharacterized as equity or not treated as valid debt.** Among the various reasons for this conclusion are the relative undercapitalization of the borrower, the non-interest bearing nature of the loans, the lack of repayment history with respect to the First Foreign Non-Interest Loan, and the circumstances regarding previous conversions of interest bearing loans into non-interest bearing loans. Although there was formal loan documentation, the Debtors recorded the First Foreign Non-Interest Loan and the Second Foreign Non-Interest Loan as debt on their books and records, and, in the case of the Second Foreign Non-Interest Loan, there was principal repayment, which potentially weighs in favor of treatment as valid debt, the Debtors believe that the presence of these factors is relatively outweighed by the previously mentioned factors supporting the conclusion that the First Foreign Non-Interest Loan and Second Foreign Non-Interest Loan are most likely to be characterized as equity or not treated as valid debt.

### (b)   The International Revolving Loans

On July 5, 2007, the International Revolving Loan was established between CLAI, as lender, and CLH B.V., as borrower. The International Revolving Loan is the result of Cengage's international cash management strategy, which involves the use of an in-house intercompany trade netting system as well as periodic cash movements to and from CLAI and CLH B.V. The in-house netting system is used to settle intercompany transactions with most affiliates (except for affiliates in countries where netting is not permitted due to exchange controls, etc.). The netting system enables intercompany receivables and payables between CLI and international affiliates to be settled in an efficient manner, provides adequate funding to settle amounts due, reduces the number of cash transfers and related bank fees, and reduces the impact of currency movements. As foreign affiliates generate excess cash, they send their cash to CLH B.V. and CLH B.V. uses the excess cash to fund other international affiliates and sends any remaining cash to CLAI. The International Revolving Loan bears interest and has formal loan documentation. As of July 2, 2013, the balance of the International Revolving Loan was approximately $6.6 million (including accrued interest).

**Based on the totality of the circumstances, the Debtors believe that, if litigated, the International Revolving Loan most likely would be characterized as valid debt.** Among the factors weighing in favor of treating the International Revolving Loan as valid debt are the existence of formal loan documentation, a contractual interest rate, a fixed maturity date, a history of regular interest repayments, and the recording of the International Revolving Loan as debt on the Debtors' books and records. Although there likely was a lack of true arm's-length negotiation and uncertainty regarding availability of third-party financing, the Debtors believe that the presence of these factors is relatively outweighed by the previously mentioned factors supporting the conclusion that the International Revolving Loan is most likely to be treated as valid debt.

### (c)   The Domestic Loans

The Domestic Loans are comprised of four separate loans between CLAI, as lender, and CLI, as borrower, in the original principal amounts of $625.0 million (the "***HM Intercompany Loan A***"), $115.4 million (the "***HM Intercompany Loan B***"), $3.4 billion (the "***2008 Intercompany Loan***"), and $72.0 million (the "***HB Intercompany Loan***").

On May 30, 2008, CLAI, as lender, and CLI, as borrower, entered into HM Intercompany Loan A and HM Intercompany Loan B (the "***Houghton Mifflin Loans***") to fund the purchase of certain assets related to the college business of Houghton Mifflin Company.  The transfer of funds was reflected on the books of both CLAI and CLI simultaneously with the payment of the purchase price to Houghton Mifflin Company.  HM Intercompany Loan A and HM Intercompany Loan B were both documented.  The funds to make HM Intercompany Loan A were obtained from proceeds of the incremental term loan under the First Lien Credit Facility, a true third-party arm's-length transaction and cash on hand.  The funds to make HM Intercompany Loan B were obtained by equity contributions from funds managed and advised by Apax and OMERS to CLAI's indirect parent company, which were then contributed downstream to CLAI for the purchase of the Houghton Mifflin assets.  Although the funding for the HM Intercompany Loan B was provided by a third party in the form of a loan, the terms of the HM Intercompany Loan B generally mirror those of HM Intercompany Loan A, the terms of which generally mirror those of the incremental term loan under the First Lien Credit Facility ( a loan negotiated at arm's length).  The Houghton Mifflin Loans bear interest and include a principal amortization schedule.  To date, CLI has stayed current on its interest and principal amortization payments on account of the Houghton Mifflin Loans.  As of July 2, 2013, the balance of HM Intercompany Loan A was approximately $594.0 million (including accrued interest) and the balance of HM Intercompany Loan B was approximately $109.7 million (including accrued interest).

**Based on the totality of the circumstances, the Debtors believe that, if litigated, the Houghton Mifflin Loans most likely would be characterized as valid debt.**  Among the factors weighing in favor of treating the Houghton Mifflin Loans as valid debt are the specific acquisition-related use of the funds, the existence of formal loan documentation, a contractual interest rate, a fixed maturity date, a principal amortization schedule, a history of regular interest payments, and the recording of the Houghton Mifflin Loans as debt on the Debtors' books and records.  Although there likely was uncertainty regarding availability of third-party financing and the source of the funds necessary to make the HM Intercompany Loan B was an equity contribution, the Debtors believe that the presence of these factors is relatively outweighed by the previously mentioned factors supporting the conclusion that the Houghton Mifflin Loans are most likely to be treated as valid debt.

In 2007, to fund the purchase of Thomson Learning business, including Thomson Learning, Inc. (now Cengage Learning Inc.), the international business, and The Gale Group Inc. (now part of Cengage Learning Inc.) CLAI borrowed funds under the First Lien Credit Facility, Senior Notes Indenture, and Subordinated Notes Indenture, combined with equity injections from funds managed and controlled by Apax and OMERS as well as the proceeds of a PIK bridge loan contributed by CL Holdco.  On June 24, 2008, CLAI and CLI entered into and documented the 2008 Intercompany Loan.  The 2008 Intercompany Loan bears interest and includes a principal amortization schedule.  Unlike the Houghton Mifflin Loans, no money flowed to CLI on account of the 2008 Intercompany Loan for the purpose of an acquisition.  Instead, the 2008 Intercompany Loan was established to upstream the cash CLI generates from its business to CLAI, which cash is used to service CLAI's funded debt obligations.  This loan cleared a capital account balance owed to CLAI and optimizes the Debtors' overall state tax position as CLI is able to deduct interest payments on the 2008 Intercompany Loan in states where it is taxed separately from CLAI.  To date, CLI has stayed current on its interest and principal amortization payments on account of the 2008 Intercompany Loan.  As of July 2, 2013, the balance of the 2008 Intercompany Loan was approximately $2.8 billion (including accrued interest).

**Based on the totality of the circumstances, the Debtors believe that, if litigated, the 2008 Intercompany Loan is most likely to be recharacterized as equity or not treated as valid debt.**  Among the various reasons for this conclusion are the timing of the documentation of the 2008 Intercompany Loan, which was completed a year after the 2007 acquisition of the Thomson Learning business, and CLI's non-receipt and non-use of funds from CLAI for anything other than a tax purpose.  Although there was formal loan documentation (the terms of which generally mirror those of the term loans under the First Lien Credit Facility), the Debtors recorded the 2008 Intercompany Loan as debt on their books and records, and principal amounts have been repaid, which potentially weighs in favor of treatment as valid debt, the Debtors believe that the presence of these factors are relatively outweighed by the previously mentioned factors supporting the conclusion that the 2008 Intercompany Loan is most likely to be characterized as equity or not treated as valid debt.

On August 1, 2011, CLAI loaned $72.0 million to CLI pursuant to the HB Intercompany Loan to fund CLI's purchase of interests in Hampton Brown.  The HB Intercompany Loan does not include a principal

amortization schedule. The HB Intercompany Loan bears interest, and to date, CLI is current on its interest payments. As of July 2, 2013, the balance of the HB Intercompany Loan was $75.5 million.

**Based on the totality of the circumstances, the Debtors believe that, if litigated, the HB Intercompany Loan most likely would be characterized as valid debt.** Among the factors weighing in favor of treating the HB Intercompany Loan as valid debt are the specific acquisition-related use of funds, the existence of formal documentation for the loan, a contractual interest rate, a fixed maturity date, a history of regular interest payments, and the recording of the HB Intercompany Loan as debt on the Debtors' books and records. Although there likely was a lack of true arm's-length negotiation and uncertainty regarding availability of third-party financing, the Debtors believe that the presence of these factors is relatively outweighed by the previously mentioned factors supporting the conclusion that the HB Intercompany Loan is most likely to be treated as valid debt.

#### (d)    The CLAI Revolving Loan

On July 5, 2007, the CLAI Revolving Loan was established between CLAI, as borrower, and CLI, as lender. The CLAI Revolving Loan is the result of Cengage's domestic cash management system, which involves the daily sweep of cash to or from CLI's bank accounts to or from a concentration bank account at CLAI. Almost all cash generated by CLI on a daily basis is transferred to the CLAI concentration account where it is used in part to pay interest, make principal amortization payments, or satisfy certain corporate expenses owed by CLAI. Funds are transferred back to CLI as needed for disbursements or otherwise invested by CLAI. The CLAI Revolving Loan bears interest and is periodically cleared by offsetting the balance of the CLAI Revolving Loan against the amounts owed by CLI to CLAI for interest and principal under the Domestic Loans. As of July 2, 2013, the balance of the CLAI Revolving Loan was approximately $10.3 million (including accrued interest).

**Based on the totality of the circumstances, the Debtors believe that, if litigated, the CLAI Revolving Loan most likely would be characterized as valid debt.** Among the factors weighing in favor of treating the CLAI Revolving Loan as valid debt are the exchange of funds, the existence of formal documentation, a contractual interest rate, a fixed maturity date, a history of regular interest payments, and the recording of the CLAI Revolving Loan as debt on the Debtors' books and records. Although there likely was a lack of true arm's-length negotiation and uncertainty regarding the availability of third-party financing, the Debtors believe that the presence of these factors is relatively outweighed by the previously mentioned factors supporting the conclusion that the CLAI Revolving Loan is most likely to be treated as valid debt.

#### (e)    The Holdco Loans

CLAI provided 26 non-interest bearing intercompany loans to CL Holdco to (1) fund the buyback of the 13.75% Senior Holdco Notes due 2015, make interest payments on account of the PIK Notes when they became cash pay in January 2012, make a mandatory alternative high yield discount obligation principal redemption payment in July 2012, and fund the refinancing costs incurred to convert the original PIK bridge loan to the PIK Notes. The Holdco Loans were issued between July 2008 and January 2013 and range in amount from approximately $130,000 to $95 million. As of July 2, 2013, the aggregate balance of the Holdco Loans was approximately $378.4 million. **Based on the totality of the circumstances, the Debtors believe that, if litigated, the Holdco Loans most likely would be recharacterized as equity or not treated as valid debt.** Ultimately, however, the Debtors believe that the characterization of the Holdco Loans is not relevant for purposes of the Plan as CL Holdco has no assets for distribution. Accordingly, whether the Holdco Loans are characterized as debt or equity does not impact individual creditor recoveries as all creditors of CL Holdco will receive no distribution on account of their claim.

#### (f)    The CL Holdings Obligation

In May and June of 2008, certain employees and/or directors of the Debtors invested approximately $4.4 million in CL Holdings in exchange for Class B Units of CL Holdings. Since then, three of the employees who invested in CL Holdings were dismissed and their investment totaling $0.5 million was returned to them, reducing the balance to approximately $3.9 million. The investment was documented and the price was paid for by the employees and/or directors with personal checks or by wire, which funds were deposited directly into the bank account of CLAI, as CL Holdings does not have its own bank account. CLAI recorded an intercompany trade

payable for the cash it received on behalf of CL Holdings.  As the dismissed employees were employees of CLI, CLI made the payments to return each dismissed employee his or her investment.  CLI recorded an intercompany receivable from CL Holdings.  As of the Petition Date, this obligation remained outstanding.  As it was an intercompany receivable and not a loan, there is no formal documentation reflecting this obligation other than entries on the books and records of CLAI and CL Holdings.  Currently, the balance of the intercompany trade payable between CLAI and CL Holdings is $4.0 million and the balance of the intercompany trade receivable between CLI and CL Holdings is $0.3 million.

**Based on the totality of the circumstances, the Debtors believe that, if litigated, the CL Holdings Obligation most likely would be characterized as valid debt.**  Among the factors weighing in favor of treating the CL Holdings Obligation as valid debt is the fact that funds were received by CLAI and the CL Holdings Obligation was recorded as debt on the Debtors' books and records.  Although there is no formal documentation or applicable interest rate, the Debtors believe that the presence of these factors is relatively outweighed by the previously mentioned factors supporting the conclusion that the CL Holdings Obligation is most likely to be treated as valid debt.

<div align="center">

**(g)    International Intercompany Trade Balances**

</div>

Intercompany trade balances exist between CLI and the foreign affiliates.  As of July 2, 2013, the foreign affiliates owed CLI approximately $10.8 million.  The balance is comprised of amounts due from the sale of books to the foreign affiliates and royalties due to CLI from the foreign affiliates, as well as other miscellaneous charges and chargebacks that occur for such items as salaries, benefits, phone bills, editorial work, telecommunication fees, convention costs, legal fees, and production costs performed by either CLI or the foreign affiliate on behalf of the other.  These balances are cleared periodically as part of the international cash management/netting process.  **Based on the totality of the circumstances, the Debtors believe that, if litigated, the International Intercompany Trade Balances most likely would be characterized as valid debt.**  Among the factors weighing in favor of treating the International Intercompany Trade Balances as valid debt is the fact that the balances represent the exchange of funds for goods to be sold and the International Intercompany Trade Balances are recorded as debt on the Debtors' books and records.  Although there potentially is a lack of true arm's-length negotiation, a lack of formal documentation, and no applicable interest rate, the Debtors believe that the presence of these factors is outweighed by the previously mentioned factors supporting the conclusion that the International Intercompany Trade Balances are most likely to be treated as valid debt.

<div align="center">

**(h)    Domestic Intercompany Trade Balances**

</div>

Intercompany trade balances exist between CLAI and CLI.  As of July 2, 2013, CLI owed approximately $3.0 million to CLAI.  The balance is comprised of certain obligations paid for by CLAI that are allocable to CLI.  These balances are cleared periodically as part of the domestic cash management/netting process.  **Based on the totality of the circumstances, the Debtors believe that, if litigated, the Domestic Intercompany Trade Balances most likely would be characterized as valid debt.**  Among the factors weighing in favor of treating the Domestic Intercompany Trade Balances as valid debt is the fact that the balances represent obligations paid for by CLAI that are allocable to CLI and the Domestic Intercompany Trade Balances are recorded as debt on the Debtors' books and records.  Although there potentially is a lack of true arm's-length negotiation, a lack of formal documentation, and no applicable interest rate, the Debtors believe that the presence of these factors is outweighed by the previously mentioned factors supporting the conclusion that the Domestic Intercompany Trade Balances are most likely to be treated as valid debt.

**F.    Appointment of a Mediator**

On September 18, 2013, counsel to various parties in interest in the Chapter 11 Cases had their first telephonic meeting with the Mediator.  On September 25, 2013, the Bankruptcy Court entered an order formally appointing the Honorable Robert D. Drain, Judge in the United States Bankruptcy Court for the Southern District of New York, to serve as mediator in the Chapter 11 Cases (the "***Mediator***") [Docket No. 518].

On September 26, 2013, counsel to various parties in interest, met with the Mediator at K&E's offices to discuss various scheduling items including, a mediation schedule and a plan confirmation schedule, subject to

Bankruptcy Court approval.  At the mediation, the parties successfully reached an agreement regarding a mediation and plan confirmation schedule.  At the hearing on September 27, 2013, the Bankruptcy Court entered an order setting the Disclosure Statement for November 12, 2013, and the Plan Confirmation hearing for February 24, 2014.  [Docket No. 530].  The parties agreed to hold the first phase of mediation in late October or early November to mediate certain "ripe" issues.  The remaining Plan Confirmation issues will be mediated during the second phase of mediation, which will be held on December 17 and 19, 2013 and January 6, 8, and 10, 2014.

### G.    Apax Issues

As previously discussed, on July 5, 2007, investment funds associated with or designated by Apax acquired 97 percent of equity of Thomson Learning and Thomson Nelson Learning (the balance of the equity was purchased by Funds associated with or designated by OMERS) from Thomson Corporation and certain of its affiliates for $7.11 billion.  Non-Debtor Cengage Learning Holdings I, L.P. is the limited partner of Debtor Cengage Learning Holdings II, L.P., which directly or indirectly owns each of the other Debtors.  Cengage Learning Holdings I, L.P. is owned approximately 97 percent by Apax, approximately 3 percent by OMERS, and less than 1 percent by current and former management employees and certain directors.  Through their ownership, Apax appointed a majority of the Debtors' boards of directors and determined corporate strategy, management, and policies.  On or about August 26, 2013, the members of the Debtors' board of directors that were employed by Apax resigned from their positions.

### (i)    *Prepetition Debt Purchases*

Prior to the Petition Date, in consultation with the Company's board of directors, Apax determined that the purchase of various senior debt instruments in the Debtors' capital structure could be a means to extend certain debt maturities and accordingly, was in the Company's best interests.  After disclosure and informed approval by the Company's board of directors, Apax made significant investments in the Company's debt (the "***Prepetition Debt Purchases***").  Prior to and after the Prepetition Debt Purchases were made, the Company disclosed generally on a periodic basis that Apax either was or could be an investor anywhere in the Debtors' capital structure.

On February 12, 2013, the Debtors engaged Richard D. Feintuch as an independent director.  Mr. Feintuch had no prior connection to the Debtors or Apax, the Debtors' majority equity holder.  At the time of Mr. Feintuch's appointment, the Debtors were exploring various restructuring alternatives to address their debt burden, with Mr. Feintuch heavily involved in discussing and analyzing all potential transactions.  During this process, Mr. Feintuch was advised that Apax had made the Prepetition Debt Purchases.

It became clear that the Prepetition Debt Purchases would be a focal point of all constituencies involved in the potential chapter 11 cases.  After discussions with counsel, Mr. Feintuch determined that the Prepetition Debt Purchases should be investigated so that the Debtors could determine whether there are any viable causes of action against Apax that could be pursued for the benefit of the Debtors' estates.  On or about May 23, 2013, and upon the request of Mr. Feintuch, the Debtors retained Willkie Farr & Gallagher LLP ("***Willkie***") as Mr. Feintuch's independent counsel to assist in an evaluation and analysis of the Prepetition Debt Purchases (the "***Apax Investigation***").  By board resolutions dated August 16, 2013, the debtors delegated to Mr. Feintuch, among other powers, the authority to determine the conduct of the Apax Investigation and, on behalf of the Company, to determine whether any potential claims or causes of action described in any materials related to the Apax Investigation should be pursued by or on behalf of the Company or be settlement by or on behalf of the Company.  On August 7, 2013, the scope of Willkie's engagement and the Apax Investigation was expanded to include the Company's prepetition debt repurchases.  It was contemplated that in connection with such engagement, after conducting the Apax Investigation, Willkie would provide a report of its findings (the "***Willkie Report***").

On July 26, 2013, the Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Terminating or, in the Alternative, Suspending the Debtors' Prepetition Investigation into Certain Conduct of Apax Partners, L.P. and its Affiliates* [Docket No. 164] (the "***Termination Motion***") seeking the termination or suspension of the Apax Investigation.  On July 30, 2013, the Debtors filed the *Debtors' Objection to the Motion of the Official Committee of Unsecured Creditors for an Order Terminating or, in the Alternative, Suspending the Debtors' Prepetition Investigation into Certain Conduct of Apax Partners, L.P. and its Affiliates* [Docket No. 180].  After extensive negotiations, the parties in interest agreed to allow the Apax Investigation to continue and settled all

relevant issues aside from the appropriate parties to whom the Willkie Report should be distributed.  On August 20, 2013, the Court denied the Termination Motion and determined that distribution of the Willkie Report should remain in the Debtors' discretion.

On September 13, 2013, after review by Mr. Feintuch, Willkie finalized the Willkie Report, which is attached hereto as **Exhibit G**.  Beginning on September 13, 2013, the Debtors provided, on a confidential basis, the Willkie Report to:  (1) counsel to the Committee, Arent Fox LLP; (2) restructuring advisor to the Committee, FTI Consulting, Inc.; (3) counsel to the Second Lien Trustee, Akin Gump Strauss Hauer & Feld; (4) counsel to the Ad Hoc First Lien Group, Milbank, Tweed, Hadley & McCloy LLP; (5) counsel to the First Lien Credit Agreement Administrative Agent, Davis Polk & Wardwell, LLP; (6) financial advisor to the First Lien Credit Agreement Administrative Agent, Blackstone Advisory Partners L.P.; (7) counsel to the First Lien Indenture Trustee, Katten Muchin Rosenman LLP, (8) counsel to Centerbridge, Jones Day; and (9) counsel to Apax, Simpson Thacher & Bartlett LLP (collectively, the "*Willkie Report Recipients*").

As further detailed in the Willkie Report, Willkie concluded that: (1) it is unlikely that either Apax, the Apax directors, or the non-Apax directors breached any fiduciary duty owed to the Company in connection with (a) the Prepetition Debt Purchases or (b) the Company's repurchases of its own debt; (2) it is unlikely that purchases of the Company's debt by Apax and the Company were made by Apax and the Company, respectively, on the basis of material non-public information; (3) it is unlikely that an attempt to equitably subordinate the Apax Debt Claims[20] in the chapter 11 cases would prevail; (4) it is unlikely that certain other remedies against Apax would prevail, including (a) equitable disallowance of the Apax Debt Claims, (b) a *per se* limitation of recovery on the Apax Debt Claims, (c) recharacterization of the Apax Debt, or (d) the designation of Apax votes on the Plan.

After reviewing the findings in the Willkie Report, Mr. Feintuch concluded that it is not in the Debtors' best interests to pursue claims against Apax and the Company's officers and directors based upon the Prepetition Debt Purchases and the Company's debt repurchases.

### (ii)        *2007 Leveraged Buy-Out ("LBO")*

As previously discussed, prior to 2007, the Company's businesses were known as Thomson Learning and Thomson Nelson Learning, divisions of Thomson Corporation, and as The Gale Group Inc.  On July 5, 2007, investment funds associated with or designated by Apax acquired 97 percent of the Company's equity (the balance of the equity was purchased by Funds associated with or designated by OMERS (together with Apax, the "*Sponsors*") from Thomson Corporation and certain of its affiliates for $7.11 billion.

The Debtors and their advisors are currently performing an analysis of the 2007 LBO, and, at this time, the Debtors do not believe there are any viable claims to pursue on behalf of their estates.  In particular, the Debtors believe that any claims related to the 2007 LBO are barred pursuant to the applicable statute of limitations regardless of which state's law applies.

The Debtors identified three possible states' laws that may apply:  Delaware, Connecticut, and New York. The fraudulent transfer statutes in Delaware and Connecticut, either of which the Debtors believe could apply with respect to the 2007 LBO, prohibit challenges brought more than four years after the transaction occurred.  Claims under the Delaware and Connecticut fraudulent transfer statutes are therefore time barred.  New York's fraudulent transfer statutes permit challenges brought up to six years after the transaction occurred.  Notwithstanding that the six-year limitation did not expire before the Debtors' chapter 11 filing, the Debtors believe that a fraudulent transfer action is time-barred under New York state law because, as set forth below, New York State law requires the application of the Delaware or Connecticut statutes of limitation.

The debt documents governing the 2007 LBO contain choice-of-law provisions indicating that New York law governs.  Under New York law, however, the applicable statute of limitations is determined by applying New

---

20    The "*Apax Debt Claims*" are the claims of Apax against the Debtors arising from the debt acquired through the Prepetition Debt Purchases (the "*Apax Debt*").

York's "borrowing statute," which requires that when a cause of action arises outside of New York, the shorter statute of limitations – either that of New York or the foreign state – applies. For the purposes of the borrowing statute, a cause of action arises in the place where the injury occurred. In the context of a fraudulent transfer claim, the place of injury is the injured party's place of business.

Here, the Debtors believe the potential cause of action arose in Delaware and Connecticut. The Debtors have their principal place of business in Connecticut. A number of the Debtors' employees work and a great deal of its transactions and business operations occur in Connecticut. Additionally, the Debtors are Delaware corporations and operate under its laws. There are no known facts to connect the 2007 LBO with New York. In light of the foregoing, regardless of whether New York law applies, the Debtors believe that the shorter, four-year statute of limitations would apply and any fraudulent transfer cause of action would therefore be time-barred.

Assuming *arguendo* that a court determines that New York state law applies with respect to the statute of limitations, all elements of a fraudulent transfer action under New York state law would still need to be proven. In evaluating a fraudulent transfer claim, courts are generally reluctant to use 20/20 hindsight to unwind transactions years later, especially based on reasonably unforeseen or unforeseeable events. Based on the facts received and the Debtors' analysis performed to date, the Debtors believe that, in addition to the statute of limitations likely passing, a cause of action seeking to avoid the 2007 LBO would not succeed on the merits. If granted standing to pursue fraudulent conveyance claims under New York state laws, plaintiffs would bear the burden of proving that the 2007 LBO lacked fair consideration and left the Debtors insolvent, inadequately capitalized, and unable to pay debts subsequently incurred. Courts evaluate these factors based upon what was known by the defendants at the time the transaction occurred, relying heavily on contemporaneous market data, statements, and financial projections. Based upon a review of substantial contemporaneous evidence, as well as the positive market performance the Debtors achieved between 2007 and 2011, the Debtors believe there is a strong argument against any fraudulent conveyance claims. The Debtors' were not rendered insolvent as a result of the 2007 LBO, which occurred six years ago. Rather, the Debtors believe their current financial problems are a result of changed market conditions in recent years, as discussed in greater detail in Section V.A. below.

### (iii)    The Apax Complaint

On September 10, 2013, Apax filed a complaint (the "***Apax Complaint***") [Adversary Case No. 1-13-01453; Docket No. 437] seeking a declaration that it is entitled to share in all distributions under the Plan made to the First Lien Secured Parties in accordance with the terms of the First Lien Intercreditor Agreement governing the respective rights and obligations of holders of the First Lien Notes and the First Lien Credit Agreement. Apax asserts that under the terms of the First Lien Intercreditor Agreement, they are entitled to the ratable distribution of proceeds from shared collateral (as defined in the First Lien Intercreditor Agreement) to all First Lien Secured Parties by the designated agent according to the waterfall provisions under the First Lien Intercreditor Agreement and the First Lien Notes Indenture.

**Based upon the findings in the Willkie Report determining that there likely are no claims against Apax on account of the Prepetition Debt Purchase and Mr. Feintuch's decision not to pursue such claims, the Debtors have modified the provisions of the Plan that were the subject of the Apax Complaint and the Plan will treat Apax no differently than all other First Lien Secured Parties. Accordingly, the Debtors believe that the Apax Complaint is moot.**

## V.    EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES

### A.    Fundamental Changes in the Educational Publishing Industry and Their Effect on the Debtors

In the past, the Debtors and their peers in the educational materials market produced only traditional print products. From kindergarten to higher education to career training, students, instructors, and institutions depended on printed goods, typically as an accompaniment to live classroom teaching. The publishers in this market provided textbooks, workbooks, and other instructional materials and relied heavily on their profits from selling new print products.

Now, the educational publishing market has entered the early stages of a major transition from print business models to a greater focus on digital products, with digital market share growing as quickly as 20 percent annually over recent years. The move to digital began with the simple substitution of electronic versions of textbooks for the printed forms. Over time, digital products such as homework programs and interactive learning software have increasingly been paired and integrated with print materials. And in some cases, digital products are becoming a favored medium for learning materials in the classroom. As much as 15 percent of learning materials sold today are in digital format, including course materials, homework programs, and interactive and online learning platforms. All indications are that digital will continue to grow in importance in this market.

In addition to this digital transition, recent market trends have considerably altered the landscape of the educational materials business. One such trend is a consistent decline over the last decade in demand for new printed materials, which traditionally was the primary driver of profitability in the Debtors' industry. Consumers are increasingly opting to rent new materials, purchase electronic books, and, most significantly, purchase or rent used books. Approximately 40 percent of all consumer transactions in the learning materials market in 2012 were used book sales or rentals. Of course, each of these transactions is less profitable—or not at all profitable—to the publisher.

Additionally, since the recent recession began in 2007, the dramatic decrease and persistent volatility in the availability of government funding have weakened demand significantly in several of the Debtors' businesses, particularly in the research and K–12 markets. These markets are driven by the spending of state and local governments, which were especially hard-hit by the recession.

Finally, publishers have also come under pressure from unconventional or even illegal activities that allow consumers to purchase products outside the normal distribution chain. Piracy, despite being illegal, has become easier as the technology for copying content has improved. Additionally, a recent Supreme Court decision permitting the practice of importing textbooks from foreign markets (where they are often discounted to reflect lower demand and relative standards of living) into the U.S. for resale is likely to increase the incentives for doing so and may put further pressure on domestic pricing.[21]

The combined force of these trends has hindered the Debtors' financial performance. For the nine months ended March 31, 2013, the Debtors' revenues were $1,298.6 million, compared to $1,458.3 million for the same period ended March 31, 2012, representing a revenue decline of approximately 11 percent. Unlevered free cash flow over the same periods fell from $568.6 million to $360.2 million. Simultaneously, the weight of the Debtors' funded debt burden has grown, with debt service payments increasing from $353.0 million for the nine months ended March 31, 2012, to $376.3 million for the same period ended March 31, 2013.

### B.     Strategic Responses and Prepetition Restructuring Efforts

In late 2012 and early 2013, the Debtors overhauled their senior management team by hiring a world-class team, led by a new chief executive officer, Michael Hansen, and a new chief product officer, chief technology officer, and chief sales and marketing officer. Mr. Hansen previously served as chief executive for Harcourt Assessment, the educational materials division of Reed Elsevier (a publisher and information provider operating in the science, medical, legal, risk, and business sectors), where he led a successful turnaround and sale of that business. With a new management team in place, the Debtors have developed and started to implement a comprehensive new business plan.

In light of the industry's transition to digital, this comprehensive new business plan centers on combining the best of innovative and complementary digital and print products with expert product support to provide whole-course packaged products covering individual courses from every angle. Currently, the Debtors are developing the MindTap platform, a full suite of digital learning solutions designed to engage students and offer instructors choice and flexibility. MindTap is just the first step in enhancing product innovation in digital formats, and it continues the Debtors' efforts to set the standard for excellence in the learning materials market. Indeed, in fiscal year 2012, the

---

[21]    *See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013).

proportion of the Debtors' revenues from digital product sales versus stand-alone print product sales increased 17.5 percent from 31.9 to 37.5 percent.

In addition to the revamped focus on positioning itself to capitalize on the digital transition and implementing the new product offerings described above, the Debtors are using new sales strategies to target particular markets that present greater growth opportunities.   Furthermore, the Debtors intend to pursue growth in their research and ELT businesses across the globe—two areas with high growth potential.  The synergies of new management, new products, and new sales strategies set a strong foundation for achieving the Debtors' envisioned transformation.

Although the Debtors worked diligently to stay apace with these sea changes from an operational standpoint, the Debtors also realized the need for a financial restructuring of its capital structure.  The Debtors engaged Lazard Freres & Co. LLC as investment banker ("*Lazard*"), Alvarez & Marsal North America, LLC as restructuring advisor ("*A&M*"), and Kirkland & Ellis LLP as counsel ("*K&E*") to advise on their contemplated restructuring.

### C.    Negotiations with Stakeholders and the Execution of the Restructuring Support Agreement

In April 2013, the Debtors requested that certain holders of the Debtors' First Lien Claims organize and form an ad hoc group.  The Ad Hoc First Lien Group is advised by Houlihan Lokey Capital Inc., as financial advisor, and Milbank, Tweed, Hadley & McCloy LLP, as counsel (collectively, the "*First Lien Advisors*").   In addition, JPMorgan Chase Bank, N.A., administrative agent under the First Lien Credit Facility Agreement, engaged Davis Polk & Wardwell LLP and Blackstone Advisory Partners LP and commenced discussions with the Debtors.  Other non-first lien creditors also commenced discussions with the Debtors and their advisors.  To permit frank and transparent discussions to the greatest extent possible, the members of the Ad Hoc First Lien Group and certain other non-first lien creditors entered into non-disclosure agreements with the Debtors.  In the period leading up to the Petition Date, the parties and their advisors held multiple meetings to exchange information, facilitate diligence, answer questions, and discuss various restructuring issues.  In addition to information on the Debtors' revised business plan and financial information, the Debtors began the process of providing creditors and their advisors with information regarding the Debtors' assets so that each group could perform diligence and assess valuations.

After considerable arm's-length negotiations, the Debtors' Consenting Holders reached a restructuring support agreement outlining a restructuring process and post-reorganization capital structure that is designed to de-lever the Debtors' balance sheet and provide for an expedient emergence from chapter 11.  At the same time, it provides unsecured creditors with appropriate time to conduct diligence on, and discuss their conclusions regarding, among other things, the value of the three primary sources of potential recoveries for unsecured creditors (such potential sources of recovery are subject to dispute by the Consenting Holders and the First Lien Credit Facility Administrative Agent and the amount of any recovery will depend on the outcome of these disputes).  The Debtors and the Consenting Holders memorialized their agreement by entering into a Restructuring Support Agreement and the three RSA Term Sheets.  The Restructuring Support Agreement and the three RSA Terms Sheets serve as the basis of the Debtors Plan.

## VI.    SUMMARY OF THE PLAN

### A.    Description of the CLAI Trust, the CLI Trust, & Resolution of the Trust Asset Disputes

#### (i)    *Establishment of the Trust*

On the Effective Date, the CLAI Trust and CLI Trust shall be established pursuant to their respective Trust Agreements for the purposes of holding the Trust Assets pending the Trust Asset Dispute Resolutions and making all distributions on account of the Trust Interests as provided for under the Plan and the Trust Agreements.  Except as provided in Article V.C of the Plan, none of the Debtors or the Reorganized Debtors shall have any liability for any cost or expense of the CLAI Trust or the CLI Trust.

### (ii)    Trust Assets

Except for the case where a given Trust Asset Dispute is resolved on or prior to the Effective Date, in which case a distribution on account of the applicable Trust Asset will be made on the Effective Date (or as soon as practicable thereafter) as if the applicable Trust Asset had been transferred to the CLAI Trust or the CLI Trust (as applicable), on the Effective Date, in accordance with section 1141 of the Bankruptcy Code, the Debtors shall transfer all Trust Assets to the CLAI Trust or CLI Trust, as applicable.  The Trust Assets may be transferred subject to certain liabilities and any Liens thereon, as provided in the Plan or the Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

### (iii)    Reorganized Debtors' Right to Use the Trust Assets

Concurrently with the Debtors' transfer of the Trust Assets to the CLAI Trust or CLI Trust, as applicable, the CLAI Trust and CLI Trust, as applicable, shall be deemed to grant to the Reorganized Debtors a sole and exclusive license to use, operate, license, and sublicense any of the Disputed Copyrights, any of the assets of the Non-Wholly Owned Subsidiaries, and such other Trust Assets as the Reorganized Debtors determine in their sole discretion, which license in the case of the Disputed Copyrights shall include all rights of a copyright owner, including, without limitation, the right to create derivative works and the right to take such legal action as may be required to restrain infringement or to seek and retain all damages therefor.  Any such exclusive license shall be freely transferable and assignable, and the Reorganized Debtors shall have full authority to transfer, assign, hypothecate, or sub-license such exclusive licenses to one or more persons, in whole or in part.  In exchange for such exclusive licenses, the Reorganized Debtors shall provide the CLI Trust with a monthly licensing fee payment determined prior to the Effective Date pursuant to a Final Order on account of the Disputed Copyrights and a monthly licensing fee payment determined prior to the Effective Date pursuant to a Final Order on account of the use of the Non-Wholly Owned Subsidiaries Interests.  The monthly licensing fee associated with any other Trust Asset that the Reorganized Debtors determine to license in their sole discretion after the Effective Date shall be in an amount determined prior to the Effective Date pursuant to a Final Order.

### (iv)    Trust Asset Election

On or before any Trust Asset Determination Date with respect to a Trust Asset, the Reorganized Debtors shall either (1) make the Trust Asset Election with respect to such Trust Asset, or (2) determine to abandon such Trust Asset for use, sale, or lease by the applicable Trustee subject to and in accordance with the applicable Trust Agreement and distribution to the Holders of the Trust Interests.  In the event that the Reorganized Debtors make the Trust Asset Election with respect to a Trust Asset, then on or before the fifth Business Day after the Trust Asset Determination Date, the Trustee shall transfer such Trust Asset to the Reorganized Debtors free and clear of all liens, claims and encumbrances in return for the Trust Consideration in respect of such Trust Asset.  Following the Trust Asset Election with respect to a Trust Asset, the Reorganized Debtors shall have no further obligation to make any licensing fee payments associated therewith.  Following the abandonment of such Trust Asset, the Reorganized Debtors shall have no further right to use, sell, or lease or license such Trust Asset and the terms of any license arrangement shall be automatically terminated.  Any licensing fee payment made by the Reorganized Debtors on account of a particular Trust Asset through and including the Trust Asset Determination Date, and by any third part after any abandonment of such Trust Asset, shall inure to the benefit of the Trust Beneficiaries holding a Trust Interest on account of such Trust Asset and the Holder of the Trust Interests entitled to receive distributions in connection with such Trust Asset shall also be entitled to receive their Pro Rata share of the allocable Net Licensing Fees associated with such Trust Asset and any payments made by any such third parties.

### (v)    Trust Agreements

On or before the Effective Date, the Debtors and the Trustees shall execute the Trust Agreements, and shall take all other necessary steps to establish the Trusts and the Trust Interests therein, which shall be for the benefit of the Trust Beneficiaries, whether the Claims of such Trust Beneficiary are Allowed before, on, or after the Effective Date.  The Trust Agreements may provide powers, duties, and authorities in addition to those explicitly stated herein.  From and after the Effective Date, any amendment, modification, or supplement to the Trust Agreements, including, without limitation, the schedules and exhibits thereto, shall require the consent of the Reorganized

Debtors, the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent (solely to the extent any such amendment, modification, or supplement is materially adverse to the First Lien Credit Facility Administrative Agent in its capacity as First Lien Credit Facility Administrative Agent) and the First Lien Indenture Trustee (solely to the extent any such amendment, modification, or supplement is materially adverse to the First Lien Indenture Trustee in its capacity as First Lien Indenture Trustee).  In the event of any inconsistency between the Plan and the Trust Agreements, the Trust Agreements shall govern.

### (vi)    *Administration of the Trust*

The Trusts shall be administered by the Trustees according to the Trust Agreements and the Plan.  The Trusts shall be managed and operated by the Trustees.  The Trustees shall be appointed on the Effective Date, or as soon as practicable thereafter.  In furtherance of and consistent with the purpose of the Trusts and the Plan, and subject to the terms of the Confirmation Order, the Plan, and the Trust Agreements, the Trustees shall, among other things, have the following rights, powers and duties: (1) to hold, manage, and distribute the Trust Assets and any Trust Consideration, (2) to hold the Trust Assets for the benefit of the Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, (3) following the Trust Asset Determination Date, to liquidate any Trust Asset that the Reorganized Debtors determine, in their sole discretion, not to acquire, and (4) to file all tax and regulatory forms, returns, reports, and other documents required with respect to the Trust.  The Trustees shall not have any standing in connection with any CLAI Cause of Action or CLI Cause of Action or any Trust Asset Dispute.  The Trustees may not sell, assign, transfer, hypothecate, or liquidate any of the Trust Assets prior to the Trust Asset Determination Date any earlier than the Trust Asset Determination Date or the date on which the Reorganized Debtors either make the Trust Asset Election with respect to such Trust Asset or determine to abandon such Trust Asset for liquidation by the applicable Trustee and distribution to the Holders of the Trust Interests.  In the event of any inconsistency between the Plan and the Trust Agreement, the Trust Agreement shall govern.

Following the Effective Date, the Trustees shall prepare and file (or cause to be prepared and filed), on behalf of the Trusts, all tax returns required to be filed or that the Trustees otherwise deems appropriate.

### (vii)    *Trust Asset Dispute Resolution*

The Estates shall be charged with the sole authority to commence and prosecute any CLAI Trust Causes of Action, CLI Trust Causes of Action, and any of the Trust Asset Disputes.  Any proceeding with respect to the Trust Assets shall be brought in the [TBD].  The Estates shall be required to commence any proceeding with respect to the CLAI Trust Causes of Action, CLI Trust Causes of Action, and any of the Trust Asset Disputes by no later than [___] days after the Effective Date.

### (viii)    *Standing of the Post-Effective Date Unsecured Creditors' Representatives Committee, First Lien Credit Facility Administrative Agent, First Lien Indenture Trustee, the Ad Hoc First Lien Group, and Apax*

On the Effective Date, the Committee shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code.  On the Effective Date, there shall be appointed the Post-Effective Date Unsecured Creditor Representatives Committee, which shall be subject to the jurisdiction of the Bankruptcy Court.  The Post-Effective Date Unsecured Creditor Representatives Committee shall be comprised of three members selected by the Committee.  The Post-Effective Date Unsecured Creditor Representatives Committee shall only have standing and power to participate in the CLAI Trust Causes of Action, CLI Trust Causes of Action, and any of the Trust Asset Disputes on behalf of the Holders of Other Unsecured Claims; provided that, for the avoidance of doubt, this provision shall not confer on the Post-Effective Date Unsecured Creditor Representatives Committee the power to commence any claims or causes of action on behalf of the Debtors.  The Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee shall have standing and power to participate in the CLAI Trust Causes of Action, CLI Trust Causes of Action, and any of the Trust Asset Disputes on behalf of the Holders of the First Lien Secured Claims and the First Lien Deficiency Claims; provided that, for the avoidance of doubt, this provision shall not confer on the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee the power to commence any claims

or causes of action on behalf of the Debtors. Apax shall have standing and power to participate in the CLAI Trust Causes of Action, CLI Trust Causes of Action, and any of the Trust Asset Disputes on its own behalf.

Unless the Post-Effective Date Unsecured Creditor Representatives Committee votes to disband earlier, the existence of the Post-Effective Date Unsecured Creditor Representatives Committee (and all powers associated therewith), shall terminate upon the determination of the Junior CLAI Recovery and the Junior CLI Recovery.

### (ix)    *CLAI Trust Causes of Action and CLI Trust Causes of Action*

[TBD]

### (x)    *Payment of Post-Effective Date Fees & Expenses*

The reasonable and documented fees and expenses of the professional advisors of the Post-Effective Date Unsecured Creditor Representatives Committee incurred shall be paid solely from the applicable Trust Assets other than the Trust Assets allocable to the CLAI Senior Trust Interests and the CLI Senior Trust Interests.

The reasonable and documented fees and expenses of the professional advisors to the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee incurred in connection with the Trust Assets transferred to the Trusts hereunder including, without limitation, in connection with the Trust Asset Disputes shall be paid solely from the applicable Trust Assets allocable to the CLAI Senior Trust Interests and the CLI Senior Trust Interests.

### (xi)    *Costs and Expenses of the Trusts*

The reasonable costs and expenses of the Trusts, including any taxes and the fees and expenses of the Trustees and its retained professionals, shall be paid solely from the applicable Trust's Trust Assets.

### (xii)    *Compensation of the Trustees*

The individual(s) serving as or comprising the Trustees shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the Bankruptcy Court and be made solely from the assets of the applicable Trust.

### (xiii)    *Retention of Professionals/Employees by the Trustees*

The Trustees may retain and compensate attorneys, other professionals, and employees to assist in their duties as Trustees on such terms as the Trustees deem appropriate without Bankruptcy Court approval.

### (xiv)    *Successor Trustee*

In the event any Trustee dies, is terminated, or resigns for any reason, a successor shall be designated in accordance with the applicable Trust Agreements; provided, however, that under no circumstance shall the Trustees be a director or officer with respect to any Affiliate of the Reorganized Debtors or the Trusts.

### (xv)    *Transferability of the Trust Interests*

The Trust Interests shall be fully transferable and assignable. In accordance with the terms of the Trust Agreement, the Holders of a Trust Interest shall provide the applicable Trustee with notice of any transfer and/or assignment and any transferee or assignee shall automatically be deemed to be a Trust Beneficiary and subject to the terms of the Trust Agreement and shall be solely responsible for providing the Trustees with any information necessary to facilitate distributions on account of any allocable Trust Interests to such Holder.

### (xvi)    *Cash*

The Trustees may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code.

### *(xvii)    Tax Treatment of Trusts*

Subject to the receipt of contrary guidance from the IRS or a court of competent jurisdiction (including the receipt by the Trustees of a private letter ruling requested by the Trustees, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustees, or a condition imposed by the IRS in connection with a private letter ruling requested by the Debtors), the Trustees shall (1) treat the Trusts as one or more disputed ownership funds for federal income tax purposes within the meaning of Treasury Regulations Section 1.468B-9(b)(1) and (2) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes, unless the Reorganized Debtors determine in consultation with the Trustees that an alternate tax treatment is applicable. All Holders of Claims shall report, for tax purposes, consistent with the foregoing.

### *(xviii)    Distribution of Trust Assets/Disputed General Unsecured Claims Reserve*

The Trustees shall distribute to the Holders of Trust Interests, as applicable, on or immediately after the Effective Date and on such interim distribution date that is no less than thirty (30) days following any Trust Asset Determination Date, all Trust Consideration on hand, except (1) Cash reserved pursuant to the Trust Agreement to fund the activities of the Trust, (2) such amounts as are allocable to or retained on account of Disputed General Unsecured Claims, and (3) such additional amounts as are reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Trust Assets, (b) pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Trust or in respect of the Trust Assets), or (c) as are necessary to satisfy other liabilities incurred or anticipated by the Trust in accordance with the Plan, or the Trust Agreement.

### (a)    Disputed General Unsecured Claims Reserve

From and after the Effective Date, and until such time as all Disputed General Unsecured Claims have been compromised and settled or determined by order of the Bankruptcy Court, the Trustees shall reserve for the benefit of each Holder of a Disputed General Unsecured Claim, Trust Consideration in an amount equal to the distributions which would have been made to the Holder of such Disputed General Unsecured Claim if it were an Allowed Claim in an amount equal to the lesser of (a) the Disputed General Unsecured Claim Amount, (b) the amount in which the Disputed General Unsecured Claim shall be estimated by the Bankruptcy Court pursuant to section 502 of the Bankruptcy Code in accordance with Article VIII.A.3 of the Plan, for purposes of allowance, which amount, unless otherwise ordered by the Bankruptcy Court, shall constitute and represent the maximum amount in which such Claim may ultimately become an Allowed Claim, (c) such other amount as may be agreed upon by the Holder of such Disputed General Unsecured Claim and the Reorganized Debtors, or (d) such other amounts set forth in a Final Order. Any Trust Consideration reserved and held for the benefit of a Holder of a Disputed General Unsecured Claim shall be treated as a payment and reduction on account of such Disputed General Unsecured Claim for purposes of computing any additional amounts to be paid in Trust Consideration in the event the Disputed General Unsecured Claim ultimately becomes an Allowed Claim. Such Trust Consideration reserved for the benefit of Holders of Disputed General Unsecured Claims shall be either (x) held by the Trustees, in an interest-bearing account or (y) invested in interest-bearing obligations issued by the United States Government, or by an agency of the United States Government and guaranteed by the United States Government, and having (in either case) a maturity of not more than thirty (30) days, for the benefit of such Holders pending determination of their entitlement thereto under the terms of the Plan. No payments or distributions shall be made with respect to all or any portion of any Disputed General Unsecured Claim pending the entire resolution thereof by Final Order.

(b)        **Allowance of Disputed General Unsecured Claims**

At such time as a Disputed General Unsecured Claim becomes, in whole or in part, an Allowed Claim, the Trustees shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Plan together with any interest that has accrued on the amount of Trust Consideration (net of any expenses, including any taxes relating thereto), but only to the extent that such interest is attributable to the amount of the Allowed Claim.  Such distribution, if any, shall be made as soon as practicable after an order or judgment of the Bankruptcy Court allowing such Disputed General Unsecured Claim is entered and becomes a Final Order but in no event more than sixty (60) days thereafter.

(c)        **Tax Treatment of Amounts Held With Respect to Disputed General Unsecured Claims:**

Subject to the receipt of contrary guidance from the IRS or a court of competent jurisdiction (including the receipt by the Trustees of a private letter ruling requested by the Trustees, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustees, or a condition imposed by the IRS in connection with a private letter ruling requested by the Debtors), the Trustees shall (a) treat the escrow with respect to Disputed Claims as one or more disputed ownership funds for federal income tax purposes within the meaning of Treasury Regulations Section 1.468B-9(b)(1) and (b) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes, unless the Reorganized Debtors determine in consultation with the Trustees that an alternate tax treatment is applicable..  All Holders of Allowed Claims shall report, for tax purposes, consistent with the foregoing.

(xix)    *Certain Tax Considerations*

The Trustees shall be responsible for payment, out of the Trust Assets, of any taxes imposed on the Trusts or their assets.

The Trustees may request an expedited determination of taxes of the Trusts, including the Trust Claims Reserve, or the Debtors under section 505(b) of Bankruptcy Code for all tax returns filed for, or on behalf of, the Trust or the Debtors for all taxable periods through the dissolution of the Trust.

(a)        **Tax Withholding by Trustees**

The Trustees may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or distribution to the Holders of Trust Interests.  All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such Holders of Trust Interests for all purposes of the Trust Agreement.  The Trustees shall be authorized to collect such tax information from the Holders of Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in their sole discretion the Trustees deem necessary to effectuate the Plan, the Confirmation Order, and the Trust Agreement.  This identification requirement generally applies to all Holders, including those who hold their securities in street name.  The Trustees may refuse to make a distribution to any Holder of a Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such Holder's Trust Interests as disputed; provided, however, that, if such information is not furnished to the Trustees within six (6) months of the original request to furnish such information, no further distributions shall be made to the Holder of such Trust Interest; and, provided, further, that, upon the delivery of such information by a Holder of a Trust Interest, the Trustees shall make such distribution to which the Holder of the Trust Interest is entitled, without additional interest occasioned by such Holder's delay in providing tax information; and, provided, further that, if the Trustees fail to withhold in respect of amounts received or distributable with respect to any such Holder and the Trustees are later held liable for the amount of such withholding, such Holder shall reimburse the Trustees for such liability (to the extent such amounts were actually distributed to such Holder).]

### (b)    Dissolution

The Trustees and the Trusts shall be discharged or dissolved, as the case may be, upon the earlier to occur of (a) all of the Trust Assets and/or Trust Consideration have been distributed pursuant to the Plan and the Trust Agreement, (b) the Trustees determine that the administration of any remaining Trust Assets is not likely to yield sufficient additional Trust proceeds to justify further pursuit, and (c) all distributions required to be made by the Trustees under the Plan and the Trust Agreement have been made; provided, however, in no event shall the Trusts be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the five year anniversary (or within the six month period prior to the end of an extension period), determines that a fixed period extension (not to exceed 10 years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Trustees that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Trust Assets.  If at any time the Trustees determine, in reliance upon such professionals as the Trustees may retain, that the expense of administering the Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Trust, the Trustees may apply to the Bankruptcy Court for authority to (x) reserve any amount necessary to dissolve the Trust, (y) donate any balance to a charitable organization (i) described in section 501(c)(3) of the IRC, (ii) exempt from United States federal income tax under section 501(a) of the IRC, (iii) not a "private foundation", as defined in section 509(a) of the IRC, and (iv) that is unrelated to the Debtors, the Reorganized Debtors, the Trusts, and any insider of the Trustees, and (z) dissolve the Trust.

### (xx)    *Indemnification of Trustees*

The Trustees or the individual(s) comprising the Trustees, as the case may be, and the Trustees' employees, agents, and professionals, shall not be liable to the Trust Beneficiaries for actions taken or omitted in their capacities as such, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all actions or inactions in their capacity, except for any actions or inactions involving willful misconduct or gross negligence.  Any indemnification claim of the Trustees (and the other parties entitled to indemnification under this subsection) shall be satisfied solely from the Trust Assets, as applicable, and shall be entitled to a priority distribution therefrom, ahead of the Trust Interests and any other claim to or interest in such assets.  The Trustees shall be entitled to rely, in good faith, on the advice of their retained professionals.

### (xxi)    *Privileges*

All attorney-work privileges, work product protections and other immunities or protections from disclosure held by the Debtors shall be transferred, assigned, and delivered to the Trusts, without waiver, and shall vest in the Trustees solely in their capacity as such (and any other individual the Trustees may designate, as well as any other individual designated in the Trust Agreement).  Pursuant to Federal Rule of Evidence 502(d), no Privileges shall be waived by disclosure to the Trustees and the Trust Advisory Board of the Debtors' information subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure.

## VII.    EVENTS DURING THE CHAPTER 11 CASES

On July 2, 2013 (the "***Petition Date***"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the bankruptcy Code.  The following is a general summary of the chapter 11 cases, including, without limitation, a discussion of the Debtors' restructuring and business initiatives since the commencement of the chapter 11 cases.

### A.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor can reorganize its business for the benefit of itself, its Creditors and its interest holders. Chapter 11 also promotes equality of treatment for similarly situated Creditors and similarly situated interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of that date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

**B.      First Day Pleadings and Other Case Matters**

*(i)      First and Second Day Pleadings*

To facilitate the chapter 11 cases and minimize disruption to the Debtors' operations, the Debtors filed certain motions and applications with the Bankruptcy Court on the Petition Date or immediately thereafter seeking certain relief summarized below.  The relief sought in the "first day" and "second day" pleadings facilitated the Debtors' seamless transition into chapter 11 and aided in the preservation of the Debtors' going-concern value.  The first and second day pleadings resulted in the following orders[22]:

- Authors and Content Sources.  On July 24, 2013, the Bankruptcy Court entered an interim order (a) authorizing the Debtors' payment of claims of certain authors and other content sources, (b) directing financial institutions to honor and process related checks and transfers, and (c) granting related relief [Docket No. 148].  The bankruptcy court entered a final order granting the relief requested on August 2, 2013 [Docket No. 216].

- Cash Management.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to continue to use their existing cash management system, existing bank accounts, existing business forms, and certain existing investment guidelines [Docket No. 39].  The Bankruptcy Court entered a final order granting the relief requested on [August 20, 2013] [Docket No. 304].

- Taxes.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to pay certain taxes and fees and similar charges in the ordinary course of business [Docket No. 37].  The Bankruptcy Court entered a final order granting the relief requested on August 2, 2013 [Docket No. 219].

- Insurance.  On August 2, 2013, the Bankruptcy Court entered a final order authorizing the Debtors to (a) maintain prepetition insurance policies, brokerage agreements, and surety bonds and (b) obtain new insurance policies, brokerage agreements, and surety bonds [Docket No. 215].

- Customer Programs.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the debtors to honor certain prepetition obligations to customers and otherwise continue certain customer programs and practices in the ordinary course of business [Docket No. 35].  The Bankruptcy Court entered a final order granting the relief requested on August 2, 2013 [Docket No. 223].

- Shippers and Warehousemen.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the debtors to (a) honor certain prepetition obligations to shippers, warehousemen, and other lien claimants and (b) continue to satisfy obligations to such claimants in the ordinary course [Docket No. 34].  The Bankruptcy Court entered a final order granting the relief requested on [August 2, 2013] [Docket No. 220].

- Employee Wages and Benefits.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to (a) pay certain prepetition wages, salaries, and reimbursable employee

---

[22]  Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the respective First Day Pleadings.

expenses, (b) pay and honor certain employee medical and other benefits, and (c) continue employee wages and benefits programs [Docket No. 36].  On July 24, 2013, the Bankruptcy Court entered a second interim order authorizing the relief requested [Docket No. 153].  The Bankruptcy Court entered a final order granting the relief requested on August 2, 2013 [Docket No. 217].

### (ii)    *Procedural and Administrative Motions*

To facilitate the efficient administration of the chapter 11 cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several procedural and administrative motions including orders:

- authorizing the joint administration of the chapter 11 cases;

- extending the time during which the Debtors may file certain schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs, the filing of which are required under section 521 of the Bankruptcy Code;

- authorizing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 30 largest creditors;

- authorizing the Debtors to retain and compensate certain professionals utilized in the ordinary course of business; determining the amount and nature of the adequate assurance payment for future utility service;

- approving the case management procedures for these Chapter 11 Cases; and

- approving the procedures for the interim compensation and reimbursement of retained Professionals in these Chapter 11 Cases.

### (iii)    *Retention of Chapter 11 Professionals*

The Debtors also filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during these Chapter 11 Cases.  These professionals include: (a) K&E, as counsel to the Debtors; (b) Lazard as investment banker to the Debtors; (c) A&M as restructuring advisor to the Debtors; (d) Donlin, Recano & Company, Inc., as the Notice and Claims Agent for the Debtors; and (e) Willkie as special counsel to the Debtors.

### (iv)    *Cash to Fund Operations*

Prior to commencing these chapter 11 cases, the Debtors engaged in extensive negotiations with the First Lien Secured Parties to secure use of Cash Collateral on a consensual basis, to ensure a smooth transition into chapter 11.  As noted, the Debtors are at a critical time in their fiscal year and ensuring adequate cash to fund operations was a priority.  Thus, the Debtors focused their efforts on obtaining the use of Cash Collateral on a consensual basis, while taking great care to protect the rights of unsecured creditors and other parties in interest with respect to the Disputed Cash.  On July 3, 2013, the Bankruptcy Court entered an interim order authorizing the Debtors to utilize cash collateral [Docket No. 40] (the "***Interim Cash Collateral Order***").  These funds were critical to the Debtors' ability to satisfy their ordinary course obligations incurred to run the business during the Chapter 11 Cases.

Following entry of the Interim Cash Collateral Order, the Debtors engaged with various representatives for the First Lien Secured Parties, the Creditors' Committee, various second lien representatives, and other parties in interest to reach a final order regarding the use of Cash Collateral.  On August 2, 2013, the Bankruptcy Court entered an order amending the Interim Cash Collateral Order to extend the deadline for obtaining a final order.

The Debtors, the Holders of First Lien Claims, and the Creditors' Committee reached a consensual form of final Order; on August 20, 2013, the Court entered the final order authorizing the Debtors' use of cash collateral [Docket No. 303] (the "***Final Cash Collateral Order***").

(v)        *Appointment of the Committee Members and Advisors for Such Committee*

On July 10, 2013, the United States Trustee for Region 2 (the "***U.S. Trustee***") appointed the following individuals to the Creditors' Committee:  (a) Wilmington Trust National Association; (b) Wells Fargo Bank National Association; (c) The Booksource; (d) Bennett Management Corporation; (e) RR Donnelley & Sons Company; (f) Gary B. Shelly; (g) Carl S. Warren; (h) BOKF, NA d/b/a Bank of Oklahoma; and (i) Central National-Gottesman Inc. [Docket No. 68].  On August 9, 2013, the Creditors' Committee filed an application to retain Arent Fox LLP as counsel to the Creditors' Committee [Docket No. 247].  On August 15, 2013, the Creditors' Committee file applications to retain FTI Consulting, Inc. as its financial advisor [Docket No. 274] and Moelis & Company ("***Moelis***") as its investment banker [Docket No. 275].

Since the formation of the Committee, the Debtors have consulted with the Committee concerning the administration of the chapter 11 cases. The Debtors have kept the Committee informed of, and have conferred with the Committee on, matters relating to the Debtors' business operations and have sought the concurrence of the Committee to the extent its constituency would be affected by proposed actions and transactions outside of the ordinary course of the Debtors' businesses. The Committee has participated actively with the Debtors' management and professional advisors in reviewing the Debtors' business plans and operations.

### C.        The Committee's Motion to Terminate Apax Investigation

As described above, the Debtors commenced the Apax Investigation, prior to the Petition Date, to analyze the events and conduct surrounding certain prepetition transactions involving Apax.  On July 26, 2013, the Creditors' Committee filed the *Motion of the Official Committee of Unsecured Creditors for an Order Terminating or, in the Alternative, Suspending the Debtors' Prepetition Investigation into Certain Conduct of Apax Partners, L.P. and its Affiliates* [Docket No. 164] (the "***Apax Investigation Termination Motion***").  The Committee asserted that the Apax Investigation would potentially usurp, impair or, impede their right to conduct an independent investigation and/or request that an examiner conduct one.  The Debtors' filed an objection to the Apax Investigation Termination Motion on July 30, 2013 [Docket No. 180].  At the hearing on August 1, 2013, the Debtors and the Creditors' Committee agreed to discuss a potential timeline whereby the Apax Investigation would continue and the Debtors would agree to certain terms and conditions ensuring proper disclosure of the Apax Investigation results and protecting the Creditors' Committee's right to seek further investigation or request an examiner.

On August 16, 2013, the Boards of Directors of Cengage Learning GP I LLC, Cengage Learning Acquisitions, Inc., Cengage Learning HoldCo Inc. and Cengage Learning Inc. adopted joint resolutions (a) confirming Mr. Feintuch's appointment and current status as an "independent" director of the Company in accordance with the guidelines established by the New York Stock Exchange, (b) documenting the Debtors', the Debtors' board of directors, and Mr. Feintuch's understanding, explicitly providing Mr. Feintuch with sole authority and power to conduct the Investigation, including the Company Purchases, and (c) ratifying all of Mr. Feintuch's prior actions with respect to the Investigation.  At the hearing on August 20, 2013, the Debtors and the Creditors' Committee resolved a majority of the issues regarding the Apax Investigation Termination Motion, with the exception of the appropriate release and disclosure of the Willkie Report.

Prior to the hearing on September 3, 2013 to resolve the outstanding issues relating to the Apax Investigation Termination Motion, the Committee filed the *Letter to the Honorable Elizabeth S. Stong Regarding Proposed Order Establishing Protocols with Respect to Debtors Internal Corporate Investigation and Final Internal Corporate Report* [Docket No. 347] seeking to limit disclosure of the Willkie Report upon completion (the "***Committee Letter*** and "***Proposed Order***" attached thereto).  In response, the Debtors, the First Lien Group, and JPMorgan Chase Bank, N.A., as administrative agents, filed letters opposing the Committee Letter and Proposed Order [Docket No. 377, 375, and 376, respectively].  At the hearing on September 3, 2013, the Court denied the Apax Investigation Motion and declined to enter the Proposed Order, thereby making the release and disclosure of the Willkie Report within the Debtors' discretion.

As previously discussed, Willkie has completed the Apax Investigation and has released the Willkie Report.  The Debtors have produced the Willkie Report to the Willkie Report Recipients.  and the Willkie Report is attached hereto as **Exhibit G**.

### D.    Creditors' Committee Discovery Requests

Throughout these chapter 11 cases, the Debtors have received discovery requests from several parties and have been as open, responsive, and cooperative as reasonably possible, as demonstrated by the following:

- To date, the Debtors have produced a total of 142,813 pages in response to 278 document requests from the Committee relating to dozens of categories of documents. The Debtors have produced documents as soon as practicable and on a rolling basis. As of September 27, 2013, the Debtors have made at least 24 separate productions.

- The Debtors have worked quickly and cooperatively with the Committee to develop search terms and potential custodians for the collection of electronic discovery, and the Debtors expect to begin the collection and production of electronic discovery not yet produced in the coming weeks.

- The Debtors have provided the Creditors' Committee with electronic access and credentials to hundreds of additional documents in Debtors' confidential data room.

- The Debtors have engaged in countless telephone conferences with the Committee's counsel to discuss the status of discovery, and have kept the Committee and other inquiring constituents updated regarding the Debtors' collection and production efforts.

### E.    Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief, which period may be extended by the bankruptcy court for a period of up to 18 months after the petition date.

During this period, no other party in interest may file a competing chapter 11 plan or plans; however, the Bankruptcy Court may modify the exclusive period upon request of a party in interest and "for cause." The Debtors have filed the Plan and Disclosure Statement within the exclusivity period and reserve the right to seek extensions of their exclusive right to file a plan or plans and solicit votes thereon if necessary and appropriate.

### F.    Pending Litigation Proceedings and the Automatic Stay

In the ordinary course of business, the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their business. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims. Nevertheless, they do not believe the outcome of any currently existing proceeding, even if determined adversely, would have a material adverse effect on their business, financial condition, or results of operations.

With certain exceptions, the filing of these Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of these Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of these Chapter 11 Cases is subject to compromise, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation claims against the Debtors may be subject to compromise in connection with these Chapter 11 Cases.

### G.    Directors and Officers of Reorganized Cengage and the Other Reorganized Debtors

#### (i)    *The New Board*

The New Board of Reorganized Cengage shall consist of seven directors, as applicable. The New Board of Reorganized Cengage shall be determined for the Initial Board Term as follows: (a) one director shall be the Chief Executive Officer of Reorganized Cengage; (b) each holder of 15% or more of the outstanding New Equity shall be entitled to nominate and have elected one director; and (c) the Ad Hoc First Lien Group shall be entitled to elect the

remaining directors; <u>provided</u> that no institution shall be entitled to nominate and have elected more than one director on the New Board at any time; <u>provided</u> <u>further</u>, <u>that</u> the Ad Hoc First Lien Group will consult with the Chief Executive Officer of Reorganized Cengage to the extent that any board nominee of the Ad Hoc First Lien Group is not employed by or otherwise directly affiliated with a member of the Ad Hoc First Lien Group.

At the end of the Initial Board Term, the New Board shall be redetermined by vote of the Holders of New Equity (which vote shall occur annually) on the same basis set forth for the Initial Board Term above, until such time as Reorganized Cengage has completed a Qualified Public Offering. After Reorganized Cengage has completed a Qualified Public Offering, the New Board will be elected by holders of its equity securities entitled to vote in the election therefor.

At all times prior to Reorganized Cengage completing a Qualified Public Offering, each Holder of 15% or more of the outstanding New Equity, in addition to the foregoing director rights, shall be entitled to appoint one observer that is a representative or otherwise affiliated with such Holder of New Equity to the New Board, subject to customary confidentiality obligations; <u>provided</u> that no observer shall be entitled to compensation for their services as an observer to the New Board.

### (ii)    *Senior Management and Management Employment Agreements*

The existing officers of the Debtors shall remain in their current capacities as officers of the Reorganized Debtors, subject to the ordinary rights and powers of the applicable New Board to remove or replace them in accordance with the New Corporate Governance Documents and any applicable employment agreements that are assumed, or assumed as amended, by the Reorganized Debtors pursuant to the Plan consistent with the Restructuring Support Agreement and RSA Term Sheets in all respects.

### (iii)    *Management Incentive Plan*

On or as soon as practicable following the Effective Date, the New Board of Reorganized Cengage shall adopt the Management Incentive Plan.

### H.    Claims Bar Date

On August 16, 2013, the Debtors filed their schedules and statements with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code. The Bankruptcy Code allows a bankruptcy court to fix the time within which proofs of claim must be filed in a chapter 11 case. Any creditor whose Claim is not scheduled in the Debtors' schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a proof of claim. On August 28, 2013, the Debtors filed a motion to set the General Bar Date for October 31, 2013 (the "***Bar Date Motion***"). The Bar Date Motion provides that the General Bar Date applies to all unsecured prepetition priority claims, including all section 503(b)(9) claims.

### I.    NOL Motion

As of the Petition Date, the Debtors' total net operating losses ("***NOLs***") and certain other tax attributes were estimated to be approximately $735 million. Under the Internal Revenue Code, and subject to certain limitations, NOLs that accumulate prior to emergence from bankruptcy (reduced by any taxable income recognized or tax attribute reduction suffered during bankruptcy or pursuant to the restructuring, including pursuant to any cancellation of indebtedness income) may be used to offset post-emergence taxable income. Under the applicable federal tax laws, however, the Debtors would lose the ability to utilize a significant portion of their NOLs if an "ownership change" were to occur prior to completion of the chapter 11 cases. Consequently, on the Petition Date, the Debtors filed the Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness with Respect to, Certain Equity Securities and for Related Relief [Docket No. 11] (the "***NOL Motion***"), pursuant to which the Debtors sought, on an interim and final basis, to restrict (i) trading of their equity securities during the pendency of the chapter 11 cases by shareholders who beneficially or constructively own (as determined   under applicable federal income tax rules), or would beneficially or constructively own after giving effect to such trades, at least 4.5% of the equity securities of CL Holdings, and (ii) the ability of shareholders that beneficially or constructively own or have owned 50% or more -- as measured under

the applicable federal income tax rules -- of the equity securities of CL Holdings to claim a federal income tax deduction for worthlessness for a taxable period ending before emergence. The Bankruptcy Court entered an interim order granting the NOL Motion July 3, 2013 [Docket No. 38] and a final order on July 25, 2013 [Docket No. 152].

## VIII.    PROJECTED FINANCIAL INFORMATION

The Debtors' projected financial information is attached hereto as **Exhibit D**.

## IX.    VALUATION OF THE DEBTORS

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors. As set forth on the valuation analysis attached hereto as Exhibit E-1, Lazard has estimated that the Debtors' enterprise value is approximately $2.9 billion.

## X.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors, they should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Risks Relating to Bankruptcy

*(i)*    ***The Debtors may be subject to protracted litigation regarding the Disputed Assets and other issues.***

There is a risk of potential protracted litigation regarding the Disputed Assets, including, but not limited to, disputes regarding the value of the Disputed Assets and whether the Disputed Assets are encumbered and therefore unavailable as a source of recovery for unsecured creditors. Parties-in-interest may bring potentially time-consuming litigation regarding the status of the Disputed Assets, subordination of claims, Allowance of Claims, and Apax Issues, some of which, as set forth above, shall be resolved in connection with Confirmation, and others of which may not be resolved until after the Effective Date.

*(ii)*    ***Parties in interest may object to the Plan's classification of claims and interests.***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

*(iii)*    ***The Debtors may fail to satisfy vote requirements.***

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

*(iv)*    ***Failure to confirm the Plan within the Milestones contained in the Restructuring Support Agreement may give rise to Termination of the Restructuring Support Agreement.***

If the Debtors do not secure confirmation of the Plan within the milestones currently contemplated by the Restructuring Support Agreement, which require, among other things, that the Effective Date to occur on or before

November 14, 2013, unless extended, the Restructuring Support Agreement may terminate prior to the Confirmation of the Plan, which could result in the loss of support for the Plan by the Debtors' largest secured and unsecured creditor constituencies. Any such loss of support could adversely affect the Debtors' ability to reorganize and confirm and consummate the Plan.

### (v)    The Debtors may not be able to obtain Confirmation of the Plan.

With regard to any proposed plan of reorganization, the debtor seeking confirmation of a plan may not receive the requisite acceptances to confirm such plan. If the requisite acceptances of the Plan are received, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances of the Plan are not received, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims. The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code if the Plan satisfies section 1129(b) of the Bankruptcy Code. To confirm a plan over the objection of a dissenting class, the Bankruptcy Court also must find that at least one impaired class (which cannot be an "insider" class) has accepted the Plan.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the plan as proposed. A dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the results of the balloting may be invalid. If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses; (b) the distributions that holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and confirm a plan of reorganization.

### (vi)    The Debtors may be unable to obtain consensual Confirmation.

In the event that any impaired class of claims does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting classes. The Debtors believe that the Plan satisfies these requirements and the Debtors may request such nonconsensual Confirmation in accordance with section 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, with respect to the Plan, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of the entities' commitments to provide support for the Plan, financially or otherwise.

### (vii)    The Debtors may object to the amount or classification of a Claim.

Except as specifically provided in the Plan, the Debtors reserve the right, under the Plan, to object to the amount or classification of any Claim. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection. Any Holder of a Claim that is or may be subject to an objection, thus, may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### (viii)    Risk of non-occurrence of the Effective Date.

There can be no assurance as to the timing or as to whether the Effective Date will, in fact, occur. The Debtors will pursue and believe that the Effective Date may occur quickly after the Confirmation Date with respect to the Plan, however, there can be no assurance as to such timing or as to whether such an Effective Date will, in

fact, occur.  In addition, the Plan will be null and void in all respects if the Effective Date does not occur on or before November 14, 2013 (under the Restructuring Support Agreement), unless otherwise agreed by the Debtors and the Required Consenting Lenders.

### (ix)    *Contingencies could affect votes of impaired classes to accept or reject the Plan.*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### (x)    *The Debtors may not be able to achieve their projected financial results.*

The financial projections set forth on **Exhibit D** to this Disclosure Statement represent the Debtor's management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular.  The Debtors' actual financial results may differ significantly from the projections.  If the Debtors do not achieve their projected financial results, the trading prices of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### (xi)    *Certain tax implications of the Debtors' chapter 11 cases.*

Holders of Allowed Claims should carefully review Article XV herein, "Certain United States Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and these chapter 11 cases may adversely affect the Reorganized Debtors.

### (xii)    *The Debtors' emergence from chapter 11 is not assured.*

While the Debtors expect to emerge from chapter 11, there can be no assurance that the Debtors will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining confirmation of the Plan.

### B.    **Risks Related to the Debtors' and Reorganized Debtors' Business**

The Debtors are subject to a number of risks, including (1) bankruptcy-related risk factors and (2) general business and financial risk factors.  Any or all such factors, which are enumerated below, could have a materially adverse effect on the business, financial condition, or results of operations of the Debtors and the Reorganized Debtors.  Additional risks and uncertainties not currently known to the Debtors or that the Debtors currently deem to be immaterial at this time may also materially adversely affect the Debtors' business, financial condition, or results of operations.  Any of the following risks could materially adversely affect the Debtors' business, financial condition, or results of operations.

### (i)    *Operational-Related Risks Due to the Pending Chapter 11 Cases*

For the duration of these Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- The Chapter 11 Cases may adversely affect the Debtors' business prospects and their ability to operate.

- The Chapter 11 Cases and the attendant difficulties of operating the Debtors' business while attempting to reorganize the business in bankruptcy may make it more difficult to maintain and promote the Debtors' goods and services and attract customers to their business.

- The Chapter 11 Cases will cause the Debtors to incur substantial costs for fees and other expenses associated with these Chapter 11 Cases.

- The Chapter 11 Cases may prevent the Debtors from continuing to grow their business and may restrict their ability to pursue other business strategies. Among other things, the Bankruptcy Code limits the Debtors' ability to incur additional indebtedness, make investments, sell assets, consolidate, merge or sell, or otherwise dispose of assets or grant liens. These restrictions may place the Debtors at a competitive disadvantage.

- Transactions by the Debtors outside the ordinary course of business are subject to the prior approval of the Bankruptcy Court, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. The Debtors may not be able to obtain Bankruptcy Court approval or such approval may be delayed with respect to actions they seek to undertake during the pendency of these Chapter 11 Cases.

- The Debtors may be unable to retain and motivate key executives and employees through the process of reorganization, and the Debtors may have difficulty attracting new employees. In addition, so long as these Chapter 11 Cases continue, the Debtors' senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.

- There can be no assurance as to the Debtors' ability to maintain sufficient financing sources to fund their business and meet future obligations. The Debtors currently are financing their operations during their reorganization using their cash collateral pursuant to the Final Cash Collateral Order.

In addition, the uncertainty regarding the eventual outcome of the Debtors' restructuring, and the effect of other unknown adverse factors could threaten the Debtors' existence as a going-concern. Continuing on a going-concern basis of the Debtors' business is dependent upon, among other things, obtaining Bankruptcy Court approval of a chapter 11 plan, maintaining the support of key vendors and customers, and retaining key personnel, along with financial, business, and other factors, many of which are beyond the Debtors' control. Under the priority scheme established by the Bankruptcy Code, unless creditors agree otherwise in accordance with the Bankruptcy Code, distributions from the estate for prepetition liabilities and postpetition liabilities must comply with section 1129 of the Bankruptcy Code. The ultimate recovery to Holders of Claims or Interests, if any, will not be determined until Confirmation of the Plan or an alternative to a chapter 11 plan. No assurance can be given as to what values, if any, will be ascribed in these Chapter 11 Cases to each of these constituencies or what types or amounts of distributions, if any, they will receive.

*(ii)*    ***General Business and Financial Risk Factors***

The Debtors are subject to various business and financial risks, including the following:

(a)    General Economic Conditions

In the financial projections, the Debtors have assumed that the general economic conditions of the United States economy will improve over the next several years. The stability of economic conditions is subject to many factors outside the Debtors' control, including interest rates, inflation, unemployment rates, the housing market, consumer spending, war, terrorism, and many other factors. Any one of these or other economic factors could have a significant impact on the operating performance of the Debtors. There is no guarantee that economic conditions will improve in the near term.

(b)    Exit Financing

The Debtors' ability to emerge from bankruptcy is dependent on obtaining certain exit financing. If the Debtors are unable to obtain sufficient exit financing, the Debtors may not be able to satisfy their obligations under the Plan or otherwise be able to operate successfully. If the Debtors are unable to obtain exit financing consistent with the Restructuring Support Agreement, the Debtors may not have the support necessary to confirm the Plan.

(c)    Implementation of the Business Plan

The Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring. However, there are risks that the goals of the Debtors' going-forward business plan and financial restructuring strategy will not be achieved. In such event, the Debtors may be unable to refinance maturing debt or be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein, or become subject to further insolvency proceedings.

(d)    Enforcement of Intellectual Property and Proprietary Rights

The Debtors' products are largely comprised of intellectual property content delivered through a variety of media, including books and digital web-based media. The Debtors rely on copyright, trademark, and other intellectual property laws to establish and protect our proprietary rights in these products. However, the Debtors cannot be certain that their proprietary rights will not be challenged, invalidated, or circumvented. The Debtors conduct business in other countries where the extent of effective legal protections for intellectual property rights is uncertain, and this uncertainty could affect future growth. Moreover, despite the existence of copyright and trademark protection under applicable laws, third parties may nonetheless violate the Debtors' intellectual property rights, and the Debtors to remedy such violations, particularly in foreign countries, may be limited. Additionally, the copying and distribution of content over the Internet creates additional challenges for the Debtors in protecting their proprietary rights. If the Debtors are unable to adequately protect and enforce their intellectual property rights, their competitive position may be harmed and business and financial results adversely affected.

(e)    Authors and Copyrights

The Debtors rely on their ability to attract and retain talented authors and develop long-term, collaborative relationships with them. The Debtors operate in a number of highly visible markets where there is intense competition for successful, published authors. The Debtors' rights to exclusively offer authors' content are dependent on the authors' transfer of copyrights to the Debtors. The United States Copyright Act of 1976, as amended, allows an author (or his or her heirs or estate), during a 5-year window, to terminate the copyright transfer and thereby regain certain United States rights to their works. An author that terminates the grant of rights to his or her work could seek to terminate all rights in their works transferred to the Debtors or else negotiate more favorable economic or other terms. The Debtors' inability to attract new authors, the loss of certain high profile authors, increased costs incurred in attracting or retaining authors or changes in the Debtors' rights to their authors' works could harm the Debtors' business, results of operations, and financial condition.

(f)    Competition

The Debtors operate in highly competitive markets with significant established competitors. The Debtors compete primarily on the basis of the quality of their content and author reputation, the effectiveness of their digital solutions, customers' familiarity with their products and, to a lesser extent, price. Many of the Debtors' competitors have substantial financial resources, recognized brands, technological expertise, and market experience. Our competitors are also continuously enhancing their products and services, developing new products and services and investing in technology. Some of the Debtors' competitors are acquiring additional businesses in key sectors that will allow them to offer a broader array of products and services than either they or the Debtors currently provide. Some of the Debtors' competitors have greater resources than us, and therefore, may be able to adapt more quickly to new or emerging technologies and changes in customer requirements, or devote greater resources to the development, promotion and sale of their products than the Debtors can.

The Debtors may also face competition from businesses that have not traditionally participated in their markets, such as Internet service companies and search providers, providers of learning management systems, and distributors, that could pose a threat to some of the Debtors' businesses by providing more in-depth offerings,

adapting their products and services to meet the demands of their customers or combining with one of their traditional competitors to enhance their products and services.

The Debtors may not be able to compete successfully with their current and future competitors. Competition may require the Debtors to reduce the price of our products and services or make additional capital investments that would adversely affect their profit margins. If they are unable or unwilling to do so, the Debtors may lose market share and their business, financial condition, and results of operations may be materially adversely affected.

(g)    Employees

The Debtors may not be able to recruit and retain qualified, skilled employees necessary to successfully implement their business plan. The Debtors operate in an industry that is not only highly competitive in terms of market share but also highly competitive in terms of recruiting and retaining employees. The Debtors need to recruit and retain skilled employees to effectuate their new business plan and position themselves for future stability and success.

(h)    Business and Customers in Foreign Countries

To take advantage of international growth opportunities and to reduce the Debtors' reliance on the Debtors' core U.S. market, the Debtors are increasing investments in foreign countries, some of which are inherently more risky than investments in the U.S. markets. Political, economic, currency, reputational, and corporate risks as well as unmanaged expansion are all factors which could limit returns on investments made in foreign markets.

(i)    Litigation

The Debtors are defendants in a number of litigation matters and are subject to various other claims, demands and investigations. These matters may divert financial and management resources that would otherwise be used to benefit their operations. No assurances can be given that the results of these matters will be favorable to the Debtors. An adverse resolution or outcome of any of these lawsuits, claims, demands or investigations could have a negative impact on the Debtors' business, financial condition, results of operations, and liquidity.

(j)    Future Business Combinations, Acquisitions, Mergers or Joint Ventures

The Debtors actively consider strategic transactions from time to time. The Debtors evaluate acquisitions, joint ventures, alliances, or co-production programs as opportunities arise, and the Debtors may be engaged in varying levels of negotiations with potential competitors at any time. The Debtors may not be able to effect transactions with strategic alliance, acquisition, or co-production program candidates on commercially reasonable terms or at all. The integration of companies that have previously been operated separately involves a number of risks; as such, if the Debtors enter into these transactions, the Debtors also may not realize the benefits the Debtors anticipate and the Debtors may subject themselves to unforeseen contingent liabilities. Consummating any acquisitions, joint ventures, alliances, or co-production programs could result in the incurrence of additional debt and related interest expense. In addition, the Debtors may not be able to obtain additional financing for these transactions.

**C.    Risks Associated with Forward Looking Statements**

*(i)    Financial information is based on the Debtors' books and records and, unless otherwise stated, no audit was performed.*

<u>**The financial information contained in this Disclosure Statement has not been audited**</u>. In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained herein and attached hereto is without inaccuracies.

*(ii)*     ***Financial projections and other forward looking statements are not assured, are subject to inherent uncertainty due to the numerous assumptions upon which they are based and, as a result, actual results may vary.***

This Disclosure Statement contains various projections concerning the financial results of the Debtors' operations, including the financial projections, that are, by their nature, forward looking, and which projections are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future experiences of the Reorganized Debtors may turn out to be different from the financial projections. The financial projections do not reflect emergence adjustments including the impact of generally accepted "fresh start" accounting.

Specifically, the projected financial results contained in this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may not materialize, including, without limitation, assumptions concerning: (a) the timing of Confirmation and Effective Date of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including the ability to maintain or increase revenue and gross margins, control future operating expenses, or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Debtors' ability to maintain market strength.

Due to the inherent uncertainties associated with projecting financial results generally, the projections contained in this Disclosure Statement will not be considered assurances or guarantees of the amount of funds or the amount of Claims that may be Allowed in the various Classes. While the Debtors believe that the financial projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.

### D.     Disclosure Statement Disclaimer

*(i)*     ***The information contained herein is for soliciting votes.***

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose..

*(ii)*     ***This Disclosure Statement was not approved by the United States Securities and Exchange Commission.***

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein.

*(iii)*     ***Reliance on exemptions from registration under the Bankruptcy Code or Securities Act.***

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws. The offer of and sale of New Equity to certain Holders of Allowed Claims has not been registered under the Securities Act or similar state securities or "blue sky" laws.

New Equity, Trust Interests, Trust Consideration, and other consideration to be issued to certain Holders of Allowed Claims will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on the exemption set forth in section 1145(a)(1) of the Bankruptcy Code or section 4(2) of the Securities Act or Regulation D promulgated thereunder.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the

debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.

Section 4(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering is exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor promulgated by the United States Securities and Exchange Commission under the Securities Act related to, among others, section 4(2) of the Securities Act.

The term "issuer," as used in section 4(2) of the Securities Act, means, among other things, a person who issues or proposes to issue any security.

Securities issued pursuant to the exemption provided by section 4(2) of the Securities Act or Regulation D promulgated thereunder are considered "restricted securities."  As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law.  Holders of such restricted securities may, however, be able, at a future time and under certain conditions described below, to sell securities without registration pursuant to the resale provisions of Rule 144 and Rule 144A under the Securities Act.

       *(iv)*       ***No legal or tax advice is provided to you by this Disclosure Statement.***

**This Disclosure Statement is not legal advice to you.**  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant, or other applicable advisor with regard to any legal, tax, and other matters concerning his or her Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

       *(v)*       ***No admissions have been made by this Disclosure Statement.***

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Allowed Interests, or any other parties in interest.

       *(vi)*       ***The failure to identify litigation claims or projected objection should not be relied upon.***

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors or the Reorganized Debtors may seek to investigate, File, and prosecute Claims and Interests and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to such Claims or Interests.

       *(vii)*       ***No waiver of right to object or right to recover transfers and assets.***

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors or the Reorganized Debtors (or any entity, as the case may be) to object to that Holder's Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified herein.

       *(viii)*       ***Information was provided by the Debtors and was relied upon by the Debtors' advisors.***

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

*(ix)*     ***Potential exists for inaccuracies, and the Debtors have no duty to update.***

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified herein, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth herein since that date.  While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so, except as otherwise noted herein, or unless ordered to do so by the Bankruptcy Court.

*(x)*     ***No representations outside this Disclosure Statement are authorized.***

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the United States Trustee for the Eastern District of New York, and counsel to the Committee.

*(xi)*     ***Liquidation under Chapter 7 of the Bankruptcy Code.***

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims or Interests and the Debtors' liquidation analysis is set forth in Article XII.B herein, "Statutory Requirements for Confirmation of the Plan" and the Liquidation Analysis attached hereto as **Exhibit C**.

## XI.     RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### A.     Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all debt (as such term is defined in section 101 of the Bankruptcy Code) that arose before the Confirmation Date, any debts of any kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, and the rights and Interests of any Holders of Interests whether or not:  (1) a Proof of Claim based on such debt or Interest is Filed; (2) a Claim or Interest based upon such debt is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and equity Interests subject to the Effective Date occurring, except as provided for under section 1141(d)(6) of the Bankruptcy Code.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

### B.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Except with respect to the First Lien Claims, pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding anything in the Plan to the contrary, and as provided in Article III of the Plan, no Holder of a Section 510(b) Claim shall receive any distribution on account of such Section 510(b) Claim, and all Section 510(b) Claims shall be extinguished.

### C.    Debtor Release

**Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, the adequacy of which is hereby confirmed, each of the Debtors, the Reorganized Debtors, and the Debtors' Estates conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release and shall be deemed to have provided a full discharge and release to each Releasee (and each such Releasee so released shall be deemed fully released and discharged by the Debtors, the Reorganized Debtors, and the Debtors' Estates) and their respective property from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or which could be asserted on behalf of the Debtors and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, these Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasee, the restructuring of Claims and Interests prior to or in these Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement, the RSA Term Sheets, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; _provided_, that the foregoing "Debtor Release" shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages remedies, Causes of Action, and liabilities of any Debtor: (1) arising under the Exit Revolver Facility Documents or any other agreements entered into pursuant to the Plan, or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, _and further_, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

### D.    Third-Party Release

**Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, each Releasing Party shall, to the maximum extent permitted by applicable law, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each Entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Releasees and their respective property from any and all Claims, interests, obligations, debts, rights, suits, damages,**

causes of action, remedies, and liabilities whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, the Restructuring Transactions, these Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasee, the restructuring of Claims and Interests prior to or in these Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement, the RSA Term Sheets, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; **provided**, that the foregoing "Third-Party Release" shall not operate to waive or Release any Claims, obligations, debts, rights, suits, damages, remedies, causes of action, and liabilities of any Releasing Party:  (1) against a Releasee arising under the Exit Revolver Facility Agreement or any other agreements entered into pursuant to the Plan; (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents; (3) with respect to Professionals' final fee applications or Accrued Professional Compensation Claims in these Chapter 11 Cases; or (4) solely arising out of or relating to acts or omissions occurring after the Confirmation Date; **provided further**, that any Holder of a Claim that is entitled to vote on the Plan and elects to opt out of the Third-Party Release shall not receive the benefit of or be deemed to have granted the Third-Party Release.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, **and**, **further**, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

E.    **Exculpation**

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, or consummating the Plan, the transactions contemplated by Restructuring Support Agreement, the RSA Term Sheets, the Disclosure Statement, the New Corporate Governance Documents, the Restructuring Transactions, the issuance, distribution, and/or sale of any shares of the New Equity or any other security offered, issued, or distributed in connection with the Plan, these Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; **provided**, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; **provided**, **further**, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; **provided**, **further**, that the foregoing "Exculpation" shall have no effect on the liability of any Entity for acts or omissions occurring after the Effective Date.

F.    **Injunction**

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, Interests, causes of action, or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to Article IX.C of the Plan; (3) have been released pursuant to Article IX.D of the Plan; (4) are subject to Exculpation pursuant to Article IX.E of the Plan (but only to the extent of the Exculpation provided in Article IX.E of the Plan); or (5) are otherwise stayed or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner any action or other

**proceeding, including on account of any Claims, Interests, causes of action, or liabilities that have been compromised or settled against the Debtors, the Reorganized Debtors, or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of or in connection with or with respect to any released, settled, compromised, or exculpated Claims, Interests, causes of action, or liabilities.**

> **G.      Setoffs**

Except as otherwise provided in the Plan and subject to applicable law, the Debtors may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, set off against any Allowed Claim or Interest (which setoff shall be made against the Allowed Claim or Interest, not against any distributions to be made under the Plan with respect to such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise), and any distribution to which a Holder is entitled under the Plan shall be made on account of the Claim or Interest, as reduced after application of the setoff described above.  In no event shall any Holder of Claims or Interests be entitled to setoff any Claim or Interest against any Claim, right, or Cause of Action of the Debtors unless such Holder obtains entry of a Final Order entered by the Bankruptcy Court authorizing such setoff or unless such setoff is otherwise agreed to in writing by the Debtors and a Holder of a Claim or Interest; provided, that, where there is no written agreement between the Debtors and a holder of a claim authorizing such setoff, nothing in the Plan shall prejudice or be deemed to have prejudiced the Debtors' rights to assert that any Holder's setoff rights were required to have been asserted by motion to the Bankruptcy Court prior to the Effective Date.

> **H.      Special Provision Governing Accrued Professional Compensation Claims and Final Fee Applications**

For the avoidance of doubt, the foregoing Debtor Release and Third-Party Release shall not waive, affect, limit, restrict, or otherwise modify the right of any party in interest to object to any Accrued Professional Compensation Claim or final fee application Filed by any Professional in these Chapter 11 Cases.

## XII.      SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in Class 3.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit C**.

## XIII.     CONFIRMATION OF THE PLAN

> **A.      Requirements for Confirmation of the Plan**

Among the requirements for the Confirmation of the Plan are that the Plan (1) is accepted by all impaired Classes of Claims, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) is feasible; and (3) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

> **B.      Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (a) has accepted the plan or (b) will receive or retain under the

plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

The Debtors and their advisors have prepared the liquidation analysis attached hereto as **Exhibit G** to demonstrate that the Plan satisfied section 1129(a)(7) of the Bankruptcy Code.

### C.        Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared financial projections, as set forth on **Exhibit D**.

### D.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[23]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance.

### E.        Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it, *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Supplement document, including to amend or modify it to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### (i)        *No Unfair Discrimination*

This test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such

---

[23]   A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### (ii)    Fair and Equitable Test

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in such class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured such that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of the Debtors.  This analysis (the "*Valuation Analysis*") **is attached hereto as Exhibit E-1**.

## XIV.    CERTAIN SECURITIES LAW MATTERS

### A.    Plan Securities

The Plan provides that, on the Effective Date, certain Holders of Allowed Claims will receive New Equity of the Reorganized Debtors.  On or prior to the Effective Date, the Reorganized Debtors will reserve for issuance the New Equity required to be issued pursuant to the Plan.

### B.    Issuance and Resale of New Equity of the Reorganized Debtors under the Plan

### (i)    Offer and Sale of New Equity: Bankruptcy Code Exemption

Pursuant to the Plan, certain Holders of Allowed Claims will receive shares of New Equity. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property.  In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan, of the New Equity to certain Holders of Allowed Claims will be exempt from registration under the Securities Act and state securities laws with respect to any Holder of Allowed Claims who is not deemed to be an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code.

In addition, the Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  Accordingly, subject to compliance with the New Corporate Governance Documents, New Equity generally may be resold (a) without registration under the Securities Act or other federal securities laws pursuant to an exemption provided by Section 4(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined under the Bankruptcy Code and (b) without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the several states.  However,

recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirement or conditions to such availability.

*(ii)*     ***Subsequent Transfers of New Equity***

Section 1145(b) of the Bankruptcy Code defines the term "underwriter" for purposes of the Securities Act as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distributing any security received in exchange for such a claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under the plan from the holders of such securities, if the offer to buy is: (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an "issuer" with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

The term "issuer" is defined in Section 2(a)(4) of the Securities Act; however, the reference contained in Section 1145(b)(1)(D) of the Bankruptcy Code to Section 2(11) of the Securities Act purports to include as statutory underwriters all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Ownership of a significant amount of voting securities of a reorganized debtor could also result in a person being considered to be a "control person."

To the extent that persons deemed to be "underwriters" receive New Equity pursuant to the Plan, resales by such persons would not be exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Such persons would not be permitted to resell such New Equity, unless sale of New Equity was registered under the Securities Act or made pursuant to an exemption from such registration requirements. Entities deemed to be statutory underwriters for purposes of Section 1145 of the Bankruptcy Code, at a future time and under certain conditions may be able to sell securities without registration pursuant to the resale provisions of Rule 144 under the Securities Act or another available exemption under the Securities Act.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the New Equity to be issued pursuant to the Plan, or an "affiliate" of the issuer, would depend upon various facts and circumstances applicable to that person. Accordingly, we express no view as to whether any such person would be such an "underwriter" or "affiliate."

**PERSONS WHO RECEIVE NEW EQUITY UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS. THE FOREGOING SUMMARY IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE NEW EQUITY OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE NEW EQUITY.**

### (iii)    *No Registration or Listing of New Equity*

The issuer of the New Equity of the Reorganized Debtors will not be required to file periodic reports under the Securities Exchange Act and will not seek to list the New Equity of the Reorganized Debtors for trading on a national securities exchange. Consequently, there will not be "current public information" (as such term is defined in Rule 144) regarding the issuer of the New Equity of the Reorganized Debtors.

## XV.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

This section remains subject to further review and may result in changes to the disclosures herein. The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors, the Reorganized Debtors and to certain Holders of Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "***IRC***"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "***IRS***") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This summary does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New Debt Rollover Facility, the New Debt Alternative Facility or New Equity, as part of a hedge, straddle, conversion or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.**     **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**

The U.S. federal income tax consequences of the implementation of the Plan to the Debtors will depend on, among other things, whether the Restructuring Transactions are structured as a taxable sale of the Debtors' assets and/or stock (such a structure, a "***Taxable Transaction***"). The Debtors have not yet determined whether or not they intend to structure the Restructuring Transactions as a Taxable Transaction, whether in whole or part.

If the transaction undertaken pursuant to the Plan is structured as a Taxable Transaction with respect to the assets of any Debtor, the Debtors would recognize taxable gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets treated as sold in the Taxable Transaction and the applicable Debtor's tax basis in such assets. It is possible the Debtors will recognize a substantial amount of taxable income or gain in connection with a Taxable Transaction and may not have sufficient NOLs or other tax attributes to apply to fully offset the amount of gain recognized, in which case the Debtors will be required to pay income taxes (federal and state) with respect to the net amount of taxable income (and the Debtors' ability to apply NOLs to reduce any such taxable income is also subject to the discussion of the Alternative Minimum Tax, below).

If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, it will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock of an entity treated as a corporation for income tax purposes, the Debtor whose stock is transferred would retain its basis in its assets (unless the seller of such stock and the Reorganized Debtor of such stock make an election under IRC section 338(h)(10) to treat the transaction as a taxable sale of the underlying assets), subject to reduction due to COD Income, as described below.

As of March 1, 2013, the Debtors estimated their current consolidated NOLs for U.S. federal income tax purposes to be approximately $735 million. Certain of these losses may be subject to limitations on their ability to offset income or gains recognized by the Debtors, including pursuant to the "separate return limitation year" tax rules. Additionally, the amount of NOL carryforwards currently available to the Debtors depends in part on the tax treatment of material transactions engaged in by the Debtors and their equity owners during the fiscal and tax year ending June 30, 2013, the treatment of which will not be finalized until the Debtors file their fiscal year 2013 consolidated federal income tax return.

As discussed further below, whether or not the Restructuring Transactions are effected (in whole or in part) as a Taxable Transaction, the Debtors expect that most, if not all, of Debtors' NOLs and tax credits will be eliminated upon implementation of the Plan.

*(i)*     *Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("***COD Income***") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (y) the amount of Cash paid and (z) the fair market value of any new consideration given in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the IRC. The reduction in tax attributes occurs only after the taxable income (or loss) for the year of the debt discharge has been determined. Aggregate tax basis in assets (determined on a consolidated basis) is not required to be reduced below the total amount of the Reorganized Debtors' indebtedness immediately after the cancellation of debt giving rise to COD Income (the "***asset tax basis floor***"). Any excess COD Income over the

amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income. The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction. Generally, if the Plan is structured as a Taxable Transaction, the tax basis of any assets deemed to be purchased by the Reorganized Debtors will not be subject to reduction based on the amount of any COD Income recognized by the Debtors (instead, the attribute reduction described above, including reduction in the tax basis of assets, will apply solely to tax attributes retained by the Debtors). The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Regardless of the implemented structure, the Debtors expect, however, that the amount of such COD Income will be sufficient to eliminate all of their remaining NOLs allocable to periods prior to the Effective Date. In addition, if the Plan is not structured as a Taxable Transaction, the Debtors expect that the tax basis in their assets will be fully reduced to the asset tax basis floor, which amount will depend on the total indebtedness of the Reorganized Debtors immediately following the Restructuring Transactions.

*(ii)*     ***Limitation of NOL Carryforwards and Other Tax Attributes***

After giving effect to the reduction in tax attributes pursuant to excluded COD Income described above, the Reorganized Debtors' ability to use any remaining tax attributes post-emergence may be subject to certain limitations under the IRC. Generally, if the Plan is not consummated as a Taxable Transaction, the Reorganized Debtors will succeed to the Debtors' tax attributes (including NOLs and tax credits) and tax accounting methods (such as current depreciation and amortization schedules) after giving effect to any reduction pursuant to excluded COD Income. If, however, the Plan is structured as a Taxable Transaction, the Reorganized Debtors would not generally succeed to any of the Debtors' tax attributes, would generally take a fair market value tax basis in their assets, and would be required to use new depreciation and amortization schedules for such assets starting on the date of purchase, and the Reorganized Debtors would not generally be subject to the limitations described below.

If the Plan is not consummated as a Taxable Transaction, following consummation of the Plan, the Debtors anticipate that their remaining NOLs (if any) may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its NOLs and built-in losses (collectively, "***Pre-Change Losses***") that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtors anticipate that the issuance of the New Equity pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies.

(a)     General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "***Section 382 Limitation***." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted Federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs, currently (approximately 3.5%). The Section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the IRC applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Equity, along with the cancellation of existing CL Holdings Interests through the Plan, is expected to cause an ownership change with respect to the Debtors on the Effective

Date.  As a result, unless an exception applies, Section 382 of the IRC will apply to limit the Debtors' use of any remaining Pre-Change Losses after the Effective Date.  This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

(b)      Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(l)(5) Exception**").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "**382(l)(6) Exception**").  When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change.  The 382(l)(6) Exception differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses.

*(iii)      Alternative Minimum Tax*

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year.  AMTI is generally equal to regular taxable income with certain adjustments.  For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated.  For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in certain years, which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards.  Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Debtors or the Reorganized Debtors.

*(iv)      CLAI Trust and CLI Trust*

As discussed herein, on the Effective Date the Debtors will establish the CLAI Trust and CLI Trust (the "**Trusts**") and contribute the Trust Assets thereto.  Although the income tax treatment of the Trusts is uncertain, it is expected that the Trusts will be treated as "disputed ownership funds" within the meaning of Treasury Regulation section 1.468B-9.  As such, each of the Trusts will be treated as persons separate from the Reorganized Debtors for tax purposes and  subject to tax on their income, excluding amounts contributed by the Debtors to the Trusts to settle the Trust Asset Disputes (but *including* amounts paid by the Reorganized Debtors to the Trusts for the use of the Trust Assets, such as royalties). Taxes payable in connection with income and gain of the Trusts, including income arising on a sale or other transfers (or deemed transfer) of the Trust Assets, including to the Reorganized Debtors in certain instances, could be significant, and any such tax expense will reduce the value to holders of Claims having an interest in the Trust Assets. Except to the extent the Debtors are treated as claiming an

ownership interest in the Trust Assets for federal income tax purposes, the contribution of the Trust Assets by the Debtors to the Trusts will be treated as a taxable sale transaction in which the Debtors will recognized taxable gain (or loss) equal to the difference between the fair market value of the Trust Assets at the time of contribution and the Debtors' federal income tax basis therein.  To the extent the Debtors continue to claim ownership of the Trust Assets, the contribution will be treated as a carryover basis transaction in which the Debtors do not recognize gain or loss.  The extent to which the Debtors will claim ownership in the Trust Assets depends in part on whether and how certain claims in the Trust Asset Dispute will be resolved prior to the Effective Date and thus is currently subject to substantial uncertainty.  Payments made by the Trusts to Holders of Allowed Claims will not be deductible by the Trusts, and will generally be treated as amounts received by such Holders in exchange for their claims (see XV.C., "Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims," below).

## C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims

The expected federal income tax consequences of the Plan to the Holders of Allowed Claims entitled to vote depend on a number of considerations that cannot be known at this time, including without limitation the following: (1) the classification (for U.S. federal income tax purposes) of the primary obligor or borrower with respect to each Class of Allowed Claims, (2) whether or not the Restructuring Transactions are structured (in whole or part) as a Taxable Transaction, (3) whether the Reorganized Debtors enter into the New Debt Alternative Facility or the New Debt Rollover Facility, (4) if the Reorganized Debtors enter the New Debt Rollover Facility, (a) whether the New Debt Rollover Facility is treated as a "security" within the meaning of applicable tax rules and (b) whether or not the entity treated as the borrower of the New Debt Rollover Facility for tax purposes is the same entity and/or the successor (for tax purposes) to the entity treated as the borrower for tax purposes with respect to the First Lien Claims for which it is exchanged, (5) whether the issuer of the New Equity is treated as the same entity or successor entity (for tax purposes) as the borrower with respect to the First Lien Loan Claims for which it is exchanged, and (6) the classification and treatment of the CLAI Trust and the CLI Trust for U.S. federal income tax purposes.

The Debtors expect to take the position, and this discussion assumes, that each of the First Lien Credit Facility Claims, First Lien Notes Claims, First Lien Swap Claims, Second Lien Claims and Subordinated Notes Claims consist of claims with respect to debt for which solely CLAI is treated as the borrower or debtor for federal income tax purposes.  The Debtors expect to take the position, and this discussion assumes, that all Claims of a Holder with respect to the First Lien Credit Facility (e.g., Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29 and Class 30 Claims of a Holder arising from an interest in the First Lien Credit Facility) are treated as arising from a single debt of CLAI for federal income tax purposes.  Likewise, all Claims of a Holder against the Debtors with respect to each of the First Lien Notes, the First Lien Swaps, the Second Lien Notes and the Senior Notes are treated, in each case, as arising from a single debt of CLAI for federal income tax purposes.  This discussion also assumes, as discussed above, that the CLAI Trust and the CLI Trust will be treated as "disputed ownership funds" for U.S. federal income tax purposes.

### (i)      Consequences to Holders of Allowed First Lien Claims (Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29 and Class 30)

Pursuant to the Plan, each Holder of an allowed First Lien Secured Claim (A) against CL Holdings shall receive such Holder's Pro Rata share of the First Lien Secured Claim Distribution allocable to CL Holdings. (B) against CL Holdco shall receive such Holder's pro rata share of the First Lien Secured Claim Distribution allocable to CL Holdco; (C) against CLAI shall receive its Pro Rata share of (i) the First Lien Secured Claim Distribution allocable to CLAI and (ii) the Senior CLAI Recovery determined to be allocable to Holders of First Lien Secured Claims against CLAI; and (D) against CLI shall receive its Pro Rata share of (i) the First Lien Secured Claim Distribution allocable to CLI and (ii) the Senior CLI Recovery determined to be allocable to Holders of First Lien Secured Claims against CLI.  Thus, each such Holder primarily will receive a combination of New Equity, Cash and, if the Reorganized Debtors do not enter into the New Debt Alternative Facility, an interest in the New Debt Rollover Facility.  Pursuant to the Plan, each Holder of an allowed First Lien Deficiency Claim shall receive its Pro Rata Share of the Senior CLAI Recovery and the Senior CLI Recovery, and any amounts of the Junior CLAI Recovery and the Junior CLI Recovery that it receives pursuant to the turnover provisions or the Second Lien Intercreditor Agreement.

Whether a Holder of an allowed First Lien Claim recognizes gain or loss as a result of the exchange of its claim for the New Debt Facility or New Equity or both depends, in part, on (x) if an interest in the New Debt

Rollover Facility is received, whether such interest constitutes a "significant modification" of the Holder's current Claim under applicable tax principles and (y) whether the exchange qualifies as a tax-free recapitalization, which in turn depends on (1) whether the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes), (2) whether the New Rollover Facility is treated as a primary obligation of CLAI (or CLAI's successor for U.S. federal income tax purposes) and (3) whether the debt underlying the allowed First Lien Claim surrendered and the New Debt Facility (with respect to receipt of the New Debt Facility) are treated as "securities" for the reorganization provisions of the IRC.

        (a)        Treatment of Exchange as Significant Modification

The exchange of existing First Lien Claims for an interest in the New Debt Rollover Facility (plus Cash and New Equity) is analyzed as if the exchange were simply a modification of the debt underlying the First Lien Claims. Under general principles of U.S. federal income tax law, the modification of a debt instrument can give rise to a deemed exchange under section 1001 of the Code upon which gain or loss is realized if the modified debt instrument differs materially either in kind or in extent from the original debt instrument. In this regard, governing Treasury regulations (the "Modification Regulations") provide that, as a general rule, a deemed exchange occurs when, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant (a "significant modification").

Under the Modification Regulations, a change in yield of a debt instrument (including the receipt of additional consideration) is a significant modification if the yield of the modified debt instrument varies from the yield on the unmodified instrument (determined as of the date of the modification) by more than the greater of (i) 25 basis points or (ii) 5 percent of the annual yield on the unmodified instrument. For this purpose, the yield of the modified debt instrument is the annual yield of a debt instrument with (i) an issue price equal to the adjusted issue price of the unmodified debt instrument on the date of the modification, increased by any accrued but unpaid interest, and decreased to reflect payments made to the holders as consideration for the modification and (ii) payments equal to the payments on the modified debt instrument from the date of the modification. The Modification Regulations further provide that a change in the timing of payments due under a debt instrument is a significant modification if it results in the material deferral of scheduled payments, which depends on all the facts and circumstances. The Modification Regulations provide in this respect a safe harbor under which a deferral of one or more scheduled payments within the safe harbor period, which is the lesser of 5 years or 50 percent of the original term of the instrument, is not a material deferral if the deferred payments are unconditionally payable no later than the end of the safe harbor period. A change in the obligor of a debt instrument also generally results in a significant modification under the Modification Regulations. Finally, the Modification Regulations provide that a modification of a debt instrument that results in a instrument or property right that is not debt for federal income tax purposes is a significant modification.

The Debtors expect, and this discussion assumes, that the exchange of First Lien Claims for an interest in the New Debt Rollover Facility (plus Cash and New Equity) will be treated as a "significant modification" of debt underlying the First Lien Claims because it is likely that the New Debt Rollover Facility will have terms that cause it to fail one or more of the tests described above (e.g., significant change in yield, change in obligor, material deferral of scheduled payments). However, it cannot be known with certainty whether each such exchange will constitute a significant modification until the terms of the New Debt Rollover Facility (if ultimately issued) are finalized.

        (b)        Treatment of a Debt Instrument as a "Security"

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the

obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a current basis or accrued.

The First Lien Credit Facility Agreement had an initial term of seven years for the unextended term loans and six years for the unextended revolver. The incremental term loan issued under the First Lien Credit Facility had an initial term of more than six years. In April 2012, a portion of the term loans and revolver debt under the First Lien Credit Facility had its maturity extended by three years (or to about five years and three months from the date of modification). The term of the First Lien Notes is just over 8 years. The Debtors expect to take the position that the Claims arising under the First Lien Credit Facility Agreement and the First Lien Notes against CLAI constitute "securities." The First Lien Swaps had a maximum initial term of approximately two years. Additionally, obligations under swap agreements are normally classified as "notional principal contracts" under applicable tax law, rather than debt instruments. Thus, the Debtors expect to take the position that the Claims with respect to the First Lien Swaps are not securities. The New Debt Rollover Facility has a proposed term of six years. Thus, the Debtors expect to take the position that the New Debt Rollover Facility is treated as a security.

        (c)        Treatment of a Holder of an Allowed First Lien Claim if the Exchange of its Claim is not Treated as a Recapitalization

If either (x) the Restructuring Transactions are effected as a Taxable Transaction, (y) a surrendered allowed First Lien Claim is not treated as a "security" for U.S. federal income tax purposes or (z) both the New Equity and (if issued) the New Debt Rollover Facility are treated as issued by an entity other than CLAI or CLAI's successor for federal income tax purposes, then a Holder of such a claim should be treated as exchanging its allowed First Lien Claim for the New Debt Facility and New Equity in a fully taxable exchange. While the terms of the New Rollover Debt Facility provide that Reorganized CLAI will be the borrower, depending on the structure of the Restructuring Transactions, Reorganized CLAI may or may not be treated as the successor to CLAI for income tax purposes (and will not be so treated in the event of a Taxable Transaction).

A Holder of an allowed First Lien Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of (x) issue price (as determined under the applicable Treasury regulations -- see below under "Issue Price and Original Issue Discount with respect to the New Debt Rollover Facility") of the New Debt Rollover Facility (if issued), (y) the fair market value of the New Equity and (z) the total amount of cash and fair market value of other consideration received by such Holder in the exchange (including in respect of the Senior CLAI Recovery and Senior CLI Recovery), in each case that is not allocable to accrued but untaxed interest, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed First Lien Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. The U.S. Federal income tax consequences of the receipt of cash allocable to accrued interest may be relevant and are summarized below. A Holder's tax basis in the New Debt Rollover Facility received on the Effective Date should equal its issue price and a Holder's tax basis in the New Equity should equal its fair market value. A Holder's holding period for the New Debt Facility and New Equity received on the Effective Date should begin on the day following the Effective Date. See the discussion below under "Post-Effective Date Distributions" for the effect that the right to receive additional amounts after the Effective Date (e.g., pursuant to the Senior CLAI Trust Interests or Senior CLI Trust Interests) may have on the tax treatment discussed above on Holders of Allowed First Lien Claims.

        (d)        Treatment of a Holder of an Allowed First Lien Secured Claim if the Exchange of its Claim is Treated as a Recapitalization

If a debt instrument constituting a surrendered allowed First Lien Claim is a security and either (x) the New Equity is treated as issued by CLAI (or CLAI's successor for U.S. federal income tax purposes) or (y) the New Debt Rollover Facility is issued by CLAI (or CLAI's successor for U.S. federal income tax purposes) and is treated as a "security" for U.S. federal income tax purposes, the exchange of a Holder's allowed First Lien Secured Claim against CLAI for the New Debt Rollover Facility and New Equity should be treated as a recapitalization, and therefore a reorganization, under the IRC. If the exchange is treated as a recapitalization, there are three potential

scenarios: (1) the New Equity is treated as issued by CLAI (or its successor), and the New Debt Rollover Facility (if issued) is not treated as a security or it is treated as not issued by CLAI (or by CLAI's successor); (2) the New Equity is not treated as issued by CLAI (or its successor) and the New Debt Rollover Facility is treated as issued by CLAI (or its successor) and is treated as a security; or (3) both the New Debt Rollover Facility and New Equity are treated as issued by CLAI (or its successor) and the New Debt Rollover Facility is treated as a security.

If the New Equity is treated as issued by CLAI (or its successor), but the New Debt Rollover Facility is either (i) not issued, (ii) not treated as a security or (iii) is not treated as issued by CLAI (or CLAI's successor), a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of Cash and the issue price of the interest in the New Debt Rollover Facility received and the fair market value of other non-New Equity consideration received (including in respect of the Senior CLAI Recovery and Senior CLI Recovery). A Holder who is subject to this treatment will take a tax basis in the interest in the New Debt Rollover received equal to its issue price. The Holder will take a tax basis in the New Equity equal to the Holder's tax basis of the surrendered First Lien Claim *increased* by the amount of gain recognized in the exchange but *reduced* by the amount of cash, the fair market value of other consideration received and the issue price of the interest received in the New Debt Rollover Facility (if any). A Holder's holding period for its interest in the New Debt Rollover Facility (if any) received (and any property received attributable to accrued but untaxed interest) should begin on the day following the Effective Date. A Holder's holding period for the New Equity received should include the holding period for the obligation constituting the surrendered allowed First Lien Claim exchanged for such property.

If the New Equity is not treated as issued by CLAI (or its successor), and the New Debt Rollover Facility is both treated as a security and treated as issued by CLAI (or CLAI's successor), a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of Cash and the fair market value of the New Equity and other consideration received other than the New Debt Rollover Facility (including in respect of the Senior CLAI Recovery and Senior CLI Recovery). A Holder who is subject to this treatment will take a tax basis in the New Equity received equal to its fair market value. The Holder will take a tax basis in its interest in the New Debt Rollover Facility received equal to the Holder's tax basis of the surrendered First Lien Claim *increased* by the amount of gain recognized in the exchange but *reduced* by the amount of cash and the fair market value of the New Equity and other consideration received. A Holder's holding period for its interest in the New Equity received (and any property received attributable to accrued and untaxed interest) should begin on the day following the Effective Date. A Holder's holding period for its interest in the New Debt Rollover Facility received should include the holding period for the obligation constituting the surrendered allowed First Lien Claim exchanged for such property.

If the New Equity is treated as issued by CLAI (or its successor) and the New Debt Rollover Facility is both treated as a security and treated as issued by CLAI (or CLAI's successor), a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of Cash and the fair market value of other consideration (excluding the New Equity and the New Debt Rollover Facility) received (including in respect of the Senior CLAI Recovery and the Senior CLI Recovery). A Holder who is subject to this treatment will take an aggregate tax basis in the New Equity and its interest in the New Debt Rollover Facility received equal to the Holder's tax basis in the surrendered First Lien Claim *increased* by the amount of gain recognized in the exchange and *reduced* by the amount of cash and the fair market value of other consideration (excluding the New Equity and the New Debt Rollover Facility) received. Such aggregate tax basis will be allocated between the New Equity and the interest in the New Debt Rollover Facility received on the basis of their relative fair market value. A Holder's holding period for the New Equity and its interest in the New Debt Rollover Facility received (except, in each case, to the extent attributable to accrued but untaxed interest) should each include the holding period for the obligation constituting the surrendered allowed First Lien Claim exchanged for such property.

See the discussion below under "Post-Effective Date Distributions" for the effect that the right to receive additional amounts after the Effective Date (e.g., pursuant to the Senior CLAI Trust Interests or Senior CLI Trust Interests) may have on the tax treatment discussed above for Holders of Allowed First Lien Claims.

**The tax consequences of the Plan and to the Holders of allowed First Lien Claims against CLAI are highly uncertain. Holders of allowed First Lien Secured Claims against CLAI should consult their tax**

**advisors regarding whether such Claims or the New Debt Facility could be treated as a "security" for U.S. federal income tax purposes.**

*(ii)*        *Consequences to Holders of Allowed Second Lien Claims (Class 5, Class 14, Class 23, Class 31)*

Pursuant to the Plan, each Holder of an Allowed Second Lien Claim against CL Holdings and CL Holdco shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdings and CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date, provided that any distributions to the Holder of Second Lien Claims against CL Holdings or CL Holdco shall be subject to the turnover provisions of the Second Lien Intercreditor Agreement.  Pursuant to the Plan, each Holder of an Allowed Second Lien Claim against CLAI shall receive its Pro Rata Share of the Junior CLAI Recovery that is not otherwise subject to the turnover provisions of the Second Lien Intercreditor Agreement.  Pursuant to the Plan, each Holder of an allowed Second Lien Claim against CLI shall receive on the Effective Date its Pro Rata share of the Junior CLI Recovery; provided that, after giving effect to the provisions of the Second Lien Intercreditor Agreement, distributions of the Junior CLI Recovery on account of the Disputed Copyrights that otherwise would have been made to Holders of Second Lien Claims against CLI shall be distributed on a ratable basis directly to the Holders of Allowed First Lien Deficiency Claims against CLI in accordance with the terms and conditions of the Second Lien Intercreditor Agreement.

Treatment of Holders of Allowed Second Lien Claims will depend in part on (x) whether or not the Junior CLAI Recovery includes New Equity, and if so (y) whether the exchange qualifies as a tax-free recapitalization, which in turn depends on (1) whether the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and  (2) whether the debt instruments underlying the allowed Second Lien Claim surrendered are treated as "securities" for the reorganization provisions of the IRC.

If the Junior CLAI Recovery does not include New Equity then a Holder of an allowed Second Lien Claim should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed Second Lien Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  The federal income tax consequences of the receipt of cash allocable to accrued interest may be relevant and are summarized below.  A Holder's tax basis in any assets received should equal their fair market value.  A Holder's holding period for any assets received on the Effective Date should begin on the day following the Effective Date.

If the Junior CLAI Recovery does include New Equity, but either (a) the Restructuring Transactions are effected as a Taxable Transaction, (b) the New Equity is not treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) or (c) debt instruments underlying the allowed Second Lien Claim surrendered are not treated as "securities" for purposes of the reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder of an allowed Second Lien Claim should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets or New Equity received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed Second Lien Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  The federal income tax consequences of the receipt of cash allocable to accrued interest may be relevant and are summarized below.  A Holder's tax basis in any assets or New Equity received should equal their fair market value.  A Holder's holding period for any assets or New Equity received on the Effective Date should begin on the day following the Effective Date.

If the Junior CLAI Recovery does include New Equity, the Restructuring Transactions are not effected as a Taxable Transaction, the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and the debt instruments underlying the allowed Second Lien Claim surrendered are treated as "securities" for the purposes reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of the amount of Cash and the fair market value of any assets (other than the New Equity) received. A Holder who is subject to this treatment will take a tax basis in the New Equity received equal to the Holder's tax basis in the surrendered Second Lien Claim *increased* by the amount of gain recognized in the exchange and *reduced* by the amount of cash and fair market value of any other assets (other than New Equity) received. A Holder's holding period for the New Equity received (except to the extent attributable to accrued but untaxed interest) should include the holding period for the obligation constituting the surrendered allowed Second Lien Claim exchanged for such property. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for any assets received on the Effective Date should begin on the day following the Effective Date.

See the discussion below under "Post-Effective Date Distributions" for the effect that the right to receive additional amounts after the Effective Date (e.g., pursuant to the Junior CLAI Trust Interests or Junior CLI Trust Interests) may have on the tax treatment discussed above for Holders of Allowed Second Lien Claims.

(iii)    ***Consequences to Holders of Allowed Senior Notes Claims (Class 6, Class 15, Class 24, Class 32)***

Pursuant to the Plan, each Holder of an allowed Senior Notes Claim shall receive such Holder's *pro rata* share of: the Junior CLAI Recovery and the Junior CLI Recovery. Treatment of Holders of Allowed Senior Notes Claims will depend in part on (x) whether or not the Junior CLAI Recovery or the Junior CLI Recovery includes New Equity, and if so (y) whether the exchange qualifies as a tax-free recapitalization, which in turn depends on (1) whether the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and (2) whether the Senior Secured Notes surrendered are treated as "securities" for the reorganization provisions of the IRC.

If neither the Junior CLAI Recovery nor the Junior CLI Recovery includes New Equity then a Holder of an allowed Senior Notes Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed Senior Notes Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for any assets received on the Effective Date should begin on the day following the Effective Date.

If either the Junior CLAI Recovery or the Junior CLI Recovery includes New Equity, but either (a) the Restructuring Transactions are effected as a Taxable Transaction, (b) the New Equity is not treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) or (c) the Senior Notes surrendered are treated as "securities" for purposes of the reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder of an allowed Senior Notes Claim should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets or New Equity received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the surrendered Senior Notes Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. The federal income tax consequences of the receipt of cash allocable to accrued interest may be relevant and are summarized below. A Holder's tax basis in any assets or New Equity received should equal their fair market value. A Holder's

holding period for any assets or New Equity received on the Effective Date should begin on the day following the Effective Date.

If either the Junior CLAI Recovery or the Junior CLI Recovery includes New Equity, the Restructuring Transactions are not effected as a Taxable Transaction, the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and the Senior Notes surrendered are treated as "securities" for purposes of the reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of the amount of cash and the fair market value of any assets (other than the New Equity) received. A Holder who is subject to this treatment will take a tax basis in the New Equity received equal to the Holder's tax basis in the surrendered Senior Notes Claim *increased* by the amount of gain recognized in the exchange and *reduced* by the amount of cash and fair market value of any other assets (other than New Equity) received. A Holder's holding period for the New Equity received (except to the extent attributable to accrued but untaxed interest) should include the holding period for the Senior Notes exchanged for such property. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for any assets received on the Effective Date should begin on the day following the Effective Date.

See the discussion below under "Post-Effective Date Distributions" for the effect that the right to receive additional amounts after the Effective Date (e.g., pursuant to the Junior CLAI Trust Interests or Junior CLI Trust Interests) may have on the tax treatment discussed above for Holders of Allowed Senior Notes Claims.

### (iv)        Consequences to Holders of Allowed General Unsecured Claims Against CLAI (Class 26)

Pursuant to the Plan, each Holder of an allowed General Unsecured Claim against CLAI shall receive such Holder's *pro rata* share of the Junior CLAI Recovery. Treatment of Holders of Allowed General Unsecured Claims against CLAI will depend in part on (x) whether or not the Junior CLAI Recovery includes New Equity, and if so (y) whether the exchange qualifies as a tax-free recapitalization, which in turn depends on (1) whether the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and  (2) whether the General Unsecured Claims surrendered are treated as "securities" for the reorganization provisions of the IRC.

If the Junior CLAI Recovery does not include New Equity then a Holder of an allowed General Unsecured Claim Against CLAI who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash and fair market value of any assets received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed General Unsecured Claim against CLAI. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for any assets received on the Effective Date should begin on the day following the Effective Date.

If the Junior CLAI Recovery does include New Equity, but either (a) the Restructuring Transactions are effected as a Taxable Transaction, (b) the New Equity is not treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) or (c) the General Unsecured Claims surrendered are treated as "securities" for the purposes reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets or New Equity received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the surrendered General Unsecured Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets or New Equity received should equal their fair market

value. A Holder's holding period for any assets or New Equity received on the Effective Date should begin on the day following the Effective Date.

If the Junior CLAI Recovery does include New Equity, the Restructuring Transactions are not effected as a Taxable Transaction, the New Equity is treated as a direct equity interest (for U.S. federal income tax purposes) in CLAI (or CLAI's successor for U.S. federal income tax purposes) and the General Unsecured Claims surrendered are treated as "securities" for purposes of the reorganization provisions of the IRC (see section C.(i).(b), above) then a Holder should not recognize loss with respect to the exchange and should not recognize gain (subject to the discussion of "Accrued Interest" below) except to the extent of the amount of cash and the fair market value of any assets (other than the New Equity) received. A Holder who is subject to this treatment will take a tax basis in the New Equity received equal to the Holder's tax basis in the surrendered General Unsecured Claim *increased* by the amount of gain recognized in the exchange and *reduced* by the amount of cash received. A Holder's holding period for the New Equity received (except to the extent attributable to accrued but untaxed interest) should include the holding period for the Senior Notes exchanged for such property. A Holder's tax basis in any assets received should equal their fair market value. A Holder's holding period for any assets received on the Effective Date should begin on the day following the Effective Date.

See the discussion below under "Post-Effective Date Distributions" for the effect that the right to receive additional amounts after the Effective Date (e.g., pursuant to the Junior CLAI Trust Interests) may have on the tax treatment discussed above for Holders of Allowed General Unsecured Claims against CLAI.

### (v)        Consequences to Holders of Allowed General Unsecured Claims Against CLI (Class 34)

Pursuant to the Plan, each Holder of an allowed General Unsecured Claim against CLI shall receive such Holder's *pro rata* share of the Junior CLI Recovery. A Holder of an allowed General Unsecured Claim Against CLI who is subject to this treatment should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash plus the fair market value of any assets (including any New Equity) received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see "Accrued Interest" below), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered allowed General Unsecured Claim against CLI. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim. See the discussions of accrued interest and market discount below. A Holder's tax basis in any assets or New Equity received should equal their fair market value. A Holder's holding period for any assets or New Equity received on the Effective Date should begin on the day following the Effective Date.

See the discussion below under "Post-Effective Date Distributions" for the effect that the right to receive additional amounts after the Effective Date (e.g., pursuant to the Junior CLI Trust Interests) may have on the tax treatment discussed above for Holders of Allowed General Unsecured Claims against CLI.

### (vi)        Issue Price and Original Issue Discount with respect to New Debt Rollover Facility

A debt instrument, such as the New Debt Rollover Facility, is treated as issued with original issue discount ("*OID*") for U.S. federal income tax purposes if its issue price is less than its stated redemption price at maturity by more than a de minimis amount. A debt instrument's stated redemption price at maturity includes all principal and interest payable over the term of the debt instrument, other than "qualified stated interest." Stated interest is "qualified stated interest" if it is unconditionally payable in cash at least annually.

The issue price of the New Debt Rollover Facility will depend on whether a substantial amount of either the New Debt Rollover Facility or the First Lien Claims for which it is exchanged is considered to be "traded on an established market." In general, a debt instrument such as the New Debt Rollover Facility will be treated as traded on an established market if, at any time during the 31-day period ending 15 days after the issue date, (a) a "sales price" for an executed purchase of the debt instrument appears on a medium that is made available to issuers of debt instruments, persons that regularly purchase or sell debt instruments, or persons that broker purchases or sales of debt instruments; (b) a "firm" price quote for the debt instrument is available from at least one broker, dealer or pricing service for property and the quoted price is substantially the same as the price for which the person

receiving the quoted price could purchase or sell the property; or (c) there are one or more "indicative" quotes available from at least one broker, dealer or pricing service for property.

If the New Debt Rollover Facility is *not* traded on an established market and the First Lien Claims *are* traded on an established market at the time of the exchange, the issue price of the new Debt Rollover Facility will be determined applying the "investment unit" rules and treating the New Debt Rollover Facility as part of an investment unit (including the New Equity) issued in exchange for the existing notes. Generally, the issue price of an investment unit is determined by applying the issue price rules applicable to debt instruments, and the debt instrument's issue price is its allocable portion of the issue price of the investment unit, based on the relative fair market value of the debt instrument and the other property right (i.e., the New Equity). Thus, if the First Lien Claims are traded on an established market, the issue price of the investment unit would be equal to the fair market value of the First Lien Claims on the date the New Debt Rollover Facility is issued (reduced by the amount of cash received by Holders in the exchange), and the issue price of the New Debt Rollover Facility will equal the allocable portion of such investment unit's issue price determined by multiplying the investment unit's issue price by the fraction obtained by dividing the fair market value of the New Debt Rollover Facility by the sum of the fair market value of the New Debt Rollover Facility and the fair market value of the New Equity. If neither the New Debt Rollover Facility nor the First Lien Claims are traded on an established market at the time of the exchange, the issue price of the New Debt Rollover Facility will generally equal its stated principal amount.

A Holder receiving an interest in the New Debt Rollover Facility, if it is issued with OID, will generally be required to include any OID in income over the term of such shares of the loans in accordance with a constant yield-to-maturity method, regardless of whether the Holder is a cash or accrual method taxpayer, and regardless of whether and when the Holder receives cash payments of interest on its interest in the New Debt Rollover Facility (other than cash attributable to qualified stated interest, which is includible in income in accordance with the Holder's normal method of tax accounting). Accordingly, a Holder could be treated as receiving income in advance of a corresponding receipt of cash. Any OID that a Holder includes in income will increase the tax basis of the Holder in its interest in the New Debt Rollover Facility. A Holder of an interest in the New Debt Rollover Facility will not be separately taxable on any cash payments that have already been taxed under the OID rules, but will reduce its tax basis in the pro rata shares of such loans by the amount of such payments.

### (vii)    *Accrued Interest*

To the extent that any amount received by a Holder of a surrendered allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered allowed claim may be able to recognize a deductible loss to the extent that any accrued interest on the debt instruments constituting such claim was previously included in the Holder's gross income but was not paid in full by the Debtors.

The extent to which the consideration received by a Holder of a surrendered allowed Claim will be attributable to accrued interest on the debts constituting the surrendered allowed claim is unclear. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but untaxed interest.

### (viii)    *Market Discount*

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered allowed claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal

to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

### (ix)    Post Effective Date Distributions

To the extent holders of Allowed Claims receive distributions after the Effective Date, a portion of the subsequent distributions may be treated as interest. Additionally, to the extent holders of Allowed Claims receive distributions in a taxable year or years, following the year of initial distribution, any loss and a portion of any gain realized by such holders may be deferred. In the case of Holders of Claims that may be entitled to receive distributions with respect to the Trust Assets of the CLAI Trust or CLI Trust, such Holders may not be able to deduct any loss with respect to their Claim until receipt of their pro rata share of any amounts remaining in the CLAI Trust or CLI Trust, respectively, after all Trust Asset Disputes have been resolved. All holders of Allowed Claims are urged to consult their tax advisors regarding the possible deferral of any loss and the application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

### D.    Limitations on Use of Capital Losses

A Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 annually ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate Holders, capital losses may only be used to offset capital gains. A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### E.    Withholding and Reporting

The Debtors will withhold all amounts required by law to be withheld from payments of interest. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a holder of a claim. Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION**

**THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

**[Remainder of page intentionally left blank.]**

## XVI.    Recommendation

In the opinion of Cengage and each of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  October 3, 2013

Respectfully submitted,

Cengage Learning, Inc.
(on behalf of itself and each of the Debtors)

By: */s/ Dean D. Durbin*
    Dean D. Durbin
    Chief Financial Officer
    Cengage Learning Holdings II, L.P.

Prepared by:

*/s/ Jonathan S. Henes*
Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Plan of Reorganization**

**<u>Exhibit B</u>**

**Declaration of Dean D. Durbin, Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Motions**

[Filed as Docket No. 15]

Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (*pro hac vice admission pending*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF DEAN D. DURBIN, CHIEF FINANCIAL OFFICER,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Dean D. Durbin, hereby declare under penalty of perjury:

1.       I am Chief Financial Officer of Cengage Learning GP I LLC, a limited liability

company organized under the laws of the State of Delaware and parent company of the

above-captioned debtors and debtors in possession (collectively, the "**_Debtors_**," and together

with their non-Debtor affiliates, the "**_Company_**").  I have served in this role since July 2009, and

I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

2.    I started my career at the McGraw-Hill Companies in 1974.  Over the next 20 years, I advanced through a variety of senior financial management positions in that company's publishing and information services divisions.  After leaving McGraw-Hill, from 1995–1997, I served as Vice President and Chief Financial Officer for Thomson Professional Publishing, a division of Thomson Reuters Corporation.  I subsequently spent 10 years at Vertis Communications, Inc., a marketing services company, where I served at various times as Chief Financial Officer, Chief Operating Officer, President, and Chief Executive Officer.  Afterward, I was the Chief Financial Officer and Chief Operating Officer of American Media, Inc., a publisher and distributor of newspapers and magazines, until I joined the Company in 2009.

3.    To minimize the adverse effects of filing for chapter 11 on their businesses, on the date hereof (the "*Petition Date*"), the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "*First Day Motions*").  The First Day Motions seek relief intended to allow the Debtors to perform and meet those obligations necessary to fulfill their duties as debtors in possession.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the interests of the Debtors' estates and creditors.

4.    I submit this declaration to provide an overview of the Company, its businesses, and these chapter 11 cases, as well as to support the Debtors' chapter 11 petitions and the First Day Motions.  Except as otherwise indicated herein, all facts set forth in this declaration are

based upon my personal knowledge of the Company's operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Company's management and the Company's advisors, or my opinion based on my experience, knowledge, and information concerning the Company's operations and financial condition. I am authorized to submit this declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.     This declaration is divided into three sections. **_Section I_** provides a brief background on the Company, describes the events leading to the filing of these chapter 11 cases, and explains the Company's restructuring efforts before and objectives during these chapter 11 cases. **_Section II_** discusses the Company's businesses, including the various educational publishing and reference markets in which the Company competes, and the Company's organizational and capital structure. **_Section III_** summarizes the relief requested in, and the facts supporting, each of the First Day Motions.

## I.     Background

6.     The Company is a leading global provider of high-quality content, innovative print and digital teaching and learning solutions, software, and associated educational services for the higher-education, research, school, career, professional, and international markets. The Company is the second largest publisher of course materials in U.S. higher education, with strong positions across all major disciplines, and is a leading global provider of library reference materials with a vast collection of primary source content.

7.     The Company manages its operations from various locations throughout the United States and internationally, with its headquarters office located in Stamford, Connecticut. As of the Petition Date, the Company employs approximately 5,200 employees. For the fiscal

year ended June 30, 2012, the Company's revenues from continuing operations were approximately $2.0 billion. In the nine months ended March 31, 2013, the Company's revenues were approximately $1.3 billion. Section II, below, provides a detailed description of the Company's businesses.

8.      Prior to 2007, the Company's businesses were known as Thomson Learning and Thomson Nelson Learning, divisions of Thomson Corporation, and as The Gale Group Inc. On July 5, 2007, investment funds associated with or designated by Apax Partners, L.P. (collectively, "***Apax***") acquired 97 percent of the Company's equity (the balance of the equity was purchased by Funds associated with or designated by OMERS Private Equity (collectively, "***OMERS***," and together with Apax, the "***Sponsors***")) from Thomson Corporation and certain of its affiliates for $7.75 billion. Shortly thereafter, the Company was rebranded as "Cengage Learning," a name chosen to reflect the Company's focus on being the "center of engagement" for students, researchers, instructors, and institutions across the globe. The July 2007 purchase was funded in part with the proceeds of approximately $5.6 billion in new debt financing, with the remainder of the purchase price funded by equity contributions from the Sponsors.[1]

### A.      A Company and Industry in Transition

9.      In the past, the Company and its peers in the educational materials market produced only traditional print products. From kindergarten to higher education to career training, students, instructors, and institutions depended on printed goods, typically as an accompaniment to live classroom teaching. The publishers in this market provided textbooks, workbooks, and other instructional materials and relied heavily on their profits from selling new print products.

---

[1]      The Company's current capital structure is described in further detail below in section II.F.

10.     Now, the educational publishing market has entered the early stages of a major transition from print business models to a greater focus on digital products, with digital market share growing as quickly as 20 percent annually over recent years.  The move to digital began with the simple substitution of electronic versions of textbooks for the printed forms.  Over time, digital products such as homework programs and interactive learning software have increasingly been paired and integrated with print materials.  And in some cases, digital products are becoming a favored medium for learning materials in the classroom.  As much as 15 percent of learning materials sold today are sold in digital format, including course materials, homework programs, and interactive and online learning platforms.  All indications are that digital will continue to grow in importance in this market.

11.     In addition to this digital transition, recent market trends have considerably altered the landscape of the educational materials business.  One such trend is a consistent decline over the last decade in demand for new printed materials, which traditionally was the primary driver of profitability in the Company's industry.  Consumers are increasingly opting to rent new materials, purchase electronic books, and, most significantly, purchase or rent used books.  Approximately 40 percent of all consumer transactions in the learning materials market in 2012 were used book sales or rentals.  Of course, each of these transactions is less profitable—or not at all profitable—to the publisher.

12.     Additionally, since the recent recession began in 2007, the dramatic decrease and persistent volatility in the availability of government funding have weakened demand significantly in several of the Company's businesses, particularly in the research and K–12 markets.  These markets are driven by the spending of state and local governments, which were especially hard-hit by the recession.

13.    Finally, publishers have also come under pressure from unconventional or even illegal activities that allow consumers to purchase products outside the normal distribution chain. Piracy, despite being illegal, has become easier as the technology for copying content has improved.  Additionally, a recent Supreme Court decision permitting the practice of importing textbooks from foreign markets (where they are often discounted to reflect lower demand and relative standards of living) into the U.S. for resale is likely to increase the incentives for doing so and may put further pressure on domestic pricing.[2]

14.    The combined force of these trends has hindered the Company's financial performance.  For the nine months ended March 31, 2013, the Company's revenues were $1,298.6 million, compared to $1,458.3 million for the same period ended March 31, 2012, representing a revenue decline of approximately 11 percent.  Unlevered free cash flow over the same periods fell from $568.6 million to $360.2 million.  Simultaneously, the burden of the Company's funded debt has grown, with debt service payments increasing from $353.0 million for the nine months ended March 31, 2012, to $376.3 million for the same period ended March 31, 2013.

### B.    A Clear Path Forward

15.    In late 2012 and early 2013, the Company overhauled its senior management team by hiring a world-class team, led by a new chief executive officer, Michael Hansen, and a new chief product officer, chief technology officer, and chief sales and marketing officer. Mr. Hansen previously served as chief executive for Harcourt Assessment, the educational materials division of Reed Elsevier (a publisher and information provider operating in the science, medical, legal, risk, and business sectors), where he led a successful turnaround and sale

---

[2]    *See Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351 (2013).

of that business.  With a new management team in place, the Company has developed and started to implement a comprehensive new business plan.

16.     In light of the industry's transition to digital, this comprehensive new business plan centers on combining the best of innovative and complementary digital and print products with expert product support to provide whole-course packaged products covering individual courses from every angle.  Currently, the Company is developing its MindTap platform, a full suite of digital learning solutions designed to engage students and offer instructors choice and flexibility.  MindTap is just the first step in enhancing product innovation in digital formats, and it continues the Company's efforts to set the standard for excellence in the learning materials market.  Indeed, in fiscal year 2012, the proportion of the Company's revenues from digital product sales versus stand-alone print product sales increased 17.5 percent from 31.9 to 37.5 percent.

17.     In addition to the revamped focus on positioning itself to capitalize on the digital transition and implementing the new product offerings described above, the Company is using new sales strategies to target particular markets that present greater growth opportunities.  Furthermore, the Company intends to pursue growth in its research and English language teaching ("**ELT**") businesses across the globe—two areas with high growth potential.  The synergies of new management, new products, and new sales strategies set a strong foundation for achieving the Company's envisioned transformation.

18.     Importantly, this transformation is not solely operational:  the Company has also carefully considered and developed clear views on its capital structure.  As described further below, the Company currently has approximately $5.8 billion in principal amount of funded indebtedness, which is simply too large given the Company's current financial condition and the

results predicted by the new business plan.  By right-sizing its balance sheet in these chapter 11

cases, the Company will attain the liquidity and flexibility it needs to implement management's

strategic vision.

### C.    Overview of Company Projections

19.    The Company's financial projections based on its revised business plan show

revenues generally stabilizing through 2016 and then returning to modest growth, totaling

$1,780.0 million in fiscal 2018.  Earnings before interest, taxes, depreciation, and amortization

("**EBITDA**") will also stabilize and bottom by 2015, with the Company's cost-saving strategies

enhancing bottom line earnings and leading to positive EBITDA growth by 2016 and projected

EBITDA of $662.0 million in fiscal 2018.  Further, the Company's digital footprint will grow

significantly, with the number of active digital users nearly doubling.  The growth in digital will

contribute to expanded margins and EBITDA growth in fiscal years 2016–2018.  Based on these

projections and certain other assumptions, the Company has determined that its current capital

structure is not sustainable and that the Company must substantially reduce its debt burden to be

able to implement management's new business plan.

### D.    Overview of Capital Structure and Importance of Deleveraging

20.    As detailed further below in Section II.F, the Company's capital structure

includes approximately $5.8 billion in funded debt, including approximately $4.6 billion in first

lien debt.  Based on management's new business plan, the Company and its advisors believe the

enterprise value of the Company is substantially less than the amount of the first lien debt.  As

the Company's financial performance has deteriorated, its capital structure has become

increasingly unsustainable, and debt-service obligations have consumed an increasing percentage

of the Company's free cash flow.  Just between 2012 and 2013, the Company's debt service

obligations increased from roughly 62 percent to 104 percent of its unlevered free cash flows.

21.    Thus, given recent performance, business plan projections, and the lack of free cash flow needed to make critical investments in its businesses, the Company has determined that deleveraging its capital structure is an absolute necessity.    Accordingly, the Company commenced these chapter 11 cases primarily to implement a balance sheet restructuring and put itself in a position to execute on its new business plan and capitalize on the industry's digital transformation.

### E.    Potential Sources of Recovery for Unsecured Creditors

22.    Notwithstanding the fact that the value of the Company falls well inside the Company's first lien debt based on any reasonable valuation exercise, the Company nonetheless expects that unsecured creditors may be entitled to some recovery under any plan of reorganization.    Specifically, following review and analysis by the Company and its advisors, the Company believes there are three primary sources of potential recoveries for unsecured creditors.

### 1.    Disputed Cash

23.    As of the Petition Date, the Company held approximately $265.0 million of cash (the "***Disputed Cash***") in an investment account that the Company asserts is not part of the secured lenders, swap counterparties, and secured noteholders' (collectively, the "***Prepetition Secured Parties***") respective collateral packages under the First Lien Credit Facility Agreement, First Lien Notes Indenture, Swaps, and Second Lien Notes Indenture (each as defined below). On March 20, 2013, the Company drew down substantially all of the remaining availability under its first lien revolving credit facilities, and invested $300.0 million in a Federated money market fund that invests in treasury securities (the "***Federated Fund***").[3]   The Federated Fund is

---

[3]    The Company's total draw on March 20, 2013 was approximately $430.0 million.    The remaining $130.0 million was swept that day from the Company's primary cash concentration account and invested in

publicly traded on the NASDAQ exchange (ticker: TOIXX). Technically, the Company's investment involved the purchase of uncertificated securities in the Federated Fund. Under the security agreements or provisions for each of the First Lien Credit Facility Agreement, First Lien Notes Indenture, Swaps, and Second Lien Notes Indenture, equity investments in entities other than wholly-owned subsidiaries of the Company are explicitly excluded from the Prepetition Secured Parties' collateral package. The Company believes that the Federated Fund is not a wholly-owned subsidiary of the Company; the Company's investment in the Federated Fund is not part of the Secured Lenders' collateral package; and the Disputed Cash is therefore unencumbered.

## 2. Equity Interests in Non-Wholly Owned Subsidiaries

24. Although the Company generally pledged all of the equity interests in their subsidiaries as collateral to the Prepetition Secured Parties, only 65 percent of the equity of their first-tier foreign subsidiary, Cengage Learning Acquisitions C.V. ("**CLA C.V.**"), was pledged, leaving 35 percent of the equity interests in their foreign affiliates unencumbered.[4] Further, the Debtors did not pledge any of their equity interests in their non-wholly owned subsidiaries, whether foreign or domestic. This category includes two non-wholly owned subsidiaries—The Hampton Brown Company LLC ("**Hampton Brown**") and CourseSmart LLC ("**CourseSmart**"). Accordingly, 35 percent of the equity value of CLA C.V. and 100 percent of the value attributable to the Company's equity interests in Hampton Brown and CourseSmart is outside of the Prepetition Secured Parties' collateral package and available for distribution to unsecured

---

shares of a different Federated money market fund, the Government Obligations Fund Institutional Shares (money market fund #5, ticker: GOIXX), in accordance with the Company's ordinary course cash management procedures.

[4] There are three intercompany loans from Debtor Cengage Learning Acquisitions, Inc. to CLA C.V. in the aggregate amount of approximately $776 million that potentially could significantly reduce, or eliminate, CLA C.V.'s equity value.

creditors.  The Hampton Brown and CourseSmart joint ventures are discussed in further detail in Section II.C.

### 3.    **Copyright Assets**

25.    In the course of conducting a collateral and perfection review, the Company's advisors recently discovered that the Prepetition Secured Parties had not perfected their interests in a pool of copyrights the Company registered during roughly the last year.  To perfect a security interest in a registered copyright, a creditor must file with the U.S. Copyright Office. The Company discovered that The Bank of New York Mellon last perfected liens for the benefit of holders of the First Lien Notes (as defined below) on May 7, 2012, and for the benefit of the holders of the Second Lien Notes (as defined below) on July 5, 2012.  The Company further discovered that Royal Bank of Scotland, as former agent for the lenders under the First Lien Credit Facility Agreement, last perfected on March 23, 2012.  Since the time of these previous perfection filings, the Company has registered approximately 1,500 additional copyrights.[5] Within the 90 days before the Petition Date, the Company understands that the agent for the lenders under the First Lien Credit Facility Agreement and the indenture trustees under the First Lien Notes Indenture and the Second Lien Notes Indenture perfected against a pool of the Debtors' registered copyrights that previously had not been perfected against (the "***Recently Perfected Copyrights***").

26.    The Prepetition Secured Parties, however, have perfected security interests in all existing inventory created by the Company from the Recently Perfected Copyrights, and have the

---

[5]    There also are approximately 14,000 copyrights that were perfected by the indenture trustees for the First Lien Notes and Second Lien Notes in 2012, but were not perfected by the agent under the First Lien Credit Facility Agreement until on or about May 22, 2013.  Under the governing intercreditor agreements, the Company does not believe that the timing of the perfection by the agent under the First Lien Credit Facility Agreement (*i.e.*, within the 90-day preference period under section 547 of the Bankruptcy Code) will have any impact on recoveries for any creditor in these chapter 11 cases, and does not believe that any value from these copyrights will flow to second lien or unsecured creditors.

right to all proceeds from sales of inventory that already had been printed as of the Petition Date. Given where the Company is in its sales cycle, it has a large volume of inventory on hand in preparation for the fall semester sales season.

27.    The Company has had extensive conversations with the advisors to the Prepetition Secured Parties and senior unsecured noteholders regarding perfection issues related to the Recently Perfected Copyrights. The Debtors intend to continue to negotiate with their creditor constituents and with the creditors' committee, when one is appointed, with the goal of reaching a consensus agreement on value in the near future. Importantly, the Prepetition Secured Parties with first lien claims will have a very substantial unsecured deficiency claim, allowing them to recover a significant portion of whatever value is ultimately awarded to unsecured creditors.

### F.    Negotiations with Creditors

28.    After the Company drew down the Unextended Revolver Facility and the Extended Revolver Facility in March 2013, certain of the holders (the "***First Lien Holders***") of the Company's first lien debt organized an ad hoc group (collectively, the "***First Lien Group***") to engage with the Company. The First Lien Group is advised by Houlihan Lokey, as financial advisor, and Milbank, Tweed, Hadley & McCloy, as counsel (collectively, the "***First Lien Advisors***"). In addition, JPM, the first lien agent, engaged Davis Polk & Wardwell and Blackstone and commenced discussions with the Company. Other non-first lien creditors also commenced discussions with the Debtors and their advisors. To permit frank and transparent discussions to the greatest extent possible, the members of the First Lien Group and certain other non-first lien creditors entered into non-disclosure agreements with the Company. In the period leading up to the Petition Date, the parties and their advisors held multiple meetings to exchange information, facilitate diligence, answer questions, and discuss various restructuring issues. In addition to information on the Company's revised business plan and financial information, the

Company began the process of providing creditors and their advisors with information regarding unencumbered and unperfected assets so that each group could perform diligence and assess valuations.

29.     After considerable arm's-length negotiations, the Debtors and holders of over $2 billion of First Lien Claims (the "***Consenting Holders***") reached a restructuring support agreement outlining a restructuring process and post-reorganization capital structure that is designed to de-lever the Company's balance sheet and provide for an expedient emergence from chapter 11.  At the same time, it provides unsecured creditors with appropriate time to conduct diligence on, and discuss their conclusions regarding, among other things, the value of the three primary sources of potential recoveries for unsecured creditors.  The Debtors and the Consenting Holders memorialized their agreement by entering into a Restructuring Support Agreement (attached hereto as **Exhibit C**, the "***RSA***"), dated as of July 2, 2013.  Attached to the RSA are three term sheets (the "***Term Sheets***"): one principally regarding the terms of the restructuring plan, one regarding the terms of the potential exit financing, and one regarding the terms of certain post-reorganization governance and shareholders' rights.

30.     The RSA contemplates, among other things, that unless and until the RSA is terminated in accordance with its terms, the Debtors and the Consenting Holders agree to support the restructuring envisioned in the Term Sheets, including the solicitation, confirmation, and consummation of the plan of reorganization contemplated therein and pursuant to the terms set forth in the RSA.  Subject to the terms of the RSA, the Consenting Holders have agreed that they will not directly or indirectly support any plan of reorganization or other transaction for any

Debtor other than the restructuring transaction contemplated by the RSA or take any action that is inconsistent with the RSA.[6]  The Debtors' support obligations are subject to a fiduciary out.

31.    The Term Sheets provide, among other things:[7]

- a de-leveraged post-reorganization capital structure consisting of (i) a new first-out revolving credit facility of no less than $250 million and up to $400 million to be raised from third-parties on market terms and (ii) $1.5 billion of last-out first lien debt (subject to increase in certain circumstances discussed below);

- holders of First Lien Secured Claims would receive their pro rata share of (1) 100% of the equity in the reorganized Debtors (subject to certain dilution), (2) excess cash (as defined in the Term Sheets), and (3) the new $1.5 billion term loan financing, which recovery can be replaced (subject to the terms of the RSA) with the cash proceeds of alternative debt financing, the principal amount of which is limited by the lesser of $1.75 billion or the amount of debt that can support interest expense of $150 million per year (excluding interest expense on the new revolving credit facility);

- unsecured creditors (including the holders of first lien deficiency claims) would receive a recovery under the Plan on account of the Disputed Cash, 35 percent of equity interests in the Debtors' first-tier non-Debtor foreign subsidiary, the Recently Perfected Copyrights, and the equity interests owned by the Debtors in Hampton-Brown and CourseSmart, which distribution will vary based on which Debtor the unsecured claims are against and will be made in accordance with a priority waterfall that shall take into account all applicable priority principles of the Bankruptcy Code and other applicable law, including but not limited to subordination provisions and provisions in intercreditor agreements;

- the terms of certain post-reorganization governance rights applicable to the holders of new equity (including rights to nominate directors);

- the cancellation of existing equity interests other than intercompany equity interests; and

- certain other customary terms and provisions.

---

[6]    This summary is qualified in all respects by the terms of the RSA.

[7]    This summary is qualified in all respects by the terms of the Term Sheet.

32.    The RSA contemplates the Debtors' complying with two major milestones.  First, the Debtors must file a plan, disclosure statement, and solicitation materials on or before 45 days following the Petition Date.  Second, the effective date of the plan must occur within 135 days of the Petition Date.

33.    Importantly, the RSA and Term Sheet do not address the value of the potential sources of recoveries for unsecured creditors.  The Debtors insisted on the ability to continue to discuss these issues with their key creditor constituents in the hopes of reaching a consensual agreement.  The Company will continue to work with representatives of the Secured Parties, representatives of unsecured creditors, the creditors' committee (when appointed), and other stakeholders with the hope of reaching an expedient, consensual agreement on the reasonable value for these three primary sources of potential recoveries for unsecured creditors.

34.    Accordingly, to implement the process contemplated by the Term Sheet, the Debtors commenced these chapter 11 cases on the Petition Date.

## II.    The Company's Businesses

35.    The Company divides its operations into two main segments:    domestic and international.  For the nine months ended March 31, 2013, the domestic segment accounted for approximately 85 percent of the Company's revenues, and the international segment accounted for the remaining approximately 15 percent of the Company's revenues.  The Company's customers include, among others, students, bookstores, academic libraries, major public libraries, and high schools across the country and around the world.

36.    As discussed further below, the Company also has two non-wholly owned joint ventures—Hampton Brown and CourseSmart.

### A.    Domestic

37.    In the U.S., the Company operates in five principal markets: two- and four-year college, research, K–12 school, career, and professional.

### 1.    Two- and Four- Year College

38.    The Company offers an array of print and digital materials and associated services to the two- and four-year college market, which is comprised of students, professors, and institutions of higher education (primarily colleges and universities). The higher education system in the U.S. is the largest in the world with over 20 million students and 4,500 institutions, figures which have expanded over the last decade. Many of the most well-known publishers compete with the Debtors in this space, including, for example, Pearson Education, Inc., McGraw-Hill Education, Inc., John Wiley & Sons, Inc., and Macmillan Publishers Ltd.

39.    In print, the Company publishes textbooks for all major academic disciplines and maintains leading positions in many major disciplines. For example, the Company has leading market positions in the United States in many of the largest academic disciplines, including the number one position in each of anthropology, business, computer training, criminal justice, health, history, paralegal studies, philosophy, and social work, and the number two position in each of accounting, chemistry, education, foreign language, linguistics, mathematics, and psychology.

40.    In digital format, the Company provides homework solutions with high quality content and interactive learning solutions and fully customized online course programs. The Company is also developing a full suite of digital learning solutions called MindTap, designed to engage students and offer instructors choice and flexibility.

41.    The Company employs two sales teams to target the college market. The first sales team focuses on securing adoptions—that is, selections by course instructors to use a

particular publisher's materials.  The second sales team seeks out institutional sales opportunities, which are more complicated and time consuming, but often offer greater volume and value to the Company.

42.     Particularly with respect to the college market, the educational publishing market is highly seasonal.  As with most publishers of educational materials, the Company receives an out-sized proportion of its earnings during the academic year.  This seasonality affects the Company's working capital requirements and overall financing needs such that it earns a cash surplus during the academic year but typically incurs a net cash deficit from operating activities outside the academic year.

### 2.     Research

43.     Over time, the Company has aggregated the world's largest online collection of magazines, journals, and newspapers, and now maintains one of the largest archives of unique primary-source special collections in the world.  In North America, substantially all of the reference collections of academic and public libraries contain one or more of the Company's research products, which include the world's largest collection of periodicals and one of the largest archives of primary source materials.

44.     Generally, research providers like the Company aim to sell specialized reference materials such as encyclopedias, directories, periodical databases, and primary-source collections.  The Company, however, also integrates this reference content in its academic products, making it the only producer of learning materials with access to proprietary content of this kind.  The Company sells directly to academic, corporate, and government libraries and indirectly via distributers, bookstores, wholesalers, and retailers worldwide, with most relationships managed via local or regional offices.

### 3. **K–12 School**

45.     The domestic K–12 school market consists of approximately 55 million students. Publishers in this market, including Pearson Education, Inc., McGraw-Hill Education, Inc., and Houghton Mifflin Harcourt Publishing Company, aim primarily for state and local school district to adopt their materials.  In the U.S. K–12 school market, the Company focuses on disciplines with the most attractive growth fundamentals, in particular advanced placement and ELT, where the Company occupies strong market positions.  Consistent with that focus, in August 2011, the Company acquired Hampton Brown, the National Geographic Society's digital and print school publishing unit, including its ELT products, elementary school level science curriculum, literacy and content publishing brand, National Geographic Explorer! Magazines, and the National Geographic Science series.[8]

### 4. **Career**

46.     The career market is comprised primarily of students and colleges in the career-oriented education system.  Career institutions typically purchase course materials directly and distribute them to all students, unlike the college market where individual professors choose and students purchase their own materials.  In the career market, the Company offers some of the most comprehensive collections of print, digital, and hybrid learning solutions for career studies across major disciplines.  In connection with these various products, the Company employs designated sales teams to focus on sales to the for-profit career colleges that make up the bulk of the market.

47.     Over the last twenty years, growth in the career market generally has outpaced that in the two- and four-year college market.  As with the college market, the Company's main

---

[8]     The Hampton Brown acquisition is discussed further below.

competitors in the career market are Pearson Education, Inc., McGraw-Hill Education, Inc., and John Wiley & Sons, Inc.

### 5.    **Professional**

48.    Providers in the professional market typically seek to sell learning materials to students seeking job training, certification, or continuing professional education in schools or other programs.  This market encompasses a wide range of vocations, and the key players generally vary across different study areas.  The Company competes in a wide range of professional study disciplines, offering products like customized materials for employers to train their employees.  To assist in these efforts, the Company employs a direct sales force focused on employers, training programs, and professionals seeking additional training.

### B.    **International**

49.    The second main segment of the Company's operations is the international segment.  The needs and demands of various international markets can differ dramatically, but the general trend across the globe is expanding demand for learning products driven by population growth and rising living standards.  The Company, through certain non-Debtor international affiliates, serves higher education, vocational, K–12, reference, and ELT markets in select geographic areas throughout the world, with operations generally divided between the regions of Asia, Australia, Latin America, and Europe, Middle East, and Africa (EMEA).  For example, the Company, through a licensee, is the leading foreign educational publisher in China with a strong position in the Chinese ELT market.  To best tap these markets, the Company's international businesses differ in their strategic focus based on prevailing local market demand for the Company's products, and it employs a sales force located in 25 regional offices around the globe to take advantage of international growth dynamics.

C.    **Joint Ventures**

50.    The Company owns equity interests in two domestic joint ventures:  Hampton

Brown and CourseSmart.  *First*, on August 1, 2011, the Company acquired 100-percent of the

controlling economic equity interests (*i.e.*, 90 Class B units) in Hampton Brown from The

National Geographic Society ("***NGS***").  As part of the sale transaction, NGS negotiated to retain

10 Class A units, which units do not entitle NGS to any control over the affairs of Hampton

Brown and entitle NGS to distributions only upon dissolution of Hampton Brown (which

distribution is capped at $8 million).  The 10 Class A units owned by NGS are subject to a call

right exercisable by the Company and a put right exercisable by NGS, the terms of which are set

forth in the purchase agreement.  Pursuant to the purchase agreement, (a) the Company may

exercise its call right to purchase the remaining interest for $8 million plus 10-percent annual

compounding interest accruing from August 1, 2012 and (b) the seller may exercise its put right

to sell the remaining interest at $6.5 million, with such right becoming exercisable August 1,

2013.  For the Company's fiscal 2012, Hampton Brown contributed $74.4 million in revenue, or

approximately 4 percent of the Company's total revenues.

51.    *Second*, since February 28, 2007, the Company has been an equity holder in

CourseSmart, a joint venture supported by the leading publishers in North American higher

education for distribution of digital course materials.  The Company owns a 33.4-percent equity

interest in CourseSmart, with equivalent voting control.  CourseSmart historically has relied on

contributions from its members to fund its operations and does not represent a material portion of

the Company's revenues or earnings.

D.    **Authors and Copyrights**

52.    The Company's leading market positions across disciplines and around the globe

are, in part, a result of its long-term, successful relationships with recognized experts across

many fields to provide exclusive and authoritative content for the Company's products. Most of these collaborative relationships are direct, with the Company obtaining copyright ownership over materials produced by a given author. Others consist primarily of long-term agreements with third party licensors for leading research materials and content. The product of these relationships is further enhanced by the Company's own workforce and their ability to develop pedagogically-sound content.

53.    Accordingly, substantially all of the Company's proprietary publications and products are covered by tens of thousands of copyrights in the U.S., which copyrights are protected by virtue of treaties or conventions in most developed countries throughout the world. With respect to the underlying content in almost all cases, copyright ownership has been assigned to the Company by the original authors. The Company also obtains significant content, materials, and technology through license arrangements with third party licensors.

### E.    Organizational Structure

54.    An organizational chart illustrating the corporate structure of the Company is annexed to this declaration as __Exhibit A__.

55.    The Company is majority-owned by Apax, which owns approximately 97 percent of the equity of Cengage Learning Holdings I, L.P.,[9] which in turn owns 99.99 percent of the equity of Debtor Cengage Learning Holdings II, L.P ("***CL Holdings II***"). Each of the other Debtors is a wholly-owned direct or indirect subsidiary of CL Holdings II. The Company is managed by the directors and officers of Cengage Learning GP I LLC, the general partner and .01-percent equity holder of CL Holdings II.

---

[9]    The balance of equity interests in Cengage Learning Holdings I, L.P. is owned by funds associated with OMERS Private Equity and members of the Company's management.

56.    Prior to February 28, 2013, the Company operated a division known as The Gale Group through distinct corporate entities:   (a) Gale Holdings I Inc., a wholly-owned direct subsidiary of CL Holdings II, and (b) The Gale Group Inc., a wholly-owned direct subsidiary of Gale Holdings I Inc.  On February 28, 2013, the Debtors merged these entities with Debtors Cengage Learning Acquisitions, Inc. ("**CLA**") and Cengage Learning, Inc. ("**CLI**"), respectively, in a tax-free reorganization.

57.    As discussed above, the Company also owns equity interests in joint ventures Hampton Brown and CourseSmart.

58.    The Debtors' international affiliates consist of direct or indirect, wholly-owned subsidiaries of CLA C.V.  Debtor CLA owns a 99.9-percent interest in CLA C.V., with the remaining 0.1-percent interest held by Cengage Learning Dutch-Co LLC, a wholly-owned subsidiary of CLA.

**F.    The Debtors' Prepetition Capital Structure.**

59.    As of March 31, 2013, the Company reported approximately $4,679.0 million book value in total assets and approximately $6,469.0 million book value in total liabilities.  As of June 30, 2013, the Debtors have outstanding funded debt obligations in the aggregate principal amount of approximately $5,803.9 million, including the following:

- approximately $3,867.9 million aggregate in principal amounts outstanding of first lien loans (the "**First Lien Loans**") in five tranches, discussed below, with varying interest rates;[10]

- approximately $725.0 million in principal amount outstanding of 11.5% first lien notes (the "**First Lien Notes**");[11]

---

[10]    The terms of the First Lien Loans are set forth that certain Credit Agreement, dated as of July 5, 2007, as amended by the Incremental Amendment, dated as of May 30, 2008, and the Amendment Agreement, dated as of April 10, 2012, among certain of the Debtors, JPMorgan Chase Bank, N.A. as administrative agent, and the other lenders party thereto (the "**First Lien Credit Facility Agreement**").

- approximately $13.3 million owed under certain of the Company's swap agreements (the "***Swaps***"), discussed below, which amount is secured by a first lien security interest;

- approximately $710.0 million in principal amount outstanding of 12% second lien notes (the "***Second Lien Notes***");[12]

- approximately $292.1 million in principal amount outstanding of 10.5% senior unsecured notes (the "***Senior Unsecured Notes***");[13]

- approximately $63.6 million in principal amount outstanding of 13.75% senior payment-in-kind notes (the "***Senior PIK Notes***");[14] and

- approximately $132.0 million in principal amount outstanding of 13.25% senior subordinated discount notes (the "***Senior Subordinated Discount Notes***").[15]

### 1.    Secured Facilities

60.    The Debtors' first lien secured facilities consist of the First Lien Loans and the First Lien Notes, which rank *pari passu*.

61.    The Debtors' approximately $3,867.9 million outstanding indebtedness under the First Lien Loans consists of the following five tranches:

---

[11]    The terms of the First Lien Notes are set forth in that certain Indenture, dated as of April 10, 2012, among Cengage Learning Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee and collateral agent, providing for the issuance of 11.50% Senior Secured Notes due 2020 (the "***First Lien Notes Indenture***").

[12]    The terms of the Second Lien Notes are set forth in that certain Indenture, dated as of July 5, 2012, among Cengage Learning Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee and collateral agent, providing for the issuance of 12.00% Senior Secured Second Lien Notes due 2019 (the "***Second Lien Notes Indenture***").

[13]    The terms of the Senior Unsecured Notes are set forth in that certain Indenture, dated as of July 5, 2007, among TL Acquisitions, Inc. (predecessor of Cengage Learning Acquisitions, Inc.), the guarantors party thereto, and The Bank of New York Mellon, as trustee, providing for the issuance of 10.50% Senior Notes due 2015 (the "***Senior Unsecured Notes Indenture***").

[14]    The terms of the Senior PIK Notes are set forth in that certain Indenture, dated as of October 31, 2008, among Cengage Learning Holdco, Inc., Cengage Learning Holdings II L.P., as guarantor, and Wells Fargo Bank National Association, as trustee, providing for the issuance of 13.75% Senior PIK Notes due 2015 (the "***Senior PIK Notes Indenture***").

[15]    The terms of the Senior Subordinated Discount Notes are set forth in that certain Indenture, dated as of July 5, 2007, among TL Acquisitions, Inc. (predecessor of Cengage Learning Acquisitions, Inc.), the guarantors party thereto, and The Bank of New York Mellon, as trustee, providing for the issuance of 13.25% Senior Subordinated Discount Notes due 2015 (the "***Senior Subordinated Discount Notes Indenture***").

- approximately $220.3 million outstanding under a revolving credit facility (the "***Unextended Revolver Facility***") with an interest rate of LIBOR plus 2.75%, maturing July 5, 2013;

- approximately $293.7 million outstanding under a revolving credit facility (the "***Extended Revolver Facility***") with an interest rate of LIBOR plus 4.5%, maturing April 10, 2017;

- approximately $1,519.1 million outstanding under a term loan facility (the "***Unextended Term Loan Facility***") with an interest rate of LIBOR plus 2.25%, maturing July 5, 2014;

- approximately $548.3 million outstanding under a term loan facility (the "***Incremental Term Loan Facility***") with an interest rate of LIBOR plus 3.75% subject to a 3.75% LIBOR floor, also maturing July 5, 2014; and

- approximately $1,286.5 million outstanding under a term loan facility (the "***Extended Term Loan Facility***" and, collectively with the Unextended Term Loan Facility and the Incremental Term Loan Facility, the "***Term Loan Facilities***") with an interest rate of LIBOR plus 5.50%, maturing July 5, 2017.

62.    The maturity dates for both the Extended Revolver Facility and the Extended Term Loan Facility are subject to springing conditions.  In general, these conditions provide that: (a) if specified principal amounts of certain of the Debtors' other debt remain outstanding as of a specified date, the Extended Revolver Facility and the Extended Term Loan Facility mature on the specified date; or (b) if any of the Debtors' other debt is refinanced and matures before July 9, 2017 (for the Extended Revolver Facility) or October 3, 2017 (for the Extended Term Loan), either or both (as applicable) of the Extended Revolver Facility and the Extended Term Loan will mature 91 days before the maturity of the refinanced debt.  Under these springing maturity provisions, the Extended Revolver Facility and the Extended Term Loan Facility could mature as early as April 5, 2014.

63.    All of the First Lien Loans are secured by a first priority security interest in substantially all of the Debtors' assets, subject to certain exceptions discussed above (*i.e.*, in the equity interests of the Debtors' non-wholly owned domestic subsidiaries and 35 percent of the

equity interests of the Debtors' top-tier foreign subsidiary, in the Disputed Cash, and in certain copyrights). The First Lien Loans are guaranteed by each of the Debtors other than CLA, which is the borrower under the First Lien Loans. The First Lien Credit Facility Agreement also provides for certain customary covenants, including with respect to financial reporting and the Debtors' leverage ratio.

### 2.    First Lien Notes

64.    The First Lien Notes mature April 15, 2020, and the First Lien Notes Indenture provides for certain customary covenants, including with respect to financial reporting. The First Lien Notes are secured with a *pari passu* first priority security interest in the same collateral package as the First Lien Loans, *i.e.*, substantially all of the Debtors' assets, subject to certain exceptions discussed above (*i.e.*, in the equity interests of the Debtors' non-wholly owned domestic subsidiaries and 35 percent of the equity interests of the Debtors' top-tier foreign subsidiary, in the Disputed Cash, and in certain copyrights). The First Lien Notes are guaranteed by each of the Debtors other than CLA, which is the issuer under the First Lien Notes Indenture.

### 3.    Swap Agreements

65.    The Company is party to six Swaps, all of which are interest rate swaps that help the Company manage interest rate exposure by achieving a desirable proportion of variable and fixed rate debt. The counterparties to the Swaps have the same collateral package as and rank *pari passu* with the holders of the First Lien Loans and First Lien Notes. The notional amounts, counterparty, and other information regarding the Swaps are as follows:

- $250 million subject to a Swap between CLA and Citibank N.A., dated as of April 21, 2010;

- $250 million subject to a Swap between CLA and Goldman Sachs Bank USA, guaranteed by The Goldman Sachs Group, Inc., dated as of April 16, 2010;

- $300 million subject to a Swap between CLA and UBS AG, London Branch, dated as of March 5, 2010;

- $300 million subject to a Swap between CLA and The Royal Bank of Scotland plc, dated as of March 1, 2010;

- $500 million subject to a Swap between CLA and UBS AG, London Branch, dated as of February 17, 2010; and

- $500 million subject to a Swap between CLA and Morgan Stanley Capital Services Inc., dated as of March 19, 2010.

The final payments under the Swaps in the aggregate amount of approximately $13.3 million were due on June 28, 2013. The Company did not make these payments.

### 4.    Second Lien Notes

66.    The Second Lien Notes mature June 30, 2019, and the Second Lien Notes Indenture provides for certain customary covenants, including with respect to financial reporting. The Second Lien Notes are secured with a second priority security interest in the same collateral package as the First Lien Facilities and are guaranteed by each of the Debtors except for CLA, which is the issuer under the Second Lien Notes Indenture.

### 5.    Intercreditor Agreements

67.    Certain of the Debtors, the collateral agent under the First Lien Credit Facility Agreement, and representatives of the First Lien Holders are parties to that certain First Lien Intercreditor Agreement, dated as of April 10, 2012 (the "***First Lien Intercreditor Agreement***"). The First Lien Intercreditor Agreement governs certain of the respective rights and interests of the First Lien Holders relating to, among other things, their rights and the exercise of remedies in connection with an Event of Default (as defined in the First Lien Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions. In particular, section 2.02 of the First Lien Intercreditor Agreement prohibits the First Lien Holders from contesting the perfection of any security interests asserted by any other First Lien Holders,

including with respect to the Company's copyrights.[16]  This provision is relevant to these chapter 11 cases due to the fact that until on or about May 22, 2013, security interests in approximately 14,000 of the Company's copyrights were perfected only by the indenture trustee for the First Lien Notes and Second Lien Notes.[17]

68.    In addition, certain of the Debtors, representatives of the First Lien Holders, and the representative of the holders of the Second Lien Notes are parties to that certain Second Lien Intercreditor Agreement, dated as of July 5, 2012 (the "*Second Lien Intercreditor Agreement*"). The Second Lien Intercreditor Agreement governs certain of the respective rights and interests of the First Lien Holders and the holders of the Second Lien Notes relating to, among other things, their rights and the exercise of remedies in connection with an Event of Default (as defined in the Second Lien Intercreditor Agreement) and in the event of a bankruptcy filing, including related enforcement and turnover provisions.

### 6.    Unsecured Notes

69.    The Debtors also have outstanding indebtedness in the form of three series of unsecured notes:  the Senior Unsecured Notes, the Senior PIK Notes, and the Senior Subordinated Discount Notes (collectively, the "*Unsecured Notes*").  The Senior Unsecured Notes mature January 15, 2015; the Senior PIK Notes mature July 15, 2015; and the Senior Subordinated Discount Notes mature July 15, 2015.

---

[16]    A substantially similar provision exists in section 2.03 of the Second Lien Intercreditor Agreement (as defined below), which prohibits the holders of the Second Lien Notes from challenging the perfection of any security interests asserted by First Lien Holders.

[17]    These 14,000 copyrights were registered by the Company prior to July 2007.

70.     The Senior Subordinated Discount Notes are contractually subordinated to the Debtors' secured and senior indebtedness, including the First Lien Loan, the First Lien Notes, the Second Lien Notes, the Senior Unsecured Notes, and the Senior PIK Notes.

71.     The Senior Unsecured Notes and the Senior PIK Notes contractually rank *pari passu*; however, the Senior PIK Notes are structurally subordinate to the Senior Unsecured Notes.  The Senior PIK Notes were issued by Cengage Learning Holdco, Inc. ("**CL Holdco**") and guaranteed by its parent company, CL Holdings II.  The Senior Unsecured Notes were issued by CL Holdco's subsidiary, CLA, making the Senior PIK Notes structurally subordinate to the Senior Unsecured Notes.

### 7.     Intercompany Obligations

72.     In addition to their debt obligations as described above, the Debtors have extended credit to certain of their international non-Debtor affiliates. Specifically, there are three term loans from CLA to CLA C.V. with an aggregate balance of approximately $777.0 million as of March 31, 2013.[18]   In addition, CLA has extended a revolving credit line to Cengage Learning Holdings B.V. that has a balance of $1.9 million as of March 31, 2013.   Finally, Cengage Learning, Inc. ("**CLI**") has issued approximately $10.4 million in aggregate trade credit to various international affiliates.[19]

73.     Domestically, the Debtors also are parties to various intercompany obligations with each other:  (a) CLA owes CLI approximately $55.1 million as of June 21, 2013 under an interest-bearing revolving credit line; (b) CLI owes CLA approximately $3,590.0 million as of

---

[18]   Of these three loans, one is interest-bearing and has a balance of approximately $245.6 million as of March 31, 2013.

[19]   CLA also owes Cengage Learning Cooperatief, a foreign subsidiary, approximately $1,000.00 on account of an intercompany balance.

March 31, 2013 under four interest-bearing term loans; and CL Holdco owes CLA approximately $378.4 million as of March 31, 2013 under 26 non-interest-bearing term loans.

### G.    Liquidity Hurdles

74.    As detailed above, the Company's capital structure includes approximately $5.8 billion in outstanding funded indebtedness.  The cost of this debt burden—including over $400 million in interest expense in 2012—severely limited the Company's profitability and liquidity available to fund operations.  Given the seasonality of the Company's cash flows, these effects are strongest during the spring and summer months.  Moreover, the maturity of $222.0 million outstanding under the Unextended Revolver Facility on July 5, 2013 created a significant and immediate liquidity demand, particularly with over $2 billion under the Unextended Term Loan Facility and Incremental Term Loan Facility maturing just one year later on July 5, 2014.

### H.    Jurisdiction

75.    The Debtors commenced these chapter 11 cases in the Eastern District of New York, which is the location of the principal assets of the Debtors' top-tier holding company, CL Holdings II.  CL Holdings II's primary asset is its equity interest in Debtor CL Holdco.  This equity interest is a certificated equity interest, which upon the Debtors' information and belief has been physically located in the Eastern District of New York since at least January 1, 2013 pursuant to the equity pledge under the First Lien Credit Facility Agreement.

## III.    First Day Motions

76.    The Debtors have filed a number of First Day Motions seeking targeted relief intended to allow the Debtors to minimize the adverse effects of the commencement of the chapter 11 cases on their ongoing business operations.  The First Day Motions seek authority to, among other things, continue to pay employee compensation and benefits in order to maintain

morale and retention during this critical juncture, and ensure the continuation of the Company's cash management systems and other business operations without interruption. Court approval of the relief requested in the First Day Motions is essential to providing the Debtors with an opportunity to successfully meet their creditor obligations in a manner that benefits all of the Debtors' constituents.

77.    I have reviewed each of the First Day Motions. The facts and descriptions of the relief requested therein are detailed below and are true and correct to the best of my information and belief. I believe that the relief sought in each of the First Day Motions is necessary: it will allow the Company to maintain baseline operations following the commencement of these chapter 11 cases; it will enable the Company to operate in chapter 11 with minimal disruption to its business operations; and it will minimize any loss of the Company's value. I believe that if the Court grants the relief requested in the First Day Motions, the prospect of achieving these objectives—to the maximum benefit of the Debtors' estates, creditors, and other parties in interest—will be substantially enhanced. Accordingly, I believe that the Court should grant each of the First Day Motions.

## ADMINISTRATIVE MOTIONS

A.    **Debtors' Motion for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases (the "*Joint Administration Motion*")**

78.    The Debtors request entry of an order directing joint administration of these chapter 11 cases for procedural purposes only. The Debtors request that this Court maintain one file and one docket for all of the jointly administered cases under the case number assigned to Cengage Learning, Inc..

79.    The Debtors operate as an integrated business with common ownership and control. Debtor Cengage Learning, Inc. is the direct or indirect subsidiary of each of the other

three Debtors. Additionally, each of the four affiliated Debtor entities is directly liable for, or a guarantor of, roughly $5.3 billion in secured funded debt obligations that the Debtors seek to restructure as part of these chapter 11 cases. As a result, many of the motions, hearings, and orders that will arise in these cases will affect each and every Debtor.

80.    The four Debtors in these chapter 11 cases are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code. Joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings, objections, and hearings, and will also allow the Office of the United States Trustee (the "*U.S. Trustee*") and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Furthermore, joint administration will not adversely affect the Debtors' respective constituencies because the motion requests only administrative, not substantive, consolidation of the Debtors' estates. Therefore, I believe parties in interest will not be harmed by the relief requested, but, instead, will benefit from the cost savings associated with the joint administration of these chapter 11 cases.

81.    Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.    Debtors' Application for the Entry of an Order Authorizing the Employment and Retention of Donlin, Recano & Company, Inc. as Notice and Claims Agent *Nunc Pro Tunc* to the Petition Date (the "*Donlin Recano Application*")**

82.    The Debtors believe that they may have more than 50,000 potential creditors. To alleviate the heavy administrative burden of the clerk of the Court, the Debtors seek to retain Donlin, Recano & Company, Inc. ("***Donlin Recano***") as notice and claims agent in these chapter 11 cases. It is my understanding the Donlin Recano has substantial experience in matters of this size and complexity and has acted as the official notice and claims agent in many large bankruptcy cases. I believe that Donlin Recano is fully equipped to manage claims issues and

provide notice to creditors and other interested parties in these chapter 11 cases. Therefore, on behalf of the Debtors, I respectfully submit that the Donlin Recano Application should be approved.

    **C.**     **Debtors' Motion for Entry of an Order (I) Granting Additional Time Within Which to File Schedules and Statements and (II) Authorizing Debtors to Mail Initial Notices and File Consolidated List of Creditors (Without Claim Amounts) in Lieu of a Matrix (the "***Schedules & Statements Extension Motion***")**

83.     The Debtors request entry of an order (a) extending the deadline to file their schedules of assets and liabilities (the "***Schedules***") and statements of financial affairs (the "***Statements***") for an additional 31 days to a total of 45 days from the Petition Date, without prejudice to the Debtors' ability to request additional time should it become necessary, and (b) authorizing the Debtors to mail initial notices through a notice and claims agent and file a consolidated list of creditors (without claim amounts) in lieu of a matrix.

84.     The complexity of the Debtors' businesses, the relatively limited staff available to perform the required internal review of their financial records and affairs, the numerous critical operational matters that their accounting and legal personnel must address in the early days of these chapter 11 cases, the pressure incident to the commencement of these chapter 11 cases, and the fact that certain prepetition invoices have not yet been received or entered into their accounting systems provide ample cause justifying, if not necessitating, a 31-day extension of the deadline to file Schedules and Statements. In addition, permitting the Debtors to focus their attention of their key accounting and legal personnel on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will help the Debtors make a smoother transition into chapter 11 and, therefore, ultimately will maximize the value of the Debtors' estates for the benefit of creditors and all parties in interest.

85.    As explained above, the Debtors are seeking to retain Donlin Recano as their notice and claims agent for these chapter 11 cases.  If such retention is approved, Donlin Recano will, among other things, (a) assist with the consolidation of the Debtors' computer records into a creditor database and (b) complete the mailing of notices to the parties in such database.

86.    Specifically, the Debtors propose that Donlin Recano undertake all mailings directed by the Court, the U.S. Trustee, or as required by the Bankruptcy Code,[20] including, without limitation, the notice of commencement of these chapter 11 cases.  The Debtors believe that using Donlin Recano for this purpose will maximize efficiency in administering these cases and will ease administrative burdens that otherwise fall upon the Court and the U.S. Trustee.  Additionally, Donlin Recano will assist the Debtors in preparing creditor lists and mailing initial notices.

87.    Additionally, pursuant to the Schedules & Statements Extension Motion, the Debtors seek the authority to file a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims.  After consultation with Donlin Recano, the Debtors believe that preparing the consolidated list will be sufficient to permit Donlin Recano to provide notice promptly to all applicable parties.  I believe that this process will maximize efficiency and accuracy and reduce costs.  Accordingly, on behalf of the Debtors, I submit that the Schedules & Statements Extension Motion should be approved.

---

[20] 11 U.S.C. §§ 101–1532.

## FINANCING MOTIONS

**D.**     **Debtors' Motion for Interim and Final Orders (I) Authorizing the Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; and (III) Scheduling a Final Hearing (the "*Cash Collateral Motion*")**

88.     The Debtors request entry of interim and final orders (i) authorizing the Debtors to use cash collateral on an interim basis, as described in more detail below; (ii) granting certain adequate protection to the Prepetition Secured Parties in connection with the use of cash collateral and any diminution in the value of the Prepetition Secured Parties' interests in the prepetition collateral; and (iii) scheduling a final hearing on the motion.  Certain of the relief requested in the Cash Collateral Motion constitutes "Extraordinary Relief" within the meaning of the Court's Administrative Order No. 565.

89.     The Debtors have set forth the material terms of the interim cash collateral order in compliance with the E.D.N.Y. Local Bankruptcy Rules in the Cash Collateral Motion. As further described in the Cash Collateral Motion, the Debtors require the immediate use of cash collateral to, among other things, fund payroll, working capital, capital expenditures, pre-publication investment, and other general corporate expenses.  The Debtors seek to use cash collateral for these purposes, all in accordance with the thirteen-week budget, annexed to the interim order attached to the Cash Collateral Motion.  Additionally, pursuant to the proposed final order granting the Cash Collateral Motion, the Debtors seek to satisfy any costs and expenses of administering these chapter 11 cases first from unencumbered cash, second from the Disputed Cash, and third from cash collateral.

90.     Despite any unencumbered cash and the Disputed Cash, the Debtors will require the use of the revenue generated from the sale of inventory, which revenue will constitute cash collateral.  Absent the Debtors' use of the cash collateral, the Debtors will not have sufficient working capital to carry on the operation of their businesses as a going concern throughout the

course of these chapter 11 cases, in accordance with prepetition practices.  In the absence of the use of cash collateral, the continued operation of the Debtors' businesses would not be possible and I believe that immediate and irreparable harm to the Debtors and their estates would occur.

91.    Moreover, while the Disputed Cash likely would be sufficient to operate the Debtors' businesses for the first few months of the cases, the Debtors believe that it is important for equitable reasons to preserve the value of the Disputed Cash for potential recovery to unsecured parties.  Consequently, the use of cash collateral is critical to preserve and maintain the going concern value of the Debtors.  Indeed, the use of cash collateral will result in increased revenue and cash flow and administrative cost-savings for the Debtors and will enhance the prospects for a successful reorganization.

92.    For the reasons noted above, the Debtors have determined, in the exercise of their sound business judgment, that they require the use of cash collateral for the maintenance, preservation, and operation of their businesses; the expenses relating thereto; and the expenses of administering these estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Collateral Motion should be granted.

## **OPERATIONAL MOTIONS**

**E.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Continued Use of Existing Cash Management System, (B) Maintenance of Existing Bank Accounts, (C) Continued Use of Existing Business Forms, and (D) Continued Use of Existing Investment Practices; and (II)(A) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Claims and (B) Authorizing Continued Performance Under Certain Intercompany Arrangements and Historical Practices (the "*Cash Management Motion*")**

93.    The Debtors request entry of interim and final orders (i) authorizing the Debtors (a) to continue to utilize their cash management system (the "*Cash Management System*"), (b) to maintain their bank accounts (the "*Bank Accounts*"), (c) to continue to use their existing

stock of business forms, and (d) to continue their investment practices and to continue to maintain their investments; and (ii) authorizing the Debtors (a) to grant superpriority administrative expense status for intercompany claims junior to the claims of the First Lien Secured Parties and (b) to continue to perform certain intercompany arrangements and historical practices.  The Cash Management Motion also requests that the Court authorize the Debtors' and their non-Debtor affiliates' banks (the "***Banks***") to continue to maintain, service, and administer the Bank Accounts and to rely on the Debtors' instructions with respect to clearing checks and otherwise administering the Bank Accounts.  Certain of the relief requested in the Cash Management Motion constitutes "Extraordinary Relief" within the meaning of the Court's Administrative Order No. 565.

94.     In the ordinary course of business, the Debtors and their non-Debtor affiliates maintain an integrated Cash Management System, which provides well-established mechanisms for the collection, concentration, management, disbursement, and investment of funds from their operations.  I believe the Debtors' continued use of the Cash Management System is critical to the success of these chapter 11 cases.

95.     The Cash Management System consists of 24 Bank Accounts and is used to receive incoming electronic payments, deposit checks, and make disbursements by check, automatic clearing house payment, or wire transfer in the ordinary course of business.  As part of this Cash Management System, the Debtors maintain certain investments (the "***Investments***") with Federated Investors, Inc., including of the Disputed Cash, in accordance with their prepetition investment practices (the "***Investment Practices***").

96.     I believe the Cash Management System is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.  Indeed, it is my

understanding that large, multiple-entity businesses use such systems because of the benefits they provide, including the abilities to (a) quickly create status reports on the location and amount of funds, thereby allowing management to track and control corporate funds, (b) ensure cash availability, (c) redeploy funds within the system to where they are needed, and (d) reduce administrative expenses by facilitating the movement of funds.  I believe these controls are particularly important to the Debtors in light of the aggregate cash flows encompassed in the Cash Management System, including approximately $1.6 billion in receipts and $2.0 billion in disbursements (approximately $700 million of which represents debt-related payments) in the twelve month period ending May 31, 2013.

97.    In the ordinary course of business, the Debtors use a number of checks and other business forms.  To minimize expenses for their estates, the Debtors would like to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, and invoices) as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms.  The Debtors will use their reasonable best efforts to cause their business forms to reflect their status as debtors in possession after the Petition Date.  I believe this process will minimize expense to the Debtors' estates in connection with their business forms.

98.    Also in the ordinary course of business, the Debtors pay, honor, or allow the deduction from the applicable account of certain service charges and other fees, costs, and expenses required by the Banks (collectively, the "***Banking Fees***").  The Debtors request that the Court authorize the Banks to continue to charge the Banking Fees to the Debtors.  I believe that

payment of the Banking Fees is necessary to ensure uninterrupted use of the Cash Management System and is therefore critical for the Debtors and their estates.

99.     Finally, various of the Debtors and their non-Debtor affiliates maintain business relationships with each other, resulting in intercompany receivables and payables (the "***Intercompany Claims***") in the ordinary course of business.  Indeed, in connection with the daily operation of the Cash Management System (including transactions by subsidiaries without their own bank accounts), at any given time there may be Intercompany Claims owing between Debtors or between a Debtor and a non-Debtor affiliate in connection with the receipt and disbursement of funds and there may be recognitions of offsets between Debtors or between a Debtor and a non-Debtor affiliate (collectively, the "***Intercompany Transactions***").  I believe the Intercompany Transactions are critical to ensuring that liquidity is available where and when needed by the Debtors and their non-Debtor affiliates.

100.    I believe that absent the requested relief, the Debtors would be unable to effectively maintain their financial operations, which would cause immediate and irreparable harm to the Debtors, their estates, creditors, and all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

> **F.      Debtors' Motion for Entry of Interim and Final Orders Authorizing, but not Directing, Payments of Prepetition (I) Wages, Salaries, and Other Compensation; (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits (the "*Wages Motion*")**

101.    The Debtors request entry of interim and final orders authorizing the Debtors to pay prepetition wages, salaries, other compensation, reimbursable employee expenses, severance obligations (to the extent requested), and unpaid deductions and payroll taxes and to continue various employee benefits programs.  The Wages Motion also requests that the Court authorize and direct financial institutions to receive, process, honor, and pay checks presented for payment

and electronic payment requests relating to prepetition employee obligations. Certain of the relief requested in the Wages Motion constitutes "Extraordinary Relief" within the meaning of the Court's Administrative Order No. 565.

102.    As of the Petition Date, the Debtors employ approximately 4,200 employees in the United States (collectively, the "*U.S. Employees*") and approximately 1,000 employees in other countries around the world (the "*International Employees*," and together with the U.S. Employees, the "*Employees*").[21]    Approximately 5,100 of the Employees are full-time employees and approximately 100 of the Employees are part-time employees.

103.    In addition to their Employees, the Debtors supplement their workforce by utilizing approximately 4,800 independent contractors (the "*Independent Contractors*") annually that are vital to the creative content of the Debtors' businesses.[22]

104.    The Employees, Independent Contractors, and Temporary Employees (collectively, the "*Debtors' Workforce*") perform a variety of critical functions, including: purchasing and sales, software and product development, distribution and shipping, marketing, customer service and support, accounting, management, legal, technical services, and other related tasks. The Debtors' Workforce provides valuable skill sets, institutional knowledge, and an understanding of the Debtors' operations and customer relations.

105.    Further, it is my understanding that the vast majority of the Debtors' Workforce relies exclusively on compensation and benefits to pay daily living expenses and will be exposed to significant financial difficulties if the Debtors are not permitted to continue paying

---

[21]    Because all of the Debtors are organized under the laws of the various states in the United States, and because none of the foreign affiliates are parties to these chapter 11 cases, unless otherwise noted herein, the Debtors have limited the description of their work force and benefits programs to their domestic operations.

[22]    The Debtors also utilize temporary employees (the "*Temporary Employees*") on an ad hoc basis to fulfill administrative, legal, and other functions outside of the creative content context. The Temporary Employees, for the most part, are included within the Independent Contractors group.

compensation, providing benefits, and maintaining certain programs benefiting the Debtors' Workforce. Moreover, if the Debtors are unable to satisfy such obligations, I believe that Employee morale and loyalty will be jeopardized at a time when Employee support is most critical.

106.    I also believe that the Independent Contractors and Temporary Employees provide services, knowledge, and skills that are vital to the success of the Debtors' businesses and that it is essential for the Debtors to honor all obligations owing to the Independent Contracts and Temporary Employees.

107.    If this authority is not granted and the Debtors are unable to pay their obligations to the Debtors' Workforce, I believe the Debtors' Workforce may be exposed to financial difficulty, experience weakened morale, and may even seek alternative employment opportunities, perhaps with the Debtors' competitors. I further believe that the Debtors' Workforce is absolutely essential to the success of these chapter 11 cases and that ensuring their morale and loyalty will benefit all parties in interest. Failure to do so could cause immediate and irreparable harm to the Debtors and their estates. Accordingly, I respectfully submit that the Wages Motion should be approved.

  **G.**  **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to Continue to Honor Obligations to Customers in the Ordinary Course of Business and Honor Certain Prepetition Obligations Arising from Customer Programs and Practices (the "*Customer Programs Motion*")**

108.    The Debtors request entry of interim and final orders authorizing the Debtors to maintain and administer customer programs (the "*Customer Programs*") and honor prepetition obligations to customers related thereto in the ordinary course of business and in a manner consistent with past practice. Certain of the relief requested in the Customer Programs Motion

constitutes "Extraordinary Relief" within the meaning of the Court's Administrative Order No. 565.

109.    To maintain the loyalty and goodwill of their customers, in the ordinary course of business the Debtors use various Customer Programs to encourage new purchases, enhance customer satisfaction, sustain goodwill, and ensure the Debtors' competitiveness. The Debtors' ability to honor their obligations under the Customer Programs in the ordinary course of business is necessary to retain their customer base and reputation for quality. I believe that the relief requested in the Customer Programs Motion will pay dividends with respect to the long-term reorganization of the Debtors' businesses—both because it will increase profits and because it will  engender goodwill, which is especially critical following the filing of these chapter 11 cases.

110.    I therefore believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate in the ordinary course without disruption. I understand that the Debtors operate in a highly competitive market, and I am informed that their failure to maintain their Customer Programs would risk losing customers to their competitors. Thus, discontinuing or not honoring their obligations under the Customer Programs could cause immediate and irreparable harm to the Debtors and their estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

**H.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Claims of Shippers, Warehousemen, and Lien Claimants and (II) Granting Administrative Expense Priority to All Undisputed Obligations for Goods Ordered Prepetition and Delivered Postpetition and Authorizing the Debtors to Satisfy Such Obligations in the Ordinary Course of Business (the "*Shippers, Warehousemen, and Lien Claimants Motion*")**

111.    The Debtors seek entry of interim and final orders authorizing the Debtors to pay, in their sole discretion, certain prepetition claims held by shippers, the warehouseman, and materialman's lien claimants.  Certain of the relief requested in the Shippers, Warehousemen, and Lien Claimants Motion constitutes "Extraordinary Relief" within the meaning of the Court's Administrative Order No. 565.

112.    I believe and have been advised that certain of the shippers and the warehouseman engaged by the Debtors have goods in their possession.  It is my understanding that the shippers and warehouseman, as bailees, may be entitled to adequate protection as holders of possessory liens on the goods in their possession.  I also believe that the Debtors routinely contract with third parties to maintain and fix equipment owned by the Debtors and renovate certain of the Debtors' facilities.  I believe and have been advised that such providers could potentially assert state law statutory liens against the estates, including mechanic's liens and materialman's liens.  I further believe that in the days leading up to the Petition Date, the Debtors placed orders for goods in the ordinary course of business.  I believe and have been advised the vendors that sold those goods to the Debtors may have claims against the Debtors' estates that are entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code.  I further believe that, as of the Petition Date, the outstanding prepetition claims of the shippers, warehouseman, mechanics, contractors, and suppliers total approximately $2,845,000.

113.    I believe that the relief requested in the Shippers, Warehousemen, and Lien Claimants Motion is in the best interest of the Debtors' estates, their creditors, and all other

parties in interest.  Indeed, because of the control and influence these parties have over certain of the Debtors' assets and operations, failure to pay their claims would threaten immediate and irreparable harm to the Debtors and their estates.  I further believe that the relief sought in the Shippers, Warehousemen, and Lien Claimants Motion will not prejudice unsecured creditors, considering that the Debtors will only pay those claims that it believes, in its business judgment, are secured by valid liens or capable of being secured by perfecting liens in the Debtors' property.  Accordingly, on behalf of the Debtors, I respectfully submit that the Shippers, Warehousemen, and Lien Claimants Motion should be approved.

I.    **Debtors' Motion for Entry of Interim and Final Orders Establishing Notification and Hearing Procedures for Transfers of, or Claims of Worthlessness With Respect to, Certain Equity Securities and for Related Relief (the "*Equity Trading Motion*")**

114.    The Debtors request entry of interim and final orders (i) establishing notification and hearing procedures regarding the trading of, or declarations of worthlessness for federal or state tax purposes with respect to, equity securities of Debtor Cengage Learning Holdings II, L.P. (the "*Equity Securities*") that must be complied with before trades or transfers of such securities or declarations of worthlessness become effective, and (ii) ordering that any purchase, sale, or other transfer of, or declaration of worthlessness with respect to the Equity Securities in violation of the procedures set forth below shall be void *ab initio*.  Certain of the relief requested in the Equity Trading Motion constitutes "Extraordinary Relief" within the meaning of the Court's Administrative Order No. 565.

115.    I am informed that the Debtors have incurred, and are currently incurring, significant net operating losses ("*NOLs*"), amounting to approximately $965 million as of the Petition Date (including estimated NOLs of $735 million for the Debtors' tax year ending June 30, 2013) and translating to potential tax savings of approximately $294 million.

116.    I believe that the Debtors' NOLs are substantial and that any loss of the Debtors' ability to utilize the NOLs could cause significant and irreparable damage to the estates and stakeholders in these chapter 11 cases.  If no restrictions on trading or worthlessness deductions are imposed by the Court, I am informed that such trading or deductions could severely limit or even eliminate the Debtors' ability to use their NOLs, which are otherwise a highly valuable asset of the Debtors' estates.  I further believe that granting the relief sought in the Equity Trading Motion on an interim basis is necessary to avoid an irrevocable loss of the NOLs and the immediate and irreparable harm that would be caused through the Debtors' loss of their ability to offset taxable income in the future with the NOLs.  Accordingly, on behalf of the Debtors, I respectfully submit that the Equity Trading Motion should be approved.

**J.      Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payments of Certain Prepetition Taxes and Fees (the "*Taxes Motion*")**

117.    The Debtors request entry of interim and final orders authorizing, but not directing, the Debtors to pay certain prepetition taxes (the "*Taxes*") and fees (the "*Fees*") owed to certain taxing and governmental authorities (the "*Authorities*") as they arise after the Petition Date.  The Taxes Motion also requests that the Court authorize and direct financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition Taxes and Fees, provided that there are sufficient good funds standing to the Debtors' credit in the applicable accounts to make the payments.  Certain of the relief requested in the Taxes Motion constitutes "Extraordinary Relief" within the meaning of the Court's Administrative Order No. 565.

118.    The Company incurs sales and use taxes, franchise, business, and similar taxes, real and personal property taxes, income taxes, foreign withholding taxes, and intellectual property fees payable to the Authorities in connection with its businesses.  As of the Petition

Date, I understand the Debtors estimate they owe approximately $4.5 million on account of prepetition Taxes and Fees. Of this amount, I am informed that approximately $1.5 million will come due during the first 21 days after the Petition Date.

119.    I believe the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest. It is my understanding that the Debtors must continue to pay the Taxes and Fees to continue operating in certain jurisdictions and to avoid costly distractions during these chapter 11 cases. I am informed by the Debtors' advisors that if the Debtors fail to pay the Taxes and Fees, the Authorities could suspend the Debtors' operations, file liens, or seek to lift the automatic stay. It is also my understanding that certain Authorities may take precipitous action against the Debtors' directors and officers for unpaid Taxes and Fees, which would undoubtedly distract those key employees from their duties. Thus, failure to pay the Taxes and Fees would lead to immediate and irreparable harm to the Debtors and their estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

## MOTIONS REQUESTING RELIEF AT A LATER HEARING

**K.    Debtors' Motion for Entry of an Order Authorizing Debtors to Pay Certain Prepetition Claims of Authors and Content Sources and Procedures Related Thereto (the "*Authors & Content Motion*")**

120.    The Debtors request entry of an order (i) authorizing, but not directing, the Debtors to pay certain prepetition claims of the authors (the "*Authors*") and other sources of content (the "*Content Sources*"), whom the Debtors rely on for content for their publications, and (ii) approving related procedures. The Authors & Content Motion also requests that the Court authorize financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition obligations to the Authors and

Content Sources, provided that there are sufficient good funds standing to the Debtors' credit in the applicable accounts to make the payments.

121.    It is my understanding and belief that content is the lifeblood of the Debtors' business.  The Debtors rely on third parties to create a collection of content that is attractive to the Debtors' various customers.  First, the Debtors rely on over 16,000 Authors with whom they have cultivated strong relationships to create the titles that comprise the Debtors' catalogue of textbook products.  Second, the Debtors rely on the Content Sources to provide materials or services that:  (a) are integral to the development and use of the Authors' content; (b) serve as the primary features of certain products; or (c) otherwise allow the Debtors to timely and cost-effectively obtain vital content needed to produce products.  The Content Sources provide unique materials such as periodicals, artifacts, print and digital archives, software, and other licensed content, as well as services that are necessary to create and deliver the Debtors' content to their target audiences.

122.    The Debtors estimate that as of the Petition Date, there are approximately 16,000 Authors who are owed approximately $80.4 million in prepetition amounts.  The Debtors estimate that the Content Sources are owed approximately $3 million in prepetition amounts.

123.    I believe the Debtors must maintain harmonious relationships with the Authors and the Content Sources to thrive in their lines of business.  I believe that failure to timely meet the Debtors' payment obligations to the Authors and Content Sources will significantly disrupt the productive relationships the Debtors have with these parties, producing short-term and long-term issues and causing harm to the Debtors and their estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Authors & Content Motion should be approved.

**L.     Debtors' Motion for Entry of an Order Authorizing the Debtors to Continue Their Insurance Programs, Surety Bonds, and Related Practices (the "*Insurance Motion*")**

124.    The Debtors request entry of an order authorizing, but not directing, the Debtors (i) to continue their prepetition insurance policies (the "***Insurance Policies***") and surety bonds (the "***Surety Bonds***") and honor obligations thereunder with their insurance carriers, insurance brokers (the "***Insurance Brokers***"), and Surety Bond counterparties, and (ii) to revise, extend, supplement, or change their insurance coverage by, among other things, entering into new insurance policies, renewing the current Insurance Policies or Surety Bonds, or purchasing new postpetition policies or bonds.  The Insurance Motion also requests that the Court authorize and direct financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to prepetition obligations related to the Insurance Policies, Insurance Brokers, or Surety Bonds, provided that there are sufficient good funds standing to the Debtors' credit in the applicable accounts to make the payments.

125.    In the ordinary course of business, the Debtors utilize 18 Insurance Policies that are maintained and administered by several third-party insurance carriers.  These policies provide coverage for, among other things, (a) commercial general liability, (b) commercial automobile liability, (c) property liability, (d) commercial crime liability, (e) employment practices liability, (f) fiduciary liability, (g) errors and omissions liability, (h) directors and officers liability, (i) directors and officers excess liability, (j) commercial excess liability (umbrella), (k) workers' compensation liability,[23] and (l) business travel accident liability.

126.    I am informed that the Debtors owe a fee to one of their Insurance Brokers for the period from July 1, 2013 to the Petition Date.  I am further informed that the Debtors do not owe

---

[23]    The Debtors seek authority to continue to administer their prepetition insurance coverage policies and practices related to workers' compensation pursuant to the Wages Motion.

any other amounts for prepetition obligations under the Insurance Policies or Surety Bonds or to the Insurance Brokers.

127.    I believe that failure to pay expenses related to the Insurance Policies, Insurance Brokers, or Surety Bonds may harm the Debtors' estates and, therefore, all parties in interest. Specifically, it is my understanding that failure to pay such expenses may affect the Debtors' ability to maintain its insurance coverage.  I believe that any lapse in insurance coverage would expose the Debtors' estates and creditors to significant risk.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**M.    Debtors' Motion for Entry of an Order Determining Adequate Assurance of Payment for Future Utility Services (the "*Utilities Motion*")**

128.    The Debtors request entry of an order (a) determining that the Debtors' utility providers (the "*Utility Providers*") have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code, (b) approving the Debtors' proposed adequate assurance, (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance, and (d) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this motion and the proposed adequate assurance procedures.

129.    In operating their businesses, I understand the Debtors use gas, electricity, water, waste disposal, telephone, internet, cable, and other services (collectively, the "*Utility Services*") provided by over 40 utility providers.  In the twelve-month period prior to the Petition Date, the Debtors paid an average of approximately $820,000 per month on account of Utility Services. The Debtors intend to pay all postpetition undisputed obligations owed to the Utility Providers in

a timely manner and anticipate that there will be sufficient funds available from cash on hand and cash from operations to permit them to do so.

130.    Furthermore, the Debtors propose to deposit $410,000 (the "***Adequate Assurance Deposit***") into a newly-created, segregated, interest-bearing bank account within five business days of entry of the proposed order approving the Utilities Motion.  The Adequate Assurance Deposit represents an amount equal to the estimated aggregate cost paid to the Utility Providers for approximately two weeks of Utility Services.  I believe that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for utilities services out of operational cash flow and liquidity provided by their cash on hand demonstrate the Debtors ability to pay for future utility services in the ordinary course of business and constitute sufficient adequate assurance to the Utility Providers.

131.    If any Utility Provider believes adequate assurance is required beyond the Proposed Adequate Assurance, the Debtors request that it be required to request such assurance pursuant to the procedures detailed in the Utilities Motion.

132.    I believe that uninterrupted Utility Services are essential to the Debtors' ongoing business operations, and hence the overall success of these chapter 11 cases.  Should any Utility Provider refuse or discontinue service, even for a brief period, I believe the Debtors' business operations could be severely disrupted, and such disruption would jeopardize the Debtors' ability to manage their reorganization efforts.  Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Brooklyn, New York
Dated:  July 2, 2013

*/s/ Dean D. Durbin*
_____
Dean D. Durbin
Chief Financial Officer
Cengage Learning GP I LLC

## Exhibit A

### Organizational Structure Chart



**<u>Exhibit B</u>**

**Schedules to Durbin Declaration**

## Schedule 1

### List of Committees Formed Before the Petition Date

Before the Petition Date, the following entities formed an *ad hoc* committee of First Lien Holders (the "***First Lien Committee***"):

| First Lien Committee Member | Advisors |
|---|---|
| Certain lenders under the First Lien Credit Facility Agreement and certain holders of notes issued under the First Lien Notes Indenture | **Legal Counsel**: <br> Milbank, Tweed, Hadley & McCloy LLP <br> 1 Chase Manhattan Plaza <br> New York, NY 10005 <br> Attn: Dennis F. Dunne <br><br> **Financial Advisor**: <br> Houlihan Lokey Capital, Inc. <br> 10250 Constellation Blvd. <br> Los Angeles, CA 90067 <br> Attn: Irwin Gold |

Before the Petition Date, the following entities formed an *ad hoc* committee of Second Lien Holders (the "***Second Lien Committee***"):

| Second Lien Committee Member | Advisors |
|---|---|
| Certain holders of notes issued under the Second Lien Notes Indenture | **Legal Counsel**: <br> Akin Gump Strauss Hauer & Feld LLP <br> 399 Park Ave. <br> New York, NY 10022 <br> Attn: Ira S. Dizengoff <br><br> **Financial Advisor**: <br> Perella Weinberg Partners LP <br> 767 Fifth Avenue <br> New York, NY 10153 <br> Attn: Mike Kramer, Josh Scherer |

## Schedule 2

## 30 Largest Unsecured Claims

Pursuant to Local Rule 1007-4(a)(v), the following provides information with respect to the holders of the 30 largest unsecured claims against the Debtors on a consolidated basis. The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts as of June 29, 2013.

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 1 | Wilimington Trust, National Association | Wilimington Trust, National Association<br>Attn: Julie Becker<br>As Admin Agent : Senior Unsecured Notes<br>50 South Sexth Street<br>Minneapolis, MN  55402<br>United States<br><br>Phone: (612) 217-5628 | Senior Unsecured Notes | | $  292,104,000 |
| 2 | Bank of Oklahoma | Bank of Oklahoma<br>Attn: Mary P. Campbell<br>As Admin Agent : Senior Subordinated Discount Notes<br>One Williams Center<br>Tulsa, OK  74172<br>United States<br><br>Phone: (918) 588-6111 | Senior Subordinated Discounted Notes | | $  131,963,000 |
| 3 | Wells Fargo Bank, National Association | Wells Fargo Bank, National Association<br>Attn: Raymond Delli Colli - Vice President<br>As Admin Agent : Senior PIK Notes<br>150 East 42Nd Street, 40Th Floor<br>New York, NY  10017<br>United States<br><br>Phone: (917) 260-1534<br>Fax: (917) 260-1593<br>Email: Raymond.dellicolli@wellsfargo.com | Senior PIK Notes | | $    63,607,025 |

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 4 | RR Donnelley | RR Donnelley Attn: Thomas J. Quinlan III - President and Chief Executive Officer 111 S Wacker Dr #3600 Chicago, IL 60606 United States<br><br>Phone: (312) 326-8000 Fax: (312) 326-8001 | Trade Payable | Unliquidated | $ 4,435,150 |
| 5 | The Booksource | The Booksource Attn: Neil Jaffe - President 1230 Macklind Ave. St. Louis, MO 63110 United States<br><br>Phone: (314) 647-0600 Fax: (314) 647-6850 | Trade Payable | Unliquidated | $ 2,342,858 |
| 6 | N. Gregory Mankiw | Personal Information (Actual Information Provided to U.S. Trustee) | Royalties | | $ 1,618,249 |
| 7 | The Thomson Corporation | The Thomson Corporation Attn: Deirdre Stanley - General Counsel & EVP Metro Center, One Station Place Stamford, CT 06902 United States<br><br>Phone: (203) 539-8000 Fax: (203) 539-7779 | Tax Indemnification | Unliquidated, Contingent | $ 1,460,000 |
| 8 | QA Info Tech Pvt Ltd | QA Info Tech Pvt Ltd Attn: Mukesh Sharma - Chief Executive Officer B-8, Sector 59 Noida, U.P. 201301 India<br><br>Phone: 91 12 0429 4329 Fax: 91 12 0258 1692 | Trade Payable | | $ 1,027,303 |
| 9 | National Geographic Society | National Geographic Society Attn: John M. Fahey, Jr. - President and Chief Executive Officer 1145 17th Street N.W Washington, DC 20036-4688 United States<br><br>Phone: (202) 857-7000 Fax: (202) 857-7741 | Trade Payable, Royalties | | $ 697,231 |

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 10 | Arvato Digital Services LLC | Arvato Digital Services LLC Attn: Frank Schirrmeister - Chief Executive Officer, North America 29011 Commerce Center Dr Valencia, CA 91355 United States<br><br>Phone: (661) 702-2789 Fax: (661) 702-2841 | Trade Payable | Unliquidated | $    669,042 |
| 11 | Jackson J. Spielvogel | Personal Information (Actual Information Provided to U.S. Trustee) | Royalties | | $    626,676 |
| 12 | Compro Technologies Private Limited | Compro Technologies Private Limited Attn: Kanwarjit Singh Chadha - Managing Director LSC Uday Park, Khel Gaon Marg New Delhi , 110049 India<br><br>Phone: 91 11 4201 1900 Fax: 91 11 2652 7016 | Trade Payable | | $    624,000 |
| 13 | Teaching Strategies | Teaching Strategies Attn: Grant Davies - Chief Executive Officer 7101 Wisconsin Ave Bethesda, MD 20814 United States<br><br>Phone: (301) 634-0818 Fax: (301) 634-0825 | Royalties | | $    580,505 |
| 14 | West Group | West Group Attn: Peter Warwick - President and Chief Executive Officer 610 Opperman Drive Eagan, MN 55123 United States<br><br>Phone: (651) 687-7000 Fax: (651) 687-5642 | Trade Payable | Unliquidated | $    570,181 |
| 15 | Lindenmeyr | Lindenmeyr Attn: Robert G. McBride - Executive Vice President Three Manhattanville Road Purchase, NY 10577 United States<br><br>Phone: (914) 696-9300 Fax: (914) 696-1066 | Trade Payable | | $    565,568 |

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 16 | Hollister Associates | Hollister Associates Attn: Kip Hollister - Chief Executive Officer 75 State Street Floor 9 Boston, MA  02109-1822 United States<br><br>Phone: (617) 654-0200 Fax: (617) 695-3807 | Trade Payable | | $ 534,536 |
| 17 | Carl S. Warren | Personal Information (Actual Information Provided to U.S. Trustee) | Royalties | | $ 489,509 |
| 18 | Eugene F. Brigham Trustee | Eugene F. Brigham Trustee 585 Country Club Dr Highlands, NC  27587 United States<br><br>Phone: (828) 526-4883 | Royalties | | $ 473,918 |
| 19 | David Nunan | Personal Information (Actual Information Provided to U.S. Trustee) | Royalties | | $ 472,856 |
| 20 | IXL Learning | IXL Learning Attn: Paul Mishkin - Chief Executive Officer 777 Mariners Island Blvd, Suite 600 San Mateo, CA  94404 United States<br><br>Phone: (650) 372-4040 Fax: (650) 372-4301 | Royalties | | $ 447,808 |
| 21 | Von Hoffmann Corporation | Von Hoffmann Corporation Attn: Michael L. Bailey  - Chief Executive Officer 1714 Deer Tracks Trails St. Louis, MO  63131 United States<br><br>Phone: (314) 966-0909 Fax: (314) 966-0910 | Trade Payable | Unliquidated | $ 445,624 |
| 22 | Cincinnati Bell Tech Solutions | Cincinnati Bell Tech Solutions Attn: John Burns - President and General Manager 4600 Montgomery Road Suite 400 Cincinnati, OH  45212 United States<br><br>Phone: (513) 841-2287 Fax: (513) 841-5072 | Trade Payable | | $ 436,663 |

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 23 | John C. Kotz | Personal Information (Actual Information Provided to U.S. Trustee) | Royalties | | $    428,352 |
| 24 | China Translation & Printing SVC | China Translation & Printing SVC Attn: Peter Po-Tak Tse - Chief Executive Officer 6/F Reliance, Manufactory Building 24 Wong Chuk Hang Road Aberdeen,   523771 Hong Kong<br><br>Phone: (852) 2873-1823 Fax: (852) 2873-6510 | Trade Payable | Unliquidated | $    419,200 |
| 25 | First Advantage Talent Management | First Advantage Talent Management Attn: Mark Parise - Chief Executive Officer 1100 Alderman Drive Alpharetta, GA  30005 United States<br><br>Phone: (866) 400-3238 | Trade Payable | | $    419,050 |
| 26 | Pearson Education Australia | Pearson Education Australia Attn: David Barnett - Chief Executive Officer Level 3/ 14 Aquatic Drive French Forest, NSW,   2086 Australia<br><br>Phone: (02) 9454-2200 Fax: (02) 9453-0089 | Trade Payable | Unliquidated | $    416,076 |
| 27 | Globus Printing Company Inc | Globus Printing Company Inc Attn: Dennis Schmiesing - President One Executive Pkwy Minster, OH  45865 United States<br><br>Phone: (419) 628-2381 Fax: (419) 628-3105 | Trade Payable | Unliquidated | $    392,748 |
| 28 | Silverbull Software | Silverbull Software Attn: Chief Executive Office 406 Farmington Ave Farmington, CT  06032 United States<br><br>Phone: (860) 292-0874 Fax: (866) 234-6525 | Trade Payable | | $    389,951 |

| | Name of Creditor | Complete mailing address, and employee, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 29 | Larson Texts Inc. | Larson Texts Inc. Attn: Robert S. O'Neil - President and Chief Executive Officer 1762 Norcross Rd Erie, PA 16510 United States

Phone: (814) 824-6365 Fax: (814) 824-6377 | Contractual Agreement | Unliquidated | Undetermined |
| 30 | Gary B. Shelly | Personal Information (Actual Information Provided to U.S. Trustee) | Contractual Agreement | Contingent Unliquidated | Undetermined |

## Schedule 3

## 5 Largest Secured Claims

Pursuant to Local Rule 1007-4(a)(vi), the following table lists the creditors holding, as of the Petition Date, the only non-contingent secured claims against the Debtors, on a consolidated basis. In addition to the parties listed below, the Debtors may have unliquidated and/or contingent claims against them as a result of parties asserting a security interest against the Debtors' assets, such as through UCC filings. Such parties are not included below.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Creditor | Contact Information | Amount of Claim as of July 1, 2013 | Description and Estimated Value of Collateral |
|---|---|---|---|
| JPMorgan Chase Bank, N.A., as Administrative Agent and Collateral Agent | 383 Madison Ave. New York, NY 10179 Attn: Spencer Y. Liu | $ 3,880.6 million | Most of the Debtors' assets, with certain exceptions—value unknown. |
| The Bank of New York Mellon, as Trustee and Collateral Agent | 101 Barclay St., Fl. 8W New York, NY 10286 Attn: Mary Miselis | $ 742.6 million | Most of the Debtors' assets, with certain exceptions—value unknown. |
| CSC Trust Company of Delaware | 2711 Centerville Rd., Ste. 220 Wilmington, DE 19808 Attn: Sandra E. Horwitz | $ 752.7 million | Most of the Debtors' assets, with certain exceptions—value unknown. |

## Schedule 4

### Summary of Debtors' Assets and Liabilities

The following financial data (unaudited) is the latest available information and reflects the Debtors' financial condition, as consolidated with their domestic and international affiliates, as of March 31, 2013.  The following financial data shall not constitute an admission of liability by the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein as liquidated or fixed is in fact a disputed claim or debt. The Debtors reserve all rights to challenge the priority, nature, amount, or status of any claim or debt.

**Total Assets (Book Value):** $ 4,678.9 million
**Total Liabilities:** $ 6,468.9 million[1]

---

[1] In addition to the Debtors' obligations arising under the First Lien Credit Facility, First Lien Notes Indenture, Second Lien Notes Indenture, Senior Unsecured Notes Indenture, Senior PIK Notes Indenture, Senior Subordinated Discount Notes Indenture, and outstanding trade debt, the total liabilities listed herein include amounts owed on account of certain non-trade items, such as intercompany balances and tax liabilities.

## Schedule 5

**Debtors' Publicly Held Securities**

As of the Petition Date, the record holders of the Debtors' publicly held securities are as follows:

- the record holder of the First Lien Notes is The Bank of New York Mellon, as trustee;
- the record holder of the Second Lien Notes is CSC Trust Company of Delaware, as trustee;
- the record holder of the Senior Unsecured Notes is Wilmington Trust Company, as trustee;
- the record holder of the Senior Subordinated Discount Notes is BOKF, NA, d/b/a Bank of Oklahoma, as trustee; and
- the record holder of the Senior PIK Notes is Wells Fargo Bank, National Association, as trustee.

## Schedule 6

### Property Not in the Debtors' Custody

In the ordinary course of business, property of the Debtors is likely to be in the possession of various third parties, including, suppliers, maintenance providers, shippers, common carriers, custodians, public officers, or escrow or other agents.  Through these arrangements, the Debtors' ownership interest is not affected.  In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would generally be impractical.  Below, the Debtors have provided information for the entity holding for the most significant portions of the Debtors' assets not in the Debtors' custody.

| Entity | Contact Information | Relationship to Debtors |
|---|---|---|
| Verst Group Logistics, Inc. | 300 Shorland Dr.<br>Walton, KY 41094<br>Tel: (859) 485-1212 | Owner and manager of a facility leased by the Debtors to store excess inventory. |

## Schedule 7

## Debtors' Owned or Leased Real Property

| Debtor | Property Address | Owned / Leased |
|---|---|---|
| Cengage Learning, Inc. | 1 North State Street<br>Chicago, IL  60602 | Leased |
| Cengage Learning, Inc. and Cengage Learning Acquisitions, Inc. | 10 & 20 Channel Center Street<br>Boston, MA  02210 | Leased |
| Cengage Learning, Inc. | 10 Water Street<br>Waterville, ME  04901 | Leased |
| Cengage Learning, Inc. and Cengage Learning Acquisitions, Inc., guaranteed by Cengage Learning Holdings II, L.P. | 10650 Toebben Drive<br>Independence, KY  41051 | Leased |
| Cengage Learning, Inc. | 1115 Broadway<br>New York, NY  10010 | Leased (license agreement) |
| Cengage Learning, Inc. | 20 Davis Drive<br>Belmont, CA  94002 | Leased |
| Cengage Learning, Inc. | 321 Research Parkway<br>Meriden, CT  06450 | Leased |
| Cengage Learning, Inc. | 40880-B County Center Drive<br>Temecula, CA  92591 | Leased |
| Cengage Learning, Inc. | 500 Office Center Drive<br>Fort Washington, PA  19034 | Leased (executive office suite) |
| Cengage Learning, Inc., guaranteed by Cengage Learning Holdings II, L.P. | 5191 Natorp Blvd., Suite 600<br>Mason, OH  45040 | Leased |
| Cengage Learning, Inc. | 75 Greene Street<br>New York, NY  10012 | Leased |
| Cengage Learning, Inc. | 1125 17th Street NW<br>Washington, DC  20036 | Leased (sublease) |
| Cengage Learning, Inc. | 25-35 Thomson Place<br>Boston, MA  02210 | Leased |
| Cengage Learning, Inc. | 2640 Eagan Woods Drive<br>Eagan, MN  55121 | Leased |
| Cengage Learning, Inc. | 3100 Cumberland Boulevard, SE<br>Atlanta, GA  30339 | Leased |
| Cengage Learning, Inc. and Cengage Learning Holdings II L.P. | 3701 Kirby Drive<br>Houston, TX  77098 | Leased |
| Cengage Learning, Inc., guaranteed by Cengage Learning Holdings II, L.P. | 5 Maxwell Drive<br>Clifton Park, NY  12065 | Leased |
| Cengage Learning, Inc. and Cengage Learning Holdings II L.P. | 500 W. 7th Street<br>Fort Worth, TX  76102 | Leased (sublease) |

| Debtor | Property Address | Owned / Leased |
|---|---|---|
| Cengage Learning, Inc. | 200 First Stamford Place<br>Stamford, CT  06902 | Leased |
| Cengage Learning, Inc. | 104 Willowbrook Lane,<br>West Chester, PA 19382 | Leased |
| Cengage Learning, Inc. | 12 Lunar Drive<br>Woodbridge, CT  06525 | Owned |
| Cengage Learning, Inc. | 27500 Drake Road<br>Farmington Hills, MI  48331 | Owned |
| Cengage Learning, Inc. | 6 & 8 Davis Drive<br>Belmont, CA  94002 | Owned |
| Cengage Learning, Inc. | 10 Davis Drive<br>Belmont, CA  94002 | Owned |

## Schedule 8

### Location of Debtors' Substantial Assets and Books and Records

Pursuant to E.D.N.Y. LBR 1007-4(a)(xi), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

**Location of Debtors' Substantial Assets**

The Debtors believe that their substantial assets are located at the following locations:

| Location of Debtors' Substantial Assets |
| --- |
| 20 Davis Drive<br>Belmont, CA  94002 |
| 6 & 8 Davis Drive<br>Belmont, CA  94002 |
| 10 Davis Drive<br>Belmont, CA  94002 |
| 10 & 20 Channel Center Street<br>Boston, MA  02210 |
| 25-35 Thomson Place<br>Boston, MA  02210 |
| 1 North State Street<br>Chicago, IL  60602 |
| 5 Maxwell Drive<br>Clifton Park, NY  12065 |
| 27500 Drake Road<br>Farmington Hills, MI  48331 |
| 500 W. 7th Street<br>Fort Worth, TX  76102 |
| 10650 Toebben Drive<br>Independence, KY  41051 |
| 5191 Natorp Blvd., Suite 600<br>Mason, OH  45040 |
| 200 First Stamford Place<br>Stamford, CT  06902 |
| 40880-B County Center Drive<br>Temecula, CA  92591 |
| 12 Lunar Drive<br>Woodbridge, CT  06525 |

**Books and Records**

The Debtors' books and records are located at their corporate headquarters at 200 First Stamford Place, 4th Floor, Stamford, Connecticut 06902.

**Debtors' Assets Outside the United States**

Debtor Cengage Learning Acquisitions, Inc. owns equity interests in two foreign subsidiaries and is the indirect parent of the Company's various, non-Debtor international affiliates.  The Debtors do not directly own any assets outside the U.S. of material value to the Debtors' estates.

## Schedule 9

**Pending Litigation**

| Case Name/Dispute Counterparty | Nature of Dispute | Status |
|---|---|---|
| *Book Dog Books v. Cengage Learning, Inc. & Pearson Education, Inc.* | Breach of Contract Claim | Pending |
| *Nord Deutsche Verlags GmbH v. Cengage Learning, Inc. & The Gale Group Inc.* | Trademark Cancellation | Pending |
| *In re Literary Works in Electronic Databases Copyright Litigation* | Copyright Infringement | Pending |
| *Robert Bagg, et al. v. Cengage Learning, Inc., et al.* | Violation of Advertising/Consumer Laws | Pending |
| ePAC Technologies, Inc. | Breach of Contract Claim | Pending (Mediation) |
| Berkshire Publishing | Copyright Infringement | Threatened |
| Photographers & Photo Agencies | Breach of License | Threatened |
| Annette M. Abbott | Patent Infringement | Threatened |

## Schedule 10

### Summary of the Debtors' Officers & Senior Management

**Michael Hansen** has served as the Chief Executive Officer of the Company since September 17, 2012.  Since 2008, Mr. Hansen had served as CEO of Elsevier Health Sciences, a unit of Reed Elsevier.  From 2006-2008, he was President and CEO of Harcourt Assessment, the education arm of Reed Elsevier, where he led a successful turnaround and sale of the business.  Before Reed Elsevier, Mr. Hansen was Executive Vice President, Operational Excellence at Bertelsmann, where he led a group-wide performance improvement initiative.  He began his career with Boston Consulting Group where he was a partner and co-chairman of their e-Business and Media practice.

**Dean D. Durbin** has served as Chief Financial Officer of the Company since July 27, 2009.  Prior to joining Cengage Learning, Mr. Durbin served as Chief Financial and Chief Operating Officer of American Media, Inc., a publisher and distributor of newspapers and magazines.  Prior to joining American Media, Inc. in 2008, over a 10-year period, he served as Chief Financial Officer, President, and Chief Operating Officer and, in his last year, as President and Chief Executive Officer of Vertis Communications, Inc., a marketing services company.  Earlier, Mr. Durbin served as Vice President and Chief Financial Officer for Thomson Professional Publishing, a division of Thomson Reuters Corporation from 1995-1997.  Mr. Durbin started his career at the McGraw-Hill Companies where in his 20 years of service he advanced through a variety of senior financial management positions in the company's publishing and information services divisions.  Mr. Durbin graduated from St. Francis University in 1974 with a B.S. in Accounting.

**Kenneth Carson** served as General Counsel of Thomson Learning beginning in 2001 and has served as General Counsel of Cengage Learning since consummation of the acquisition by the Sponsors in July 2007.  At the industry level, Mr. Carson is the Chairman of the Association of American Publishers' Copyright Committee.  From 1998 to 2001, Mr. Carson served as Assistant General Counsel for Thomson Reuters Corporation. From 1994 to 1998, Mr. Carson worked as Associate General Counsel for Thomson Reuters Corporation.  From 1989 to 1994, Mr. Carson was Assistant General Counsel at Macmillan Publishing Co., Inc.  He received his law degree from the University of Maryland.

**James Donohue** has served as Executive Vice President, Chief Product Officer of the Company since January 2013.  Prior to joining Cengage Learning, Mr. Donohue served as Managing Director of the Global Clinical Reference group at Elsevier Health Sciences.  Mr. Donohue began working at Elsevier in 2006 as Managing Director for Science and Technology Books and then as the Senior Vice President and General Manager of MD Consult.  Mr. Donohue holds a B.A. Honors in Political Science and Rhetoric from the University of Arizona, and an M.A. in Rhetoric and Public Address from the University of Iowa.

**David Faiman** has served as the Senior Vice President, Chief Accounting Officer for Cengage Learning since 2009.  Mr. Faiman had been the Senior Vice President of Finance and Accounting of Cengage Learning since the consummation of the acquisition by the Sponsors in

July 2007 and of Thomson Learning since January 2007.  He became Senior Vice President of Finance and Accounting after acting in such capacity during 2006.  Prior to that, he held the position of Vice President, Finance and Assistant Controller of Thomson Learning.  From 2004 to 2006, Mr. Faiman served as Assistant Controller.  From 2003 to 2004, Mr. Faiman worked as Director of Financial Reporting for CIGNA Corporation.  From 1995 to 2003, Mr. Faiman worked at PricewaterhouseCoopers LLP in the assurance and business advisory practice.  He received his B.S. in Business Administration from the University of Connecticut.

**Mark Howe** was appointed Executive Vice President of Human Resources for Cengage Learning in August 2012.  Prior to his current role, Mr. Howe served as Senior Vice President of Human Resources at Cengage Learning for five years.  From 1998 to 2007, Mr. Howe served as Vice President and then Senior Vice President of Thomson Learning.  Earlier in his career, Mr. Howe was Director, Human Resources with Matthew Bender & Co. (a subsidiary of Reed Elsevier) from 1989 to 1998, and Humans Resources Systems Supervisor with Avon Products, Inc. from 1986 to 1988.  Mr. Howe holds an M.B.A. in Human Resources Information Systems from the State University of New York at Albany and a B.S. in Business Administration from Cornell University.

**George Moore** has served as the Chief Technology Officer for the Company since December 2012.  Prior to joining Cengage Learning, Mr. Moore served as Chief Technology Officer of Elsevier Health Science, and also was Senior Vice President of Product Development for Thomson Reuter's Healthcare organization.  In addition, Mr. Moore served as Vice President of Product Development at Liquent, the industry leader in Pharmaceutical Publishing and Enterprise Resource Planning (ERP) software.

**William D. Rieders** has been a part of Cengage Learning management since January 2008 and was named Executive Vice President for Global Strategy & Business Development on September 15, 2011.  From July 2010 until September 2011, Mr. Rieders served as Executive Vice President, New Media prior to which he was Executive Vice President of Global New Media and Chief of Strategy, beginning in October 2008.  Between January and September 2008, he served as interim president of Nelson Education, Ltd., in Toronto, and currently serves on its Board of Directors.  Mr. Rieders also serves as a member of the board of managers of CourseSmart, LLC and is a past board member of the IMS Global Learning Consortium, as well as a member of the Board of the Charles River Watershed Association.  He is a graduate of Connecticut College and holds an M.B.A./M.S.I.A. from Carnegie Mellon University.  On April 23, 2013, the Company announced Mr. Rieders's decision to leave the Company, effective July 12, 2013.

**Kevin Stone** has served as the Chief Sales and Marketing Officer for the Company since December 2012.  Mr. Stone has more than 22 years of experience in the publishing industry, most recently serving as Chief Sales Officer of the Higher Education unit at Pearson.  Mr. Stone also worked at various subsidiaries of Pearson and held positions in editorial, marketing, technology and sales.  He holds an MBA from Boston University's Graduate School of Management and a BS in Marketing from Oswego State University of New York.

## Schedule 11

**Debtors' Gross Weekly Payroll Within 30 Days After the Petition Date**

Pursuant to E.D.N.Y. LBR 1007-4(a)(xiv)–(xv), the following provides the estimated amount of weekly payroll to the Debtors' employees and the estimated amount to be paid to officers, stockholders, directors and financial and business consultants retained by Debtors, for the 30 day period following the Petition Date.

| | | | |
|---|---|---|---|
| Payments to Employees (Not including Officers, Directors and Stockholders) | $ | 23.1 | million |
| Payments to Officers, Directors and Stockholders | $ | 0.5 | million |
|   Officers | $ | 0.4 | million |
|   Directors | $ | 0.1 | million |
|   Stockholders | $ | 0.0 | million |
| Payments to Financial and Business Consultants | $ | 0.0 | million |

## Schedule 12

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, and Unpaid Obligations and Receivables**

Pursuant to E.D.N.Y. LBR 1007-4(a)(xvi), the following provides, for the 30 day period following the Petition Date, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | | |
|---|---|---|
| Cash Receipts | $ 90.5 | million |
| Cash Disbursements | $ 80.2 | million |
| Net Cash Gain (Loss) | $ 10.3 | million |
| Unpaid Obligations | $ 30.9 | million |
| Unpaid Receivables | $ 283.9 | million |

## Exhibit C

**Restructuring Support Agreement**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (this "Agreement") is made and entered into as of July 2, 2013, by and among: (i) Cengage Learning Acquisitions, Inc. (the "Company"), Cengage Learning Holdco, Inc., Cengage Learning Holdings II, L.P., and Cengage Learning, Inc. (together with the Company, the "Debtors"), (ii) the undersigned Credit Agreement Lenders (as defined below) (together with their permitted successors and assigns, each, a "Consenting Credit Agreement Lender"), and (iii) the undersigned First Lien Noteholders (as defined below) (together with their permitted successors and assigns, each, a "Consenting First Lien Noteholder," and together with the Consenting Credit Agreement Lender, the "Consenting Lenders" or "Restructuring Support Parties"). Each of the Debtors, the Consenting Credit Agreement Lenders and the Consenting First Lien Noteholders shall be referred to as a "Party" and, collectively, as the "Parties."

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the restructuring term sheet attached hereto as Exhibit A, which term sheet and all annexes thereto are expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet, including all exhibits and annexes thereto, may be amended or modified in accordance with Section 6 hereof, the "Restructuring Term Sheet").

## RECITALS

**WHEREAS**, the Parties have engaged in arm's length good faith discussions regarding a restructuring of the Debtors' capital structure by any means (the "Restructuring"), including the Debtors' indebtedness and obligations under (i) that certain Credit Agreement, dated as of July 5, 2007, as subsequently amended by the Incremental Amendment, dated as of May 30, 2008 and the Amendment Agreement, dated as of April 10, 2012, and as further amended, modified, waived, or supplemented through the date hereof (as amended, the "First Lien Credit Facility"), by and among certain of the Debtors, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent for the First Lien Credit Facility (in such capacity, the "Credit Agreement Agent"), and the various lenders from time to time party thereto (collectively with the holders of economic interests or economic rights relating to the loans issued under the First Lien Credit Facility, the "Credit Agreement Lenders"), and (ii) that certain Indenture, dated as of April 10, 2012, providing for the issuance of 11.5% Senior Secured Notes due 2020 (as further amended, modified, waived, or supplemented through the date hereof, the "First Lien Indenture," such notes issued under such First Lien Indenture, the "First Lien Notes," and such holders of such First Lien Notes, the "First Lien Noteholders"), by and among certain of the Debtors and The Bank of New York Mellon, as trustee and collateral agent for the First Lien Indenture (the "First Lien Notes Agent" and together with the Credit Agreement Agent, the "First Lien Agents");

**WHEREAS**, each Party desires that the Restructuring be implemented through a joint chapter 11 plan of reorganization for the Debtors on the terms and conditions set forth in the Restructuring Term Sheet, consistent with this Agreement (the "Agreed Restructuring Plan"), and in form and substance acceptable to the Required Consenting Lenders (as defined below) hereto;

**WHEREAS**, to effectuate the Restructuring, the Debtors propose to commence voluntary reorganization cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"). In connection with the Chapter 11 Cases, the Debtors intend to file a disclosure statement (as may be amended from time to time, the "Disclosure Statement") and related Agreed Restructuring Plan;

**WHEREAS,** as set forth herein and consistent with the terms and conditions set forth in the Restructuring Term Sheet, the Debtors have agreed to use commercially reasonable efforts to obtain a new first out revolving credit facility in connection with the Agreed Restructuring Plan and emergence of the Debtors from Chapter 11 Cases (the "New Revolving Credit Facility"), in form and substance reasonably satisfactory to the Debtors and the Required Consenting Lenders;

**WHEREAS**, as set forth herein and in the Restructuring Term Sheet, the Consenting Lenders have agreed, to the extent that replacement financing has not been obtained on the terms set forth in this Agreement, that the holders of the First Lien Claims shall receive their pro rata share of a new first lien term loan (the "Rollover Facility"), on the terms and conditions set forth on Exhibit B hereto (the "Rollover Facility Term Sheet"); provided that, to the extent that replacement financing on a new first lien term loan facility is available to the Debtors on commercially reasonable terms (the "New Term Loan Facility"), the Debtors have agreed to seek a New Term Loan Facility, subject to the limitations and consent rights set forth herein;

**WHEREAS**, the Debtors, the Consenting Lenders and the Credit Agreement Agent have agreed to the terms of a consensual form of interim and final order (the "Cash Collateral Order"), in form and substance acceptable to the Consenting Lenders and the Credit Agreement Agent, regarding the Debtors' postpetition use of the cash collateral (as such term is defined in section 363 of the Bankruptcy Code) of the holders of First Lien Claims (the "Cash Collateral"), pursuant to that certain form of cash collateral order attached hereto as Exhibit C (the "Form Cash Collateral Order");

**WHEREAS**, each Party has agreed to the terms of certain governance documentation, including a shareholders' agreement and a registration rights agreement, on substantially the terms set forth in the equity term sheet attached hereto as Exhibit D (the "Equity Term Sheet" and together with the Agreed Restructuring Plan, Disclosure Statement, Restructuring Term Sheet, the Form Cash Collateral Order, the Equity Term Sheet and Rollover Facility Term Sheet, the "Restructuring Documents and Term Sheets");

**WHEREAS**, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the following sets forth the agreement among the Parties concerning their respective obligations; and

**WHEREAS**, each Party has reviewed or has had the opportunity to review the Restructuring Documents and Term Sheets and each Party has agreed to the terms of the Restructuring on the terms set forth in the Restructuring Documents and Term Sheets.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

<center>AGREEMENT</center>

**Section 1.    Agreement Effective Date; Conditions to Effectiveness.**

This Agreement shall become effective and binding upon each of the Parties immediately following the occurrence of the following conditions (the "Effective Date"):

    a.    Counsel to the Restructuring Support Parties shall have received duly executed signature pages for this Agreement signed by each of the Debtors;

    b.    The Debtors shall have received duly executed signature pages for this Agreement from the Restructuring Support Parties; and

    c.    The Debtors, the Consenting Lenders and the Credit Agreement Agent shall have agreed on the Form Cash Collateral Order, which shall be in form and substance acceptable to the Consenting Lenders and the Credit Agreement Agent.

Upon the Effective Date, the Restructuring Documents and Term Sheets shall be deemed effective for the purposes of this Agreement, and thereafter the terms and conditions therein may only be amended, modified, waived, or otherwise supplemented as set forth in Section 6 herein.

**Section 2.    Restructuring Documents and Term Sheets.**

The Restructuring Documents and Term Sheets are expressly incorporated herein and are made part of this Agreement. The general terms and conditions of the Restructuring are set forth in the Restructuring Documents and Term Sheets; however, the Restructuring Documents and Term Sheets are supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Restructuring Documents and Term Sheets, the conflicting term of this Agreement shall control and govern.

**Section 3.    Commitments Regarding the Restructuring Transactions.**

3.01.    Agreement to Support. Subject to the terms and conditions hereof and for so long as this Agreement has not been terminated in accordance with the terms hereof, each of the Parties, as applicable, agrees to comply with the following covenants:

    (a)    Consummation of the Transaction.

    (i)    Each of the Parties hereby covenants and agrees to support consummation of the Restructuring, including the solicitation, confirmation, and consummation of the Agreed Restructuring Plan, as may be applicable, pursuant to the terms set forth in this Agreement and the Restructuring Documents and Term Sheets;

<center>3</center>

(ii)     The Debtors hereby covenant and agree to use commercially reasonable efforts to obtain the New Revolving Credit Facility in connection with the emergence of the Debtors from the Chapter 11 Cases, in form and substance reasonably satisfactory to the Required Consenting Lenders;

(iii)     To the extent that a New Term Loan Facility is available on commercially reasonable terms in connection with the emergence of the Debtors from the Chapter 11 Cases, the Debtors hereby covenant and agree to obtain the New Term Loan Facility, in form and substance satisfactory to the Required Consenting Lenders (which approval will not be unreasonably withheld), in the amount of approximately $1,500,000,000; provided that, so long as the pro forma annual interest expense of such New Term Loan Facility is no more than $150,000,000, the reorganized Debtors shall be permitted to increase the principal amount of the New Term Loan Facility to up to $1,750,000,000; and in each case, shall distribute cash in the amount of all of the initial principal amount of the New Term Loan Facility pro rata to holders of allowed First Lien Claims as partial satisfaction of their respective allowed First Lien Claims;

(iv)     To the extent that a New Term Loan Facility is not available or approved pursuant to Section 3.01(a)(iii) above, the Consenting Lenders agree that the holders of the First Lien Claims shall receive their respective portion of the Rollover Facility (proportionately) in accordance with the terms set forth in the Rollover Facility Term Sheet, and otherwise on such terms and conditions and in form and substance acceptable to the Required Consenting Lenders and the Debtors;

(v)     Each of the Parties hereby covenants and agrees not to, in its capacity as a Party, or in any other capacity, in any material respect, (A) object to, delay, impede, or take any other action to interfere with the Restructuring, or (B) propose, file, support, or vote (or to cause any of the foregoing to occur) for any restructuring, workout, or chapter 11 plan for the Debtors other than the Agreed Restructuring Plan;

(vi)     So long as its vote has been properly solicited pursuant to sections 1125 and 1126 of the Bankruptcy Code, including receipt of a Bankruptcy Court approved Disclosure Statement, each Consenting Lender hereby covenants and agrees to (i) vote or cause to be voted all principal amount of the outstanding obligations under the First Lien Credit Facility (the "Credit Agreement Lender Claims") and all principal amount of the outstanding obligations under the First Lien Indenture (the "First Lien Noteholder Claims" and together with the Credit Agreement Lender Claims, including such claims in respect of any L/C Obligations (as defined in the First Lien Credit Agreement) and obligations under the Secured Hedge Agreement(s) (as defined in the First Lien Credit Agreement), the "First Lien Claims") that it holds, controls or has the ability to control to accept the Agreed Restructuring Plan by delivering its duly executed and timely completed ballot or ballots accepting the Agreed Restructuring Plan following commencement of the solicitation of acceptances of the Agreed Restructuring

Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn); provided, however, that such vote shall be immediately revoked and deemed *void ab initio* upon termination of this Agreement pursuant to the terms hereof;

(vii)    Each of the Consenting Lenders hereby covenants and agrees not to object to, vote or cause to be voted any of its First Lien Claims or other claims under its control to reject, the Agreed Restructuring Plan, or otherwise commence any proceeding to oppose the Agreed Restructuring Plan, the Disclosure Statement, or any other pleadings or reorganization documents filed by any of the Debtors in connection with the Agreed Restructuring Plan;

(viii)    Each of the Parties hereby covenants and agrees to not object, on any grounds, to the terms, conditions, nature or amount set forth in the Cash Collateral Order, except to the extent that such terms are not in form and substance acceptable to the Consenting Lenders;

(ix)    Each of the Parties hereby covenants and agrees to not object, on any grounds, to the terms, conditions, nature or amount of the Rollover Facility or the New Term Loan Facility, as the case may be, except to the extent that such terms are not set forth herein or in an exhibit hereto and are not otherwise in form and substance acceptable to the Required Consenting Lenders; and

(x)    Each of the Restructuring Support Parties hereby covenants and agrees to not directly or indirectly (i) seek, solicit, support, encourage, or vote its First Lien Claims for, consent to, or encourage any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets, or restructuring for any of the Debtors other than the Agreed Restructuring Plan and the New Term Loan Facility, or the Rollover Facility, as the case may be, (ii) seek, solicit, support or encourage post-petition financing, or (iii) take any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of the Agreed Restructuring Plan.

provided, however, that, except as otherwise expressly set forth in this Agreement, the foregoing provisions of this Section 3.01(a) will not (a) prohibit instruction to the Credit Agreement Agent to take or not to take any action relating to the maintenance, protection and preservation of the collateral under the First Lien Credit Facility; (b) prohibit the Credit Agreement Agent from taking any action relating to the maintenance, protection and preservation of the collateral under the First Lien Credit Facility; (c) prohibit the Credit Agreement Agent or the Consenting Lenders from objecting to any motion or pleading filed with the Bankruptcy Court seeking approval to use Cash Collateral (other than any motion or pleading filed in respect of the consensual Cash Collateral use arrangement described in the Cash Collateral Order); (d) limit the rights of the Parties under the applicable credit agreement or loan document, including the First Lien Credit Facility, First Lien Indenture, and/or applicable law to appear and participate as a party in

interest in any matter to be adjudicated in any case under the Bankruptcy Code (or otherwise) concerning the Debtors, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or the terms of the proposed Restructuring and do not hinder, delay or prevent consummation of the proposed Restructuring or (e) prohibit the Credit Agreement Agent or any Consenting Lender from appearing in proceedings for the purpose of contesting whether any matter or fact is or results in a breach of, or is inconsistent with, this Agreement (so long as such appearance is not for the purpose of hindering or intending to hinder, the Restructuring) or bringing any motion for the appointment of an examiner for limited purposes; provided, further that the Debtors hereby reserve their rights to oppose such relief; provided, further that except as expressly provided herein, this Agreement and all communications and negotiations among the Parties with respect hereto or any of the transactions contemplated hereunder are without waiver or prejudice to the Parties' rights and remedies and the Parties hereby reserve all claims, defenses and positions that they may have with respect to each other; provided, further, that nothing in this Agreement shall be deemed to limit or restrict any action by any Party to enforce any right, remedy, condition, consent, or approval requirement under the Definitive Documents (as defined below).

Notwithstanding the foregoing, nothing in this Agreement shall prevent any of the Debtors from taking or failing to take any action that it is obligated to take (or fail to take) in the performance of any fiduciary duty or as otherwise required by applicable law which such Debtor owes to any other person or entity under applicable law, provided, that it is agreed that any such action that results in a Termination Event hereunder shall be subject to the provisions set forth in Section 5 hereto. Each of the Debtors represent to the Restructuring Support Parties that as of the Effective Date, based on the facts and circumstances actually known by the Debtors as of the Effective Date, the Debtors' entry into this Agreement is consistent with each of the Debtors' fiduciary duties.

(b)    Definitive Documents. Each Party hereby covenants and agrees to (x) negotiate in good faith each of the documents implementing, achieving and relating to the Restructuring, including without limitation, all definitive documents necessary for the Agreed Restructuring Plan, including without limitation, (A) all first-day motions, including those relating to, and applications, payment of general unsecured claims in the ordinary course, payment of utilities, payment of critical vendors, payments under customer programs, payment of wages to employees, payment to maintain insurance obligations, and of maintenance of the existing cash management system (collectively, the "First Day Motions"), (B) the Agreed Restructuring Plan, (C) the Disclosure Statement, ballots, and other solicitation materials in respect of the Agreed Restructuring Plan (collectively, the "Plan Solicitation Materials"), (D) the motion to approve the Disclosure Statement and seeking confirmation of the Agreed Restructuring Plan, (E) the proposed order approving the Plan Solicitation Materials and confirming the Agreed Restructuring Plan (the "Confirmation Order"), and (F)  the plan supplement (the "Plan Supplement"), which may include the shareholders' agreement, the registration rights agreement, the credit agreements for the New Revolving Credit Facility, the Rollover Facility or the New Term Loan Facility, and all other post-effective date financing documents (including commitment letters), new or amended charter and by-laws, identity of new

board members and officers, and terms of the post-reorganization corporate structure and any annexes, exhibits, schedules, amendments, supplements or modifications and related documents with respect to any of the foregoing ((A) through (F), collectively, the "Definitive Documents"), which documents shall contain terms and conditions consistent in all respects with the Restructuring Documents and Term Sheets and be on terms acceptable to the Consenting Lenders holding, controlling or having the ability to control more than 66-⅔% of the aggregate amount of First Lien Claims directly or indirectly held, controlled or having the ability to be controlled by the Consenting Lenders (the "Required Consenting Lenders"), and (y) execute (to the extent such Party is a party thereto) and otherwise support the Definitive Documents.

(c)    Fees.   The Debtors shall pay, when due and payable, all outstanding prepetition and all postpetition (a) reasonable and documented fees and expenses incurred by that certain ad hoc group of Credit Agreement Lenders and First Lien Noteholders (the "First Lien Group"), including, without limitation, the reasonable and documented fees and expenses incurred by Milbank Tweed, Hadley & McCloy LLP, as counsel to the First Lien Group, and Houlihan Lokey Capital, Inc., as financial advisors to the First Lien Group, (b) reasonable and documented fees and expenses incurred by counsel to the Credit Agreement Agent, Davis Polk & Wardwell LLP, and the financial advisor to the Credit Agreement Agent, Blackstone Advisory Partners, L.P., and (c) reasonable and documented fees and expenses incurred by Katten Muchin Rosenman LLP, counsel to the First Lien Notes Agent.

(d)    Investment Manager Limitation.   The obligations of any Consenting Lender in this Agreement are limited to, in the case of investment advisors, the First Lien Claims controlled by such investment manager in the funds or accounts it manages.

3.02.   Obligations of the Debtors.  Each Debtor hereby covenants and agrees to:

(a)    subject to entry into appropriate confidentiality agreements with the Debtors, permit and facilitate any and all due diligence necessary to consummate the Restructuring, including, but not limited to, (i) cooperating fully with the Restructuring Support Parties, and causing its officers, directors, employees, and advisors to cooperate fully, in furnishing information as and when reasonably requested by any Restructuring Support Party, including with respect to the Debtors' financial affairs, finances, financial condition, business and operations, (ii) authorizing the Restructuring Support Parties to meet and/or have discussions with any of its officers, directors, employees and advisors from time to time as reasonably requested by any Restructuring Support Party to discuss any matters regarding the Debtors' financial affairs, finances, financial condition, business and operations, and (iii) directing and authorizing all such persons and entities to fully disclose to the Restructuring Support Party, all information requested by such Restructuring Support Party regarding the foregoing;

(b)    file the Agreed Restructuring Plan, the Disclosure Statement, the Plan Solicitation Materials, and the motion to approve the Disclosure Statement, on or before 45 days following the date the Debtors commence the Chapter 11 Cases (the "Petition Date");

(c)    (i) obtain entry of the Confirmation Order, in form and substance acceptable to the Required Consenting Lenders, with all exhibits, appendices, plan supplement documents, and related documents; provided that such order has not been vacated, stayed or

reversed ("Stayed") and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of the Confirmation Order, or has otherwise been dismissed with prejudice, and (ii) cause the effective date of the Agreed Restructuring Plan (the "Plan Effective Date") to occur within 135 days of the Petition Date;

(d)  to the extent practicable, endeavor to distribute draft copies of all motions, applications, proposed orders, pleadings and other related documents the Debtors intend to file with the Bankruptcy Court to counsel to the Consenting Lenders and the First Lien Agents at least three days prior to the date when the Debtors intend to file such document, provided that with respect to any such document relating to a Definitive Document, such document shall be provided on no less than five days' notice, and prior to any such filing shall, to the extent practicable, endeavor to consult in good faith with such counsel regarding the form and substance of any such proposed filing;;

(e)  operate its business in the ordinary course, including, but not limited to, maintaining its accounting methods, using its commercially reasonable efforts to preserve the assets and its business relationships, continuing to operate its billing and collection procedures, using its commercially reasonable efforts to retain key employees, and maintaining its business records in accordance with its past practices;

(f)  timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee, (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases; provided that, for the avoidance of doubt, nothing in this Agreement shall prohibit or restrict the rights of the Consenting Lenders to seek an order for the appointment of an examiner for limited purposes; provided further, that the Debtors hereby reserve their rights to oppose such relief;

(g)  timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization;

(h)  if the Debtors know or should know of a breach by such Debtor in any respect of any of the obligations, representations, warranties, or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within [3] business days of such actual knowledge) to the Restructuring Support Parties; and

(i)  that the Debtors shall not amend or restate the employment agreements for any member of its management prior to the consummation of the Restructuring without the prior written consent of the Required Consenting Lenders.

3.03.   <u>Voting; Forbearance</u>. Subject to Section 3.01(d) hereof, as long as this Agreement has not been terminated in accordance with the terms hereof, each of the Restructuring Support Parties covenants and agrees, subject to the receipt by such Restructuring Support Party of the Plan Solicitation Materials, to (i) vote or cause to be voted its First Lien Claims (inclusive of any Claim acquired pursuant to Section 3.04 hereof; <u>provided</u>, <u>however</u>, that as used herein, "<u>Claims</u>" shall not include any claim held in a fiduciary capacity or held by any other distinct business unit of such Party (other than the business unit or division expressly identified on the signature pages hereto), unless such business unit is or becomes a party to this Agreement) to accept the Agreed Restructuring Plan by delivering or causing to be delivered the duly executed and completed ballots accepting the Agreed Restructuring Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Plan Solicitation Materials and ballot, and (ii) not change or withdraw (or cause to be changed or withdrawn) such votes.

3.04.   <u>Transfer of Interests and Securities</u>.

(a)     Except as expressly provided herein, this Agreement shall not in any way restrict the right or ability of any Restructuring Support Party to sell, use, assign, transfer, or otherwise dispose of ("<u>Transfer</u>") any of the First Lien Claims; <u>provided</u>, <u>however</u>, that for the period commencing as of the date such Restructuring Support Party executes this Agreement until termination of this Agreement pursuant to the terms hereof, no Restructuring Support Party shall Transfer any rights with respect to the First Lien Claims and any purported Transfer of any rights with respect to the First Lien Claims shall be void and without effect, unless (a) the transferee is a Restructuring Support Party or (b) if the transferee is not a Restructuring Support Party, at or prior to closing of the Transfer, such transferee delivers to the Company, at or prior to the time of the proposed Transfer, an executed copy of a transfer agreement in the form of <u>Exhibit E</u> attached hereto pursuant to which such transferee shall assume all obligations of the Restructuring Support Party transferor hereunder in respect of the rights with respect to the First Lien Claims being transferred (such transferee, if any, to also be a Restructuring Support Party hereunder).   For the avoidance of doubt, all First Lien Claims held or controlled by any Restructuring Support Party, regardless of whether acquired before or after the date of this Agreement shall be subject to, and shall be treated in accordance with, the terms of this Agreement. Any Transfer that does not comply with the foregoing shall be deemed void *ab initio*. This Agreement shall in no way be construed to preclude the Restructuring Support Parties from acquiring additional First Lien Claims or rights with respect to any additional First Lien Claims so long as such additional First Lien Claims are treated in accordance with the terms of this Agreement.

(b)     Notwithstanding the foregoing Section 3.04(a), (i) any Restructuring Support Party may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in such First Lien Claims against the Debtors to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become an RSA Party (as defined below), provided that the Qualified Marketmaker subsequently transfers (by purchase, sale, assignment, participation or otherwise) the right, title or interest in such First Lien Claims against the Debtors to a transferee that is or becomes an RSA Party, and (ii) to the extent that a Restructuring Support Party is acting in its capacity as a Qualified Marketmaker, it  may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in such First Lien Claims against the

Debtors that the Qualified Marketmaker acquires from a holder of the First Lien Claims who is not an RSA Party without the requirement that the transferee be or become an RSA Party.

(c)     For these purposes, a "Qualified Marketmaker" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against the Debtors, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt); and an "RSA Party" means an entity that is a party to this Agreement or executes a transfer agreement in the form of Exhibit E attached hereto with respect to the transferred right, title or interest in such First Lien Claims.

## Section 4.       Representations and Warranties.

4.01.   <u>Representations of the Debtors</u>. Notwithstanding any other provision herein or any subsequent termination of this Agreement, the Debtors hereby irrevocably acknowledge, confirm and agree that as of the date hereof:

(a)     that entering into this Agreement and the consummation of the transactions contemplated hereby (including the receipt by the Credit Agreement Lenders and the First Lien Noteholders of all or substantially all of the equity in the reorganized Company), will not (i) conflict with or result in a violation or breach of, (ii) constitute (with or without notice or lapse of time or both) a default under, (iii) require any Debtor or any of its subsidiaries to obtain any consent, approval or action of, make any filing with or give any notice to any person as a result or under the terms of, (iv) result in or give to any person any right of termination, cancellation, acceleration or modification in or with respect to, (v) result in or give to any person any additional rights or entitlement to increased, additional, accelerated or guaranteed payments under, or (vi) result in the creation or imposition of any lien upon the Debtors or any of its subsidiaries or any of their respective assets and properties under, any material contract or license to which any Debtor or any subsidiary is a party or by which any of their respective assets and properties is bound.

4.02.   <u>Mutual Representations and Warranties</u>. Subject to Section 3.01(d) hereof, each of the Parties, severally and not jointly, represents, warrants, and covenants to each other Party, as of the date of this Agreement, as follows (each of which is a continuing representation, warranty, and covenant):

(a)     It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws;

(b)     Except as expressly provided in this Agreement, it has all requisite direct or indirect power and authority to enter into this Agreement and to carry out the Restructuring contemplated by, and perform its respective obligations under, this Agreement;

(c)     The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part and no consent, approval or action of, filing with or notice to any governmental or regulatory authority is required in connection with the execution, delivery and performance of this Agreement; and

(d)     It has been represented by legal counsel of its choosing in connection with this Agreement and the transactions contemplated by this Agreement, has had the opportunity to review this Agreement with its legal counsel and has not relied on any statements made by any other Party or its legal counsel as to the meaning of any term or condition contained herein or in deciding whether to enter into this Agreement or the transactions contemplated hereof.

4.03.   <u>Representations of Consenting Lenders</u>. Subject to Section 3.01(d) hereof, each of the Consenting Lenders, severally and not jointly, represents and warrants that, as of the date such Consenting Lender executes and delivers this Agreement:

(a)     it is the sole beneficial owner of the face amount of the First Lien Claims, or is the nominee, investment manager, advisor for the beneficial holders or otherwise has the ability to vote or cause to be voted the First Lien Claims, as reflected in such Consenting Lender's signature block to this Agreement, which amount the Debtors and each Consenting Lender understands and acknowledges is proprietary and confidential to such Consenting Lender; and

(b)     has the direct or indirect authority to act on behalf of, cause to be voted or vote and consent to matters concerning the First Lien Claims and to dispose of, exchange, assign and transfer such rights with respect to the First Lien Claims.

**Section 5.     Termination Events.**

5.01.   <u>Lender Termination Events</u>. This Agreement shall be automatically terminated as to all Parties upon the occurrence and continuation of any of the following events (each, a "<u>Lender Termination Event</u>"), unless the Required Consenting Lenders waive such Lender Termination Event in writing within three days of the occurrence of such Lender Termination Event:

(a)     <u>Lender Termination Events</u>:

(i)     The failure of the Debtors to comply with Section 3.02(b) or Section 3.02(c) hereof; or

(ii)    the termination of the use of Cash Collateral as described in the Cash Collateral Order;

(iii)   the breach in any respect by the Debtors of (or failure to satisfy) any of the obligations, representations, warranties, or covenants of such Party set forth in this Agreement (including, without limitation, in Section 3.02 hereof);

(iv)    the Debtors file any motion, pleading, or related document with the Bankruptcy Court, with each of the foregoing in a manner that is inconsistent in

any respect with this Agreement or the Restructuring Documents and Term Sheets, and such motion, pleading, or related document has not been withdrawn after three days of the Debtors receiving written notice in accordance with Section 8.10 hereof from the Required Consenting Lenders that such motion or pleading violates this Section 5.01(a)(iv);

(v)     subject to Section 5.01(d) below, the Bankruptcy Court enters an order approving debtor-in-possession financing or exit financing (unless described herein or otherwise agreed to by the Credit Agreement Agent and the Required Consenting Lenders);

(vi)     any of the Definitive Documents or any order entered by the Bankruptcy Court related thereto shall have been modified, abrogated, terminated, or otherwise are not in full force and effect, in each case without the consent of the Required Consenting Lenders;

(vii)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order enjoining the consummation of the Restructuring in a way that cannot be reasonably remedied by the Debtors in a manner that is satisfactory to the Credit Agreement Agent and the Required Consenting Lenders;

(viii)   the Bankruptcy Court enters an order (i) directing the appointment of an examiner with expanded powers to operate the Debtors' businesses pursuant to section 1104 of the Bankruptcy Code or a trustee in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Chapter 11 Cases;

(ix)     the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code;

(x)     if the Debtors exercise their "fiduciary out" as a debtor-in-possession as provided for in Section 3.01 of this Agreement;

(xi)     a condition precedent to funding under the New Revolving Credit Facility shall not have been satisfied;

(xii)     to the extent that the New Term Loan Facility is obtained consistent herewith, a condition precedent to funding under the New Term Loan Facility shall not have been satisfied; and

(xiii)   to the extent that the New Term Loan Facility is not obtained consistent herewith, the Rollover Facility shall not have been made available to the reorganized Debtors on the terms described herein;

(b)     _Lender Termination Event Resulting in Automatic Termination_: Notwithstanding anything to the contrary herein, if the Restructuring, as contemplated pursuant

to this Agreement does not occur on or prior to 135 days after the Petition Date, any Consenting Lender may terminate its obligations under this Agreement after providing written notice to the Parties in accordance with Section 8.10 hereof.

(c)     No Violation of Automatic Stay.  The Required Consenting Lenders and the First Lien Agents on behalf of the Consenting Lenders are authorized to take any steps necessary to effectuate the termination of this Agreement, as applicable, including the sending of any applicable notices to the Company, notwithstanding section 362 of the Bankruptcy Code or any other applicable law and provide that no cure period contained in this Agreement or the Cash Collateral Order shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of the Credit Agreement Agent and the Required Consenting Lenders.

(d)     A Lender Termination Event shall not occur if the Debtors pursue or the Bankruptcy Court approves exit financing on terms materially better than the New Revolving Credit Facility or the New Term Loan Facility (or the Rollover Facility, as the case may be), as determined by the Required Consenting Lenders.

5.02.   Debtors Termination Events.  The Debtors may terminate their obligations and liabilities under this Agreement upon three (3) business days prior written notice delivered in accordance with Section 8.10 hereof, upon the occurrence of any of the following events (each, a "Company Termination Event" and together with the Lender Termination Events, the "Termination Events") (a) the material breach by any of the Restructuring Support Parties (other than the Debtors) of any of the representations, warranties, or covenants of such Parties set forth in this Agreement that would have a material adverse impact on the consummation of the Restructuring (taken as a whole) that remains uncured for a period of five business days after the receipt by the breaching Parties of written notice of such breach from the Debtors, (b) the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that would have a material adverse impact on the consummation of the Restructuring (taken as a whole), or (c) following the Debtors determining that proceeding with the transactions contemplated by this Agreement would be inconsistent with the continued exercise of its fiduciary duties.

Notwithstanding any provision in this Agreement to the contrary, no party shall terminate this Agreement if such party (in any capacity that is Party to this Agreement) is in breach of any provision hereof; provided that the Debtors may terminate under section 5.02(c) notwithstanding any existing breach by the Debtors.

5.03.   Mutual Termination. This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among (a) the Debtors, (b) the Consenting Credit Agreement Lenders and (c) the Consenting First Lien Noteholders.

5.04.   Individual Lender Termination.  In the event of a material breach or material violation of Section 6 hereof, a Consenting Lender adversely impacted by such material breach or material violation may terminate its rights and obligations under this Agreement without effecting the obligations of the other Parties hereto by providing notice of the same in accordance with Section 8.10 hereof.

5.05.    Effect of Termination. Upon termination of this Agreement with respect to an individual Consenting Lender pursuant to Section 5.01(b) or 5.04, this Agreement shall terminate solely with respect to the applicable and remain valid and binding on all non-terminating Parties. Upon termination of this Agreement under Section 5.01(a) or 5.02, (i) this Agreement shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, and (ii) any and all consents tendered by the Restructuring Support Parties prior to such termination shall be deemed, for all purposes, to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise and such consents may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Debtors allowing such change or resubmission). Upon termination of this Agreement under Section 5.04, this Agreement shall be of no further force and effect as to the individual Consenting Lender terminating its obligations hereunder and such Consenting Lender shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement. Notwithstanding the foregoing, other than in the case of mutual termination under Section 5.03, any claim for breach of this Agreement that accrued prior to the date of a Party's termination or termination of this Agreement (as the case may be) and all rights and remedies of the Parties hereto shall not be prejudiced as a result of termination.

5.06.    Termination Upon Consummation of the Restructuring. This Agreement shall terminate automatically without any further required action or notice on, as applicable, the Plan Effective Date of the Agreed Restructuring Plan.

## Section 6.    Amendments.

Except as otherwise provided herein, this Agreement, the Restructuring Documents and Term Sheets or any annexes thereto may not be modified, amended, or supplemented without prior written agreement signed by (a) each of the Debtors, and (b) the Required Consenting Lenders; provided, however, that notwithstanding anything to the contrary herein, any modification, amendment or supplement to this Agreement, the Restructuring Documents and Term Sheets, any Definitive Documents, or any other agreement contemplated as part of this Restructuring that alters any of the economic terms set forth herein or in the Restructuring Documents and Term Sheets, or any of the annexes thereto in any manner adverse to a Restructuring Support Party (in such party's reasonable discretion), shall require the consent of such Restructuring Support Party.

## Section 7.    No Solicitation.

Notwithstanding anything to the contrary, this Agreement is not and shall not be deemed to be (a) a solicitation of consents to the Agreed Restructuring Plan or any chapter 11 plan or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of

securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act and the Securities Exchange Act of 1934, as amended. The acceptance of the Credit Agreement Lenders and the First Lien Noteholders will not be solicited until the Credit Agreement Lenders and the First Lien Noteholders, as applicable, have received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

**Section 8.**     **Miscellaneous**.

8.01.   Further Assurances. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, from time to time, to effectuate the Restructuring in a manner materially consistent with the terms set forth in the Restructuring Documents and Term Sheets, as applicable.

8.02.   Complete Agreement. This Agreement, exhibits and the annexes hereto represent the entire agreement between the Parties with respect to the subject matter hereof and supersede all prior agreements, oral or written, between the Parties with respect thereto. No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against any Party, except on the basis of a written instrument executed by or on behalf of such Party.

8.03.   Parties. This Agreement shall be binding upon, and inure to the benefit of, the Parties. No rights or obligations of any Party under this Agreement may be assigned or transferred to any other person or entity except as provided in Section 3.04 hereof. Nothing in this Agreement, express or implied, shall give to any person or entity, other than the Parties, any benefit or any legal or equitable right, remedy, or claim under this Agreement.

8.04.   Headings. The headings of all Sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

8.05.   GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF (EXCEPT FOR SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in either the United States District Court for the Eastern District of New York or any New York State court sitting in New York City or following the Petition Date, the Bankruptcy Court (the "Chosen Courts"), and solely in connection with claims arising under this Agreement (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto. Each Party hereto irrevocably waives any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

Notwithstanding the foregoing, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall be the Chosen Court.

8.06.    Execution of Agreement. This Agreement may be executed and delivered (by facsimile, electronic mail, or otherwise) in any number of counterparts, each of which, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.

8.07.    Interpretation. This Agreement is the product of negotiations between the Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.

8.08.    Successors and Assigns. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives, other than a trustee or similar representative appointed in a bankruptcy case.

8.09.    Acknowledgements. Notwithstanding anything herein to the contrary, (a) this Agreement shall not be construed to limit the Debtors or any member of the Debtors' boards of director's exercise (in its sole discretion) of its fiduciary duties to any person, including but not limited to those arising from the Company's status as a debtor or debtor in possession under the Bankruptcy Code or under other applicable law, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; [and (b) if any Consenting Lender is appointed to and serves on an official committee in the Chapter 11 Cases, the terms of this Agreement shall not be construed so as to limit such Party's exercise (in its sole discretion) of its fiduciary duties to any person arising from its service on such committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement]; provided, however, that nothing in this Agreement shall be construed as requiring any Consenting Lender to serve on any official committee in the Chapter 11 Cases. Nothing in this Agreement shall limit in any way the right of a Consenting Lender to participate in the Chapter 11 Cases; provided that such participation does not violate and is not inconsistent with the terms of this Agreement and the Restructuring Documents and Term Sheets.

8.10.    Notices. All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to the Debtors, to:

Cengage Learning
200 First Stamford Place, 4th Floor
Stamford, Connecticut 06902
New York, New York 10005
Attention:  Kenneth A. Carson, General Counsel

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Jonathan S. Henes and Christopher J. Marcus
E-mail addresses: jonathan.henes@kirkland.com,
            christopher.marcus@kirkland.com

-and-

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention:  Ross. M. Kwasteniet
E-mail addresses: ross.kwasteniet@kirkland.com

(b)     if to a Consenting Lender or a transferee thereof, to the address set forth below following the Consenting Lender's signature (or as directed by any transferee thereof), as the case may be.

with copies (which shall not constitute notice) to:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005
Attention: Dennis Dunne
        Lauren Cohen
E-mail address: ddunne@milbank.com
            ldoyle@milbank.com


and in the case of JPMorgan Chase Bank, N.A., with additional copies (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10024
Attn: Damian S. Schaible
    Darren S. Klein
E-mail address: damian.schaible@davispolk.com
            darren.klein@davispolk.com

All Consenting Lenders shall be provided reasonable notice of any actions or documents requiring the consent of some or all Consenting Lenders.

Any notice given by hand delivery, electronic mail, mail, or courier shall be effective when received.

8.11.    _Access_. The Debtors will afford the First Lien Agents, the Credit Agreement Lenders, the First Lien Noteholders and each of their respective attorneys, consultants, accountants, and other authorized representatives reasonable access, upon reasonable notice during normal business hours, to all properties, books, contracts, commitments, records, management personnel, lenders, and advisors of the Debtors; provided, however, that the Debtors' obligation hereunder shall be conditioned upon such Party being party to an executed confidentiality agreement approved by and with the Company, unless such Party is otherwise subject to confidentiality obligations in connection with the First Lien Credit Facility, the First Lien Indenture or the Restructuring.

8.12.    _Waiver_. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Restructuring Support Party or the ability of each of the Restructuring Support Parties to protect and preserve its rights, remedies, and interests, including, without limitation, its claims against or interests in the Debtors including under the First Lien Credit Agreement, the First Lien Indenture and applicable law.  If the Restructuring is not consummated, or if this Agreement is terminated for any reason (other than Section 5.03 hereof), the Parties fully reserve any and all of their rights. Pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

8.13.    _Several, Not Joint, Obligations_. The agreements, representations, and obligations of the Parties under this Agreement are, in all respects, several and not joint. It is understood and agreed that any Consenting Lender may trade in the First Lien Claims or other debt or equity securities of the Debtors without the consent of the Debtors or any other Consenting Lender, subject to applicable laws, if any, Section 3.04 herein and the First Lien Credit Facility or First Lien Indenture (as each may be applicable).  No Consenting Lender shall have any responsibility for any such trading by any other entity by virtue of this Agreement.

8.14.    _Remedies Cumulative_. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

8.15.    _No Third-Party Beneficiaries_. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties, and no other person or entity shall be a third-party beneficiary hereof.

8.16.    _Automatic Stay_. The Parties acknowledge that the giving of notice or termination by any Party pursuant to this Agreement shall not be violation of the automatic stay of section 362 of the Bankruptcy Code.

8.17.    _Survival of Agreement_. Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Debtors and in contemplation of possible chapter 11 filings by the Debtors, and (a) the rights granted in this Agreement are enforceable by each signatory hereto without

approval of the Bankruptcy Court, and (b) the Debtors waive any rights to assert that the exercise of such rights violate the automatic stay, or any other provisions of the Bankruptcy Code.

8.18.    <u>Settlement Discussions</u>. This Agreement and the Restructuring Documents and Term Sheets are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

8.19.    <u>Consideration</u>. The Parties hereby acknowledge that no consideration, other than that specifically described herein, the Restructuring Documents and Term Sheet shall be due or paid to any Party for its agreement to vote to accept the Agreed Restructuring Plan in accordance with the terms and conditions of this Agreement.

**Section 9.    Disclosure**.  Prior to any disclosure, the Debtors shall submit to counsel for the Restructuring Support Parties all press releases and public documents that constitute the initial disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement. Except as required by law (as determined by outside counsel to the Debtors, and with reasonable prior notice to the Restructuring Support Parties), the Debtors shall not (x) use the name of any Restructuring Support Party in any public manner without such Party's prior written consent, or (y) disclose to any person other than legal and financial advisors to the Debtors the principal amount or percentage of any First Lien Claims or any other securities of the Debtors or any of their respective subsidiaries held by any Consenting Lenders; <u>provided</u>, <u>however</u>, that the Debtors shall be permitted to disclose at any time the aggregate principal amount of and aggregate percentage of the First Lien Claims held by the Consenting Lenders; <u>provided further</u>, <u>however</u>, that when the Debtors file this Agreement with the Bankruptcy Court, the Debtors shall redact the names of any Restructuring Support Party from the recitals of this Agreement and any signature pages hereto. The Debtors shall not request or demand that any entity or committee representing more than one of the Credit Agreement Lenders, including, solely for the purposes hereof, the Credit Agreement Agent, any Consenting Lender, and any professional representing any or all of the foregoing, file a verified statement pursuant to rule 2019 of the Federal Rules of Bankruptcy Procedure.

*[Signatures on Following Page]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers or other agents, solely in their respective capacity as officers or other agents of the undersigned and not in any other capacity, as of the date first set forth above.

**CENGAGE LEARNING HOLDINGS II, L.P.**

By:  Cengage Learning GP I LLC

By: _____
Name:
Title:

**CENGAGE LEARNING ACQUISITIONS, INC.**

By: _____
Name:
Title:

**CENGAGE LEARNING HOLDCO, INC.**

By: _____
Name:
Title:

**CENGAGE LEARNING, INC.**

By: _____
Name:
Title:

BlackRock Financial Management, Inc., on behalf
of the funds and accounts listed on Schedule B hereto

By: _____

Name:  AnnMarie Smith
Title:  Authorized Signatory

Address:

c/o BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attn:  David Trucano, Andy Taylor
Email:  david.trucano@blackrock.com, andy.taylor@blackrock.com

With a copy (which shall not constitute notice) to:

c/o BlackRock, Inc.
Office of the General Counsel
40 East 52nd Street
New York, NY 10022
Attn: David Maryles and Vincent Taurassi
Email:  groupl&custransactions@blackrock.com

[Signature Page to Restructuring Support Agreement]

## SCHEDULE B
BlackRock Funds

Allied World Assurance, Ltd.
JPMBI re BlackRock BankLoan Fund
BlackRock Credit Investors Master Fund, L.P.
BlackRock Funds II, BlackRock Floating Rate Income Portfolio
BGF Global Multi-Asset Income Fund Global High Yield
BlackRock Secured Credit Portfolio of BlackRock Funds II
BlackRock High Yield V.I. Fund of BlackRock Variable Series Funds, Inc.
Den Professionelle Forening Danske Invest Institutional High Yield Portfolio
Den Professionelle Forening Danske Invest Institutional High Yield Bond Portfolio
Global High Yield Bond Fund, a series of DSBI - Global Investment Trust
BlackRock Global Investment Series: Income Strategies Portfolio
Adfam Investment Company LLC
Ironshore Inc.
MET Investors Series Trust - BlackRock High Yield Portfolio
Fixed Income Portable Alpha Master Series Trust
Navy Exchange Service Command Retirement Trust
The Obsidian Master Fund
The PNC Financial Services Group, Inc. Pension Plan
PPL Services Corporation Master Trust
Advanced Series Trust - AST BlackRock Global Strategies Portfolio
Universal-Investment-Gesellschaft mbh re RB-UI-FONDS
Value Credit Partners (Offshore) Master L.P.
Value Credit Partners. L.P.
BlackRock Funds II, BlackRock High Yield Bond Portfolio
BlackRock High Yield Trust
BlackRock Senior High Income Fund, Inc.
BlackRock Credit Investors Master Fund SPV, L.P.
BlackRock Floating Rate Income Trust
BlackRock Strategic Bond Trust
BlackRock Defined Opportunity Credit Trust
BlackRock Limited Duration Income Trust
BMI CLO I
BlackRock Senior Income Series II
BlackRock Senior Income Series IV
BlackRock Senior Income Series V Limited
BlackRock High Yield Portfolio of BlackRock Series Fund, Inc
California State Teachers' Retirement System
BlackRock Corporate High Yield Fund, Inc.
BlackRock Corporate High Yield Fund III, Inc.
BlackRock Debt Strategies Fund, Inc.

[Signature Page to Restructuring Support Agreement]

BGF Global High Yield Bond Fund
Employees' Retirement Fund of the City of Dallas
Fonditalia Bond Global High Yield Fund
BlackRock Fixed Income Value Opportunities
BlackRock Floating Rate Income Strategies Fund, Inc.
BlackRock High Income Shares
BlackRock Corporate High Yield Fund VI, Inc.
BlackRock Corporate High Yield Fund V, Inc.
Magnetite V CLO, Limited
Magnetite VI, Limited
BlackRock Senior Floating Rate Portfolio
BGF US Dollar High Yield Bond Fund
BAV RBI Renten US HY I

[Signature Page to Restructuring Support Agreement]

R3 Capital Partners Master, L.P.

By: Blackrock Investment Management, LLC,  its Investment Manager


By:

Name:  AnnMarie Smith
Title:  Authorized Signatory


Address:


c/o BlackRock Financial Management, Inc.
Leveraged Finance Group
55 East 52nd Street
New York, NY 10055
Attn:  David Trucano, Andy Taylor
Email:  david.trucano@blackrock.com, andy.taylor@blackrock.com

With a copy (which shall not constitute notice) to:

c/o BlackRock, Inc.
Office of the General Counsel
40 East 52nd Street
New York, NY 10022
Attn: David Maryles and Vincent Taurassi
Email:  groupl&custransactions@blackrock.com


[Signature Page to Restructuring Support Agreement]

Midtown Acquisitions L.P.

By:  Midtown Acquisitions GP LLC, its general partner

By: _____

Name: CONOR BASTABLE

Title: Manager


Address:

c/o Davidson Kempner Capital Management LLC
65 east 55th Street , 20th Floor
New York, NY 10022

[Signature Page to Restructuring Support Agreement]

DEUTSCHE BANK TRUST COMPANY
AMERICAS, solely as it pertains to Class B
Extended Revolver Commitments managed
By the Deutsche Bank Trust Company
Americas Workout Group

By: _____
Name: _____
Title: _____
          **Mark B. Cohen**
          **Managing Director**

By: _____
Name: _____
          **Kelvin Ji**
Title: _____
          **Vice President**

Address:

c/o Deutsche Bank Trust Company Americas
60 Wall St, 43rd Floor
New York, NY 10005

Franklin Mutual Advisers, LLC, on behalf of the
funds and accounts listed on Schedule C hereto

By: _____
Name: _____
Title: _____

Address:

c/o Franklin Mutual Advisers, LLC
101 John F. Kennedy Parkway
Short Hills, NJ 07078

[Signature Page to Restructuring Support Agreement]

## SCHEDULE C
Franklin Mutual Advisers Funds

EQ/Mutual Large Cap Equity Portfolio
AZL/Mutual Shares Strategy
Mutual Beacon Fund (Canada)
Mutual Discovery Fund (Canada)
ING Franklin Mutual Shares Portfolio
John Hancock Variable Insurance Trust – Mutual Shares Trust
John Hancock Funds II – John Hancock Mutual Shares Fund
JNL/Franklin Templeton Mutual Shares Fund
Mutual Beacon Fund
Mutual Global Discovery Fund
Mutual Quest Fund
Franklin Mutual Recovery Fund
Mutual Shares Fund
Advanced Series Trust – AST Franklin Templeton Founding Funds Allocation Portfolio –
Mutual Shares
Mutual Global Discovery Securities Fund
Mutual Shares Securities Fund

JPMorgan Chase Bank, N.A.
as Consenting Lender

By: _____
Name: Charles O. Freedgood
Title: Managing Director

<u>Joinder to Restructuring Support Agreement</u>

JPMorgan Chase Bank, N.A. hereby executes this Joinder to the Restructuring Support Agreement in its capacity as Credit Agreement Agent for the purpose of evidencing its support for the Restructuring on the terms set forth in the Restructuring Documents and Term Sheets; provided that in the event that (i) the Required Lenders (as defined in the First Lien Credit Facility) direct the Credit Agreement Agent in accordance with section 10.04(a) of the First Lien Credit Facility to withdraw its support for the Restructuring or (ii) any terms or conditions of any proposed Definitive Documents or any determinations made in connection with the Restructuring are not acceptable to the Credit Agreement Agent in its sole discretion, the Credit Agreement Agent may withdraw its support for the Restructuring.  For the avoidance of doubt, neither this Joinder nor any provision of the Restructuring Support Agreement or the Restructuring Term Sheet shall be deemed to modify or amend any provision of the First Lien Credit Facility, including without limitation section 10.04 thereof or any of the Credit Agreement Agent's rights and obligations thereunder.

JPMORGAN CHASE BANK, N.A.
as Credit Agreement Agent

By: _____

Name: Charles O. Freedgood
Title:  Managing Director

KKR Asset Management LLC., on behalf of
the funds and accounts listed on Schedule A hereto

By: _____
Name:  Nicole J. Macarchuk
Title:    Authorized Signatory

Address:

c/o KKR Asset Management LLC
555 California Street, 50th Floor
San Francisco, CA 94104
Attn: Jamie Ely and Harlan Cherniak
Email: Jamison.Ely@kkr.com; Harlan.Cherniak@kkr.com; KAMlegal@kkr.com

## SCHEDULE A
### KKR Asset Management LLC Funds

8 Capital Partners L.P.
CCT Funding LLC
KKR Alternative Corp Opportunities Fund
KKR Financial CLO 2005-2, Ltd.
KKR Financial CLO 2006-1, Ltd.
KKR Financial CLO 2007-1, Ltd.
KKR Financial CLO 2007-A, Ltd.
KKR Financial CLO 2011-1, Ltd
KKR Corporate Credit Partners L.P.
KKR Debt Investors II (2006) (Ireland) L.P.
KKR Financial Holdings III, LLC
KKR-Keats Capital Partners L.P.
KKR-PBPR Capital Partners L.P.
Maryland State Retirement and Pension System
Oregon Public Employees Retirement Fund
Spruce Investors Limited
ACE Tempest Reinsurance Ltd.
KKR Credit Relative Value Master Fund L.P.
Montpelier Capital Limited
KKR Alternative High Yield Fund
KKR Floating Rate Fund L.P.
KKR-Milton Capital Partners L.P.

OAK HILL ADVISORS, L.P., on behalf of certain
private funds and separate accounts that it manages

By: Oak Hill Advisors GenPar, L.P.,
Its: General Partner

By: Oak Hill Advisors MGP, L.P.,
Its: Managing General Partner

By: _____

Name: _____

Title: _____


Address:

c/o Oak Hill Advisors, L.P.
1114 Avenue of the Americas, 27th Floor
New York City, NY  10036

[Signature Page to Restructuring Support Agreement]

Oaktree Opportunities Fund VIIIb, L.P.
Oaktree Opportunities Fund VIIIb (Parallel), L.P.

By: Oaktree Opportunities Fund VIIIb GP, L.P.
Its: General Partner

By: Oaktree Opportunities Fund VIIIb GP Ltd.
Its: General Partner

By: Oaktree Capital Management, L.P.
Its: Director

By: _____
Name: Brian Laibow
Title: Managing Director


By: _____
Name: Brook Hinchman
Title: Vice President



Address:

c/o Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Floor
Los Angeles, CA 90071

Oaktree Value Opportunities Fund, L.P.

By: Oaktree Value Opportunities Fund GP, L.P.
Its: General Partner

By: Oaktree Value Opportunities Fund GP Ltd.
Its: General Partner

By: Oaktree Capital Management, L.P.
Its: Director

By: _____
Name: _Brian Laibow_____
Title: _Managing Director_____


By: _____
Name: _Brook Hinchman_____
Title: _Vice President_____


Address:

c/o Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Floor
Los Angeles, CA 90071

Oaktree FF Investment Fund, L.P. – Class F

By: Oaktree FF Investment Fund GP, L.P.
Its: General Partner

By: Oaktree FF Investment Fund GP Ltd.
Its: General Partner

By: Oaktree Capital Management, L.P.
Its: Director

By: _____
Name:  Brian Laibow
Title:  Managing Director


By: _____
Name:  Brook Hinchman
Title:  Vice President


Address:

c/o Oaktree Capital Management, L.P.
333 S. Grand Avenue, 28th Floor
Los Angeles, CA 90071

[Signature Page to Restructuring Support Agreement]

Searchlight (DDI) I, L.P.
By: Searchlight (DDI) I GP, LLC, its general partner

By: _____
Name: Eric Zinterhofer
Title: Authorized Person


Address:

c/o Searchlight Capital Partners
745 Fifth Avenue , 32nd Floor
New York, NY 10151

Western Asset Management Company, as investment
manager and agent on behalf of certain of its clients

By: _____

Name:  W. Stephen Venable, Jr.
Title:  Manager, U.S. Legal and Corporate Affairs


Address:

c/o Western Asset Management Company
385 E. Colorado Boulevard
Pasadena, CA  91101

## Exhibit A

### Restructuring Term Sheet

## CENGAGE LEARNING HOLDINGS II L.P., ET AL.

## RESTRUCTURING TERM SHEET

### July 2, 2013

THIS TERM SHEET (THIS **"TERM SHEET"**) DESCRIBES THE MATERIAL TERMS OF A PROPOSED RESTRUCTURING (THE **"RESTRUCTURING"**) PURSUANT TO WHICH CENGAGE LEARNING HOLDINGS II L.P. (THE **"COMPANY"**) AND CERTAIN OF THE COMPANY'S DOMESTIC SUBSIDIARIES (TOGETHER WITH THE COMPANY, THE **"DEBTORS"**)[1] WILL RESTRUCTURE THEIR CAPITAL STRUCTURE THROUGH A JOINT PLAN OF REORGANIZATION FILED IN CONNECTION WITH VOLUNTARY CASES (THE **"CHAPTER 11 CASES"**) COMMENCED UNDER CHAPTER 11 OF TITLE 11 OF THE UNITED STATES CODE (THE **"BANKRUPTCY CODE"**) IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF NEW YORK (THE **"BANKRUPTCY COURT"**).

THIS TERM SHEET DOES NOT CONSTITUTE AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET IS A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. THIS TERM SHEET IS NOT A COMMITMENT TO LEND OR TO AGREE TO THE TERMS OF ANY RESTRUCTURING. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. THIS TERM SHEET IS SUBJECT TO ALL EXISTING CONFIDENTIALITY AGREEMENTS.

THIS TERM SHEET IS SUBJECT TO ONGOING REVIEW AND APPROVAL BY ALL PARTIES AND IS NOT BINDING, IS SUBJECT TO MATERIAL CHANGE, AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY.

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | Prior to the date of commencement of the Chapter 11 Cases (the **"Petition Date"**), those holders of First Lien Claims (as defined herein) who are signatories hereto shall have executed the restructuring support agreement to which this Term Sheet is attached |

---

[1] The Debtors are Cengage Learning Holdings II, L.P. (**"CL Holdings"**); Cengage Learning Holdco, Inc. (**CL Holdco"**); Cengage Learning Acquisitions, Inc. (**"CLAI"**); and Cengage Learning, Inc. (**"CLI"**).

|  | (the "**RSA**") pursuant to which the Debtors will agree to pursue and implement a restructuring process consistent with this Term Sheet in order to consummate a plan of reorganization (the "**Plan**").

This Term Sheet outlines the terms of a balance-sheet restructuring of the Debtors and is premised on the Company's estimated total enterprise value at emergence of $2.8 billion. The Plan, as outlined in this Term Sheet and subject to the terms of the RSA, shall provide for the holders of the First Lien Claims (as defined below) to receive in satisfaction of their secured claims their pro rata share of 100% of the equity in the Debtors as reorganized under the Plan (the "**Reorganized Debtors**"), Excess Cash (as defined herein), and, subject to the RSA and the Rollover Facility Term Sheet attached to the RSA, new debt or cash on account of new debt. The Unsecured Creditor Assets (as defined herein), or the value thereof, shall be reserved for the benefit of the holders of Unsecured Claims (as defined below), including the First Lien Deficiency Claims (as defined below).

This Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the Plan and the related definitive documentation governing the Restructuring identified in the RSA (which shall be in form and substance acceptable to the Debtors and the Required Consenting Lenders, the "**Definitive Documents**"). The Definitive Documents, all motions, and related orders and the plan solicitation documents shall satisfy the requirements of the Bankruptcy Code and be consistent with the RSA and this Term Sheet. |
|---|---|
| **Debt to be Restructured** | Indebtedness that will be treated under the Plan includes, among other things, the following indebtedness and obligations (which amounts are not binding):[2]

(1) approximately $3,880.7 million of obligations outstanding under that certain Credit Agreement, dated as of July 5, 2007, as amended by the Incremental Amendment, dated as of May 30, 2008, and the Amendment Agreement, dated as of April 10, 2012, by and among certain of the Debtors, JPMorgan Chase Bank, N.A. as administrative agent, and the other lenders party thereto (the "**First Lien Credit Facility Agreement**" and, together with all related agreements and documents executed by any of the Debtors in connection with the |

---

[2] Amounts include accrued non-default interest through July 1, 2013, and is exclusive of other interest, fees and expenses.

Credit Agreement, the "**First Lien Credit Agreement Documents**"), consisting of (a) approximately $222.5 million of obligations under the Class A Revolving Credit Facility (as defined in the First Lien Credit Facility Agreement) (the "**Unextended Revolver Claims**"); (b) approximately $293.2 million of obligations under the Class B Revolving Credit Facility (as defined in the First Lien Credit Facility Agreement) (the "**Extended Revolver Claims**"); (c) approximately $1,522.7 million of obligations under the Original Term Loans (as defined in the First Lien Credit Facility Agreement) (the "**Unextended Term Loan Claims**"); (d) approximately $549.5 million of obligations under the Tranche 1 Incremental Term Loans (as defined in the First Lien Credit Facility Agreement) (the "**Incremental Term Loan Claims**"); and (e) approximately $1,292.8 million of obligations under the Tranche B Term Loans (as defined in the First Lien Credit Facility Agreement) (the "**Extended Term Loan Claims**," and together with the Unextended Revolver Claims, the Extended Revolver Claims, the Unextended Term Loan Claims, the Incremental Term Loan Claims, and all accrued and unpaid interest, fees, costs, expenses, indemnities and other charges thereunder, the "**First Lien Credit Facility Claims**");

(2) approximately $742.6 million of obligations outstanding under that certain Indenture, dated as of April 10, 2012, by and among Cengage Learning Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee and collateral agent, providing for the issuance of 11.50% Senior Secured Notes due 2020 (such indenture, the "**First Lien Indenture**," and together with all related agreements and documents executed by any of the Debtors in connection with the First Lien Indenture, the "**First Lien Indenture Documents**"), and such obligations thereunder, the "**First Lien Notes Claims**");

(3) approximately $13.3 million of obligations outstanding under certain secured interest rate swap agreements (together with all related agreements and documents executed by any of the Debtors in connection with the First Lien Indenture, the "**First Lien Swap Documents**," and together with the First Lien Credit Agreement Documents and the First Lien Indenture Documents, the "**First Lien Documents**"), and such obligations thereunder, the "**First Lien Swap Claims**," and together with the First Lien Credit Facility Claims and the First Lien Notes Claims, the "**First Lien Claims**," a holder of the

First Lien Claims, a "**First Lien Claimant**," such amounts of First Lien Claims that are Secured,[3] the "**First Lien Secured Claims**," and such amounts of First Lien Claims that are not Secured, the "**First Lien Deficiency Claims**")

(4) approximately $752.7 million of obligations outstanding under that certain Indenture, dated as of July 5, 2012, among Cengage Learning Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee and collateral agent, providing for the issuance of 12.00% Senior Secured Second Lien Notes due 2019 (together with all related agreements and documents executed by any of the Debtors in connection with the Second Lien Indenture, the "**Second Lien Indenture Documents**," and such obligations thereunder, the "**Second Lien Claims**")

(5) approximately $305.4 million of obligations outstanding under that certain Indenture, dated as of July 5, 2007, among TL Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee, providing for the issuance of 10.50% Senior Notes due 2015 (and obligations arising under such indenture and all related agreements and documents executed by any of the Debtors in connection with such indenture, the "**Senior Notes Claims**");

(6) approximately $67.6 million of obligations outstanding under that certain Indenture, dated as of October 31, 2008, among Cengage Learning Holdco, Inc., Cengage Learning Holdings II L.P., as guarantor, and Wells Fargo Banks National Association, as trustee, providing for the issuance of 13.75% Senior PIK Notes due 2015 (and obligations arising under such indenture and all related agreements and documents executed by any of the Debtors in connection with such indenture, the "**PIK Notes Claims**");

(7) approximately $140.0 million of obligations outstanding under that certain Indenture, dated as of July 5, 2007, by and among TL Acquisitions, Inc., the guarantors party thereto, and The Bank of New York Mellon, as trustee, providing for the issuance of 13.25% Senior Subordinated Discount Notes due 2015 (and obligations arising under such indenture and all related agreements and documents executed by

---

[3]  "**Secured**" shall mean when referring to a claim any claim that is secured by a lien on or security interest in property, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

| | |
|---|---|
| | any of the Debtors in connection with such indenture, the "**Subordinated Notes Claims**"); and |
| | (8) all other non-priority general unsecured claims against the Debtors (including allowed intercompany claims) that are not First Lien Deficiency Claims, Second Lien Claims, Senior Notes Claims, PIK Notes Claims, or Subordinated Notes Claims (the "**General Unsecured Claims**," and together with the First Lien Deficiency Claims, the Second Lien Claims, the Senior Notes Claims, the PIK Notes Claims, and the Subordinated Notes Claims, the "**Unsecured Claims**"). |
| | For the avoidance of doubt, all allowed intercompany claims shall participate in any distribution to the holders of Unsecured Claims. To the extent such intercompany claim is pledged as collateral under the First Lien Documents, such distribution shall be paid over to the holders of the First Lien Claims on account of their First Lien Secured Claims. |
| | Notwithstanding anything to the contrary herein, for purposes of the Plan, allowed amounts of claims shall reflect the impact (if any) of any final order of the Bankruptcy Court as of the Effective Date allowing, disallowing, recharacterizing, or subordinating any such claim. All distributions in respect of any indebtedness described above shall be made to the applicable administrative agent, indenture trustee, or other paying agent so designated under the applicable debt agreements to be applied and distributed to lenders and/or holders thereunder in accordance with the provisions of those agreements (including, but not limited to, any applicable waterfall provisions, subordination provisions, and provisions in intercreditor agreements). |
| **Exit Financing** | On the effective date of the Plan (the "**Effective Date**"), the Reorganized Debtors will use commercially reasonable efforts to enter into a new first-out revolving credit agreement of no less than $250 million and up to $400 million to be raised on market terms (the "**New Revolver**"), which new credit agreement shall be subject to the consent of the Consenting Lenders (such consent not to be unreasonably withheld); provided that without limiting the foregoing the Consenting Lenders agree that the New Revolver should be in an amount as large as possible but not to exceed $400 million provided it is raised on market terms. |
| | Other terms of the New Revolver will be set forth in the Definitive Documents, which shall be in form and substance acceptable to the Debtors, the Required Consenting Lenders, and the Credit Agreement |

| | |
|---|---|
| | Agent. |
| **Plan Consideration** | The primary forms of consideration for distributions under the Plan will be the New Debt Facility, the New Equity, and the Excess Cash (each as defined herein) (collectively, the "**Plan Consideration**"). |
| | "**New Debt Facility Consideration**" shall mean, subject to the terms of the RSA and the Rollover Facility Term Sheet, either, (1) the Rollover Facility or (2) cash received from the Reorganized Debtors' entry, on the Effective Date, into the New Term Loan Facility in accordance with the provisions of section 3.01(a)(iii) of the RSA. |
| | "**New Equity**" shall mean 100% (subject to dilution for the Management Incentive Plan (as defined herein) and as otherwise provided in the Plan) of the new equity interests issued by the Reorganized Debtors pursuant to the Plan (the "**New Equity**") following the cancellation of the existing equity interests on the Effective Date, and subject to the terms and conditions of the RSA and the Equity Term Sheet attached to the RSA. |
| | "**Excess Cash**" shall mean any cash other than the Disputed Cash (as defined herein) remaining on the Company's balance sheet as of the Effective Date after funding all payments and reserves required under the Plan, less $50 million (subject to working capital adjustments to be negotiated). |
| **Unsecured Creditor Distribution** | "**Unsecured Creditor Distribution**" shall mean a recovery under the Plan on account of the following assets (the "**Unsecured Creditor Assets**") to the holders of Unsecured Claims, including the First Lien Deficiency Claims: |
| | (1) cash, if any, that (A) the Required Consenting Lenders and the Debtors agree is not subject to any perfected unavoidable liens under the First Lien Documents or the Second Lien Documents or (B) is determined by a final order of the Bankruptcy Court to not be subject to any perfected unavoidable liens under the First Lien Documents or the Second Lien Documents (in either case, the "**Disputed Cash**") |
| | (2) 35% of the equity interests in Cengage Learning Acquisitions C.V. ("**CLA C.V.**"), the Debtors' first-tier non-Debtor foreign subsidiary, or the value thereof (if any), after taking into account any valid intercompany claims owing by CLA C.V. or its subsidiaries to the Debtors (the "**CLA C.V. 35% Equity Value**"); |
| | (3) all copyrights that were registered by the Debtors with the United States Copyright Office after July 5, 2012 but prior to the Petition |

| | |
|---|---|
| | Date and (A) with respect to which copyrights no perfection recording was made with the United States Copyright Office for the benefit of either the First Lien Claimants or the Second Lien Claimants or (B) if they were perfected with the United States Copyright Office for the benefit of either the First Lien Claimants or the Second Lien Claimants, they were perfected with the United States Copyright Office within the 90 days prior to the Petition Date and such perfection has been avoided pursuant to a final order of the Bankruptcy Code (the "**Disputed Copyrights**"); provided, however, the Debtors shall, to the extent requested by the Reorganized Debtors, grant the Reorganized Debtors a license with respect to the Disputed Copyrights for fair value;<br><br>(4) all equity interests owned by the Debtors in The Hampton Brown Company LLC and CourseSmart LLC (the "**Non-Wholly Owned Subsidiaries Interests**"); and<br><br>(5) the $8,883,986.42 of cash invested in a money market fund operated by Federated Investors, Inc. and traded under the ticker "TOIXX" (the "**Federated Fund**") to replace funds used from the Federated Fund to make an amortization payment on June 28, 2013, but solely to the extent the other funds in the Federated Fund are determined to constitute Disputed Cash (the "**Additional Disputed Cash**"). |
| **Convenience Class and Reporting Company Status** | The Reorganized Debtors intend to emerge from the Chapter 11 Cases as a company that is not subject to the reporting requirements of the Securities Exchange Act of 1934 (the "**Reporting Requirements**"). Accordingly, the Reorganized Debtors intend to set a dollar amount threshold (the "**Reporting Company Threshold**") applicable to General Unsecured Claims that in the Reorganized Debtors' estimate will result in fewer than 2,000 holders of New Equity and fewer than 500 holders of New Equity that are not "accredited investors." General Unsecured Claims in an amount less than the Reporting Company Threshold will be classified as "convenience class" general unsecured claims and will receive cash in a dollar amount equal to the value of the Plan Consideration that such holder would otherwise have received if such General Unsecured Claim were not less than the Reporting Company Threshold. Subject to the terms and conditions of the Equity Term Sheet and the RSA, the Reorganized Debtors' organizational documents, in form and substance acceptable to the Required Consenting Lenders, will contain appropriate and customary restrictions on transfers of the New Equity for the purpose of maintaining the Reorganized Debtors' status as a company that is not |

| | subject to the Reporting Requirements. |
|---|---|
| **TREATMENT OF CLAIMS** ||
| **Administrative Claims**<br><br>**Priority Tax Claims**<br><br>**Other Priority Claims**<br><br>**Other Secured Claims**<br><br>**(Against All Debtors)** | Customary treatment provisions for each of these classes in order to render the holders of such claims unimpaired. |
| **First Lien Secured Claims** | Each holder of an Allowed First Lien Secured Claim shall receive its pro rata share of (1) 100% of the New Equity, (2) the New Debt Facility Consideration, and (3) the Excess Cash. |
| **Unsecured Claims Against CLI** | Each Holder of an Allowed Unsecured Claim against CLI (including First Lien Deficiency Claims against CLI) shall receive its pro rata share of the Unsecured Creditor Distribution that is attributable to the assets of CLI consisting of Non-Wholly Owned Subsidiaries Interests, and the Disputed Copyrights , which shall be allocated ratably to holders of claims in accordance with a priority waterfall that shall take into account all applicable priority principles of the Bankruptcy Code and other applicable law, including but not limited to subordination provisions and provisions in intercreditor agreements.<br><br>Notwithstanding anything herein to the contrary, the Second Lien Claims shall be separately classified in order to give effect to the intercreditor agreement between the holders of the First Lien Claims and the Second Lien Claims. The holders of Second Lien Claims shall be required to turnover their recoveries on account of the Disputed Copyrights and any other proceeds of the collateral securing the Second Lien Claims and the First Lien Claims to the holders of First Lien Deficiency Claims.<br><br>For the avoidance of doubt, the Subordinated Notes Claims shall not be entitled to any recovery under the Plan. |
| **Unsecured Claims Against CLAI** | Each Holder of an Allowed Unsecured Claim against CLAI (including First Lien Deficiency Claims against CLAI) shall receive its pro rata share of the Unsecured Creditor Distribution that is attributable to the assets of CLAI consisting of the Disputed Cash, the Additional Disputed Cash, and the CLA C.V. 35% Equity Value , which shall be allocated ratably to holders of claims in accordance with a priority |

K&E 26906466.14

|  | waterfall that shall take into account all applicable priority principles of the Bankruptcy Code and other applicable law, including but not limited to subordination provisions and provisions in intercreditor agreements.<br><br>Notwithstanding anything herein to the contrary, the Second Lien Claims shall be separately classified in order to give effect to the intercreditor agreement between the holders of the First Lien Claims and the Second Lien Claims. The holders of Second Lien Claims shall be required to turnover their recoveries on account any proceeds of the collateral securing the Second Lien Claims and the First Lien Claims to the holders of First Lien Deficiency Claims.<br><br>For the avoidance of doubt, the Subordinated Notes Claims shall not be entitled to any recovery under the Plan. |
|---|---|
| **Unsecured Claims against CL Holdings and CL Holdco** | Holders of Unsecured Claims against CL Holdings and CL Holdco (including First Lien Deficiency Claims against CL Holdings and CL Holdco) will receive a pro rata distribution of any unencumbered assets, if any, of CL Holdings or CL Holdco, as applicable, on account of such claims, which shall be allocated to holders of Allowed Unsecured Claims against CL Holdings and CL Holdco, as applicable, in accordance with a priority waterfall that shall take into account all applicable priority principles of the Bankruptcy Code and all other applicable law, including but not limited to subordination provisions and provisions in intercreditor agreements.<br><br>For the avoidance of doubt, the Subordinated Notes Claims shall not be entitled to any recovery under the Plan. |
| **Section 510(b) Claim Against All Debtors** | "**Section 510(b) Claims**" means any claim against any of the Debtors that is described in section 510(b) of the Bankruptcy Code.<br><br>Holders of Section 510(b) Claims will not receive any distribution on account of such claims, and Section 510(b) Claims shall be discharged, cancelled, released, and extinguished as of the Effective Date. |
| **Existing Equity Interests** | "**Equity Interests in the Company**" means any share of common stock, preferred stock or other instrument evidencing an ownership interest in the Company, whether or not transferable, and any option, warrant, restricted stock unit, or right, contractual or otherwise, to acquire any such interest in the Company that existed immediately prior to the Effective Date.<br><br>**Treatment.** Holders of Equity Interests in the Company will not receive any distribution on account of such interests, and Equity Interests in the Company shall be discharged, cancelled, released, and |

<table>
<tr>
<td></td>
<td>extinguished as of the Effective Date.</td>
</tr>
<tr>
<td></td>
<td>"<b>Intercompany Interests</b>" shall include any share of common stock or other instrument evidencing an ownership interest in any of the Debtors other than the Company, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest in a Debtor other than the Company, which is held by another Debtor or an affiliate of a Debtor.</td>
</tr>
<tr>
<td></td>
<td>Although Intercompany Interests shall not receive any distribution on account of such Intercompany Interests, solely to implement the Plan, Intercompany Interests shall be retained and not cancelled, and the legal, equitable, and contractual rights to which holders of Intercompany Interests are entitled shall remain unaltered to the extent necessary to implement the Plan.</td>
</tr>
<tr>
<td colspan="2" align="center"><b><u>GENERAL PROVISIONS</u></b></td>
</tr>
<tr>
<td><b>Issuance of New Equity</b></td>
<td>On the Effective Date, the New Equity distributed under the Plan shall be deemed fully paid and non-assessable.</td>
</tr>
<tr>
<td><b>Corporate Governance</b></td>
<td>Shall be subject to the terms and conditions set forth in the RSA and the Equity Term Sheet.</td>
</tr>
<tr>
<td><b>Management Incentive Plan</b></td>
<td>The Plan shall provide for a percentage of New Equity equal to $75 million as determined based on an assumed equity value of $1.3 billion to be allocated for the implementation of a market-level management and director equity incentive program to be developed in consultation with Towers Watson and the Required Consenting Lenders and/or their advisors (the "<b><u>Management Incentive Plan</u></b>"). The terms and conditions of the Management Incentive Plan will be agreed to by no later than the date set forth in the milestone set forth in section 3.02(b) of the RSA (including provisions as to granting, vesting, allocation, and amount and form of incentive awards (e.g., warrants, options, LTIP, RSUs, profit interests, etc.)). Awards so granted shall be dilutive of the New Equity interests. The terms and conditions of the Management Incentive Plan, when agreed, shall be deemed incorporated into the RSA and this Term Sheet by reference, and the Management Incentive Plan will be approved in connection with confirmation of the Plan.</td>
</tr>
<tr>
<td><b>Management Employment Agreements</b></td>
<td>The Plan shall provide for the assumption of the employment agreements of members of senior management, subject to a market analysis by Towers Watson and consultation with the Required Consenting Lenders and/or their advisors, and subject to any appropriate adjustments in response to such review and to otherwise</td>
</tr>
</table>

10

|  | conform with the Management Incentive Plan, which adjustments (if any) and such other terms of the employment agreement shall be satisfactory to the Company, the applicable member of management, and the Required Consenting Lenders and/or their advisors, and be determined no later than the milestone date set forth in section 3.02(b) of the RSA. The terms of the employment agreements of members of senior management shall be deemed incorporated into the RSA and the Term Sheet by reference, and shall be assumed in connection with the Plan. |
|---|---|
| **Definitive Documents** | Any final agreement shall be subject to the Definitive Documents, which Definitive Documents shall be consistent with the terms of this Term Sheet and the RSA in all respect unless otherwise agreed to pursuant to the terms of the RSA. The Definitive Documents shall contain terms, conditions, representations, warranties, and covenants, each customary for the transactions described herein consistent with the terms of this Term Sheet. |
| **Tax Issues** | The Restructuring shall be structured to preserve favorable tax attributes to the extent practicable. |

## Exhibit B

**Rollover Facility Term Sheet**

**SENIOR SECURED ROLLOVER EXIT TERM LOAN FACILITY
SUMMARY OF PROPOSED TERMS AND CONDITIONS**

**CONFIDENTIAL; FOR DISCUSSION PURPOSES ONLY
NOT A COMMITMENT TO LEND**

**THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY BE DISTRIBUTED ONLY WITH THE EXPRESS WRITTEN CONSENT OF THE CONSENTING LENDERS (AS DEFINED IN THAT CERTAIN RESTRUCTURING SUPPORT AGREEMENT, DATED AS OF [_____], 2013 AMONG THE LOAN PARTIES (AS DEFINED BELOW), THE LENDERS AND NOTEHOLDERS SIGNATORY THERETO, [JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT AND COLLATERAL AGENT AND THE BANK OF NEW YORK MELLON, AS TRUSTEE AND COLLATERAL AGENT] (AS IT MAY BE AMENDED, THE "RESTRUCTURING SUPPORT AGREEMENT")).**

**THIS TERM SHEET IS SUBJECT TO ONGOING REVIEW BY THE CONSENTING LENDERS AND THEIR PROFESSIONALS, IS SUBJECT TO MATERIAL CHANGE AND IS BEING DISTRIBUTED FOR DISCUSSION PURPOSES ONLY. THIS IS NOT A COMMITMENT TO LEND. THIS TERM SHEET IS NON-BINDING AND THE PROPOSALS CONTAINED HEREIN ARE SUBJECT TO, AMONG OTHER THINGS, DUE DILIGENCE, CREDIT APPROVAL AND THE NEGOTIATION, DOCUMENTATION AND EXECUTION OF DEFINITIVE DOCUMENTATION. ONLY EXECUTION AND DELIVERY OF DEFINITIVE DOCUMENTATION RELATING TO THE TRANSACTIONS SHALL RESULT IN ANY BINDING OR ENFORCEABLE OBLIGATIONS OF ANY PARTY RELATING TO THE TRANSACTIONS.**

**UNLESS OTHERWISE SPECIFICALLY DEFINED HEREIN, EACH CAPITALIZED TERM USED IN THIS TERM SHEET THAT IS DEFINED IN THE RESTRUCTURING SUPPORT AGREEMENT SHALL HAVE THE MEANING ASSIGNED TO SUCH TERM IN THE RESTRUCTURING SUPPORT AGREEMENT.**

| | |
|---|---|
| Borrower: | Cengage Learning Acquisitions, Inc., a Delaware corporation (the "Borrower"). |
| Holdings: | Cengage Learning Holdco, Inc., a Delaware corporation ("Holdings").[1] |
| Lenders: | Initially, holders of First Lien Claims (the "Lenders"). |
| Agents: | An administrative agent (in such capacity, the "Administrative Agent") and collateral agent (in such capacity, the "Collateral Agent" and together with the Administrative Agent, collectively, the "Agents") to be selected by the Borrower and approved by the Consenting Lenders. |
| Term Loan Facility: | A senior secured term loan facility (the "Term Loan Facility"; the loans thereunder, the "Term Loans") in an aggregate principal amount of $1.5 billion. The Term |

---

[1] Ownership structure to be collapsed to dissolve Cengage Learning Holdings II, L.P. if no material adverse tax consequences of doing so (as determined by the Consenting Lenders).

Loans will be distributed to the Lenders as partial satisfaction of their respective First Lien Claims.

Closing Date:

The Term Loan Facility shall close and become effective on the date (the "Closing Date") of (i) the execution and delivery of the Financing Documentation (as defined below) by the Borrower, the Guarantors (as defined below), the Agents and the respective Lenders party thereto, (ii) the satisfaction of the conditions precedent to effectiveness of the Term Loan Facility specified in the credit agreement, including those described herein and (iii) the effectiveness of the Agreed Restructuring Plan (pursuant to the Confirmation Order).

Ratings:

At the sole cost and expense of the Borrower, the Borrower shall use commercially reasonable efforts to obtain, and use commercially reasonable efforts to maintain, a public corporate level rating, a public family level rating, a public facility level rating and a public recovery rating from each of Standard & Poor's and Moody's.

Amortization:

1.0% of the initial principal amount of the Term Loans on an annualized basis payable in quarterly installments, beginning on the last business day of the first full fiscal quarter following the Closing Date. Any remaining principal shall be due on the Maturity Date unless earlier payment is required from mandatory prepayments or following an event of default.

Documentation:

Usual and customary for facilities and transactions of this type, to include, among others, a credit agreement, guarantees and appropriate pledge agreements, security agreements, mortgages, control agreements, intercreditor agreements and other collateral documents (collectively, the "Financing Documentation").

Guarantors:

The obligations of the Borrower under the Term Loan Facility will be unconditionally guaranteed, on a joint and several basis, by Holdings and each existing and subsequently acquired or formed direct and indirect domestic subsidiary other than any domestic subsidiaries of foreign subsidiaries (each a "Guarantor"; and such guarantee being referred to herein as a "Guarantee"). All Guarantees shall be guarantees of payment and not of collection. The Borrower and the Guarantors are herein referred to as the "Loan Parties" and, individually, as a "Loan Party."

Security:

The Term Loan Facility shall be secured by a perfected first priority (subject to certain exceptions (including

liens securing the New Revolving Credit Facility, which New Revolving Credit Facility shall be on terms reasonably acceptable to the Consenting Lenders) to be set forth in the Financing Documentation) security interest in all of the present and future tangible and intangible assets of the Loan Parties (including, without limitation, cash, deposit and securities accounts, accounts receivable, inventory, intellectual property, material owned real property, 100% of the capital stock of the Borrower and the Guarantors and 100% of the non-voting capital stock, and 65% of the voting stock, of each first-tier foreign subsidiary of the Borrower) (the "Collateral").

| | |
|---|---|
| Maturity Date: | The final maturity of the Term Loan Facility will occur on the sixth anniversary of the Closing Date (the "Maturity Date"). |
| Interest Rate: | The Consenting Lenders will consult with the Borrower to determine a mutually acceptable interest rate for the Term Loan based on each party's good faith judgment of the rate that would allow the initial secondary market price to be equal to par. |
| | After the occurrence and during the continuance of an Event of Default, interest on all amounts then outstanding will accrue at a rate equal to 2.00% per annum above the interest rate then in effect and will be payable on demand. |
| Interest Payments: | Except as set forth below, on the last day of selected interest periods (which may be one, two, three or six months) for Term Loans (except, in the case of interest periods of longer than three months, at the end of every three months); and upon prepayment, in each case payable in arrears and computed on the basis of a 360-day year. |
| Mandatory Prepayments: | Mandatory prepayments will be required with respect to excess cash flow, asset sales (subject to customary reinvestment provisions), insurance proceeds and incurrence of non-permitted indebtedness (subject to certain exceptions and basket amounts to be negotiated in the definitive Financing Documentation). |
| Optional Prepayments: | Term Loans may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice and in minimum principal amounts and in multiples to be agreed upon. |

| | |
|---|---|
| Prepayment Premium: | If the Term Loans are prepaid or accelerated at any time (excluding certain mandatory prepayments agreed to by the Lenders),  the Borrower shall, in addition to such prepayment of the principal of, and interest on, the Term Loans, pay to the Lenders the Prepayment Premium. |

"Prepayment Premium"  means a percentage of the principal prepaid or accelerated in the following months after the Closing Date:

| Months | Prepayment Premium |
|---|---|
| 1-6 | 0% |
| 7-18 | 1.0% |
| 19 and thereafter | 0% |

| | |
|---|---|
| Conditions to Closing: | The availability of the Term Loan Facility shall be conditioned upon the satisfaction of the conditions precedent set forth in the Conditions Annex attached hereto as Annex A hereto. |
| Representations and Warranties: | The Loan Parties will make representations and warranties usual and customary for transactions of this type and other terms deemed appropriate by the Lenders, including, without limitation: (i) material accuracy of disclosure and absence of undisclosed liabilities as of the Closing Date, (ii) corporate existence, (iii) compliance with law, (iv) corporate power and authority, (v) enforceability of Financing Documentation, (vi) no conflict with law or contractual obligations, (vii) no material litigation, (viii) no default, (ix) ownership of property, (x) liens, (xi) intellectual property, (xii) no burdensome restrictions, (xiii) taxes, (xiv) Federal Reserve margin regulations, (xv) ERISA, (xvi) Investment Company Act, (xvii) subsidiaries, (xviii) collateral, (xix) environmental matters, (xx) labor matters, (xxi) significant authors and the status of contracts therewith, and (xxii) compliance with all applicable "know your customer" and anti-money laundering rules and regulations (including, without limitation, the Patriot Act). |
| Affirmative Covenants: | The Loan Parties will comply with affirmative covenants customary for transactions of this type and other terms deemed appropriate by the Lenders, including, without limitation: (i) compliance with laws and material contractual obligations, (ii) payment of taxes and other material obligations, (iii) maintenance of insurance, (iv) conduct of business, (v) preservation of corporate existence, (vi) keeping of books and records, (vii) maintenance of properties, (viii) transactions with affiliates, (ix) reporting requirements (including, without |

limitation, as detailed below under the heading "Information Rights"), (x) additional guarantors, (xi) right of Lenders to inspect property and books and records, (xii) notices of defaults, litigation and other material events, (xiii) compliance with environmental laws and (xiv) further assurances.

Negative Covenants:

The Loan Parties will comply with negative covenants customary for transactions of this type and other terms deemed appropriate by the Lenders, including, without limitation, but subject to baskets, limits and incurrence tests to be agreed upon on: (i) indebtedness (including guarantee obligations), (ii) liens, (iii) payment restrictions affecting subsidiaries, (iv) restricted payments, (v) material changes in business, (vi) negative pledge, (vii) transactions with affiliates, (vii) changes in fiscal year, (ix) sale of all or substantially all assets, (x) investments and (xi) prepayment of junior debt classes.

Financial Covenants:

Customary for a covenant lite loan transaction of this type. Notwithstanding the foregoing, the Financing Documentation may include a maximum leverage or minimum Consolidated EBITDA covenant.

Information Rights:

The Loan Parties shall provide to the Lenders, and any prospective lender (who is not a direct competitor of the Loan Parties) that has entered into a confidentiality agreement on customary terms and for purposes of evaluating the investment ("Qualified Prospective Investor") on a reputable password-protected online data system, such as Intralinks, annual reports, quarterly reports, proxy statements and other periodic reports that would be required to be filed pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), prepared as if the Loan Parties were reporting companies under the Exchange Act. The Loan Parties shall hold live quarterly conference calls (with a question and answer period) for the Lenders and Qualified Prospective Investors, with dates and dial-in information announced on the password-protected online data system utilized by the Loan Parties at least three (3) days prior to such quarterly calls.

Events of Default:

The following will constitute Events of Default, subject to customary exceptions, materiality qualifications and notice periods to be agreed upon and, where applicable (other than clause (i) below), cure and grace periods to be determined: (i) nonpayment of principal when due and nonpayment of interest, fees or other amounts after a grace period to be determined, (ii) material inaccuracy of

representations or warranties, (iii) failure to perform or observe negative and certain affirmative covenants set forth in the Financing Documentation, (iv) bankruptcy and insolvency defaults of any Loan Party or any of their material subsidiaries, (v) change of control (the definition of which is to be agreed upon), (vi) customary ERISA defaults, (vii) any Guarantee ceases to be in full force and effect, (viii) material judgments, and (ix) other Events of Default to be determined.

| | |
|---|---|
| Defaulting Lender Provisions, Yield Protection and Increased Costs: | Customary for transactions of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, illegality, unavailability, increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and payments free and clear of withholding or other taxes. |
| Assignments and Participations: | Lenders will be permitted to make assignments in a minimum amount to be agreed (unless such assignment is of a Lender's entire interest in the Term Loan Facility) to any person or entity (other than a natural person and other entities to be agreed), acceptable to Agents and, so long as no default or event of default has occurred and is continuing, Borrower, which acceptances shall not be unreasonably withheld or delayed; provided, however, that the approval of the Borrower shall not be required in connection with assignments to other Lenders (or to affiliates or approved funds of Lenders). |
| | Without the consent of the Borrower or the Agents, each Lender may sell participations in all or a portion of its loans and commitments, subject to customary restrictions on the participants' voting rights. |
| Amendments and Waivers: | Amendments and waivers of the provisions of the Financing Documentation will require the approval of Lenders holding Term Loans representing more than 50% of the aggregate amount of the Term Loans (the "*Required Lenders*"), except that in certain customary circumstances the consent of a greater percentage (or of all) the Lenders may be required. |
| Indemnification: | Customary indemnification provisions for the benefit of the Lenders and their related parties shall apply. |
| Governing Law and Forum: | New York.  The Borrower will waive any right to trial by jury. |

*Exhibit C*

## SUMMARY OF CONDITIONS PRECEDENT TO EFFECTIVENESS OF
## THE TERM LOAN FACILITY

Closing and the availability of the Term Loan Facility will be subject to the satisfaction of the following conditions precedent:

(a)  Financing Documentation and Customary Closing Documentation. (i) Financing Documentation reflecting and consistent with the terms and conditions set forth herein and otherwise reasonably satisfactory to the Consenting Lenders, will have been executed and delivered, (ii) the Agents will have received such customary legal opinions (including, without limitation, opinions of special counsel and local counsel as may be reasonably requested by the Consenting Lenders), documents and other instruments as are customary for transactions of this type, (iii) all documents, instruments, reports and policies required to perfect or evidence the Collateral Agent's security interest (with the relevant priority) in, and liens on, the Collateral (including, without limitation, all certificates evidencing pledged capital stock or membership or partnership interests, as applicable, with accompanying executed stock powers, all UCC financing statements to be filed in the applicable government UCC filing offices, all intellectual property security agreements to be filed with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, and all deposit account control agreements) will have been executed and/or delivered and, to the extent applicable, be in proper form for filing (including UCC and other lien searches, intellectual property searches, insurance policies, access letters (if material) and environmental reports on owned real property), (iv) all governmental and third party consents and all equityholder and board of directors (or comparable entity management body) authorizations shall have been obtained and shall be in full force and effect, (v) other than the Chapter 11 Cases, there shall not be any material pending or threatened litigation, bankruptcy or other proceeding, and (vi) all fees and expenses then due.

(b)  Confirmation of Plan of Reorganization. The Agreed Restructuring Plan shall have been consummated in accordance with the terms of the Support Agreement.

(c)  Information Required by Regulatory Authorities. The Loan Parties will have provided the documentation and other information to the Lenders that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act.

(d)  Representations and Warranties. All representations and warranties made by the Loan Parties shall be true and correct in all material respects (unless already qualified by materiality or material adverse effect in which case they shall be true and correct in all respects).

(e)  New Revolving Credit Facility . The definitive documentation for the New Revolving Credit Facility shall be in form and substance satisfactory to the Consenting Lenders.

(f)  Minimum EBITDA. Holdings and its subsidiaries shall have minimum Consolidated EBITDA on a twelve trailing month basis of $540,000,000.

As used herein, the term "Consolidated EBITDA" shall be defined as the Consolidated Net Income (to be defined in the Financing Documentation) of Holdings and its

subsidiaries increased (without duplication) by the following, in each case to the extent deducted in determining Consolidated Net Income for such period:

(i)      provision for taxes based on income or profits or capital, including, without limitation, state, franchise and similar taxes and foreign withholding taxes paid or accrued during such period; plus

(ii)      Consolidated Interest Expense (to be defined in the Financing Documentation) for such period (including (x) net losses or any obligations under any Swap Contracts (to be defined in the Financing Documentation) or other derivative instruments entered into for the purpose of hedging interest rate risk, (y) bank fees and (z) costs of surety bonds in connection with financing activities, plus certain agreed amounts excluded from Consolidated Interest Expense); plus

(iii)      Consolidated Depreciation and Amortization Expense (to be defined in the Financing Documentation) for such period and all original issue discount relating to any loan agreements or credit facilities of the Loan Parties deducted in such period; plus

(iv)      (a) fees, costs, charges, commissions, operating losses, write-downs and expenses paid or reimbursed to any legal counsel or professional advisor to the Loan Parties and the other Debtors in connection with the negotiation, execution and ongoing performance of the Financing Documentation (and the transactions contemplated thereby and of the New Revolving Credit Facility and the transactions contemplated thereby) incurred during such period in connection with the Financing Documentation, the financing documentation under the New Revolving Credit Facility, the Chapter 11 Cases, the chapter 11 plan of reorganization and the transactions contemplated by any of the foregoing, and (b) costs and expenses incurred in connection with the Debtors' operational restructuring as contemplated in the management business plan; provided that such amounts set forth in this subclause (iv) shall not exceed $107,000,000 in the aggregate when added to all amounts added back to the calculation of Consolidated EBITDA under subclause (v) below; plus

(v)      the amount of management, monitoring, consulting and advisory fees and related indemnities and expenses paid in such period to the Sponsor to the extent such payment was permitted in the Borrower's existing credit agreement; provided that such amounts set forth in this subclause (v) shall not exceed $107,000,000 in the aggregate when added to all amounts added back to the calculation of Consolidated EBITDA under subclause (iv)  above; plus

(vi)      non-cash charges (other than (1) amortization of a prepaid cash item that was paid and not expensed in a prior period and (2) write down of current assets), including (a) write-downs of property, plant and equipment and other assets, (b) impairment of intangible assets, (c) losses resulting from cumulative effect of change in accounting principles, and (d) unrealized losses from foreign currency transaction costs; provided that if such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent; minus

(vii)      without duplication and to the extent included in Consolidated Net Income for such period, the sum of (i) interest income (except to the extent deducted in determining Consolidated Interest Expense), (ii) other non-cash gains increasing

2

Consolidated Net Income for such period (excluding any such non-cash gain to the extent it represents a reversal of an accrual or reserve for potential cash gain in any prior period) (*provided*, that any cash received with respect to any non-cash items of income (other than extraordinary gains) for any prior period shall be added to the computation of Consolidated EBITDA, and (iii) any other non-cash income arising from the cumulative effect of changes in accounting principles.

3

## Exhibit C

**Form Cash Collateral Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENGAGE LEARNING INC., *et al.*,[1] | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | Case No. 13-_____ (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## INTERIM ORDER (I) AUTHORIZING THE USE
## OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO
## PREPETITION SECURED PARTIES, AND (III) SCHEDULING A FINAL HEARING

Upon the motion of Cengage Learning, Inc. and its debtor affiliates, as debtors
and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases
(collectively, the "Chapter 11 Cases"), dated July 2, 2013 (the "Motion"),[2] for entry of the
Interim Order (this "Interim Order") and a final order (a "Final Order") under sections 105, 361,
362, 363, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as
amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of
Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), Rules 4001-5 and 9013-1 of the
Local Rules of the United States Bankruptcy Court for the Eastern District of New York (the
"E.D.N.Y. Local Bankruptcy Rules"), and the *Guidelines for Financing Motions* set forth in
Administrative Order No. 558 of the United States Bankruptcy Court for the Eastern District of
New York (the "Financing Guidelines"), *inter alia*:

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal
taxpayer-identification number, include: Cengage Learning, Inc. (4491); Cengage Learning Holdings II,
L.P. (5675); Cengage Learning Acquisitions, Inc. (0935); Cengage Learning Holdco, Inc. (0831). The
Debtors' service address at their corporate headquarters is 200 First Stamford Place, 4th Floor, Stamford,
Connecticut 06902.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

(a)     authorizing the Debtors' use of Cash Collateral (as defined below), subject to and pursuant to the terms and conditions set forth in this Interim Order;

(b)     granting adequate protection on account of the Debtors' use of Cash Collateral and any diminution in the value of the First Lien Secured Parties' (as defined below) and the Second Lien Secured Parties' (as defined below) respective interests in the Prepetition Collateral (as defined below) to the (i) First Lien Secured Parties (as defined below) under (1) that certain Credit Agreement, dated as of July 5, 2007, which was subsequently amended by the Incremental Amendment, dated as of May 30, 2008, and the Amendment Agreement, dated as of April 10, 2012 (as amended, the "Credit Agreement" and, together with all related agreements and documents executed by any of the Debtors in connection with the Credit Agreement, the "Credit Agreement Documents"), by and among Cengage Learning Acquisitions, Inc., as borrower (the "Borrower"), Cengage Learning Holdings II, L.P., Cengage Learning Holdco, Inc., and Cengage Learning, Inc., as guarantors (the "Guarantors"), JPMorgan Chase Bank, N.A., as successor administrative and collateral agent (in each such capacity, the "Credit Agreement Agent"), and each of the lenders party thereto (together with the Credit Agreement Agent, the "Credit Agreement Secured Parties"); (2) that certain Indenture dated as of April 10, 2012 (as amended, the "Initial Additional First Lien Agreement" and, together with all related agreements and documents executed by any of the Debtors in connection

with the Initial Additional First Lien Agreement, the "Initial Additional First Lien Documents") among the Borrower, the Guarantors party thereto, and The Bank of New York Mellon, as Trustee and as Collateral Agent (in such capacities, the "First Lien Notes Trustee," and, together with each of the holders of those certain 11.5% Senior Secured Notes due 2020, the "Initial Additional First Lien Secured Parties"), and (3) (A) those two certain Rate Swap Transactions dated as of February 12, 2010 and March 4, 2010 among Cengage Learning Acquisitions, Inc. and UBS AG, London Branch ("UBS"), (B) that certain Swap Transaction dated as of April 6 2010 among Cengage Learning Acquisitions, Inc. and Citibank, N.A., New York ("Citi"), (C) that certain Transaction dated as of April 16 2010 among Cengage Learning Acquisitions, Inc. and Goldman Sachs Bank USA ("GS USA"), (D) that certain effective as of February 26, 2010 Transaction and (E) that certain Swap Transaction dated as of March 19, 2010 among Morgan Stanley Capital Services Inc. and Cengage Learning Acquisition, Inc. (the documents described in each of (A), (B), (C), (D) and (E), the "Rate Swap Transaction Documents," and together with the Credit Agreement Documents and the Initial Additional First Lien Documents, the "First Lien Documents") among Cengage Learning Acquisitions, Inc. and The Royal Bank of Scotland plc (together with UBS, Citi and GS USA, the "Secured Rate Swap Parties," and together with the Initial Additional First Lien Secured Parties, the First Lien Notes Trustee, and the Credit Agreement Secured Parties, the "First Lien

Secured Parties"); and (ii) the Second Lien Secured Parties (as defined below) under that certain Indenture dated as of July 5, 2012 (as amended, the "Second Lien Agreement" and, together with all related agreements and documents executed by any of the Debtors in connection with the Second Lien Agreement, the "Second Lien Documents", the Second Lien Documents and the First Lien Documents, collectively, the "Lien Documents") among the Borrower, the Guarantors party thereto, and CSC Trust Company of Delaware, as successor Trustee and as Collateral Agent (in such capacities, the "Second Lien Notes Trustee," and, together with each of the holders of those certain 12% Senior Secured Second Lien Notes due 2019, the "Second Lien Secured Parties", the Second Lien Secured Parties and the First Lien Secured Parties, collectively, the "Secured Parties");

(c)     subject to entry of a Final Order and to the extent set forth herein, waiving the Debtors' right to surcharge the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

(d)     modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit the Debtors and the Secured Parties to implement the terms of this Interim Order;

(e)     waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order; and

(f)    scheduling of a final hearing (the "Final Hearing") on the Motion no later

than [July 24, 2013] to consider entry of a Final Order granting the relief

requested in the Motion on a final basis.

Upon due and sufficient notice of the Motion and the interim hearing on the

Motion (the "Interim Hearing") having been provided by the Debtors; and the Interim Hearing

having been held on _____, 2013; and after considering all the pleadings filed with this

Court; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being

proper in this District pursuant to 28 U.S.C. § 1408; and upon the record made by the Debtors at

the Interim Hearing; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors, their estates, creditors and all parties in interest;

and after due deliberation and consideration and good and sufficient cause appearing therefor,

**THE COURT FINDS AS FOLLOWS:**

A.    Petition Date.  On July 2, 2013 (the "Petition Date"), each of the Debtors filed a

voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy

Court for the Eastern District of New York (the "Court").  On _____, 2013, this Court

entered an order approving the joint administration of the Chapter 11 Cases.

B.    Debtors in Possession.  The Debtors are continuing in the management and

operation of their business and properties as debtors in possession pursuant to sections 1107

and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these

Chapter 11 Cases.

C.    <u>Jurisdiction and Venue</u>.    This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings and over the persons and property affected hereby. Venue for the Chapter 11 Cases is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

D.    <u>Debtors' Stipulations</u>.    Subject in all respects to all parties' rights and defenses with respect to (i) the Disputed Collateral (as defined herein) and the limitations thereon described below in Paragraph 9 of this Interim Order and (ii) any Affiliated Lender, Affiliated Institutional Lender (each as defined in the Credit Agreement), or any affiliate of the Debtors, or any claims or obligations held by such party as described in paragraph D.g of this Interim Order, the Debtors admit, acknowledge, agree and stipulate to the following (collectively, the "<u>Debtors' Stipulations</u>"):

a.    <u>First Lien Obligations</u>.    As of the Petition Date, the Debtors were truly and justly indebted to the First Lien Secured Parties pursuant to the First Lien Documents, without defense, counterclaim, or offset of any kind, in the aggregate principal amount of (i) (A) $3,353,842,720.49 outstanding under the Term Loan Facilities (as defined in the Credit Agreement), (B) $513,999,999.99 outstanding under the Revolving Facilities (as defined in the Credit Agreement), (C) $6,226,252.50 outstanding under L/C Borrowings (as defined in the Credit Agreement), (D) $13,300,000 outstanding under the Rate Swap Transaction Documents, and (E) $725,000,000 outstanding under the Initial Additional First Lien Agreement, plus (ii) accrued and unpaid interest with respect thereto and any additional fees, costs and expenses (including any attorneys', financial advisors', and other professionals' fees and expenses that are chargeable or reimbursable under the First Lien Documents) and all other Obligations (as defined in the First Lien Documents) owing under or in connection with the First Lien

Documents (collectively, the "First Lien Obligations"). The Debtors are in default of their debts and obligations under the First Lien Documents.

b.     Prepetition Liens and Prepetition Collateral. The First Lien Obligations are secured by first priority security interests in and liens on (the "Prepetition First Priority Liens") substantially all of the Debtors' assets including Cash Collateral as defined in section 363 of the Bankruptcy Code (the "Cash Collateral"), as more particularly described in and on the terms set forth in the First Lien Documents (collectively, the "Prepetition Collateral"), and the Obligations (as defined in the Second Lien Documents) owing under or in connection with the Second Lien Documents (collectively, the "Second Lien Obligations", and together with the First Lien Obligations, the "Secured Obligations") are secured by second priority security interests in and liens on (the "Prepetition Second Priority Liens", and together with the Prepetition First Priority Liens, the "Prepetition Liens") the Prepetition Collateral, including Cash Collateral.

c.     Validity and Perfection of Prepetition First Priority Liens. The Prepetition First Priority Liens are (i) valid, binding, perfected and enforceable liens on and security interests in the Prepetition Collateral; (ii) not subject to, pursuant to the Bankruptcy Code or other applicable law, avoidance, disallowance, reduction, recharacterization, recovery, subordination, attachment, offset, counterclaim, defense, "claim" (as defined in the Bankruptcy Code), impairment or any other challenge of any kind; and (iii) subject and subordinate only to (A) the Carve-Out (as defined below) and (B) valid and enforceable liens and encumbrances in the Prepetition Collateral that were perfected prior to the Petition Date, that were made expressly senior to the applicable First Lien Secured Parties' liens under the applicable First Lien Documents, that are valid, perfected, enforceable and non-avoidable as of the Petition Date and

that are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law ("Permitted Liens"),[3] and the Debtors each irrevocably waive, for themselves and their subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validation and enforceability of the Prepetition First Priority Liens or the validity or enforceability of the First Lien Obligations and the First Lien Documents.

        d.     Validity of First Lien Obligations.  The First Lien Obligations constitute legal, valid and binding obligations of each of the Debtors.  No offsets, defenses, or counterclaims to the First Lien Obligations exist.  No portion of the First Lien Obligations is subject to set-off, avoidance, disallowance, reduction, or subordination (whether equitable, contractual or otherwise) counterclaims, cross-claims, defenses or any other challenges under or pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  The First Lien Documents are valid and enforceable by each of the First Lien Secured Parties, the Credit Agreement Agent and the First Lien Notes Trustee, as applicable, for the benefit of the First Lien Secured Parties against each of the applicable Debtors.  The First Lien Obligations constitute allowed claims against the applicable Debtors' estates.  No claim of or cause of action held by the Debtors or their estates exists against any of the First Lien Secured Parties or their agents, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the First Lien Documents (or the transactions contemplated thereunder), First Lien Obligations, or

---

[3]      Nothing shall prejudice the rights of any party-in-interest including, but not limited to, the Debtors and the First Lien Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection or extent of any such liens and/or security interests.

Prepetition First Priority Liens, including without limitation, any right to assert any disgorgement or recovery.

   e. <u>Releases by the Debtors</u>: Except with respect to the Disputed Collateral (as defined below), each of the Debtors and the Debtors' estates, on its own behalf and on behalf of its past, present and future predecessors, successors, heirs, subsidiaries, and assigns (collectively, the "<u>Releasors</u>") shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the First Lien Secured Parties (other than any Affiliated Lender or Affiliated Institutional Lender (each as defined in the Credit Agreement), or any affiliate of the Debtors) and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "<u>Releasees</u>") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the First Lien Documents, or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action regarding the

validity, priority, perfection or avoidability of the liens or claims of the First Lien Secured Parties. The Debtors' acknowledgment and stipulations, and releases shall be binding on the Debtors and their respective representatives, successors and assigns and, subject to any action timely commenced by a Committee before the Investigation Termination Date (as defined below), on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors and assigns, including, without limitation, any trustee or other representative appointed in these Chapter 11 Cases, whether such trustee or representative is appointed in chapter 11 or chapter 7.

        f.      <u>Disputed Collateral.</u>  Notwithstanding anything to the contrary contained herein, the Debtors do not stipulate that the First Lien Secured Parties or the Second Lien Secured Parties have valid, binding, perfected, enforceable, and non-avoidable liens on and security interests in: (i) the Debtors' investment in the Federated Treasury Obligations Fund, TOIXX Fund No. 68 (the "<u>Treasury Fund</u>") as of the Petition Date (until such time as such investment is ultimately determined by final non-appealable Order of the Court (or another court of competent jurisdiction) to be Unencumbered Cash or Cash Collateral, the "<u>Disputed Cash</u>"); and (ii) all copyrights registered by the Debtors with the United States Copyright Office after July 5, 2012 and before the Petition Date, and perfected prepetition within the 90 days prior to the Petition Date (the "<u>Disputed Copyrights</u>," and together with the Disputed Cash, the "<u>Disputed Collateral</u>"). The First Lien Secured Parties and the Debtors each reserve all rights, claims, and defenses with respect to the Disputed Collateral. Unless otherwise ordered by the Court, on subsequent notice and a hearing, the Debtors retain standing to bring any claims relating to Disputed Collateral on behalf of the Debtors' estates.

g.      Affiliated Lender.   Notwithstanding anything to the contrary contained herein, (i) the Debtors' Stipulations, including any acknowledgements, agreements, stipulations, or releases contained in this paragraph D, shall not apply to any Affiliated Lender, Affiliated Institutional Lender (each as defined in the Credit Agreement), or any affiliate of the Debtors, or any claims or obligations held by such party, (ii) the Debtors and all other parties in interest reserve all rights, claims, and defenses with respect thereto and (iii) unless otherwise ordered by the Court, on subsequent notice and a hearing, the Debtors retain standing to bring any claims against such parties on behalf of the Debtors' estates.   Nothing in this Order shall be deemed an admission, finding or determination that there exists any claims or causes of action by the Debtors or any such party against any Affiliated Lender or Affiliated Institutional Lender and nothing in this Order (including, without limitations, any releases granted in this Order) shall be deemed to prejudice, waive or release the rights, claims, privileges and defenses of any Affiliated Lender or Affiliated Institutional Lender against or with respect to the Debtors or any party, including (without limitation) any under the First Lien Documents, the Second Lien Documents or otherwise

E.      Approved Budget.   Attached hereto as Exhibit A is a 13-week cash flow forecast setting forth all projected cash receipts and cash disbursements on a weekly basis (the "Approved Budget").   The Approved Budget is an integral part of this Interim Order and has been relied upon by the First Lien Secured Parties in consenting to this Interim Order and to permit the use of the Cash Collateral.   The Debtors represent and warrant to the First Lien Secured Parties and this Court that the Approved Budget includes and contains the Debtors' best estimate of all operational receipts and all operational disbursements, fees, costs, and other expenses that will be payable, incurred and/or accrued by any of the Debtors during the period covered by the

11

Approved Budget and that such operational disbursements, fees, costs, and other expenses will be timely paid in the ordinary course of business pursuant to and in accordance with the Approved Budget unless such operational disbursements, fees, costs, and other expenses are not incurred or otherwise payable.    The Debtors further represent that the Approved Budget is achievable and will allow the Debtors to operate in the Chapter 11 Cases and pay postpetition administrative expenses as they come due.    The Debtors shall be required to provide to the advisors of that certain *ad hoc* group of First Lien Secured Parties (the "First Lien Group") and advisors to the Credit Agreement Agent, a Budget Variance Report (as defined below) in accordance with the provisions of paragraph 6L.c of this Interim Order.

    F.  Use of Cash Collateral.    An immediate and critical need exists for the Debtors to use the Cash Collateral for (i) working capital purposes; (ii) other general corporate purposes of the Debtors; and (iii) subject to the Final Hearing and entry of the Final Order, the satisfaction of the costs and expenses of administering the Chapter 11 Cases, provided that the Debtors shall be required to satisfy (and shall be deemed to have satisfied) any costs and expenses incurred pursuant to sub-clause (iii) *first* from unencumbered cash (which shall include, solely for the waterfall purposes set forth in this Interim Order, any cash encumbered solely by Adequate Protection Liens (as defined below)), including any Disputed Cash that is ultimately determined by final non-appealable order of the Court (or another court of competent jurisdiction) to be unencumbered (collectively, the "Unencumbered Cash"),[4] *second* from Disputed Cash and third from Cash Collateral so as to avoid immediate and irreparable harm to their estates and the value of their assets.

---

[4] Without affecting the waterfall provisions set forth herein, and to the extent there is no readily identifiable Unencumbered Cash available, the costs of administering the estate may be paid from the Treasury Fund; provided that such costs shall be deemed to have been first satisfied from, in accordance with the waterfall provisions hereof, any Unencumbered Cash that may ultimately be determined to exist by final, non-appealable order of the Bankruptcy Court (or other court of competent jurisdiction).

G.    <u>Consent by First Lien Secured Parties</u>.  The Collateral Agents (as defined below) and First Lien Group (as defined below) have consented to, conditioned on the entry of this Interim Order, the Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order, and such consent is binding on all First Lien Secured Parties.

H.    <u>Adequate Protection</u>.  The adequate protection provided to the Secured Parties, as set forth more fully in paragraph 6 of this Interim Order, for any diminution in the value of the Secured Parties' interest in the Prepetition Collateral from and after the Petition Date resulting from the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the use, sale, or lease of the Cash Collateral under section 363 of the Bankruptcy Code, or the liens and security interests granted in respect of the Intercompany Loan (as defined below) is consistent with and authorized by the Bankruptcy Code and is offered by the Debtors to protect such parties' interests in the Prepetition Collateral in accordance with sections 361, 362, 363 and 364 of the Bankruptcy Code.  The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to (i) protect the Secured Parties from the diminution of their respective interests in the value of their Prepetition Collateral and (ii) obtain the foregoing consents and agreements.

I.    <u>Good Cause Shown; Best Interest</u>.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and E.D.N.Y. Local Bankruptcy Rule 4001-5.  Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of

the Debtors' existing businesses and enhance the Debtors' prospects for a successful reorganization.

J.    <u>No Liability to Third Parties</u>.  The Debtors stipulate and the Court finds that in permitting the Debtors to use the Cash Collateral, or in taking any other actions permitted by this Interim Order, none of the Secured Parties shall (i) have liability to any third party or be deemed to be in control of the operation of any of the Debtors or to be acting as a "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of any of the Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any other Federal or state statute) or (ii) owe any fiduciary duty to any of the Debtors, their creditors or estates, or shall constitute or be deemed to constitute a joint venture or partnership with any of the Debtors.

K.    <u>Section 552(b)</u>.  Each of the First Lien Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.  Subject to the Final Hearing and entry of the Final Order, the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the First Lien Secured Parties with respect to proceeds, product, offspring, or profits with respect to any of the Collateral; <u>provided, however</u> that the Debtors and all parties in interest reserve the right to argue for a carve-out from the First Lien Secured Parties' collateral pursuant to the "equities of the case" exception under section 552(b) of the Bankruptcy Code based on and in an amount equal to the depletion (after giving effect to the Restored Cash Amount (as defined below)) of the Disputed Cash that is ultimately determined by final non-appealable Order of the Court (or another court of competent

jurisdiction) to be Unencumbered Cash, and the First Lien Secured Parties reserve all rights, defenses and counterclaims with respect thereto.

L.    Notice.    The Interim Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001 and E.D.N.Y. Local Bankruptcy Rule 4001-5.    Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, or hand delivery, on July 2, 2013, to certain parties-in-interest, including: (a) the U.S. Trustee, (b) the 30 largest non-insider unsecured creditors of the Debtors on a consolidated basis, (c) the Credit Agreement Agent, (d) Davis Polk & Wardwell LLP, as counsel to the Credit Agreement Agent, (e) the First Lien Notes Trustee, (f) Katten Muchin Rosenman LLP, as counsel to the First Lien Notes Trustee, (g) Milbank, Tweed, Hadley & McCloy LLP, as counsel to the First Lien Group (as defined below), (h) the indenture trustees under the Debtors' prepetition senior unsecured notes, senior PIK notes, and senior subordinated discount notes; (i) the Internal Revenue Service and (j) the United States Attorney for the Eastern District of New York.    Under the circumstances, such notice of the Motion, the relief requested therein and the Interim Hearing complies with Bankruptcy Rules 4001(b), (c), and (d), the E.D.N.Y. Local Bankruptcy Rules, and the Financing Guidelines.

Based upon the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT**:

1.    Approval of Interim Order.    The Motion is approved on the terms and conditions set forth in this Interim Order.    Any objections that have not previously been withdrawn are hereby overruled.    This Interim Order shall become effective immediately upon its entry.

2.    <u>Authorization to Use Cash Collateral</u>.  Pursuant to this Interim Order, the Debtors are authorized on an interim basis, subject to entry of a Final Order, to use Cash Collateral for (i) working capital purposes; (ii) other general corporate purposes of the Debtors; and (iii) subject to the Final Hearing and entry of the Final Order, the satisfaction of the costs and expenses of administering the Chapter 11 Cases, <u>provided</u> that the Debtors shall be required to satisfy (and shall be deemed to have satisfied) any costs and expenses incurred pursuant to sub-clause (iii) *first* from Unencumbered Cash, *second* from Disputed Cash and third from Cash Collateral, in each case in accordance with the Approved Budget (subject to permitted variances) through and including the Termination Date (as defined below) (the "<u>Cash Collateral Period</u>"). To the extent that Cash Collateral of any Debtor is used by another Debtor, the Debtor funding such use shall have an allowed superpriority claim junior in priority only to the claims of the Secured Parties, including those set forth herein.  Moreover, to the extent that Cash Collateral (including, for the avoidance of doubt, any Disputed Collateral that is determined by order of the Court to be Cash Collateral) of any Debtor is used by an affiliate that is not a Debtor to fund operations, such intercompany transfer shall be, in accordance with the Approved Budget and evidenced through the issuance of a first priority senior secured promissory note or by other means sufficient to provide the Debtor with a valid and enforceable secured claim against the recipient of such funds; <u>provided, however</u>, that any such intercompany transfer to The Hampton Brown Company LLC shall be made in the ordinary course of business in accordance with the Approved Budget; *provided*, *further*, *however*, that any such transfers to The Hampton Brown Company LLC shall not exceed two million dollars ($2,000,000).  The Debtors shall segregate (or hereby shall be deemed to have segregated) Cash Collateral (including, for the avoidance of doubt, any Disputed Cash that is ultimately determined by order of the Court to be Cash

Collateral) and continuously track (or hereby shall be deemed to have continuously tracked) the deposit and use of all such collateral in a manner that satisfies (and hereby is deemed to satisfy) any requirement that the Secured Parties trace such collateral in accordance with any provisions of the Uniform Commercial Code, the Bankruptcy Code, or other applicable law.

3.    Refund of Prepetition Principal Payments.  Within five days after the Investigation Termination Date, the Debtors shall refund $8,883,986.42 from Cash Collateral to the Treasury Fund, which amount reflects the Debtors' prepetition principal payments due and payable on June 28, 2013 on account of the Term Loan Facilities (as defined in the Credit Agreement), to the extent that no Claims and Defenses (as defined below) have been brought with respect thereto.

4.    Replacement of Disputed Cash Used For Operations Postpetition.  To the extent the Debtors are required to transfer Disputed Cash to an account that is subject to the Secured Parties' liens (an "Encumbered Cash Account") on account of projected postpetition operational expenses, any such advance shall be senior to any and all prepetition liens and security interests of the Secured Parties, but junior in priority to the Adequate Protection Liens (as defined herein); provided, however, that no more than $25 million, in the aggregate, shall be transferred on account of such expenses.  To the extent that the funds transferred to the Encumbered Cash Account are not needed to fund projected postpetition operational expenses, the Debtors will restore any such amount to the Treasury Fund as soon as practicable (the "Restored Cash Amount").  To the extent the Debtors are required to transfer any cash from the Encumbered Cash Account to Cengage Leaning, Inc. on account of realized postpetition operational expenses, the Debtors will reflect such transfer from the Encumbered Cash Account with a secured loan from Cengage Learning Acquisitions, Inc. to Cengage Learning, Inc. (the

"Intercompany Loan"). The Intercompany Loan shall be senior to any and all prepetition liens and security interests of the Secured Parties, but junior in priority to the Adequate Protection Liens (as defined herein). Upon receipt of sufficient Cash Collateral, the Intercompany Loan will be repaid (the "Loan Repayment") and restored to the Treasury Fund as soon as practicable. The Restored Cash Amount and the Loan Repayment will be deemed "Disputed Cash" under this Interim Order, unless and until, and solely to the extent that such Disputed Cash is ultimately determined by final non-appealable Order of the Court (or another court of competent jurisdiction) to be Unencumbered Cash or Cash Collateral. Notwithstanding anything herein to the contrary, to the extent that the Debtors use Disputed Cash to fund operations postpetition (including for working capital or other general corporate purposes) and do restore such amounts to the Treasury Fund pursuant to this paragraph 4, the Debtors and all parties in interest shall be deemed to have waived any right to assert, under section 552 of the Bankruptcy Code or otherwise, that the proceeds, product, offspring, or profits thereof are not subject to the Secured Parties' liens or proceeds of the Secured Parties' liens (including, in each case, any Adequate Protection Liens (as defined below)).

5.    Termination Event. Notwithstanding anything contained herein, the authority for use of Cash Collateral shall terminate (the "Termination Date") upon the earlier to occur of (i) the date that is 135 day after the Petition Date, (ii) three days after notice of the date upon which any Event of Default (as defined below) occurs and is continuing, (iii) the date that any Debtor or any other party in interest with proper standing granted by order of the Court (or another court of competent jurisdiction) asserts, in a pleading filed with the Court (or another court of competent jurisdiction), a claim or challenge against any of the Secured Parties contrary to the Debtors' acknowledgements, stipulations and releases contained herein; and (iv) the date

that any Debtor shall file a motion seeking any modification or extension of this Interim Order without the prior written consent of the Credit Agreement Agent and the holders of a sixty-six and two-thirds of the First Lien Obligations held by the members of First Lien Group (the "Requisite First Lien Lenders"). For the avoidance of doubt, the authority for the use of Cash Collateral shall not terminate if the Debtors assert a claim or challenge against any of the Secured Parties with respect to any liens or security interests in the Disputed Collateral, and the Debtors expressly retain the right to assert such a claim or challenge with respect to such Disputed Collateral, and the Secured Parties expressly reserve their rights, objections and defenses with respect to any such claim or challenge brought by the Debtors or any other party.

6. Secured Parties' Adequate Protection. The Secured Parties are entitled pursuant to sections 361, 363(c) and 364 of the Bankruptcy Code to adequate protection of their interests in the Prepetition Collateral (including Cash Collateral) to the extent of any diminution in the value of the Secured Parties' interest in the Prepetition Collateral from and after the Petition Date in any way resulting from the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code, the use, sale, or lease of the Cash Collateral under section 363 of the Bankruptcy Code or the liens and security interests granted in respect of the Intercompany Loan. The Credit Agreement Agent and the First Lien Notes Trustee (collectively, the "Collateral Agents"), in each case, on behalf of itself and for the benefit of each of the respective First Lien Secured Parties, and the Second Lien Notes Trustee, on behalf of itself and for the benefit of each of the Second Lien Secured Parties, are hereby granted, to the extent of any diminution in value of their interests in the Prepetition Collateral from and after the Petition Date, the following (collectively, the "Prepetition Adequate Protection Obligations"):

a.    <u>Adequate Protection Liens</u>.    Valid, binding, enforceable and perfected security interests in and liens upon (the "<u>Adequate Protection Liens</u>") all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries (including the Debtors' equity interests comprising 35% of the non-Debtor international subsidiaries to the extent there are no material adverse tax consequences as reasonably determined by the Debtors, the Credit Agreement Agent and the Requisite First Lien Lenders), money, investment property, and causes of action (including causes of action arising under section 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code) and subject to entry of the Final Order, the proceeds of any causes of action under sections 502(d), 544, 545, 547, 548, 550 (except as provided above) or 553 of the Bankruptcy Code (the "<u>Avoidance Actions</u>"), Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property,

securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (all such property, other than the Prepetition Collateral in existence immediately prior to the Petition Date, being collectively referred to as, the "Postpetition Collateral" and collectively with the Prepetition Collateral, the "Collateral"), which liens and security interests shall be senior to any and all others liens and security interests, but subject to (A) the Carve Out (as defined below) and (B) Permitted Liens; provided, however, that, other than in respect of any Adequate Protection Lien granted on or Superpriority Claim payable from the proceeds of any Avoidance Action, no particular Secured Party shall be entitled to any recovery (other than in respect of any such Secured Party's unsecured claim) from any proceeds of a successful Avoidance Action against such Secured Party.  The Adequate Protection Liens granted to the Credit Agreement Agent and the First Lien Notes Trustee (collectively, the "First Priority Adequate Protection Liens") shall be *pari passu* with one another, and the Adequate Protection Liens granted to the Second Lien Notes Trustee shall be junior and subordinate to the First Priority Adequate Protection Liens as provided in that certain Second Lien Intercreditor Agreement dated as of July 5, 2012 among Cengage Learning Acquisitions, Inc. (f/k/a TL Acquisitions, Inc.), as Borrower, Cengage Learning Holdco, Inc. (f/k/a TL US Holdco, Inc.,), as Holdings, Cengage Learning Holdings II, L.P. (f/k/a TL Holdings II L.P.), as Parent, JPMorgan Chase Bank, N.A, as Senior Representative for the Credit Agreement Secured Parties, The Bank of New York Mellon, as Representative for the Initial Second Priority Debt Parties, The Bank of New York Mellon, as Representative for the Additional Senior Debt Parties under the 11.5% Senior Secured Notes Indenture, and each additional Representative from time to time party thereto.  For the avoidance

of doubt, such Adequate Protection Liens shall be deemed to be effective and perfected automatically as of the Petition Date and without the necessity of the execution by the Debtors, or the filing of, as applicable, mortgages, security agreements, pledge agreements, financing statements, state or federal notices, recordings (including, without limitation, any recordings with the United States Copyright Office) or other agreements and without the necessity of taking possession or control of any Collateral.    Except as otherwise provided herein, under no circumstances shall the Adequate Protection Liens be made subordinate to the lien of any other party, no matter when arising.    Notwithstanding anything to the contrary contained herein, the First Lien Secured Parties reserve all of their rights to assert claims pursuant to section 507(b) of the Bankruptcy Code.

> b.    <u>Superpriority Claims</u>.    An allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a) and 507(b) of the Bankruptcy Code as provided for in section 507(b) of the Bankruptcy Code (the "<u>Superpriority Claim</u>").    The Superpriority Claim shall be subject only to the Carve-Out, and shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including, without limitation, all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including, without limitation, sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment.    The Superpriority Claim, subject to entry of the Final Order to the extent provided therein, shall be payable from and have recourse to the

proceeds of the Avoidance Actions; provided, however, that, other than in respect of any Adequate Protection Lien granted on or Superpriority Claim payable from the proceeds of any Avoidance Action, no particular Secured Party shall be entitled to assert a Superpriority Claim against any proceeds of a successful Avoidance Action against such Secured Party (other than in respect of any such Secured Party's unsecured claim).  The Superpriority Claim granted to the Credit Agreement Agent and the First Lien Notes Trustee (collectively, the "First Priority Superpriority Claims") shall be *pari passu* with one another, and the Superpriority Claim granted to the Second Lien Notes Trustee shall be immediately junior to the First Priority Superpriority Claims. The allowed Superpriority Claim also shall be payable from and have recourse to all unencumbered pre- and post-petition property of the Debtors.  Other than the Carve-Out, no cost or expense of administration under sections 105, 503 or 507 of the Bankruptcy Code or otherwise, including any such cost or expense resulting from or arising after the conversion of the any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code, shall be senior to, or *pari passu* with, the First Priority Superpriority Claims.

        c.      Fees and Expenses.  Within five (5) days of receipt of invoices therefor, payment, without further order of, or application to, the Bankruptcy Court or notice to any party, of all outstanding prepetition and all postpetition (a) reasonable and documented fees and expenses incurred by the First Lien Group, including, without limitation, the reasonable and documented fees and expenses incurred by Milbank Tweed, Hadley & McCloy LLP, as counsel to the First Lien Group, and Houlihan Lokey Capital, Inc., as financial advisors to the First Lien Group and (b) reasonable and documented fees and expenses incurred by the Credit Agreement Agent, including, without limitation, the reasonable and documented fees and expenses incurred by Davis Polk & Wardwell LLP, as counsel to the Credit Agreement Agent, and Blackstone

Advisory Partners L.P., as financial advisors to the Credit Agreement Agent and (c) reasonable and documented fees and expenses of the First Lien Notes Trustee, including, without limitation, the reasonable and documented fees and expenses incurred by Katten Muchin Rosenman LLP, as counsel to the First Lien Notes Trustee; provided, however, that all such fees and expenses provided for in this paragraph 6c shall be satisfied solely from Cash Collateral; provided; further, that such invoices shall also be provided to the United States Trustee on five (5) days notice.

   d.  Reporting and Budget Compliance. The Debtors shall comply with the Approved Budget, the initial version of which is attached hereto as Exhibit A (the "Initial Approved Budget"). Every four weeks, the Debtors shall deliver an updated budget for the following 13-week period (each a "Proposed Budget") (with the first Proposed Budget to be delivered during the week of July 22, 2013) to the advisors to the Credit Agreement Agent and the advisors to the First Lien Group on a professional eyes' only basis; provided, that the Proposed Budget may be shared with Credit Agreement Agent. Every week (beginning with the first full week after the Petition Date), on the third business day of such week, the Debtors shall deliver to the advisors to the Credit Agreement Agent and the advisors to the First Lien Group, on a professional eyes' only basis, a weekly variance report from the previous week comparing the actual cash receipts and disbursements of the Debtors with the receipts and disbursements in the Approved Budget (the "Budget Variance Report"); provided, that the Budget Variance Report may be shared with the Credit Agreement Agent. The Debtors shall ensure that at no time shall any of the following occur: (i) an unfavorable variance by the lesser of (x) $30 million or (y) 20% or more from the "Total Receipts" line item in the Approved Budget, tested every other week on a cumulative rolling four (4) week basis; (to begin on the fifth week); (ii) an unfavorable variance by 15% or more from the "Total Disbursements", tested every other week

on a cumulative rolling four (4) week basis (such cumulative rolling basis to begin on the fifth week), provided, that, "Total Disbursements" shall include any disbursements made by the Debtors (including, but not limited to, any payments, expenditures or advances) other than (a) professional fees and expenses related to adequate protection and (b) professional fees and expenses relating to administration of these Chapter 11 Cases.  The Initial Approved Budget will be the first Approved Budget for reporting and permitted variance purposes.  Each Proposed Budget provided to the advisors to the Credit Agreement Agent and the advisors to the First Lien Group shall be of no force and effect unless and until it is approved by the such advisors and until such approval is given, the prior Approved Budget shall remain in effect.  The advisors to the Credit Agreement Agent and the advisors to the First Lien Group shall approve or reject each Proposed Budget within one week after delivery by the Debtors to such parties (and such parties shall be deemed to have approved the Proposed Budget upon the passage of one week with no objection by either such party).  Any such Proposed Budget, upon the approval of the advisors to the Credit Agreement Agent and the advisors to the First Lien Group shall become, as of the date of such approval and for the period of time covered thereby, the Approved Budget, and shall prospectively replace any prior Approved Budget, and the summary of such Approved Budget, substantially in the form of Exhibit A hereto shall be made public.

        e.      Access to Records.  In addition to, and without limiting, whatever rights to access the First Lien Secured Parties have under their respective First Lien Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall permit representatives, agents, and employees of the First Lien Secured Parties (i) to have access to and inspect the Debtors' properties, (ii) to examine the Debtors' books and records, and (iii) to

discuss the Debtors' affairs, finances, and condition with the Debtors' officers and financial advisors.

        f.      <u>Right to Seek Additional Adequate Protection</u>.  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the First Lien Secured Parties to request additional forms of adequate protection at any time or the rights of the Debtors or any other party to contest such request.

        7.      <u>Events of Default</u>.  The occurrence of any of the following events shall constitute an event of default (collectively, the "<u>Events of Default</u>"):

        a.      termination of the prepetition restructuring support agreement entered into by the First Lien Group and the Credit Agreement Agent dated as of July 2, 2013 (the "<u>Restructuring Support Agreement</u>");

        b.      the Debtors shall not have filed with the Court a plan of reorganization in form and substance consistent with the Restructuring Support Agreement and acceptable to the Credit Agreement Agent and the Requisite First Lien Lenders (the "<u>Plan</u>") and a disclosure statement in form and substance acceptable to the Credit Agreement Agent and the Requisite First Lien Lenders with respect thereto (the "<u>Disclosure Statement</u>") on or before 45 days following the Petition Date;

        c.      the Plan shall not have been confirmed pursuant to an order of the Court in form and substance acceptable to the Credit Agreement Agent and the Requisite First Lien Lenders and consummated within 135 days of the Petition Date;

        d.      the Court shall have failed to have entered the Final Order in form and substance acceptable to the Credit Agreement Agent and the Requisite First Lien Lenders within 30 days of the Petition Date;

e.    the Court shall have entered an order dismissing any of the Chapter 11 Cases;

f.    the Court shall have entered an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

g.    the Court shall have entered an order appointing a chapter 11 trustee, responsible officer, or any examiner with enlarged powers relating to the operation of the businesses in the Chapter 11 Cases, unless consented to in writing by the Credit Agreement Agent and the Requisite First Lien Lenders; provided, however, that nothing herein shall preclude any party from seeking to appoint an examiner;

h.    the Court shall have entered an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any of the Debtors' assets which have an aggregate value in excess of $50,000,000;

i.    the Court shall have entered an order (i) reversing, amending, supplementing, vacating, or otherwise modifying this Interim Order without the consent of the Credit Agreement Agent and the Requisite First Lien Lenders or (ii) avoiding or requiring repayment of any portion of the payments made pursuant to the terms hereof;

j.    five days after notice provided by, as applicable, the Credit Agreement Agent, the First Lien Notes Trustee or the affected First Lien Secured Party that the Debtors have failed to make any payment to any First Lien Secured Party when due under the terms hereof;

k.      five days after notice provided by the Credit Agreement Agent or the First Lien Group that the Debtors have failed to comply with the Approved Budget (including any variance) or any other material terms hereof;

l.      the Debtors shall have filed a motion seeking to create any postpetition liens or security interests other that those granted or permitted pursuant hereto; and

m.      the Debtors lose the exclusive right to file and solicit acceptances of a plan of reorganization; or

n.      (i) the Debtors shall withdraw or revoke the Plan, or file, propound or otherwise support any plan of reorganization other than the Plan (as it may be amended in accordance with the Restructuring Support Agreement), or lose the exclusive right to file and solicit acceptances of a plan of reorganization or (ii) other creditors of the Debtors shall file a plan of reorganization other than the Plan (as it may be amended in accordance with the Restructuring Support Agreement).

8.      <u>Rights and Remedies Upon Event of Default</u>.  Upon occurrence of an Event of Default and following the giving of seven (7) days' notice to the Debtors, the United States Trustee and the Committee (the "<u>Notice Period</u>"), the First Lien Secured Parties may exercise the remedies available to them under this Interim Order and applicable non-bankruptcy law, including but not limited to revoking the Debtors' right, if any, to use Cash Collateral and collecting and applying any proceeds of the Collateral in accordance with the terms of this Interim Order and the Lien Documents.  Unless the Court orders otherwise during the Notice Period, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated at the end of the Notice Period, without further notice or order of the Court and the First Lien Secured Parties shall be permitted to exercise all rights and remedies set forth in this

Interim Order, the First Lien Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated for the purposes of giving any notice contemplated hereunder, under any of the Lien Documents or under the Restructuring Support Agreement by the Credit Collateral Agent or the First Lien Secured Parties.

9.    Effect of Stipulations on Third Parties.  The stipulations and admissions contained in this Interim Order, including, without limitation, in paragraph D of this Interim Order, shall be binding upon the Debtors and their affiliates and any of their respective successors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for the Debtor) in all circumstances.  The stipulations and admissions contained in this Interim Order, including, without limitation, in paragraph D of this Interim Order, shall be binding upon all other parties in interest, including, without limitation, any committee appointed in these Chapter 11 Cases and any other person or entity acting on behalf of the Debtors' estate, unless and except to the extent that, upon three (3) days' prior written notice to the Debtors, the Collateral Agents and the First Lien Group, (i) a party in interest with proper standing granted by order of the Court (or another court of competent jurisdiction) has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph 12) by no later than the date that is the earlier of 75 days from the entry of this Interim Order or 60 days from the date of formation of any official committee of unsecured creditors (the "Committee") or such later date (x) as has been agreed to, in writing, by the Credit Agreement Agent and the Requisite First Lien Lenders in their sole discretion or (y) as has been

ordered by the Court (the "Investigation Termination Date"), (ii) challenging the validity, enforceability, priority or extent of the First Lien Obligations or (iii) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses to the extent released by the Debtors under paragraph D (collectively, "Claims and Defenses") against any of the First Lien Secured Parties or their affiliates, representatives, attorneys or advisors in connection with matters related to the Lien Documents or the Prepetition Collateral, and (iv) there is a final order in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter; *provided* that any challenge or claim shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Investigation Termination Date shall be forever deemed waived, released and barred.  If no such adversary proceeding or contested matter is timely filed, (x) the First Lien Obligations shall constitute allowed claims, not subject to counterclaim, setoff, recoupment, reduction, subordination, recharacterization, defense or avoidance, for all purposes in the Case and any subsequent chapter 7 case, (y) the liens and security interests securing the First Lien Obligations shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance, (z) the First Lien Obligations, the liens and security interests securing the First Lien Obligations, and the First Lien Secured Parties shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of any Debtor's estate, including, without limitation any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for the Debtor).  If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraph D of this Interim

Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any committee appointed in this Case and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter prior to the Investigation Termination Date. Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any committee appointed in this Case, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the First Lien Documents or the First Lien Obligations, and an order of the Court conferring such standing on the Committee or other party-in-interest shall be a prerequisite for the prosecution of a Challenge by the Committee or such other party-in-interest. Nothing in this paragraph 9 shall or shall be deemed to release or benefit any Affiliated Lender or any Affiliated Institutional Lender or any affiliate of the Debtors.

10.    <u>Carve-Out</u>. The liens, security interests, and superpriority claims granted herein, including the Adequate Protection Liens, any Superpriority Claims, the Prepetition Liens, and any other liens, claims, or interest of any person, shall be subject and subordinate to the Carve-Out. "<u>Carve-Out</u>" shall mean, upon the Termination Date, the sum of (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) fees and expenses of up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order or otherwise, all unpaid fees, costs and expenses (the "<u>Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the

Bankruptcy Code or any statutory committee appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (collectively, the "Professional Persons"), before or on the date of delivery by the Credit Agreement Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (the "Pre-Trigger Date Fees"); and (iv) after the date of delivery of the Carve-Out Trigger Notice (the "Trigger Date"), to the extent incurred after the Trigger Date allowed at any time thereafter, whether by interim order, procedural order or otherwise, the payment of Professional Fees of Professional Persons in an aggregate amount not to exceed $4,000,000, (the amount set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"); provided, however, that the Post-Carve Out Trigger Notice Cap shall be reduced dollar for dollar by the amount of any Unencumbered Cash in the Carve-Out Reserve (as defined below).  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean notice by the Credit Agreement Agent to the Debtors, its lead counsel, the United States Trustee, and lead counsel for any committee appointed in the Chapter 11 Cases, delivered upon the occurrence of a Termination Date under the Interim Order, stating that the Post-Carve Out Trigger Notice Cap has been invoked.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in any prepetition loan or financing documents, the Carve-Out shall be senior to all liens and claims, including the Adequate Protection Liens, any Superpriority Claims, the Prepetition Liens, and any other liens, claims, or interest of any person.  On the day on which a Carve-Out Trigger Notice is given to the Debtors, such Carve-Out Trigger Notice also shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an aggregate amount equal to the accrued and unpaid Pre-Trigger Date Fees, and the Debtors shall deposit and hold any such amounts in a segregated account in trust for the

Professional Persons (the "Carve-Out Reserve") (it being understood that the Secured Parties shall have a lien and security interest in any residual amount of such segregated account). After the Carve-Out Reserve has been fully funded, the Debtors may escrow additional monies in an amount not to exceed the amount of projected Professional Fees reasonably and in good faith anticipated by the Debtors to be incurred by the Debtors for the immediately succeeding 30-day period ("Additional Reserved Funds"), and such Additional Reserved Funds shall reduce on a dollar for dollar basis the Post-Carve Out Trigger Notice Cap; provided, however, notwithstanding anything herein to the contrary, the Carve-Out, the Pre-Trigger Date Fees, the Post-Carve-Out Trigger Cap, and any amounts used to fund any applicable Carve-Out Reserve, in each case shall be satisfied (and shall be deemed to have been satisfied) *first* from Unencumbered Cash, *second* from Disputed Cash and *third* from Cash Collateral.

11.    No proceeds of the Prepetition Collateral, Cash Collateral, the Postpetition Collateral (to the extent it constitutes proceeds of Prepetition Collateral or Cash Collateral or there has been diminution in value of the Prepetition Collateral or Cash Collateral) or the Carve-Out shall be used for the purpose of: (a) investigating, objecting to, challenging or contesting in any manner, or in raising any defenses to, the amount, validity, extent, perfection, priority or enforceability of the Secured Obligations, or any liens or security interests with respect thereto, or any other rights or interests of any of the Secured Parties, whether in their capacity as such or otherwise, including with respect to the Adequate Protection Liens, or in asserting any claims or causes of action against any of the Secured Parties (whether in their capacity as such or otherwise), including, without limitation, for lender liability or pursuant to section 105, 510, 544, 547, 548, 549, 550, or 552 of the Bankruptcy Code, applicable non-bankruptcy law or otherwise; (b) seeking to have confirmed any plan of reorganization, plan of liquidation, or asset sale, that,

is not supported by the Credit Agreement Agent and the Requisite First Lien Lenders or does not comply in all respects with the Restructuring Support Agreement; (c) seeking to modify any of the rights granted to the Secured Parties hereunder; (d) preventing, hindering or otherwise delaying the Secured Parties' assertion, enforcement or realization upon any Collateral in accordance with the Lien Documents and this Interim Order; or (e) paying any amount on account of any claims arising before the Petition Date unless such payments are approved by an order of this Court; <u>provided</u> that up to $50,000 of Cash Collateral shall be made available to the Committee for fees and expenses incurred in connection with any Lien Investigation (the "<u>Committee Investigation Budget</u>"); <u>provided, further, however</u>, that any such fees and expenses incurred in connection with any such Lien Investigation shall be satisfied (and shall be deemed to have been satisfied) *first* from any Unencumbered Cash, *second* from Disputed Cash and *third* from Cash Collateral; <u>provided, further</u>, that any such fees and expenses satisfied (or deemed to have been satisfied), whether by Unencumbered Cash, Disputed Collateral or Cash Collateral, shall reduce dollar for dollar the Committee Investigation Budget.   The First Lien Secured Parties reserve the right to object to, contest or otherwise challenge any claim incurred in connection with any activities described above (other than as permitted in connection with the Committee Investigation Budget in an amount not exceeding such Committee Investigation Budget) on the ground that such claim should not be allowed, treated or payable as an administrative expense claim for purposes of section 1129(a)(9)(A) of the Bankruptcy Code.

12.    <u>No Waiver of First Lien Secured Parties' Rights; Reservation of Rights</u>. Notwithstanding any provision in this Interim Order to the contrary, this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, any of the First Lien Secured Parties' rights with respect to any person or entity other than the Debtors or with respect

to any other collateral owned or held by any person or entity other than the Debtors. The rights of the First Lien Secured Parties are expressly reserved and entry of this Interim Order shall be without prejudice to, and does not constitute a waiver, expressly or implicitly, of:

o. the First Lien Secured Parties' rights under any of the First Lien Documents;

p. the First Lien Secured Parties' rights to seek any other or supplemental relief in respect of the Debtors;

q. the First Lien Secured Parties' rights to seek modification of the grant of adequate protection provided under this Interim Order so as to provide different or additional adequate protection at any time;

r. any of the First Lien Secured Parties' rights under the Bankruptcy Code or under non-bankruptcy law including, without limitation, to the right to: (i) request modification of the automatic stay of section 362 of the Bankruptcy Code; (ii) request dismissal of the Chapter 11 Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7, or appointment of a chapter 11 trustee or examiner with extended powers, or (iii) propose, subject to section 1121 of the Bankruptcy Code, a chapter 11 plan or plans;

s. any of the First Lien Secured Parties' unqualified right to credit bid up to the full amount of any remaining First Lien Obligations in the sale of any Prepetition Collateral or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code; or

t. any other rights, claims, or privileges (whether legal, equitable, or otherwise) of the First Lien Secured Parties.

13.    <u>Further Assurances</u>.    The Debtors shall execute and deliver to the Collateral Agents and the First Lien Group all such agreements, financing statements, instruments, and other documents as they may reasonably request to evidence, confirm, validate, or evidence the perfection of the Adequate Protection Liens granted pursuant hereto.

14.    <u>Compliance With Credit Agreement Covenants</u>.    The Debtors shall comply will all reporting requirements contained in the First Lien Loan Documents, including any reporting requirements contained in section 2.04(e) of that certain Intellectual Property Security Agreement dated as of July 5, 2007, which shall be provided during the Chapter 11 Cases on no less than a monthly basis.

15.    <u>506(c) Waiver</u>.    Subject to the entry of a Final Order, except solely with respect to any Disputed Collateral that is ultimately determined by final non-appealable Order of the Court (or another court of competent jurisdiction) to be unencumbered and is used for the satisfaction of the costs and expenses of administering the Chapter 11 Cases, no costs or expenses of administration which have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against any First Lien Secured Party, any of the First Lien Obligations, any of their respective claims, or the Collateral pursuant to sections 506(c) or 105(a) of the Bankruptcy Code, or otherwise, without the prior written consent of the Credit Agreement Agent and the Requisite First Lien Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by any of the First Lien Secured Parties or their respective representatives.

16.    <u>Restrictions on Granting Postpetition Claims and Liens</u>.    No claim or lien that is *pari passu* with or senior to the claims and liens of any of the First Lien Secured Parties

shall be offered by any Debtor, or granted, to any other person, except in connection with any financing used to pay in full the claims of the First Lien Secured Parties.

17.    <u>Automatic Effectiveness of Liens</u>.  The Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable, and effective by operation of law as of the Petition Date, having the priority set forth in Paragraph 4 of this Interim Order, without any further action by the Debtors or the First Lien Secured Parties and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or the Library of Congress, or other documents or the taking of any other actions.  If either of the Collateral Agents hereafter requests that the Debtors execute and deliver to them financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the Adequate Protection Liens, as applicable, the Debtors are hereby directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the Collateral Agents are hereby authorized to file or record such documents in their discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

18.    <u>No Marshaling/Application of Proceeds</u>.  The Collateral Agents shall be entitled to apply the payments or proceeds of the Prepetition Collateral in accordance with the provisions of the First Lien Documents, including any related intercreditor agreements, and in no event shall any of the First Lien Secured Parties be subject to the equitable doctrine of

"marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral for the benefit of any non-First Lien Secured Party.

19.      Binding Effect.    Subject to Paragraph 9 of this Interim Order, the provisions of this Interim Order shall be binding upon and inure to the benefit of the Secured Parties to the extent and as set forth herein, the Debtors, the Committee, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).  To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

20.      Survival.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order:  (i) confirming any plan of reorganization in any of the Chapter 11 Cases, (ii) converting any of the Chapter 11 Cases to a chapter 7 case, or (iii) dismissing any of the Chapter 11 Cases, and, with respect to the entry of any order as set forth in clause (ii) or (iii) of this Paragraph 20, the terms and provisions of this Interim Order as well as the Adequate Protection Liens and Superpriority Claim shall continue in full force and effect notwithstanding the entry of any such order.

21.      Effect of Dismissal of Chapter 11 Cases.  If any of the Chapter 11 Cases is dismissed, converted, or substantively consolidated, such dismissal, conversion, or substantive consolidation of these Chapter 11 Cases shall not affect the rights of the First Lien Secured

Parties under this Interim Order, and all of their rights and remedies thereunder shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, or substantively consolidated.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide or be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that:  (i) subject to Paragraph 9 of this Interim Order, the Prepetition First Priority Liens, Adequate Protection Liens, and Superpriority Claim granted to and conferred upon the First Lien Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such Superpriority Claim shall, notwithstanding such dismissal, remain binding on all interested parties) and (ii) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the Prepetition First Priority Liens, Adequate Protection Liens, and Superpriority Claim referred to in this Interim Order.

22.    _Order Effective_.  This Interim Order shall be effective as of the date of the signature by the Court.

23.    _No Requirement to Accept Title to Collateral_.  The First Lien Secured Parties shall not be obligated to accept title to any portion of the Prepetition Collateral in payment of the indebtedness owed to them by the Debtors, in lieu of payment in cash or cash equivalents, nor shall the First Lien Secured Parties be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity.

24.    _Controlling Effect of Interim Order_.  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion or any prepetition agreement, the provisions of this Interim Order shall control to the extent of such conflict.

25.    <u>Final Hearing</u>.  A final hearing on the Motion shall be heard before the Honorable Judge Elizabeth S. Stong on _____, 2013 at __:__ a.m./p.m. at the United States Bankruptcy Court, 271 Cadman Plaza East, Courtroom ___, Brooklyn, NY 11201.  Any objections shall be filed with the Bankruptcy Court on or before _____, 2013 at 5:00 p.m. (prevailing Eastern Time), and served upon (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022, Attn:  Jonathan S. Henes and Christopher J. Marcus, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, IL 60654, Attn: Ross M. Kwasteniet, as counsel for the Debtors; (b) Milbank, Tweed, Hadley & McCloy LLP, Attn.: Gregory Bray and Lauren Doyle, as counsel to the First Lien Group; (c) Davis Polk & Wardwell LLP, as counsel to the Credit Agreement Agent, Attn.: Damian S. Schaible and Darren S. Klein, and (d) Katten Muchin Rosenman LLP, Attn.: Karen Dine and David Crichlow, as counsel to the First Lien Notes Trustee.

## Exhibit D

**Equity Term Sheet**

## Cengage Learning – Equity Term Sheet

THIS TERM SHEET IS NON-BINDING AND DOES NOT CREATE LEGALLY BINDING OBLIGATIONS AMONG THE PARTIES. THE TERMS CONTEMPLATED HEREIN ARE SUBJECT TO, AMONG OTHER THINGS, DEFINITIVE DOCUMENTATION AND ARE FOR DISCUSSION PURPOSES ONLY. CAPITALIZED TERMS NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE RESTRUCTURING SUPPORT AGREEMENT.

| | |
|---|---|
| **Private Company Status** | The reorganized Debtors (the "Reorganized Debtors") shall not be required to file reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). |
| **Classes of Equity** | Upon consummation of the Agreed Restructuring, there shall be one class of common stock (the "Common Stock") of the reorganized Company, a Delaware corporation (the "Reorganized Company") issued on account of claims under the Agreed Restructuring.  The Common Stock shall be uncertificated and shall be issued in electronic format only. |
| **Transferability** | Subject to the requirements of the Securities Act of 1933, as amended, the Common Stock shall not be subject to rights of first refusal, rights of first offer, or any other restrictions on transfer; provided however that the Common Stock may contain reasonable and customary restrictions designed to maintain the Reorganized Company as a private company. |
| **Tag-Along Rights** | The stockholders agreement shall contain tag-along rights that are customary in transactions of this type. |
| **Drag-Along Rights** | The stockholders agreement shall contain drag-along rights that are customary in transactions of this type. |
| **Preemptive Rights** | Each holder of the Reorganized Company's Common Stock who has voted in favor of the Agreed Restructuring Plan shall be entitled to reasonable and customary preemptive rights, subject to customary exceptions. Any proposed elimination of preemptive rights shall require the consent of each affected holder of Common Stock. |
| **Information Rights** | At all times prior to the Reorganized Company completing a Qualified Public Offering (as defined below), the  Reorganized Debtors shall provide to the shareholders and any prospective investor (who is not a direct competitor of the Debtors) that has entered into a confidentiality agreement on customary terms and for purposes of evaluating the investment ("Qualified Prospective Investor"), on a reputable password-protected online data system, such as Intralinks,  annual reports, quarterly reports, proxy statements and other periodic reports that would |

| | |
|---|---|
| | be required to be filed pursuant to Section 13 or 15(d) of the Exchange Act, prepared as if the Reorganized Debtors were a reporting company under the Exchange Act.  The Reorganized Debtors shall hold live quarterly conference calls (with a question and answer period) for shareholders and Qualified Prospective Investors, with dates and dial-in information announced on the password-protected online data system utilized by the Reorganized Debtors at least three (3) days prior to such quarterly calls. |
| **Governance Rights** | Except as otherwise set forth below for the election of directors, each share of Common Stock shall be entitled to one vote and shall be entitled to vote for all such matters that are put to the stockholders for approval under Reorganized Company's governing documents and applicable law.  Notwithstanding the foregoing, management and governance of the Reorganized Debtor shall be determined by the Board of Directors (as defined below) for all matters except those that require shareholder approval under applicable law.<br><br>The number of directors on the board of directors of the Reorganized Company (the "Board of Directors") shall be established at seven (7) directors.<br><br>The Board of Directors shall be determined for the first two (2) years following the Plan Effective Date (the "Initial Board Term") as follows:<br><br>(i)    One (1) director shall be the Chief Executive Officer of the Reorganized Company (the "CEO");<br><br>(ii)    each holder of 15% or more of the outstanding Common Stock of the Reorganized Company, shall be entitled to nominate and have elected one (1) director on the Board of Directors; and<br><br>(iii)    the ad hoc committee of Consenting Lenders shall be entitled to elect the remaining directors; provided that no institution shall be entitled to nominate and have elected more than one director on the Board of Directors at any time; provided further, that the Consenting Lenders will consult with the CEO to the extent that any board nominee of the Consenting Lenders is not employed by or otherwise directly affiliated with a Consenting Lender.<br><br>At the end of the Initial Board Term, the Board of Directors shall be redetermined by shareholder vote (which vote shall occur annually) on the same basis set forth for the Initial Board Term above, until such time as the Reorganized Company has completed a Qualified Public Offering.  After the Reorganized Company has completed a Qualified Public Offering, the Board of Directors will be elected by holders of its equity securities entitled to vote in the election therefor. |

| | At all times prior to the Reorganized Company completing a Qualified Public Offering, each holder of 15% or more of the outstanding Common Stock of the Reorganized Company, in addition to the foregoing director rights, shall be entitled to appoint one (1) observer that is a representative or otherwise affiliated with shareholder of the Reorganized Company to the Board of Directors, subject to customary confidentiality obligations; provided that no observer shall be entitled to compensation for their services as an observer to the Board of Directors. |
|---|---|
| **Equity Incentives** | Any equity incentives granted or issued to management or employees of the Reorganized Company or its subsidiaries, or to any providers of services to the Reorganized Company or its subsidiaries, shall dilute each holder of Common Stock equally and ratably, regardless of the time of issue of such incentive or approval of any plan for such issuance. |
| **Termination of Equity Rights** | The shareholder rights set forth herein other than Registration Rights shall terminate upon an underwritten public offering of the Common Stock so long as the Common Stock, in connection with such offering, will be listed on a national securities exchange (a "Qualified Public Offering"). |
| **Registration Rights** | Holders of Common Stock shall have (i) demand registration rights (including the right to demand the Reorganized Company complete an initial public offering of its Common Stock) exercisable at any time after the second (2nd) anniversary (but prior to the third (3rd) anniversary) of the Plan Effective Date, by holders of more than 50% of Common Stock, and at any time on or after the third (3rd) anniversary of the Plan Effective Date, by holders of 33⅓% of Common Stock, subject to the registration rights or similar agreement setting forth the registration rights herein, and (ii) reasonable and customary piggy back registration rights exercisable at any time after the Reorganized Company has consummated a public offering of its Common Stock. |

## Exhibit E

### Form Transfer Agreement

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement (the "Agreement"), dated as of [_____], by and among the Debtors and the Consenting Lenders, including the transferor to the Transferee of any First Lien Claims (the "Transferor"), and agrees to assume, be bound by and timely perform all of the terms and provisions of the Agreement (as the same may be hereafter amended, restated or otherwise modified from time to time) to the extent Transferor was thereby bound, and shall hereafter be deemed to have all of the rights and obligations of, and to be, a Consenting Credit Agreement Lender or Consenting First Lien Noteholder (as applicable) for all purposes under the Agreement. Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement, a copy of which, together with the Restructuring Term Sheet (as defined in the Agreement), is attached hereto as Exhibit A.

With respect to all First Lien Claims held by the Transferee, all related rights and causes of action arising out of or in connection with or otherwise relating to such First Lien Claims, the Transferee hereby makes all of the representations and warranties of a Consenting Credit Agreement Lender or Consenting First Lien Noteholder (as applicable) as set forth in the Agreement, including, without limitation, the representations and warranties set forth in Section 4 of the Agreement, as applicable.

The Transferee specifically agrees (i) to be bound by the terms and conditions of the First Lien Credit Facility and/or the First Lien Indenture, as applicable, and the Agreement and (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the Transfer of any First Lien Claim.

Date Executed: _____, 201[ ]

 

_____
**Print name of Transferee**
**Name:**
**Title:**

**Address:**   _____

_____

_____
**Attention:**   _____
**Telephone:**   _____
**Facsimile:**   _____

| Principal Amount Held | |
| --- | --- |
| **First Lien Claim** | **Amount** |
| First Lien Claims (specify type) | |

**Exhibit C**

**Disclosure Statement Order**

**[TO COME]**

## Exhibit D

**Financial Projections**

**Financial Projections**

## PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION OF PLAN [1]

In connection with the Disclosure Statement, the Debtors' management team ("Management") prepared Financial Projections for the fiscal years 2014 through 2018 (the "Projection Period"). The Financial Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the future performance of the Reorganized Debtors' operations. The Debtors' board of directors was not asked to, and thus did not, approve the Financial Projections or evaluate or endorse the projections or the assumptions underlying the Financial Projections. Although Management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtors can provide no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

The following Financial Projections were not prepared with a view toward compliance with published rules of the Securities and Exchange Commission or the American Institute of Certified Public Accountants regarding projections. The Reorganized Debtors' independent auditor has not examined, compiled or performed any procedures with respect to the prospective financial information contained in this exhibit and, accordingly, it does not express an opinion or any other form of assurance on such information or its achievability. The Debtors' independent auditor assumes no responsibility for, and denies any association with the prospective financial information.

### Principal Assumptions for the Financial Projections

The Financial Projections are based on, and assume the successful implementation of, the Reorganized Debtors' business plan. Both the business plan and the Financial Projections reflect numerous assumptions, including various assumptions regarding the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors. In addition, the assumptions do not take into account the uncertainty and disruption of business that may accompany a restructuring in Court. Therefore, although the Financial Projections are necessarily presented with numerical specificity, the actual results achieved during the Projection Period will likely vary from the projected results. These variations may be material. Accordingly, no representation can be or is being made with respect to the accuracy of the Financial Projections or the ability of the Reorganized Debtors to achieve the projected results of operations. See "*Risk Factors*".

In deciding whether to vote to accept or reject the proposed Plan, creditors must make their own determinations as to the reasonableness of such assumptions and the reliability of the Financial Projections. See "*Risk Factors*". Moreover, the Financial Projections were prepared solely in connection with the restructuring pursuant to the Plan.

Under Accounting Standards Codification "ASC" 852, "Reorganizations" ("ASC 852"), the Reorganized Debtors note that the Financial Projections reflect the operational emergence from chapter 11 but not the impact of fresh start accounting that will likely be required upon emergence. The Financial Projections account for the reorganization and related transactions pursuant to the Plan. While the Company expects that it will be required to implement fresh start accounting upon emergence, it has not yet completed the work required to quantify the impact to its Financial Projections. When the Company does fully implement fresh start accounting, differences from the depiction presented are anticipated and those differences could be material. Fresh start accounting requires all assets, liabilities, and equity instruments to be valued at "fair value." In the attached presentation, no such adjustments have been made to individual asset, liability and equity categories. Instead, for simplicity, the

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* to which the Financial Projections are attached.

difference between overall estimated reorganization value and predecessor Company book values has been reflected principally as goodwill adjustments on the attached balance sheets.

## Safe Harbor Statement Under The Private Securities Litigation Reform Act Of 1995

These projections contain statements which constitute "forward-looking statements" within the meaning of the Securities Act of 1933, as amended (the "Securities Act") and the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 (the "Exchange Act"). Forward-looking statements in these projections include the intent, belief or current expectations of the Reorganized Debtors and members of its management team with respect to the timing of, completion of and scope of the current restructuring, reorganization plan, strategic business plan, bank financing, and debt and equity market conditions and the Reorganized Debtors' future liquidity, as well as the assumptions upon which such statements are based.

While the Debtors believe that the expectations are based on reasonable assumptions within the bounds of their knowledge of their business and operations, parties in interest are cautioned that any such forward-looking statements are not guarantees of future performance, and involve risks and uncertainties, and that actual results may differ materially from those contemplated by such forward-looking statements.

## Select Risk Factors Related to the Financial Projections

The Debtors recently completed their 5-year business plan, covering fiscal 2014 through 2018 (the Debtors operate on a June 30 fiscal year-end). The business plan was developed on an operational rather than legal entity basis. For purposes of the consolidated Financial Projections included in this document, the FY2014 business plan has been updated to include actual results for July and August 2013, while holding the remainder of the forecast periods consistent with the business plan. July and August represent only a part of the critical summer selling season, which is not yet complete. The Debtors continue to analyze the year to date results and will revisit the analysis at the conclusion of the summer selling season. Preliminary analysis suggests that market performance is materially below expectations, but that Cengage's performance has outpaced the market and 5-year business plan due to unusually heavy ordering levels from one channel partner and strong price realization, both of which may be one-time non-recurring benefits to FY 2014 results.

A potential impact of chapter 11 not incorporated into the Financial Projections are risks associated with a decline in revenue associated with the stigma of having filed for reorganization under chapter 11 of the bankruptcy laws.

Another potential impact of a chapter 11 filing, which is not incorporated into the Financial Projections, is employee turnover at the management, product development and sales force levels. Loss of employees from these and other parts of the Reorganized Debtors could have an adverse impact on the Reorganized Debtors' financial performance.

The Financial Projections for U.S. Higher Education and Career segments are based on a bottoms up product development plan for the top 100 Courses and trend analyses for the remaining courses. Both of these forecasts are underpinned by the Debtors' broader market projections. To the extent the market underperforms the forecast or the Debtors are unable to execute its product plan, financial performance could be materially different than shown in the Financial Projections. For the Debtors' School segment, the projections are based on a combination of market and the Debtors' revenue trend analyses as well as the state adoption calendar. To the extent that state spending deviates from Management's expectations, financial performance could be materially different than shown in the Financial Projections. For the Research segment and International segments, the Debtors' forecast is based on macroeconomic expectations and recent segment revenue trends. In the Research segment, performance is dependent on state and local library budgets as well as spending by academic institutions and schools on reference materials. The Debtors' International revenue may be adversely impacted by the Supreme Court ruling in Kirtsaeng v. John Wiley & Sons, Inc. This ruling held that the sale of lawfully-made copies purchased overseas was protected by the first-sale doctrine. As a result, the Debtors have increased the price of texts in several international markets.

Other potential risk factors include, but are not limited to:

- The Reorganized Debtors operate in a highly competitive market, with significant established competitors, and competition may reduce overall market share, revenues and profitability.
- The Reorganized Debtors' success is dependent, in part, on its ability to attract and retain talented authors and develop long-term, collaborative relationships to remain competitive and grow as well as the right to exclusively offer authors' content. The Reorganized Debtors' inability to attract new authors, the loss of certain high profile authors, the potential for increased costs incurred in attracting or retaining authors or changes in the rights to utilize authors' works could harm the business, the results of operations and the financial condition.
- The Reorganized Debtors face competition from the used textbook market and rental textbook programs. The growth of the used textbook and/or rental textbook programs may materially adversely affect the Reorganized Debtors' business.
- Changes in governmental programs and private lending practices may reduce the Reorganized Debtors' revenues or profitability. Students comprise a large portion of the Reorganized Debtors' consumer base. Many of these students depend on government and private funding, in the form of loans or grants, to pay for their education. Many of these programs are highly regulated and subject to frequent and substantial changes.
- The Debtors have made, and the Reorganized Debtors may be required to make in the future, substantial investments in its technology infrastructure. If the Reorganized Debtors do not make such investments or do not effectively make such investments, the business, financial condition and results of operations may be materially adversely affected. The method of delivering its products is subject to technological change. Over the past several years, the Debtors have made significant investments in technology, including spending on computer hardware, software, electronic systems, telecommunications infrastructure and digitization of content.
- The Reorganized Debtors' ability to successfully implement its business strategy is subject to a number of risks, many of which are beyond its control, including: (i) rising development costs due to customers' requirements for more customized instructional materials and assessment programs, (ii) higher technology costs due to the trend toward delivering more educational content in both traditional print and digital formats, (iii) rising advances for popular authors and market pressures to maintain competitive retail pricing, (iv) a material increase in product returns or in certain production costs, (v) regulatory pressure on textbook prices, (vi) market acceptance and sell-through of new technology products, including online or computer-based learning, (vii) decreases in higher education enrollment trends, changing demographics and preferences of college students and professors that may affect product offerings and revenues, and (viii) consolidation in the retail and wholesale book market.

The foregoing assumptions and resulting computations were made solely for purposes of preparing the Financial Projections. Upon emergence from any chapter 11 case, the Reorganized Debtors would be required to determine the amount by which its reorganization value as of the Effective Date exceeds, or is less than, the fair value of its assets as of the Effective Date. Such determination will be based upon the fair values at that time, which may be based on, among other things, a different methodology than the above-mentioned valuation. In any event, such valuations, as well as the determination of the fair value of the Reorganized Debtors' assets and liabilities, will be made as of the Effective Date. The changes between the amounts of any or all of the foregoing items as assumed in the Financial Projections and the actual amounts thereof as of the Effective Date may be material.

**Financial Projections**

The Projections set forth below have been prepared based on the assumption that the Effective Date is February 28, 2014. Although the Debtors will seek the Effective Date to occur as soon as practicable, there can be no assurance as to when the Effective Date will actually occur. The Debtors' Consolidated Financial Statements, including Balance Sheet, Income Statement and Statement of Cash Flows for the Projection Period set forth on the following pages present the projected consolidated position of the Reorganized Debtors (including foreign entities and Trust Assets) after giving effect to confirmation and the consummation of the transactions contemplated by the Plan, as of the end of each fiscal year in the Projection Period. At this time, the Debtors do not have specificity as to the potential licensing payments that may be required to be made to the CLAI Trust or the CLI Trust in exchange for

the Reorganized Debtors use of the Trust Assets, and have therefore not separately forecasted revenues, costs, and cash flows associated with such Trust Assets for purposes of evaluating the feasibility of the Plan. The Debtors do not believe the impact of any such licensing payments on the Reorganized Debtors' financial statements would have a material impact on the feasibility of the Plan. THE INDEPENDENT AUDITOR FOR THE REORGANIZED DEBTORS HAS NOT EXAMINED, COMPILED, OR OTHERWISE PERFORMED ANY PROCEDURES ON THE PROSPECTIVE FINANCIAL INFORMATION AND, CONSEQUENTLY, DOES NOT EXPRESS AN OPINION OR ANY OTHER FORM OR ASSURANCE WITH RESPECT TO THE PROSPECTIVE FINANCIAL INFORMATION.

## UNAUDITED PROJECTED BALANCE SHEET

*($ in Millions)*

*(Fiscal Year End: June 30)*

| | Notes | Pro Forma FY 2014 | Pro Forma FY 2015 | Pro Forma FY 2016 | Pro Forma FY 2017 | Pro Forma FY 2018 |
|---|---|---|---|---|---|---|
| **Assets** | | | | | | |
| Cash and cash equivalents | Note A | $ 86.2 | $ 85.5 | $ 93.1 | $ 98.6 | $ 105.0 |
| Accounts receivable, net | Note B | 224.4 | 219.3 | 217.5 | 221.9 | 222.4 |
| Inventory, net | Note B | 186.2 | 181.2 | 176.2 | 171.2 | 166.2 |
| Current deferred tax assets | Note C | 173.3 | 173.3 | 173.3 | 173.3 | 173.3 |
| Other current assets | | 51.0 | 45.4 | 46.3 | 47.5 | 48.8 |
| Total Current Assets | | 721.1 | 704.7 | 706.4 | 712.6 | 715.6 |
| Property Plant & Equipment, net | | 204.8 | 201.8 | 198.5 | 196.9 | 192.7 |
| Pre-publication costs, net | | 329.7 | 331.4 | 329.2 | 327.6 | 325.5 |
| Identifiable intang. assets, net & Goodwill | | 2,076.0 | 1,916.5 | 1,758.8 | 1,601.1 | 1,444.4 |
| Non-current deferred tax asset | Note C | 4.9 | 4.9 | 4.9 | 4.9 | 4.9 |
| Other non current assets | | 76.4 | 62.1 | 50.6 | 39.1 | 27.6 |
| **Total Assets** | | **$ 3,412.9** | **$ 3,221.5** | **$ 3,048.4** | **$ 2,882.2** | **$ 2,710.8** |
| **Liabilities and Partners' Equity** | | | | | | |
| Accounts payable | Note B | 92.6 | 91.5 | 89.7 | 90.0 | 89.4 |
| Accrued royalties | | 70.1 | 69.8 | 70.4 | 72.8 | 73.9 |
| Other accrued expenses | Note B | 130.6 | 129.2 | 130.4 | 130.9 | 131.4 |
| Deferred revenue | Note D | 135.0 | 139.0 | 149.0 | 162.6 | 175.9 |
| Revolving credit facility draw | Note E | - | - | - | - | - |
| Current deferred tax liability | Note C | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Other current liabilities | | 7.1 | 7.1 | 7.1 | 7.1 | 7.1 |
| Total Current Liabilities | | 435.4 | 436.5 | 446.6 | 463.3 | 477.6 |
| Long term debt | Note F | 1,482.1 | 1,375.4 | 1,227.3 | 1,028.8 | 797.4 |
| Non-current deferred tax liabilities, net | Note C | 184.2 | 184.2 | 184.2 | 184.2 | 184.2 |
| Other non-current liabilities | | 42.5 | 35.7 | 30.6 | 28.6 | 26.9 |
| Total Liabilities | | 2,144.2 | 2,031.9 | 1,888.7 | 1,704.9 | 1,486.1 |
| Equity | Note G | 1,268.7 | 1,189.6 | 1,159.7 | 1,177.3 | 1,224.7 |
| **Total Liabilities and Equity** | | **$ 3,412.9** | **$ 3,221.5** | **$ 3,048.4** | **$ 2,882.2** | **$ 2,710.8** |

# UNAUDITED PROJECTED INCOME STATEMENT

($ in Millions)

(Fiscal Year End: June 30)

| | Notes | Pro Forma FY 2014 | Pro Forma FY 2015 | Pro Forma FY 2016 | Pro Forma FY 2017 | Pro Forma FY 2018 |
|---|---|---|---|---|---|---|
| Net Revenues | Note H | $ 1,713.6 | $ 1,634.1 | $ 1,655.0 | $ 1,726.3 | $ 1,780.9 |
| Cost of Revenues, excl. Allocated Operating Expenses | | 427.0 | 413.8 | 420.5 | 440.1 | 456.0 |
| Amortization of pre-publication costs | Note I | 173.4 | 169.4 | 169.3 | 168.3 | 165.8 |
| Total Cost of Revenues, excl. Allocated Operating Expenses | | 600.4 | 583.2 | 589.8 | 608.4 | 621.9 |
| Operating Expenses, excl. Depreciation | Note J | 680.9 | 657.1 | 633.0 | 644.2 | 653.5 |
| Restructuring Charges | | 12.6 | 10.0 | 17.5 | - | - |
| Other Expenses | | 4.9 | 5.0 | 5.0 | 5.0 | 5.0 |
| Depreciation | Note I | 73.9 | 73.5 | 76.8 | 71.2 | 69.5 |
| Amortization of Intangible Assets | Note I | 161.7 | 159.6 | 157.7 | 157.7 | 156.7 |
| Total Costs and Expenses | | 933.9 | 905.2 | 890.0 | 878.1 | 884.6 |
| **Operating Income / (Loss)** | | **179.3** | **145.7** | **175.2** | **239.8** | **274.4** |
| Reorganization Cost | | 110.9 | - | - | - | - |
| Other (Income)/Expense | | (3,020.3) | - | - | - | - |
| Interest Expense | Note K | 50.7 | 145.7 | 138.9 | 134.3 | 119.3 |
| Interest Income | | (0.3) | (0.3) | (0.3) | (0.3) | (0.3) |
| Total Interest | | 50.4 | 145.4 | 138.6 | 134.0 | 119.0 |
| **Income / (Loss) from Continuing Operations** | | **3,038.3** | **0.3** | **36.6** | **105.9** | **155.5** |
| Income Taxes | Note L | 19.5 | 75.8 | 62.9 | 84.6 | 104.5 |
| Equity in Losses of Affiliates | | 3.4 | 3.6 | 3.6 | 3.6 | 3.6 |
| **Net Income / (Loss) from Continuing Operations** | | **$ 3,015.5** | **$ (79.1)** | **$ (29.9)** | **$ 17.6** | **$ 47.3** |

## UNAUDITED PROJECTED STATEMENT OF CASH FLOWS

*($ in Millions)*

*(Fiscal Year End: June 30)*

| | Notes | Pro Forma FY 2014 | Pro Forma FY 2015 | Pro Forma FY 2016 | Pro Forma FY 2017 | Pro Forma FY 2018 |
|---|---|---|---|---|---|---|
| Net Income / (Loss) | | $ 3,015.5 | $ (79.1) | $ (29.9) | $ 17.6 | $ 47.3 |
| **Plus/Less:** | | | | | | |
| Non-cash items, net | | (2,600.6) | 416.0 | 417.4 | 410.8 | 405.6 |
| Net Change in Working Capital | Note M | 86.7 | 13.2 | 11.2 | 14.5 | 16.3 |
| Cash from operating activities | | 501.5 | 350.1 | 398.7 | 442.9 | 469.2 |
| **Investing activities** | | | | | | |
| Additions to pre-publication costs | Note N | (169.7) | (171.1) | (167.1) | (166.7) | (163.7) |
| Additions to Property Plant & Equipment | Note N | (86.3) | (70.5) | (73.4) | (69.7) | (65.3) |
| Cash from investing activities | | (246.2) | (241.6) | (240.5) | (236.4) | (229.0) |
| **Cash from financing activities** | | | | | | |
| Proceeds from issuance of debt | Note E | 1,485.0 | - | - | - | - |
| Debt issuance costs and other financing fees | | (45.0) | - | - | - | - |
| Repayments of long-term debt | Note O | (3.8) | (109.2) | (150.6) | (201.0) | (233.9) |
| Liabilities Subject to Compromise | | (1,933.5) | - | - | - | - |
| Revolver borrowings / (repayment) | | - | - | - | - | - |
| Total Cash from financing activities | | (497.2) | (109.2) | (150.6) | (201.0) | (233.9) |
| Increase / (decrease) in cash and cash equivalents | | (242.4) | (0.7) | 7.6 | 5.5 | 6.3 |
| Cash and cash equivalents, beginning of period | | 328.6 | 86.2 | 85.5 | 93.1 | 98.6 |
| Cash and cash equivalents, end of current period | | $ 86.2 | $ 85.5 | $ 93.1 | $ 98.6 | $ 105.0 |

## EBITDA & ADJUSTED EBITDA RECONCILIATION

*($ in Millions)*

| *(Fiscal Year End: June 30)* | Pro Forma FY 2014 | Pro Forma FY 2015 | Pro Forma FY 2016 | Pro Forma FY 2017 | Pro Forma FY 2018 |
|---|---|---|---|---|---|
| Consolidated Net Income / (Loss) | $ 3,015.5 | $ (79.1) | $ (29.9) | $ 17.6 | $ 47.3 |
| Add: Income Taxes | 19.5 | 75.8 | 62.9 | 84.6 | 104.5 |
| Add/(Less): Other (Income)/Expense | (3,020.3) | - | - | - | - |
| Add: Equity in Losses of Affiliates | 3.4 | 3.6 | 3.6 | 3.6 | 3.6 |
| Add: Net Interest Expense | 50.4 | 145.4 | 138.6 | 134.0 | 119.0 |
| Add: Amort. of Intangible Assets | 161.7 | 159.6 | 157.7 | 157.7 | 156.7 |
| Add: Depreciation | 73.9 | 73.5 | 76.8 | 71.2 | 69.5 |
| Add: PrePub Amortization | 173.4 | 169.4 | 169.3 | 168.3 | 165.8 |
| **EBITDA** | $ 477.4 | $ 548.1 | $ 579.0 | $ 637.0 | $ 666.4 |
| Add: Restructuring Charge | 12.6 | 10.0 | 17.5 | - | - |
| Add: Reorganization Cost | 110.9 | - | - | - | - |
| Add: Other Operating Expenses | 4.9 | 5.0 | 5.0 | 5.0 | 5.0 |
| **Adjusted EBITDA** | $ 605.8 | $ 563.1 | $ 601.5 | $ 642.0 | $ 671.4 |

## NOTES TO FINANCIAL PROJECTIONS

*General Assumptions*

1. **Methodology.** The Debtors recently completed their 5-year business plan, covering fiscal 2014 through 2018 (the Debtors operate on a June 30 fiscal year-end). The business plan was developed on an operational rather than legal entity basis. For purposes of the consolidated Financial Projections included in this document, the FY2014 business plan has been updated to include actual results for July and August 2013, while holding the remainder of the forecast periods consistent with the business plan. July and August represent only a part of the critical summer selling season, which is not yet complete. The Debtors continue to analyze the year to date results and will revisit the analysis at the conclusion of the summer selling season. Preliminary analysis suggests that market performance is materially below expectations, but that Cengage's performance has outpaced the market and 5-year business plan due to unusually heavy ordering levels from one channel partner and strong price realization, both of which may be one-time non-recurring benefits to FY 2014 results.

2. **Emergence Date.** These projections are further based on the assumption that the Debtors will emerge from chapter 11 on or about February 28, 2014 – the assumed Effective Date of the Reorganization Plan. If the Effective Date is significantly delayed, additional expenses, including professional fees, may be incurred and operating results may be negatively impacted. In addition, the Reorganized Debtors believe that their businesses will be adversely impacted as a result of being in a prolonged chapter 11 process, particularly with respect to potential loss of revenue, content partners and trade contraction, both domestically and internationally.

3. **Macroeconomic & Industry Environment.** The Financial Projections take into account the current difficult economic environment and challenged state and municipal budgets, which are negatively impacting the Reorganized Debtors and industry. This includes the budgets of K-12 school districts, public and private higher education institutions. Higher education institutions are also currently dealing with adverse enrollment trends which may directly affect the Reorganized Debtors' business. In addition to enrollment trends, increased costs within the higher education segment may lead to reduced sales for the Gale segment. These projections also assume constant foreign currency exchange rates and stable commodity pricing environments.

4. **Operations.** These projections incorporate the Reorganized Debtors' planned revenue and cost initiatives as well as operational restructuring activities. These projections further assume the Reorganized Debtors will be able to retain and attract the employees required to execute its business plan. The Debtors continually review the operations, the economic environment and the markets in which they compete, to evaluate the potential future profitability of each of the product lines. The actual operations of the Reorganized Debtors, as well as the financial results from operations, could vary significantly from the assumptions used to generate these projections as a result of, among other things, changes to the Reorganized Debtors' future operations.

5. **Other Assumptions.** These projections also assume that: (1) there will be no material change in legislation or regulations, or the administration thereof, that will have an unexpected effect on the operations of the Reorganized Debtors; (2) there will be no change in GAAP in the United States that will have a material effect on the reported financial results of the Reorganized Debtors; (3) the application of fresh-start reporting will not materially change the Reorganized Debtors' accounting procedures; and (4) there will be no material contingent or unliquidated litigation or indemnity claims applicable to the Reorganized Debtors. The assets of the international and/or non-Debtor entities are considered immaterial relative to the total value of the estate and, as such, are not being provided separately.

*Note A – Cash & Cash Equivalents*

The Reorganized Debtors consider cash to consist of cash on deposit in banks. Cash equivalents are investments with original maturities of less than 90 days. Cash is forecasted to accumulate on the Reorganized Debtors' balance sheet throughout the Projection Period. Cash in excess of $100 million, held in the domestic entities, is assumed to be swept to repay the exit term loan at the end of the third quarter of each fiscal year.

*Note B – Working Capital Accounts*

The Financial Projections assume the Reorganized Debtors' working capital accounts, including accounts receivable, inventories, prepaid expenses, author advances, accounts payable, accrued expenses, and deferred revenue continue to perform according to the historical relationships with respect to revenue and expense activity. Accounts receivable and accounts payable balances are projected based on days outstanding calculations and forecasted to be generally in-line with historical ratios. All working capital balances fluctuate significantly within years depending on seasonality.

*Note C – Deferred Taxes*

For the purposes of the Financial Projections, Current and Non-current tax assets and liabilities reflect June 30, 2013 balances prior to any potential reorganization entries or the impact of fresh start accounting.

*Note D – Deferred Revenue*

Changes in deferred revenue are primarily driven by changes in the Reorganized Debtors' sales mix (print to digital). The Reorganized Debtors recognize revenues from the sale of subscription-based products, including hosted digital solutions, ratably over the term of the subscription. When a sales arrangement requires the delivery of more than one product or service, the individual elements are accounted for separately, if applicable criteria are met. Specifically, the revenue is allocated to each element on a relative basis if reliable and objective evidence of fair value for each element is available.

*Note E – Revolving Credit Facility Draw*

The Financial Projections illustrate an exit revolver facility in the amount of $300 million to be entered into by the Reorganized Debtors as of and subject to the occurrence of the Effective Date.

*Note F – Long Term Debt*

The Financial Projections illustrate an exit term loan facility in the amount of $1.5 billion to be entered into by the Reorganized Debtors as of and subject to the occurrence of the Effective Date. The exit term loan facility assumes a 1% Original Issue Discount ($15 million) which is amortized and reflected in the term loan balance and proceeds on the balance sheet and statement of cash flows. The term loan facility is assumed to have a 6-year maturity.

*Note G – Equity*

The FY 2014 Pro forma equity value represents an enterprise value of $2.9 billion as of the Effective Date for the Reorganized Debtors as included in the Enterprise Valuation Analysis.

*Note H – Net Revenues*

The Financial Projections are based on Management's view of the Reorganized Debtors' market position, product strategies, specific adoption schedules and overall economic outlook. Due to recent secular declines in the traditional printed text market, revenue is expected to be volatile and increase modestly in FY 2014 and decline in FY 2015

(2.2% and -4.6%, respectively). As the Reorganized Debtors continue to develop digital platforms and transition their customer base, revenue is expected to increase. Annual revenue increases from its FY 2015 low-point of $1.634 billion to $1.781 billion by FY 2018.

### Note I – Depreciation and Amortization

The Reorganized Debtors' depreciation and amortization in the Financial Projections are based on the publication cycle of the copyrighted materials. However, values for depreciation and amortization are subject to material change based on accounting treatments of the Reorganized Debtors' financials upon emergence.

### Note J – Operating Expenses

Management has done a comprehensive operating expense review and intends to continue cost reduction initiatives throughout bankruptcy and post-emergence. Identified savings opportunities include costs related to: employee related programs, purchase & service contracts, travel & entertainment, and executory contract rejections and re-negotiations. Future expense reductions may also include product rationalization, cost of sales reductions, SG&A, capital expenditures and pre-pub related costs. Operating expenses in FY 2014 are expected to be $681 million and decline to $653 million by FY 2018. Operating expenses are expected to improve from 40% of revenue in FY 2014 to 37% of revenue in FY 2018.

### Note K – Interest Expense

Interest expense for the Reorganized Debtors' exit term loan facility is assumed to be LIBOR plus 775 basis points cash interest with a LIBOR floor of 150 basis points. Interest expense for the Reorganized Debtors' Exit Revolver Facility issued at exit is assumed to be LIBOR plus 450 basis points cash interest based on availability, with a LIBOR floor of 150 basis points. LIBOR rates for both the exit term loan facility and the exit revolver facility are projected based on a forward LIBOR curve.

### Note L – Income Taxes

The Reorganized Debtors are projected to be Federal and State cash tax payers based on the Reorganized Debtors' anticipated capital structure and tax attribute reduction as a result of the bankruptcy.

### Note M – Net Working Capital

Changes in Net Working Capital are primarily driven by changes in accounts receivable, inventories, prepaid expenses, author advances, accounts payable, accrued expenses, deferred revenue and royalties.

### Note N – Pre-publication and Capital Expenditures

The Reorganized Debtors' projected plate capital expenditures take into consideration the adoption calendar and open territory market share forecast. Plate capital expenditures are required to be spent beginning 18 to 36 months prior to the scheduled adoption. Projected non-plate capital expenditures are driven by platform investment to support the enterprise solutions businesses and maintenance spending.

### Note O – Scheduled Debt Amortization

Reflects mandatory debt amortization of 1% annually, consistent with the terms of the anticipated New Term Loan. The Reorganized Debtors have contemplated an optional redemption, sweeping cash in excess of $100 million domestically to repay the exit term loan in the third quarter of each fiscal year.

## Exhibit E-1

**Enterprise Valuation Analysis**

## Exhibit E-1: Consolidated Enterprise Valuation Analysis

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.[1]

### I.       Overview of Valuation

Solely for purposes of the Plan, the Debtors have been advised by Lazard, their investment banker and financial advisors, with respect to the consolidated going-concern value (the "*Enterprise Value*") of the Reorganized Debtors' and their direct and indirect subsidiaries' (together, "*Reorganized CL*").   The consolidated Enterprise Value is based on projections provided by the Debtors' management for the fiscal years 2014 through 2018 (the "*Projection Period*"),[2] attached to this Disclosure Statement as Exhibit D.   Lazard has undertaken this Valuation Analysis to estimate the value available for distribution to Holders of Claims entitled to a recovery under the Plan and to analyze the relative recoveries to such Holders thereunder. The Valuation Analysis assumes that the Effective Date occurs on February 28, 2014.

Based on the Debtors' projections and solely for purposes of the Plan, Lazard estimates that Reorganized CL's Enterprise Value is $2,900 million.   The Enterprise Value reflects the estimated value of Reorganized CL's consolidated operations on a going concern basis, plus the estimated value of its post-emergence tax attributes as of the assumed Effective Date.

The estimated total value available for distribution to Holders of Allowed Claims pursuant to the Plan (the "*Distributable Value*") consists of the Enterprise Value, plus balance sheet cash on the Effective Date after accounting for certain estate expenses, including the payment of administrative and priority claims, as well as Professional fees and exit financing fees.   At this time, the Debtors estimate that they will have approximately $682 million of cash on the Effective Date.   The Debtors and their advisors estimate that accrued and unpaid Professional fees will total approximately $33 million, exit facility financing fees will total approximately $60 million,[3] Cure Costs will total approximately $31 million, other Allowed Administrative Claims will total approximately $5 million, and Other Priority Claims and Other Secured Claims together will total approximately $5 million.   As a result, the Debtors estimate that their Distributable Value will be approximately $3,449, which includes approximately $549 million of cash as of the Effective Date after accounting for certain estate expenses.

---

[1]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* to which this *Valuation Analysis* is attached.

[2]   The Debtors' fiscal year is July 1 through June 30.

[3]   The Debtors' financial projections reflect $15 million of this amount as an original issue discount to the Debtors' exit financing.

Solely for purposes of the Plan, Lazard estimates that the total equity value of Reorganized CL is $1,571 million, which reflects the Enterprise Value, plus cash of $171 million to be retained post emergence by Reorganized CL,[4] less the estimated amount of funded indebtedness at emergence of $1,500 million.  For the avoidance of doubt, Reorganized CL's equity value is subject to dilution by shares issued under the Management Incentive Plan.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE DATE HEREOF AND IS PREMISED UPON, AMONG OTHER THINGS, AN ASSUMED EFFECTIVE DATE OF FEBRUARY 28, 2014.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THESE ESTIMATES.  IMPORTANTLY, HOWEVER, THE DEBTORS ARE NEARING THE END OF THEIR MOST IMPORTANT SELLING SEASON AND THE DEBTOR'S PERFORMANCE THEREIN, AS WELL AS THE INDUSTRY AS A WHOLE, MAY HAVE A MATERIAL IMPACT ON VALUATION.  ACCORDINGLY, LAZARD AND THE DEBTORS RESERVE THE RIGHT, BUT NOT THE OBLIGATION, TO UPDATE THE ENTERPRISE VALUE AND DISTRIBUTABLE VALUE FOR THE DEBTORS IN THE FUTURE AFTER THE RESULTS OF SUCH SELLING SEASON ARE AVAILABLE.

Lazard assumed that the Financial Projections prepared by the Debtors' management were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and financial performance of Reorganized CL.  Lazard's Valuation Analysis assumes that Reorganized CL will achieve its Financial Projections in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins, earnings, cash flow, and tax savings, as projected.  If the business performs at levels below those set forth in the Financial Projections, such performance may have a materially negative impact on the value of Reorganized CL and the New Equity.  Conversely, if the business performs at levels above those set forth in the Financial Projections, such performance may have a materially positive impact on the value of Reorganized CL and the New Equity.

In performing its Valuation Analysis, Lazard: (a) reviewed certain historical financial information of the Debtors and their subsidiaries for recent years; (b) reviewed certain internal financial and operating data of the Debtors and their subsidiaries, which data was prepared and provided to Lazard by the management of the Debtors and which relates to Reorganized CL's business and its prospects; (c) met with the Debtors' senior management team to discuss Reorganized CL's present and future operations and business prospects; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in evaluating the operating business of Reorganized CL; (e) considered certain economic and industry information relevant to the operating business; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate.  Lazard assumed and relied on the accuracy and completeness of all financial and other

---

[4]    The amount of cash retained at emergence reflects approximately $50 million of minimum operating balance sheet cash plus $121 million of retained cash pursuant to a working capital adjustment to reflect the deficit position in Reorganized CL's working capital cycle on the Effective Date relative to the average working capital position over the previous 12 months.

information furnished to it by management of the Debtors and the Debtors' advisors, as well as publicly available information.

Lazard did not independently verify the Financial Projections in connection with its Valuation Analysis, and no independent valuations or appraisals of Reorganized CL were sought or obtained in connection herewith. Such forecasts were developed solely for purposes of the formulation and negotiation of the Plan. The estimates of the Enterprise Value prepared by Lazard represent the hypothetical reorganization value of Reorganized CL. Such estimates were developed solely for purposes of the Plan and the analysis of implied relative recoveries to creditors thereunder.

Lazard's Valuation Analysis of Reorganized CL does not constitute a recommendation to any Holder of an Allowed Claim entitled to vote to accept or reject the Plan. Lazard has not been asked to, and does not express, any view as to what the trading value of Reorganized CL's securities may be when issued on the Effective Date or the prices at which they may trade in the future. Lazard's Valuation Analysis of Reorganized CL set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the distribution to be received by such person under the Plan. Lazard's Valuation Analysis reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated valuation of Reorganized CL set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, Reorganized CL, Lazard, nor any other person assumes responsibility for any differences between the estimated valuation and such actual outcomes. Actual market prices of securities at issuance will depend upon, among other things, the operating performance of Reorganized CL, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in Reorganized CL's industry and economic conditions generally, and other factors which generally influence the prices of securities.

As noted above, Lazard's estimate of the hypothetical Enterprise Value consists of the aggregate Enterprise Value of consolidated Reorganized CL on a going-concern basis as of the assumed Effective Date. The Plan does not consolidate the Debtor entities for purposes of measuring claims or distributions. As such, the values of the individual Debtors and the Allowed Claims against such Debtors may affect amounts available for distribution to the creditors of each individual Debtor.

## II.     Additional Assumptions Regarding the Reorganized Debtors

Solely for purposes of the Plan, with respect to the Enterprise Value of Reorganized CL, in addition to the foregoing, Lazard has relied upon the following assumptions:

- The successful reorganization of the Debtors' businesses and finances in a timely manner.

- The implementation of Reorganized CL's business plan and the achievement of the financial forecasts reflected therein.

- The present senior management of the Debtors will continue in their current positions following consummation of the Plan.

- The general financial and market conditions as of the assumed Effective Date of the Plan will not differ materially from those conditions prevailing as of the date of this Disclosure Statement or through the Projection Period.

- The Plan becomes effective in accordance with the estimates and other assumptions discussed herein.

## III.    Valuation Methodology

The following is a brief summary of certain financial analyses performed by Lazard, including a discounted cash flow analysis, publicly traded company analysis and precedent transactions analysis, to arrive at its estimate of the hypothetical Enterprise Value of Reorganized CL. Lazard performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the Debtors' management on which such analyses were based and other factors, including the projected financial results of Reorganized CL.

Under the valuation methodologies summarized below, Lazard derived a going-concern value estimate assuming Reorganized CL is a full federal cash taxpayer. Lazard separately analyzed the value of the Debtors' post-emergence tax attributes as of the assumed Effective Date and added this value to derive the Enterprise Value of Reorganized CL.

## A.    Discounted Cash Flow Analysis

The Discounted Cash Flow ("**DCF**") analysis is a forward-looking enterprise valuation methodology that relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology discounts projected future cash flows by the business's weighted average cost of capital (the "**WACC**"). The WACC reflects the estimated blended rate of return that debt and equity investors would require to invest in the business based on a long-term industry average capital structure. The DCF analysis calculates Reorganized CL's Enterprise Value by measuring the present value of Reorganized CL's unlevered after-tax free cash flows based on the Debtors' projections from January 1, 2014 to June 30, 2018 plus an estimate of the value of the firm beyond the Projection Period, known as the terminal value. The terminal value is derived by applying a perpetuity growth rate for Reorganized CL's terminal year unlevered free cash flow. Lazard also considered calculating the terminal value by applying a multiple to Reorganized CL's projected Post-Plate EBITDA in the terminal year, discounted back to the present by the WACC. The terminal year multiple calculation substantiated the perpetuity growth method for analyzing terminal value.

To estimate the WACC, Lazard used the implied cost of equity and the implied after-tax cost of debt for Reorganized CL, assuming a targeted long-term debt-to-total capitalization ratio

consistent with the educational publishing industry average. Lazard calculated the cost of equity based on the "Capital Asset Pricing Model" which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market. To estimate the cost of debt, Lazard estimated Reorganized CL's blended cost of debt assuming Reorganized CL is a "B" credit and assuming a targeted long-term capital structure. In determining terminal value, Lazard relied upon a range of long-term growth rates, and compared perpetuity growth rates that incorporated various perspectives of growth for companies in the educational publishing sector.

The estimated cash flows and estimated WACC of Reorganized CL are used to derive a potential value. Analyzing the results of such an estimate is not purely mathematical, but instead involves complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of Reorganized CL, as well as other factors that could affect the future prospects and cost of capital considerations for the company.

Lazard performed the DCF calculation based on the unlevered after-tax free cash flows for the Projection Period. Lazard utilized management's detailed financial projections as the primary input. Beginning with earnings before interest and taxes, the analysis taxes this figure at an assumed rate of 35% to calculate an unlevered net income figure. The analysis then adds back the non-cash operating expense of depreciation and amortization. In addition, other factors affecting free cash flow are taken into account, such as the change in working capital, as well as pre-publication and other capital expenditures, all of which do not affect the income statement and therefore require separate adjustments in the calculation of unlevered after-tax free cash flows.

## B.    Publicly Traded Company Analysis

A publicly traded company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. The analysis establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common financial metric. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In determining an estimate for the Enterprise Value of Reorganized CL using this valuation approach, Lazard principally focused on three comparable companies in the

educational publishing industry, namely Pearson PLC, John Wiley & Sons, Inc., and Scholastic Corp. While none of these companies are perfectly comparable to Reorganized CL, the application of the trading multiples of these companies to various financial metrics of Reorganized CL presents a reasonable indication of the Enterprise Value of Reorganized CL.

## C.    Precedent Transactions Analysis

The precedent transactions analysis estimates value by examining public merger and acquisition transactions. The valuations paid in such acquisitions or implied in such mergers are analyzed as ratios of various financial results. These transaction multiples are calculated based on the purchase price (including any debt assumed or retired) paid to acquire companies that are comparable to Reorganized CL. Since precedent transactions analysis reflects aspects of value other than the intrinsic value of a company, coupled with the fact that these transactions may have occurred in a different operating and financial environment, there can be potential limitations to the application of precedent transactions analysis to determining the Enterprise Value of Reorganized CL. While Lazard considered precedent transactions since 1998, Lazard believes that only Apollo's acquisition of McGraw-Hill Education in March 2013 is relevant when assessing the Enterprise Value of Reorganized CL.

## D.    Analysis of Post-Emergence Tax Attributes

Reorganized CL expects to have certain tax attributes following its emergence from bankruptcy. Reorganized CL expects that its accumulated net operating losses ("*NOLs*") would be substantially eliminated through cancellation-of-indebtedness income triggered in these chapter 11 cases and Reorganized CL's fiscal year 2014 federal tax liability. After certain required write-downs, Reorganized CL expects to preserve approximately $665 million of amortizable basis post-emergence which would offset a portion of its estimated federal taxable liability through 2027. Based on input from management and the Debtors' tax advisors, Lazard has valued these tax attributes by calculating the present value of the tax savings they would be expected to provide relative to the taxes that the Reorganized CL would otherwise pay absent the availability of such attributes. In calculating the present value of the tax savings, Lazard discounted the cash flows at a range of discount rates based on Reorganized CL's cost of equity. Furthermore, Lazard took into account a variety of qualitative factors in estimating the value of the tax attributes, including factors such as implementation and utilization risk.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

**Exhibit E-2**

**Disputed Assets Valuation Analysis**

## Exhibit E-2:Valuations of Certain Disputed Assets

Solely for purposes of the Plan, the Debtors have been advised by Lazard, their investment banker and financial advisors, with respect to valuations regarding certain Disputed Assets, as set forth in further detail below.

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL VALUE THAT MAY BE REALIZED THROUGH THE ACQUISITION OR DISPOSITION OF ANY ASSETS DISCUSSED HEREIN OR THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THE ESTIMATED VALUATIONS HEREIN ARE SOLELY FOR PURPOSES OF THE PLAN AND MAY NOT BE USED FOR ANY OTHER PURPOSE.  THE ESTIMATED VALUATIONS HEREIN REFLECT WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE DATE HEREOF AND ARE PREMISED UPON, AMONG OTHER THINGS, AN ASSUMED EFFECTIVE DATE OF FEBRUARY 28, 2014.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THESE ESTIMATES.  IMPORTANTLY, HOWEVER, THE DEBTORS ARE NEARING THE END OF THEIR MOST IMPORTANT SELLING SEASON AND THE DEBTOR'S PERFORMANCE THEREIN, AS WELL AS THE INDUSTRY AS A WHOLE, MAY HAVE A MATERIAL IMPACT ON VALUATION.  ACCORDINGLY, LAZARD AND THE DEBTORS RESERVE THE RIGHT, BUT NOT THE OBLIGATION, TO UPDATE ITS VALUATIONS OF CERTAIN DISPUTED ASSETS IN THE FUTURE AFTER THE RESULTS OF SUCH SELLING SEASON ARE AVAILABLE.

THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.[1]

THE SUMMARIES SET FORTH BELOW DO NOT PURPORT TO BE COMPLETE DESCRIPTIONS OF THE ANALYSES PERFORMED BY LAZARD.  THE PREPARATION OF VALUATION ESTIMATES INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH ESTIMATES ARE NOT READILY SUITABLE TO SUMMARY DESCRIPTION.  IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS.  THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL

---

[1]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* to which this Valuation Analysis is attached.

VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

Lazard assumed that all financial information prepared by the Debtors' management were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to future operating and financial performance. Lazard's analyses assume that projections will be met in all material respects, including revenue and EBITDA growth and improvements in EBITDA margins, earnings, cash flow, and tax savings, as projected. If business performance does not meet projections, such performance may have a materially negative impact on the estimated valuations herein. Conversely, if business performance exceeds projections, such performance may have a materially positive impact on the valuations herein.

Lazard did not independently verify any financial projections or other materials provided by management in connection with the valuations herein, and no independent valuations or appraisals were sought or obtained in connection herewith. Such forecasts were developed solely for purposes of the formulation and negotiation of the Plan. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by management of the Debtors and the Debtors' advisors as well as publicly available information.

Lazard's valuation analyses summarized herein do not constitute a recommendation to any Holder of an Allowed Claim entitled to vote to accept or reject the Plan. Lazard's valuation analyses summarized herein do not constitute an opinion as to fairness from a financial point of view to any person of the distribution to be received by such person under the Plan. Lazard's valuation analyses summarized herein reflect the application of standard valuation techniques and do not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any assets or securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Neither the Debtors, Reorganized CL, Lazard, nor any other person assumes responsibility for any differences between the estimated valuations herein and actual outcomes.

### I.      Equity Interests in CourseSmart

During 2013, CourseSmart considered purchase offers from unaffiliated third parties. Although none of these transactions were consummated, Lazard reviewed certain key proposed transaction terms provided by management. Based on this review of the potential proceeds from a sale of CourseSmart, Lazard estimates that the value of Debtor CLI's 33.4 percent interest in CourseSmart is $5.0 million.

### II.     Equity Interests in Foreign Subsidiaries

Solely for purposes of the Plan, Lazard performed a valuation of Debtor CLAI's equity interests in its first-tier foreign subsidiary, CLA C.V. As set forth in further detail in Section IV.E.(i).(c) of this Disclosure Statement, because CLA C.V. directly or indirectly owns all of the equity of the Debtors' international subsidiaries, CLAI's equity interests in CLA C.V. reflect (A) the Enterprise Value of the Debtors' consolidated international operations (the "*International Operations*") plus (B) cash held by the Debtors' international subsidiaries less (C) the amount of

any intercompany obligations from the Debtors to their international subsidiaries that are characterized as valid debt (the "***International Intercompany Obligations***").

Solely for purposes of the Plan, with respect to the Enterprise Value of the International Operations, in addition to the foregoing, Lazard has relied upon the following assumptions:

- The successful reorganization of the Debtors' businesses and finances in a timely manner, including as they relate to the International Operations.

- The implementation of Reorganized CL's business plan and the achievement of the financial forecasts reflected therein, including as they relate to the International Operations.

- The present senior management of the Debtors will continue in their current positions following consummation of the Plan.

- The general financial and market conditions as of the assumed Effective Date of the Plan will not differ materially from those conditions prevailing as of the date of this Disclosure Statement or through the projection period.

- The Plan becomes effective in accordance with the estimates and other assumptions discussed herein.

## A.    International Operations

Lazard estimated the consolidated Enterprise Value of the International Operations as of the assumed Effective Date based on financial projections provided by the Debtors' management for the fiscal years 2014 through 2018 (the "***Projection Period***").    Consistent with historical practice, management's financial projections for the International Operations incorporate the payment of licensing and development fees to CLI for the use of CLI's intellectual property. Based on management's financial projections, Lazard estimates that the Enterprise Value of the International Operations is $260.0 million.[2]

Lazard primarily valued the International Operations according to three methodologies: a DCF analysis, a publicly traded company analysis, and a precedent transaction analysis. Lazard's methodologies for valuing the International Operations are generally consistent with the methodologies used to estimate the Enterprise Value of Reorganized CL set forth in Exhibit E-1.[3]    In performing its valuation, Lazard principally relied on the discounted cash flow methodology.    While Lazard assessed both publicly traded company and precedent transaction

---

[2]    Lazard's valuation assumed that the International Operations pay trade obligations, including those owed to CLI, in the ordinary course of business.

[3]    Certain parameters of Lazard's valuation of the Debtors' International Operations differed from those used in Lazard's consolidated Enterprise Value calculations, as dictated by the International Operations' facts and circumstances.  For example, in its DCF analysis of the International Operations, Lazard used a WACC that incorporated larger size and unsystematic risk premiums relative to Lazard's consolidated WACC.  In addition, with respect to its publicly traded company analysis of the International Operations, Lazard used multiples that were higher than those used in its consolidated Valuation Analysis to reflect the International Operations' better relative long-term growth outlook.

analyses, Lazard believes both of these approaches have limitations arising from the lack of relevant comparables.

### B.    Cash at International Entities

Based on information provided to Lazard by management, the Debtors' international subsidiaries are expected to hold cash of approximately $42.6 million as of the Effective Date.

### C.    International Intercompany Obligations

Based on information provided by management, there are four International Intercompany Obligations totaling approximately $785 million of indebtedness (including accrued interest):

1.  An interest-free intercompany obligation from CLAI to CLA C.V. with a balance on the Petition Date of approximately $520.1 million.

2.  An interest-bearing intercompany obligation from CLAI to CLA C.V. with a balance on the Petition Date of approximately $246.9 million (including accrued interest).

3.  An interest-free intercompany obligation from CLAI to CLA C.V. with a balance on the Petition Date of approximately $10.9 million.

4.  An interest-bearing intercompany obligation from CLAI to Cengage B.V. with a balance on the Petition Date of approximately $6.6 million (including accrued interest).

Debtors' counsel has informed Lazard that, at a minimum, the $246.9 million obligation from CLAI to CLA C.V. and the $6.6 million obligation from CLAI to Cengage B.V. likely would be characterized as valid debt were a party in interest to seek recharacterization of all of the International Intercompany Obligations. Accordingly, the equity interests in CLA C.V. only have value to the extent the International Operations' Enterprise Value plus the cash at international entities on the Effective Date exceeds this amount of valid debt. As a result of the foregoing, Lazard estimates that CLAI's equity interests in CLA C.V. have a value of $49.1 million. Accordingly, Lazard estimates that the value of CLAI's 35% equity stake in CLA B.V. that is not part of Prepetition Secured Parties' collateral is valued at $17.2 million.

| IMPLIED VALUE OF 35% OF CLA C.V. EQUITY | |
| --- | --- |
| Enterprise Valuation of International Operations | $260.0 |
| Projected Cash Balance on Effective Date | 42.6 |
| **Distributable Value** | **$302.6** |
| Intercompany Loans from CLAI | (253.5) |
| Residual CLA C.V. Equity Value | $49.1 |
| **35% of Residual CLA C.V. Equity Value** | **$17.2** |

## III.    Hampton Brown Disputed Assets

As set forth in further detail in Sections IV.A.(iii).(a) and IV.E.(i).(d) of the Disclosure Statement, the Hampton Brown Disputed Assets consist of up to three assets that are

unencumbered by Prepetition Secured Parties' liens: (A) portions of the National Geographic Explorer! Magazine business, (B) approximately 1,850 Hampton Brown-registered copyrights, and (C) approximately 400 Hampton Brown-related copyrights registered by CLI. Solely for purposes of the Plan, Lazard estimated the value of the National Geographic Explorer! Magazine (including associated receivables), and Ocean Tomo estimated the value of the approximately 1,850 Hampton Brown-registered copyrights and the approximately 400 Hampton Brown-related copyrights registered by CLI.[4]

Lazard estimated the value of the National Geographic Explorer! Magazine based on financial projections provided by the Debtors' management for the fiscal years 2014 through 2018. Because the National Geographic Explorer! Magazine is not operated on a stand-alone basis, these projections included revenue and certain direct costs, as well as current assets associated with the magazine, principally receivables.

Lazard valued the National Geographic Explorer! Magazine by applying a revenue multiple to the magazine's estimated fiscal year 2014 revenues and adding the estimated associated net working capital balance. Based on the facts and circumstances of the magazine's business, Lazard determined that the appropriate revenue multiple in this case was the revenue multiple implied by CLI's 2011 acquisition of Hampton Brown. According to this methodology, Lazard estimates that the value of the National Geographic Explorer! Magazine is $6.7 million.

The Debtors are continuing to review the National Geographic Explorer! Magazine operations to determine the extent to which The Hampton Brown Company, LLC is the beneficial owner of the magazine business. At this time and for purposes of this Disclosure Statement, the Debtors have assumed that the entire value of the National Geographic Explorer! Magazine business is unencumbered.

As set forth in further detail in Exhibit E-3 of the Disclosure Statement, Ocean Tomo estimated the combined value of the approximately 1,850 Hampton Brown-registered copyrights and the approximately 400 Hampton Brown-related copyrights registered by CLI at $7.0 million.[5] Together with the $6.7 million value of the National Geographic Explorer! Magazine, the total value of the Hampton Brown Disputed Assets is estimated to be $13.7 million.

---

[4] Ocean Tomo's copyright valuations are as of the Petition Date.

[5] $7.0 million represents the midpoint of Ocean Tomo's valuation estimate of $4.0 to $10.0 million.

**Exhibit E-3**

**Disputed Copyrights Analysis**

**Exhibit E-3: Ocean Tomo Analysis of the Value of Certain Copyrights**

The Debtors have been advised by Ocean Tomo, LLC ("***Ocean Tomo***") with respect to valuations regarding certain copyright assets, as set forth in further detail below.[1]

THE VALUATION INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL VALUE THAT MAY BE REALIZED THROUGH THE DISPOSITION OF ANY ASSETS DISCUSSED HEREIN.  THE ESTIMATED VALUATIONS HEREIN ARE SOLELY FOR PURPOSES OF THE PLAN AND MAY NOT BE USED FOR ANY OTHER PURPOSE.  THE ESTIMATED VALUATIONS HEREIN REFLECT WORK PERFORMED BY OCEAN TOMO ON THE BASIS OF INFORMATION AVAILABLE TO OCEAN TOMO AS OF THE DATE HEREOF.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT OCEAN TOMO'S CONCLUSIONS, NEITHER OCEAN TOMO NOR THE DEBTORS HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM THESE ESTIMATES.

THE SUMMARIES SET FORTH BELOW DO NOT PURPORT TO BE COMPLETE DESCRIPTIONS OF THE ANALYSES PERFORMED BY OCEAN TOMO.  THE PREPARATION OF VALUATION ESTIMATES INVOLVES VARIOUS DETERMINATIONS AS TO THE APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES.

In performing these analyses, Ocean Tomo and the Debtors made certain assumptions. For example, Ocean Tomo assumed that all financial information prepared by the Debtors' management was reasonably prepared in good faith and on a basis reflecting the Debtors' currently available estimates and judgments as to future operating and financial performance. Ocean Tomo's analyses assume that projections will be met in all material respects.  If business performance does not meet projections, such performance may have a materially negative impact on the estimated valuations herein.  Conversely, if business performance exceeds projections, such performance may have a materially positive impact on the valuations herein.

Certain data and information used by Ocean Tomo was provided by Cengage's internal forecasting database.  This database reports financial data on a real-time basis.  The data provided for the Applicable Copyrights and Additional Copyrights (as those terms are defined below) was pulled from this database on different dates, and therefore a review of data pulled on the same date may impact the preliminary, indicative range of values set forth herein. In addition, certain revenue projections may be revised due to further analysis and discussion with Cengage's management.  Further, Ocean Tomo relied on certain assumptions in preparing its preliminary valuations, and such assumptions may be further refined in discussions with Cengage's management.  Any change to these assumptions may impact Ocean Tomo's analysis.

---

[1]  Capitalized terms used but not otherwise defined in this exhibit will have the meaning ascribed to such terms in the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* to which this exhibit is attached.

Ocean Tomo did not independently verify any financial projections or other materials provided by management in connection with the valuations herein, and no independent valuations or appraisals were sought or obtained in connection herewith. Ocean Tomo assumed and relied on the accuracy and completeness of all financial and other information furnished to it by management of the Debtors and the Debtors' advisors as well as publicly available information.

Ocean Tomo's valuation analyses summarized herein do not constitute a recommendation to any Holder of an Allowed Claim entitled to vote to accept or reject the Plan or an opinion as to fairness from a financial point of view to any person of the distribution to be received by such person under the Plan. Ocean Tomo's valuation analyses summarized herein reflect the application of standard, tested and generally accepted valuation techniques to estimate a fair market value. Neither the Debtors, the Reorganized Cengage, Ocean Tomo, nor any other person assumes responsibility for any differences between the estimated valuations herein and actual outcomes.

## I.    Applicable Copyrights

The Debtors requested that Ocean Tomo provide independent research and analysis in order to provide a fair market value estimate for certain sets of registered copyrights that the Debtors believe are unencumbered or whose liens are subject to avoidance under the Bankruptcy Code due to the timing of the recordings made with the U.S. Copyright Office (the "***Applicable Copyrights***").

The first set consists of the Debtors' registered copyrights in which none of the Prepetition Secured Parties recorded an interest with the U.S. Copyright Office prior to the 90 days before the Petition Date (the "***Preference Period***"). Ocean Tomo valued 1,678 copyrights in this set (collectively, the "***Recently Registered Copyrights***").[2]

The second set consists of the Debtors' registered copyrights in which the First Lien Indenture Trustee and/or the Second Lien Indenture Trustee (or their predecessors, as applicable) recorded an interest with the U.S. Copyright Office in 2012, but that the First Lien Credit Facility Administrative Agent did not record an interest with the U.S. Copyright Office until during the Preference Period. Ocean Tomo valued 12,965 copyrights in this set (collectively, the "***Additional Copyrights***").

The third set consists of the copyrights related to Hampton Brown, which were either registered by Hampton Brown or CLI and with respect to which none of the Prepetition Secured Parties recorded an interest with the U.S. Copyright Office until during the Preference Period, if at all. To value these copyrights, Ocean Tomo considered the revenues attributable to Hampton Brown, which the Debtors track separately (collectively, the "***Hampton Brown Copyrights***").

---

[2]    This excludes approximately 400 copyrights that relate to Hampton Brown. Ocean Tomo has provided a separate valuation for the copyrights owned by or relating to Hampton Brown, as indicated in the third set of copyrights.

## II.    Summary of Potential Valuation Methodologies

Generally, there are three tested and accepted approaches used to arrive at a valuation of intellectual property assets: (A) the cost approach; (B) the market approach; and (C) the income approach.

### A.    The Cost Approach (the "*Cost Approach*")

The Cost Approach to value is based on the assumption that the value of the asset is equal to the cost of reproducing or replacing the asset, less allowances for depreciation and obsolescence as applicable. The Cost Approach can be utilized to value certain intellectual property such as early-stage, non- or recently-commercialized technologies. In the case of copyrights, however, this methodology does not reflect the commercialized nature of the assets, and thus Ocean Tomo did not use the Cost Approach to value the Applicable Copyrights.

### B.    The Market Approach (the "*Market Approach*")

The Market Approach to value is based on identifying comparable sales of like assets in the same technology field and attributing value to the subject assets based on the values achieved in those market transactions. In the case of copyrights, however, a market for the transfer of copyrights between market participants is not available, and thus Ocean Tomo did not use the Market Approach to value the Applicable Copyrights.

### C.    The Income Approach (the "*Income Approach*")

The Income Approach to value is based on ascribing value to assets equal to the present value of the expected future benefits accruing to the owners of the assets. The expected future cash-flow stream derived from the assets—usually a series of periodic amounts—may be quantified using a variety of approaches depending on the specific circumstances of each case. In the context of valuing intellectual property, three distinct methodologies that follow the Income Approach are commonly considered: the Incremental Income Methodology, Relief from Royalty Methodology, and Excess Earnings Methodology (each as defined herein).

#### 1.    Incremental Income (the "*Incremental Income Methodology*")

The Incremental Income Methodology measures a property's value by the incremental earnings achieved by a proprietary product relative to an essentially identical but non-proprietary product (*e.g.*, a generic version of the same product). The incremental earnings may result from the proprietary product commanding a price premium, delivering manufacturing cost savings, or achieving larger sales quantities. As is the case with the Applicable Copyrights, finding a generic version of the proprietary product can often prove challenging, limiting the applicability of this methodology.

#### 2.    Relief from Royalty (the "*Relief from Royalty Methodology*")

The Relief from Royalty Methodology measures a property's value by what the owner of the property would pay in royalties if it did not own the property and had to license it from a

third party.  Alternatively, this approach may also quantify the amount of income the owner would generate by licensing the intellectual property to others.

The Relief from Royalty methodology represents an estimate of value "in-exchange." Said differently, it is an estimate of value that a third party may be willing to pay to own the copyrights outright with no expectation that contributory assets related to selling the final product will transfer with the sale of the assets.

### 3.    Excess Earnings

The Excess Earnings Methodology is often used in valuing intangible assets, where value is measured by estimating revenues and cash flows derived from the intangible asset and then deducting portions of the cash flow that can be attributed to supporting assets, such as a brand name or fixed assets that contributed to the generation of the cash flows.  These deductions are sometimes referred to as "contributory asset charges."  The resulting cash flow, which is attributable solely to the subject intangible asset, is then discounted at a rate of return commensurate with the risk of the asset to calculate a present value.

The Excess Earnings Methodology represents an estimate of value "in-use."  Said differently, this methodology values the copyrights under the assumption that the supporting assets of the company will be utilized to achieve revenues and cash flows.  Those estimates are typically in line with the company's ability to use and realize the value of the copyrights in the normal course of its business.

## III.    Application of Valuation Methodologies

Ocean Tomo concluded that the Income Approach is the most probative methodology for valuing the Applicable Copyrights.  In particular, the use of the Relief from Royalty Methodology and the Excess Earnings Methodology provide a reasonable basis for valuing the Applicable Copyrights.

### A.    Relief from Royalty Methodology

The Relief from Royalty Methodology is applicable when a company pays royalty rates to the owner of the content that are either favorable or unfavorable when compared to market rates.  In the case of the Applicable Copyrights, the Debtors pay ongoing running royalties to the authors that produce the content within the Applicable Copyrights.  If the Applicable Copyrights were hypothetically sold to a third party, it is likely that the existing royalty agreements would transfer fully intact and the new owners of the copyrights would continue paying royalties to the authors.

In order to derive an estimate of value using the Relief from Royalty Methodology, Ocean Tomo assumed that a potential buyer of the Applicable Copyrights may be willing to pay a content-aggregation premium above and beyond the royalty rates paid to content authors.

The complete application of the Relief from Royalty Methodology can be segregated into the following considerations:

1)    Royalty Base:  the royalty base for the Applicable Copyrights is based upon the expected revenues over the economic life of an edition.

2)    Royalty Rate:  the royalty rate is based on a content-aggregation premium.

3)    After royalty income is determined, the cash flow is then tax affected and discounted to a net present value based upon a discount rate commensurate with risk of investing in an asset of this nature.

The Relief from Royalty Methodology assumes that any complementary assets that are necessary to commercialize the copyrights in the ordinary course of business will be provided by a hypothetical buyer.  Ocean Tomo believes that the Excess Earnings Methodology represents a more reliable methodology for valuing the Applicable Copyrights than the Relief from Royalty Methodology and that the way it applied the Excess Earnings Methodology that partially incorporates the Relief from Royalty Methodology for future editions (as discussed below) is more appropriate than a straight application of the Relief from Royalty Methodology or a straight application of the Excess Earning Methodology.

**B.    Excess Earnings Methodology**

The Excess Earnings Methodology seeks to allocate revenue and cash flows that are derived directly as a result of owning specific, primary intangible assets.  In the case of the Applicable Copyrights, the copyrights are the primary intangible asset, yet they are a complementary asset to the operating business as a whole.  Application of this methodology is useful in isolating the value of the current edition of copyrights while simultaneously excluding the value of the content in copyrights for previous or future editions of a family of titles of which the Applicable Copyrights are a part.

The process of applying the Excess Earnings Methodology in relation to the Applicable Copyrights includes developing forecast projections of the Applicable Copyrights as follows:

1)    Reviewing the historical and forecast revenue for the Applicable Copyrights;

2)    Determining the economic life of the Applicable Copyrights based on the expected sales cycle of the relevant copyright edition;

3)    Applying various attrition types to the revenues in order to isolate the copyright content written for the relevant copyright edition;

4)    Determining total costs associated with publishing the copyrights;

5)    Determining contributory asset charges, including assets necessary to support the sale and distribution of the copyright material (*e.g.*, working capital, fixed assets, trademarks/trade names, royalties to authors); and

6)    The Excess Earnings model determines the net cash flows to estimate the value of the newly developed content in the relevant editions of the Applicable Copyrights. Ocean Tomo then used a Relief from Royalty Methodology to estimate the value

of the content subject to the Applicable Copyrights in future editions. The amount from the Relief from Royalty Methodology was added to the current year estimate to obtain an estimate of value attributable to the Applicable Copyrights in both relevant and future editions based on the Excess Earnings Methodology. Ocean Tomo selected this approach because of the limited visibility into future company-specific pre-publication costs and expenses and because it excludes non-copyright intangible assets, such as customer relationships.

7) Tax affecting and discounting to a net present value (based upon a discount rate commensurate with risk of investing in an asset of this nature) the cash flow/operating margin after expenses/costs are deducted and contributory asset charges applied.

## IV.    Overview of Valuation

The application of the valuation methodologies described above resulted in the following valuation of the Applicable Copyrights:[3]

| Recently Registered Copyrights | *Relief from Royalty Methodology* $0.0 million to $16.0 million (midpoint of $8.0 million) | *Excess Earnings Methodology* $60.0 million to $70.3 million (midpoint of $65.2 million) |
| --- | --- | --- |
| Additional Copyrights | *Relief from Royalty Methodology* $0.0 million to $6.5 million (midpoint of $3.3 million) | *Excess Earnings Methodology* $29.9 million to $38.8 million (midpoint of $34.4 million) |
| Hampton Brown Copyrights | *Relief from Royalty Methodology* $4.0 million to $10.0 million (midpoint of $7.0 million) | *Excess Earnings Methodology* $0.0 million, or Not Applicable due to negative operating margins (midpoint of $0.0 million) |

---

[3]    The recoveries set forth in the Disclosure Statement include the midpoint valuations using the Excess Earnings Methodology for the Recently Registered Copyrights and the Additional Copyrights and the midpoint valuation using the Relief from Royalty Methodology for the Hampton Brown Copyrights.

**<u>Exhibit F</u>**

**Liquidation Analysis**

## Exhibit G

**Willkie Report**

**CONFIDENTIAL**

# REPORT OF RICHARD D. FEINTUCH,
## INDEPENDENT DIRECTOR OF CENGAGE LEARNING GP I LLC

**Counsel**
Willkie Farr & Gallagher LLP

September 13, 2013

**CONFIDENTIAL**

9940842

## TABLE OF CONTENTS

**PAGE**

EXECUTIVE SUMMARY ........................................................................................................... 1

BACKGROUND ......................................................................................................................... 7

I.  Investigation Background ............................................................................................ 7
  A.  Investigation Process ........................................................................................ 7
  B.  Presentation of Conclusions ............................................................................. 9

II.  Cengage Generally .................................................................................................... 10
  A.  Organizational Structure of Cengage ............................................................. 10
  B.  2007 Apax Acquisition of Cengage ................................................................ 12
  C.  Cengage Disclosures Regarding Apax ........................................................... 14

III.  Results of the Investigation ....................................................................................... 17
  A.  Cengage's 2012 Efforts to Address Its Debt Maturity Schedule ................... 17
  B.  Cengage's Declining Performance Summer/Fall 2012 .................................. 20
  C.  The Potential McGraw Hill Transaction ........................................................ 21
  D.  Apax's Decision to Purchase Cengage Debt as a Purported Means by
      Which to Manage Cengage's Capital Structure .............................................. 22
  E.  The Cengage Resolution Approving Apax Debt Purchases ........................... 26
  F.  Cengage's Decision to Repurchase Debt as a Purported Means by Which
      to Deleverage .................................................................................................. 27
  G.  The November 9, 2012 Earnings Call ............................................................ 28
  H.  Apax and Cengage Purchases of Cengage Debt ............................................ 31
  I.  The November 19, 2012 Board Meeting and Other November 2012
      Communications Between Cengage and Apax ................................................ 41
  J.  Cengage's Performance Continued to Decline in 2013 .................................. 44
  K.  Copyright Perfection ...................................................................................... 46
  L.  The Apax Debt Purchases Were Not Profitable ............................................. 47

ANALYSIS ............................................................................................................................... 48

I.  WFG Concludes It Is Unlikely that a Claim that the Apax Debt Purchases or the
    Cengage Debt Purchases Breached a Fiduciary Duty of Apax, the Apax Directors,
    or the Non-Apax Directors Would Prevail .................................................................. 49
  A.  It Is Unlikely that the Apax Debt Purchases Resulted in a Breach of a
      Fiduciary Duty by Apax or the Apax Directors .............................................. 49
  B.  It Is Unlikely that the Cengage Debt Purchases Resulted in a Breach of a
      Fiduciary Duty by the Apax Directors or the Non-Apax Directors ................ 52

**CONFIDENTIAL**                                                                                9940842

II.     WFG Concludes that the Evidence Does Not Support the Proposition that the Apax Debt Purchases or Cengage Debt Purchases Were Made on the Basis of Material Non-Public Information. ...............................................................................55

    A.    The Insider Trading Legal Framework ............................................................55

    B.    Analysis..........................................................................................................58

        1.    WFG Concludes that the Evidence Supports that the November 9, 2012 Earnings Call and Quarterly Materials Disclosed All Material Non-Public Information Known to Cengage and Apax at the Time .........59

        2.    WFG Concludes that the Evidence Supports that Apax and Cengage Did Not Obtain Material Non-Public Information Between November 9, 2012 and the Effective Dates of the Rule 10b5-1 Plans..........................................................................................64

        3.    WFG Concludes that the Evidence Supports that the Apax and Cengage Debt Purchases from December 3 and 5, 2012 through February 12, 2013, Were Pursuant to Valid Rule 10b5-1 Plans...............68

III.    WFG Concludes It Is Unlikely that Equitable Subordination Would Prevail ...................73

    A.    Equitable Subordination Legal Framework .....................................................73

        1.    Factors to Determine Whether Equitable Subordination Is Appropriate ..........................................................................................73

            a.    Inequitable Conduct .......................................................74

            b.    Injury to Creditors or an Unfair Advantage for the Claimant........77

            c.    Equitable Subordination Must Not Be Inconsistent with Bankruptcy Law...................................................................78

        2.    Burden of Proof..........................................................................79

        3.    Other Limitations on Equitable Subordination .............................79

    B.    WFG Concludes It Is Unlikely that Equitable Subordination Would Prevail .............................................................................................................81

        1.    WFG Concludes that the Evidence Does Not Support the Proposition that Apax Has Engaged in Inequitable Conduct.....................81

            a.    WFG Concludes that the Evidence Does Not Support that Apax Engaged in Inequitable Conduct Even Under the Standard Applicable to an Insider.................................................81

        2.    WFG Concludes that the Evidence Does Not Support the Proposition that Apax Debt Purchases Have Harmed Cengage's Creditors..................................................................................83

IV.    WFG Concludes It Is Unlikely that Certain Other Remedies Against Apax Would Prevail .............................................................................................................86

    A.    WFG Concludes It Is Unlikely that Equitable Disallowance Would Prevail ........86

    B.    WFG Concludes It Is Unlikely that a *Per Se* Limitation On Recovery Claim Would Prevail..............................................................................................89

**CONFIDENTIAL**

9940842

C.  WFG Concludes It Is Unlikely that a Recharacterization Claim Would Prevail ..................................................................................................91

D.  WFG Concludes it is Unlikely that Vote Designation Would Prevail..................93

CONCLUSION.................................................................................................................96

**APPENDIX**

- Transcript of November 9, 2012 Earnings Call

- Transcript of February 13, 2013 Earnings Call

- Document Request to Apax

- Organizational Chart of Cengage

**CONFIDENTIAL**                                                                    9940842

## EXECUTIVE SUMMARY

This report summarizes the results of the investigation by Willkie Farr &

Gallagher LLP ("*WFG*") — special investigation counsel to Richard D. Feintuch, a director of

Cengage (as defined below) — into the circumstances surrounding the acquisition by Apax

Partners and/or certain of its affiliates, and by Cengage, of certain debt instruments of Cengage

and matters related to such acquisitions.

Following an investigation described herein, WFG has concluded that:[1] (i) it is

unlikely that either Apax (as defined below), the Apax Directors (as defined below), or the Non-

Apax Directors (as defined below) breached any fiduciary or other duty owed to Cengage in

connection with (a) Apax's purchases of Cengage debt or (b) Cengage's repurchases of its own

debt; (ii) it is unlikely that purchases of Cengage debt by Apax and Cengage were made by Apax

and Cengage, respectively, on the basis of material non-public information; (iii) it is unlikely that

an attempt to equitably subordinate the Apax Debt Claims (as defined below) in the Chapter 11

Cases (as defined below) would prevail; and (iv) it is unlikely that certain other remedies against

Apax would prevail, including (a) equitable disallowance of the Apax Debt Claims, (b) a *per se*

limitation of recovery on the Apax Debt Claims, (c) recharacterization of the Apax Debt (as

defined below), or (d) the designation of Apax votes on a plan of reorganization for the Debtors

(as defined below).

In 2007, as part of a leveraged buyout transaction, Apax acquired 97% of the

equity of Cengage for total consideration of approximately $7.75 billion. The acquisition was

funded with the proceeds of $5.6 billion in new debt issued by Cengage, with the remainder of

the purchase price (approximately $2.0 billion) funded by equity contributions from the new

---

[1]    *See* Background Section I.B. for a description of the methodology used to report conclusions herein.

1

**CONFIDENTIAL**                                                                 99340842

equity sponsors, including Apax. As a result of the 2007 acquisition, Apax ultimately controlled

the business and affairs of Cengage's parent entity, Cengage Learning Holdings I, L.P., through

Apax's control of such parent entity's general partner, Cengage Learning G.P. I, L.L.C.[2] During

the period in which the debt purchases relevant to this investigation occurred, two of five board

members of Cengage were partners at Apax.

From the time of the 2007 acquisition through the spring of 2012, Cengage's

performance generally had been in line with Cengage's expectations. In August 2012, however,

Cengage and Apax learned that Cengage was significantly underperforming in the 2012 summer

selling season — the season that typically generates a significant portion of Cengage's annual

revenue. The considerable decline in sales caused concern about Cengage's ability to raise new

financing.

In consultation with the Cengage board of directors, Apax determined in the fall

of 2012 that it would purchase significant portions of Cengage senior debt with the ultimate goal

of extending Cengage's maturities. Apax believed that if it held significant amounts of Cengage

senior debt, Apax (and Cengage) could negotiate an extension of Cengage's debt with sufficient

holders of Cengage debt (possibly, for example, in exchange for Apax's voluntary subordination

of its holdings of senior Cengage debt). Because internal analyses at Apax showed that the

commercial prospects for Cengage remained positive — the 2012 summer selling season

notwithstanding — Apax believed that debt purchases would preserve the value of Cengage

equity held by Apax and that the debt purchases could yield long-term high returns for Apax.

Prior to making its debt purchases, Apax disclosed to the Cengage board of

directors that it planned to purchase significant portions of Cengage's debt. By unanimous

---

[2]     *See* Appendix, Organizational Chart of Cengage.

**CONFIDENTIAL**

9940842

written consent, the Cengage board of directors determined that such debt purchases by Apax were in Cengage's best interest and declined to pursue the debt purchases on Cengage's own behalf. Although Cengage did not have the liquidity for substantial buybacks of its senior debt, the Cengage board of directors, in consultation with financial and legal advisers, executed a unanimous written consent authorizing Cengage to repurchase portions of its unsecured notes, which were then trading at steep discounts.

Both Cengage and Apax began purchasing Cengage debt following Cengage's fiscal year 2013 first quarter investor conference call, which occurred on November 9, 2012. After consulting with legal counsel, Apax and Cengage independently concluded that the investor conference call disclosed to the market all material non-public information known by Apax and Cengage. By the middle of November 2012, in consultation with financial and legal advisors, both Cengage and Apax had begun to formulate written Rule 10b5-1 trading plans for purchases of Cengage debt. In or around the beginning of December 2012, Cengage and Apax executed binding Rule 10b5-1 plans, which transferred to J.P. Morgan (as defined below) the discretion for executing purchases of Cengage debt on behalf of Apax and Cengage. Both Cengage and Apax consulted with legal counsel and determined that they were not in possession of material non-public information when the Rule 10b5-1 plans went into effect. The Rule 10b5-1 plans effectively put the debt purchases on "autopilot" and neither Apax nor Cengage interfered with J.P. Morgan's performance under the Rule 10b5-1 plans. Neither Cengage nor Apax purchased Cengage debt following the termination of the Rule 10b5-1 plans and at no point between the commencement of the 10b5-1 plans and the cessation of debt purchases were the Rule 10b5-1 plans suspended or cancelled.

**CONFIDENTIAL**                                                    99408-12

WFG's investigation concluded that it is unlikely that Apax, the Apax Directors, or the Non-Apax Directors breached a fiduciary duty through Apax's or Cengage's respective purchases of Cengage's debt. The principal means through which the Apax Directors arguably could have violated a fiduciary duty was by the usurpation of a corporate opportunity. Here, upon disclosure by Apax that it intended to acquire Cengage's debt, the Cengage board of directors discussed and ultimately waived the opportunity. By obtaining Cengage's informed approval, it is unlikely that either Apax or the Apax Directors can be said to have usurped a corporate opportunity with respect to Apax's purchases of Cengage debt. In addition, the evidence indicates that Apax made its intent to purchase debt clear and unambiguous to Cengage's board of directors, which unanimously (including the majority of Non-Apax Directors) elected not to have Cengage repurchase such debt and approved the trading by Apax in such debt. Further, it is unlikely that Cengage's repurchases of its debt — which were approved by the board in good faith after an informed decision-making process — resulted in a breach of fiduciary duty by Apax, the Apax Directors, or the Non-Apax Directors.

None of the materials WFG received and reviewed in connection with the investigation indicates that Apax's and Cengage's purchases of Cengage debt were made on the basis of material non-public information. Both companies began purchasing Cengage debt following Cengage's fiscal year 2013 first quarter investor conference call on November 9, 2012. Representatives from Cengage and Apax claim — and WFG's investigation did not uncover anything to the contrary — that all material non-public information was disclosed to the market during that conference call and by related financial disclosures. Additionally, WFG has concluded that it is unlikely that representatives of Cengage and Apax came into possession of material non-public information at any point subsequent to the first quarter investor call and

before the time that both companies executed their respective Rule 10b5-1 trading plans, in early December 2012.

WFG's investigation has also concluded that claims of equitable subordination or equitable disallowance would face very serious obstacles and it is unlikely that such claims would prevail based on the evidence adduced in the investigation. There is no evidence that any of the types of inequitable conduct typically associated with claims for equitable subordination — fraud; illegality; breach of fiduciary duty; unconscionable, unjust, unfair, or foul conduct; undercapitalization; or a parent company's use of a subsidiary as an alter ego for the parent's benefit — are present here. To the contrary, the investigation supports that Apax's debt purchases caused no legally cognizable harm to Cengage and its stakeholders, and was undertaken with the intention of advancing the best interests of Cengage.

Finally, WFG's investigation has concluded that other claims, such as equitable disallowance of the Apax Debt Claims, a *per se* limitation of recovery on the Apax Debt Claims, recharacterization of the Apax Debt, and designation of Apax votes, are unlikely to prevail for various reasons. A claim of equitable disallowance is unlikely to prevail because, as with equitable subordination, there is no evidence of the inequitable conduct that is necessary to support equitable disallowance. A claim of *per se* limitation of recovery on the Apax Debt Claims is also unlikely to prevail, as the Apax Debt Purchases were made by Apax prior to Cengage's filing for bankruptcy and at a time when bankruptcy was not contemplated. Further, a claim of recharacterization is unlikely to prevail because there is no evidence that the entities that purchased Cengage's original issuances of debt (in arm's-length transactions) were making disguised capital contributions, as would be necessary to establish a claim of recharacterization. A claim of vote designation is unlikely to prevail because there is no evidence that Apax

**CONFIDENTIAL**                                                                                          9940842

purchased Cengage's debt in bad faith, with an ulterior motive, or otherwise under circumstances sufficient to establish such a claim.

In sum, WFG has concluded, based on the body of evidence obtained and evaluated, that it is unlikely that: (i) Apax, the Apax Directors, or the Non-Apax Directors breached any fiduciary or other duty owed to Cengage in connection with (a) Apax's purchases of Cengage debt, or (b) Cengage's repurchases of its own debt; (ii) purchases of Cengage debt by Apax and Cengage were made by Apax and Cengage, respectively, on the basis of material non-public information; (iii) an attempt to equitably subordinate the Apax Debt Claims in the Chapter 11 Cases would prevail; and (iv) certain other remedies against Apax would prevail, including (a) equitable disallowance of the Apax Debt Claims, (b) a *per se* limitation of recovery on the Apax Debt Claims, (c) recharacterization of the Apax Debt, or (d) the designation of Apax votes on a plan of reorganization by the Debtors.

**CONFIDENTIAL**

## BACKGROUND

**I.    Investigation Background**

WFG was engaged by the Debtors to assist Richard D. Feintuch (the

*"Investigation Director"*), in his capacity as a director of Cengage, in the evaluation and analysis

of the lawfulness and/or propriety of the acquisition by Apax Partners and/or certain of its

affiliates, and by Cengage, of certain debt instruments of Cengage and matters related to such

acquisitions.[3]

A.    Investigation Process

Over the past three months, WFG has conducted a detailed investigation (the

*"Investigation"*) in furtherance of those requests.  Among other things, the Investigation

included the following steps:

- Collecting from Apax and Cengage over 41,000 documents, which span 425,624 pages;[4]
  - 140,586 pages collected from Apax custodians;[5]

---

[3]   The scope of the Investigation was expanded by revised engagement letters dated August 7, 2013 and August 20, 2013, which provide for an evaluation and analysis of Cengage's acquisition of its own debt and that WFG will be retained only by the Debtors to represent the Investigation Director, and not by the non-Debtor Cengage Learning GP I, LLC.

[4]   During the period addressed by WFG's document requests to Apax, emails were archived in Apax's technological infrastructure and recoverable in response to WFG's document requests only if a user of Apax's email system(s) did not delete the email from his or her account for 40 days following the receipt of that email.  Emails that were manually deleted by Apax users within this time period were purged from Apax's technological infrastructure in a manner such that they were not recoverable in response to WFG's document requests.  The Apax representatives interviewed as part of the Investigation indicated that they did not intentionally delete any responsive documents.  WFG requested a copy of Apax's document retention policy, and counsel for Apax stated that Apax had no written document retention policy during the period addressed by WFG's document requests to Apax.

[5]   As part of the Investigation, WFG requested from Apax all documents relating to Cengage from January 1, 2008, to the present.  Apax's counsel was receptive to the request and, after negotiations, Apax's counsel agreed to provide relevant documents from January 1, 2008, through March 31, 2013, for the following custodians: Andrew Sillitoe, Christian Stahl, David Kim, Derek Lim, Emilio Voli, Ian Jones, John Mcgrue, Jonathan Gandelman, Marcelo Gigliani, Mark Zubko, Martin Halusa, Michael Phillips, Nico Hansen, Niraj Shah, Roy Mackenzie, Steve Hare, Tom Hall, Tripp Lane, and Vivek Vyas.  Apax's counsel asserted privilege, however, with respect to certain documents that would have otherwise been responsive to WFG's

**CONFIDENTIAL**

9940842

      ○  285,038 pages collected from Cengage custodians;[6]

- Reviewing over 27,000 documents, including materials from Apax's Investment, International Investment, Portfolio Review, and Approval committees and all board materials of Cengage Learning GP I LLC from 2008 to the present;

- Interviewing Christian Stahl, a director of Cengage during the Acquisition Period (as defined below), and Tripp Lane of Apax in New York, New York, on July 12, 2013;[7]

- Interviewing Dean Durbin, CFO of Cengage, and Brian Mulligan, Senior Vice President and Treasurer of Cengage, in Stamford, Connecticut, on July 18, 2013 and telephonically on September 5, 2013;[8]

- Interviewing Ronald Dunn, former CEO and current Chairman of the Board of directors of Cengage, telephonically on September 3, 2013;

- Interviewing Laura Yachimski from JP Morgan Chase & Co. ("*J.P. Morgan*") in New York, New York, on August 8, 2013;[9]

- Interviewing James DePonte from PricewaterhouseCoopers ("*PwC*") telephonically on August 19, 2013;

- Interviewing Richard D. Feintuch telephonically on August 28, 2013;

- Reviewing various disclosures by Cengage;

---

document requests. Apax's counsel provided a privilege log for the period of September 2012 through December 2012.

Documents were collected from the following Cengage custodians: Brian Mulligan, Dean Durbin, Ronald Dunn, and Michael Hansen.

Stahl and Lane were interviewed because, based on the materials that were reviewed as part of the Investigation, they were the individuals from Apax most directly involved in the strategy and implementation of the Apax Debt Purchases (as defined below) and Apax Rule 10b5-1 Plans (as defined below). Stahl was on the Board from September 2007 through August 2013. Lane was on the Board from April 2013 through August 2013.

Durbin and Mulligan were interviewed because, based on the materials that were reviewed as part of the Investigation, they were the individuals from Cengage most directly involved in the strategy and implementation of the Apax Debt Purchases, the Cengage Debt Purchases (as defined below), and also the Rule 10b5-1 Plans (as defined below).

Yachimski was interviewed because she was identified by Apax representatives and by J.P. Morgan's counsel as a person knowledgeable about the debt purchases by Cengage and Apax and the Rule 10b5-1 Plans that those entities executed with J.P. Morgan.

9910842

- Reviewing Cengage's Code of Business Ethics and Corporate Disclosure Policy;

- Reviewing documents sufficient to analyze Cengage's capital structure and sources of liquidity from July 2007 through March 2013;

- Reviewing the trade summaries of Apax's acquisitions of Cengage debt during the period of November 9, 2012, through and including February 12, 2013 (the "***Acquisition Period***");

- Reviewing the trade summaries of Cengage's repurchases of its own debt during the Acquisition Period; and

- Reviewing the Rule 10b5-1 trading plans executed by Cengage and Apax for acquisitions of Cengage debt made during the Acquisition Period.

B.    Presentation of Conclusions

The factual findings and conclusions in this report are based upon WFG's review of the materials listed in Background Section I.A. of this report.  In order to provide a consistent formulation of factual findings and conclusions of law in connection with the Investigation, WFG generally presents its findings throughout this report in the manner set forth in this section.[10]  WFG has reported its legal conclusions in connection with the Investigation in the following manner:

- WFG concludes it is likely that the [claim or defense] would prevail.

- WFG concludes it is unlikely that the [claim or defense] would prevail.

WFG has reported its factual findings in connection with the Investigation in the following manner:

---

[10]    WFG does not expect that readers will assign numerical probabilities to the findings and conclusions herein, nor did WFG assign any such numerical probabilities.  In describing a claim (or defense) as "likely" or "unlikely" to prevail, WFG determined that the prospects of failing or succeeding, respectively, on the claim (or defense) were significantly doubtful.  In describing a proposition as "supported" or "not supported" by the evidence, WFG determined that a substantial amount of the evidence adduced in the Investigation corroborated the proposition or that the evidence adduced in the Investigation did not substantially corroborate the proposition.

CONFIDENTIAL                                                                                9940842

- WFG concludes that the evidence supports the proposition that . . .

- WFG concludes that the evidence does not support the proposition that . . .

II.    **Cengage Generally**

    A.    <u>Organizational Structure of Cengage</u>[11]

    Cengage Learning GP I LLC is a limited liability company organized under the

laws of the State of Delaware.[12]  Cengage Learning GP I LLC is the general partner and .01-

percent equity holder of CL Holdings II L.P., a limited partnership.  The remaining equity of CL

Holdings II L.P. is held by its limited partner, Cengage Learning Holdings I L.P.  Cengage

Learning Holdings I L.P., in turn, is 97% owned by Apax Partners, L.P. (a London-based private

equity firm), including investment funds associated with or designated by Apax Partners, L.P.

(collectively, "*Apax*").  OMERS Private Equity (a Canada-based pension fund), including

investment funds associated with or designated by OMERS Private Equity (collectively,

"*OMERS*"), owns the remaining 3% of the equity of Cengage Learning Holdings I L.P.  Unless

otherwise denoted, "*Cengage*" or the "*Company*" means collectively Cengage Learning GP I

LLC, Cengage Learning Holdings I L.P., Cengage Learning Holdings II LP, and all companies

owned directly or indirectly or affiliated with Cengage Learning Holdings II L.P.[13]

---

[11]    *See* Appendix, Organizational Chart of Cengage.

[12]    No Cengage entity within the enterprise is subject to the reporting requirements of Section 13 or 15(d) of
the Securities Exchange Act of 1934, as amended.  However, entities within Cengage have contractual
obligations to post, on a publicly accessible page on the Cengage website and otherwise make available,
certain financial and other information that Cengage would be required to file with the Securities and
Exchange Commission were it subject to Sections 13 or 15(d) of the Securities Exchange Act of 1934, as
amended.

[13]    On July 2, 2013 (the "*Petition Date*"), four Cengage companies commenced cases (collectively, the
"*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the
United States Bankruptcy Court for the Eastern District of New York.  *See* Voluntary Petition, *In re
Cengage Learning, Inc., et al.*, Case Nos. 13-44105, 13-44106, 13-44107, & 13-44108 (E.D.N.Y. filed July
2, 2013).  Those companies are Cengage Learning, Inc., Cengage Learning Acquisitions, Inc., Cengage
Learning Holdco, Inc., and Cengage Learning Holdings II, L.P. (collectively, the "*Debtors*").  *Id.*  The
Chapter 11 Cases are assigned to the Honorable Elizabeth S. Stong.

**CONFIDENTIAL** 9940842

Cengage is managed primarily by the directors and officers of Cengage Learning GP I LLC. During the Acquisition Period, the board of Cengage Learning GP I LLC (the "***Board***") had five members, as follows:

| Name | Position/Affiliation |
|------|---------------------|
| Ronald Dunn | Executive Chairman and Director/Former Cengage CEO |
| Michael Hansen | Chief Executive Officer and Director |
| Paul Renaud | Director/OMERS |
| Marcelo Gigliani | Director/Apax partner |
| Christian Stahl | Director/Apax partner |

Two of those members, Christian Stahl and Marcelo Gigliani[14] (the "***Apax Directors***"),[15] were partners at Apax during the time they were on the Board. Paul Renaud was President and Chief Executive Officer of OMERS. Ronald Dunn was the chief executive officer of Cengage until September 17, 2012, when he retired and assumed the role of Executive Chairman. Michael Hansen is the current chief executive officer of Cengage, a position he held beginning September 17, 2012, and throughout the Acquisition Period.

Richard D. Feintuch was elected to the Board on February 12, 2013, and Renaud simultaneously retired from the Board.[16] At the time of his election, Feintuch was the only member of the Board who was not affiliated with Cengage management or the owners of Cengage equity. Feintuch is a retired partner from the law firm of Wachtell, Lipton, Rosen & Katz LLP. On April 11, 2013, Tripp Lane, another Apax partner, was added to the Board. On or around August 23, 2013, Marcelo Gigliani, Christian Stahl, and Tripp Lane resigned from the Board. The current Board composition is as follows:

---

[14] While Gigliani was a director during the Acquisition Period, his involvement in the Apax Debt Purchases was more limited than his colleagues' involvement, which Cengage confirmed. In addition, Stahl and Lane stated that they were the persons most involved in overseeing Apax's investment in Cengage. Accordingly, WFG determined that it was not necessary to interview Gigliani.

[15] Dunn, Hansen, and Renaud are referred to herein as the "***Non-Apax Directors***."

[16] Cengage Learning Holdings II L.P., Current Report (Feb. 12, 2013) (CENG0103394).

CONFIDENTIAL                                                                9940842

| Name | Position/Affiliation |
|---|---|
| Ronald Dunn | Executive Chairman and Director/Former Cengage CEO |
| Michael Hansen | Chief Executive Officer and Director |
| Richard Feintuch | Independent Director |

Both the Company and Feintuch, the Investigation Director, have determined that

Feintuch qualifies as an independent director of Cengage, and that Feintuch does not have a

previous relationship with Cengage, Apax, or OMERS.  In the course of the Investigation, WFG

did not uncover any evidence contradicting such independence or indicating that, for any

substantial reason, Feintuch would be incapable of making a decision with only the best interests

of the Company in mind.[17]

B.      2007 Apax Acquisition of Cengage

Cengage is a leading provider of teaching, learning, and research solutions for the

academic, professional, and library markets worldwide.[18]  Cengage is the second largest

publisher of course material in United States higher education, with strong positions across all

major disciplines.[19]  The Company competes in five specific segments: two and four year

colleges, research, career, school, and professional.

In May 2007, after an auction process, Apax and OMERS acquired the higher

education, career learning, and library reference assets of Thomson Learning and Nelson Canada

for total consideration of approximately $7.75 billion, and the business comprised of the assets of

---

[17]   *In re Oracle Corp. Derivative Litig.*, 824 A.2d 917, 920 & 939 (Del. Ch. 2003) ("The question of independence 'turns on whether a director is, *for any substantial reason*, incapable of making a decision with only the best interests of the corporation in mind.'" This question should take into account "personal or other relationships, not just financial relationships.").  Counsel to the Creditors' Committee (defined below) has questioned the independence of Feintuch.  *See In re Cengage Learning, Inc., et al.*, Case No. 13-44106 (ESS) (Bankr. E.D.N.Y.) Hr'g Tr. 36:20 – 37:1, 43:19 – 44:12 Aug. 1, 2013; *In re Cengage Learning, Inc., et al.*, Case No. 13-44106 (ESS) (Bankr. E.D.N.Y.) Hr'g Tr. 17:7-15 Aug. 20, 2013.  While WFG has not uncovered any evidence questioning Feintuch's independence, WFG is not opining on that point, and has not been requested to provide such an opinion.

[18]   Cengage Learning Holdings II, L.P., Annual Report (June 30, 2012), at 1.

[19]   *Id.*

12

**CONFIDENTIAL**

Thomson Learning was renamed Cengage.[20]  The acquisition was partially financed by the issuance of approximately $5.6 billion in debt by Cengage Learning Acquisitions, Inc. and Cengage Learning Holdco, Inc.

In connection with the acquisition, Cengage Learning Acquisitions, Inc. entered into an agreement providing for a senior first-lien secured credit facility (the "*First Lien Credit Facility Agreement*"), consisting of $3.44 billion in senior secured term loans (the "*First Lien Loans*") and $300 million in a senior first-lien secured revolving facility.  Cengage Learning Acquisitions, Inc. then issued:  (1) $1,215,600,000 aggregate principal amount of 10.50% Senior Notes due 2015 (the "*Senior Unsecured Notes*"); and (2) $519 million aggregate principal amount at maturity ($400,112,670 in gross proceeds) of 13.25% senior subordinated discount unsecured notes due 2015 (the "*Senior Subordinated Discount Notes*").[21]  Cengage Learning Holdco, Inc. also entered into a Senior Bridge Loan Credit agreement for $540 million in aggregate principal amount.[22]  Following the acquisition, Cengage's debt structure was as follows:

---

[20]  Press Release, Apax Partners, *Funds advised by Apax Partners to acquire Thomson Learning higher education assets from Thomson for US$7.75 billion* (May 11, 2007) (*available at* http://www.apax.com/news/apax-news/2007/may/funds-advised-by-apax-partners-and-omers-capital-partners-to-acquire-thomson-learning-higher-education-assets-from-thomson-for-us$775-billion.aspx.)

[21]  The Senior Subordinated Discount Notes were issued through a Rule 144A/Reg S offering.

[22]  In 2008, the Senior Bridge Loan was converted into 13.75% Senior PIK Notes due 2015 (the "*Senior PIK Notes*" and, collectively with the Senior Unsecured Notes and the Senior Subordinated Discount Notes, the "*Unsecured Notes*").

CONFIDENTIAL                                                                    9940842

| TABLE 1:  CENGAGE DEBT STRUCTURE AS OF JULY 2007 | | |
| --- | --- | --- |
| | Initial Principal Balance | Maturity |
| **Secured Debt** | | |
| First Lien Loans | $3,440,000,000 | 7/3/2014 |
| First Lien Revolver | $300,000,000 (in availability) | 7/5/2013 |
| **Unsecured Debt** | | |
| Senior Unsecured Notes | $1,215,600,000 | 1/15/2015 |
| Senior Subordinated Notes | $519,000,000 | 7/15/2015 |
| Senior Bridge Loan | $540,000,000 | 7/15/2015 |

The First Lien Credit Agreement Facility and the indentures governing Cengage's various debt instruments expressly permit Apax to acquire Cengage's outstanding debt.[23] Although the First Lien Credit Agreement Facility restricts Apax and OMERS from holding at any one time more than 25% of the aggregate principal amount of Cengage's First Lien Loans,[24] that restriction was not violated by the Apax Debt Purchases.

C.    Cengage Disclosures Regarding Apax

As a result of the May 2007 transaction, Apax acquired approximately 97% of Cengage's equity and the ability to exert control over Cengage, including the ability to directly or indirectly exert control over Cengage's subsidiaries and their respective boards and effectively control the appointment of all officers of Cengage.  In its annual and quarterly reports, Cengage

---

[23]    Section 11.07 of the Credit Agreement dated as of July 5, 2007, and as amended by the Incremental Amendment, dated as of May 30, 2008 and the Amendment Agreement, dated as of April 10, 2012, among Cengage Learning Acquisitions, Inc., as Borrower, Cengage Learning Holdco, Inc., as Holdings, Cengage Learning Holdings II, L.P., as Parent, JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent and Swing Line Lender and the Other Lenders Party Thereto; Sections 2.06, 2.08, and 2.09 of the Indenture, dated as of April 10, 2012, among Cengage Learning Acquisitions, Inc., the Guarantors named therein, and The Bank of New York Mellon, as Trustee and as Collateral Agent; Sections 2.08 and 2.09 of the Indenture, dated as of October 31, 2008, among Cengage Learning Holdco, Inc., Cengage Learning Holdings II L.P., as Guarantor, and Wells Fargo Bank, Nat'l Assoc., as Trustee; Sections 2.08 and 2.09 of the Indenture, dated July 5, 2007, among TL Acquisitions, Inc., the Guarantors named therein, and The Bank of New York as Trustee.

[24]    Section 11.07 of the Credit Agreement, dated as of July 5, 2007, and as amended by the Incremental Amendment, dated as of May 30, 2008, and the Amendment Agreement, dated as of April 10, 2012, among Cengage Learning Acquisitions, Inc., as Borrower, Cengage Learning Holdco, Inc., as Holdings, Cengage Learning Holdings II, L.P., as Parent, JPMorgan Chase Bank, N.A., as Administrative Agent, Collateral Agent and Swing Line Lender and the Other Lenders Party Thereto.

discloses Apax's ownership interest and the control Apax could exert over Cengage's decisions. For example, in its most recent Annual Report, dated June 30, 2012, Cengage stated, in relevant part,

> Investment funds associated with or designated by Apax control us. Apax is able to appoint a majority of our board of directors and determine our corporate strategy, management and policies. In addition, Apax has control over our decisions to enter into any corporate transaction and has the ability to prevent any transaction that requires the approval of shareholders.[25]
>
> * * * *
>
> Certain affiliates of Apax and OMERS, certain other co-investors and two management investment vehicles are parties to an amended and restated limited partnership agreement for our parent entity, Cengage Learning Holdings I, L.P. Apax manages and controls the business and affairs of Cengage Learning Holdings I, L.P.'s general partner and therefore controls Cengage Learning Holdings I, L.P. The limited partnership agreement contains restrictions on the transferability of the interests in the partnership, the economic rights of the limited partnership interests and the rights of the limited partners to participate in certain asset sales by the partnership or sales of interests in the partnership by certain affiliates of Apax and OMERS.[26]

Cengage's Annual and Quarterly Reports also discuss acquisitions of Cengage debt by both Apax and Cengage.

> We, our Sponsors [Apax and OMERS], entities controlled by our Sponsors and our affiliates have in the past and may in the future, depending on market conditions and prices, contractual restrictions, our financial liquidity and other factors, acquire our outstanding debt securities and/or bank loans, in privately negotiated or open market transactions . . . .[27]

---

25 Cengage Learning Holdings II, L.P., Annual Report (June 30, 2012), at 20.

26 *Id.* at 28.

27 *Id.* The disclosure of potential, but not specifics of actual, acquisitions of Cengage debt by Cengage and Apax was generally included in Cengage's annual and quarterly reports. *See, e.g.*, Cengage Learning Holdings II, L.P. Fiscal 2013 Third Quarter Report (May 10, 2013), at 20; Cengage Learning Holdings II, L.P. Fiscal 2013 Second Quarter Report (Feb. 13, 2013), at 15; Cengage Learning Holdings II, L.P. Fiscal 2013 First Quarter Report (Nov. 9, 2012), at 15; Cengage Learning Holdings II, L.P., Fiscal 2012 Annual Report (Amendment No. 1) (June 28, 2012), at 15; Cengage Learning Holdings II, L.P. Fiscal 2012 Third

**CONFIDENTIAL**

9940842

Cengage also disclosed in its November 9, 2012 earnings call that it and Apax might purchase Cengage's debt from time to time.[28] That call includes the following exchanges:

> [Question:] Have your Sponsors [acquired] any of your best securities in the open market?

> [Answer:] From the standpoint of debt buybacks, obviously, our sponsors have in the past made debt buyback purchases. We are required to – we are only required because that arm's length transaction not with us but with another party, not to report on the amounts of those buybacks but we do report the interest – [nominal] interest related to those buybacks. So the answer is yes. And we've disclosed – there is disclosure in our reports, our quarterly and annual report indicate that from time to time not only will we be buying back opportunistically, but so will the sponsors and they have.[29]

> \*       \*       \*       \*

> [Question:] Isn't it publicly disclosed the nominal interest associated with the bond purchased by the sponsors?

> [Answer:] As far as the fees and the nominal interest, if you look at our quarterly report on page 15, transactions with our sponsors, it gives you a little table and all in, not broken out because we don't break it out, the management fees and the nominal interests on any debt that they have bought back was $3.6 million in the quarter and $2.7 million same quarter last year.[30]

---

Quarter Report (June 28, 2012), at 16; Cengage Learning Holdings II, L.P. Fiscal 2012 Second Quarter Report (Amendment No. 1) (June 28, 2012), at 27; Cengage Learning Holdings II, L.P. Fiscal 2012 First Quarter Report (Amendment No. 1) (June 28, 2012), at 26.

[28]    *See infra* Background Section III.G.

[29]    Transcript of Cengage Learning, Inc. Fiscal 2013 First Quarter Investor Conference Call Tr. 29 Nov. 9, 2012 (hereinafter "*Cengage Inv. Conf. Tr.*").

[30]    *Id.* at 34-35.

**CONFIDENTIAL**

III.    **Results of the Investigation**

    A.    Cengage's 2012 Efforts to Address Its Debt Maturity Schedule

        Given that Cengage's revolver was set to mature in July 2013, and Cengage had

$5.4 billion in other debt that was set to mature between 2014 and 2015, Apax and Cengage were

focused on extending those maturities in the spring of 2012.

        On April 10, 2012, Cengage completed an "amend and extend" ("*A&E*")

transaction, with participating holders of its First Lien Loans, which provided for (i) a $485

million cash paydown of First Lien Loans, and (ii) an extension of the maturity (to 2017) of

approximately $1.3 billion of the First Lien Loans.  In connection with the A&E, the maturity of

$300 million available under Cengage's revolver was also extended to 2017.  The remaining

$1.985 billion in First Lien Loans has a stated maturity of 2014.  The cash paydown was

financed by the issuance of $725 million in new senior secured notes (maturing in 2020) (the

"*First Lien Notes*" and, collectively with the First Lien Loans, the "*First Lien Debt*"), which

issuance also provided incremental cash proceeds to Cengage.

        Initially, Cengage and Apax planned a $500 million first-lien bond offering to

raise capital for the cash paydown required by the A&E.  The First Lien Notes were marketed

originally with a 10.50% interest rate.  However, during the bond "road show," investors

expressed concern regarding Cengage's ability to meet its near-term maturities and, as a result,

there was an approximately $100 million shortfall in the order book.[31]  Cengage successfully

completed the offering of the First Lien Notes by increasing the applicable interest rate to

11.50% and upsizing the offering to $725 million.

---

[31]    Apax Investment Committee Presentation  (April 2, 2012) (APAX0003009).

**CONFIDENTIAL**                                                                                         9040842

Following the A&E in the spring of 2012, Cengage sought to negotiate a maturity extension of the balance of the First Lien Loans, which mature in 2014. Lenders holding a significant amount of First Lien Loans informed Cengage that they would not participate in a negotiated exchange so long as the Senior Unsecured Notes, which mature in 2015, remained outstanding. In the spring of 2012, there was approximately $1.216 billion in principal amount of Senior Unsecured Notes outstanding.

Cengage's initial plan to deal with the 2015 maturity of the Senior Unsecured Notes, at least in part, was to launch a par-for-par debt exchange for $700 million of second-lien notes, offering to all of the holders of Senior Unsecured Notes the opportunity to swap into longer-dated second-lien notes. However, when pre-marketing the exchange, Cengage learned that the largest holders of the Senior Unsecured Notes (whose participation was needed for a successful exchange) would not participate unless they could exchange all of their holdings. Because Cengage had a limited second-lien basket capacity under the First Lien Credit Facility Agreement, which would not allow Cengage to issue more than $710 million in second lien debt, Cengage decided to offer the exchange only to the five largest holders of the Senior Unsecured Notes, which collectively held over 60% of the outstanding principal amount of the Senior Unsecured Notes.[32] In July 2012, Cengage completed a privately negotiated exchange whereby the Company exchanged approximately $710 million aggregate principal amount of Senior Unsecured Notes for approximately $710 million newly issued 12.00% senior secured second-lien notes due 2019 (the "*Second Lien Notes*," and, collectively with the First Lien Notes, the

---

[32]      *Id*.; Cengage Learning G.P. I, L.L.C. Bd. Meeting Minutes (June 21, 2012) at 4.

**CONFIDENTIAL**

Senior Unsecured Notes, the Senior Subordinated Notes, and the Senior PIK Notes, the

"*Notes*").[33]

As of September 30, 2012, Cengage's debt structure was as follows:

| TABLE 2:  CENGAGE DEBT STRUCTURE AS OF SEPTEMBER 30, 2012 | | | |
|---|---|---|---|
| Loan | Outstanding Balance | Interest Rate | Maturity |
| Unextended Term Loan ($1,539mn)[34] | $1,531,100,000 | L + 225 | 7/3/2014 |
| Extended Term Loan ($1,304mn)[35] | $1,296,700,000 | L + 550 | 7/5/2017 |
| Incremental Term Loan ($625mn)[36] | $552,600,000 | L + 375 | 7/3/2014 |
| Unextended Revolver ($225mn)[37] | $24,400,000 | L + 175 | 7/5/2013 |
| Extended Revolver ($300mn)[38] | $32,600,000 | L + 450 | 4/10/2017 |
| First Lien Notes | $725,000,000 | 11.50% | 4/15/2020 |
| Totals for 1st Lien Debt: | $4,162,400,000 | | |
| | | | |
| Second Lien Notes | $710,000,000 | 12.00% | 6/30/2019 |
| | | | |
| Senior Unsecured Notes | $403,700,000 | 10.50% | 1/15/2015 |
| Senior Subordinated Notes | $174,800,000 | 13.25% | 7/15/2015 |
| Senior PIK Notes[39] | $77,400,000 | 13.75% | 7/15/2015 |
| | | | |
| Total: | $5,528,300,000 | | |

---

[33]     Cengage Learning Holdings II, L.P., Annual Report (September 13, 2012), at 93.

[34]     Hereinafter the "*Unextended Term Loan*."

[35]     Hereinafter the "*Extended Term Loan*."

[36]     Hereinafter the "*Incremental Term Loan*," and together with the Unextended Term Loan and the Extended Term Loan, the "*Loans*."

[37]     Hereinafter the "*Unextended Revolver*."

[38]     Hereinafter the "*Extended Revolver*," and together with the Unextended Revolver, the Loans and the First Lien Notes, the "*First Lien Debt*."

[39]     In Table 2, Table 3A, Table 3B, Table 5A, and Table 5B, outstanding balances and purchase amounts for Senior PIK Notes reflect the final maturity value of the Senior PIK Notes after mandatory "Applicable High Yield Debt Obligation" principal redemption payments made in accordance with the Internal Revenue Code.

CONFIDENTIAL                                                                9940842

B.    Cengage's Declining Performance Summer/Fall 2012

From 2007 to 2011, Cengage's performance generally was in line with the

Company's expectations. Although sales were relatively flat during that period, Cengage

lowered costs and, as a result, its EBITDA increased significantly. Given Cengage's

performance at the time, Apax believed Cengage could seriously consider conducting an initial

public offering ("*IPO*") of its equity prior to July 2014.

Cengage's business is seasonal, and the summer months leading to the start of the

academic year generate a significant portion of Cengage's annual revenue. Apax and Cengage

started to gain visibility into the results of Cengage's poor summer 2012 sales in late August

2012. At that point, there was significant concern that Cengage's August earnings — and, thus,

its earnings for the first quarter of fiscal year ("*FY*") 2013 (July to September 2012)[40] — would

be significantly below the results for the same period for FY 2012. Ultimately, August FY

2013's EDITDA was 31.90% below the EBITDA for August FY 2012.

From late August through October 2012, Cengage attempted to determine the

cause of the decline in sales. Apax was also independently analyzing the reason for Cengage's

decline in sales during that period.[41] Cengage ultimately identified several components

contributing to the low quarterly sales, including: (i) a significant reduction in orders by

Amazon; (ii) lower "attach rates" of Cengage's digital products;[42] and (iii) a $38 million

---

[40]    Unless denoted by "FY" or "fiscal year," dates refer to the calendar year, not the fiscal year. Cengage's
fiscal year ran from July of the preceding calendar year through June of the next calendar year. For
example, FY 2013 commenced in July 2012, and the first quarter of FY 2013 was from July 2012 to
September 2012.

[41]    *See* Apax Investment Committee Meeting Minutes (Sept. 17, 2012) (APAX00000031) ("Cengage's current
trading is puzzling. Many pieces do not seem to fit. . . . The deal team expects to have better data in two
weeks from now.").

[42]    The "Attach Rate" is a measure of the extent to which professors require rather than recommend the use of
a digital platform. When the use of a digital solution is required, more students buy the product and the
attach rate is higher.

CONFIDENTIAL                                                                        9940842

"revenue shift" from the fourth quarter of FY 2011 to the first quarter of FY 2012, which resulted in higher revenue in July of FY 2012 and the appearance of a corresponding reduction in revenue for the first quarter of FY 2013.[43] Upon learning of the significant decline in sales, Apax had concerns about Cengage's ability to raise new financing.

C.    The Potential McGraw Hill Transaction

Beginning in July 2012, Apax and Cengage had been considering a potential acquisition of the McGraw-Hill Education business ("*McGraw Hill*") from the McGraw-Hill Companies. On October 25, 2012, Apax made a non-binding proposal to acquire McGraw Hill. Apax believed that a combination of McGraw Hill and Cengage would yield significant synergies and that a portion of the financing obtained in connection with that transaction could be used to retire Cengage's near-term debt maturities or otherwise effectuate a maturity extension of then-existing debt.

A combination of Cengage's low sales for the first quarter of FY 2013 (July to September 2012) and potential regulatory hurdles made the acquisition less likely. By late October 2012, the Cengage Board knew that Apax's bid would not be successful.[44] In the first week of November 2012, Apax and Cengage were informed by the McGraw-Hill Companies that it had declined Cengage's offer.

---

[43]    Cengage Inv. Conf. Tr. 4 Nov. 9, 2012 (CENG0176742). The revenue shift resulted from the timing of orders in June 2011, which caused $38 million of revenue to be recognized in July 2011 (*i.e.*, the first quarter of FY 2012), rather than June 2011 (*i.e.*, the fourth quarter of FY 2011). The $38 million that was recognized in the first quarter of FY 2012 made the decline in FY 2013 appear more severe, given that, in June 2012, Cengage did not experience timing issues comparable to those that occurred in June 2011.

[44]    Letter from Apax Partners to the Board of Directors of the McGraw-Hill Companies (Oct. 25, 2012) (CENG0162083).

21

CONFIDENTIAL                                                                9940842

D.     Apax's Decision to Purchase Cengage Debt as a Purported Means by Which to Manage Cengage's Capital Structure

With the McGraw Hill acquisition unlikely, Apax began to consider in the fall of 2012 other strategic options in light of Cengage's performance and upcoming debt maturities.[45] As part of that process, Apax considered purchasing Cengage's debt to facilitate a maturity extension because, as a holder of significant portions of Cengage debt, Apax could, if necessary, possibly subordinate its First Lien Debt to other First Lien Debt holdings (pursuant to negotiated arrangements) in exchange for the extension.[46] Moreover, internal analysis at Apax showed that, the first quarter results of FY 2013 notwithstanding, commercial prospects for Cengage remained positive and Cengage's forward enterprise value exceeded the face value of Cengage's debts.[47] Apax believed that debt purchases would preserve the value of Cengage equity held by Apax and could yield high returns in the long-term, given the relatively low price at which Cengage's debt was trading at the time.

Apax personnel and Cengage management stated to WFG — and the contemporaneous documents reviewed by WFG so support — that both Apax and Cengage did

---

[45]     Apax Investment Committee Meeting Minutes (October 18, 2012) (APAX0000036) ("The alternative to the Monte Cristo acquisition is buying debt in CL.").

[46]     Apax Investment Committee Presentation (Nov. 1, 2012) (APAX0019725). Apax originally considered that it should not subordinate its First Lien Debt purchases unless other Cengage First Lien Debt holders agreed to an A&E. *See* Apax IIC Presentation, Capital Structure Options (Nov. 8, 2012) (APAX0033330) ("Would not subordinate claim without receiving 1st lien extension in return."). The minutes of the Apax Investment Committee meeting that authorized the Apax Debt Purchases, however, state that it is "an open question" whether "the swap into a 1.5 lien should be tied to the senior extending, or the junior extending. This will likely have to be decided depending on the market reaction." Apax Partners Europe Managers Ltd, Minutes of the Investment Committee Meeting (Nov. 8, 2012) (APAX0000018).

[47]     Apax IAC Presentation (Nov. 1, 2012) (APAX0019726) ("As we believe that the higher educational business model remains relatively healthy . . . , we believe the forward enterprise value of Cengage should exceed the current debt of $5.5bn.").

CONFIDENTIAL

not believe, in the fall of 2012, that Cengage was facing a Chapter 11 restructuring.[48]  Apax

representatives stated that, had Apax thought otherwise, it would not have made the significant

investments in Cengage's debt that it did during the fall of 2012.  Apax preferred to purchase

outstanding Cengage debt rather than contribute equity to Cengage, because Apax had little

incentive to invest additional equity in Cengage, given that Apax already owned 97% of

Cengage's equity, and Apax had no duty to provide any such additional equity.[49]

After deliberations by Apax personnel and Apax's investment committee, Apax

concluded that debt purchases would both support Cengage's efforts to extend its debt maturities

and could potentially create value for Apax.  Apax planned to buy sufficient amounts of the

outstanding debt to enable Apax to offer a compelling intra-debt tranche subordination and

induce the extension of the short-term maturities, which would provide Cengage with more time

to effect a sales recovery in a more stable financial environment.  For example, one strategy that

Apax considered involved Apax's subordinating its First Lien Debt into a "1.5 lien" intra-debt

tranche between Cengage's First Lien Debt and Second Lien Notes, in exchange for Cengage's

---

[48]     Although some contemporaneous Apax documents analyze whether a debt purchase would be "in the money" in the event of a Cengage bankruptcy, Apax representatives stated that they did not consider a Cengage bankruptcy to be a significant possibility as of November 2012.  Apax representatives stated that Apax considers worst-case scenarios such as bankruptcy as a matter of course when analyzing investments in companies that have significant debt.

[49]     *See* Third Amended and Restated Limited Partnership Agreement of Cengage Learning Holdings I L.P. (APAX0014125) ("No Partner shall be required to make any additional Capital Contribution without the consent of such Partner."); *see also* Del. C. § 15-306(c) ("An obligation of a partnership arising out of or related to circumstances or events occurring while the partnership is a limited liability partnership or incurred while the partnership is a limited liability partnership, whether arising in contract, tort or otherwise, is solely the obligation of the partnership. A partner is not personally liable, directly or indirectly, by way of indemnification, contribution, assessment or otherwise, for such an obligation solely by reason of being or so acting as a partner.").

CONFIDENTIAL

other holders of First Lien Debt agreeing to an A&E.[50]  Apax could then swap its "1.5 lien" debt

for junior debt to extend the maturities of Cengage's junior debt.[51]

Internal analysis by Apax showed that if Cengage's maturities were extended by

five years, Cengage would be in a position to refinance such debt at maturity, or could even

conduct an initial public offering.  By late October 2012, both Apax and Cengage believed that

the best strategy for Cengage to extend the maturities of a significant amount of debt was by

means of Apax's purchases of a significant amount of Cengage debt.  Apax decided to purchase

Cengage debt and monitor the market to determine how best to use its holdings of Cengage debt

to extend Cengage's maturities.[52]

By November 1, 2012, Apax began to formulate an investment strategy and

determine the tranches of Cengage debt in which it would consider investing.  Apax concluded

that it should purchase primarily First Lien Debt because this could facilitate another A&E

among holders of First Lien Debt, which would provide additional runway for a subsequent

A&E of the junior debt.[53]  If this strategy were implemented, the maturities of a significant

---

[50]   Apax IIC Presentation, Capital Structure Options (Nov. 8, 2012) (APAX0033330) ("Would not subordinate claim without receiving 1st lien extension in return.").

[51]   Id. ("If exchanged into 1.5 lien, wait to convert until 2015, or steep discount on jr. can be achieved . . . . If earlier (more attractive) exchange not possible, conduct par for par exchange with jr. debt holders in 2015.")

[52]   Apax Partners Europe Managers Ltd, Minutes of the Investment Committee Meeting (Nov. 8, 2012) (APAX0000018).

[53]   Apax IAC Presentation (Nov. 1, 2012) (APAX0019726) ("As we believe that the higher educational business model remains relatively healthy (see prior committee decks), we believe the forward enterprise value of Cengage should exceed the current debt of $5.5 bn.  An investment in debt that preserves this equity value is therefore likely to provide incremental value beyond the intrinsic returns of the debt repurchase."); Apax Investment Committee Meeting Minutes (Nov. 8, 2012) (APAX0000018) ("The main advantage of senior debt buying is in facilitating an A&E in the senior and subsequently restructuring in the junior, which would buy time for another 5 years."); Apax Investment Committee Meeting Minutes (Nov. 15, 2012) (APAX0000028) ("The larger the invested amount, the more likely a benign restructuring/clean A&E becomes.  This will provide the company with needed cash resources and avoid a costly Ch 11 process."); Apax International Investment Committee Presentation (Nov. 15, 2012) (APAX0000066) (listing as the "Debt Repurchase Priorities" - "Acceptable risk/return on new money (with heavy weight

**CONFIDENTIAL**

amount of debt could potentially be extended until 2017.[54]  In addition, Apax also considered

that if a Chapter 11 restructuring were ever required, Apax would be more likely to recover its

investment in First Lien Debt than in junior debt.[55]

Within the First Lien Debt, Apax decided to concentrate its purchases on the

Unextended Term Loan because it matured in July 2014.  Although significant acquisitions of

the Unextended Term Loan would have a lower cash yield as an investment than other tranches

of First Lien Debt, such as the First Lien Notes, which had a higher interest rate and were trading

at attractive prices, Apax concluded that investments in the Unextended Term Loan were

necessary to manage Cengage's short-term debt maturities.[56]

Apax determined that the best time to begin its debt purchases was after an

earnings call that was scheduled for November 9, 2012.  The reason for that was twofold:

(i) Apax understood that it was in possession of material non-public information regarding

Cengage and believed that the earnings call and related disclosures would "cleanse" Apax of all

---

towards preserving new capital invested[;]" "Reduction in 1st lien leverage to allow for successful extension of remaining 2014 maturities at acceptable interest rates[;]" "Reduction in 2014 maturities to improve supply/demand dynamics in new money bond offering[;]" "Reduction in interest expense to company to allow for improved post-interest free cash flow (to be used for, among other things, NPV positive investments in digital product[;]" [and] "Capture discount on debt.").

[54] Apax Investment Committee Meeting Minutes (Nov. 8, 2012) (APAX0000018) ("The senior purchasing programme has little value creation from buying at discounts but will likely leave the Apax Funds' debt position in the money even in a bankruptcy.  The main advantage of senior debt buying is in facilitating an A&E in the senior and subsequently a restructuring in the junior, which would buy time for another 5 years.").

[55] *Id.* Apax IIC Presentation (Nov. 8, 2012) (APAX0019285) ("Based on research conducted to date, we believe . . . [t]hat while the value of the enterprise is unclear, the likelihood for value to break in the 2nd lien debt in a bankruptcy scenario is high (which significantly increases the risk of repurchasing jr. debt).").

[56] *See* Apax Investment Committee Presentation (Nov. 15, 2012) (chart showing advantages and disadvantages of repurchases by tranche).

9940842

such information;[57] and (ii) the price of Cengage's debt likely would decrease following the

release of Cengage's FY 2013 first-quarter earnings and the market's awareness that Cengage

would not be acquiring McGraw Hill.[58]  Apax's decision to purchase Cengage debt following the

November 9, 2012 earnings call was consistent with Apax's prior purchases of Cengage debt,

which also occurred after a Cengage earnings call.[59]

> E.    The Cengage Resolution Approving Apax Debt Purchases

Cengage supported Apax's decision to make significant investments in Cengage's

debt.  Prior to making any purchases of Cengage debt, Apax disclosed its strategy to Cengage

and obtained Cengage's informed approval of Apax making such debt purchases.  In a

unanimous written consent passed by the Board on November 8, 2012 (the "***Consent***"), the

Board noted that:

- Apax disclosed to Cengage that it intended to acquire Cengage's debt;

- Cengage was "afforded the opportunity, prior to the consummation of any Debt Acquisition [by Apax], to acquire all or a portion" of the Cengage debt at issue;

- "[T]he board of directors [of Cengage] has reviewed the Debt Acquisition, as well as the current business plan, financial condition, liquidity and prospects of [Cengage], in order to determine if it is in the best interests of [Cengage] for certain investment funds controlled by Apax . . . to consummate the Debt Acquisition in lieu of, or in addition to, [Cengage] acquiring all or a portion" of the Cengage debt at issue; and

---

[57]  Apax Investment Committee Meeting Minutes (Nov. 8, 2012) (APAX0000018) ("The deal team has received confidential information.  Confidential information has been shared with the individuals listed above.  We believe the earnings announcement will distribute all MNPI to the public.").

[58]  Apax Investment Committee Presentation (Nov. 1, 2012) (APAX0019726) ("[T]he upcoming earnings announcement coupled with a potential end of the McGraw Hill deal may lead to an opportunity to repurchase debt at attractive prices . . . .").

[59]  Email from T. Lane to C. Stahl (Nov. 14, 2011) (APAX0003451) (noting Apax debt purchases on or around November 14, 2011); Cengage, www.cengage/com/investor/investor_call_replays.html (Cengage investor call on November 10, 2011).

CONFIDENTIAL                                                                   9940842

- "[T]he Board of Directors [of Cengage] (i) deems it to be advisable and in the best interests of the Partnership and the other Cengage Entities not to pursue the opportunity to acquire [the debt at issue] at this time" and "(ii) approves the pursuit of the opportunity of [the debt at issue] by investment funds controlled by Apax."[60]

The Cengage representatives interviewed also expressed their belief that Apax's purchases of Cengage debt benefitted Cengage because Apax's ownership of that debt would assist Cengage in any attempt to extend Cengage's maturities. The Investigation did not adduce any evidence that contravened this stated belief.

F.    Cengage's Decision to Repurchase Debt as a Purported Means by Which to Deleverage

In late 2012, Cengage did not have the liquidity for substantial buybacks of First Lien Debt. Cengage concluded that its limited liquidity should be used to repurchase unsecured debt, which was likely to be trading at a steep discount following the earnings call and therefore offered more "bang for the buck" in terms of reduced interest payments. That conclusion was based on an analysis of the cash that was available to Cengage, which analysis was presented to the Board. On November 8, 2012, the Board passed a unanimous written consent that authorized Cengage to spend up to $50 million to repurchase its Unsecured Notes.[61] The maximum prices at which Cengage would be able to repurchase its Unsecured Notes was to be determined by the Chief Financial Officer and/or the Treasurer of the Company. The Board and Cengage's management generally considered other uses for its available liquidity, such as possible acquisitions, and determined in their judgment that debt repurchases were the best use of Cengage's excess liquidity. Representatives from Cengage interviewed as part of the

---

[60]    Cengage Learning GP I, LLC, Unanimous Written Consent In Lieu Of Meeting Of The Bd. Of Directors (Nov. 8, 2012) (APAX0019258).

[61]    See Cengage Learning GP I, LLC, Unanimous Written Consent In Lieu of Meeting of the Board of Directors (Nov. 8, 2012) (CENG0169149).

**CONFIDENTIAL**

Investigation stated that the decision to pursue debt repurchases originated internally from

Cengage and that Apax did not apply pressure on Cengage to repurchase its debt or attempt to

influence Cengage's strategy for repurchasing its debt. The Investigation did not adduce any

evidence that contravened those statements.

      G.     The November 9, 2012 Earnings Call

           Cengage's FY 2013 first-quarter earnings were released on November 9, 2012,

and Cengage's FY 2013 First Quarter Investor Conference Call was held on the morning of that

same day. During that call, Cengage's management disclosed the revenues for the fiscal year's

first quarter and the factors that management believed contributed to the poor results.[62] The first-

quarter results included a 22% decline in consolidated revenue and a 33% decline in adjusted

EBITDA from the first quarter of the prior fiscal year. Ronald Dunn, Cengage's Executive

Chairman, described the factors contributing to the losses, which included overall market

conditions and factors unique to Cengage. The overall market conditions negatively affecting

Cengage's results in the first quarter of FY 2013 were: (i) declining sales of new printed

textbooks; (ii) professors delaying decisions to switch to new editions of textbooks; and (iii)

slower rates of enrollment growth than in the past.[63] Dean Durbin, Cengage's Chief Financial

Officer, then detailed factors unique to Cengage that negatively affected earnings. Those factors

included: (i) a significant reduction in orders by one of Cengage's channel partners (Amazon);

(ii) lower attach rates; and (iii) a $38 million revenue shift from the fourth quarter of FY 2011 to

---

[62]    *See* Cengage Inv. Conf. Tr. Nov. 9, 2012 (CENG0176739 - CENG0176774).

[63]    *Id.* at CENG0176740 - CENG0176741.

CONFIDENTIAL

the first quarter of FY 2012, which resulted in the appearance of a corresponding reduction in

revenue for the first quarter of FY 2013.[64]

In response to questions about whether the first quarter FY 2013 results could

lead to a Chapter 11 restructuring, Durbin stated:

> I think that if we hit the numbers that we're projecting over the balance of
> the year, we will not have a problem getting the amount of our maturities
> pushed out so that we don't have any issues with the springing maturities
> [triggered by the failure to meet certain financial obligations], the first of
> which is in April of 2013. There is still runway here. . . . And if there is
> any discussion of [a Chapter 11] restructuring, they're not being had with
> me or my colleagues.[65]

Both the Apax and Cengage representatives interviewed stressed that, given the

information available to them at the time, they agreed with Durbin's view that they had no cause

to conclude Cengage was heading toward a Chapter 11 restructuring as of November 9, 2012.

Later in the call, Durbin responded to a question about whether Apax had

acquired Cengage's debt in the open market. Durbin stated:

> From the standpoint of debt buybacks, obviously, our sponsors have in the
> past made debt buyback purchases. We are required to – we are only
> required because that's arm's length transaction not with us but with
> another party, not to report on the amounts of those buybacks but we do
> report the interest – [nominal] interest related to those buybacks. So the
> answer is yes. And we've disclosed – there is disclosure in our reports,
> our quarterly and annual report that indicate that from time to time not
> only will we be buying back opportunistically, but so will the sponsors
> and they have.[66]

---

[64] *Id.* at CENG0176741 - CENG0176742. The revenue shift resulted from the timing of orders in June 2011, which caused $38 million of revenue to be recognized in July 2011 (*i.e.*, the first quarter of FY 2012), rather than June 2011 (*i.e.*, the fourth quarter of FY 2011). The $38 million that was recognized in the first quarter of FY 2012 made the decline in FY 2013 look more severe, given that, in June 2012, Cengage did not experience timing issues comparable to those that occurred in June 2011.

[65] *Id.* at CENG0176761.

[66] *Id.* at CENG0176767. *See supra* Background Section II.C. for an example of the disclosures that were included in Cengage's annual and quarterly reports.

CONFIDENTIAL                                                                    9940842

At the time of the November 9, 2012 earnings call, both Apax and Cengage believed that the conditions contributing to Cengage's poor first quarter performance were short-term phenomena and that Cengage's performance would recover.[67]

Cengage's auditor, PwC, which had been Cengage's auditor since the 2007 acquisition by Apax,[68] did not dispute or find substantial doubt with respect to Cengage's belief that a chapter 11 bankruptcy was unlikely.  Under Generally Accepted Auditing Standards, upon auditing or reviewing Cengage's financials, PwC had the responsibility to assess whether Cengage had sufficient liquidity to continue as a "going concern" for a period of one year following the date of the audit or review.[69]  On November 7, 2012, PwC addressed the Cengage audit committee, which, at the time, consisted of Paul Renaud, Christian Stahl, and Marcelo Gigliani.  PwC noted that "the Company had updated its five year financial forecasts" and that "the Company's forecasts indicated that there will be adequate liquidity available from operating cash flows and borrowings under the credit facility to meet its obligations as they become due,

---

[67] The documents reviewed as part of the Investigation indicate that Cengage did not begin the process of talking to restructuring advisors until January 2013.  The representatives of Cengage interviewed as part of the Investigation also stated so and, according to its engagement letter, Kirkland & Ellis was not formally retained as Cengage's restructuring counsel until on or about March 15, 2013.

[68] PwC, although not engaged as Apax's outside auditor, performs services for eleven APAX-related entities in the United States.

[69] Specifically, Generally Accepted Auditing Standards provide that an "auditor has a responsibility to evaluate whether there is a substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited." AU § 341.02.  That evaluation requires consideration of whether the results of audit procedures performed related to the various audit objectives identify existing conditions and events that indicate substantial doubt about the client's ability to continue as a going concern.  Those conditions and events are divided into four categories:  (i) negative trends; (ii) other indications of possible financial difficulties, such as default on a loan or similar agreements, restructuring of debt, and noncompliance with statutory capital requirements; (iii) internal matters, such as work stoppages or other labor difficulties; and (iv) external matters, such as loss of a key franchise, license or patent.  *Id.* at § 341.06.  When, after considering conditions and events in the aggregate, the auditors believe that substantial doubt may exist, they should consider management's plans for dealing with the effects of those conditions and events and if, after considering the conditions and events and management's plans, the auditors conclude that substantial doubt remains, the audit report should include an explanatory paragraph to reflect this uncertainty.  *Id.* at § 341.07.

**CONFIDENTIAL**                                                              9940842

and thus the Company concluded that as of the end of the first quarter, there were no anticipated

going concern issues over the coming twelve months."[70]  The Apax Directors, both of whom

were on the Cengage Audit Committee, did not object to or dissent from that conclusion.  PwC

also reviewed Cengage's financial results for the first quarter of FY 2013 in November 2012 and

did not conclude that substantial doubt existed about Cengage's ability to continue as a going

concern.[71]

        H.        <u>Apax and Cengage Purchases of Cengage Debt</u>

        On November 9, 2012, Apax concluded that Cengage's earnings call and related

financial disclosures had distributed all material non-public information to the market.[72]

Individuals at Apax understood that a "trading window" for insiders had opened after the

November 9, 2012 earnings announcement.  In addition to its internal analyses, Apax consulted

with counsel at Simpson Thacher & Bartlett, LLP ("**STB**") prior to its first purchase of Cengage

debt to confirm that Apax did not possess material non-public information concerning

Cengage.[73]  The Apax representatives interviewed also stated that they believed that Apax did

not have material non-public information following the disclosures made during the November

9, 2012, earnings call.

        Apax decided to execute its debt purchases on the open market, working through

the syndication desk of J.P. Morgan.  A representative from J.P. Morgan, Laura Yachinmski,

---

[70]      Cengage Learning GP I LLC, Audit Committee Bd. of Directors Meeting Minutes, at 2 (Nov. 7, 2012) (CENG0092882).

[71]      Cengage Learning GP I LLC Meeting of the Bd. of Directors Minutes (Nov. 19, 2012), at 5.

[72]      Apax Investment Committee Meeting Minutes (Nov. 8, 2012) (APAX0000018) ("We believe the earnings announcement will distribute all MNPI to the public.").

[73]      November 28, 2012 email from Tripp Lane to various recipients (APAX0020595) ("In addition (and to be clear) we are working very closely with Simpson Thacher to ensure we are not trading while in possession of Material Non-Public Information (and at this point we do not believe ourselves to be in possession of any such information.)").

9940842

stated that J.P. Morgan executed Apax's debt purchases consistently with J.P. Morgan's internal

procedures.  Prior to J.P. Morgan's purchasing debt on behalf of Apax, J.P. Morgan, as is its

standard practice, asked Apax to provide a written representation that it had no material non-

public information and that it would inform J.P. Morgan immediately if Apax acquired material

non-public information.  On November 9, 2012, Apax provided the representations required by

J.P. Morgan.[74]  After providing those representations, on November 9, 2012, Apax directed J.P.

Morgan to begin purchasing certain tranches of Cengage's debt.  In the days following

November 9, 2012, Apax acquired the First Lien Debt and Second Lien Notes of Cengage.

Apax's purchases for the period of November 9, 2012, through November 30, 2012, are detailed

below:

---

[74]    Email from T. Lane to L. Carey (Nov. 9, 2012) (APAX0140416).  In that email, Lane wrote to Carey of
J.P. Morgan that, "[f]ollowing the earnings announcement and excluding [Apax's] desire to purchase debt,
[Apax] can confirm the below statement[,]" which provided, "'No Undisclosed Information
Representation' by a Person means that such Person is not in possession of any material Nonpublic
Information with respect to Parent, Holdings, the Borrower or any Subsidiary of the Borrower that has not
been disclosed to the Lenders (other than Lenders that do not wish to receive material Nonpublic
Information with respect to Parent, Holdings, the Borrower or any Subsidiary of the Borrower) prior to
such time.  For purposes of this definition 'material Nonpublic Information' shall mean Nonpublic
Information that would reasonably be expected to be material to a decision by any Lender to assign or
acquire any Term Loans or would otherwise be material for purposes of the United States Federal and state
securities laws."  At the time that Lane wrote that email to Carey, Lane had reviewed the script for the
November 9, 2012 earnings call that was scheduled for later that day, but that call had not yet occurred.
Apax did not instruct J.P. Morgan to begin purchasing Cengage debt until after the November 9, 2012
earnings call.

CONFIDENTIAL

9940842

| TABLE 3A: SUMMARY OF APAX DEBT PURCHASES PRE 10b5-1 TRADING PLAN | | | | | |
|---|---|---|---|---|---|
| Loan | Outstanding Balance as of 12/31/12 | Interest Rate | Maturity | Apax Purchases | Apax Expenditures |
| Unextended Term Loan ($1,539mm) | $1,527,100,000 | L + 250 | 7/3/2014 | Redacted | Redacted |
| Extended Term Loan ($1,304mm) | $1,293,300,000 | L + 550 | 7/5/2017 | | |
| Incremental Term Loan ($625mm) | $551,200,000 | L +375 | 7/3/2014 | | |
| Unextended Revolver ($225mm) | $12,900,000 | L + 175 | 7/5/2013 | | |
| Extended Revolver ($300mm) | $17,100,000 | L + 450 | 4/10/2017 | | |
| First Lien Notes | $725,000,000 | 11.50% | 4/15/2020 | | |
| Totals for 1st Lien Debt: | $4,126,600,000 | | | $343,817,573 | $269,760,730 |
| Second Lien Notes | $710,000,000 | 12.00% | 6/30/2019 | Redacted | Redacted |
| Senior Unsecured Notes | $328,800,000 | 10.50% | 1/15/2015 | | |
| Senior Subordinated Notes | $132,000,000 | 13.25% | 7/15/2015 | | |
| Senior PIK Notes | $66,200,000 | 13.75% | 7/15/2015 | | |
| Gross: | $5,363,600,000 | | | $521,531,573 | $341,972,370 |

At or around the same time, Cengage, as it has done in previous periods, decided to repurchase its debt following the November 9, 2012 earnings call. Cengage also consulted with STB, which was representing both Cengage and Apax. Cengage determined that it was not in possession of material non-public information following the November 9, 2012 earnings call.[75] Apax was aware that (i) Cengage was going to buy debt; and (ii) Cengage believed that it did not have material non-public information following the November 9, 2012 earnings call.

Cengage also represented to J.P. Morgan that it was not in possession of material non-public information prior to its November 9, 2012 debt repurchases and would immediately

---

[75]    The Cengage Code of Business Conduct and Ethics provides that "[n]o officer, director or employee of the company or any of its subsidiaries may trade in Cengage Learning securities while in possession of material nonpublic information. Trading based on material nonpublic information is a violation of the law and can result in severe penalties." Cengage Code of Business Conduct and Ethics at 22 (CENG0204726). In addition, Cengage's Corporate Disclosure Policy, an internal document, provides that "[a]ll employees, officers and directors [of Cengage] . . . may not use [material non-public information] to their personal advantage or for the benefit of others."

CONFIDENTIAL                                                                    9940842

inform J.P. Morgan in the event that it acquired material non-public information. A

representative from J.P. Morgan stated that, as had been the case with Apax, Cengage's

repurchases of debt were made on the open market consistently with J.P. Morgan's internal

procedures. A chart detailing Cengage's debt purchases during this period is below:

| TABLE 3B: SUMMARY OF CENGAGE DEBT PURCHASES PRE 10b5-1 TRADING PLAN | | | | | |
|---|---|---|---|---|---|
| Loan | Outstanding Balance as of 12/31/12 | Interest Rate | Maturity | Cengage Purchases | Cengage Expenditures |
| Unextended Term Loan ($1,539mm) | $1,527,100,000 | L + 250 | 7/3/2014 | | |
| Extended Term Loan ($1,304mm) | $1,293,300,000 | L + 550 | 7/5/2017 | | |
| Incremental Term Loan ($625mm) | $551,200,000 | L +375 | 7/3/2014 | | |
| Unextended Revolver ($225mm) | $12,900,000 | L + 175 | 7/5/2013 | | |
| Extended Revolver ($300mm) | $17,100,000 | L + 450 | 4/10/2017 | | |
| First Lien Notes | $725,000,000 | 11.50% | 4/15/2020 | | |
| Totals for 1st Lien Debt: | $4,126,600,000 | | | | |
| | | | | | |
| Second Lien Notes | $710,000,000 | 12.00% | 6/30/2019 | | |
| | | | | | |
| Senior Unsecured Notes | $328,800,000 | 10.50% | 1/15/2015 | $59,712,000 | $17,141,418 |
| Senior Subordinated Notes | $132,000,000 | 13.25% | 7/15/2015 | $40,824,000 | $10,177,291 |
| Senior PIK Notes | $66,200,000 | 13.75% | 7/15/2015 | $ 9,459,778 | $2,790,634 |
| | | | | | |
| Gross: | $5,363,600,000 | | | $109,995,778 | $30,109,343 |

On or around November 16, 2012, Apax and Cengage, in consultation with STB

and J.P. Morgan, began discussing the implementation of Rule 10b5-1 plans. Although Cengage

and Apax believed that the November 9, 2012 earnings call had cleansed them of all material

non-public information concerning Cengage, Apax and Cengage also were concerned that

eventually they would come into possession of such information as the second quarter of FY

2013 continued. In order to continue purchasing Cengage debt after learning material non-public

information, Apax, Cengage, and their advisors determined that Apax and Cengage should

**CONFIDENTIAL**

execute respective Rule 10b5-1 discretionary trading plans at a time when they did not have material non-public information.

Throughout the last two weeks of November 2012, discussions with J.P. Morgan and counsel continued regarding the creation and execution of Rule 10b5-1 trading plans. These discussions resulted in the creation of two Apax Rule 10b5-1 plans (the "*Apax Rule 10b5-1 Plans*"), one that addressed purchases of Notes and another that addressed purchases of Loans.[76] A separate Rule 10b5-1 plan that addressed Cengage's repurchases of its Unsecured Notes (the "*Cengage Rule 10b5-1 Plan*," and, collectively with the Apax Rule 10b5-1 Plans, the "*Rule 10b5-1 Plans*") was also created. The Apax Rule 10b5-1 Plans were executed on November 30, 2012, and were effective as of December 5, 2012. The Cengage Rule 10b5-1 Plan was executed on November 30, 2012, and was effective as of December 3, 2012.

Cengage and Apax each included language in their respective Rule 10b5-1 Plans representing that they did not have material non-public information, which Cengage and Apax representatives interviewed during the Investigation reiterated. The Cengage Rule 10b5-1 Plan and the Apax Rule 10b5-1 Plan that concerned the Notes,[77] respectively, each contained the following representations and agreements concerning Cengage and Apax, each of which was necessary for the Rule 10b5-1 Plans to be legally effective:

- "[J.P. Morgan and Cengage or Apax, respectively] intend that this Agreement comply with the requirements of Rule 10b5-1(c)(1) under the Securities Exchange Act of 1934, as amended (the 'Exchange Act');"

- "In particular [Cengage or Apax, respectively] represents that, as of the date hereof, it is not aware of any material, nonpublic information about [Cengage or its securities] and [Cengage or Apax, respectively] is entering into this Agreement in good faith and not as a part of a plan or scheme to

---

[76]  Apax executed separate trading plans for Notes and Loans at the direction of counsel.

[77]  The Apax Rule 10b5-1 Plan that concerned the Loans did not address material non-public information.

CONFIDENTIAL

9940842

evade the prohibitions of Rule 10b5-1 of the Exchange Act or other applicable laws;" and

- Cengage or Apax, respectively, "agrees not to alter or deviate from the terms of this Agreement or enter into a corresponding or hedging transaction or position with respect to [the debt purchases] during the [time in which the plan is in effect]."[78]

The Apax Rule 10b5-1 Plans delineated which tranches of debt could be purchased, a maximum purchase price for each tranche, and the maximum total expenditures for each tranche (or group of tranches), but otherwise granted total discretion to J.P. Morgan with respect to the purchases. The Apax Rule 10b5-1 Plans authorized J.P. Morgan to purchase Notes or Loans on prevailing market terms up to the following maximum aggregate expenditures and at prices not exceeding the following:

| TABLE 4A: MAXIMUM APAX 10b5-1 PURCHASE PRICE AND EXPENDITURES FOR NOTES: | | |
|---|---|---|
| Series of Notes: | Maximum Purchase Price: | Maximum Aggregate Expenditures: |
| First Lien Notes | Redacted | Redacted |
| Second Lien Notes | | |
| Senior Unsecured Notes | | |
| Senior Subordinated Discount Notes | | |
| Senior PIK Notes | | |

* Subject to increase based on the circumstances of the Apax Rule 10b5-1 Plan with respect to Loans.

| TABLE 4B: MAXIMUM APAX 10b5-1 PURCHASE PRICE AND EXPENDITURES FOR LOANS | | |
|---|---|---|
| Series of Loan: | Maximum Purchase Price: | Maximum Aggregate Expenditures: |
| Unextended Term Loan | Redacted | Redacted |
| Incremental Term Loan | | |
| Extended Term Loan | | |

---

[78]     Cengage Rule 10b5-1 Plan ¶ 5; Apax Rule 10b5-1 Plan concerning Cengage Notes ¶ 5.

**CONFIDENTIAL**                                                                    9940842

In addition, Apax's Rule 10b5-1 Plan that governed purchases of Notes restricted J.P. Morgan from acquiring any Unsecured Notes on behalf of Apax until Cengage had acquired the maximum amount of Unsecured Notes specified in the Cengage Rule 10b5-1 Plan (described below).

Although Apax had the right to terminate the Apax Rule 10b5-1 Plans prior to the termination date set forth in the Apax Rule 10b5-1 Plans, Apax's termination right could be exercised only with respect to the entire purchasing program, not with respect to an individual class of instruments.[79]   The Apax Rule 10b5-1 Plans ended on their own terms on the day Cengage released its earnings report for the second quarter of FY 2013, February 13, 2013, without the exercise of any early termination right.

Like the Apax Rule 10b5-1 Plans, the Cengage Rule 10b5-1 Plan specified the series of Notes that could be repurchased, the maximum price for those series of Notes, and the maximum aggregate expenditures.  The Cengage Rule 10b5-1 Plan provided as follows:

| TABLE 4C:  MAXIMUM CENGAGE 10b5-1 REPURCHASE PRICE AND EXPENDITURES | | |
|---|---|---|
| **Series of Loan:** | **Maximum Purchase Price:** | **Maximum Aggregate Expenditures:** |
| Senior Unsecured Notes | 50% of face amount | $19,890,675 among all Unsecured Notes |
| Senior Subordinated Discount Notes | 50% of face amount | $19,890,675 among all Unsecured Notes |
| Senior PIK Notes | 50% of face amount | $19,890,675 among all Unsecured Notes |

Although Cengage had the right to terminate the Cengage Rule 10b5-1 Plan prior to the termination date set forth in the Cengage Rule 10b5-1 Plan, Cengage's termination right could be exercised only with respect to the entire purchasing program, not with respect to an

---

[79]   Apax Rule 10b5-1 Plan concerning Cengage Notes, ¶ 6(a); Apax Rule 10b5-1 Plan concerning Cengage Loans, ¶ 7.

CONFIDENTIAL                                                                9940842

individual class of instruments.[80] The Cengage Rule 10b5-1 Plan ended on its own terms on the

day before Cengage released its earnings report for the second quarter of FY 2013, February 12,

2013, without the exercise of any early termination right.

Representatives from Cengage and Apax stated that no one from Cengage or

Apax, respectively, had attempted to amend, interfere with, or in any way direct purchases

pursuant to the Cengage and Apax Rule 10b5-1 Plans. A representative from J.P. Morgan

confirmed those statements. In addition, a representative from J.P. Morgan stated that it is the

policy of J.P. Morgan not to have substantive communications with principals during the time in

which a Rule 10b5-1 plan is in effect and that, consistent with that policy, interactions by J.P.

Morgan with Cengage and Apax during the Acquisition Period were limited to non-substantive

communications concerning executed transactions.

Each of Apax's and Cengage's purchases or repurchases of Cengage debt were

made in the open market and were effected by J.P. Morgan through arm's-length transactions. In

making those purchases, a J.P. Morgan representative stated that J.P. Morgan was acting as a

"market maker," *i.e.*, it was matching purchasers and sellers of Cengage debt. J.P. Morgan's

standard practice when purchasing or selling debt on behalf of a third party is not to disclose the

identity of that party, even if a trader is directly asked about the counterparty's identity, which

occurs rarely, according to J.P. Morgan. J.P. Morgan stated that it followed its policy of non-

disclosure with respect to the purchases of Cengage debt on behalf of Cengage and Apax and did

not disclose or otherwise misrepresent the identity of either Cengage or Apax to any seller of

Cengage debt. Nor did Cengage or Apax ask J.P. Morgan to make any such misrepresentation,

according to the evidence adduced in the Investigation.

---

[80]     Cengage Rule 10b5-1 Purchase Plan, ¶ 6(a).

**CONFIDENTIAL**    9940842

Cengage and Apax did want to keep confidential their contemporaneous debt purchases.[81] Apax was concerned that if its identity were known, the seller would seek a higher, "hold-up" price on the basis of the substantial purchases that Apax was making. That would have reduced the amount of Cengage debt that Apax would have been willing or, under the Apax Rule 10b5-1 Plans, able to purchase.

During the Acquisition Period, Cengage, Apax, and J.P. Morgan considered the fact that Cengage and Apax were purchasing debt to be confidential. For example, in an email from Lane of Apax to one of Apax's co-investors that detailed Apax's debt purchases for November 13, 2012, Lane referred to the information as "highly confidential."[82]

Apax's aggregate purchases of Cengage debt during the Acquisition Period (the "*Apax Debt Purchases*"), are summarized in the following table:

---

[81]    The Apax Debt Purchases were subsequently disclosed in Cengage's quarterly report that was issued on February 13, 2012: "Our Sponsors [Apax and OMERS] advised us that during the six months ended December 31, 2012, funds advised by Apax purchased a substantial amount of our outstanding debt through open market transactions and that a significant majority of such purchases have been first lien debt. These purchases did not impact our financial statement pre-tax book income, nor our effective tax rate." Cengage Learning Holdings II, L.P., Second Quarter Report (Feb. 13, 2012), at 28. The Cengage Debt Purchases were also disclosed in that report. *Id.* at 9-10, 18.

[82]    Email from **Redacted** (Nov. 14, 2012) (APAX0022196).

CONFIDENTIAL

9940842

| TABLE 5A: SUMMARY OF APAX DEBT PURCHASES: NOVEMBER 2012 – FEBRUARY 2013 | | | | | | |
|---|---|---|---|---|---|---|
| Instrument | Outstanding Balance as of 12/31/12 | Interest Rate | Maturity | Trading Date Range | Apax Purchases (Notional) | Apax Expenditures |
| Unextended Term Loan ($1,539mm) | $1,527,100,000 | L + 250 | 7/3/2014 | 11/09/2012 - 02/12/2013 | Redacted | Redacted |
| Extended Term Loan ($1,304mm) | $1,293,300,000 | L + 550 | 7/5/2017 | 11/14/2012 - 01/24/2013 | | |
| Incremental Term Loan ($625mm) | $551,200,000 | L + 375 | 7/3/2014 | 11/09/2012 - 02/12/2013 | | |
| Unextended Revolver ($225mm) | $12,900,000 | L + 175 | 7/5/2013 | | | |
| Extended Revolver ($300mm) | $17,100,000 | L + 450 | 4/10/2017 | | | |
| First Lien Notes | $725,000,000 | 11.50% | 4/15/2020 | 11/16/2012 - 01/25/2013 | | |
| **Totals for 1st Lien Debt:** | **$4,126,600,000** | | | | $845,784,284 | $678,169,466 |
| | | | | | | |
| Second Lien Notes | $710,000,000 | 12.00% | 6/30/2019 | 11/13/2012 - 02/11/2013 | Redacted | Redacted |
| | | | | | | |
| Senior Unsecured Notes | $328,800,000 | 10.50% | 1/15/2015 | 02/01/2013 - 02/12/2013 | | |
| Senior Subordinated Discount Notes | $132,000,000 | 13.25% | 7/15/2015 | 02/12/2013 - 02/12/2013 | | |
| Senior PIK Notes | $66,200,000 | 13.75% | 7/15/2015 | | | |
| | | | | | | |
| **Gross:** | **$5,363,600,000** | | | | **$1,210,599,284** | **$832,914,969** |

In total, Apax purchased $1,210,599,284 in principal amount of Cengage Notes and Loans and expended $832,914,969 in funds for such purchases. Approximately 81% of Apax's purchases were of Cengage's First Lien Debt. Apax has not purchased Cengage debt after the Acquisition Period.

Cengage repurchased three series of Notes: (1) the Senior Unsecured Notes, (2) the Senior Subordinated Discount Notes, and (3) the Senior PIK Notes. As had been the case with Apax, each of Cengage's debt repurchases were made in the open market and were effected by J.P. Morgan through arm's-length transactions. Cengage's aggregate purchases of debt during the Acquisition Period (the "*Cengage Debt Purchases*") are summarized in the following table:

CONFIDENTIAL

| TABLE 5B: SUMMARY OF CENGAGE DEBT PURCHASES: NOVEMBER 2012 – FEBRUARY 2013 | | | | | | |
|---|---|---|---|---|---|---|
| Instrument | Outstanding Balance as of 12/31/12 | Interest Rate | Maturity | Trading Date Range | Cengage Purchases (Notional) | Cengage Expenditures |
| Senior Unsecured Notes | $328,800,000 | 10.50% | 1/15/2015 | 11/09/2012 - 02/01/2013 | $111,645,000 | $35,083,411 |
| Senior Subordinated Discount Notes | $132,000,000 | 13.25% | 7/15/2015 | 11/13/2012 - 12/12/2012 | $42,824,000 | $10,812,291 |
| Senior PIK Notes | $66,200,000 | 13.75% | 7/15/2015 | 11/26/2012 - 01/22/2013 | $13,815,408 | $4,104,030 |
| Totals: | | | | | $168,284,408 | $49,999,732 |

In total, Cengage purchased $168,284,408 in principal amount of Unsecured Notes and expended $49,999,732 in funds for such purchases. All of Cengage's repurchases were of Unsecured Notes with a maturity of 2015. Cengage has not repurchased its debt after the Acquisition Period.

I.    The November 19, 2012 Board Meeting and Other November 2012 Communications Between Cengage and Apax

A Cengage Board meeting occurred on November 19, 2012, and the Apax Directors attended that meeting. In connection with that meeting, the members of the Board, including the Apax Directors, received a packet of materials. Those materials included:

- An update concerning an ongoing effort by Cengage to realign its cost structure;[83]

- An analysis of Cengage's key performance indicators relevant to performance management;[84]

- An update on internal strategy regarding Cengage's "Mindtap" product offering;[85]

- An update on "adoptions," *i.e.*, the use of Cengage materials, for a selected sample that had been tracked during the fall 2012 selling season;[86]

---

[83]    *See* Cengage Learning: Board Update Portfolio Optimization Status (Nov. 19, 2012).

[84]    *See* Cengage Learning Performance Management (Nov. 19, 2012).

[85]    *See* Cengage Learning Project Henley: Mindtap Accelerated Product Innovation Efforts (Nov. 2012).

CONFIDENTIAL

- An update concerning ongoing sales and marketing initiatives;[87]

- An October 2012 year-to-date financial review that provided updated revenues, EBITDA, gross sales by segment, financial ratios, and other metrics (the "*October Financials*");[88] and

- A management plan that contained, among other things, revenue and EBITDA projections for FY 2013 (the "*Management Plan*").[89]

As part of the Investigation, the November 19, 2012 Board materials, including the October Financials and Management Plan, were shown to representatives of Cengage and Apax, who were questioned extensively on those materials. The representative of Cengage and Apax each stated their belief that the materials that were distributed as part of the November 19, 2012 Board meeting would not be material to a reasonable investor for the following reasons.

According to Cengage and Apax representatives, the month of October tends to generate a small portion of Cengage's revenues. October is typically a small month for Cengage in terms of revenue due to the seasonal nature of Cengage's business. That is, October is not part of the selling season for textbooks. The minutes from the November 19, 2012 Board meeting similarly state that "Mr. Durbin provided an update on the Company's [Fiscal Year To Date] results, which focused on the First Quarter results given that October is always a small month for revenues due to seasonality of the Company's business."[90]

---

[86]    *See* Cengage Learning Higher Ed Top Adoption Tracking (Nov. 15, 2012).

[87]    *See* Cengage Learning Sales and Marketing Initiatives (Nov. 19, 2012).

[88]    *See* Cengage Learning October 2012 Year-to-Date Financial Review (Nov. 19, 2012).

[89]    *See* Cengage Learning Proposed FY13 Plan (Nov. 19, 2012).

[90]    Cengage Learning GP I LLC Bd. Meeting Minutes (Nov. 19, 2012), at 5. *See also* November 10, 2012 email from Tripp Lane to various recipients (APAX0022689) (stating, in relevant part, "We don't have the October numbers yet, but it is a very small month (as bookstores stock up immediately prior to the start of semesters.")).

**CONFIDENTIAL**                                                    9940842

With respect to the Management Plan, Cengage and Apax representatives interviewed considered the forward-looking information contained in the FY 2013 updated plan to be speculative and immaterial. Cengage's subsequent financial results have proved to be substantially below those included in the Management Plan.

In addition, high-level personnel from Cengage and Apax continued to communicate with one another throughout November 2012. The individuals interviewed in connection with the Investigation, however, stated that the information that was communicated by Cengage to Apax after November 9, 2012 was similar to what was provided to the Board before the November 19, 2012 meeting. Moreover, the Apax representatives stated that information learned at the November 19, 2012 Board meeting did not have any bearing on Apax's decision to purchase Cengage debt. Apax's business decision to purchase Cengage debt was made in late October 2012[91] and trading began just after the November 9, 2012 earnings conference call once material nonpublic information had been disclosed to the market.

As part of the Investigation, WFG collected, reviewed, and analyzed the documents that were transmitted from Cengage to Apax personnel from November 9, 2012 through December 5, 2012. Except as noted above with respect to the November 19, 2012 Board materials (which are analyzed below in Analysis Section II.B.2.),[92] the documents that were reviewed as part of the Investigation do not reflect the transmission by Cengage to Apax of information that would be significant to a reasonable investor during that time period.

---

[91]     *See supra* Background Section III.D.

[92]     In addition, the substance of the October Financials was communicated from Cengage to Apax in materials other than those provided to the Board in connection with the November 19, 2012 Board meeting.

9940842

J.    Cengage's Performance Continued to Decline in 2013

In early January 2013, Cengage and Apax learned that Cengage's sales results for December 2012 were significantly below expectations. On February 13, 2013, Cengage released its results for the three and six months ended December 31, 2012. Cengage reported an 18% drop in revenue for the six months ended December 31, 2012, as compared to the six months ended December 31, 2011.[93]

After discussion with Apax Directors and other Apax representatives, Cengage management determined in late January 2013 that it should begin the process of retaining restructuring advisors. Cengage ultimately signed engagement letters with Lazard Freres & Co. LLC on or around March 21, 2013[94] to advise on restructuring initiatives, and with Alvarez & Marsal North America LLC ("*A&M*") on or around March 18, 2013,[95] to perform cash-forecasting research. Prior to Cengage's retention of restructuring counsel, Kirkland & Ellis LLP, on or around March 15, 2013,[96] STB functioned as primary outside counsel to both Apax and Cengage. Even though Cengage decided to hire restructuring advisors, at the time, in early 2013, Apax and Cengage did not think that a chapter 11 restructuring was inescapable and continued to believe that Cengage's equity could have value.[97]

---

[93]    Cengage Learning Holdings II, L.P., Second Quarter Report (Feb. 13, 2013), at 1.

[94]    Letter from Lazard Freres & Co. LLC to Cengage Learning Holdings II, L.P. (Mar. 21, 2013) (CENG0133097).

[95]    The engagement letter with A&M was dated February 25, 2013. *See* Letter from Alvarez & Marsal North America, LLC, to Dean D. Durbin (Feb. 25, 2013) (CENG0144077).

[96]    *In re Cengage Learning, Inc.*, Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. July 10, 2013) [Docket No. 71], Ex. A, Ex. 1.

[97]    During the interviews conducted as part of the Investigation, representatives from Apax stated that, as of early 2013, they believed that it was possible that an initial public offering of Cengage's equity could occur within four to five years. Further, during the February 13, 2013 earnings call, Cengage expressed confidence that Cengage would have sufficient liquidity in the coming months, and that Cengage has made progress in turning around its business performance. "While we are still at the early stages, I am pleased to

**CONFIDENTIAL**                                                                    9940842

On February 12, 2013, Cengage elected Feintuch to the board of directors following the resignation of Renaud.

In the spring of 2013, both Cengage and Apax determined that Cengage was unlikely to be able to extend the maturity of its debt through an out-of-court process. The agreements that govern Cengage's Notes and Senior Secured Credit Facilities contain cross-default and/or cross-acceleration provisions,[98] and if Cengage failed to pay the amounts due on July 5, 2013 under the Unextended Revolver, substantially all of the company's indebtedness would be accelerated and become immediately due and payable. In such an event, Cengage's secured lenders could proceed against the collateral granted to them to secure their indebtedness.[99] Cengage had already drawn $222 million under its Unextended Revolver.

On March 20, 2013, Cengage drew down approximately $430 million, which was substantially all of the remaining availability under its Extended Revolver and Unextended

---

say that we have made marked progress to building the foundations for the turnaround of our business. We are starting to see some impact in our performance relative to our last quarter. When we last spoke with you, we outlined contributing factors to our performance and since then, we've taken several measures to right the ship. I will update you now on the most important of those measures, keeping in mind that none of these are quick fixes and we must be realistic in recognizing that some of the changes will take time before they affect our results." (p 3-4) (CENG0100440 - CENG0100441).

"Consistent with the last time we spoke, I wanted to reaffirm that we continue to closely monitor our current and future liquidity requirements, and based on our most recent analysis, we expect cash flows from operations combined with the availability under our revolving credit facility to provide sufficient liquidity to fund our operations over the next 12 months. However, we may incur additional levels of borrowing under our revolving credit facility to meet such obligations." (p. 8) (CENG0100445).

". . . we fully expect to get a clean opinion from Pricewaterhouse. (p. 11) (CENG0100448).

[98]    Cengage Learning Holdings II, L.P., Third Quarter Report (May 10, 2013), at 5.

[99]    Cengage Learning Holdings II, L.P., Third Quarter Report (May 10, 2013).