**CONFIDENTIAL**                                                                9940842

Revolver.[100]  In anticipation of an eventual restructuring, on or about May 23, 2013, Cengage

retained WFG to provide counsel to Feintuch in connection with the Investigation.[101]

      K.    <u>Copyright Perfection</u>

          In advance of the Chapter 11 Cases, Cengage's restructuring advisors performed a

collateral and perfection review with respect to Cengage's significant secured debt.  In May

2013, Cengage's restructuring advisors informed WFG that the collateral review demonstrated

that certain secured creditors had not perfected their interests in two separate pools of copyrights

that secure Cengage's obligations under certain of the relevant security documents.  Such

perfection issues (together, the "***Copyright Perfection Issues***") relate to:  (i) a pool of

approximately 1,500 copyrights that were registered during the approximate one-year period

before the Petition Date, but were not perfected via a filing with the U.S. Copyright Office by the

indenture trustees for the First Lien Notes and Second Lien Notes, or the agent under the First

Lien Credit Facility Agreement; and (ii) approximately 14,000 copyrights that were perfected by

the indenture trustees for the First Lien Notes and Second Lien Notes in 2012, but were, on

information and belief, inadvertently not perfected by the agent under the First Lien Credit

Facility Agreement.  WFG understands that the indenture trustees for the First Lien Notes and

Second Lien Notes and the agent under the First Lien Credit Facility Agreement each made

perfection filings with the U.S. Copyright Office on or about May 22, 2013 with respect to the

above-referenced previously unperfected copyrights.[102]

---

[100]     Cengage Learning Holdings II, L.P., Current Report (March 22, 2013).

[101]     As discussed below, WFG's engagement letter was subsequently revised so that entities retaining WFG
only included the Debtors.

[102]     *In re Cengage Learning, Inc., et al.*, Case No. 13-44106 (ESS) (Bankr. E.D.N.Y.) Doc. No. 15, ¶ 25.

**CONFIDENTIAL**                                                                                    9940842

L.    The Apax Debt Purchases Were Not Profitable

Although Apax has not sold any of the debt acquired by the Apax Debt Purchases

(the "*Apax Debt*") as of the date of this report, nearly every purchase of Apax Debt was made at

a price that is higher than the market prices for such debt instruments at either of the Petition

Date or the date of this report.  As detailed in Table 6, if Apax would have sold the Apax Debt

on the Petition Date, it would have lost more than Redacted And if Apax would have sold

the Apax Debt on September 11, 2013, it would have lost more than Redacted

| TABLE 6:  LOSSES ON APAX DEBT PURCHASES AS OF JULY 2 AND SEPTEMBER 11, 2013[103] | | | | | |
|---|---|---|---|---|---|
| Instrument | Weighted Average Purchase Price | Price on July 2 | Notional Losses as of July 2 | Price on Sept. 11 | Notional Loss as of Sept. 11 |
| Unextended Term Loan | Redacted | $74.50 | Redacted | $73.50 | Redacted |
| Extended Term Loan | | $75.90 | | $74.60 | |
| Incremental Term Loan | | $74.00 | | $73.40 | |
| First Lien Notes | | $74.80 | | $74.80 | |
| Second Lien Notes | | $12.90 | | $13.40 | |
| Senior Unsecured Notes | | $12.90 | | $19.90 | |
| Senior Subordinated Discount Notes | | $1.90 | | $.90 | |
| **Totals** | | | | | |

---

[103]    Pricing information obtained from Advantage Data, Inc.

**CONFIDENTIAL**                                                                9940842

## ANALYSIS

The principal issues analyzed in the Investigation are: (i) whether Apax, the Apax

Directors, of the Non-Apax Directors breached a duty owed to Cengage, under Delaware law, by

virtue of the Apax Debt Purchases or Cengage Debt Purchases; (ii) whether the Apax Debt

Purchases or Cengage Debt Purchases were made on the basis of material non-public

information; (iii) whether the claims of Apax against Cengage arising from the Apax Debt (the

"*Apax Debt Claims*") can be equitably subordinated in the Chapter 11 Cases; and (iv) whether

claims of equitable disallowance, *per se* recovery limitation, recharacterization, or vote

designation would be viable.[104] This report does not purport to address in detail each and every

type of claim that could potentially be asserted with respect to the Apax Debt Purchases, but

rather focuses on the legal principles and resulting claims that WFG determined would have

potential merit.

As a result of the Investigation, this report concludes that: (i) none of Apax, the

Apax Directors, or the Non-Apax Directors breached any duties as a result of either the Apax

Debt Purchases or the Cengage Debt Purchases; (ii) it is unlikely that the Apax Debt Purchases

or the Cengage Debt Purchases were made on the basis of material non-public information; (iii)

an attempt to equitably subordinate the Apax Debt Claims likely would not prevail; and (iv)

---

[104] A central tenet of equitable subordination is "that there should be subordination only to the extent necessary to offset the harm which the bankrupt and his creditors suffered on account of the inequitable conduct." *In re Featherworks Corp.*, 25 B.R. 634, 648 (Bankr. E.D.N.Y. 1982). Accordingly, if applicable, the doctrine of equitable subordination might apply to only a subset of the Apax Debt Claims or, conversely, in addition to the Apax Debt Claims, any other claims asserted by Apax against the Debtors. Further, courts have stated that inequitable conduct that supports equitable subordination of a claim need not have been related to the assertion of the claim itself. *See, e.g., Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22 (Bankr. D. Del. 2011) (citing *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 68-69 (Bankr. D. Del. 2002) (citing *Benjamin v. Diamond (In re Mobile Steel)*, 563 F.2d 692, 699 (5th Cir. 1977)). Although the Investigation focused primarily on Apax's and Cengage's conduct in connection with the Apax Debt Purchases and the Cengage Debt Purchases, the evidence reviewed during the Investigation did not suggest that Apax engaged in any other improper conduct with respect to Cengage.

**CONFIDENTIAL**                                                                    9940842

claims of equitable disallowance, *per se* recovery limitation, recharacterization, or vote

designation likely would not prevail.  The basis for those conclusions is discussed below.

**I.      WFG Concludes It Is Unlikely that a Claim that the Apax Debt Purchases or the Cengage Debt Purchases Breached a Fiduciary Duty of Apax, the Apax Directors, or the Non-Apax Directors Would Prevail**

A claimant might assert that Apax, the Apax Directors, or the Non-Apax

Directors breached a fiduciary duty to Cengage.[105]  Moreover, a claimant might allege that the

Apax Directors or the Non-Apax Directors breached a fiduciary duty to Cengage through the

Cengage Debt Purchases.  The Investigation, however, supports that none of Apax, the Apax

Directors, or the Non-Apax Directors breached any fiduciary duties to Cengage in connection

with the Apax Debt Purchases or the Cengage Debt Purchases.

**A.      It Is Unlikely that the Apax Debt Purchases Resulted in a Breach of a Fiduciary Duty by Apax or the Apax Directors**

The principal means through which Apax or the Apax Directors might be alleged

to have violated a fiduciary duty is by the usurpation of a corporate opportunity of Cengage.

Under Delaware law, "[t]he doctrine of corporate opportunity represents but one species of the

---

[105]    The Apax Directors and Non-Apax Directors owed fiduciary duties to Cengage, including the duties of care and loyalty, during the Acquisition Period.  Under Delaware law, under which Cengage Learning GP I LLC is incorporated, directors of a general partner (such as Cengage Learning GP I LLC) owe fiduciary duties to the limited partnership managed by the general partner (such as CL Holdings II L.P.).  *See Wallace v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999) (duties of directors of a general partner to partnership include, among others, "the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership" (quoting *In re USACafes, L.P. Litig.*, 600 A.2d 43, 49 (Del. Ch. 1991))); *Bigelow/Diversified Secondary P'ship Fund 1990 v. Damson/Birtcher Partners*, No. Civ. A. 16630-NC, 2001 WL 1641239, at *8 (Del. Ch. Dec. 4, 2001) ("While mere ownership – either direct or indirect – of the general partner does not result in the establishment of a fiduciary relationship, those affiliates of a general partner who exercise control over the partnership's property may find themselves owing fiduciary duties to both the partnership and its limited partners."); *James River-Pennington Inc. v. CRSS Capital, Inc.*, Civ. A. No. 13870, 1995 WL 106554, at *11 (Del. Ch. Mar. 6, 1995) ("The JRP Directors [directors of the general partner] have fiduciary duties to the Partnership and its limited partners because they control the Partnership property.").

**CONFIDENTIAL**

broad fiduciary duties assumed by a corporate director or officer."[106]  Under the corporate

opportunity doctrine,

> if there is presented to a corporate officer or director a business
> opportunity which the corporation is financially able to undertake, is, from
> its nature, in the line of the corporation's business and is of practical
> advantage to it, is one in which the corporation has an interest or a
> reasonable expectancy, and, by embracing the opportunity, the self-
> interest of the officer or director will be brought into conflict with that of
> the corporation, the law will not permit him to seize the opportunity for
> himself.[107]

Thus, a director or officer that takes a business opportunity usurps that

opportunity from the corporation if: "(1) the corporation is financially able to exploit the

opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation

has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own,

the corporate fiduciary will thereby be placed in a position inimicable to his duties to the

corporation."[108]

A director or officer, however, may insulate himself from a claim that he usurped

a corporate opportunity by presenting that opportunity to the board of the corporation and

obtaining their informed approval for the director or officer to pursue the opportunity.

"[P]resenting the opportunity to the board creates a kind of 'safe harbor' for the director, which

removes the specter of a *post hoc* judicial determination that the director or officer has

improperly usurped a corporate opportunity."[109]

---

[106]   *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del. 1996).

[107]   *Guth v. Loft, Inc.*, 5 A.2d 503, 511 (1939).

[108]   *Broz*, 673 A.2d at 155.

[109]   *Id.* at 157; *see also Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 442 n.7 (Del. 1996) ("Disclosure to and
informed approval by the board may insulate a director from liability where the corporate opportunity
doctrine otherwise applies." (quoting *Fliegler v. Lawrence*, 361 A.2d 218, 220 (Del. 1976))).

CONFIDENTIAL                                                                9940842

Here, a claim that Apax or the Apax Directors breached their fiduciary duty by usurping the opportunity for Cengage to repurchase its own debt and having Apax effect the Apax Debt Purchases is unlikely to prevail. Prior to pursuing the Apax Debt Purchases, Apax disclosed to the Cengage Board that it intended to acquire Cengage's debt and the Cengage Board executed the Consent. The Consent acknowledged that the Cengage Board had been "afforded the opportunity, prior to the consummation of any Debt Acquisition [by Apax], to acquire all or a portion" of the debt acquired in the Apax Debt Purchases. The Board "deem[ed] it to be advisable and in the best interests of [Cengage] not to pursue the opportunity to acquire [the debt at issue] at this time."[110]

Further, Cengage did not have sufficient funds to purchase the quantity of debt that Apax did (which purchases were determined to be in the best interests of Cengage). By obtaining Cengage's informed approval, as reflected in the Consent, the Apax Directors and Apax cannot be liable for usurping a corporate opportunity with respect to the Apax Debt Purchases.[111]

In addition, the Cengage representatives that were interviewed during the Investigation stated that Apax did not usurp a Cengage corporate opportunity. Indeed, the representatives of Cengage interviewed in the Investigation, at the time and with the benefit of hindsight, believed that Apax was acting in Cengage's best interests by making the Apax Debt

---

[110]    Cengage Learning GP I, LLC Unanimous Written Consent In Lieu Of Meeting Of The Board Of Directors (Nov. 8, 2012) (APAX0019258).

[111]    Although certain cases have found a corporate opportunity that was disclosed to the board nevertheless to be usurped, *see, e.g., Brown v. Presbyterian Ministers Fund*, 484 F.2d 998 (3d Cir. 1973), such cases found the usurpation of the corporate opportunity only when the corporation had filed for protection under the bankruptcy laws and the opportunity "should have been disclosed to the receiver as representative of the creditors." *Id.* at 1005. That doctrine does not apply in these circumstances because, at the time that Apax and Cengage agreed that Apax could pursue the Apax Debt Purchases, the decision was not made with any knowledge of Cengage being insolvent, and Cengage was not even considering a bankruptcy restructuring.

CONFIDENTIAL

Purchases.[112]  The contemporaneous documents also support that conclusion.  For example, on

the November 9, 2012 earnings call, Durbin stated that "Apax is fully supportive of our

company."[113]  That statement was made at a time when Durbin knew that Apax was planning to

purchase Cengage debt.  Any claim that the Non-Apax Directors breached their fiduciary duties

by approving the Consent is thus unlikely to prevail, as the Investigation supports that the Non-

Apax Directors acted in good faith and were not grossly negligent in approving the Consent.[114]

  B.    It Is Unlikely that the Cengage Debt Purchases Resulted in a Breach of a Fiduciary
        Duty by the Apax Directors or the Non-Apax Directors

        WFG concludes it is unlikely that the Cengage Debt Purchases resulted in

breaches of the duties of care or loyalty by the Apax Directors or the Non-Apax Directors or that

the Cengage Debt Purchases constituted corporate waste.[115]  Under Delaware law, the business

judgment rule "presumes that in making a business decision the directors of a corporation acted

on an informed basis, in good faith and in the honest belief that the action taken was in the best

---

[112]  Apax did not have a duty to invest additional equity in Cengage.  *See Jedwab v. MGM Grand Hotels, Inc.*,
509 A.2d 584, 598 (Del. Ch. 1986) (finding that Delaware law "does not . . . require . . . controlling
shareholders [to] sacrifice their own financial interest in the enterprise for the sake of the corporation or its
minority shareholders.").

[113]  Cengage Inv. Conf. Tr. 10 Nov. 9, 2012 (CENG0176748).

[114]  *See In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006); *Sutherland v. Sutherland*, No. 2399-
VCN, 2013 Del. Ch. LEXIS 140, at *39 (Del. Ch. May 30, 2013); *Stone v. Ritter*, 911 A.2d 362, 370 (Del.
2006) (quoting *Walt Disney Co. Deriv. Litig.*, 906 A.2d at 67).

[115]  WFG has concluded that a claim against Apax (or any other party involved in the transactions) for aiding
and abetting a breach of fiduciary duty is unlikely to prevail because (i) WFG has concluded that a claim
against Cengage's directors or officers for breach of fiduciary duty is unlikely to prevail, and (ii) there is no
evidence that Apax believed the approval of the Cengage Debt Purchases or the Apax Debt Purchases
would result in a breach of fiduciary duty.

CONFIDENTIAL                                                                    9940842

interests of the company."[116]  To rebut that presumption for purposes of the duty of care, it must

be shown that the directors acted with gross negligence.[117]

The Investigation does not support that either the Apax Directors or the Non-

Apax Directors acted with gross negligence in approving the Cengage Debt Purchases.  To the

contrary, the Investigation supports that the decision by the Board to approve the Cengage Debt

Purchases followed an informed decision-making process.  That process led Cengage to

conclude that the Cengage Debt Purchases were in the best interests of the Company because the

directors believed at the time that the buybacks would facilitate an extension of Cengage's debt

maturities, help avoid the trigger of the springing maturities, and reduce the Company's cash-

interest expense.  Moreover, given the discounts at which the Unsecured Notes were trading

following the November 9, 2012 earnings call, Cengage could repurchase Unsecured Debt at

prices significantly below 50% of face value.  Cash forecasts developed in the fall of 2012

indicated that, Cengage's poor first quarter FY 2013 earnings notwithstanding, the Company had

sufficient liquidity for the Cengage Debt Purchases.  Based on this information, the Board

approved the Cengage Debt Purchases.  WFG concludes it is unlikely that the Board acted with

gross negligence in approving the Cengage Debt Purchases and, therefore, it is unlikely that a

claim for the breach of the duty of care would prevail against the Apax Directors of the Non-

Apax Directors.[118]

Likewise, the Investigation does not support that the Cengage Debt Purchases

resulted in a breach of the duty of loyalty by either the Apax Directors or the Non-Apax

---

[116]   *In re Trados Inc. S'holder Litig.*, No. Civ. A. 1512, 2013 WL 4516775, at *20 (Del. Ch. May 21, 2013) (internal citation and quotation marks omitted).

[117]   *See Walt Disney Co. Deriv. Litig.*, 906 A.2d at 66; *see also Sutherland*, 2013 Del. Ch. LEXIS 140, at *39.

[118]   *See Walt Disney Co. Deriv. Litig.*, 906 A.2d at 66; *Sutherland*, 2013 Del. Ch. LEXIS 140, at *39.

CONFIDENTIAL                                                                                    9940842

Directors. Rather, WFG concludes that both the Apax Directors and the Non-Apax Directors did

not "act[] with a purpose other than that of advancing the best interests of the corporation," "act[]

with the intent to violate applicable positive law," or "intentionally fail[] to act in the face of a

known duty to act," which would show the lack of good faith necessary to establish a breach of

the duty of loyalty.[119] As discussed above, the Investigation supports that the Board believed

that it was acting to further the best interests of Cengage. Also, the evidence supports that the

Cengage Debt Purchases did not involve self-dealing because neither the Non-Apax Directors

nor the Apax Directors derived a personal benefit from the Cengage Debt Purchases at the

expense of Cengage. Rather, the intended function of the buybacks — to extend the Company's

maturities and buy back debt at steep discounts — inured to the benefit of the enterprise and not

to any individual director or shareholder.[120]

   Finally, WFG concludes it is unlikely that the Cengage Debt Purchases

constituted corporate waste. Waste can be found only when "what the corporation has received

is so inadequate in value that no person of ordinary, sound business judgment would deem it

worth that which the corporation has paid."[121] Because the Unsecured Notes were trading at

significant discounts following the November 9, 2012 earnings call and the purchases could

---

[119]   *Stone v. Ritter*, 911 A.2d at 370 (quoting *Walt Disney Co. Deriv. Litig.*, 906 A.2d at 67).

[120]   It also is unlikely that the Cengage Debt Purchases resulted in a breach of a fiduciary duty by Apax. Although controlling shareholders and parent corporations owe a fiduciary duty to a subsidiary when there are parent-subsidiary dealings, the business judgment rule nevertheless will apply unless it can be shown that the transaction involved self-dealing. *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971). "Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent received something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary." *Id.* Here, as discussed above, the Investigation supports that Apax did not receive a benefit from the Cengage Debt Purchases. Moreover, Cengage representatives stated that the strategy of Cengage repurchasing debt originated within Cengage and that Apax did not pressure Cengage to repurchase its debt.

[121]   *Khanna v. McMinn*, No. 20545-NC, 2006 WL 1388744, at *23 n.177 (Del. Ch. May 9, 2006) (quoting *Grobow v. Perot*, 539 A.2d 180, 189 (Del. 1988)).

**CONFIDENTIAL**                                                                                                 9940842

ultimately support a maturity extension, Cengage management and the Board believed that the

Cengage Debt Purchases were in the best interests of the Company. Accordingly, it is unlikely

that Cengage's repurchasing its Unsecured Notes at a discount was "so one sided that no

reasonable and ordinary business person would consider it adequate consideration."[122]

II. **WFG Concludes that the Evidence Does Not Support the Proposition that the Apax Debt Purchases or Cengage Debt Purchases Were Made on the Basis of Material Non-Public Information.**

    A.    The Insider Trading Legal Framework

        The law of insider trading is based on Section 10(b) of the Securities Act of

1934[123] and Securities and Exchange Commission (the "*SEC*") Rule 10b-5.[124] Section 10(b) and

---

[122]   *See In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 137 (Del. Ch. 2009) (allegation that company repurchased its stock at (or at a slightly inflated) market price "utterly fails" to state a claim for waste under Delaware law).

WFG also considered whether a claim for the state-law cause of action of deepening insolvency could be brought against either Apax, Cengage's directors (including the Apax Directors) or Cengage's officers for engaging in the Cengage Debt Purchases on the theory that the use of Cengage's cash to make such purchases resulted in fewer assets being available for distributions to Cengage's creditors. Deepening insolvency refers to "an injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Official Comm. of Unsecured Creditors v. Am. Tower Corp. (In re Verestar, Inc.)*, 343 B.R. 444, 475 (Bankr. S.D.N.Y. 2006) (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340, 347-48 (3d Cir. 2001)). "Claims of deepening insolvency usually involve misconduct that causes a financially troubled company to suffer losses by incurring additional debt with little or no hope of recovery, damaging creditors in the process." *Id.* With some exceptions, the courts that recognize a deepening insolvency cause of action typically require fraudulent conduct, and mere negligence will not suffice. *Seitz v. Detweiler, Hershey & Assocs., P.C. (In re CitX Corp.)*, 448 F.3d 672, 680-281 (3d Cir. 2006) (recognizing deepening insolvency as a cause of action under Pennsylvania state law, but requiring fraudulent conduct to prove such cause of action). Under Delaware law, deepening insolvency is not a recognized cause of action, but may be recognized as a theory of damages stemming from a breach of fiduciary duty. *Compare Trenwick America Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2006) (deepening insolvency is not a cause of action in Delaware) *with Miller v. McCown DeLeeuw & Co. (In re The Brown Schools)*, 386 B.R. 37 (Bankr. D. Del. 2008) (deepening insolvency is a valid damages theory in connection with a breach of fiduciary duty claim). WFG determined that a deepening insolvency action would be unlikely to prevail against either Apax or Cengage's directors and officers because (i) deepening insolvency is not a cause of action under Delaware law, which would likely govern the actions of Apax and Cengage with respect to the Cengage Debt Purchases; (ii) the Cengage Debt Purchases resulted in a reduction of corporate debt, rather than an expansion of corporate debt; (iii) the Investigation concluded that a breach of fiduciary duty claim was unlikely to prevail; and (iv) WFG found no evidence of fraud or misconduct in connection with the Apax Debt Purchases or the Cengage Debt Purchases.

[123]   Section 10(b) of the Securities Act of 1934 states:

**CONFIDENTIAL**

Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material non-public information.[125] "On the basis of" means while "aware of" material non-public information.[126] The actual use of material non-public information in effecting the trade is not necessary.[127] In addition, to establish a violation of Rule 10b-5, a plaintiff must show scienter. Scienter is "a mental state embracing intent to deceive, manipulate or defraud."[128]

In the civil context, scienter can be established by "recklessness," which means "highly unreasonable (conduct). involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . which presents a danger of

---

It shall be unlawful for any person, directly or in-directly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchanges-

. . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).

[124] Rule 10b-5, which was promulgated under Section 10(b), states:

It shall be unlawful for any person, directly or directly (a) [t]o use or employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[125] *See United States v. O'Hagan,* 521 U.S. 642, 651-52 (1997).

[126] Rule 10b5-1(b); *see SEC v. Mozilo,* Case No. CV 09-3994-JFW, 2010 WL 3656068, at *20 (C.D. Cal. Sept. 16, 2010).

[127] *Id.*

[128] *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).

**CONFIDENTIAL**

misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[129]

Both Apax and the Apax Directors are "insiders" under the securities laws.[130] For purposes of the securities laws, an "insider" is a person who has an obligation of disclosure to other traders in the marketplace when he stands in a fiduciary-like relationship with them.[131] "Insiders" include the directors of the company issuing the securities.[132]

To violate the applicable securities laws, an insider must trade while in the possession of "material" non-public information. Information is material when "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision.[133] Material information must be substantially likely to alter the "total mix" of information available to investors.[134] The Supreme Court has been "'careful not to set too low a standard of materiality' for fear that management would 'bury the shareholders in an avalanche of trivial information.'"[135]

---

[129] *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979).

[130] The report assumes Apax to be in possession of information obtained by the Apax Directors or any other employees of Apax.

[131] *O'Hagan*, 521 U.S. at 652.

[132] *Id.*

[133] *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). A materiality determination is a mixed question of law and fact. A court thus can determine materiality as a matter of law only if "no reasonable juror could determine that the undisclosed [information] would have assumed actual significance in the deliberations of reasonable investors." *Id.* at 538; *see also SEC v. Siebel Sys., Inc.*, 384 F. Supp. 2d 694, 704 (S.D.N.Y. 2005) ("A complaint may only be dismissed on the grounds that the alleged private disclosure of information was immaterial if the subject information is 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of its importance.'").

[134] *TSC Indus., Inc.*, 426 U.S. at 449.

[135] *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *TSC Indus., Inc.*, 426 U.S. at 448-49).

CONFIDENTIAL                                                    9940842

     Whether information is "material" is an objective standard.[136] Moreover,

materiality determinations are not made "in a vacuum"; rather, materiality must be evaluated in

the context in which the information arises.[137] The Supreme Court has repeatedly rejected

"categorical rules" for determining materiality in favor of a fact-specific, case-by-case

approach.[138]

    B.   <u>Analysis</u>

     The analysis of whether Apax made the Apax Debt Purchases or Cengage made

the Cengage Debt Purchases on the basis of material non-public information can be divided into

three discrete time intervals, each of which warrant independent evaluation.[139] First, Apax and

Cengage began trading on November 9, 2012, following the announcement of Cengage's first

quarter FY 2013 earnings and a related investor call. The first of three interdependent questions

is whether the November 9, 2012 earnings announcement and investor call disclosed all material

non-public information known to Cengage and Apax.

---

[136]   *TSC Indus., Inc.*, 426 U.S. at 449.

[137]   *SEC v. Bausch & Lomb, Inc.*, 420 F. Supp. 1226, 1233 (S.D.N.Y. 1976).

[138]   *Matrixx Initiatives, Inc.*, 131 S. Ct. at 1318-19 (refusing to adopt a "bright-line rule that reports of adverse events associated with a pharmaceutical company's products cannot be material absent a sufficient number of such reports to establish a statistically significant risk that the product is in fact causing the events" (footnote omitted)); *Basic, Inc. v. Levinson*, 485 U.S. 224, 232-34 (1988) (rejecting bright-line rule that "preliminary merger discussions do not become material until 'agreement-in-principle' as to the price and structure of the transaction has been reached between the would-be merger partners").

[139]   The Loans purchased by Apax might not constitute "securities" under the insider-trading laws. *See Banco Espanol de Credito v. Security P. Nat'l Bank*, 973 F.2d 51, 55-56 (2d Cir. 1992); *see also Asset Prot. Plans, Inc. v. Oppenheimer & Co.*, No. 11-cv-440-T-23MAP, 2011 U.S. Dist. LEXIS 68959, at *10-11 (M.D. Fla. June 27, 2011) (applying federal law). For purposes of this analysis, we assume the possibility that the Loans might be considered "securities" under the insider-trading laws for the purpose of analyzing equitable subordination under that scenario, as discussed in Analysis Section III.

**CONFIDENTIAL**                                                                                          9940842

Second, from November 9, 2012 through November 30, 2012 (inclusive),[140] Apax and Cengage executed trades in Cengage's debt based upon their own discretion. The question with respect to that period is whether Apax or Cengage acquired material non-public information and then traded based upon it.

Third, in or around the end of November 2012, Cengage and Apax executed the Rule 10b5-1 Plans, which, if effective, provide an affirmative defense to insider trading.[141] Those plans were effective as of December 3 and 5, 2012, respectively. The question with respect to the period of December 3 and 5, 2012 through February 12, 2013 is whether the Cengage Debt Purchases and Apax Debt Purchases were executed in accordance with the requirements for an effective Rule 10b5-1 plan.

> 1.    WFG Concludes that the Evidence Supports that the November 9, 2012 Earnings Call and Quarterly Materials Disclosed All Material Non-Public Information Known to Cengage and Apax at the Time

It is common for insiders to make stock purchases following the release of quarterly earnings and related financial disclosures. Indeed, courts have recognized that "trading [by insiders] after the release of financial information has been held to be appropriate and commonplace." *In re Bear Stearns Cos. Secs. Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 500 (S.D.N.Y. 2011); *see Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) ("Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures."); *Kairalla v. Advanced Med. Optics, Inc.*, No. CV 07-05569 (SJO), 2008 WL 2879087, at *10 (C.D. Cal. June 6, 2008) (same). Here, the Investigation supports that Cengage did not withhold material information in

---

[140]    Neither Cengage nor Apax made purchases after November 30, 2012 and prior to December 5, 2012. All Apax Debt Purchases and Cengage Debt Purchases after November 30, 2012 were made pursuant to the respective Rules 10b5-1 Plan.

[141]    *See* Analysis Section II.B.3. for a discussion on the elements of an effective Rule 10b5-1 plan.

**CONFIDENTIAL**

connection with its disclosures on November 9, 2012, and Apax and Cengage did not possess material non-public information as of that date.

Cengage's quarterly earnings[142] and investor conference call[143] provided in-depth information concerning Cengage's performance. The earnings call lasted over ninety minutes and reported information that included the following for the three months ended September 30, 2012:

- Total revenues declined by 22% for the quarter. This decline primarily was in the domestic segment and to a lesser extent in Cengage's international segment.[144]

- Adjusted EBITDA declined 33.2% from the prior year. The decline was due to lower revenues. On a percentage decline basis, the impact of declining revenues on adjusted EBITDA is higher due to the high margin flow-through on Cengage's revenue, which is a result of its fixed-cost base.[145]

- Cengage's total liquidity was $522.4 million, consisting of $57 million in cash and cash equivalents and $465 million available under the revolving credit facilities.[146]

- The previous 12 months' bank [adjusted] EBITDA of $712 million yielded a senior secured leverage ratio of 6.17 times and a total leverage ratio of 7.68 times.[147]

- Unleveraged free cash flow declined by $88 million to $188 million. The decline was primarily due to decreased net income, which was partially offset by lower use of cash for working capital due to the decline in revenue.[148]

---

[142]    *See* Cengage Learning Holdings II, L.P., First Quarter Report Three Months Ended Sep. 30, 2012

[143]    *See* Cengage Inv. Conf. Tr. Nov. 9, 2012 (CENG0176739 - CENG0176774).

[144]    *Id.* at 6.

[145]    *Id.*

[146]    *Id.* at 20.

[147]    *Id.* at 8.

[148]    *Id.*

**CONFIDENTIAL**                                                                9940842

- Cengage's net indebtedness was $5,465,600,000.

During the call, Dunn explained that Cengage's revenue had been affected both by overall market conditions and to a greater extent by factors unique to Cengage. Regarding general market conditions, Dunn explained:

- "Sales of new printed textbooks have been declining in the past few years as more students buy lower-cost alternatives such as textbook rentals, superseded editions, and gray market books."[149]

- "More professors seems to be delaying decisions to switch to new editions of textbooks. In the spring of [the] 2012 selling season, we closely monitored almost 700 cases in which Cengage Learning textbooks [were] coming out in a new edition when a professor would typically switch to the new edition to have access to the latest materials. In more than 15% of those cases, the professors decided to delay their adoption decisions and continue using the previous editions of the books. In the past, that deferral rate would have been much smaller."[150]

- "[W]e are now seeing slower rates of enrollment growth than in the past. The for-profit college sector continues to be particularly hard hit."[151]

Dunn also described the factors unique to Cengage that negatively affected its first quarter FY 2013 performance:

- "One issue impacting revenue for the quarter is the timing of sales we booked in June and July. . . . [A]t the end of June 2011, we had a significant backlog of orders that wound up being shipped and booked during the first quarter of our fiscal year 2012. By contrast, at the end of June 2012, we were able to ship all but a small volume of the orders we had on hand. This had the effect of making sales in June of 2012 significantly larger than in June 2011 while sales in the first quarter of fiscal '13 were correspondingly reduced from the same period in the prior year. We estimate that this revenue shift from July to June reduced revenue in the [first] quarter by about $38 million."[152]

---

[149]   *Id.* at 3.

[150]   *Id.*

[151]   *Id.*

[152]   *Id.*

CONFIDENTIAL                                                                9040842

- "[T]he attach rate . . . is a measure of the extent to which professors require rather than recommend the use of a digital tool. When the use of a digital solution is required, more students are motivated to buy the product and the attach rate is higher. Our most sophisticated digital solutions . . . tend to have high attach rates . . . . Unfortunately, in the most recent sales season, we had more adoptions of the less sophisticated products which are optional and fewer adoptions of the more sophisticated solutions which tend to be mandatory. As a result, our overall sales of digital products declined in the quarter by approximately $13 million."[153]

- "Thirdly, in the first quarter, we saw some significant changes in the behavior of some of our distribution channel partners which had a negative effect on sales. . . . For the most part, we sell our products to retailers, either traditional bookstores or other distribution partners. . . . Those channel partners then sell the products on to students or other ultimate consumers. . . . What we are now finding is that our channel partners are changing their behavior in various ways to more accurately match their ordering patterns to their actual sell through experience . . . . Specifically, our partners are not buying as much inventory up front as they did in the past. In addition, one major channel partner in particular reduced its level of purchases dramatically over the past year although we expect those sales to return to normal levels in the future either through this partner or through others. . . . We believe this issue reduced our revenue in the first quarter by as much as $30 million."[154]

- "In the aggregate, these three factors account for approximately $81 million of our revenue shortfall in the quarter . . . ."[155]

Following the earnings call, Apax and Cengage determined that the call had disclosed to the market all material non-public information known to Apax or Cengage as of November 9, 2012. Apax believed, however, that it had "to wait a little bit to buy [Cengage debt] so the market can absorb the news," which it did.[156]

In addition, following the November 9, 2012 earnings call, both Cengage and Apax represented to J.P. Morgan that they respectively lacked material non-public information.

---

[153]    *Id.* at 4.

[154]    *Id.*

[155]    *Id.*

[156]    Email from T. Lane to C. Stahl (Nov. 9, 2012), (APAX0011153).

CONFIDENTIAL                                                                    9940842

Redacted

Redacted

Redacted

Redacted Those representations were received by J.P. Morgan, processed through J.P.

Morgan's ordinary-course procedures, and accepted by J.P. Morgan.

Representatives from Apax and Cengage who were interviewed stated that,

following the November 9, 2012 call, they believed that all Cengage material non-public

information had been disclosed to the market, and all of the Cengage and Apax representatives

interviewed as part of the Investigation continued to believe that to be true (even with the benefit

of hindsight and after being questioned extensively on this topic). In addition, the Investigation

did not uncover material non-public information that was known to Cengage or Apax as of

November 9, 2012, but which was not disclosed in connection with Cengage's quarterly earnings

report and investor call. In particular, the Investigation supports that Cengage did not withhold

material information by not stating that Cengage was moving toward a chapter 11 restructuring

as of November 9, 2012.[157] Although information concerning a proposed chapter 11

restructuring would have been likely to be material to investors, the facts developed in the

Investigation support that Cengage did not believe as of November 9, 2012 that a chapter 11

filing was likely.[158]

---

[157]    And, even if Cengage were contemplating a chapter 11 filing at the time of the November 9, 2012 earnings
call, there would likely have been no duty to disclose such fact. *See Beleson v. Schwartz*, 599 F. Supp. 2d
519, 527 (S.D.N.Y. 2009).

[158]    In addition, the Investigation did not produce any evidence that either Apax or Cengage was aware of the
Copyright Perfection Issues during the Acquisition Period or that either Apax or Cengage used the Apax
Debt Purchases or Cengage Debt Purchases, respectively, or any other means to benefit from the Copyright
Perfection Issues. Further, nothing in Apax's debt purchase strategy indicates that Apax was aware of the
Copyright Perfection Issues at the time of the Apax Debt Purchases, which may marginally negatively
impact the recovery on the First Lien Debt that was purchased by Apax.

**CONFIDENTIAL**

2.   WFG Concludes that the Evidence Supports that Apax and Cengage Did
     Not Obtain Material Non-Public Information Between November 9, 2012
     and the Effective Dates of the Rule 10b5-1 Plans

Representatives of Apax and Cengage continued to communicate during

November 2012 regarding various matters concerning Cengage's business.  In addition, the Apax

Directors attended a Board meeting on November 19, 2012, at which they received confidential

information about Cengage's business.  As part of the Investigation, WFG reviewed information

flowing from Cengage to Apax from November 9, 2012 through December 5, 2012, and

discovered no information that would, on balance, alter the total mix of information that had

been disclosed to the market on November 9, 2012.  As noted above, the Company made full

disclosure of the Company's FY 2013 first quarter earnings and performance which was subject

to extensive discussion on the November 9, 2012 earnings call.  Although it would perhaps have

been more prudent for Apax to refrain from receiving any confidential information from

Cengage about its ongoing business between November 9, 2012 and December 5, 2012 (during

which time period Apax was purchasing Cengage debt), the evidence supports that Apax's

failure to do so did not lead to its acquiring material non-public information.

As part of the Investigation, all emails collected by WFG dated between

November 9, 2012 and December 5, 2012 (inclusive), were analyzed for whether they contained

material non-public information, and none did.[159]  Further, the Cengage and Apax

representatives that were interviewed as part of the Investigation were asked whether material

non-public information was communicated between Cengage and Apax during that time.  Those

interviews included a detailed review of the packet of materials provided to the Board in

---

[159]   Further, no evidence reviewed as part of the Investigation indicated that Cengage or Apax acquired
        material non-public information during the period from November 9, 2012 to December 5, 2012, through
        any other means.

**CONFIDENTIAL**                                                                                      9940842

connection with the November 19, 2012 Board meeting to determine whether any of those

documents contained material non-public information.  Each person that was interviewed was

adamant that no material non-public information had been shared during this period. Redacted

# Redacted
# Redacted

In particular, two documents that were distributed in connection with the

November 19, 2012 Board meeting merit further discussion.  Those materials are (i) the October

Financials and (ii) the Management Plan.

While such materials are concededly non-public, it is very difficult to conclude

that the October Financials and the Management Plan contained facts that would be material to

an investment decision.  With respect to the October Financials, Apax and Cengage

representatives stated that they did not believe the October Financials would be material because,

due to the seasonality of Cengage's business, October results are not indicative of Cengage's

yearly revenue or financial performance.  The conclusion that the October Financials did not

contain material information is supported by an analysis of Cengage's revenue during similar

earlier periods.  For example, the revenue and EBITDA of October 2012 as a percentage of the

yearly revenue and EBITDA for the 12 months ending October 2012 (*i.e.*, November 1, 2011 to

October 31, 2012) were, respectively, 5% and 2%.[160]  Similarly, the revenue and EBITDA for

October FY 2012 (*i.e.*, October 2011) as a percentage of Cengage's FY 2012 revenue and

EBITDA were, respectively, 5% and 3%.[161]  Those figures support the statements by Apax and

---

[160]    *See* October 2012 Year-to-Date Financial Review (Nov. 19, 2012) (revenue and adjusted EBITDA for the twelve months ended October 31, 2012 were, respectively, $1,824 million and $693.5 million); October Fiscal 2012 Results (Nov. 14, 2012) (CENG0176327) (revenue and adjusted EBITDA for October 2012 were, respectively, $96.7 million and $13.1 million).

[161]    *See* Cengage Learning, Annual Report for the Fiscal Year Ended June 30, 2012, at 40 (revenue and adjusted EBITDA for FY 2012 were, respectively, $1,992.6 million and $788.6 million); October Fiscal

**CONFIDENTIAL**                                                                                   9040842

Cengage representatives that Cengage's October performance typically does not materially

impact its yearly performance and would not be a metric material to an investment decision. In

addition, the immateriality of the October Financials is supported by the fact that, after learning

those results, neither Apax nor Cengage appear to have altered their strategy for purchasing

Cengage debt.[162]

With respect to the Management Plan, the mere fact that the Management Plan is

forward-looking does not make it *per se* immaterial. Forward-looking information can, under

certain circumstances, be material within the meaning of Rule 10b-5, depending "upon a

balancing of both the indicated probability that the event will occur and the anticipated

magnitude of the event in light of totality of the company activity." *United States v. Smith*, 155

F.3d 1051, 1065-66 (9th Cir. 1998) (*citing Basic*, 485 U.S. at 232-36).[163] However, the Cengage

and Apax representatives interviewed as part of the Investigation stated their belief that a

reasonable investor would not consider the Management Plan to be material because the numbers

in the plan were speculative and not actual facts, which the Investigation confirmed. Financial

projections are routinely held not to be material. *See In re VeriFone Sec. Litig.*, 11 F.3d 865, 869

(9th Cir. 1993) ("Absent allegations that VeriFone withheld financial data or other existing facts

---

2011 Results (Nov. 4, 2011) (CENG0004502) (revenue and adjusted EBITDA for October 2011 were, respectively, $106.6 million and $22.5 million).

[162]  *See Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 166-67 (2d Cir. 1980) (holding insider information not material because, *inter alia*, those that heard it did not sell their shares as a result).

[163]  Although the Supreme Court was explicit that its decision in *Basic* was not addressing "other kinds of contingent or speculative information, such as earnings forecasts or projections," *Basic*, 485 U.S. at 232 n.9, its decision makes clear that materiality cannot be ascertained via a bright line rule but rather only through a fact-specific inquiry. *Id.* at 236 ("Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive.").

CONFIDENTIAL                                                                 9940842

from which forecasts are typically derived, the alleged omissions [of financial projections] are

not of material, actual facts.").[164]

      WFG concludes that the Management Plan was immaterial in light of the

circumstances surrounding the Management Plan and Cengage's prior disclosures because the

Management Plan was not substantially likely to alter the total mix of information available to

investors. The revenue and EBITDA numbers in the Management Plan turned out to be

significantly more optimistic than Cengage's actual performance, which again supports that the

projections in the Management Plan were speculative and not akin to figures that could be

calculated with certainty. Moreover, it is important to note that the Management Plan was

distributed to the Board after the November 9, 2012 earnings call, during which Cengage stated

that it would look to fix the company-specific problems in the first quarter of FY 2013 and

would look to do "as good or better than the industry" in the remainder of the year.[165] That

assessment in context broadly reflected the numbers in the Management Plan, which forecasted a

0.6% decline in domestic revenue for the remainder of FY 2013 and a 1.2% increase in total

revenue.[166]

      In addition, in or around the end of November 2012, Cengage and Apax each

executed their respective Rule 10b5-1 Plans. Those plans each contained a statement that, as of

---

[164]   *See also Panter v. Marshall Field & Co.*, 646 F.2d 271, 291-93 (7th Cir. 1981) (holding that defendant did not fail to disclose material information because "firms need not disclose tentative internal estimates, even though they conflict with published estimates, unless the internal estimates are so certain that they reveal the published figures as materially misleading"); *James v. Gerber Prods. Co.*, 587 F.2d 324, 327 (6th Cir. 1978) (affirming jury conclusion that undisclosed financial earnings that had not yet been calculated with certainty were not material, for purposes of an insider trading charge, because "sales figures, projections, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty"); *SEC v. Hoover*, 903 F. Supp. 1135, 1146 (S.D. Tex. 1995) (holding that undisclosed revisions to financial projections were not material information).

[165]   Cengage Inv. Conf. Tr. 26 Nov. 9, 2012 (CENG0176764).

[166]   Proposed FY13 Plan (Nov. 19, 2012), at 6.

**CONFIDENTIAL**                                                        9940842

the date thereof, Cengage and Apax were "not aware of any material, nonpublic information

about [Cengage or its securities]."[167] Those plans were executed after Cengage and Apax each

consulted with STB. Those representations further support that neither Cengage nor Apax

acquired material non-public information during the period between November 9, 2012 and

December 5, 2012.

The fact that the identity of Cengage or Apax was not disclosed to the

counterparties selling Cengage debt does not alter the analysis concerning material non-public

information. A representative of J.P. Morgan stated that non-disclosure of the identity of the

purchaser of securities, as occurred here, is J.P. Morgan's standard operating procedure, and that

its traders are rarely asked to reveal the identity of a counterparty.

> 3. <u>WFG Concludes that the Evidence Supports that the Apax and Cengage Debt Purchases from December 3 and 5, 2012 through February 12, 2013, Were Pursuant to Valid Rule 10b5-1 Plans</u>

SEC Rule 10b5-1(c) creates an affirmative defense to section 10(b) liability.[168]

Under Rule 10b5-1(c), a purchase or sale of securities "is not 'on the basis of' material nonpublic

information" if such purchase or sale was made pursuant to a plan that was established at the

time that the purchaser or seller had no material non-public information.[169] The purpose of a

Rule 10b5-1 plan is "to allow corporate insiders to 'passively' sell their stock based on triggers,

---

[167]    Cengage Rule 10b5-1 Plan ¶ 5; Apax Rule 10b5-1 Plan concerning Cengage Notes ¶ 5.

[168]    *See* 17 C.F.R. § 240.10b5-1(c). Because a Rule 10b5-1 plan is an affirmative defense, the defendant bears the burden of pleading and proving the elements that are necessary to establish an effective 10b5-1 plan. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 201 (S.D.N.Y. 2010).

[169]    *See* 17 C.F.R. § 240.10b5-1(c)(1)(i)(A) (establishing an affirmative defense for plans made "[b]efore becoming aware of insider information . . . ."); *In re Nutrisystem, Inc. Deriv. Litig.*, 666 F. Supp. 2d 501, 518 n.11 (E.D. Pa. 2009); *See E*Trade*, 712 F. Supp. 2d at 200 (refusing to dismiss complaint where plaintiffs alleged that "Defendants were already aware of the Company's mortgage exposure time bombs at the time [certain Defendants] adopted their trading plans"); *Applestein v. Medivation*, No. C-10-0998, 2011 WL 3651149, at *7 (N.D. Cal. Aug. 18, 2011) (same); *Mozilo*, 2010 WL 3656068 (same).

CONFIDENTIAL 9940842

such as specified dates and prices, without direct involvement."[170] Sales made pursuant to effective Rule 10b5-1 plans "counter any inference that the trades were made on the basis of insider knowledge," even if the trader obtains material non-public information after executing the plan.[171]

The SEC regulations provide that to establish an effective plan under Rule 10b5-1(c), a person must have "(1) entered into a binding contract to purchase or sell the security, (2) [i]nstructed another person to purchase or sell the security for the instructing person's account, or (3) [a]dopted a written plan for trading securities."[172] In addition, any such plan must not permit the person who executed the plan to have discretion in trading the securities.[173] A plan can remove the discretion of the person buying or selling securities by specifying the terms of sale, having a formula or algorithm direct the sales, or vesting discretion for trading with a person that is not aware of material non-public information.[174]

Moreover, to establish a defense based on a Rule 10b5-1 plan, the purchases or sales of securities must have occurred "pursuant to the contract, instruction, or plan."[175]

---

[170] *See In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008).

[171] *Nutrisystem*, 666 F. Supp. 2d at 518.

[172] 17 C.F.R. §§ 240.10b5-1(c)(1)(i)(A)(1) - (3).

[173] *Id.* § 240.10b5-1(c)(1)(i)(B).

[174] *Id.* Regulation 17 C.F.R. § 240.10b5-1(c)(1)(i)(B) provides: "The contract, instruction, or plan described in paragraph (c)(1)(i)(A) of this Section [must have]: (1) Specified the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold; (2) Included a written formula or algorithm, or computer program, for determining the amount of securities to be purchased or sold and the price at which and the date on which the securities were to be purchased or sold; or (3) [] not permit[ed] the person to exercise any subsequent influence over how, when, or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the contract, instruction, or plan, did exercise such influence must not have been aware of the material nonpublic information when doing so."

[175] *Id.* § 240.10b5-1(c)(1)(i)(C); *Cf. Countrywide*, 554 F. Supp. 2d at 1069 ("[A]mendments of 10b5-1 plans at the height of the market does not support the inference that the sales were pre-scheduled and not suspicious." (internal quotation marks removed)).

CONFIDENTIAL

Purchases or sales of securities do not occur pursuant to a contract, instruction, or plan if the purchases or sales deviate from what is established in the contract, instruction, or plan.[176]

Although it would perhaps have been more prudent for Cengage and Apax to have implemented their respective Rule 10b5-1 Plans earlier in November 2012, the materials reviewed support that the Rule 10b5-1 Plans executed by Apax and Cengage likely would provide a valid defense to a claim that the Apax Debt Purchases or Cengage Debt Purchases were made on the basis of material non-public information during the time that the plans were effective. First, as discussed above,[177] Apax and Cengage did not have, and represented that they did not have, material non-public information at the time that they entered into their respective Rule 10b5-1 Plans.

Second, the Rule 10b5-1 Plans constitute written plans that transferred to J.P. Morgan the discretion for executing the Apax Debt Purchases and the Cengage Debt Purchases. The Rule 10b5-1 Plans each established a particular time period in which securities could be traded and set maximum prices and total expenditures for the securities to be purchased pursuant to the plans.[178]

Third, the Investigation supports that all of the debt purchases by Cengage and Apax during the period starting on December 3, 2012, when the Cengage Rule 10b5-1 Plan became effective, and December 5, 2012, when the Apax 10b5-1 Plans became effective,

---

[176] Section 240.10b5-1(c)(1)(i)(C). In addition, the safe harbor created by Rule 10b5-1(c) applies only when the contract, instruction, or plan to purchase or sell securities was entered into in good faith and not as part of a plan or scheme to evade insider trading prohibitions. 17 C.F.R. § 240.10b5-1(c)(1)(ii); *see In re Able Laboratories Sec. Litig.*, No. 05-2681, 2008 WL 1967509 (D.N.J. Mar. 24, 2008).

[177] *See* Analysis Sections II.B.1, 2.

[178] Cengage Rule 10b5-1 Plan, ¶¶ 2, 3(a), Sch. 1; Apax Rule 10b5-1 Plan concerning Cengage Notes, ¶¶ 2, 3(a), Sch. 1; Apax Rule 10b5-1 Plan concerning Cengage Loans, ¶¶ 2, 3(a), Sch. 1.

CONFIDENTIAL                                                                9940842

through February 12, 2013 were made "pursuant to the contract, instruction, or plan."[179] Apax and Cengage did not attempt to alter, amend, or manipulate the manner in which J.P. Morgan performed its duties under their respective Rule 10b5-1 Plans. After the execution of the Rule 10b5-1 Plans, the plans were on "auto-pilot" and operated without interference. The representative from J.P. Morgan confirmed that fact and further stated that communications between Apax and Cengage, on the one hand, and J.P. Morgan, on the other hand, were limited to non-substantive communications. Moreover, in the Apax Rule 10b5-1 Plan concerning the Notes, Apax agreed "not to alter or deviate from the terms of this Agreement." Cengage agreed to identical language in the Cengage Rule 10b5-1 Plan. In addition, all purchases were made within the pricing and spending limits of the Rule 10b5-1 Plans.

Finally, WFG concludes that the evidence does not support that Apax or Cengage acted in bad faith or with a purpose to manipulate the securities laws by executing their respective Rule 10b5-1 Plans. To the contrary, the Investigation showed that the Rule 10b5-1 Plans were a means by which Apax and Cengage sought to comply with the securities laws by ensuring that they were "passive" investors in Cengage securities after the execution of the plans.

The validity of the Rule 10b5-1 Plans is not undermined by the fact that the plans were executed shortly before purchases were made pursuant to those plans and at a time when Apax and Cengage were purchasing securities based on their own discretion. Rule 10b5-1(c) does not prescribe a waiting period that must be observed between the execution of the plan and the start of purchases thereunder.

---

[179]     *Id.* § 240.10b5-1(c)(1)(i)(C); *Cf. Countrywide*, 554 F. Supp. 2d at 1069.

**CONFIDENTIAL**

9940842

\*       \*       \*       \*       \*

Finally, any claim that Apax used material non-public information to profit on the Apax Debt Purchases is undercut by the substantial losses that Apax has to date incurred on those purchases. Apax has lost money on nearly every trade of Cengage debt for which current market prices are available — in total, the market value of the debt instruments that Apax acquired has declined by Redacted Those significant losses are inconsistent with the standard theory of insider trading.[180] Nor did the Investigation disclose a motive for Apax to use material non-public information to effect losing trades; Redacted

Redacted

Redacted However, such expenditures do show that Apax was willing to spend a considerable amount of capital in an attempt to preserve its equity value in Cengage.

In sum, the Investigation supports the conclusion that the Apax Debt Purchases and the Cengage Debt Purchases were not made on the basis of material non-public information.[181]

---

[180] *Cf. Chiarella v. U.S.*, 445 U.S. 222, 229 (1980) ("The federal courts have found violations of § 10(b) where corporate insiders used undisclosed information *for their own benefit*." (emphasis added)).

[181] For similar reasons, WFG concludes that it is unlikely that a claim against Apax, the Apax Directors, or the Non-Apax Directors would succeed under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949). A *Brophy* claim requires a showing that the corporate fiduciary possessed material, non-public company information and that the fiduciary improperly used that information to make trades motivated by that information's substance. *See id.* at 7. Here, as discussed above, the evidence supports a finding that Apax did not have material, non-public information during the Acquisition Period. And, in any event, the evidence supports that Apax, the Apax Directors, and the Non-Apax Directors were not motivated by the substance of any purported material non-public information in purchasing Cengage debt.

**CONFIDENTIAL**                                                                 9940842

### III.    WFG Concludes It Is Unlikely that Equitable Subordination Would Prevail

    A.    Equitable Subordination Legal Framework

The power of the bankruptcy court to equitably subordinate debt is set forth in section 510(c) of the Bankruptcy Code.[182] That section provides that a court may

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

> (2) order that any lien securing such a subordinated claim be transferred to the estate.

Through equitable subordination, a claim may be subordinated or relegated to the "bottom rung of claims," or it may be dropped below the claims of those creditors injured by the holder of the claim to be subordinated.[183] Equitable subordination is a drastic remedy that should be applied only in limited circumstances.[184]

    1.    Factors to Determine Whether Equitable Subordination Is Appropriate

In determining whether equitable subordination is appropriate, courts, including those in the Eastern District of New York, have consistently applied the three-pronged test set forth in *Mobile Steel*.[185] Under the *Mobile Steel* test, a court may equitably subordinate a claim

---

[182]    11 U.S.C. § 510(c).

[183]    5 COLLIER ON BANKRUPTCY ¶ 510.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013). "The plain language and legislative history of § 510(c) indicate that a claim may be subordinated to another claim and an interest may be subordinated to another interest under court-developed principles of equitable subordination." *Adelphia Recovery Trust v. Bank of Am.*, 390 B.R. 80, 98–99 (S.D.N.Y. 2008).

[184]    *See In re Featherworks Corp.*, 25 B.R. at 649.

[185]    *Benjamin v. Diamond (In re Mobile Steel Corp.)*, 563 F.2d 692 (5th Cir. 1977); *see Official Comm. of Unsecured Creditors of Interstate Cigar Co. v. Bambu Sales, Inc. (In re Interstate Cigar Co.)*, 182 B.R. 675, 680 (Bankr. E.D.N.Y. 1995) (referring to standards set forth in *Mobile Steel* to evaluate whether equitable subordination is appropriate); *see Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 68 (Bankr. S.D.N.Y. 2007) ("Courts in this district, and elsewhere, regularly apply the standards set forth in the Fifth Circuit's decision in *Mobile Steel*, even though *Mobile Steel*, like *Pepper*, was a case under the former Act.") (footnote omitted), *aff'd in part sub nom. Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64 (S.D.N.Y. 2008).

CONFIDENTIAL                                                    9940842

when:  (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted

in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable

subordination is consistent with bankruptcy law.[186]

### a.    Inequitable Conduct

A court will not equitably subordinate a claim in the absence of inequitable

conduct.[187]  An inequitable result, by itself, will not justify equitable subordination.[188]

Inequitable conduct is a "very slippery concept with little predictive value," making it a difficult

prong to apply.[189]  General descriptions of inequitable conduct have included everything from

unlawful acts, such as fraudulent conduct, to lawful conduct that "shocks one's good

conscience."[190]

---

[186]    *In re Mobile Steel*, 563 F.2d at 700 (cited with approval in *United States v. Noland*, 517 U.S. 535, 538 (1996)); *see Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.)*, 420 F.3d 53, 59 (1st Cir. 2005); *Official Comm. of Unsecured Creditors v. Austin Fin. Serv., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508-09 (Bankr. S.D.N.Y. 1999); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994); *see also Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009); *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008); *In re Kreisler*, 546 F.3d 863, 866 (7th Cir. 2008); *In re Enron Corp.*, 379 B.R. at 433 ("Even after the enactment of section 510(c), the vast majority of courts have continued to apply the *Mobile Steel* test.").

[187]    *See* Richard C. Solow, *The Very Limited No-Fault Equitable Subordination Theory: Why Section 510(c) Requires Misconduct in Nearly All Cases*, 22 NORTON J. OF BANKR. L. AND PRACT. 101, 122 (2013) (noting that, other than cases involving punitive claims, "not a single decision has applied no-fault subordination before or after the 1978 Bankruptcy Code was enacted"); *see also In re 80 Nassau Assocs.*, 169 B.R. at 837 ("Equitable subordination requires proof of 'inequitable conduct.'").

[188]    *See Official Comm. of Unsecured Creditors v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 362 (Bankr. S.D.N.Y. 2010) (noting that a court will analyze the second prong only if inequitable conduct is demonstrated).

[189]    *In re 80 Nassau Assocs.*, 169 B.R. at 837.

[190]    *In re Adelphia Commc'ns Corp.*, 365 B.R. at 68; *see also Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 65 (Bankr. S.D.N.Y. 2004); *Picard v. Katz*, 462 B.R. 447, 456 (S.D.N.Y. 2007); *Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron)*, 379 B.R. 425, 433 n.39 (S.D.N.Y. 2007); *In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002).

**CONFIDENTIAL**                                                                     9940842

The conduct of insiders, such as Apax, is subject to a higher level of scrutiny than that of non-insiders due to the enhanced opportunities for insiders to adjust their position in a way that may prejudice other creditors.[191]

An insider's claim can be equitably subordinated if the insider breached a fiduciary duty or otherwise engaged in unfair conduct.[192] "Inequitable conduct by an insider may also include unjust enrichment caused by unconscionable, unjust, unfair, or foul conduct."[193] Courts have equitably subordinated insider claims in cases involving: "(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, and (3) control or use of the debtor as an alter ego for the benefit of the claimant."[194]

Undercapitalization alone, however, is generally insufficient to equitably subordinate an insider's claim.[195] Undercapitalization is typically tested at the time of the initial

---

[191]   *In re Interstate Cigar Co.*, 182 B.R. at 680; *See In re Hydrogen, L.L.C.*, 431 B.R. at 361  ("The scrutiny for presence of inequitable conduct is more stringent with respect to creditors who are insiders of the debtor . . ."); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("When the defendant is an insider, his conduct is subject to greater scrutiny."); *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.)*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) ("If the creditor is an insider, his conduct is subject to greater scrutiny."); *Blasbalg v. Tarro (In re Hyperion Enters., Inc.)*, 158 B.R. 555, 563 (D.R.I. 1993) ("The reason that transactions of insiders will be closely studied is because such parties usually have greater opportunities for such inequitable conduct, not because the relationship itself is somehow grounds for subordination.") (citations omitted).

[192]   *See In re Hydrogen, L.L.C.*, 431 B.R. at 361 (noting that "a breach of fiduciary duty or even mere engagement in conduct that is "somehow unfair" on the part of the insider may constitute inequitable conduct"); *see also Liberty Mut. Ins. Co. v. Leroy Holding Co.*, 226 B.R. 746, 755 (N.D.N.Y. 1998) ("This closer scrutiny means that an insider's claim will be subordinated if it is proven that the insider either breached a fiduciary duty or engaged in conduct that is somehow unfair.").

[193]   *Liberty Mut. Ins. Co.*, 226 B.R. at 755 (citation omitted).

[194]   *In re KDI Holdings, Inc.*, 277 B.R. at 511 (holding that committee's claims of creditor self-dealing and impermissible leveraging of debtor's assets were sufficient to allow court to find that creditor had control of debtor and creditor's contingent secured claims should be equitably subordinated to claims of general unsecured creditors) (citing *In re 80 Nassau Assocs.*, 169 B.R. at 837); *see Nisselson v. Ford Motor Co. (In re Monahan Ford Corp. of Flushing)*, 340 B.R. 1, 45 (Bankr. E.D.N.Y 2006).

[195]   *See In re Hydrogen, L.L.C.*, 431 B.R. at 362; *see also Summit Coffee Co. v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, 132 (5th Cir. 1993).  Capitalization is generally measured at the time of a company's formation; *see also Rego Crescent Corp. v. Tymon (In re Rego Crescent Corp.)*, 23 B.R. 958,

**CONFIDENTIAL**    9940842

capitalization of the company; however, some courts may test undercapitalization at the time that the subject loans were made.[196]

When addressing equitable subordination of a parent's claim, courts have concluded that the requisite inequitable conduct would include: "(i) . . . the 'looting' of [a subsidiary by its parent] during the period of [the subsidiary's] financial decline; (ii) the creation of false documentation for the purpose of improving the parent's position; and (iii) unjust double-dealing."[197] Use of a subsidiary as a mere instrumentality may also give rise to equitable subordination claims.[198] Domination of a subsidiary alone will not automatically result in the equitable subordination of a parent's claim.[199] Domination and exploitation of a subsidiary for the benefit of the parent may, however, lead to the equitable subordination of a parent's claim.[200] In addition, management of the subsidiary solely for the benefit of the parent's interests (and not for the benefit of the interests of the subsidiary's other creditors) may lead to the equitable

---

965 (Bankr. E.D.N.Y.1982) ("in many cases where the courts have subordinated debts arising from insider loans there has been some inequitable conduct in addition to undercapitalization").

[196]    *In re Rego Crescent Corp.*, 23 B.R. at 965.

[197]    *In re Verestar, Inc.*, 343 B.R. at 461.

[198]    *See N.Y. Trust Co. v. Island Oil & Transport Corp.*, 56 F.2d 580, 583 (2d Cir. 1932) ("If a subsidiary is a mere instrumentality and its business is really that of the parent company, a loan by the parent to the subsidiary will be subordinated to the claims of creditors of the subsidiary."); *see also In re Otsego Waxed Paper Co.*, 14 F. Supp. 15, 16 (W.D. Mich. 1935) ("The applicable principle is that, where a corporation is so organized and controlled as to make it a mere instrumentality or adjunct of another, and the subsidiary becomes bankrupt, the parent corporation cannot have its claim paid until all other claims are first satisfied.").

[199]    "[E]ven total control of a debtor's affairs does not necessarily lead to equitable subordination; debts owed stockholders and directors are not automatically denied equality of distribution." *In re Featherworks*, 25 B.R. at 648 (citations omitted); *see Liberty Mut. Ins. Co.*, 226 B.R. at 756 (noting that, although parent dominated subsidiary, there was no showing of wrongful conduct); *see also In re All Prods. Co.*, 32 B.R. 811, 816 (Bankr. E.D. Mich. 1983) ("Domination of a subsidiary by a parent standing alone is not sufficient to invoke the doctrine.").

[200]    *See Pepper v. Litton*, 308 U.S. 295, 308-10 (1939). In *Pepper*, the Supreme Court noted that equitable subordination would be appropriate where there is a "history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by [the parent] to the detriment of the public investors." *Id.*

CONFIDENTIAL    9940842

subordination of the parent's claim, and "proof of fraud or illegality is not necessary" in such a situation.[201]

The insider and non-insider distinction is also important because if a creditor is an insider, "once the proponent provides a substantial basis to support the charge of unfairness, the burden shifts to the insider to show the fairness of his claim."[202]

> b.    Injury to Creditors or an Unfair Advantage for the Claimant

To satisfy the second element of the *Mobile Steel* test, "the proponent of equitable subordination need only allege 'that general creditors are less likely to collect their debts' as a result of the allegedly inequitable conduct."[203]    In general, this element would be satisfied by identifying how the inequitable conduct affected or was unfair to other creditors.[204]    If no unfair advantage was gained as a result of inequitable conduct, a court will not be justified in

---

[201]    *Gannett Co. v. Larry*, 221 F.2d 269, 275 (2d Cir. 1955).

[202]    *In re 80 Nassau Assocs.*, 169 B.R. at 839 n.5 (citations omitted); *see Wallach v. Buchheit (In re Northstar Dev. Corp.)*, 465 B.R. 6, 16 (Bankr. W.D.N.Y. 2012) (noting that the plaintiff has "the initial burden to establish the necessary elements of . . . equitable subordination" and once established "the burden then shifts to [the insider] to demonstrate its good faith and the fairness of its conduct"); *In re Le Café Creme, Ltd.*, 244 B.R. at 235; *see also Unsecured Creditors Comm. v. Banque Paribas (In re Heartland Chemicals, Inc.)*, 136 B.R. 503, 516-17 (Bankr. C.D. Ill. 1992) (noting that "once some inequity is demonstrated vis-à-vis an insider, the insider then has the burden of demonstrating the underlying fairness of the transaction").

[203]    *In re KDI Holdings, Inc.*, 277 B.R. at 509 (citing *In re 80 Nassau Assocs.*, 169 B.R. at 840) ("If the misconduct results in harm to the entire creditor body the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner.").    "There is no requirement that the purported misconduct be a major cause of the debtor's bankruptcy." *Liberty Mut. Ins. Co.*, 226 B.R. at 757 (citation omitted).

[204]    *See 201 Forest Street LLC v. LBM Fin. LLC (In re 201 Forest St. LLC)*, 409 B.R. 543, 572-73 (Bankr. D. Mass. 2009) ("The presence of inequitable conduct alone is not sufficient, as the second prong requires the bankruptcy court to identify how the inequitable conduct affected or was unfair to other creditors."); *Liberty Mut. Ins. Co.*, 226 B.R. at 757 ("If the misconduct harmed the entire creditor class, it is sufficient to show as harm that general creditors will be less likely to collect their debts as a result of the misconduct. When a specific creditor is the only party affected by the misconduct, the offending claimant should be subordinated only to that claim.").

CONFIDENTIAL                                                                9940842

subordinating a creditor's claim.[205]  Further, this element limits subordination to the extent

necessary to remedy the harm.[206]

> ### c.  Equitable Subordination Must Not Be Inconsistent with Bankruptcy Law

The third element is relevant only after the first two elements have been satisfied.

Some courts have concluded that by virtue of the enactment of section 510(c) and the

codification of the bankruptcy court's ability to equitably subordinate claims, which was not the

case when *Mobile Steel* was decided, this element is likely moot.[207]  "Accordingly, a complaint

that satisfies the first two prongs of the *Mobile Steel* test would survive a motion to dismiss."[208]

Nevertheless, courts have acknowledged that the third *Mobile Steel* element generally serves as a

reminder that although bankruptcy courts are courts of equity, they should not lightly alter the

statutory priority scheme.[209]

---

[205]    *Liberty Mut. Ins. Co.*, 226 B.R. at 757 (refusing to equitably subordinate claims where there was no showing that other creditors suffered harm or were prejudiced).

[206]    *See In re BH S&B Holdings LLC*, 420 B.R. at 156 ("Under this prong, that claim is subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct.").

[207]    *See In re Hydrogen, L.L.C.*, 431 B.R. at 360-61 ("The third prong of the *Mobile Steel* test carries minimal significance today because the current Bankruptcy Code provides explicitly for the remedy of equitable subordination, whereas the former Bankruptcy Act—under which *In re Mobile Steel Co.* was decided—did not."); *In re 80 Nassau Assocs.*, 169 B.R. at 840 (noting that "since the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot"). *But see Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims of Papercraft Corp.*, 160 F.3d 982, 990 (3d Cir. 1998) ("This requirement 'has been read' as a 'reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable.'").

[208]    *In re Hydrogen, L.L.C.*, 431 B.R. at 361.

[209]    *See In re BH S&B Holdings LLC*, 420 B.R. at 156 (citations omitted). "This element recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code." *Id.* (quoting *Official Comm. of Unsecured Creditors v. Morgan Stanley & Co. (In re Sunbeam Corp.)*, 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002)).

**CONFIDENTIAL**                                                                                        9940842

### 2.    Burden of Proof

Generally, "the burden of proving all the elements of subordination is on the objectant."[210] However, where "the validity of the underlying claim is in issue, the claimant has the burden of proving both the amount and legitimacy of the claim."[211] Once the claimant satisfies its burden, then "the objectant must prove *by a preponderance of the evidence* that the claimant engaged in such substantial inequitable conduct to the detriment of the debtor's other creditors that subordination is warranted."[212] As discussed above, there is a shifting of the burden in the insider context, whereby the burden of proof with respect to the lack of any inequitable conduct shifts to the insider upon a showing of a substantial basis to a charge of unfairness.

### 3.    Other Limitations on Equitable Subordination

There are limitations to the court's power to equitably subordinate a claim. Equitable subordination is "an unusual remedy, which should be applied only in limited circumstances."[213] The Supreme Court in *United States v. Noland* noted that a court may not "adjust the legally valid claim of an innocent party who asserts a claim in good faith merely

---

[210]    *Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 29 B.R. 139, 168 (Bankr. E.D.N.Y. 1983) (citation omitted).

[211]    *Id.* at 168-69 (citation omitted).

[212]    *Id.* at 169 (emphasis added) (citation omitted); *see In re Heartland Chemicals, Inc.*, 136 B.R. at 517 (citations omitted) (stating that "the plaintiff must justify equitable subordination by a preponderance of the evidence"); *In re Le Café Crème, Ltd.*, 244 B.R. at 235 (citations omitted) (stating that "[u]nder the Mobile Steel test, a claim is equitably subordinated if there is a showing by a preponderance of the evidence" of the three prongs of the equitable subordination test).

[213]    *Id.* at 235 (citing *Fabricators, Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir. 1991)); *see also In re Enron Corp.*, 379 B.R. at 434 (citations omitted) (stating that "many courts view equitable subordination as a 'drastic and unusual remedy'"); *Assante v. E. Savs. Bank, FSB (In re Assante)*, No. 12-CV-5309 (CS), 2013 WL 787968, at *3 (S.D.N.Y. Mar. 4, 2013) (describing equitable subordination as an "unusual remedy").

CONFIDENTIAL                                                                    9940842

because the court perceives that the result is inequitable."[214]  Nor may the court "set up a

subclassification of claims . . . and fix an order of priority for the sub-classes according to its

theory of equity."[215]  In *United States v. Reorganized CF&I Fabricators of Utah, Inc.*, the

Supreme Court further explained that its holding in *Noland* stands for the proposition that

"categorical reordering of priorities [by a court] that takes place at the legislative level of

consideration is beyond the scope of judicial authority to order equitable subordination under

510(c)."[216]

        Bankruptcy courts are also limited by the fact that "equitable subordination is

remedial, not penal . . . a claim will be subordinated only to the extent necessary to offset the

harm that resulted."[217]  Given the remedial nature of the equitable subordination remedy, a court

would likely consider the entire course of dealing and conduct of an offending claimant to

determine whether such conduct, when considered in light of all relevant facts and

circumstances, requires that the claimant not share in accordance with the priority asserted for its

claim.[218]

---

[214]    517 U.S. 535, 539 (1996).

[215]    *Id.* at 543 (citations omitted).

[216]    518 U.S. 213, 228-29 (1996).

[217]    *In re KDI Holdings, Inc.*, 277 B.R. at 509 (citing *In re 80 Nassau Assocs.*, 169 B.R. at 840); *see In re Mobile Steel Corp.*, 563 F.2d at 701 (citing *Pepper v. Litton*, 308 U.S. at 304); *see also In re BH S&B Holdings LLC*, 420 B.R. at 156 ("This sets the 'limit of the remedy regardless of the nature of the claimant's conduct.'"); *In re Enron Corp.*, 333 B.R. at 219 ("The application of the *Mobile Steel* test ensures that the full breadth of the remedy of equitable subordination is available while ensuring that its reach does not violate any provision of the Bankruptcy Code or become punitive as opposed to remedial.").

[218]    *See In re Clap*, 5 F. Cas. 816, 817 (D. Mass. 1873) (noting that "a court of equity will consider all circumstances and decline to assist the creditor, if, upon the whole, justice so requires"); *see also In re Porter*, 50 B.R. 510 (Bankr. E.D. Va. 1985) (concluding that residual claim should not be subordinated because payment of settlement purged claimant's participation in fraudulent conveyance).

**CONFIDENTIAL**                                                                                      9910842

B.    WFG Concludes It Is Unlikely that Equitable Subordination Would Prevail

The Investigation analyzed the Apax Debt Purchases for any evidence of:

(i) fraud; (ii) illegality; (iii) breach of fiduciary duty; (iv) unconscionable, unjust, unfair, or foul

conduct; (v) undercapitalization; or (vi) Apax's control or use of Cengage as an alter ego for

Apax's benefit. The Investigation also analyzed whether creditors were harmed by the Apax

Debt Purchases in a manner that would satisfy the second element of the *Mobile Steel* test.[219]

1.    WFG Concludes that the Evidence Does Not Support the Proposition that Apax Has Engaged in Inequitable Conduct

Although Apax is an insider of Cengage, WFG concludes that the evidence does

not support a finding of (i) fraud; (ii) illegality; (iii) breach of fiduciary duty; or (iv)

unconscionable, unjust, unfair, or foul conduct; (v) undercapitalization; or (vi) Apax's control or

use of Cengage as an alter ego for Apax's benefit, which would be required to equitably

subordinate Apax's claims arising from the Apax Debt Purchases.[220]

a.    WFG Concludes that the Evidence Does Not Support that Apax Engaged in Inequitable Conduct Even Under the Standard Applicable to an Insider

The results of the Investigation conclude it is unlikely that a claim against Apax

for equitable subordination would prevail because there is no evidence of inequitable conduct

with respect to the Apax Debt Purchases. As discussed above, the Apax Debt Purchases likely

did not involve the usurpation of a corporate opportunity or the trading on material non-public

---

[219]    As an initial matter, a proof of claim must be filed in order for a court to equitably subordinate the relevant claim: "[i]f a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve." *In re BII S& B Holdings LLC*, 420 B.R. at 154 (citations omitted); *see In re AlphaStar Ins. Group Ltd.*, 383 B.R. at 276 ("If a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve."). We have assumed, for purposes of this report, that a proof of claim in respect of the Apax claims will be filed or that such filing will be deemed to have been made under relevant orders of the Bankruptcy Court.

[220]    Apax's ownership interest is sufficient to establish Apax's status as an affiliate, and therefore an insider of each of the Debtors. Such equity holdings would also be sufficient to establish Apax's control over the Debtors for purposes of a determination that Apax is an insider.

**CONFIDENTIAL**    9940842

information or the breach of any other duty.  Nor did the Investigation develop facts that suggest

that the Apax Debt Purchases involved any other type of fraud, illegality, or breach of fiduciary

duty.

On the basis that Apax simply purchased pre-existing debt and did not create a

new debt obligation of Cengage at the time of the Apax Debt Purchases, the Investigation also

concludes that the first prong of the *Mobile Steel* test likely would not be satisfied on the basis

that Cengage was undercapitalized.  The test for undercapitalization is typically either at the time

of the initial capitalization of the company (in this case, 2007) or at the time of the issuance of a

loan by the insider.  The Loans and Notes purchased by Apax were for the most part initially

issued in 2007.[221]  While WFG has not, and has not been asked to, conduct an investigation into

the adequacy of the initial capitalization of Cengage, the Investigation has uncovered no

evidence that Cengage was undercapitalized in 2007.

Further, WFG concludes that the evidence does not support the proposition that

Cengage was the "alter ego" or a mere instrumentality of Apax.  While Apax had the ability to

appoint the Board under the terms of Cengage's various governing documents, the Investigation

indicates that Cengage was operated as an independent enterprise, not as an alter ego for

Apax.[222]  As part of the investigation into the Apax Debt Purchases no evidence was uncovered

demonstrating inequitable conduct such as looting or double-dealing.[223]

---

[221]    The Second Lien Notes were issued in 2012, but as part of an exchange of Senior Unsecured Notes that
were initially issued in 2007.

[222]    In the course of the Investigation, WFG also considered similar claims or potential remedies against Apax,
including potential piercing of the corporate veil or substantive consolidation.  "Under Delaware law, to
pierce the corporate veil and establish alter-ego liability, a plaintiff must show (1) that the parent and
subsidiary 'operated as a single economic entity,' and (2) that an 'overall element of injustice or unfairness
is present.'" *In re BH S&B Holdings LLC*, 420 B.R. at 133-34 (quoting *Trevino v. Merscorp, Inc.*, 583 F.
Supp. 2d 521, 528 (D. Del. 2008)); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d
168,177 (2d Cir. 2008) (same).  In order to prevail in the substantive consolidation of the assets and
liabilities of Cengage with those of Apax, a court would need to determine either that "(i) the operational

**CONFIDENTIAL**                                                                        9940842

To the contrary, the Investigation supports that Apax Debt Purchases were made by Apax with the best interests of Cengage in mind. Notably, the Apax Debt Purchases were conducted in the open market with third parties in arm's-length transactions, not on preferential terms directly with the Debtors. The Investigation also supports that the principal purpose of the Apax Debt Purchases was to "extend the runway," *i.e.*, to facilitate an extension of Cengage's debt maturities. Indeed, Cengage representatives stated that they appreciated that Apax invested in Cengage's debt, which was intended to provided Cengage with more flexibility in dealing with its capital structure.

> 2. WFG Concludes that the Evidence Does Not Support the Proposition that Apax Debt Purchases Have Harmed Cengage's Creditors

Under the second prong of the *Mobile Steel* test, the proponent of equitable subordination needs to show "that general creditors are less likely to collect their debts as a result of the allegedly inequitable conduct."[224] In general, this element would be satisfied by identifying how the inequitable conduct affected or was unfair to other creditors.[225] If no unfair

---

and financial affairs of the entities to be consolidated are so entangled that the accurate identification and allocation of assets and liabilities cannot be achieved, or (ii) creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit." *In re Verestar, Inc.*, 343 B.R. at 462-63 (citing *In re Augie/Restivo Baking Co.*, 860 F.2d 515, 518 (2d Cir. 1988)). WFG did not uncover evidence in the Investigation indicating that substantive consolidation or veil-piercing is appropriate as between Apax and Cengage. To the contrary, WFG uncovered evidence that Apax and Cengage operated as separate economic entities with independent identities and independent operational and financial affairs, making a claim of veil-piercing or substantive consolidation unlikely to prevail.

[223]   Notably, Cengage's auditors reviewed Cengage's quarterly reports from 2007 through at least November 2012 and never expressed doubts as to Cengage's remaining a going concern.

[224]   *In re KDI Holdings, Inc.*, 277 B.R. at 509 (*citing In re 80 Nassau Assocs.*, 169 B.R. at 840) ("If the misconduct results in harm to the entire creditor body the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner."); *Liberty Mut. Ins. Co.*, 226 B.R. at 757 ("There is no requirement that the purported misconduct be a major cause of the debtor's bankruptcy." (citation omitted)).

[225]   *See In re 201 Forest St. LLC*, 409 B.R. at 572-73 ("The presence of inequitable conduct alone is not sufficient, as the second prong requires the bankruptcy court to identify how the inequitable conduct affected or was unfair to other creditors."); *Liberty Mut. Ins. Co.*, 226 B.R. at 757 ("If the misconduct harmed the entire creditor class, it is sufficient to show as harm that general creditors will be less likely to

**CONFIDENTIAL**

advantage was gained as a result of inequitable conduct, a court will not be justified in subordinating a creditor's claim.[226] Further, a claim should only be subordinated to the extent necessary to remedy the harm.[227]

WFG concludes that the evidence does not support the proposition that the creditors in the Chapter 11 Cases were economically harmed because of the Apax Debt Purchases. Specifically, Apax purchased debt in arm's-length transactions from third parties and at prices higher than those at which the debt is trading today.[228] Therefore, regardless of whether Apax purchased such debt or if it remained in third-party hands, it would currently be outstanding and assertable against the Debtors. While the evidence indicates that sellers were

---

collect their debts as a result of the misconduct. When a specific creditor is the only party affected by the misconduct, the offending claimant should be subordinated only to that claim.").

[226] *Liberty Mut. Ins. Co.*, 226 B.R. at 757 (refusing to equitably subordinate claims where there was no showing that other creditors suffered harm or were prejudiced).

[227] *See In re BH S&B Holdings LLC*, 420 B.R. at 156 ("Under this prong, that claim is subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct.").

[228] WFG also concludes that Cengage's creditors were not harmed by virtue of tax consequences arising from the Apax Debt Purchases. Even if tax consequences could constitute harm for purposes of equitable subordination as a matter of law, the evidence disclosed in the Investigation supports that the Apax Debt Purchases did not economically harm Cengage by causing Cengage to incur a material cash tax cost in FY 2013. For United States federal and state income tax purposes, purchases of Cengage debt by Apax are treated "as if [Cengage] had purchased the debt at a discount and reissued the debt at a discount to the respective funds advised by Apax, creating a taxable gain equal to the discount. If the taxable gain for the fiscal year from debt purchases by funds advised by Apax were to exceed [Cengage's] current year taxable loss and [Cengage's] available tax loss carryforwards, the excess would trigger a cash tax cost. The deemed reissuance creates an equivalent amount of original issue discount that is deductible when the reissued debt is repaid or deemed repaid for United States tax purposes." *See* Cengage Learning Holdings II, L.P. Fiscal 2013 Second Quarter Report (Feb. 13, 2013), at 13. Cengage's FY 2013 tax returns have not been completed. Cengage estimates, however, that its tax losses from FY 2013 operations and available tax loss carryforwards exceed the taxable gain for the fiscal year from the Apax Debt Purchases and, to the extent that the Apax Debt Purchases might cause Cengage to incur a cash tax cost under the United States federal alternative minimum tax, such tax cost is likely to be *de minimis*.

**CONFIDENTIAL**                                                                 9940842

not informed that J.P. Morgan was purchasing debt on behalf of Apax,[229] there is no evidence

that such concealment harmed Cengage's creditors.[230]

The Investigation also did not uncover any attempt by Apax to depress the market

price of the debt. As discussed above, under the Rule 10b5-1 Plans, J.P. Morgan was authorized

to purchase debt as long as such debt was at or below pre-selected prices. Following the entry

into the Apax Rule 10b5-1 Plans, J.P. Morgan, not Apax, determined when to purchase Cengage

debt so long as such purchases were consistent with the terms of the Rule 10b5-1 Plans.

Further, while the Apax Debt Purchases could conceivably have been used by

Apax as a means to control Cengage's chapter 11 restructuring — for instance by purchasing

sufficient positions in each tranche of debt to allow Apax to block any chapter 11 restructuring

plan proposed without Apax's consent — the Investigation does not support the presence of any

such tactic. First, the Apax Debt Purchases only gave rise to a greater than one-third position by

Apax in two tranches of debt: the Second Lien Notes and the Incremental Term Loan.[231]

However, under the Proposed Plan, all of the First Lien Debt is classified together (including the

---

[229] The large volume of the Apax Debt Purchases, when viewed against the backdrop of the general disclosures by Cengage management during the November 9, 2012 earnings call and the disclosures in Cengage's quarterly and annual reports concerning Apax's past and future debt purchases, gives rise to the possibility that the sellers of Cengage debt understood that Apax might be on the other side of the transaction.

[230] In *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, the Third Circuit affirmed the bankruptcy court's finding that a fiduciary's secret purchases of significant portions of a debtor's notes at a discount caused injury to the debtor's creditors because the "selling note holders were deprived of the ability to make a fully informed decision to sell their claims." 160 F.3d 982, 990 (3d Cir. 1998). The court found that the fiduciary's identity as the purchaser of the debtor's debt was material because the fiduciary had inside information about the debtor and it purchased the debt with the intent of steering the reorganization towards a sale of the debtor to the fiduciary. *Id.* at 988. Here, as discussed above, Apax did not make the Apax Debt Purchases on the basis of material non-public information. Moreover, the purpose of the Apax Debt Purchases was to support Cengage's capital structure.

[231] A class of claims under a chapter 11 plan has accepted a plan if at least two-thirds in amount and more than one-half in number of creditors voting on a plan have voted in favor of the plan. 11 U.S.C. § 1126(c). Therefore, a creditor holding greater than one-third of claims in a particular class may hold a "blocking position."

CONFIDENTIAL

Incremental Term Loan).  With the Apax Debt Purchases constituting less than 21% of the total

First Lien Debt, the Apax Debt Purchases would not give rise to the definitive ability of Apax to

block any proposed chapter 11 plan.  Second, the Investigation has uncovered no evidence that

Apax has, or has sought to, control or obstruct the Debtors' chapter 11 process to the detriment

of other creditors.  In fact, Apax is not a party to the Restructuring Support Agreement among

the Debtors and certain consenting noteholders, which was entered into prior to the Petition

Date.[232]  These facts are in contrast to those of *Citicorp Venture Capital, Ltd.*, where a fiduciary

purchased debt of the debtor with the intent of steering the reorganization towards a sale of the

debtor to the fiduciary.  160 F.3d at 988.

      In sum, the materials collected and reviewed by WFG did not suggest any means

by which the Apax Debt Purchases would harm other Cengage creditors.  Nor did any Cengage

or Apax representatives suggest a means by which Cengage creditors could be harmed by the

Apax Debt Purchases.

## IV.  WFG Concludes It Is Unlikely that Certain Other Remedies Against Apax Would Prevail

### A.    WFG Concludes It Is Unlikely that Equitable Disallowance Would Prevail

      In addition to a review of the ability of a bankruptcy court to equitably

subordinate claims of Apax relating to the Apax Debt Purchases, WFG also reviewed the ability

of a bankruptcy court to equitably disallow such claims.  Equitable disallowance by a bankruptcy

court was most notably recognized in *Pepper v. Litton*.[233]  There, the Supreme Court noted that

"for many purposes courts of bankruptcy are essentially courts of equity and their proceedings

---

[232]    Declaration of Dean D. Durbin, Chief Financial Officer, in Support of Chapter 11 Petitions and First Day Motions, *In re Cengage Learning, Inc.*, Case No. 13-44106 (ESS) (Bankr. E.D.N.Y. July 2, 2013) at Ex. C.

[233]    308 U.S. 295 (1939).

**CONFIDENTIAL**

9940842

inherently proceedings in equity" and that a claim may be disallowed or subordinated in light of certain equitable considerations.[234]  In *Litton*, the Supreme Court considered whether a bankruptcy court could disallow a judgment obtained by a controlling stockholder of a "one man" corporation, and such stockholder's related claim in the bankruptcy proceeding after the stockholder manipulated the corporation and its assets to ensure that a creditor's attempts to recover on a judgment would be futile.  On review, the bankruptcy court disallowed Litton's claim on the grounds that he had made a "deliberate and carefully planned attempt" to avoid payment of debt and impair the rights of other creditors, finding that Litton was "in reality the same" as the corporation.[235]  The district court further found that there existed a planned fraudulent scheme, and held that equity demanded disallowance of Litton's claim.[236]  On review of the appellate court's reversal on procedural grounds, the Supreme Court found that the bankruptcy court properly disallowed Litton's claim.  In particular, the Supreme Court noted that under "certain cardinal principles of equity," a court may disallow (or subordinate) a claim, and found that Litton's claim was properly disallowed because Litton utilized legal maneuvering to acquire most of the debtor's assets and engaged in a "planned and fraudulent scheme."[237]  The court emphasized the fact that Litton had breached his fiduciary duties and responsibilities and the rules of "fair play," and had used "his power for his personal advantage."[238]  Accordingly,

---

[234]    *Id.* at 303-04, 305.

[235]    *Id.* at 301.

[236]    *Id.* at 301-02.

[237]    *Id.* at 295, 306, 311-12

[238]    *Id.* at 310-11

**CONFIDENTIAL**

"[w]here there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation."[239]

Although a number of courts, in applying the doctrine of equitable disallowance, have followed the Supreme Court's reasoning in *Litton*,[240] it has been recognized that the use of the doctrine should be "very rare," and invoked in only "extreme instances."[241]  This caution stems, in part, from the absence of a Bankruptcy Code provision authorizing equitable disallowance, in contrast to the Bankruptcy Code's specification of equitable *subordination* of a claim as a remedy.[242]

In the rare case in which the bankruptcy courts have exercised their discretion to equitably disallow claims, the circumstances have involved fraud or similar inequitable conduct that put into question the very validity of the claim at issue.  As shown above, the Investigation has not uncovered any such extreme circumstances, nor has it uncovered inequitable conduct in connection with the Apax Debt Purchases.  Further, as the Apax Debt Purchases did not give rise to new debt, but rather solely transferred ownership of debt that was already valid and outstanding, there is no evidence that such transfers would have invalidated such debt under state

---

[239]     *Id.* at 311.

[240]     The result in *Litton* is not universally lauded and certain courts have questioned the viability of equitable disallowance as a remedy.  See, *e.g.*, Alan M. Ahart, *Why the Equitable Disallowance of Claims in Bankruptcy Must be Disallowed*, 20 AM. BANKR. INST. L. REV. 445, 463 (2012) (stating that "[f]ederal bankruptcy law simply does not enable the bankruptcy court to equitably disallow a claim in the first instance"); *Grede v. Bank of N.Y.*, No. 08 C 2582, 2009 WL 188460, at *8 (N.D. Ill. Jan. 27, 2009); *Austin v. Chisick (In re First Alliance Mortg. Co.)*, 298 B.R. 652, 666 (C.D. Cal. 2003); *In re Nassau Assocs.*, 169 B.R. at 837; *In re Century Inns, Inc.*, 59 B.R. 507, 522 (Bankr. S.D. Miss. 1986).

[241]     *In re Wash. Mut., Inc.*, 461 B.R. 200, 256 (Bankr. D. Del. 2011) *vacated on other grounds*, No. 08-12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb. 24, 2012).

[242]     11 U.S.C. 510(c).  *See In re Nassau Assocs.*, 169 B.R. at 837 n.4 (noting that the doctrine of equitable subordination embodied in section 510(c) "is limited to reordering priorities, and does not permit disallowance of claim," but recognizing the possibility of disallowing a claim if conduct is so "egregious that it affects the validity of the claim under applicable law").

CONFIDENTIAL                                                                9940842

law, further diminishing any likelihood of disallowance. Therefore, WFG concludes it is

unlikely that the claim of equitable disallowance would prevail.

    B.    WFG Concludes It Is Unlikely that a *Per Se* Limitation On Recovery Claim Would Prevail

       While, as discussed herein, there is no rule that claims of insiders will be

automatically equitably subordinated, in a narrow set of circumstances courts have limited the

recovery of estate fiduciaries when such fiduciaries purchase claims at a discount *after* the

instigation of insolvency proceedings against the debtor, even in instances where no breach of

fiduciary duty was found.[243]  In such cases, courts limit the fiduciary's recovery in the

insolvency proceedings to the amount paid for the claims, rather than the face amount of the

claims.  In doing so, courts have reasoned that "[w]hen bankruptcy follows insolvency and the

debtor is left in possession without the intervention of a trustee, the directors, holding office

under Court appointment or Court approval, become in all respects so far as their fiduciary

obligations are concerned, the full equivalent of a trustee in bankruptcy.  As such, they may not

traffic to their own profit, in either the assets or the obligations of the debtor."[244]

       As articulated by the Supreme Court in *Manufacturers Trust Co. v. Becker*,[245]

this *"per se"* limitation on recoveries for fiduciaries does not apply to claims acquired prior to a

bankruptcy filing.  In *Manufacturers Trust*, the indenture trustee objected to the allowance at

face value of bonds acquired over-the-counter and from other insiders by a director pre-

---

[243]    *In re UVAS Farming Corp.*, 91 B.R. 575, 578 (Bankr. D.N.M. 1988) (holding that, where a group led by a director of the debtor purchased claims after the bankruptcy petition was filed, the director was only entitled to recover on the claims purchased postpetition to the extent of the purchase price).

[244]    *In re Philadelphia & Western Ry. Co.*, 64 F.Supp. 738, 740 (E.D. Pa. 1946) (internal citations omitted).

[245]    338 U.S. 304 (1949).

**CONFIDENTIAL**                                                9940842

bankruptcy but while the debtor was insolvent.[246]  While the Court acknowledged the power of

bankruptcy courts to limit the claims of fiduciaries in the exercise of their equitable jurisdiction

over the allowance of claims, the Court refused to apply a *per se* limitation on the claims because

the bonds had been purchased prepetition while the debtor was a going concern (albeit

insolvent).  Therefore the Court affirmed the allowance of the claims at face because facts

surrounding the purchase of the claims did not otherwise give rise to a breach of fiduciary duty,

or injury to the corporation or its creditors, and no adverse influence on corporate decision-

making was found.

While courts have not articulated a clear test for when the *per se* rule should be

applied and its consequences, a few unifying principles appear to exist.  First, the rule is typically

only applied to officers, directors, or general partners of the debtor, the individuals responsible

for operating the debtor during its insolvency and negotiating its plan of reorganization.[247]  This

responsibility for the reorganization and the potential temptation to influence the reorganization

proceeding for profit has been cited as a motivation for the *per se* rule.[248]  Second, courts

applying the rule have only applied it to claims purchased postpetition.  Per *Manufacturers Trust*,

in a prepetition context there must be more than the purchase of a claim by a fiduciary to justify

the limitation on the claim.[249]  Third, courts primarily use the *per se* rule to equitably limit the

---

[246]     The bonds were acquired by the director with the funds of, and for the benefit of, the director's mother and
          sister.  For the purpose of its analysis, however, the Supreme Court treated the bonds as if owned by the
          director.  *Manufacturers Trust Co.*, 338 U.S. at 314 n.16.

[247]     *In re MC2 Capital Partners, LLC*, No. 11-14366, 2013 WL 772959, *2 (Bankr. N.D. Cal. Feb. 27, 2013)
          (noting the recovery limitation is applied to persons owing a fiduciary duty to the debtor).

[248]     *In re Gladstone Glen*, 739 F.2d 1233, 1237 (7th Cir. 1984) (noting that, when debtor's general partners
          purchased a second lien position, the third lien lender had equitable right to not have his claim extinguished
          under a plan that was proposed by those who were profiting from such plan).

[249]     *Manufacturers Trust Co.*, 338 U.S. at 312-13.

**CONFIDENTIAL**                                                                    9040842

*recovery* that the fiduciary can receive on account of the claim, not as a limit to the allowed amount of the claim itself.[250]

Because the Apex Debt Purchases occurred prior to the Petition Date at a time when bankruptcy was not considered to be likely by Apax or Cengage, an action to limit Apax's recoveries in the Chapter 11 Cases to the amount paid for its claims is unlikely to prevail.

C.       WFG Concludes It Is Unlikely that a Recharacterization Claim Would Prevail

In connection with the Investigation, WFG also reviewed whether a court would recharacterize as equity the debt acquired by Apax in the Apax Debt Purchases.  As a court of equity, a bankruptcy court may, where appropriate, acknowledge economic reality by recharacterizing purported debt as equity if the court determines that the parties intended the transaction to be an equity investment.[251]  While courts have adopted a variety of recharacterization tests, they can all be distilled into a "court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else.  That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.  Answers lie in

---

[250]    *In re Papercraft Corp.*, 211 B.R. 813, 825 n.14 (W.D. Pa. 1997) (collecting cases), *aff'd sub nom. Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims of Papercraft Corp.*, 160 F.3d 982 (3d Cir. 1998).

[251]    *See, e.g., Pepper v. Litton*, 308 U.S. at 305 (noting that a bankruptcy court's equitable powers "have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done"); *In re BH S&B Holdings LLC*, 420 B.R. at 157 n.17 (noting that "courts in this jurisdiction . . . have held that courts do have equitable power to recharacterize debt as equity"), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

**CONFIDENTIAL**

9940842

facts that confer context case-by-case."[252]  Notably, a party need not have engaged in inequitable conduct in order to have such party's claim be recharacterized as equity.[253]

In determining whether to recharacterize a loan, many courts, including those located in the Second Circuit, consider the following factors: (1) the names given to the instruments; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and shareholder; (7) the security for the advances; (8) the corporation's ability to obtain financing elsewhere; (9) the extent to which the advances were subordinated; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide for repayment.[254]  Courts may weigh the factors differently depending upon the situation, and no single factor will dictate whether recharacterization is appropriate.[255]  The party seeking to recharacterize a claim bears the burden of proof.[256]

---

[252]    *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006).

[253]    *See, e.g., Adelphia Commc'ns Corp. v. Bank of Am.*, 365 B.R. at 74 (noting that "recharacterization and equitable subordination analyses differ from each other in that recharacterization analyses focus on the substance of the transaction, whereas equitable subordination analyses focus on the creditor's behavior").

[254]    *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 747-48 (6th Cir. 2001) (adopting factors used in *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986); *see also In re BH S&B Holdings LLC*, 420 B.R. at 154, *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *Adelphia Commc'ns Corp. v. Bank of Am.*, 365 B.R. at 74. The list set forth herein is generally referred to as the "*AutoStyle*" or "*Roth Steel*" factors.

[255]    *See Sender v. Bronze Grp. Ltd. (In re Hedged-Invs. Assocs., Inc.)*, 380 B.R. 1292, 1298-99 (10th Cir. 2004) ("None of these factors is dispositive and their significance may vary depending upon circumstances."). "No mechanistic scorecard suffices. And none should . . . ." *In re Submicron Sys. Corp.*, 432 F.3d at 456.

[256]    *See Viera v. AGM II, LLC (In re Worldwide Wholesale Lumber, Inc.)*, 378 B.R. 120, 124 (Bankr. D.S.C. 2007) ("The party seeking to reclassify a debt as an equity contribution needs to demonstrate that the intent of the parties at the time they entered into the transaction was to enter into an investment relationship, not a lending relationship.").

**CONFIDENTIAL**                                                                                    9940842

Particularly important, the analysis of whether an asserted debt should be treated as equity depends on the facts and circumstances *at the time of the issuance of the purported debt.*[257]

Given the applicable legal standard, WFG concludes that an attempt to recharacterize the Apax Debt would be unlikely to prevail. Since a recharacterization analysis examines the parties' intent at the time of the issuance of the purported debt, an attempt to recharacterize the Apax Debt would have to be premised upon an assertion that Cengage's original issuances of debt to unrelated third parties in arm's-length third parties were disguised capital contributions.[258] The Investigation did not uncover any evidence that would support this premise. Further, WFG has not found any instance in which a court has recharacterized validly issued debt merely because it was subsequently acquired by an insider.

D.    WFG Concludes it is Unlikely that Vote Designation Would Prevail

While the report focuses primarily on the potential claims that may be asserted against Apax and related parties, in the course of the Investigation, WFG considered whether any votes cast by Apax on a plan of reorganization of the Debtors would be subject to "designation". Section 1126(e) of the Bankruptcy Code allows the court to "designate" — *i.e.*, not count — the vote of any creditor on a plan of reorganization whose vote is not cast or procured in "good faith."[259] The Bankruptcy Code contains no definition of "good faith" or "bad faith," though

---

[257]    *Rockville Orthopedic Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 442 (Bankr. D. Conn. 2007) (citing *In re Cold Harbor Assoc., L.P.*, 204 B.R. 904, 916-17 (Bankr. E.D. Va. 1997)); *see, e.g., In re AutoStyle Plastics, Inc.*, 269 F.3d at 747-48 ("Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution [ ] *ab initio*.'"); *see also In re BH S& B Holdings LLC*, 420 B.R. at 157 (citing *In re AutoStyle Plastics, Inc.*, 269 F.3d at 747-48).

[258]    *See In re Rockville Orthopedic Assocs., P. C.*, 377 B.R. at 444 (noting "expectation of repayment is relevant to the nature of the transaction only at the time of the transaction").

[259]    *See* 11 U.S.C. § 1126(e) ("On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.").

**CONFIDENTIAL**                                                               9940842

courts have developed a relevant analytical framework. While a plan of reorganization has been

filed in the Chapter 11 Cases, votes on the proposed plan have not been solicited. Accordingly,

the Investigation did not consider the circumstances of casting any vote by Apax, which has

not yet occurred.

For the reasons set forth above that make it unlikely that (i) a viable insider

trading or fiduciary duty breach claim could be asserted against Apax and the Apax Directors or

(ii) the Apax Debt Claims could be equitably subordinated or disallowed, it is unlikely that

Apax's votes related to the Apax Debt Claims would be designated. While Apax may have been

acting in its own interests as shareholder in undertaking the Apax Debt Claims, it is well

established that a creditor is entitled to pursue its self-interest as a creditor, *i.e.*, to increase or

protect recovery on its claims, without being subject to vote designation.[260] Further, the

evidence supports that it is unlikely that Apax acted with an "ulterior motive" in acquiring the

Apax Debt Claims, which would constitute "bad faith" within the meaning of section 1126(e).

Recognized ulterior motives include, among other things, impeding the assertion of a cause of

action against the creditor in question, injuring the debtor's business to the benefit of such

creditor's competing business and obtaining benefits under a third-party private agreement that is

dependent on the failure of the debtor's reorganization.[261] The evidence does not support that

---

[260]  *Figter Ltd. v. Teachers Ins. & Ann. Ass'n of Am. (In re Figter Ltd.)*, 118 F.3d 635, 639 (9th Cir. 1997)
(citations omitted); *see also In re Gilbert*, 104 B.R. 206, 217 (Bankr. W.D. Mo. 1989) ("As long as a
creditor acts to preserve what he reasonably perceives as his fair share of the debtor's estate, bad faith will
not be attributed to his purchase of claims to control a class vote."); *In re Pine Hill Collieries Co.*, 46 F.
Supp. 669, 671 (E.D. Pa. 1942) ("If a selfish motive were sufficient to condemn re-organization policies of
interested parties, very few, if any, would pass muster.").

[261]  *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 61 (Bankr. S.D.N.Y. 2006) (noting that "badges of the
requisite bad faith include creditor votes designed to (1) assume control of the debtor; (2) put the debtor out
of business or otherwise gain a competitive advantage; (3) destroy the debtor out of pure malice or (4)
obtain benefits available under a private agreement with a third party that depends on the debtor's failure to
reorganize" (internal quotation marks omitted)).

**CONFIDENTIAL**                                                                    9940842

Apax had any such ulterior motive in making the Apax Debt Purchases — there was no cause of action threatened or pending by Cengage against Apax at the time; the value of the Apax Debt Claims would presumably have only eroded further by a further degradation of Cengage's business; and there is no evidence of any third party agreement entered into by Apax through which Apax would have been rewarded economically by the inability of Cengage to restructure its obligations.

*        *        *        *        *

In sum, the Investigation does not support that any of equitable subordination, *per se* limitation of recovery, equitable disallowance, or vote designation is warranted with respect to the Apax Debt Claims. Although Apax is an insider, even by the standards attributable to insiders, the Apax Debt Purchases were not inequitable. In addition, the Investigation did not develop any facts that suggest that Apax Debt Purchases harmed the other creditors of Cengage.

CONFIDENTIAL

9946842

## CONCLUSION

For the reasons stated above, WFG concludes, based on the body of evidence obtained and evaluated, that:  (i) it is unlikely that Apax, the Apax Directors, or the Non-Apax Directors breached any fiduciary or other duty owed to Cengage in connection with (a) Apax's purchases of Cengage debt, or (b) Cengage's repurchases of its own debt; (ii) it is unlikely that purchases of Cengage debt by Apax and Cengage were made by Apax and Cengage, respectively, on the basis of material non-public information; (iii) it is unlikely that an attempt to equitably subordinate the Apax Debt Claims in the Chapter 11 Cases would prevail; and (iv) it is unlikely that certain other remedies against Apax would prevail, including (a) equitable disallowance of the Apax Debt Claims, (b) a *per se* limitation of recovery on the Apax Debt Claims; (c) recharacterization of the Apax Debt, or (d) the designation of Apax votes on a plan of reorganization by the Debtors.

WILLKIE FARR & GALLAGHER LLP

By:  Marc Abrams
     Tariq Mundiya
     Todd G. Cosenza
     Shaunna D. Jones
     787 Seventh Avenue
     New York, New York 10019

CONFIDENTIAL

# APPENDIX A

## TRANSCRIPT OF NOVEMBER 9, 2012

## EARNINGS CALL

CONFIDENTIAL



Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

# Transcript of
# Cengage Learning, Inc. (CENL)
# Fiscal 2013 First Quarter Investor Conference Call
## November 9, 2012

## Participants

Ronald G. Dunn, Executive Chairman
Michael Hansen, Chief Executive Officer
Dean D. Durbin, Chief Financial Officer
David Faiman, Senior Vice President of Finance and Chief Accounting Officer

## Presentation

### Operator

Good morning and welcome to Cengage Learning's Fiscal 2013 First Quarter Investor Conference Call.

Participating on the call will be Ron Dunn, Executive Chairman; Michael Hansen, Chief Executive Officer; Dean Durbin, Chief Financial Officer; and Dave Faiman, Senior Vice President and Chief Accounting Officer.

At this time, all participants are on a listen-only mode. A brief question-and-answer session will follow the formal presentation. As a reminder, this conference is being recorded.

It is now my pleasure to introduce, Dave Faiman.

### Dave Faiman – Cengage Learning, Inc. – Senior Vice President of Finance and Chief Accounting Officer

Good morning, everyone, and welcome to Cengage Learning's Fiscal 2013 First Quarter Investor Conference Call. A copy of the slide presentation for today's call has been posted in the company's website at cengage.com. You can also view the slides by going to investorcalendar.com and clicking on the Cengage Learning conference call on the list of today's events.

The following discussion may contain forward-looking statements including statements about the outlook and prospects for Cengage Learning. Forward-looking statements are those which are not historical facts. These and other statements that relate to future results and events are based on Cengage Learning's current expectations and assumptions and are subject to risks and uncertainties which may cause the actual results in future periods to differ materially from those currently expected because of risk factors discussed in this presentation, our first quarter report for the three months ended September 30, 2012, and the "Risk Factors" section of our annual report for the year ended June 30, 2012. Please consult these documents for more complete understanding of these risks and uncertainties. We disclaim any

CONFIDENTIAL



*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

intention or obligation to update or revise any forward-looking statements whether as a result of new information, future events, or otherwise.

This presentation contains disclosures of Adjusted EBITDA, Unlevered Free Cash Flow, and Bank EBITDA which are non-GAAP financial measures. Reconciliations of each of these measures to the most directly comparable GAAP financial measure are disclosed within this presentation and the management discussion analysis section of the first quarter report and three months ended September 30, 2012. This presentation may also contain discussions of gross sales by market which represents amounts invoiced to our customers. Gross sales are before any adjustments or sales returns provision, or revenue deferral. We believe this measure provides investors with a more comprehensive understanding of our underlying revenue results and trends by presenting amounts invoiced on a consistent basis.

In addition, we may discuss digital product sales, which represents one, revenue recognized on the sale of digital products that are not packaged with printed materials, and two, gross sales with actual returns of bundled print and digital products where we believe that the value proposition to our customer is driven by the digital offering.

We will now proceed with the agenda. Ron Dunn, Executive Chairman, will begin by discussing our business results and analysis followed by Michael Hansen, Chief Executive Officer, who will speak to you about our plans to address performance. Afterwards, Dean Durbin, Chief Financial Officer, will take you to the details of the first quarter financial results. Following those presentations, we will open the call for questions.

Let me now introduce the Executive Chairman of Cengage Learning, Ron Dunn.

### Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman
Hello everyone and thanks for participating in today's call. Those of you who have reviewed the materials that we posted to the website last night will know that the first quarter of fiscal year of 2013 was a challenging one for Cengage Learning.

This morning, we will review our financial results for the quarter as well as our plans to address some issues that have negatively affected our recent performance.

In the quarter ended September 30, 2012, Cengage Learning's total revenue declined by 22%. Our revenue was affected both by overall market conditions and to a greater extent by some factors that are unique to our situation. Many of my comments will focus on the higher education market which, as you know, is the largest driver of our business. In the quarter, gross sales for the higher education publishing industry as a whole declined by about 7% from the prior year while Cengage Learning's gross sales were down by more than 20%. We feel it's important for you to understand all of the major issues that influenced our performance. So our goal today is to communicate openly and answer as many of your questions as we can.

First, let me speak to general market conditions which affect not just Cengage Learning but also our peers in the industry and these are addressed on slide 6. In

CENG0176740

2



CONFIDENTIAL

fact, some of our competitors have commented recently on some of these factors when they reported their results.

Sales of new printed textbooks have been declining in the past few years as more students buy lower cost alternatives such as textbook rentals, superseded editions, and gray market books. Textbook rentals continue to grow but, as we predicted for the past couple of years, the rate of growth is slowing and the rental market appears to be nearing its maximum level.

As we've noted before, sales in the school and library markets continue to suffer from reductions in public funding for those institutions.

More professors seem to be delaying decisions to switch to new editions of textbooks. In the spring of 2012 selling season, we closely monitored almost 700 cases in which Cengage Learning textbook was coming out in a new edition when a professor would typically switch to the new edition to have access to the latest materials. **In more than 15% of those cases, the professors decided to delay their adoption decisions and continue using the previous editions of the books.** In the past, that deferral rate would have been much smaller.

One of the key drivers in the higher education market is enrollments. As you know, our industry enjoyed growing enrollments for several years particularly in the period 2008 to 2010. However, we are now seeing slower rates of enrolment growth than in the past. The for-profit college sector continues to be particularly hard hit. According to the trade publication, Educational Marketer, for the three months ended June 30, 2012, enrollments at the 15 largest for-profit colleges fell 7.8% from the prior year. Some state-supported institutions have also suffered enrolment declines. **For example, in the California community college system, which receives more than 60% of its financial support from the state and which has seen sharp cut backs in funding, enrollments have fallen from 2.9 million in 2008 and 2009 to 2.4 million today.**

Turning now to slide 7, after taking account of those market conditions, we experienced a further decline in revenue that's attributable to other factors that are specific to Cengage Learning. We carefully analyzed these factors and I'd like to tell you what we've learned in three key areas. A familiar topic is a revenue shift between June and July and then there is slower growth of digital sales and changes in the dynamics of our distribution channels.

One issue impacting revenue for the quarter is the timing of sales we booked in June and July. Many of you will recall that at the end of June 2011, we had a significant backlog of orders that wound up being shipped and booked during the first quarter of our fiscal year 2012. By contrast, at the end of June 2012, we were able to ship all but a small volume of the orders we had on hand. This had the effect of making sales in June of 2012 significantly larger than in June 2011 while sales in the first quarter of fiscal '13 were correspondingly reduced from the same period in the prior year. We estimate that this revenue shift from July to June reduced revenue in the quarter by about $38 million.

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

3

CENG0176741

CONFIDENTIAL



Secondly, as you know, we've been strongly focused on sales of digital solutions for some time now. One of the keys to success with digital solutions is what we call the attach rate which is a measure of the extent to which professors require rather than recommend the use of a digital tool. When the use of a digital solution is required, more students are motivated to buy the product and the attach rate is higher. Our most sophisticate digital solutions like Aplia and SAM tend to have high attach rates while less sophisticated products like CourseMate have lower attach rates and are often recommended but not required by professors.

Unfortunately, in the most recent sales season, we had more adoptions of the less sophisticated products which are optional and fewer adoptions of the more sophisticated solutions which tend to be mandatory. As a result, our overall sales of digital products declined in the quarter by approximately $13 million.

Thirdly, in the first quarter, we saw some significant changes in the behavior of some of our distribution channel partners which had a negative effect on sales. On slide 8, we've illustrated that the most basic level the way our distribution channel works to help explain some of the channels we're seeing - I'm sorry, some of the changes we're seeing. For the most part, we sell our products to retailers, either traditional bookstores or other distribution partners. Those transactions generate our gross revenue and give our channel partners their inventory. The channel partners then sell the products on to students or other ultimate consumers. Unsold inventory is then returned to us for credit by the retailers.

What we are now finding is that our channel partners are changing their behavior in various ways to more accurately match their ordering patterns to their actual sell through experience which would allow them to reduce the cost of holding and returning excess inventory. Specifically, our partners are not buying as much inventory upfront as they did in the past. In addition, one major channel partner in particular reduced its level of purchases dramatically over the past year although we expect those sales to return to normal levels in the future either through this partner or through others. While these changes in ordering patterns have the effect of reducing our revenue in the short run, we believe they may lead to lower rates of sales returns in the future which upon balance would be a good thing for both us and the industry as a whole. We believe this issue reduced our revenue in the first quarter by as much as $30 million.

In the aggregate, these three factors account for approximately $81 million of our revenue shortfall in the quarter and Dean will discuss other contributing factors in his remarks.

Turning now slide 9, at the time of her last earnings call, our search for a new CEO was still underway. Today, I'm pleased to be able to introduce you to Michael Hansen, the new Chief Executive Officer of Cengage Learning. Michael has a wealth of experience that is directly applicable to the challenges and opportunities we face. Before joining Cengage Learning about seven weeks ago, Michael was CEO of Elsevier Health Sciences, a division of Reed Elsevier from 2008 to 2012. Elsevier Health Sciences is a $1.6 billion business. It is similar in size and complexity to Cengage Learning. Michael led that business through a successful print to digital

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

4

CENG0176742

CONFIDENTIAL



transition and implemented a variety of effective strategies including a usage base fronting model for new digital products. From 2006 to 2008, Michael served as President and CEO of Harcourt Assessment, the educational arm of Reed Elsevier, where he turned around a loss making operation, restoring the business to growth and profitability, and eventually selling it to Pearson. Earlier in his career, Michael was Executive Vice President of Operational Excellence at Bertelsmann, a $20 billion global media company. In that capacity, he led a group wide performance improvement initiative and set the future strategic direction for the business. Michael is extremely well qualified to lead Cengage Learning in the next phase of its growth and development. His experience with print to digital transformations and performance improvement initiatives will serve us well.

Now, I'd like to turn the call over to Michael Hansen who will describe some of his initial plans for actions that will improve the company's performance.

**Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer**
Thank you, Ron. Thank you for the introduction. With only a short time behind me here at Cengage and the top current quarter, I'm still encouraged by many things about Cengage Learning and I appreciate the commitment of its employees as we take on challenging times in the business.

As Ron said, we've been working very closely together to analyze the issues that have impacted first quarter results and I want to spend a few minutes today talking about what we are doing to direct these areas. We want to ensure that we are building upon things that we're doing well and that we quickly adjust in other areas to further restore us on a path to success.

First, we must ensure that we have a data driven approach to performance management. We will drive the execution of all strategic initiatives by a metrics driven, key performance indicator or KPI approach at all levels of the organization. And we kicked off this KPI project already on October 1st. This approach will be implemented by all functions within the company and we will tie performance payments of all key managers to coincide in KPI achievements. This shift in operations will keep all efforts coordinated and focused on share properties and clear accountability. The metrics driven approach will serve as the foundation of our operational improvement.

Now, I will share with you a number of very specific initiatives we are undertaking. I have ordered them by when they will have an impact on our performance.

If I could ask you to turn to slide 11, Ron shared with you some insights on the changing behavior of some of our channel partners, which have negatively impacted our results this quarter. As a result, it is clear that we need to improve our channel management and work to align with partners more strategically. Specifically, I have made it my personal priority to initiate discussions with our channel partners at the highest levels. In addition, we all create a formal channel management organization for the company and create a cross functional pricing and distribution council, each of which will help ensure better collaboration.

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

5

CENG0176743

CONFIDENTIAL



*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

With regard to our sales performance, it is abundantly clear that we need to make some changes. Our overall objectives are to drive digital product sales and improve sell through of our products to students. As such, we have already been taking steps to make sure all reps are capable of selling digital products. We need to immediately begin to drive digital sales outside of the traditional adoption cycles, expanding our opportunity for growth. As part of our KPI initiatives, mentioned earlier, we will measure and reward sales for attach rates and activations.

Finally, we will launch student engagement initiatives across major campuses which will help create closer relationships with students as the main user of our products.

Looking at slide 13, it is clear that our efforts in product development need to be focused first on high impact digital solutions. With MindTap, we have a very promising product in the markets and we continue to deploy it in more disciplines. In addition, we have created a next generation MindTap SWAT team in strategically important disciplines to drive rapid development of the next generation's product release.

Lastly, we must continue to align product features and functionality with user needs. And to do this, we will intensify our end user research as a key input for our products' design. Our products will only succeed if they have the customer in mind so this research is an integral part of our product development process.

At this point, I'm going to turn this to Dean Durbin, Chief Financial Officer, to speak to the details of our financials. But I will be back before the Q&A to share a few additional thoughts. Dean?

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Thanks, Michael, and good morning, everyone.

Let's turn to slide 15. Consolidated revenue for the quarter was $538 million which represents a decline of 22% from the prior year. This decline was primarily in the domestic segment and to a lesser extent in our international segment. Adjusted EBITDA of $233 million decreased approximately $116 million or 33% from the prior year due to the lower revenues. On a percentage decline basis, the impact is higher on adjusted EBITDA due to the high margin flow through on our revenue which is a result of our fixed cost base. Excluding the flow through from the revenue decline, expenses overall were flat versus the prior year.

Our domestic segment revenues for the quarter were $480 million which represented a decline of 23.6% or approximately $148 million from the prior year. In the two- and four-year college career and professional markets, the decline was driven by a number of factors that Ron mentioned. Enrolments were down particularly in the career market coupled with lower inventory stocking by many bookstores and online retailers. In addition, changes in customer ordering patterns resulted in the shift of $38 million of revenue from the fourth quarter of fiscal 2011 to the first quarter of fiscal 2012.

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

6

CENG0176744

CONFIDENTIAL



*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

Finally, in these three markets, the continued migration from traditional print products which are recognized upfront to digital solutions which are recognized over time is having the effect of deferring revenue into future periods. For example, in the quarter, 17% of our gross sales were deferred versus 12% in the same quarter last year. I'll speak more to the impact of deferred revenue accounting in a moment.

In the school market, sales declined when compared to the prior year which included an expected decline due to a large Texas adoption last year which did not repeat.

Finally, in the research market, revenue declined reflecting the impact of continued funding constraints on our customers.

Domestic EBITDA for the quarter decreased approximately $114 million or 33% and adjusted EBITDA margin declined to 48.3% due to the lower revenues. The flow through from the revenue decline accounts for the decrease in EBITDA.

Finally, revenue in our international segment decreased approximately $6 million or 9%, approximately $2 million of the decline was due to foreign currency translation. Adjusted EBITDA in the international segment decreased by $4 million reflecting the lower revenues partially offset by net foreign currency transaction gains.

Moving on to slide 16. As we mentioned in the past, the migration from traditional print products, which are typically recognized upfront to digital solutions which are recognized over time, impacts our revenue and adjusted EBITDA quarter-over-quarter. As I mentioned earlier, in the domestic revenue discussions, some of the revenue decline in the quarter is attributable to this accounting. If we exclude the impact of deferred revenue accounting associated with this transition, the first quarter revenue would have decreased 21.5% on a consolidated basis and 22.7% for domestic. We've estimated the flow through on adjusted EBITDA but, as you can see, the impact to adjusted EBITDA is a little bit greater.

On slide 17, our capital expenditures increased slightly as we continue to invest in print and digital products while our spending on our global ERP system has decreased significantly.

Turning now to our capital structure on slide 18. Since September 2011, we completed an amendment and extension of a portion of our term loan and, in conjunction with that, issued $725 million of 11.50% first lien notes due 2020. Our net indebtedness declined as a result of debt buybacks in the open market, principal amortization, our mandatory AHITO (ph) payments, and buybacks associated with our July 2012 debt exchange.

As I mentioned on our fiscal 2012 year-end call in August, we successfully exchanged $710 million of our 10.5% unsecured notes due in 2015 for $710 million of 12% second lien notes due 2019. Our outstanding borrowings on our revolving credit facilities of $57 million are significantly lower than the same time last year. LTM EBITDA of $712 million is a decline from the prior year reflecting decreased revenue and adjusted EBITDA in the quarter.

7

CENG0176745



CONFIDENTIAL

*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

I know many of you will be asking about our plans to address the upcoming maturities. What I can tell you is we intend to refinance the majority of our remaining unextended maturities over the next 9 to 12 months and we will use all tools available to achieve this objective.

With respect to our leverage ratios, on slide 19, as of September 30, 2012, our last 12 months bank EBITDA of $712 million yields a senior secured leverage ratio of 6.17 times and the total leverage ratio of 7.68 times.

On slide 20, you can see that we have $522 million of total liquidity versus $208 million as of the same time last year. This is mainly due to the incremental revolving credit facility secured during our credit agreement, amendment, and extension process in April 2012.

Unleveraged free cash flow declined by $88 million to $188 million primarily due to decreased net income, partially offset by lower use of cash for working capital, the latter due to the decline in revenue.

I want to pause in this slide for a moment to briefly discuss our liquidity and covenant compliance for the next 12 months and beyond. We have analyzed current and future liquidity and based on that analysis, we expect cash flows from operations combined with availability under our revolving credit facilities to provide sufficient liquidity to fund our needs over the next 12 months.

With that, I'm going to turn the call back over to Michael for some closing remarks before we move to Q&A. Michael?

**Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer**
Thank you, Dean.

Before we jump into the Q&A section of today's all, I want to close with a few thoughts. We clearly have work to do and the coming months and quarters will require us to challenge many old ways of operating in order to get ahead of the market and the issues that we now face. As our industry is changing, we, too, must make changes and it is going to require a lot of hard work to turn things around. That said, I am confident that we could this as the fundamentals of our industry are strong and I'm getting to know the Cengage organization as a dedicated group of people hungry to succeed. Clearly, this will not happen overnight and not without tough decisions along the way. I accepted this job understanding the challenging climate and changing dynamic of our industry and despite our disappointing financial performance for the quarter, I am very excited to be part of this company who is at the forefront of changing the educational environment.

With that, operator, we are ready to open the line for questions.

**Operator**
That concludes our formal remarks. We will now open the line for questions. To allow time for all participants to ask questions, you ask that you limit yourself to one question initially. If you have an additional questions and time permits, we will come

8

CENG0176746

CONFIDENTIAL



**Transcript:**
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

back to you for followup. If you would like to ask a question, please press *1 on your telephone keypad. A confirmation tone will indicate your line is in the question queue. You may press *2 if you would like to remove your question from the queue. For participants using speaker equipment, it may be necessary to pick up your handset before pressing the * keys. One moment please while we pool for questions.

Thank you. Our first question is from the line of Avi Steiner with JPMorgan. Please proceed with your question.

### Avi Steiner – JPMorgan
I'm going to have only one question, I really hope you can take this. On the channel partner issue you cited, can you tell us who that is? How much revenue is specifically related to that partner? When that partner may be coming back in? What the flow through margin on the revenue is related to that? And there are notes about a $45 million vendor claim and I'm wondering if that's related to the channel partner and then I have a couple of followups. Thank you.

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
Okay. I'll begin. Avi, good morning. Well, first of all, we, as a matter of policy, don't reveal individual client issues. I can tell you this is one of the larger distributors that we deal with. I told you that the estimated amount of revenue decline that's associated with that is about $30 million and that's the part that we think is unique to Cengage Learning as opposed to any generalized change in behavior of that particular channel. We expect that that client will return to normal ordering patterns beginning in the next selling season and that we will get back to a normal business relationship in the next few weeks and months. The $45 million claim is unrelated to this issue entirely.

### Avi Steiner – JPMorgan
That's one on that. So I'm just curious why you seemed to be the only one getting impacted by at least this channel partner. Is it just a specific issue between you and the channel partner? No one else has really cited that and maybe has dovetail to that, on the weakness in digital because no one else has really talked about digital weakness, is it product related? Is it something on a relative basis your digital offerings to the competitors because, again, no one has really cited digital weakness? Is there a share shift going on here? And then I have one more followup. Thank you.

### Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman
Again, with respect to the channel partner, that issue is the result of very specific circumstances that are related to us and not to other participants in the industry. The weakness in digital, we think is not a product issue but instead a selling and strategic selling issue. As I mentioned, we had sold too much of our less sophisticated digital products and not enough of the more sophisticated digital products. The result being we were selling more things that are optional, which students buy at lower rates, and less sales that are required that students buy at higher rates.

### Operator
Thank you. Our next question is from the line of Aaron Watts of Deutsche Bank. Please proceed with your questions.

9

CENG0176747

CONFIDENTIAL



Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

### Aaron Watts – Deutsche Bank

Hey, guys. A few quick ones for me, just a quick followup on Avi's. When you said, Ron, that next selling season, you'll see things return to normal at this channel partner. What quarter – I mean how far out quarter-wise in your number should we be thinking about that return to normal season? Will the next quarter still have this kind of overhang on it?

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer

This is Michael. Let me address that issue. Just to be clear, we are thinking – we believe that this channel partner will return to normal in the next selling season which is the third quarter of our fiscal year. That doesn't mean that there is going to be a full catch up because clearly the selling season has past and the issue with the sale – when the issue with the channel partner was not resolved. So the quarter to look at in that respect is the third quarter of our fiscal year.

### Operator

Thank you. Our next question is from the line of Mary Gilbert of Imperial Capital. Please proceed with your questions.

### Mary Gilbert – Imperial Capital

Yes, thank you. I just have a couple of questions. One, I just wanted to follow up on this channel partner. It sounds like what you're saying is that even though this partner is coming back in the third quarter, we've lost sales and we are not going to get it back so the third quarter impact isn't going to offset what we lost. So that means that we're – it sounds like we're on trend and that's what I want to get confirmation. If you look at the financial performance in this quarter and we annualize it for the year, it looks like from a cash EBITDA perspective, we're going from $484 million down to about $400 million so that kind of leads to the next question in terms of how you cover your cash requirement and I'm also wondering if you could talk about APAX and what their commitment is and how you can get to a point to refinance? Or are we looking at restructuring?

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer

Hi, Mary. This is Dean. The majority of the revenue from this quarter by far, meaning the second quarter, comes in December so we're certainly not going to be able to talk anymore about this quarter's performance this early into the second quarter. And obviously, you're correct. We're not expecting that the shortfalls in the first quarter to be totally recouped over the balance of the year. As you know, the first quarter is our biggest quarter and with this magnitude of the decline, that won't happen. So, obviously, we will be down for the full year on both revenue and EBITDA. As far as – I might be skipping one of the questions, you can remind me in a moment.

As far as APAX is fully supportive of our company. They continue to be and if you had specific questions for them, you would have to ask them because we wouldn't be able to answer for them.

And, no, I don't think that we are moving toward a restructuring and, as I said, I believe, based on the analysis of our cash flow over the next 12 months, that were

10

CENG0176748

CONFIDENTIAL



*Transcript:*
*Cengage Learning, Inc. (CENL)*
Fiscal 2013 First Quarter Investor Conference **Call**
November 9, 2012

going to be able to meet all of our obligations whether they be from a working capital standpoint, debt service, et cetera.

## Operator

Thank you. As a reminder ladies and gentlemen, we ask that you limit yourself to one question. If you have any additional questions and time permits, we will come back to you for a followup.

Our next question is from Andrew Finkelstein of Barclays. Please proceed with your questions.

## Andrew Finkelstein – Barclays Capital

Hey, guys. Hi. You know just on the channel thing, not to beat that horse here, but in my understanding of the business was always that returns are relatively easy for the bookstore for that side, if it is not - if it isn't one of those channels and I'm not sure, so I'm just trying to understand why they would make this move. If it's just a return – is it just that return issue or – because otherwise where is that demand coming from. I mean the professors are still adopting your books. Kids use those books on the other side so you would think that demand would flow elsewhere. So I'm just wondering if you could sort of clear that out because either we should see that demand somewhere or some point or maybe it's just that return issue which I'm also not as clear about. And then on the professor side, in terms of their deferral, is there a broader industry issue here with professors sort of extending the life on books where you've had been able to put out a new edition and get sort of a new book buying and knock out some of the used material after, say three years, where now we start thinking about four to five years so were just stretching through a longer adoption which could lower sales kind of as we move through these adjustments. And, Dean, I was just hoping maybe you could just give us total NGSP revenue this quarter versus last year. Thanks.

## Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer

Okay. Andrew, there were three questions as far as I noted down. This is Michael and I'll take the first one. I'll ask Ron to take the second and Dean to take the third one.

With regard to the channel partner, let me maybe explain it in very simple terms that you – I think alluded to all the right things. So this channel partner has decided to buy less. The underlying demands for the books could have gone into various different directions. It could have gone to a competitor of this channel partner which we expect some of that has gone there. It could have gone to used books. It could have gone to rentals. For us, it is extremely hard at this point to quantify which ones of that – you know, what the magnitude of each one of those sectors is going to be. And therefore, we are monitoring and working with our channels partner very closely to monitor what amount of reduction in returns we're going to see because they have sold more because of the underlying demand and, you know, that will manifest itself over the next few months. So your question was absolutely right. I think we will see some of that come back by way lower returns. It is at this point extraordinarily hard for us to quantify that.

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

11



CONFIDENTIAL

*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

With regard to the deferral in adoptions that we have seen, I'll ask Ron to comment on that whether that is a sustained trend or whether this is a temporary phenomenon.

**Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman**
Hello, Andrew. And the answer to that is we don't yet know because it's a new phenomenon. In the past, these deferrals would have been minimal. This is the first time we've seen significant professor deferrals. Our research tells us that that is driven sometimes by the professor simply not wanting to make a change in the way he or she teaches the course and sometimes by price sensitivity on the part of students who lobby to be able to continue to use the previous edition. So the question of whether it will extend revision cycles, I think that's unlikely but as Michael pointed out earlier, our objective in any case is to begin selling through the revision cycle, not waiting for the revision cycle to come around to make big new sales only once in a three-year period and that's another example of where digital solutions allow us to change the business model in a way that's beneficial to the business.

**Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer**
And, Andrew, let me just add from my perspective. This is Michael again. One piece of anecdotal evidence. As part of my coming on board at Cengage Learning, I spent a lot of time with customers and professors and talked to them and what I'm picking from these discussions is that the primary reaction is really to defer an adoption is to essentially accommodate students who are saying it's a tough economic environment right now. We're not quite sure whether we're going to get a job coming out of school and we really need any relief that we can get. It is not a conviction that they are better off teaching out of an older book rather than a newer book. Let me ask Dean to handle the third question that you raised.

**Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer**
Hi, Andrew. Revenue for NGSP last year in the first quarter was just under $29 million and in this quarter it was $15 million, so down about $14 million, almost half.

Andrew Finkelstein – Barclays Capital
Thanks.

**Operator**
Thank you. Our next question is from the line of Matt Swope of Gleacher. Please proceed with your question.

**Matt Swope – Gleacher & Company**
Yeah. Good morning, guys. You might have just answered part of this with that last comment but when you went through the various pieces that made up the revenue hole including the three specific items you mentioned, including the 7% macro, I'm still left with about a $40 million hole. It sounds like maybe 14 or 15 of that can be explained by National Geographic from what you just said. Can you comment on the rest of miss and whether market share might be an issue? Any comments you can make on market share and then just one other one for me would be did you guys passed your goodwill for impairment this quarter and if so, did you write it down at all?

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

12

CENG0176750



CONFIDENTIAL

*Transcript:*
*Cengage Learning, Inc. (CENL)*
Fiscal 2013 First Quarter Investor Conference Call
November 9, 2012

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Thanks for your questions, Matt. This is Dean. Here's the breakdown of the variances in total. The backlog as we've said was $38 million. The enrollment/market about $10 million. The changes attributed to our channel partners were $30 million. The digital performance that was discussed was $13 million. The Texas adoption cycle was $15 million. The deferred revenue accounting variance was $4 million. Research in total was $7 million. There was a slight uptick in our reserve for returns provision which is another $6 million and I think if you add that up, that's a $123 million or 83% of the $148 million overall decline. And the difference between 83 and 100 is a lot of foreign business all over the board.

### Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman
Goodwill.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
From the goodwill impairment, we definitely -- as we put into the quarterly report, we did the appropriate testing based on all of the governing rules and we had no cause to take a write down in the first quarter.

### Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman
And Matt, it's Ron, with respect to your question about market share, the arithmetic is undeniable. We clearly lost some market share. If the market declined at 7% and we declined it more than 20%. We've commented on this issue before in the sense that Pearson, we believe, has taken some share over the last several quarters and they do it with a very aggressive creative digital strategy, which we have developed responses to.

### Operator
Thank you. Our next question is from the line of Michael Kass of BlueMountain Capital. Please proceed with your question.

### Michael Kass – BlueMountain Capital
Hi. I was wondering if you guys could address with a little bit more specificity maybe in the past your cost structure. Specifically, it looks like cost were relatively flat year-over-year given the revenue decline, I guess, is the sales force overcompensated or are there ways in which it could be retooled when the other large buckets of coffee you guys can take at if the revenue trends don't moderate?

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
Well, let me just comment on the sales force question and then Dean can talk about the rest of the cost structure. The sales force is definitely not overcompensated because if we don't make the numbers they don't make their bonuses.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
And in fact there was a benefit in the quarter related to that, probably $10 million, and likewise on the annual incentive plan, there was no accrual for that at all in the first quarter based on this performance. Now, what offset that is obviously there was an overall merit increase for the company and that's 5000 people roughly. There is the full year impact that we incurred the first quarter of that for people that weren't on

13

CENG0176751

CONFIDENTIAL



Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

board the first quarter last year, but net-net, if you take all of our costs, whether the cost of goods sold, our SG&A, et cetera, the main variance – a 100% or about a $1 million was the impact of the revenue fall through and that makes sense because when this happens, you certainly can't react quick enough with a fixed cost base like we have which is primarily people to offsetting of that.

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
And let me – this is Michael. Let me just add my comment from my perspectives having been here obviously only for seven weeks. One of the things I am squarely focused on in terms of evaluating the business as a whole is clearly if the revenue trends continuing the way we're seeing them, which we do not expect just to be clear on that, we will need to make adjustments to the cost base and we're looking at every conceivable way to do that. But the other element as part of that is not only a reduction of the cost base but also making the cost base more flexible. As Dean mentioned, I mean this is a very high fixed cost business. We do need to look at all conceivable options to make it more flexible. This won't be 100% solution but definitely there are opportunities that we are looking at right now.

### Operator
Thank you. Our next question is from the line of Lance Vitanza of CRT Capital. Please proceed with your question.

### Lance Vitanza – CRT Capital Group
Hi. Thanks for taking the question. I still don't understand why the channel partner issue was specific to you as opposed to the broader industry. I'm presuming that the channel partner is doing business with your competitors as well so maybe that's my mistake. But if so, then why is that partner not reducing inventory with other publishers? And then my related question is you did the – I think a very good job just going through the revenue variance. I'm wondering if you have the same detail for an EBITDA variance. Thanks.

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
I'm happy, Lance, to come back to the question of the channel partner. As Ron mentioned before, this was a very specific dispute with this channel partner and us that we're in the process of settling. So this is not a phenomenon affecting other participants in the industry. And as I've said before, we are in the process of settling. It is a very high priority for me to get this done. Overall, I would say there is definitely in the industry as a whole that channel partners across the board are getting more efficient in managing their inventory and they're managing the inventory downwards in response to the trends that they are seeing with reduced amount in the marketplace. But the specific issue that hit us and hit us only was related to this one dispute.

### Operator
Thank you.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
And as far as, Lance, the EBITDA related to the bridge that I gave you, each of those factors – or each of those items I mean, may have a little bit of a different characteristic but its always very accurate that if you apply to our total business, that

14

CENG0176752



CONFIDENTIAL

*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

the fall through is usually 75% to EBITDA and if you do that math, that's $111 million and the overall EBITDA variance is $116 million. So as it was in revenue, the main issue in the EBITDA is the fall through from the items that impacted revenue.

### Operator
Thank you. Our next question is from Jared Weisman of Oak Hill Advisors. Please proceed with your question.

### Jared Weisman – Oak Hill Advisors
Hi. Thank you very much for taking our questions. The question has to do with liquidity. Do you mind sharing more thoughts – regarding your thoughts on the cash usage over the next 12 months and your plans on plain CapEx and the CapEx as well? Thank you.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Was that Tommy?

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
Yes. That was Tom and Jerry.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Oh, Jared. Sorry, Jared

### Jared Weisman – Oak Hill Advisors
Oh, this is Tommy.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Pardon me?

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
This is Tommy.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Oh, I thought so. I think I know your voice by now.

### Jared Weisman – Oak Hill Advisors
Yes.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Anyway, Tommy, like I said, we obviously aren't projecting that the rest of this year is going to be the rate of first quarter was. We feel that we are going to fixed the things that we inflicted on ourselves and therefore, then the only thing that we can't fix is whatever the markets doing and, as Ron pointed out, the overall market without us wasn't down nearly the way we were. So the cash flow is not going to behave in the next three quarters the way it behaved in Q1. So we think that we have sufficient cash and this - I'm not counting obviously the extra revolver - the older revolver because, obviously, you know as of July it will go down to $300 million. So we've had to look out not just for our own purposes but, obviously, Price Waterhouse has to determine growing concern that isn't just through June, that's through next

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

15

CENG0176753

CONFIDENTIAL



**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

September. And all of our analysis indicates that we will be able to operate the way we need to operate. Obviously, that assumes that we make our numbers and that's what we are all about doing – making our numbers.

### Operator

Thank you. Our next question is from the line of Ian Whittaker of Liberum. Please proceed with your question.

### Ian Whittaker – Liberum Capital

Thank you very much. Three questions please. And the first is really common. The first one is - I just want to pick on what you said about Pearson being very aggressive in their digital tactics. I wonder if you can just explain what you mean by that. Do you mean on price? Do you mean on what they're offering? It would be great to get a bit more clarity. And then the second thing and it also relates to Pearson as well. One thing that they specifically mentioned is they're trying to move away from in higher education from just pure provision of textbooks into the provision of services. So, for example, providing administration and back office support, for example, for higher education institutions. Do you think this is something that you could get into? And also do you actually think it generates that much in revenues or it's really more the margins?

### Ronald G. Dunn – Cengage Learning, Inc. -- Executive Chairman

Well, let me begin, Ian, and talk about what I meant when I spoke of Pearson's digital strategy and we have commented on this before. Pearson was very early to the market with a committed digital strategy. They were well ahead of us and everybody else at the time Cengage Learning was formed in 2007 and they pursued a very cohesive strategy in the intervening five and a half years. So we've been playing catch up across that period. We think that we have the strategy correct. We think we've built the product set now in a way that is appropriate and we're working on aligning all of our resources including sales and marketing with technology and product to compete very effectively.

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer

Let me – this is Michael. Let me take the second part of your question around the services. It is very clear when you spent time with customers that this transition to digital is for many of our institutions easier said than done. Everybody on the service is committed to it but in many cases it takes a fair amount of training. It takes a fair amount of transitioning integration with systems and campuses, et cetera. And therefore, services will become a very important component of driving that transition to digital. In and of themselves, I don't see them as a tremendous revenue source standalone. It's not we want to get into the services businesses but to drive the digital transition, we need to have a good chunk of our revenue come from services to help with that transition for our customers.

### Operator

Thank you. Our next question is from the line of Sami Kassab of Exane. Please proceed with your question.

16

CENG0176754

**CONFIDENTIAL**



*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

### Sami Kassab -- Exane

Good morning, everybody. This is Sami at Exane. Two questions from me. The first one is on with the discussion properly the reason why digital revenues are down this quarter is because your attach rate has come down. Can you comment on why in this quarter other than in another quarter, why is the attach rate not sticky (ph)? Why is the attach rate coming down in this quarter in particular? And secondly, can I ask from all your previous revenues how much -- what proportion do you think can in due course the transition to a (inaudible) type of digital solutions. Do we say at all print revenues that you have to date can we lead to transition to a learning solutions or will be part of them for some reason and not be over to transitions. Thank you, Ron.

### Ronald G. Dunn -- Cengage Learning, Inc. -- Executive Chairman

Good morning, Sami. Well, let me comment first on the question of digital and attach rates. This is really a product mix question. As I said in my earlier comments, we have very sophisticated solutions like Aplia and SAM which have very high attach rates and we have less robust solutions like CourseMate which have lower attach rates. So in the selling season that's delivering the -- that delivered revenues in the last period we had sold more of the lower attached rate product than of the higher attach rate products. Very simple product mix, selling mix issue. Eventually, I think that we will generate digital revenue from a very high percentage of the portfolio. We have already more than 75% of our product portfolio that is covered by one or more digital tools. That number I think will continue to increase in the future. Will it reach 100%? Probably not but I think that we will see the percentage of digital revenue continue to increase over time. It's already hit 40% and will continue to grow.

### Michael Hansen -- Cengage Learning, Inc. -- Chief Executive Officer

And, Stanley, this is Michael, let me add to what Ron is saying. In terms of your referral to Aplia and other homework solutions, I think it is safe to say that we're really only at the beginning of this digital transition in the market space. If you think about Aplia and many of the other solutions that are currently selling in the market, these are homework solutions, meaning they are really adjacent to the core of the textbook. We are now getting into much more sophisticated solutions which we call Course Solutions where the entire course is really digitized and the way that a particular subject is taught is actually changed by the fact that it is now available digitally that you can add very different media to it and really alter the way that a particular subject is taught. That comes back to, you know, this is a fundamental change for professors as well and that's why this takes time and it takes service as I mentioned before.

### Operator

Thank you. Our next question is from John Carver of Bennett Asset Management. Please proceed with your question.

### John Koerber -- Bennett Management

Okay. I'm going to probably ask more than one question. First question, you used to give activation and homework data in a number of online solutions. What were those in the first quarter?

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

CENG0176755

CONFIDENTIAL



*Transcript:*
*Cengage Learning, Inc. (CENL)*
Fiscal 2013 First Quarter Investor Conference Call
November 9, 2012

### Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman

Well, in the first quarter, our curriculum solutions portfolio which is the number that we've quoted before, for the last 12 months ended September 30, we have 3.3 million activations and those students who did those activations then did 96 million online sessions.

### Operator

Thank you. Our next question is from the line of Patrick Schafer of Apollo Capital. Please proceed with your question.

### Patrick Schafer – Apollo Capital

Hi, guys. How are you? Two quick questions, two questions in one maybe a little bit lengthier. I noticed in your financials that you're swapped on your LIBOR runoff at some point in this calendar year. When exactly did those roll off, that is the one quick one. And then need to a little bit more detail, just wondering if you could give a little bit more detail on the mix shift in your digital, you mentioned that in this particular quarter, you sold more of the digital products that was more optional but I just wanted to get a sense of whether that was the teacher or the channel partner deciding that that was a better value proposition whether that was driven from the individual professors not wanting to spend more money or perhaps from kind of your sales team is just focusing on the wrong products.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
### Operator

Hey, Patrick. It's Dean. The swaps roll off at the end of this fiscal year after June 30th, they're not there. They were in for two years.

### Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman

And Patrick, it's Ron. On the digital mix shift again, this is to a very large extent a self-inflicted wound. We sold the wrong products. We had all the products in the mix and the ones that wound up being sold at a higher level were the ones with lower attach rates. That problem will solve itself. As Michael mentioned earlier, we're changing incentives plan for the sales people and every single sales person will carry an incentive that's based on attach rates in the future.

### Operator

Our next question is from the line of Amy Stepnowski of The Hartford. Please proceed with your question.

### Amy Stepnowski – The Hartford Financial

Hi. Could you please tell us what the balance today on your revolving credit and just a followup on the issue of the self-inflicted sales problem? At the end of the fiscal year 2012 on the call in August, the tone was a bit more upbeat with regard to market share and having rectified some of the previous issues. Can you tell us what happened between then and now to have such a material effect?

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

CENG0176756

CONFIDENTIAL



### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
**Operator**
Amy, this is Dean. I'll answer the first question. We have the balance on the revolver is $25 million.

### Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman
Hi, Amy. It's Ron. The difference between then and now is that when we talked about our selling success at that point, we were really talking about adoptions. And in fact, we won the adoptions but as we sold the product into those adoptions, that's where the issue arose because we were selling products with lower attach rates that therefore were bought at lower rates ultimately by the students. So at that time, we were talking about adoption success, now were talking about sell through success.

### Operator
Thank you. Our next question is from the line of Eris Hsiao with Beach Point. Please proceed with your question.

### Eric Hsiao – Beach Point
Hi. Can you kind of talk and give us color for what makes you think the digital channel partners actually could come back for the next selling season?

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
I'm sorry. Could you repeat the question? I couldn't hear it.

### Eric Hsiao – Beach Point
What makes you think the channel partners is going to return for the next selling season?

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
The ongoing discussions that we have with them make me very confident that they will return for the next selling season.

### Operator
Thanks. Our next question is from the line of Thomas Cubeta of UBS. Please proceed with your question.

### Thomas Cubeta – UBS
Hi, guys. In the fourth quarter last year, you paid $20 million domestic incentives for what appear to be $35 million of revenue growth but now that we know that there's actually $38 million pull through and your National Geographic was about $17 million, core is really down to $30 million. What does it have to be justified and waiting for all those back? Secondly, you talked about addressing 2014, can you talk about what tools you actually have to address this? Thanks.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
This is Dean. I'll take the first part of that. The way the plan works – well, first of all, when we talk about the backlog, the backlog did not get shift the year before and everybody got penalized for that because we couldn't get it out the door on June 30th. And that was only because we had the biggest shipping day in the history of the

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

19

CENG0176757

CONFIDENTIAL



*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

company that day but we still had that $54 million in gross leftover. Obviously, we shipped it out the next day and the day after that it was gone. But we still didn't pay bonuses because of that. Now, you can't turn around in a year but we actually do recognize the revenue from that because that's actually when we shipped the books and say that that was an overpayment. So I think that's from a practical standpoint that that's how you have to look at that.

### Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman
And the second point concerning that is that the goal – the original goals for that fiscal year included the National Geographic performance for that.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
That's correct.

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
And I think the second part of the question that Eric had, Dean, could you address about the 2014 maturities. What instruments do we have available to address those?

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Well, I think that you would know all of the things that we have available. We can, obviously, do an A&E, we can do other exchanges, and we can do other bond offerings. I mean at this point, it obviously isn't something that we're going to go out and do tomorrow off of these numbers but the bottom line is where going to avail ourselves of all the tools that we have to take care of the rest of those maturities and we are confident that we will be able to do that.

### Operator
Thank you. Our next question is from the line of Karl Hermann with Babson Capital. Please proceed with your question.

### Karl Hermann – Babson Capital
Thanks, guys. I was wondering if you could maybe list out the top three or five channel distributors that you guys use.

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
Let me address this because now there are been several questions trying to get us to be more specific on that dispute. You guys are all – many of you are shareholders and have an invested interest in the company. I think it would not be a good policy for us to drag these things by whatever methodology that we open. We are resolving them. I am actively in these discussions right now. As soon as we have to resolve them, you will know about this. But if I could ask you for a little bit of patience around that, I would really appreciate this.

### Operator
Thank you. Our next question is from the line of Justin Vanvleck with Linden Advisors. Please proceed with your question.

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

20

CENG0176758

CONFIDENTIAL



*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

### Justin Vanvleck – Linden Advisors

Hi, guys. I was wondering if you could just give us a little bit more color on what you think the cadence of revenue growth will be for the back half of the year. I guess the last three quarters of the year. It sounds like you think the growth or the decline will lessen but any type of incremental color there. I guess the second question would be do you expect to meet your senior secured leverage ratio covenant for the rest of the year?

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer

Hi, it's Dean. The answer to the latter question was we will meet it. We will not exceed it. And I don't mean to be precise. I mean we're not going to have a covenant issue at the end of the year nor would we have a covenant issue by the end of next September either because as I've mentioned earlier from an audit standpoint, from a growing concern standpoint, we have to look out 10 months from the end of the quarter end. Would you repeat the first part of your question?

### Justin Vanvleck – Linden Advisors

More color on the performance for the rest of the year.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer

I think that, obviously, we're going to fix the things that were self-inflicted and that takes care of a lot of what happened in the first quarter but there's still the fact that the overall market was down. So I think that it's going to be - we're going to do everything we can to at least perform at where the market performs, if not better.

### Operator

Our next question is from the line of Steve Bassett of Capitol Hill. Please proceed with your question.

### Steve Bassett – Capital Hill

Could you talk a little bit more about the recommended versus required digital add-ons? You talked about how the salespeople weren't necessarily selling the right thing but I guess the question I have is how much ability do they have to drive professors buying the required product? Was it more professors and students just looking to save incremental costs?

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer

Let me take this and I appreciate the question. The first point is the required types of digital home works take more selling time and face-to-face time with the professors to convince them that this is truly value-added for them and for the students. And what we alluded to before, net selling needs to stop way before the adoption cycle. That needs to start in the summer while you familiarize the professor with the tools, the features, how that makes their life easier, how they can spend more time teaching individual students. So in that respect, it is not just simply a matter of take product A versus product B, but it is a longer process that you need to go through to convince them to adopt those. Once we have seen these adoptions of the stickier more sophisticated home work solutions with these attach rates, what we are seeing is that actually there is a very high retention rate. Professors like it, students like it; it's much more streamlined, much more efficient.

21

CENG0176759

**CONFIDENTIAL**



*Transcript:*
*Cengage Learning, Inc. (CENL)*
Fiscal 2013 First Quarter Investor Conference Call
November 9, 2012

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

**Operator**
Thank you. Our next question is from the line of Peter Gingold with Angelo Gordon.
Please proceed with your question.

**Peter Gingold – Angelo, Gordon**
Hey, guys. Thank you for taking my questions. [Inaudible]

**Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman**
Hey, Peter. Excuse me. We can't hear you. Could you speak up?

**Peter Gingold – Angelo, Gordon**
Sure. Is it better or worse?

**Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman**
That's better, Peter.

**Peter Gingold – Angelo, Gordon**
Great. I know the summer of '11, you talked about MindTap being developed and you
said you had about 500 solutions scheduled in 2012 enrolment period and you had
that [inaudible]

**Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman**
Sorry, Peter. You're really breaking up.

**Peter Gingold – Angelo, Gordon**
I am? Hold on a second. Is this any better?

**Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman**
Much better. Much better.

**Peter Gingold – Angelo, Gordon**
So let me start again. So in 2011, the summer, we got a demonstration of MindTap
from you guys and you mentioned you had I think 500 solutions or courses that you
were scheduling to release for this for 2012 enrolment period. And you had that
magic slide; I call it, where you walk us through the digital transformation and how the
business model would work. I was just trying to get some color on how that actually
played out this period in terms of what you're selling through the MindTap, the core
solution that you had the partnership with Blackboard with and if you could sort of
opine a little bit about how that's coming along that would be helpful. Thanks.

**Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman**
Sure. Well, it has, Peter, unfolded, I'm happy to say, almost exactly as we had
projected that it would. We did in fact beginning the summer launch by 500 MindTap
products into the market. They have not yet had any effect on our revenue because
this is the first season in which we've been able to sell those products. They only
became available in the summertime so the salespeople are selling them right now
but they're selling into the smaller semester, the one that begins in January. So it's
really going to be the fall semester of next year before we begin to see substantive

22

CENG0176760

**CONFIDENTIAL**



effects of having those products in the marketplace and having them sold effectively. The relationship with Blackboard, I'm happy to say has gone very, very well and we are signing up increasing numbers of institutions to use that solution to come to MindTap and our other digital offerings.

**Operator**
Thank you. Our next question is from the line of Matt Swope of Gleacher. Please proceed with your question.

**Matt Swope – Gleacher & Company**
Obviously, your bonds are down a fair amount today. Could you remind us how much room do you have to buyback bonds and whether you consider doing that right now?

**Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer**
Hey, Matt. It's Dean. Obviously, we're giving the first quarter's performance. We have to be even more vigilant in how we spend our cash. And having said that, we'll still be opportunistic in the marketplace when it's appropriate for the company.

**Operator**
Our next question is from the line of Mike Guenere with Nomura. Please proceed with your question.

**Michael Guenere – Nomura Group**
Great, thanks very much. I wanted to just see if I can get a little more comment on the cash structure. First of all, thanks for all the specific language and confidence on the next 12 months and covenants, et cetera. But the tools are no secret, right? And we all know what you have and as investors particularly if one of the senior creditor, you know, you worry about lower levels of profitability given all the central goal and secular trends that you've openly discussed on the call and I guess I'm wondering if the board has or is considering hiring restructuring advisers. But I guess as a senior creditor you worry about a lot of interest being paid out to subordinated creditors. You know when you should have looked at the tools you have available and you know, you got a pretty difficult – pretty difficult challenges ahead of you. So I'm curious on that question, any comments that you have?

**Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer**
Well, Michael, I've said that we are confident that we can make all of our commitments from the capital structure standpoint, debt service, et cetera. And I've also said that we would enough to fund operations and I've even said stretched out through September of next year, not even the end of this year. I also mentioned that our sponsors are very supportive of the company. I can't answer questions that should be directed to them but as you said you know what tools are available to us and I think that if we hit the numbers that we're projecting over the balance of the year, we will not have a problem getting the amount of our maturities pushed out so that we don't have any issues with the springing maturities, the first of which is in April of 2014. There is still runway here. And we want to fix the things that like this in Q1 and then we want to go on and I think we'll be fine. And if there is any discussion of restructuring, they're not being had with me or my colleagues.

**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

23

CENG0176761

**CONFIDENTIAL**



**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

### Operator
Thank you. Our next question is from the line of Nick (inaudible) of Royal Bank of Canada. Please proceed with your question.

### Nick (inaudible) – Royal Bank of Canada
Hi. I was hoping you could share what the fiscal 2012 revenue was relating to the channel partner that you guys are having issues with. And then in terms of bringing them back on and selling through to them in the beginning of 2013, is it anticipated that you're going to have give them favorable pricing or the margins are going to be the same? Any comment there would be great. Thanks.

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
Again, this is Michael, let me take this. I appreciate the interest in the matter but we're not revealing specific revenue information from channel partners because simply we're just prohibited from doing so. This will not have an effect on margin. This is not a dispute about margins and, therefore, I don't expect this having any effect on margins.

### Operator
Thank you. Our next question is from the line of Michael Kass of BlueMountain Capital. Please proceed with your question.

### Michael Kass – BlueMountain Capital
Hi. I was wondering if you guys could clarify what lien in (ph) currency you guys have left?

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
There's nothing left at this point in time based on the numbers where we are and the leverage where we are.

### Operator
The next question is from the line of Brian Hirschfeld with Sankaty Advisors. Please proceed with your question.

### Brian Hirschfeld – Sankaty Advisors
Hi, guys. Thanks for taking the question. I'm wondering a little bit more about the returns. You mentioned a $6 million headwind in terms of additions to your provision for returns and also if you could give us any sense you had six weeks of the new quarter, when would you start to see some impact in terms of lower returns from your channel partners operating more leanly this year as opposed to prior years?

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
Okay. So if I have all the questions, let me take them one by one. The $6 million may sound like a lot and, obviously, we don't like having the $6 million but it's on a base of almost $2 billion because our returns come in over a long tail of 18 months. So you're not just looking at 12 months worth of revenue, you're looking at 18 months worth of revenue. So even a slight uptick in the rate, which was all it was, can cause a fairly more sizeable amount like the $6 million I referenced.

24

CENG0176762

CONFIDENTIAL



*Transcript:*
*Cengage Learning, Inc. (CENL)*
Fiscal 2013 First Quarter Investor Conference Call
November 9, 2012

Because it's an 18 months tail and you just figured we're in the second month coming out of the quarter, if you use September and you can go backwards, we're still very early in that cycle. In the first 12 months, we usually get about 95% of the returns, but it takes at least six to get even to 50% of the returns and that's why there were previous references to. We think that, in theory, we should have less returns, obviously from a volume standpoint, we'll have less whether or not the rate of the return will also go down, we don't know yet. It could but I can't give you any indication of how much and precisely when. I think it's going to be into the third or even may be the very beginning of the fourth quarter before we'll know for sure.

As far as how some of these things are going to impact us in the future, if the channel partners are buying less and then returning less and our net revenues the same, we're indifferent. They're saving money for themselves and we're saving money not having to get the stuff back and put it back in the warehouse, et cetera. So it's a matter of letting this shake out. This is the first quarter where this has happened. As Michael said, were working with these folks as we speak, to get a better understanding of what's going to happen as they try to improve their purchasing process.

**Operator**
Our next question is from the line of Tracey Chu of Jefferies. Please proceed with your question.

**Tracey Chu – Jefferies & Company**
Hey.

**Ronald G. Dunn – Cengage Learning, Inc. – Executive Chairman**
Hello. Hello. I think we lost Tracey.

**Operator**
Our next question is from the line of Melissa Tan of RW Pressprich. Please proceed with your question.

**Melissa Tan – RW Pressprich**
Thanks for taking my call. My first question is on the deferred revenue, you spoke about that – about 17% of your gross sales versus 14% a year ago and I just like to know what your expectation of that gross range going forward. Do you expect that to accelerate or decelerate or be pretty stable for future quarters?

**Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer**
I think at this point in time, other than the slow down a little bit that we experienced overall in the first quarter that it should continue to accelerate because of all the things that both Michael and Ron mentioned. I mean we're focused on the digital component of our business for all of the reasons that they stated. So it should continue to be higher.

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

25

CENG0176763

**CONFIDENTIAL**



*Transcript:*
*Cengage Learning, Inc. (CENL)*
**Fiscal 2013 First Quarter Investor Conference Call**
**November 9, 2012**

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

**Melissa Tan – RW Pressprich**
Okay. Thank you. And just a more bigger picture-wise, I mean you definitely listed out the specific issues that's related to Cengage why the revenue was down for the first quarter, by going forward with, you know, excluding all those events, you do think that for this year going forward that number should be in line with the industry, either decline or growth in that sense?

**Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer**
When I made that comment a little bit earlier I was saying that we would certainly look to do as good as or better than the industry. We are not actually giving guidance on what we think the rest of our year is going to be except to say that as far off as we were in the first quarter, which is a variance that could be big enough for any full year, that we're not going to be up this quarter – this year on revenue or EBITDA.

**Operator**
Thank you. Our next question is from Ian Whittaker of Liberum. Please proceed with your question.

**Ian Whittaker – Liberum Capital**
Hi, sorry. It's just a quick followup question to the early ones. Just on this market share this year and the fact that you have lost share because of one of your competitor has been very aggressive on digital. How much longer do you think that situation will continue and so that when do you think you can actually get back to sort of at least stabilizing loses in market share because of what's happening in digital?

**Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer**
Ian, this is Michael. Let me take that. Again to be clear, you know there's the adoption share in which we are holding our share and then there is a sell through share in which we have lost share for the reasons that we have cited before. The issue around when it's going to stabilize is really driven by product introduction and, you know, what the kinds of products that we are pushing in the market. As I said before, we're very encouraged by MindTap and many of you have seen the demonstration of MindTap. I, as part of my coming on board, have done extensive benchmarking of MindTap against other products that are out in the market and I'm very encouraged by that. And as we are now getting ready to actually sell that product in the market, I would expect that the share loss on the sell through and redirecting the sales force against the appropriate selling of the higher value-added product, I expect this to stabilize. I can't give you a pinpoint answer with regard to when this is exactly going to happen but I feel we have a very competitive product and with the sales force pointing in the right direction, I see no reasons why we shouldn't have our fair share.

**Operator**
Thank you. Our next question is from Jared Weisman of Oak Hill Advisors. Please proceed with your question.

**Jared Weisman – Oak Hill Advisors**
Hi guys. This is Tommy again. Do you mind just walking us through again when you look out going forward, how much of the stabilization you think is predicated on the

26

CENG0176764

CONFIDENTIAL



**Vcall**
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

return being slowing down versus market stabilizing? I just want to go back – if you go back to the organic declines in baby food (ph), excluding the channel partners and all the other things that you broke out specifically which is very helpful, just a little bit more specific would be of help. Thank you.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer

Well, obviously, Tommy, I'll take a stab at it. It's Dean. The backlog is a one-time thing. The year we had the backlog is the only year we ever had a backlog like that. So that was a one off when it was the backlog and it was a one off - it was getting back to normal, not having it. When it comes to any impact of the market in enrollments, obviously, those are things that we don't control. We just try to find ways to take advantage of them. But that's more of a longer-term issue. Michael has indicated on I don't know how many different answers that he believes that we're going to work out and we believe that we are going to work out our issues with our channel partners and so that $30 million that I gave for everything in that category is more of a short-term issue. We're going to fix the things that we didn't execute on properly in the digital performance so that's a temporary item. The adoption cycle in Texas which largely impacted the NGSP but also some of our other school products, you know how the school market works and the adoption some times are on a five or seven-year cycles so that one time good performance was is not going to come around again. But obviously, we're going to try to win the adoptions that are - that are there. Deferred revenue accounting is going to be with us for a long time. Research being off $7 million is obviously still due to the funding environment and the sales return rate increase. We're going to watch it as we go through every quarter and every month like we always do and if indeed, the change in the purchasing behavior with our channel partners comes out the way we think it may, that may come down. So the only thing in that list that I would say is a longer term issue is how the market is being impacted by enrollments particularly the enrollment trends in career.

### Operator

Thank you. Our next question is from John Koerber of Bennett Asset Management. Please proceed with your question.

### John Koerber – Bennett Asset Management

You know, I'm wondering about your trend on capital expenditure over time. If I look at over the five-year – on slide 17, you lump pre-pub and CapEx and software all together and called it CapEx. If you have increased you pre-pub spending over the last five years from $124 million to $186 million and maybe some of that was a catch up but as you talked about a lengthening cycle of adoption, is it possible that you'll be cutting back on that number over time and you know, in the last three years your CapEx has gone from 203 to 258, will you be at the lower end of that range or at the higher end of the range do you think in 2013 and beyond?

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer

John, there are two main issues – or two major issues, maybe three. Number one, that the high water mark that you mentioned we were spending heavily on our ERP for those three years and probably spend upwards at $35-37 million and it's in all of our annual reports how much we spent in each one of those years. If you exclude that in fiscal '09, I think we were around just under 10% in nine-point something as a percent

CENG0176765

CONFIDENTIAL



of revenue and we grew last year excluding the ERP to just over 12% of our revenue and I expect it now obviously, if you take out ERP which is now completed except for some of our foreign regions, which the dollar is related to that or not significant. I believe that overall, as a percent of revenue, CapEx, the high water mark was last year. Now, that doesn't mean that if something comes up that we think is going to drive revenue that we might not keep it up at that 12% level but that will depend on the projects that come before us.

### Operator
Our next question is from the line of Lance Vitanza with CRT Capital. Please proceed with your question.

### Lance Vitanza – CRT Capital Group
Hi. I guess I'm just trying to reconcile the timing and the magnitude of the negative variance in the quarter with you having bought back some $70 million of the unsecured bonds in the open market as recently as I think it was August. Did these – I mean would have these types of things all develop later in the quarter or could you comment on that?

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
August is the biggest month in the quarter and September is the second biggest month in the quarter. And the only part of that list of things that I gave you that we were aware of was obviously, when we closed our books, on June 30, we know that we shipped clean. There is only like $2.7 million left in the backlog which is normal. The rest of the things develop later in the bigger months toward the end of the quarter.

### Operator
Thank you. Our next question is from Scott Vogel of Davidson Kempner. Please proceed with your question.

### Scott Vogel – Davidson Kempner
Yeah, hi. Just a couple. Is the channel partner that you've been talking – that we've been talking about the same company that is asserting the $45 million claim and then secondly, is there any distribution - are there any divestitures on the block? And can you be a little bit more detailed in terms of what investments you're making in the sales force? Thanks.

### Michael Hansen – Cengage Learning, Inc. – Chief Executive Officer
On the first, I'll be happy to answer this. This is Michael. No, they're not the same. They're entirely different issues, entirely different entities.

### Dean D. Durbin – Cengage Learning, Inc. – Chief Financial Officer
On the divestiture front, as we always do, we look at any businesses that are either not producing their fair share of cash based on what their investment needs are, and also any that are not core to our overall business strategies. And we've done that in the past and we've had some divestitures. We'll continue to analyze our portfolio in that same fashion as we go forward and if it makes sense to divest of something, that's what we would do.

Vcall
601 Moorefield Park Dr.
Richmond, VA 23236

Phone: 888-301-5399
Fax: 804-327-7554

info@vcall.com
www.vcall.com
www.investorcalendar.com

28

CENG0176766