Hearing Date:  November 12, 2013 at 8:30 a.m. (prevailing Eastern Time)
Objection Deadline:  November 5, 2013 at 4:00 p.m. (prevailing Eastern Time)

Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-44106 (ESS) |
| | ) | Case No. 13-44105 (ESS) |
| | ) | Case No. 13-44107 (ESS) |
| | ) | Case No. 13-44108 (ESS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF HEARING ON DEBTORS' MOTION
FOR ENTRY OF AN ORDER PURSUANT TO SECTION 363
OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004(f)
AUTHORIZING THE PRIVATE SALE OF CERTAIN REAL PROPERTY
FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES**

**PLEASE TAKE NOTICE** that on October 21, 2013, Cengage Learning, Inc. and its debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), filed the *Debtors' Motion for Entry of an Order Pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 6004(f) Authorizing the Private Sale of Certain Real Property Free and Clear of Liens, Claims, Interests and Encumbrances* (the "***Motion***")[1] with the United States Bankruptcy Court for the Eastern District of New York (the "***Court***").

**PLEASE TAKE FURTHER NOTICE** that any objections or responses to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Eastern District of New York and shall be filed with the Court electronically by registered users of the Court's case filing system, and by all other parties in interest, on a 3.5 inch floppy disk, compact disc or flash drive (preferably in Portable Document Format (PDF), Microsoft Word, or any other Windows-based word processing format) with a hard copy delivered directly to the chambers of the Honorable Judge Elizabeth S. Stong and shall be served **so as to be actually received by no later than November 5, 2013 at 4:00 p.m. (prevailing Eastern Time)** (the "***Objection Deadline***") by the following parties:    (a) the Debtors, Cengage Learning, Inc., 200 First Stamford Place, 4th Floor, Stamford, Connecticut 06902, Attn:  Dean D. Durbin; (b) counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Jonathan S. Henes, Esq. and Christopher Marcus, Esq. and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Ross M. Kwasteniet, Esq. (c) counsel to the statutory committee of unsecured creditors, Arent Fox, 1675 Broadway, New York, New York 10019, Attn.: Andrew I. Silfen, Esq.; (d) counsel to the ad hoc group of holders of certain first lien claims, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase

---

[1]    Capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

Manhattan Plaza, New York, New York 10005, Attn: Gregory Bray, Esq. and Lauren Cohen, Esq.; (e) counsel to the agent under the First Lien Credit Agreement, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, New York 10017, Attn: Damian S. Schaible, Esq. and Darren S. Klein, Esq.; (f) counsel to the indenture trustee for the first lien noteholders, Katten Muchin Rosenman LLP, 575 Madison Avenue, Number 14, New York, New York 10022, Attn: Karen Dine, Esq. and David Crichlow, Esq.; (g) counsel to the indenture trustee for the secured second lien notes, Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 1003, Attn:  Mark R. Somerstein, Esq.; (h) counsel to the indenture trustee for the senior PIK notes, Loeb & Loeb LLP, 345 Park Avenue, New York, New York 10154, Attn:  Walter H. Curchack, Esq.; (i) counsel to the indenture trustee for the senior unsecured notes, Kilpatrick Townsend, 1100 Peachtree Street, NE, Suite 2800, Atlanta, Georgia 30309, Attn:  Todd Meyers, Esq.; (j) the indenture trustee for the senior subordinated discount notes, Bank of Oklahoma, One Williams Center, Tulsa, Oklahoma 74172, Attn: Mary Campbell; (k) counsel to the ad hoc group of holders of certain second lien notes, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036, Attn: Ira Dizengoff, Esq.; (l) counsel to affiliates of Centerbridge Partners, L.P., as holders of certain senior unsecured notes, Jones Day, 222 East 41st Street, New York, New York 10017, Attn: Lisa Laukitis, Esq.; (m) counsel to the prepetition majority equity holders, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attn: Peter Pantaleo, Esq.; (n) the United States Trustee for Region 2, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Susan Golden, Esq. and 271 Cadman Plaza East, Suite 4529, Brooklyn, New York 11201, Attn: Alicia Leonhard, Esq. and William Curtin, Esq.; (o) counsel to Crystal Springs Uplands School, McKenna Long & Aldridge LLP:  (i) One Market Plaza, Spear Tower, 24th Floor, San Francisco, California 94105, Attn: Jennifer Renk, Esq. and

Jennifer Hayes, Esq. and (ii) 230 Park Avenue, Suite 1700, New York, New York 10169, Attn:

Christopher F. Graham, Esq.; and (m) any persons who have filed a request for notice in the

above-captioned cases pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure.

**PLEASE TAKE FURTHER NOTICE THAT** a hearing to consider such Motion and

any objections related thereto will be held before the Honorable Judge Elizabeth S. Stong of the

United States Bankruptcy Court for the Eastern District of New York, 271 Cadman Plaza East,

Courtroom 2554, Brooklyn, New York 11201 on **November 12, 2013 at 8:30 a.m. prevailing**

**Eastern Time**.

Brooklyn, New York  
Dated:  October 21, 2013

/s/ Jonathan S. Henes
_____
Jonathan S. Henes  
Christopher Marcus  
KIRKLAND & ELLIS LLP  
KIRKLAND & ELLIS INTERNATIONAL LLP  
601 Lexington Avenue  
New York, New York 10022  
Telephone:    (212) 446-4800  
Facsimile:    (212) 446-4900  

- and -

James H.M. Sprayregen  
Ross M. Kwasteniet (admitted *pro hac vice*)  
KIRKLAND & ELLIS LLP  
KIRKLAND & ELLIS INTERNATIONAL LLP  
300 North LaSalle  
Chicago, Illinois 60654  
Telephone:    (312) 862-2000  
Facsimile:    (312) 862-2200  

*Counsel to the Debtors and Debtors in Possession*

Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-44106 (ESS) |
| | ) | Case No. 13-44105 (ESS) |
| | ) | Case No. 13-44107 (ESS) |
| | ) | Case No. 13-44108 (ESS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY
## OF AN ORDER PURSUANT TO SECTION 363
## OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004(f)
## AUTHORIZING THE PRIVATE SALE OF CERTAIN REAL PROPERTY
## FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES

Cengage Learning, Inc. ("***Cengage***") and its debtor affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "***Debtors***"), file this motion

seeking entry of an order authorizing the Debtors to sell certain real property.  In support of this

motion, the Debtors respectfully represent as follows:

## Preliminary Statement

1.      The Debtors seek authority to sell certain real property and improvements located

at 6–8 & 10 Davis Drive in the City of Belmont, San Mateo County, California (collectively, the

"***Property***") to Crystal Springs Uplands School ("***Crystal Springs***") for approximately $11

million in cash (the "***Purchase Price***").  The Property comprises approximately 6.47 acres of

land and improvements, including a 61,539 square foot office building and a 22,355 square foot

warehouse building.[1]  The Debtors seek authority to sell the Property free and clear of liens,

claims, interests, and encumbrances (the "***Sale***").

2.      Currently, the Debtors do not use the Property in the operation of their business.

The Property has been vacant for almost four years and currently costs the Debtors

approximately $275,000 in annual carrying costs, including maintenance and taxes.  The Debtors

do not anticipate that selling the Property will negatively impact the Debtors' business.  Rather,

the Sale will allow the Debtors to monetize property that otherwise provides the Debtors with no

operational benefits.  As discussed herein, the Debtors believe that Crystal Springs' offer is the

highest and best consideration the Debtors are likely to receive for the Property.  Accordingly,

the Debtors believe that the Sale to Crystal Springs represents a sound exercise of the Debtors'

business judgment, is in the best interests of their estates, and should be approved.

---

[1]     A legal description of the Property is attached as Exhibit A to that certain Agreement of Purchase and Sale (the "***Purchase Agreement***") attached hereto as **Exhibit A**.  The Property also contains certain fixtures, furniture, and equipment that the Debtors believe have nominal value, which will be conveyed to Crystal Springs.

## **Background**

3.     The Debtors are a leading global provider of high-quality content, innovative print and digital teaching and learning solutions, software, and associated educational services for the higher-education, research, school, career, professional, and international markets.  The Debtors are the second largest publisher of course materials in U.S. higher education, with strong positions across all major disciplines, and are a leading global provider of library reference materials, with a vast collection of primary source content.

4.     On July 2, 2013, each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United Sates Code (the "***Bankruptcy Code***").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On July 3, 2013, the Court entered an order [Docket No. 31] authorizing the joint administration and procedural consolidation of these chapter 11 cases pursuant to rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***").  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases. On July 10, 2013, the U.S. Trustee appointed the Creditors' Committee [Docket No. 68].

## **Jurisdiction**

5.     The United States Bankruptcy Court for the Eastern District of New York (the "***Court***") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

6.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory bases for the relief requested herein are section 363 of the Bankruptcy Code, Bankruptcy Rule 6004(f), and rule 6004-1 of the Local Bankruptcy Rules for the Eastern District of New York (the "***E.D.N.Y. Local Bankruptcy Rules***").

**Relief Requested**

8.      The Debtors seek entry of an order (the "***Order***") in the form attached hereto as **Exhibit B**, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 6004(f), authorizing the Debtors to sell the Property to Crystal Springs free and clear of liens, claims, interests, and encumbrances and pay related broker fees and closing costs.

**Prior Marketing and Proposed Sale**

9.      The Debtors currently have no use for the Property, which sits vacant.  The layout of the Property is not well-suited for any office space configuration useful to the Debtors. Further, if the Debtors maintain ownership of the Property, they will continue to incur carrying costs, including maintenance and tax expenses, for real estate that does not benefit their operations.  Based on the foregoing, the Debtors determined that selling the Property would maximize its value.  Thus, since 2011, the Debtors and their advisors have explored potential sale options for the Property.

10.     With the assistance of Colliers International ("***Colliers***"), a highly regarded international broker, the Debtors conducted a thorough marketing process.  Beginning in 2011, the Debtors contacted potential interested parties and explored their interest in purchasing the Property.  In 2011, Crystal Springs and Cengage entered into a purchase and sale agreement that was not consummated due to the inability to obtain the local authority's approval to re-zone the Property to accommodate a school.  In early 2013, Colliers began re-soliciting bids for the Property and requested proposals from multiple interested buyers.  The Debtors received proposals from and entered into negotiations with seven (7) viable bidders.  Ultimately, Crystal Springs again submitted a high bid that did not include a re-zoning contingency, and was thus superior to the other offers the Debtors had received in both price and terms, including a higher

4

security deposit, fewer contingencies, and a shorter closing period.  Given the proposed purchase price of approximately $11 million, the Debtors expect to realize net proceeds of approximately $9.9 million after deducting broker fees and other standard closing costs.

11.     The Debtors determined that Crystal Springs' $11 million offer is fair and reasonable and should be approved by the Court for two primary reasons.  *First*, the Debtors do not currently use the Property.  Thus, the Debtors could dispose of and monetize the Property without impacting their ongoing business operations.  *Second*, the Sale will yield net proceeds of approximately $9.9 million (after taking into account approximately $1.1 million of broker fees and closing costs) (all such net proceeds generated by the Sale, the "***Proceeds***"), which was the highest and best offer received after a fulsome marketing process led by Colliers.  Accordingly, the Debtors moved ahead to finalize and document the Sale, and now seek approval of the Purchase Agreement and to carry out the transactions contemplated therein.

### Summary of Proposed Sale Terms

12.     The following is a summary of the material terms of the Purchase Agreement:[2]

| | |
|---|---|
| **Seller:** | Cengage Learning, Inc. |
| **Buyer:** | Crystal Springs Uplands School |
| **Acquired Assets:** | 6.47 acres of real property, including a 61,539 square foot office building and a 22,355 square foot warehouse building. |
| **Purchase Price:** | $11,000,000, of which $500,000 was deposited into an escrow account within two business days after the Purchase Agreement was executed and the remaining amount will be payable in cash at the Closing. |

---

[2]     This summary is for informational purposes only.  In the event of any inconsistency between this summary and the Purchase Agreement, the Purchase Agreement shall control in all respects.  Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Purchase Agreement.

**Closing:**  The closing of the Sale, pursuant to the Purchase Agreement, subject to Court approval, will take place on the later of (a) fifteen days after entry of the Order, or (b) November 12, 2013 (the "***Closing***").

**Title**:  At Closing, the Debtors will deliver to Crystal Springs a Grant Deed to be recorded in the Official Records of San Mateo County, California, and such other documents as are reasonable and necessary to close the transaction and convey title to the Property.

## Basis for Relief

### I.  The Sale Is A Sound Exercise Of The Debtors' Business Judgment And Should Be Approved.

13.  Section 363(b)(1) of the Bankruptcy Code empowers a debtor-in-possession, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate."  To approve a sale under section 363(b)(1) of the Bankruptcy Code, the Second Circuit requires a debtor to show that the decision to sell the property outside of the ordinary course of business was based on the debtor's business judgment.  *See In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1066 (2d Cir. 1983) (same); *In re Brooklyn Hosp. Ctr.*, 341 B.R. 405, 410 (Bankr. E.D.N.Y. 2006); *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998) (recognizing that the standard to approve transactions under section 363(b)(1) of the Bankruptcy Code is the "business judgment test"); *In re Dial-A-Mattress Operating Corp.*, Case No. 09-41966 (DEM), 2009 WL 1851059, at *5 (Bankr. E.D.N.Y. June 24, 2009) (same); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (noting that standard for determining a section 363(b) motion is a "good business reason"); *Official Comm. of Subordinated Bondholders v. In re Integrated Res., Inc. (In*

*re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (upholding debtor's decision so

long as it was attributable to "any rational business purposes").

14.    The business judgment rule shields a debtor's management from judicial second-

guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he

Code favors the continued operation of a business by a debtor and a presumption of

reasonableness attaches to a Debtor's management decisions.").  The business judgment rule is

satisfied where "the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action taken was in the best interests of the company." *Integrated Res.*,

147 BR. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)). In fact, "[w]here

the debtor articulates a reasonable basis for its business decisions (as distinct from a decision

made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's

conduct." *Johns-Manville Corp.*, 60 B.R. at 616.

15.    Based on these principles, the Court should grant this motion.  *First*, the Debtors'

do not use the Property.  As such, the Debtors determined that a sale of the Property would

maximize its value.  *Second*, after an extensive marketing process and after engaging in good

faith, arms-length negotiations with Crystal Springs, the parties agreed on the form of the

Purchase Agreement under which the Debtors will receive Proceeds of approximately $9.9

million, an amount which exceeds the amount the Debtors would have realized from the next

highest offer and satisfies the Debtors' view of the fair value of the Property.  Based on these

factors, the Debtors concluded that Crystal Springs' proposed purchase price for the Property

was fair and reasonable.  Because a sound business reason exists for the Sale, fair and reasonable

consideration is provided, the transaction has been proposed and negotiated in good faith, and

adequate and reasonable notice will have been provided, the proposed Sale is based on the

Debtors' sound business judgment and should be approved.  *See Lionel*, 722 F.2d at 1071 (setting forth the "sound business purpose" test).

## II.    The Proposed Sale Is Appropriate Pursuant To Bankruptcy Rule 6004(f).

16.    Bankruptcy Rule 6004(f)(1) authorizes a debtor to sell estate property outside of the ordinary course of its business by private sale or public auction.  Private sales by a debtor outside of the ordinary course of business are appropriate where the debtor demonstrates that the sale is permissible pursuant to section 363 of the Bankruptcy Code.  *See, e.g.*, *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (trustee has ample authority to conduct a sale of estate property through private sale); *see also In re Schipper*, 933 F.2d 513, 514 (7th Cir. 1991) (private real estate sale by debtor approved when purchase price was the same as independent appraisal); *In re Pritam Realty, Inc.*, 233 B.R. 619, 624 (D.P.R. 1999) (upholding bankruptcy court order approving private sale by debtor); *In re Adamson*, 312 B.R. 16, 22 (Bankr. D. Mass. 2004) (approving private sale by debtor).

17.    The Debtors have determined that a private sale of the Property to Crystal Springs is in the best interests of their estates and their stakeholders.  A public auction would cause delay and require the Debtors' estates to incur substantial additional costs, and the Debtors do not believe an auction would result in additional value sufficient to justify the incurrence of such costs.  Moreover, with the help of Colliers, the Debtors already have solicited bids from several different potential purchasers and have selected the highest bidder.  Accordingly, because of their marketing process already run to date, the Debtors do not believe a higher and better sale is likely and the Debtors submit that a private sale of the Property to Crystal Springs is appropriate under the circumstances.

III.    **The Sale Free And Clear Of Liens And Other Interests Is Authorized By Section 363(f) of the Bankruptcy Code.**

18.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Because these requirements are listed in the disjunctive, the Debtors only need to satisfy one of the five requirements to permit the Property to be sold "free and clear" of liens and interests.  *See In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); *see also In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991).

19.    Other than the Permitted Exceptions (as defined in the Purchase Agreement), the Debtors believe that the only third-party interests in the Property are the liens of:  (a) JPMorgan Chase Bank, N.A., as Collateral Agent, and The Bank of New York Mellon, as Indenture Trustee, (the "***First Lien Secured Parties***") securing the Debtors' prepetition first lien financings; (b)  CSC Trust Company of Delaware as second lien trustee (together with the First Lien Secured Parties, the "***Secured Parties***"); and (c) Civil Engineering Associates, Inc., a California corporation ("***Civil Engineering***"), which liens are described more fully in **Exhibit 1**

to **Exhibit B**. In the event the Debtors are able to obtain such parties' consent, section 363(f)(2) of the Bankruptcy Code will be satisfied. Further, any existing interests in the Property will be adequately protected by such interests attaching to the Proceeds. *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free and clear of third-party interests, the third party is adequately protected if his interest is assertable against the proceeds of the disposition."). Accordingly, the Debtors request authority to transfer the Property to Crystal Springs free and clear of liens, claims, interests, and encumbrances, other than the Permitted Exceptions, with any such liens, claims, interests, and encumbrances, including the liens of the Secured Parties and Civil Engineering, attaching to the Proceeds.

IV.    **Crystal Springs Is a Good Faith Purchaser and Is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code.**

20.    Section 363(m) of the Bankruptcy Code provides that "[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith[.]" While good faith is not specifically defined in the Bankruptcy Code, the Second Circuit has stated that:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings … A purchaser's good faith is lost by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Gucci*, 126 F.3d 380, 390 (2d Cir. 1997) (internal quotations omitted).

21.    The Purchase Agreement and its terms are the product of good faith, arm's-length negotiations. There is no indication of fraud or any improper insider dealing. Further, the consideration from Crystal Springs for the Property is fair and reasonable. Accordingly, the

Debtors request that the Court enter an order entitling Crystal Springs to the full protections of section 363(m) of the Bankruptcy Code as a good faith purchaser of the Property.

## Motion Practice

22.     This motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this motion.  Accordingly, the Debtors submit that this Motion satisfies E.D.N.Y. Local Bankruptcy Rule 9013-1(a).

## Notice

23.     The Debtors have provided notice of this motion to:  (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the agent under the Debtors' prepetition senior secured credit facility; (d) the indenture trustees under the Debtors' prepetition secured first lien notes, secured second lien notes, senior unsecured notes, senior PIK notes, and senior subordinated discount notes; (e) counsel to the ad hoc group of holders of certain first lien claims; (f) the United States Attorney for the Eastern District of New York; (g) the Internal Revenue Service; (h) Crystal Springs; (i) all applicable state and local taxing authorities; (j) the United States Environmental Protection Agency; (k) the California Environmental Protection Agency; (l) Civil Engineering; and (m) all parties entitled to receive notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## No Prior Request

24.     No prior request for the relief sought in the motion has been made to this or any other court.

*[Remainder of Page Left Intentionally Blank]*

11

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper and enter an Order substantially in the form of **Exhibit B** attached hereto.

Brooklyn, New York
Dated: October 21, 2013

*/s/ Jonathan S. Henes*

Jonathan S. Henes
Christopher Marcus
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

# **<u>Exhibit A</u>**

## **Purchase Agreement**

## AGREEMENT OF PURCHASE AND SALE

by and between

**CENGAGE LEARNING, INC.,**
a Delaware corporation,

as Seller

and

**CRYSTAL SPRINGS UPLANDS SCHOOL,**
a California corporation

as Buyer

DATED AS OF OCTOBER 3, 2013

## AGREEMENT OF PURCHASE AND SALE

THIS AGREEMENT OF PURCHASE AND SALE (this "**Agreement**") is entered into as of the 3rd day of October, 2013, by and between CENGAGE LEARNING, INC., a Delaware corporation ("**Seller**") and CRYSTAL SPRINGS UPLANDS SCHOOL, a California corporation ("**Buyer**").

## R E C I T A L S:

WHEREAS, Seller is the owner in fee simple of certain land and improvements thereon located in Belmont, California, having a street address of 10 Davis Drive and 6-8 Davis Drive, Belmont, California, which real property is more fully described in Exhibit "A" attached hereto and incorporated herein by this reference (the "**Real Property**"), together with any and all easements, rights-of-way, privileges and appurtenances, and rights to same, belonging to and inuring to the benefit of the Real Property, and the owner of certain personal property (the "**Personal Property**") and intangible property (the "**Intangible Property**") described in the bill of sale attached hereto as Exhibit "D" and incorporated herein by this reference. The Real Property, the Personal Property and the Intangible Property are sometimes collectively referred to herein as the "**Property**"; and

WHEREAS, Seller desires to sell the Property to Buyer, and Buyer desires to purchase the Property from Seller, all upon the terms and conditions hereinafter set forth in this Agreement.

NOW, THEREFORE, Seller and Buyer do hereby covenant, agree, represent and warrant, as follows:

1.     **Sale of Property**. Subject to the terms and conditions set forth in this Agreement, Seller agrees to sell the Property to Buyer, and Buyer agrees to buy the Property from Seller, for the Purchase Price (as defined in Section 2).

2.     **Purchase of Property**.

    **2.1.1**   **Purchase Price and Deposit**. The purchase price for the Property (the "**Purchase Price**") shall be $11,000,000.00 payable as follows:

    a.     $500,000.00 within two (2) Business Days of the Effective Date (the "**Deposit**") shall be deposited by Buyer with Escrow Holder in accordance with Section 2.2 herein and shall be credited to Buyer at Closing; and

    b.     The balance of the Purchase Price to be delivered by Buyer at Closing (as defined in Section 5) in cash, by wire transfer of immediately available funds to an escrow account established with the Escrow Holder, less or plus the net closing adjustment due to or from Buyer, if any, as provided in Sections 5.3 and 5.4.

1



**2.1.2  Independent Consideration.** Buyer shall deposit into Escrow, concurrently with and in addition to the Deposit, the amount of One Hundred Dollars ($100.00) (the "**Independent Consideration**"). The Independent Consideration shall be non-refundable to Buyer as independent consideration for the rights and options extended to Buyer hereunder, including, without limitation, the right and option to terminate this Agreement as provided herein. The Independent Consideration shall be disbursed to Seller immediately following Buyer's deposit thereof into Escrow. In all instances under this Agreement in which Buyer elects to terminate or is deemed to have terminated this Agreement and the Deposit is returned to Buyer, Seller shall retain the Independent Consideration when the Deposit is returned to Buyer. The Independent Consideration shall not be applicable to the Purchase Price or treated as consideration given by Buyer for any purpose other than as provided herein. Buyer and Seller hereby acknowledge and confirm that they have had an opportunity to review this provision with their respective, independent counsel.

**2.2.  Escrow Account for Deposit.**

**2.2.1.  Deposit.** The Deposit and Independent Consideration shall be delivered by Buyer to Commonwealth Land Title Insurance Company (the "**Escrow Holder**") c/o Fidelity National Title Company located at the street address 601 California Street #1501, San Francisco, CA 94108 (Attention: Rita ~~two (2)~~ Lin, Vice President and Branch Manager, Fidelity National Title Company, telephone number: 415-837-2312, facsimile number: 415-837-2311) ~~one (1)~~ Business Day after the Effective Date, and the Deposit shall be deposited by Escrow Holder in an insured money market account or other similar interest bearing account for the benefit of the Buyer and Seller subject to the terms and conditions of this Agreement and pursuant to Section 10 hereof and the Independent Consideration shall be disbursed to Seller.

**3.    Representations and Warranties.**

**3.1.  Seller's Representations and Warranties.** Seller represents and warrants to Buyer, which representations and warranties shall be true and correct as of the date hereof and as of the Closing that:

**3.1.1.** Seller is duly organized, validly existing and in good standing under the laws of the state of its formation and has all requisite power, authority and legal right to execute, deliver and perform the terms of this Agreement. Subject to the Seller Approval, defined in Section 11.19 hereof, this Agreement constitutes valid and legally binding obligations of Seller enforceable in accordance with its respective terms. Subject to the Seller Approval, all requisite corporate action has been taken by Seller in connection with Seller's execution of this Agreement, the agreements, instruments, or other documents to be executed by Seller pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby.

**3.1.2.** Subject to the Seller Approval, the individuals executing this Agreement and the agreements, instruments, or other documents to be executed by Seller pursuant to this Agreement on behalf of Seller each have been duly authorized to bind Seller to the terms and conditions hereof and thereof. Subject to the Seller Approval, upon execution and delivery by Seller, this Agreement, and each of the

2

agreements, instruments or other documents to be delivered by Seller to Buyer in accordance with this Agreement, shall be binding upon and enforceable against Seller in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, and other principles relating to or limiting the right of contracting parties generally.

**3.1.3.**   Except for the Seller Approval, no consent, approval or authorization by any individual or entity or any court, administrative agency or other governmental authority is required in connection with the execution and delivery of this Agreement or the consummation of the transactions contemplated by this Agreement by Seller other than those consents, approvals and authorizations which shall be obtained by Seller prior to Closing.  The consummation of the transactions contemplated by this Agreement will not result in a breach of, or constitute a default under, any mortgage, deed of trust, bank loan, credit agreement or other instrument to which Seller is a party or by which Seller may be bound or affected.

**3.1.4.**   To Seller's knowledge, except for the Seller Approval, defined in Section 11.19 hereof, the execution and delivery of this Agreement and the consummation of the transaction contemplated hereby does not and will not result in a default (or an event which, with the giving of notice or the passage of time, would constitute a default) under, any material instrument or obligation to which Seller is a party or by which Seller is bound, or violate any law, order, writ, injunction or decree of any court or regulatory agency with jurisdiction over Seller or the Property.

**3.1.5.**   To Seller's knowledge, there are no pending or threatened legal actions, suits, or other legal or administrative proceedings against the Property or that would affect the ability of Seller to perform its obligations under this Agreement except the Bankruptcy Action (hereinafter defined).

**3.1.6.**   To Seller's knowledge, other than the Permitted Exceptions, there are no unrecorded liens or encumbrances materially and adversely affecting marketable title to the Property that cannot be released at Closing by the payment of a portion of the Closing proceeds.

**3.1.7.**   Seller is not a "foreign person" within the meaning of IRC Section 1445(f)(3).  The sale of the Property is exempt from the withholding requirements imposed by California Revenue and Taxation Code Section 18662.

**3.1.8.**   Except for the Bankruptcy Action, no proceedings under any federal or state bankruptcy or insolvency laws have been commenced by or against Seller that have not been terminated; no general assignment for the benefit of creditors has been made by Seller; and no trustee or receiver of Seller's property has been appointed.

**3.1.9.**   To Seller's knowledge, Seller has not received written notice of any condemnation, environmental, zoning, sewer moratorium, or other land-use regulation proceedings, which would affect the existing use and operation of the Property, nor has Seller received written notice of any special assessment proceedings affecting the Property.

{Client Files/RMF/AGT/00254281.DOC ver 5}



**3.1.10.** There are no leases, subleases, licenses or other occupancy agreements (or other parties in possession) with respect to the Property.

**3.1.11.** No parties have a right or any options to purchase the Property.

**3.1.12.** To Seller's knowledge, there are no contracts, leases, licenses or agreements not terminable in thirty (30) days or less which Seller is a party that would materially impair the rights of Buyer and which will survive or otherwise be enforceable against Buyer with respect to the Property following the Closing Date.

**3.1.13.** To Seller's knowledge, there are no tax reduction proceedings pending or threatened against the Property.

**3.1.14.** If, prior to the Closing, Seller becomes aware of any fact or circumstance that would materially change a representation or warranty of Seller in this Agreement (i.e., any such representation would not be true if remade at Closing) and would constitute a material adverse change in the Property or its future use or operation, then Seller shall promptly, and in all events at least five (5) days prior to the close of escrow (which date shall be extended if necessary to give Buyer five days to review such material change), give written notice of such changed fact or circumstance to Buyer. If, prior to close of escrow, upon Seller's notice or otherwise, Buyer becomes aware of the untruth or inaccuracy of, facts or circumstances that would change materially, any representation or warranty of Seller in this Agreement (i.e., any such representation would not be true if remade at Closing) and would constitute a material adverse change in the Property or its future use or operation, then Buyer shall have the option of: (i) waiving such untrue representation or warranty or material adverse change and completing its purchase of the Property pursuant to this Agreement; (ii) reaching agreement with Seller to adjust the terms of this Agreement to compensate Buyer for such change (it being agreed that Buyer and Seller shall not be obligated to reach any such agreement and may refuse to do so each in their sole discretion); or (iii) terminating this Agreement and receiving the return of the Deposit provided, however, (x) in the event the changed facts and circumstances in such representation are within Seller's control, the portion of the Deposit previously released to Seller shall also be returned to Buyer and (y) in the event the changed facts and circumstances affecting such representation are not in Seller's control, the portion of the Deposit previously released to Seller shall be retained by Seller, as Buyer's sole remedy prior to Closing. As used herein, "to Seller's knowledge" shall mean the actual personal knowledge of Stephen Gibson, the Vice President, Real Estate, of the Seller, but without any investigation or inquiry.

**3.2.** **Buyer's Representations and Warranties**. Buyer represents and warrants to Seller, which representations and warranties shall be true as of the date hereof and at Closing, that:

**3.2.1.** **Due Formation and Authorization**. Buyer is duly organized, validly existing and in good standing under the laws of the state of its formation and has all requisite power, authority and legal right to execute, deliver and perform the terms of this Agreement. This Agreement constitutes valid and legally

4

T.S.

binding obligations of Buyer enforceable in accordance with its respective terms. All requisite corporate action has been taken by Buyer in connection with Buyer's execution of this Agreement, the agreements, instruments, or other documents to be executed by Buyer pursuant to this Agreement, and the consummation of the transactions contemplated hereby and thereby.

**3.2.2.** The individuals executing this Agreement and the agreements, instruments, or other documents to be executed by Buyer pursuant to this Agreement on behalf of Buyer each have been duly authorized to bind Buyer to the terms and conditions hereof and thereof. Upon execution and delivery by Buyer, this Agreement, and each of the agreements, instruments or other documents to be delivered by Buyer to Seller in accordance with this Agreement, shall be binding upon and enforceable against Buyer in accordance with their respective terms, except to the extent that such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, and other principles relating to or limiting the right of contracting parties generally.

**3.2.3.** **Consent**. No consent, approval or authorization by any individual or entity or any court, administrative agency or other governmental authority is required in connection with the execution or delivery of this Agreement or the consummation of this transaction by Buyer other than those consents, approvals and authorizations which will have been obtained by Closing.

## 4. **Conditions Precedent.**

**4.1.** **Conditions Precedent to Obligations of Buyer**. The obligations of Buyer under this Agreement are, at Buyer's option, subject to the fulfillment of the following conditions at or prior to the Closing:

**4.1.1.** **Delivery of Documents**. Seller having delivered, or having caused to be delivered, to Escrow Holder those items listed in Section 5.1 of this Agreement.

**4.1.2.** **Performance**. Seller performing and complying in all material respects with each and all of the covenants, agreements, terms and conditions to be performed and complied with by Seller prior to and at the Closing pursuant to the provisions of this Agreement.

**4.1.3.** **Representations and Warranties**. The representations and warranties set forth in Section 3.1 hereof being true and accurate in all material respects as of the Closing.

**4.1.4.** **Title**.

(a) As of the Closing, Commonwealth Land Title Insurance Company's (the "**Title Company**") irrevocable commitment to issue, upon the sole condition of the payment of its regularly scheduled premium, an American Land Title Association owner's form policy of title insurance (the "**Owner's Title Policy**"), insuring Buyer in the amount of the Purchase Price that title to the Property is vested of record in Buyer as of the Closing Date, subject only to the following matters (collectively, the "**Permitted Exceptions**"):

5




T.S.

(i)      subject to Section 4.1.4(b) below, the covenants, easements, restrictions, and agreements of record affecting the Property listed on Exhibit "B" attached hereto and incorporated herein by this reference, and all other covenants, easements, restrictions, and agreements of record affecting the Property that are hereby deemed to be Permitted Exceptions;

(ii)      the standard printed exclusions and exceptions in the form of the Owner's Title Policy;

(iii)      any restriction or limitations imposed or to be imposed by governmental authority, including the zoning and planning rules and regulations of the City of Belmont, California;

(iv)      any state of facts that would be shown by an accurate survey and/or physical inspection of the Property; and

(v)      the waiver in the form of Exhibit "L" attached hereto and made a part hereof ("Waiver") of certain restrictions contained in the Declaration of Restrictions (the "Declaration"), shown as Exception Number 5 for Parcel One in that certain Preliminary Report dated February 14, 2011 issued by the North American Title Company (the "Preliminary Report") which Declaration was recorded on March 11, 1965 as Instrument No. 25711-X in Book/Reel 4911, Page/Image 134 of the Official Records of San Mateo County, California.

(b)      Seller shall be obligated to remove or bond over all monetary exceptions to title (meaning mortgages and deeds of trust, mechanics liens and judgments) other than non-delinquent real property taxes prior to the Closing. Seller may utilize the closing proceeds to satisfy such monetary exceptions to title.

(c)      If, at or before the Closing, it should appear that the Property is affected by any outstanding interest or question of title which arises or is discovered after the Effective Date, which renders title unmarketable or not insurable at standard premium rates and as to which Buyer is not obliged to take subject to and in accordance with the terms of this Agreement and Buyer notifies Seller that Buyer objects thereto, and if such interest or question of title may, according to reasonable expectations, be removed as an objection to title within thirty (30) days from the Closing Date, the Seller may adjourn the Closing Date for a period of thirty (30) days for such purpose. If such title defect or title insurance issue shall be incapable of cure by Seller notwithstanding its best efforts to do so, Buyer may, in its sole discretion, and as its sole remedy, elect to (i) terminate this Agreement, and upon such termination, the entire Deposit shall be returned to the Buyer including all amounts of the Deposit that have been previously released from Buyer to Seller, or (ii) proceed to closing in accordance with the applicable provisions of this Agreement without adjustment to the Purchase Price. In the event Buyer elects to proceed to Closing, such defects shall be deemed Permitted Exceptions.

### 4.1.5.  "As Is" Condition.
Buyer has had an opportunity to inspect the Property and accepts the property in its "as is" condition. Within three (3) Business Days of the

6

{Client Files/RMF/AGT/00254281.DOC ver 5}

T.S,

Effective Date, Seller shall deliver to Buyer a Natural Hazards Disclosure Report with respect to the Property (the "Report"). Upon receipt of the Report, Buyer shall acknowledge that (a) Buyer received the Report, (b) Buyer read and understands the Report, (c) any hazards described in the Report may limit Buyer's ability to develop the Property, to obtain insurance or to receive assistance after a disaster, (d) the maps on which the disclosures contained in the Report are based estimate where natural hazards exist and are not definitive indicators of whether or not a property will be affected by a natural disaster, and (e) Buyer had the opportunity to obtain professional advice regarding the hazards described in the Report and any other hazards that may affect the Property.

**4.1.6.    Contracts**. Attached hereto as Exhibit "H" and incorporated herein by this reference is a list of all management, maintenance and service agreements for the management, maintenance and operation of the Property (the "**Service Agreements**"). To the extent that they are assignable, the Service Agreements shall be assigned by Seller to Buyer only if Buyer elects, by written notice, on or before the Effective Date to accept same. As to any Service Agreements that Buyer does not elect to assume, Seller shall cause such Service Agreements to be terminated as of the Closing.

**4.1.7    Title Company and Escrow Holder Documents.** Seller delivering to the Title Company (as defined hereinafter) and Escrow Holder all documents and information reasonably required of Seller by the Title Company and Escrow Holder for the issuance of the Owner's Title Policy and the closing of the transaction contemplated under this Agreement.

**4.1.8    Final Order of Approval.** Seller shall have received and delivered to Buyer and to Title Company a Final Order of Approval, as defined in Section 11.19 of this Agreement, and any other order, decrees and consents of the Bankruptcy Court, as defined in Section 11.19 of this Agreement, which may be required by the Title Company to close the transaction contemplated under this Agreement.

**4.2.    Conditions Precedent to Obligations of Seller**. The obligations of Seller under this Agreement are, at Seller's option, subject to the fulfillment of the following conditions at or prior to Closing:

**4.2.1.    Performance**. Buyer performing and complying with each and all of the covenants, agreements, terms and conditions to be performed and complied with by Buyer prior to and at the Closing pursuant to provisions of this Agreement;

**4.2.2.    Representations and Warranties.** The representations and warranties set forth in Section 3.2.1 hereof being true and accurate in all material respects as of the Closing;

**4.2.3.    Purchase Price.** Buyer delivering the balance of the Purchase Price to Escrow Holder no later than one (1) Business Day prior to the Closing Date;

7


T.S.

**4.2.4. Closing Documents.** Buyer delivering to Escrow Holder (i) an executed assignment and assumption of leases, contracts and entitlements substantially in the form attached hereto as Exhibit "E" (the "**Assignment of Leases**"), (ii) a bill of sale to the Personal Property and the Intangible Property substantially in the form attached hereto as Exhibit "D" (the "**Bill of Sale**"); and (iii) a true copy of Buyer's Articles of Incorporation and By-laws as well as a Secretary's Certificate signed by the Secretary of Buyer as to incumbency, resolution approving this transaction and due authority of the officers of the Buyer executing this Agreement and the related closing documents on behalf of Buyer; and

**4.2.5. Title Company Documents.** Buyer delivering to the Seller, Title Company and Escrow Holder all documents and information reasonably required of Buyer by the Title Company and Escrow Holder for the issuance of the Owner's Title Policy and the closing of the transaction contemplated under this Agreement.

**4.3. As Is.** The sale of the Property by Seller to Buyer is being made in its "AS-IS" condition, WITH ALL FAULTS, IF ANY AND WITH NO REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) BY SELLER WHATSOEVER (other than as expressly set forth in this Agreement) including, without limitation, that Seller is making no representation or warranty as to physical condition, title, fitness, environmental condition, the Leases (as defined in Exhibit "E" of this Agreement), tenants, access, permits, entitlements, fitness for any particular purpose, merchantability, design, quality, operation or income, compliance with drawings or specifications, absence of defects, absence of hazardous or toxic substances, absence of faults, flooding, or compliance with laws and regulations including, without limitation, those relating to health, safety, and the environment, or any other matter relating to the Property. Buyer agrees that it is not relying on Seller for any of the foregoing and that, if any materials are delivered by or on behalf of Seller to Buyer relating thereto, such materials shall have no effect and cannot be relied upon as being true, accurate or complete. Buyer acknowledges that Buyer has entered into this Agreement with the intention of making and relying upon its own investigation of the physical, environmental, economic use, compliance, and legal condition of the Property and, except for the representations specifically set forth in this Agreement, Buyer is not now relying, and will not later rely, upon any representations and warranties made by Seller or anyone acting or claiming to act, by, through or under or on Seller's behalf concerning the Property except as specifically set forth in this Agreement. Buyer, for itself and any entity affiliated with Buyer, waives and releases Seller and its employees, agents, officers, trustees, directors and shareholders from and against any claims, demands, penalties, fines, liabilities, settlements, damages, costs or expenses of whatever kind or nature, known or unknown, existing and future, contingent or otherwise made, incurred, or suffered by Buyer or any entity affiliated with Buyer relating to the presence, misuse, use, disposal, release or threatened release of any hazardous or toxic materials, chemicals or wastes at the Property and any liability or claim related to the Property arising under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, and the Toxic Substance Control Act, all as amended, or any other cause of action based on any other state, local, or federal environmental law, rule or regulation, provided, however, the foregoing release shall not operate to release any claim by Buyer against any person or entity other than described above in this paragraph.

8

T.S.



The provisions of this paragraph shall survive indefinitely any Closing or termination of this Agreement and shall not be merged into the Closing documents.

     **5.**    <u>Closing</u>. Subject to the satisfaction or waiver of the conditions set forth in Section 4 hereof, the consummation of the purchase and sale of the Property (the "**Closing**") shall take place on the date (the "**Closing Date**") which is the later of: (a) fifteen (15) days after the issuance of a Final Order of Approval with respect to the transaction contemplated by this Agreement by the United States Bankruptcy Court, and (b) November 12, 2013. The closing shall be conducted through an escrow with the Escrow Holder.

     **5.1.**    <u>Deliveries at Closing</u>. Seller shall deliver, or cause to be delivered, to Escrow Holder on or before the Closing Date all of the following:

     (a)    Grant Deed substantially in the form attached hereto as <u>Exhibit "C"</u> (the "**Deed**") to the Real Property duly executed and acknowledged by Seller and in recordable form;

     (b)    the Bill of Sale duly executed by Seller;

     (c)    the Assignment of Leases duly executed by Seller;

     (d)    a certification of non-foreign status substantially in the form attached hereto as <u>Exhibit "F"</u> (the "**FIRPTA Certificate**") duly executed by Seller;

     (e)    such other customary documentation as is reasonably required by the Title Company (as defined in <u>Section 4.1.4</u>) in order to consummate the transactions contemplated hereby;

     (f)    all files, books and records pertaining to the operation of the Property which are in Seller's possession or control;

     (g)    keys for the Property in Seller's possession, including the keys for any individual unit or leased space and any office, storage or other facilities used in connection with the Property;

     (h)    possession of the Personal Property;

     (i)    a certificate regarding representations and warranties as described in <u>Section 4.1.3</u> substantially in the form attached hereto as <u>Exhibit "K"</u> duly executed by Seller; and

     (j)    the Waiver duly executed by Seller, as the case may be.

     **5.2.**    <u>Recording; Delivery of Deed and Closing Duties</u>.

     (a)    Subject to the fulfillment of the conditions set forth in <u>Section 4</u> hereof and the deliveries contemplated by <u>Section 5.1</u>, the parties shall direct the Title Company to immediately cause the Deed with respect to the Real Property to be recorded in the Office of the County Clerk of San Mateo County, California, deliver the

9

T.S.



Owner's Title Policy to Buyer as soon after the Closing as is practicable, and to take all other actions as reasonably necessary to close the transaction contemplated by this Agreement.

(b)    Escrow Holder shall deliver to Buyer the Bill of Sale, the Assignment of Leases, and all other documents and items provided to Escrow Holder in accordance with Section 5.1 above, and copies of all Title Company and Escrow Holder documents prepared in connection with the Closing of the transaction contemplated under this Agreement.

(c)    Escrow Holder shall deliver to Seller the Deposit, the balance of the Purchase Price (subject to adjustments and prorations), the Bill of Sale, the Assignment of Leases and copies of all Title Company and Escrow Holder documents prepared in connection with the Closing of the transaction contemplated under this Agreement.

5.3.    **Closing Costs**.  Seller shall pay (a) all San Mateo County documentary transfer taxes, (b) 50% of any applicable City transfer taxes, (c) all of its own attorneys' fees and expenses in connection with the transactions contemplated by this Agreement, (d) one-half of all Escrow Holder's fee, and (e) any recording fees for the removal of Seller liens and encumbrances against the Real Property.  Buyer shall pay (i) 50% of any applicable City transfer taxes, (ii) one-half of all Escrow Holder's fee; (iii) all title fees including, without limitation, the cost of the Owner's Title Policy and any endorsements thereto, (iv) the cost of recording the Deed to the Real Property, (v) all of its own attorneys' fees and expenses in connection with the transactions contemplated by this Agreement, and (vi) survey costs.  All other fees, costs and expenses, if any, associated with the transactions contemplated by this Agreement and not otherwise expressly set forth in this Section 5.3, shall be paid in accordance with the customs of San Mateo County.

5.4.    **Prorations**.  Seller and Buyer shall cooperate to produce on or before the Closing Date a schedule of prorations as complete and accurate as reasonably possible.  All prorations which can be liquidated accurately or reasonably estimated as of the Closing Date shall be made in escrow on the Closing Date.  All other prorations, and adjustments to initial estimated prorations, shall be made by Buyer and Seller with due diligence and cooperation within thirty (30) days following the Closing Date, or such later time as may be required to obtain the necessary information for proration.  Any net credit due one party from the other as a result of such post-closing prorations and adjustments shall be paid by the other in cash immediately upon the parties' written agreement to a final schedule of post-closing prorations and adjustments. Seller and Buyer shall prorate with the following clarifications and exceptions:

(a)    The following are to be apportioned as of 12:01 a.m., P.S.T., on the Closing Date:

(i)    Real Property and Personal Property taxes upon the Property for the current calendar or fiscal year shall be prorated as of the Closing Date, Seller's pro rata portion of such taxes shall be based upon taxes actually assessed for the current calendar or fiscal year.  If, for any reason, such taxes for the current calendar year have not been assessed on the Property, such proration shall be estimated based upon

10

T-3.



such taxes for the immediately preceding calendar or fiscal year, and thereafter adjusted when actual amounts become available;

           (ii)     Water charges, storm water charges and sewer charges on the basis of the calendar year for which assessed;

           (iii)     Fuel, including steam, oil and coal, if any, at the price charged therefor by Seller's supplier;

           (iv)     Amounts paid or payable under service contracts and similar agreements affecting the Property; and

           (v)     Rents, not in arrears, and any prepaid rent under the Leases and proposed leases approved by Buyer pursuant to <u>Section 7.1</u> hereof (the **"Approved Leases"**).

           (b)     Buyer shall be credited at Closing with an amount equal to the security deposits, if any, in connection with the Leases and any Approved Leases, or Seller shall turn such security deposits over to Buyer at Closing.

           (c)     All charges for electric and gas service supplied to the Property prior to the Closing Date shall be the obligation of Seller, and Seller agrees to pay the invoices rendered in connection with such services promptly upon receipt thereof, whether such receipt is received before or after the Closing.

           (d)     If there is a water meter on the Property, Seller shall furnish a reading or readings to a date not more than three days before the Closing Date and the unfixed meter charge and sewer rent, if any, shall be apportioned on the basis of such last reading.

           (e)     Seller shall have the option to credit Buyer as an adjustment of the cash portion of the Purchase Price with the amount of any unpaid water charges and sewer rents, together with any interest and penalties thereon.

           (f)     Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal or calendar year during which the Closing occurs shall be apportioned between Seller and Buyer, after deducting reasonable expenses of collection thereof; provided, that Buyer shall not be obligated to pay Seller its share of the same to the extent that Buyer determines, in the exercise of its reasonable judgment, that tenants under the Leases or Approved Leases are entitled to the same and Buyer pays the same to such tenants.

           (g)     Any errors or omissions in computing apportionments at the Closing shall be corrected as soon after discovery as possible.  The provisions of this <u>Section 5.4</u> shall survive the Closing for a period of twelve (12) months.

           (h)     Seller shall forthwith turn over to Buyer any rental, additional rental and any other amounts received by Seller in respect of the Property at any time after the Closing and properly allocable to the period after the Closing.  Buyer shall forthwith turn over to the Seller any rental, additional rental and other amounts

11

{Client Files/RMP/AGT/00254281.DOC ver 5}

T-S.



received by Buyer in respect of the Property and properly allocable to the period prior to the Closing. Seller shall have the right to pursue any delinquent rents for the period up to the Closing Date provided Seller shall not have the right to commence any dispossess actions against such tenants.

**5.5.** Filing of Reports. Title Company shall be solely responsible for the timely filing of any reports or returns required pursuant to the provisions of Section 6045(e) of the Internal Revenue Code of 1986 (and any similar reports or returns required under any state or local laws) in connection with the closing of the transaction contemplated in this Agreement

**6.** <u>Notice.</u> All notices and communications to any party hereunder shall be in writing and shall be deemed properly given if delivered personally, sent by registered or certified mail, postage prepaid, by facsimile or by Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery, to the following addresses or at such other address as such party may specify from time to time by notice to the other parties:

Seller:              Cengage Learning, Inc.
                     1120 Birchmount Road
                     Toronto, Ontario
                     Canada
                     M1K 5G4
                     Attention: Stephen P. Gibson
                                 Vice President
                     Fax: (416) 750-6656

12

T. S.



| With a copy to: | Cengage Learning, Inc. |
| | 200 First Stamford Place |
| | Stamford, CT 06902 |
| | Attention: Richard M. Vicenzi, |
| | Vice President and Senior Counsel |
| | Fax: 203-965-8509 |

and

| With a copy to: | Levett Rockwood P.C. |
| | 33 Riverside Avenue |
| | Westport, Connecticut 06880 |
| | Attention: Regina M. Flaherty, Esq. |
| | Fax: 203-226-8025 |

| Buyer: | Crystal Springs Uplands School |
| | 400 Uplands Drive |
| | Hillsborough, CA 94010 |
| | Attention: Tony Stayner and Amy Richards |
| | Fax: 650-342-7623 |

| With a copy to: | McKenna Long & Aldridge LLP |
| | One Market Plaza, Spear Tower, 24th Floor |
| | San Francisco, CA 94105 |
| | Attention: Jennifer Renk, Esq. |
| | Kenneth Tze, Esq. |
| | Fax: 415-356-4610 |

Any notice so given by mail shall be deemed to have been given as of the date of delivery (whether accepted or refused) established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be. Any such notice given by facsimile shall be deemed given as of the time sent as shown on the confirmation. Any such notice not so given shall be deemed given upon receipt of the same by the party to whom the same is to be given.

7.    **Leasing and Service Contracts.**

7.1.    **Proposed Agreements.** From the Effective Date hereof through Closing, provided Buyer is not in default under this Agreement, and except with respect to proposed leases or service contracts which Seller is required by law to execute, prior to signing any proposed lease, amendments and modifications to existing leases (other than lease extensions or renewals that are required pursuant to leases of the Property existing as of the Effective Date) or service contract (other than service contracts which are cancelable as of the Closing) affecting the Property (each, a **"Proposed Agreement"**), Seller shall submit a Proposed Agreement to Buyer for Buyer's approval. Buyer shall notify Seller in writing of Buyer's approval or disapproval of each Proposed Agreement submitted to Buyer within seven (7) Business Days after Buyer's receipt thereof. Buyer's failure to approve or disapprove any Proposed

13

{Client Files/RMF/AGT/00254281.DOC ver 5}

T-S.

Agreement within such period specified in this Section 7.1 shall conclusively be deemed to constitute Buyer's approval of such Proposed Agreement. Any notice of disapproval of a Proposed Agreement by Buyer shall set forth Buyer's specific objections thereto and Seller shall not be permitted to enter into any disapproved Proposed Agreements. Seller may submit a Proposed Agreement to Buyer for approval after Seller's execution thereof, provided such Proposed Agreement contains appropriate conditions regarding Buyer's approval of such Proposed Agreement.

      **7.2.**    **Leasing Costs.** From the Effective Date, and provided this Agreement has not been terminated prior to Closing, Buyer shall be solely responsible for all costs associated with any proposed lease approved by Buyer in accordance with Section 7.1 above, including, but not limited to, any leasing commissions or tenant costs associated with any lease extensions or expansions or new lease entered into after the Effective Date. Buyer shall execute any agreements requested by Seller to acknowledge and affirm Buyer's obligations with respect to such costs.

      **8.**    **Condemnation, Destruction or Damage Prior to Closing.** This Agreement shall be governed by the Uniform Vendor and Purchaser Risk Act as set forth in Section 1662 of the California Civil Code as supplemented and modified by this Article 8.

      (a)    Damage. In the event of loss or damage to the Property or any portion thereof which is not "Major" (as hereinafter defined), this Agreement shall remain in full force and effect provided that Seller shall, at Seller's option, either (a) perform any necessary repairs, or (b) assign to Buyer all of Seller's right, title and interest in and to any claims and proceeds Seller may have with respect to any casualty insurance policies or condemnation awards relating to the premises in question. In the event that Seller elects to perform repairs upon the Property, Seller shall use reasonable efforts to complete such repairs promptly and the date of Closing shall be extended a reasonable time in order to allow for the completion of such repairs. If Seller elects to assign a casualty claim to Buyer, the Purchase Price shall be reduced by an amount equal to the greater of the deductible damage amount under Seller's insurance policy or the cost of such repairs (provided that in the event of uninsured damage, such reduction in the Purchase Price shall equal the estimated cost of such repairs). Upon Closing, full risk of loss with respect to the Property shall pass to Buyer.

      (b)    Major Damage. In the event of a "Major" loss or damage, Buyer may terminate this Agreement by written notice to Seller, in which event the Deposit and any portions of the Deposit that has been released to the Seller shall be returned to Buyer. If Buyer does not elect to terminate this Agreement within fifteen (15) days after Seller sends Buyer written notice of the occurrence of such Major loss or damage (which notice shall state the cost of repair or restoration thereof as opined by an architect in accordance with Section 8.(c) hereof), then Buyer shall be deemed to have elected to proceed with Closing, in which event Seller shall, at Seller's option, either (a) perform any necessary repairs, or (b) assign to Buyer all of Seller's right, title and interest in and to any claims and proceeds Seller may have with respect to any casualty insurance policies or condemnation awards relating to the premises in question. In the event that Seller elects to perform repairs upon the Property, Seller shall use reasonable efforts to complete such repairs promptly and the date of Closing shall be extended a reasonable time in order to allow for the completion of such repairs. If Seller elects to assign a

14

T.S.



casualty claim to Buyer, the Purchase Price shall be reduced by an amount equal to the greater of the deductible amount under Seller's insurance policy or the cost of such repairs (provided that in the event of uninsured damage, such reduction in the Purchase Price shall equal the estimated cost of such repairs). Upon Closing, full risk of loss with respect to the Property shall pass to Buyer.

(c)    Definition of "Major" Loss or Damage. For purposes of this Section, "Major" loss or damage refers to the following: any loss due to a casualty or condemnation that has an estimated value of $1,500,000 or more. The determination of "Major" loss or damage shall be made by an architect mutually reasonably approved by Buyer and Seller.

(d)    Buyer shall be bound to purchase the Property for the Purchase Price as required by the terms of this Agreement without regard to the occurrence or effect of any damage to or destruction of the improvements on the Property, provided (i) that such damage or destruction is covered by insurance; (ii) that upon the Closing Buyer shall receive a credit against the Purchase Price in the amount of any insurance proceeds collected by Seller as a result of any such damage or destruction; and (iii) that Seller shall assign to Buyer all of Seller's rights to such insurance proceeds as shall not have been collected prior to the Closing.

## 9.    Default.

**9.1.    LIQUIDATED DAMAGES - DEPOSIT.** EXCEPT AS OTHERWISE PROVIDED IN SECTION 4 OF THIS AGREEMENT AND SUBJECT TO THE PROVISIONS CONTAINED HEREIN, IF THE SALE OF THE PROPERTY TO BUYER IS NOT CONSUMMATED DUE TO A FAILURE BY BUYER TO PERFORM BUYER'S OBLIGATIONS UNDER THIS AGREEMENT, SELLER SHALL BE ENTITLED TO RETAIN THE DEPOSIT AS SELLER'S LIQUIDATED DAMAGES. THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE AND EXTREMELY DIFFICULT TO ASCERTAIN THE ACTUAL DAMAGES SUFFERED BY SELLER AS A RESULT OF BUYER'S FAILURE TO COMPLETE THE PURCHASE OF THE PROPERTY PURSUANT TO THIS AGREEMENT, AND THAT UNDER THE CIRCUMSTANCES EXISTING AS OF THE DATE OF THIS AGREEMENT, THE LIQUIDATED DAMAGES PROVIDED FOR IN THIS SECTION REPRESENTS A REASONABLE ESTIMATE OF THE DAMAGES WHICH SELLER WILL INCUR AS A RESULT OF SUCH FAILURE, PROVIDED, HOWEVER, THAT THIS SECTION SHALL NOT WAIVE OR AFFECT SELLER'S RIGHTS AND BUYER'S INDEMNITY OBLIGATIONS UNDER OTHER SECTIONS OF THIS AGREEMENT. THE PARTIES ACKNOWLEDGE THAT THE PAYMENT OF SUCH LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER IN THE EVENT OF A FAILURE BY BUYER TO PERFORM. BUYER AND SELLER AGREE THAT SELLER'S RIGHT TO RETAIN THE DEPOSIT SHALL BE THE SOLE REMEDY OF SELLER AT LAW IN THE EVENT OF A BREACH OF THIS AGREEMENT BY BUYER.

Accepted and agreed to:

Buyer _____

5

T. S.

Seller_____

**9.2.    Buyer's Pre-Closing Remedies.**  In the event Seller fails to perform any material act required to be performed by Seller pursuant to this Agreement on or before the Closing, then Buyer shall execute and deliver to Seller written notice of such material breach, which notice shall set forth complete information about the nature of the material breach.  Seller shall have a period of ten (10) Business Days to cure such material breach.  If such material breach remains uncured beyond the ten (10) Business Day period described above, then Buyer's sole and exclusive remedy shall be to cancel this Agreement, in which event the Deposit and portions thereof which have been released to Seller shall be returned to Buyer; provided, however, that in the event such material breach is not capable of being cured by Seller within such ten (10) business-day period, Seller shall not be considered in breach hereunder so long as Seller diligently pursues the cure of such material breach.

**9.3.    Specific Performance.**  In lieu of Buyer's right to terminate this Agreement in accordance with Section 9.2 above and to receive the Deposit from Seller, in the event Buyer is ready, willing and able to purchase the Property from Seller and Buyer is not in default of this Agreement, Buyer shall have the right to pursue specific performance on account of Seller's failure to sell the Property to Buyer pursuant to this Agreement.

**9.4.    No Contesting Liquidated Damages.**  As material consideration to each party's agreement to the liquidated damages provisions stated above, each party hereby agrees to waive any and all rights whatsoever to contest the validity of the liquidated damage provisions for any reason whatsoever, including, but not limited to, that such provision was unreasonable under circumstances existing at the time this Agreement was made.

**9.5.    Limitation on Seller's Liability.**  Buyer agrees that its sole and exclusive remedies against Seller under this Agreement are limited to either (a) the return of the Deposit, or (b) specific performance, as more fully set forth in this Article 9. Further, Buyer agrees that in no event shall Buyer (i) be entitled to, seek or obtain any other damages of any kind, including, without limitation, consequential, indirect or punitive damages or (ii) seek or obtain any recovery or judgment against any of Seller's other assets (if any) or against any of Seller's investment advisors, directors, officers, employees or shareholders.

**10.    Escrow.**

**10.1.**        The  Deposit under this Agreement shall be delivered to the Escrow Holder within the time limit specified in Section 2.1.1 of this Agreement to be held in escrow.  Escrow Holder shall hold the Deposit in escrow and shall dispose of same only in accordance with the provisions of this Agreement.

**10.2.**    Escrow Holder will deliver the Deposit or portions thereof to Seller or Buyer, as the case may be, upon the following conditions:

16

T.S.



(a)    To Seller at the Closing upon the consummation thereof in accordance with this Agreement; or

(b)    To Buyer in the event Seller gives Buyer written notice that Seller is unable to provide the Seller Approval or in the event Buyer elects to terminate this Agreement pursuant to Section 11.19 after (i) the Motion Submission Date due to Seller's failure to file a motion seeking a Final Order of Approval on or before the Motion Submission Date, or (ii) the Outside Date due to Seller's failure to provide the Seller Approval on or before the Outside Date; or

(c)    To Seller upon receipt from Seller of written demand thereof, stating that Buyer has defaulted in the performance of this Agreement and the facts and circumstances underlying such default subject to the terms and conditions of this Agreement; provided, however, that Escrow Holder shall not honor such demand until five (5) Business Days after Escrow Holder shall have mailed a copy of such demand to Buyer, nor thereafter if Escrow Holder shall have received written notice of objection from Buyer in accordance with the provisions of Section 10.3 of this Agreement; or

(d)    To Buyer, upon receipt from Buyer of written demand therefor, stating that (x) this Agreement has been terminated and that Buyer is entitled under this Agreement to the return of the Deposit or (y) Seller has materially defaulted in Seller's performance required pursuant to this Agreement and the facts and circumstances underlying such default subject to the terms and conditions of this Agreement; provided, however, that Escrow Holder shall not honor such demand until more than five (5) Business Days after Escrow Holder has mailed a copy of such demand to Seller, nor thereafter if Escrow Holder shall have received written notice of objection from Seller in accordance with the provisions of Section 10.3 of this Agreement.

**10.3.**    Upon receipt of a written demand for the Deposit or portions thereof by Buyer or Seller, pursuant to subsections (c) or (d) of Section 10.2 of this Agreement, Escrow Holder shall promptly mail a copy of such demand to the other party. The other party shall have the right to object to the delivery of the Deposit by filing written notice of such objection with Escrow Holder at any time within ten (10) days after the receipt of such copy to such other party, but not thereafter. Such notice shall set forth the basis for objection to the delivery of the Deposit or portions thereof. Upon receipt of such notice, Escrow Holder shall promptly mail a copy thereof to the party who filed the written demand.

**10.4.**    In the event Escrow Holder shall have received the notice of objection provided for in Section 10.3 above and within the time therein prescribed, Escrow Holder shall continue to hold the Deposit until (i) Escrow Holder receives written notice signed by both Seller and Buyer directing the disbursement of said Deposit in which case Escrow Holder shall then disburse said Deposit in accordance with said direction or (ii) in the event of litigation between Seller and Buyer, Escrow Holder shall deposit the Deposit with the Clerk of the Court in which said litigation is pending; or (iii) Escrow Holder takes such affirmative steps as Escrow Holder may, at Escrow Holder's option, elect in order to terminate Escrow Holder's duties as Escrow Holder,

17



including but not limited to deposit of the Deposit in Court and the institution of an action in interpleader, the costs thereof to be borne by whichever of Seller or Buyer is the losing party.

**10.5.** Escrow Holder may act upon any instrument or other writing believed by it, in good faith, to be genuine and to be signed and presented by the proper person, and shall not be liable in connection with the performance of any duties imposed upon Escrow Holder by the provision of this Agreement and any modification of this Agreement except for Escrow Holder's own willful default or gross negligence. Escrow Holder shall have no duties or responsibilities except those set forth herein. Escrow Holder shall not be bound by any modification of this Agreement unless the same is in writing and signed by Buyer and Seller and if Escrow Holder shall have given prior written consent thereto. In the event that Escrow Holder shall be uncertain as to Escrow Holder's duties or rights hereunder, or shall receive instructions from Buyer or Seller which, in Escrow Holder's opinion, are in conflict with any of the provisions hereof, Escrow Holder shall be entitled to hold and disburse the Deposit pursuant to Section 10.4 above and may decline to take any other action.

**10.6.** Escrow Holder shall deposit the Deposit in an insured money market account or other similar interest bearing account. At Closing, the Deposit together with interest earned thereon shall be delivered to Seller and such Deposit shall be treated as a credit against the Purchase Price.

**10.7.** Seller and Buyer hereby agree to jointly and severally indemnify and hold Escrow Holder harmless from any damage, cost, liability or expense (including, but not limited to, reasonable legal fees) which Escrow Holder may incur by reason of its action hereunder without prejudice to any right either party may have to recover from the other party for any such damage, cost, liability or expense, except that this indemnity shall not apply in the event the damage, cost, liability or expense is caused by or arises from Escrow Holder's gross negligence or willful misconduct.

**10.8.** Duties of Escrow Holder:

(a)    Seller and Buyer agree that Escrow Holder is an escrow holder and is responsible for:

(i)    the prompt presentation for collection of the Deposit, to the extent the same is paid by check;

(ii)    the safekeeping of the Deposit;

(iii)    delivery of the Deposit and interest accrued thereon in accord with the terms of this Agreement; and

(iv)    any and all other duties and actions reasonably necessary or required of an escrow officer or holder to facilitate the transactions and the closing contemplated by and under this Agreement, or as reasonably requested by Buyer or Seller with the transactions contemplated by and under this Agreement.

18

T-2



(b)    Escrow Holder shall not be required to determine questions of fact or law, and may rely upon any instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Holder, after due inquiry of the parties hereto, in good faith shall believe to be genuine, to have been signed or presented by the person or party purporting to sign or present the same and to conform to the provisions of this Agreement.

(c)    Escrow Holder shall not be responsible to Buyer and Seller, or to either of them, except in the case of Escrow Holder's gross negligence or willful misconduct.

(d)    In the event that a dispute shall arise with respect to any matter pertaining to the Deposit under this Agreement, Escrow Holder is authorized by the parties to pay the Deposit into a court of competent jurisdiction in the County of San Mateo, State of California, and thereafter and thereby Escrow Holder shall be deemed discharged from any further obligation under this Agreement.

## 11.    Miscellaneous.

**11.1.    Entire Agreement.** This Agreement supersedes any prior agreement, oral or written, and contains the entire agreement among Seller and Buyer with respect to the subject matter hereof. No subsequent agreement, representation or promise made by any party hereto, or by or to any employee, officer, agent or representative of any party, shall be of any effect unless it is in writing and executed by the party to be bound thereby. This Agreement shall not create any rights in any third party and may be amended by the parties hereto as set forth herein without liability to any third party.

**11.2.    Further Assurances.** Each of Seller and Buyer shall, whenever and as often as it shall be requested to do so, cause to be executed, acknowledged or delivered any and all such further instruments and documents as may be reasonably necessary or proper in order to carry out the intent and purpose of this Agreement.

**11.3.    Construction.** This Agreement shall be construed as a whole and in accordance with its fair meaning. Captions and organizations are for convenience only and shall not be used in interpreting this Agreement or construing meaning. Whenever the words "including", "include" or "includes" are used in this Agreement or the Closing documents, they shall be interpreted in a non-exclusive manner as though the words "without limitation" immediately followed the same. Masculine, feminine, or neuter gender and the singular and the plural number, shall each be considered to include the other whenever the context so requires. If any party consists of more than one person, each such person shall be jointly and severally liable.

**11.4.    No Waiver.** The waiver by any party of the performance of any covenant, condition or promise shall not invalidate this Agreement, nor shall it be construed a waiver by any other party or of any other covenant, condition or promise. The waiver by any party of the time for performing any act shall not be considered a waiver of the time for performing any other act or an identical act required to be

19

J.-J.

performed at a later time. No waiver shall be enforceable against any party unless signed by such party in writing.

**11.5.** <u>Governing Law</u>. This Agreement shall be construed in accordance with and governed by the laws of the State of California.

**11.6.** <u>Counterparts</u>. This Agreement may be executed in any number of counterparts all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

**11.7.** <u>Controversy</u>. In the event of any controversy, claim or dispute between the parties hereto affecting or relating to the purposes or subject matter of this Agreement, the prevailing party or parties shall be entitled to recover from the non-prevailing party or parties all of its expenses, including, without limitation, attorneys' fees and cost, including without limitation, any such fees or costs arising out of any appellate proceedings or any bankruptcy proceedings affecting Seller, Buyer or the Property.

**11.8.** <u>References</u>. References in this Agreement to Sections, Exhibits or Schedules shall refer to sections, exhibits and schedules to this Agreement unless the context requires otherwise. All Exhibits and Schedules to this Agreement are hereby incorporated into this Agreement in their entirety by this reference.

**11.9.** <u>Confidentiality</u>. (a) Each of Seller and Buyer shall keep the terms of this Agreement strictly confidential and shall not disclose or permit its employees or agents to disclose the terms of this Agreement (except for reasonably necessary disclosures to its attorneys, accountants, lenders and investors and the filing of this Agreement with the Bankruptcy Court in connection with the motion to obtain a Final Order of Approval).

(b)    Buyer agrees to keep confidential any of the documents, material or information regarding the Property supplied to Buyer by Seller or by any third party at Seller's request, and the results of Buyer's inspections, investigations or tests including, without limitation any environmental site assessment reports furnished to Buyer except to Buyer's consultants, prospective lenders, investors, financial advisors, attorneys and any permitted assignees of this Agreement on a "need to know" basis, unless Buyer is compelled to disclose such documents, material or information by law or by subpoena. Buyer agrees to indemnify and hold harmless Seller from and against any and all losses, damages, claims and liabilities of any kind (including, without limitation, reasonable attorneys' fees) arising out of Buyer's breach of this Section 11.9(b). In the event that the Closing does not occur in accordance with the terms of this Agreement, Buyer shall return to Seller all of the documents, material or information regarding the Property supplied to Buyer by Seller or at the request of Seller. The provisions of this Section 11.9(b) shall survive the termination of this Agreement but shall no longer be applicable following Closing in accordance with the terms of this Agreement. Notwithstanding the foregoing, the provisions of this Section 11.9(b) shall not apply to any information which is within the public domain.

20

T-3.



**11.10. Time of the Essence.** Time is of the essence of this Agreement.

**11.11. Third Party Exchanges.** Buyer and Seller agree to cooperate with each other in order for Seller and/or Buyer to accomplish a real estate exchange pursuant to Section 1031 of the Internal Revenue Code, provided such exchanges do not cause Buyer or Seller to incur any liability, do not require Buyer or Seller to take title to any other property, do not delay the Closing and do not cause Buyer or Seller to incur any additional cost or expense, other than nominal expense for their attorneys to review any applicable documents.

**11.12. No Brokers.** Each of Seller and Buyer represents and warrants that it has dealt with no broker, finder or other person or entity in connection with the transactions contemplated by this Agreement other than Colliers International, as Seller's agent, and The Trafton Group, as Buyer's agent (collectively, the **"Brokers"**), and each shall indemnify and hold harmless the other against any liability, claim, loss, damage, cost or expense (including attorney's fees and disbursement) suffered as a result of the foregoing representation being or being alleged to be false. Seller shall pay Brokers pursuant to a separate agreement. Notwithstanding anything to the contrary contained in this Agreement, the indemnification obligations set forth herein shall survive the Closing and shall not be merged with the Deeds, and shall survive the termination of this Agreement prior to the Closing.

**11.13. Survival.** Unless otherwise specifically provided in this Agreement, all warranties, representations, covenants, obligations and agreements contained in this Agreement shall not survive the Closing hereunder. All warranties and representations shall be effective regardless of any investigation made or which could have been made.

**11.14. WAIVER OF TRIAL BY JURY.** TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

**11.15. No Offer.** Submission to Buyer by Seller of this Agreement for review and execution by Buyer shall confer no rights nor impose any obligations on any party unless and until both Buyer and Seller shall have executed this Agreement and duplicate originals thereof have been delivered to the respective parties hereto.

**11.16. Successors and Assigns; Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Buyer may not assign its rights or obligations hereunder without the written consent of Seller, which shall not be unreasonably withheld in the case of an assignment to an entity controlled by the Buyer. Seller may assign all or any part of its rights or obligations hereunder without the consent of Buyer. In the event of an

21

T- S.



assignment, the assigning party shall not be released from any obligations hereunder due to such assignment.

**11.17. Effective Date.** The "**Effective Date**" as used in this Agreement shall be the date on which the last party of Seller and Buyer to sign executes this Agreement.

**11.18. Business Day.** The term "**Business Day**" as used in this Agreement means any day other than (a) a Saturday or Sunday, and (b) any day on which national banks are authorized to close.

**11.19. Subject to Approval.** Seller's obligations under this Agreement are subject to the receipt by Seller of the approval by the United States Bankruptcy Court for the Eastern District of New York (the "**Seller Approval**"). Seller is the debtor in a Chapter 11 bankruptcy filing in the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**") captioned In re Cengage Learning, Inc., et al., Case Nos. 13-44106, 13-44105, 13-44107 and 13-44108 (the "**Bankruptcy Action**"). Seller shall use commercially reasonably efforts to obtain the Seller Approval as soon after the Effective Date as is reasonably practicable and shall provide notices to Buyer when the Seller Approval has been obtained and/or is denied. Notwithstanding anything contained herein to the contrary, Seller shall on or before November 15, 2013 ("**Motion Submission Date**"), file a motion with the Bankruptcy Court seeking a final order of approval of the Bankruptcy Court with respect to the transaction contemplated under this Agreement ("**Final Order of Approval**") and shall use commercially reasonable efforts to obtain such Final Order of Approval by no later than January 31, 2014 (the "**Outside Date**"). In the event the Final Order of Approval shall be contested or appealed, Seller and Buyer shall use their commercially reasonable efforts to defend such an action or appeal. Notwithstanding anything to the contrary set forth herein, nothing herein shall negate or limit the requirement of a finding that the Buyer is entitled to the protection afforded to good faith purchasers under Section 363(m) of the United States Bankruptcy Code, 11 U.S.C. §§101 et seq. Any breach by Seller of any Seller's obligations under this Section 11.19 or the failure to obtain a Final Order of Approval on or before the Outside Date shall permit Buyer to immediately terminate this Agreement upon written notice to Seller and Buyer shall be entitled to the return of the Deposit in accordance with Section 10.2 of this Agreement.

[Signatures on next page]

22

T.-S.



IN WITNESS WHEREOF, Seller and Buyer have caused this Agreement to be executed as of the date first above written.

**SELLER:**

CENGAGE LEARNING, INC.,
a Delaware corporation

Date executed by Seller:                     By:  _____

_____                          Name: Dean D Durbin
                                             Its: Chief Financial Officer

**BUYER:**

CRYSTAL SPRINGS UPLANDS SCHOOL,
a California corporation

Date executed by Buyer:                      By:  _____

_____                          Name: Tony Stayner
                                             Its: President, Board of Trustees

Acceptance by Escrow Holder
Escrow Holder acknowledges receipt of the
foregoing Agreement and accepts the
instructions contained therein.

**Fidelity Title Insurance Company**

By:  _____
Name: _____
Its: _____

23

T-S.

## LIST OF EXHIBITS AND SCHEDULES

### Exhibits

| | |
|---|---|
| Exhibit A: | Legal Description of Property |
| Exhibit B: | Permitted Exceptions for Property |
| Exhibit C: | Form of Grant Deed |
| Exhibit D: | Form of Bill of Sale |
| Exhibit E: | Form of Assignment and Assumption of Leases, Contracts and Entitlements |
| Exhibit F: | Form of FIRPTA Certificate |
| Exhibit G: | Rent Roll |
| Exhibit H: | Service Contracts |
| Exhibit I: | Personal Property |
| Exhibit J: | Seller's Documents |
| Exhibit K: | Seller's Closing Certificate |
| Exhibit L: | Form of Waiver |

## EXHIBIT A

### LEGAL DESCRIPTION OF PROPERTY

Parcel One:

PARCEL 1 AS SHOWN ON THAT CERTAIN PARCEL MAP FILED FOR RECORD ON DECEMBER 27, 1977, ON BOOK 40 OF PARCEL MAPS AT PAGE 10, SAN MATEO COUNTY.

APN: 043-340-170

Parcel Two:

PARCEL 2 AS SHOWN ON THAT CERTAIN PARCEL MAP FILED FOR RECORD ON DECEMBER 27, 1977, ON BOOK 40 OF PARCEL MAPS AT PAGE 10, SAN MATEO COUNTY.

APN: 043-340-180

**EXHIBIT B**

**PERMITTED EXCEPTIONS TO PROPERTY**

Parcel One:

1.  General and special taxes and assessments for the fiscal year 2012-2013 and any fiscal years thereafter occurring prior to Closing hereunder, a lien not yet due or payable.

2.  Intentionally Deleted

3.  The lien of a Special Tax resulting from the inclusion of the property in a Mello-Roos Community Facilities District and the sale of bonds by the district.

4.  The lien of bonds and assessment liens, if applicable, collected with the general and special taxes.

5.  The terms and provisions contained in the document entitled "NOTICE OF CONSENT TO USE OF LAND" recorded MARCH 22, 1974 as INSTRUMENT NO. 25628AH IN VOLUME 6574, PAGE 474 of Official Records.

6.  An easement shown or dedicated on the Map as referred to in the legal description
    For:    PUBLIC UTILITIES and incidental purposes.

7.  An easement for the purposes shown below and rights incidental thereto as shown or as offered for dedication on the recorded map shown below.

    | | |
    |---|---|
    | Map of: | Ralston Park Subdivision |
    | Recorded: | February 10, 1965 in Volume 61 of Maps, Page 37 |
    | Purpose: | Public Utilities |
    | Affects: | An Easterly portion of the premises |

8.  An easement for the purpose shown below and rights incidental thereto as set forth in a document

    | | |
    |---|---|
    | Granted to: | Envirotech Systems, Inc. and general public |
    | Purpose: | Public Utilities |
    | Recorded: | March 22, 1974, in Book 6574, Page 474 Instrument No. 25628AH, Official Records |
    | Affects: | Strip of land 15 feet wide over northeasterly portion of premises and as shown on the map |

9.  An easement for the purpose shown below and rights incidental thereto as reserved in a document

    | | |
    |---|---|
    | Grantor: | Envirotech Corporation, a Delaware corporation |

T-S.

|  |  |
|---|---|
| Purpose: | A non-exclusive easement for an emergency and service access only in, on , under, over and along a strip of land 20 feet over a portion of premises |
| Recorded: | July 27, 1973, in Book 6439, Page 440, Instrument No. 59356AG, Official Records |
| Affects: | Reference is made to said document for full particulars |

## Parcel Two:

1. General and special taxes and assessments for the fiscal year 2012-2013 and any fiscal years thereafter occurring prior to Closing hereunder, a lien not yet due or payable.

2. Intentionally deleted.

3. The lien of supplemental taxes, if any, assessed pursuant to Chapter 3.5 commencing with Section 75 of the California Revenue and Tax Code.

4. The lien of special tax for the following community facilities district, which tax is collected with the county taxes.

   District:    BEL CFD 2001-1 LIB



T.S.



**EXHIBIT C**

**FORM OF GRANT DEED**

**RECORDING REQUESTED
BY AND WHEN RECORDED
MAIL TO:**

_____
_____
_____
_____

_____

**GRANT DEED**

Transfer Tax:  [see separate sheet]

**GRANTOR:**          CENGAGE LEARNING, INC., a Delaware corporation

**HEREBY GRANTS TO:**  CRYSTAL SPRINGS UPLANDS SCHOOL,
                       a California corporation

that certain real property in the County of San Mateo, State of California, more particularly described in the legal description attached hereto as Exhibit "A".

The Grantor declares that documentary transfer tax is not shown, pursuant to Section 11932 of the Revenue and Taxation Code, as amended.

Dated: _____          CENGAGE LEARNING, INC.,
                                a Delaware corporation


                                By_____
                                Its_____

**Exhibit A to Grant Deed**
**Legal Description**

**[To be attached by Title Company]**

T.S.

STATE OF CALIFORNIA          )
                             )
COUNTY OF_____    )

On _____, before me,_____ _____,

personally appeared_____
who proved to me on the basis of satisfactory evidence to be the person(s) whose
name(s) is/are subscribed to the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____
that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


_____
Signature                              (Seal)

T-S.

# ATTACHMENT TO GRANT DEED

_____, 2013

**To:**    San Mateo County Recorder

Dear San Mateo County Recorder:

In accordance with Section 11932 of the Revenue and Taxation Code, the undersigned hereby requests that this statement of documentary transfer tax not be recorded with the attached Grant Deed (the "**Deed**"), but be affixed to the Deed after recordation and before return, as directed on the Deed.

The Deed names CRYSTAL SPRINGS UPLANDS SCHOOL, a California corporation, as grantee. The property that is the subject of the Deed is located in the County of San Mateo.

The amount of documentary transfer tax due on the attached Deed is $_____, computed on the full value of the property less any encumbrances remaining on the property.

**SELLER**

CENGAGE LEARNING, INC.,
a Delaware corporation

By_____

Its_____

T-S.



**EXHIBIT D**

**FORM OF BILL OF SALE**

KNOW ALL MEN BY THESE PRESENTS, that whereas, by grant deed of even date herewith, CENGAGE LEARNING, INC., a Delaware corporation ("**Grantor**"), did grant and convey unto CRYSTAL SPRINGS UPLANDS SCHOOL ("**Grantee**"), all of Grantor's interest in the land and improvements thereon located in Belmont, San Mateo County, State of California Apartments and having a sheet address of 10 Davis Drive and 6-8 Davis Drive, which property is more particularly described therein (the "**Property**");

NOW, THEREFORE, in consideration of the sum of Ten ($10.00) Dollars, and other good and valuable consideration to Grantor in hand paid by Grantee, the receipt, adequacy and sufficiency of which is hereby acknowledged, Grantor has BARGAINED, SOLD, ASSIGNED, TRANSFERRED AND DELIVERED, and by these presents does hereby BARGAIN, SELL, ASSIGN, TRANSFER AND DELIVER, unto Grantee absolutely and not as security, the "**Personal Property**" and "**Intangible Property**" (as such terms are hereinafter defined).

"**Personal Property**" shall mean all of Grantor's right, title and interest in and to the personal property owned by Grantor and used in connection with the operation of the Property as set forth on Schedule "1" attached hereto and incorporated herein by this reference.

"**Intangible Property**" shall mean all of Grantor's right, title and interest in and to any intangible property owned by Grantor relating to the Property including, but not limited to, the following: (a) plans, specifications and surveys; (b) engineering, soil, environmental and inspection reports; (c) management reports, marketing reports, marketing displays and brochures; (d) warranties from contractors, subcontractors, suppliers, architects, engineers and any other warranty covering the Property or Personal Property whether written or implied; and (e) all books and records; and excluding confidential information retained by Grantor.

Grantor further agrees as follows:

1.      <u>Representations and Warranties of Grantor.</u>  Grantor represents and warrants to Grantee that: (a) Grantor has not assigned or granted a security interest in any of the Personal Property or Intangible Property to anyone; (b) Grantor's interests in neither the Personal Property nor the Intangible Property are subject to any lien, encumbrance, claim, set-off or deduction created by or through Grantor; and (c) Grantor is the owner of and has the right to convey the Personal Property.  Grantor makes no warranty or representation of any kind with respect to its right, title and interest in and to the Intangible Property.

2.      <u>Additional Instruments.</u>  Grantor agrees that it will, upon request from Grantee and at Grantee's sole cost and expense, at any time from time to time after the date hereof and without further consideration, do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered all such further acts, assignments, transfers, conveyances and assurances deemed by Grantee, its successors and assigns, to be necessary or proper to better effect the sale, assignment, transfer, conveyance and delivery of ownership of the Personal Property and Intangible Property to Grantee.

T.S.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, GRANTOR HAS NOT MADE AND DOES NOT MAKE ANY EXPRESS OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND WHATSOEVER WITH RESPECT TO THE PERSONAL PROPERTY, INCLUDING BUT NOT LIMITED TO:  TITLE; MERCHANTABILITY OF THE PERSONAL PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE; THE DESIGN OR CONDITION OF THE PERSONAL PROPERTY; THE QUANTITY, QUALITY OR CAPACITY OF THE PERSONAL PROPERTY; WORKMANSHIP OR COMPLIANCE OF THE PERSONAL PROPERTY WITH THE REQUIREMENTS OF ANY LAW, RULE, SPECIFICATION OR CONTRACT PERTAINING THERETO; PATENT INFRINGEMENT OR LATENT DEFECTS.

EXCEPT AS EXPRESSLY SET FORTH HEREIN, GRANTEE ACCEPTS THE PERSONAL PROPERTY ON AN "AS IS, WHERE IS" BASIS.

IN WITNESS WHEREOF, Grantor has executed this Bill of Sale as of this _____ day of _____, 2013.

CENGAGE LEARNING, INC.,
a Delaware corporation


By: _____
    Name: _____
    Title: _____


CRYSTAL SPRINGS UPLANDS SCHOOL,
a California corporation


By:_____
    Name:_____
    Its:_____

T. S.



**Schedule 1 to Bill of Sale**
**Schedule of Personal Property**

**[To be attached by Seller]**

T. S.

## EXHIBIT E

## FORM OF ASSIGNMENT AND ASSUMPTION OF LEASES, CONTRACTS AND ENTITLEMENTS

The undersigned, CENGAGE LEARNING, INC., a Delaware corporation ("**Assignor**"), for consideration paid, the receipt and sufficiency of which is hereby acknowledged, hereby sells, assigns and transfers unto CRYSTAL SPRINGS UPLANDS SCHOOL, a California corporation ("**Assignee**") WITHOUT RECOURSE, REPRESENTATION OR WARRANTY:

All of Assignor's right, title and interest in and to: (i) those certain leases set forth in Schedule A hereto (collectively, the "**Leases**") with respect to the property located on those certain parcels of land, together with the improvements now or hereafter located thereon, located in Belmont, California as more particularly described in the grant deed from Assignor to Assignee of even date herewith (the "**Real Property**"); (ii) those certain assignable contracts benefitting the Real Property set forth on Schedule B hereto (the "**Contracts**"); and (iii) (a) all subdivision maps, filings, applications, entitlements, permits (including conditional use permits, building permits and certificates of occupancy) and licenses, (b) engineering, soil, environmental and inspection reports, and (c) any other similar items or rights relating to the Real Property (collectively, the "**Entitlements**").

To have and to hold the same unto Assignee, its successors and assigns from and after the date hereof for all of the rest of any term thereof, subject to the covenants, conditions and terms thereof.

Assignee, by its acceptance of this assignment, hereby assumes and agrees to be bound by the representations, obligations, terms and conditions of the Leases, Contracts and Entitlements from and after the date hereof. Assignee agrees to indemnify and defend Assignor against and hold Assignor harmless from any and all claims, liabilities, losses, damages, costs or expenses, including, without limitation, reasonable attorneys' fees and costs, originating on or subsequent to the date on which the Property is conveyed to Assignee (the "**Conveyance Date**") and arising out of the Assignor's obligations under the Leases and Contracts.

Assignor agrees to indemnify and defend Assignee against and hold Assignee harmless from any and all claims, liabilities, losses, damages, costs or expenses, including, without limitation, reasonable attorneys' fees and costs, originating prior to the Conveyance Date and arising out of the Assignor's obligations under the Leases and Contracts.

This Assignment shall be binding on and inure to the benefit of the parties hereto, their heirs, executors, administrators, successors in interest and assigns.

The obligations of Assignor and Assignee contained herein are intended to be binding only upon the property of Assignor and Assignee and shall not be personally binding upon, nor shall any resort be had to the private properties of, any of their officers, directors, or shareholders, their investment manager or any employees or agents of Assignor and Assignee or their investment manager.

*T·S·*

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment as of the date first above written.

**ASSIGNOR**:

CENGAGE LEARNING, INC., a Delaware corporation

By:_____
   Name:_____
   Its:_____

**ASSIGNEE**:

CRYSTAL SPRINGS UPLANDS SCHOOL, a California corporation

By:_____
   Name:_____
   Its:_____

T-3.



## SCHEDULE A

### LEASES

NONE.

T·S·

## SCHEDULE B

## CONTRACTS

## [TO BE ATTACHED]

T. S.

**<u>Exhibit B</u>**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CENGAGE LEARNING, INC., *et al.*, | ) | Case No. 13-44106 (ESS) |
| | ) | Case No. 13-44105 (ESS) |
| | ) | Case No. 13-44107 (ESS) |
| | ) | Case No. 13-44108 (ESS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**ORDER PURSUANT TO SECTION 363 OF**
**THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004(f)**
**AUTHORIZING THE PRIVATE SALE OF CERTAIN REAL PROPERTY**
**FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES**

Upon the motion (the "***Motion***")[1] of the above-captioned debtors (collectively, the "***Debtors***") seeking entry of an order (the "***Order***") pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 6004(f) authorizing the Sale of the Property free and clear of liens, claims, interests, and encumbrances; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. § 1408; and due and proper notice of the Motion being adequate and appropriate under the particular circumstances; and a hearing having been held to consider the relief requested in the Motion (the "***Hearing***"); and upon consideration of the record of the Hearing, and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and any

---

[1]    Capitalized terms used but otherwise not defined herein shall have the meanings set forth in the Motion.

objections to the requested relief having been withdrawn or overruled on the merits; and after

due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

### Jurisdiction, Final Order, and Statutory Predicates

A.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

B.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    The Order constitutes a final and appealable order within the meaning of

28 U.S.C. § 158(a).

### Notice of the Sale

D.    Actual written notice of the Motion, the Hearing, and the Sale and a reasonable

opportunity to object or be heard with respect to the Motion and the relief requested therein has

been afforded to interested persons and entities, including:  (a) the U.S. Trustee; (b) counsel to

the Committee; (c) counsel to the agent under the Debtors' prepetition senior secured credit

facility; (d) the indenture trustees under the Debtors' prepetition secured first lien notes, secured

second lien notes, senior unsecured notes, senior PIK notes, and senior subordinated discount

notes; (e) counsel to the ad hoc group of holders of certain first lien claims; (f) the United States

Attorney for the Eastern District of New York; (g) the Internal Revenue Service; (h) Crystal

Springs; (i) all applicable state and local taxing authorities; (j) the United States Environmental

Protection Agency; (k) the California Environmental Protection Agency; (l) Civil Engineering;

and (m) all parties entitled to receive notice pursuant to Bankruptcy Rule 2002.

E.    As evidenced by the affidavit of service previously filed with this Court, proper,

timely, adequate, and sufficient notice of the Motion, the Hearing, and the Sale has been

provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy

Rules 2002(a)(2) and 6004.  The foregoing notice was good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Hearing, or the Sale is required.

### Good Faith Purchaser

F.       Crystal Springs is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

G.       Crystal Springs is purchasing the Property in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code.

### Fair and Reasonable Price

H.       The Purchase Agreement represents a fair and reasonable offer to purchase the Property under the circumstances of these chapter 11 cases.

I.       Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtors, their creditors, their estates, and other parties in interest.

J.       The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

### Section 363(f) of the Bankruptcy Code is Satisfied

K.       The Debtors are authorized to sell the Property free and clear of liens, claims, interests, and encumbrances against the Debtors or their estates, including but not limited to such liens, claims, interests, and encumbrances listed on **Exhibit 1** attached hereto, because one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied, provided that, other than the Permitted Exceptions, all liens, claims, interests, and encumbrances on and against the Property, including the liens of the Secured Parties and Civil

Engineering, and as more particularly described in **Exhibit 1** attached hereto, shall attach to the Proceeds with the same priority that existed immediately prior to the Closing.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

### General Provisions

1.      The relief requested in the Motion is granted and approved to the extent indicated below, and the Sale contemplated thereby is approved as set forth in the Order.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn or otherwise resolved are overruled.

### Approval of Purchase Agreement

3.      The Purchase Agreement is hereby approved.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale of the Property to Crystal Springs pursuant to and in accordance with the terms and conditions of the Purchase Agreement, including payment of broker fees, closing costs, and any other agreed upon expenses in connection therewith, if any, (b) close the Sale as contemplated in the Purchase Agreement and this Order, and (c) execute and deliver, perform under, consummate, implement, and close fully the Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Purchase Agreement and such other ancillary documents.

5.      This Order shall be binding upon Crystal Springs and all successors and assigns of Crystal Springs, the Debtors, their estates, all creditors of and holders of equity interests in the

Debtors, and any holders of liens, claims, interests, or encumbrances against or on all or any portion of the Property. This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, Crystal Springs, and their respective successors and assigns.

## **Transfer of the Property**

6.      The transfer of the Property shall constitute a legal, valid, binding, and effective transfer of such property. Upon the Closing, Crystal Springs shall take title to and possession of the Property and, pursuant to section 363(f) of the Bankruptcy Code, the transfer of title to the Property shall be free and clear of liens, and all interests, liabilities, obligations, encumbrances, or claims including all liens and interests set forth in **Exhibit 1** attached hereto and all "claims" within the meaning of section 101(5) of the Bankruptcy Code, other than the Permitted Exceptions. Except for the Permitted Exceptions, all liens, claims, interests, and encumbrances on and against the Property, including those identified in the attached **Exhibit 1**, shall attach to the Proceeds with the same priority that existed immediately prior to the Closing.

7.      Other than with respect to the Permitted Exceptions, all persons and entities holding liens, claims, interests, or encumbrances on or against the Property, including the Secured Parties and Civil Engineering (whose liens and interests are more particularly described in the attached **Exhibit 1**), arising under or out of, in connection with, or in any way relating to the Debtors, the Property, or the transfer of the Property to Crystal Springs, hereby are forever barred, estopped, and permanently enjoined from asserting against Crystal Springs or its successors or assigns, their property, or the Property, such persons' or entities' liens, claims, interests, or encumbrances on or against the Property.

8.      After the closing of the Sale, the Debtors shall have no further liability with respect to the Property (other than any liability to Crystal Springs that may arise pursuant to, and survive the closing of, the Purchase Agreement), and any claims, whether administrative or otherwise, relating to or arising from the Property after the closing of the Sale asserted against the Debtors shall be deemed disallowed; <u>provided</u> that such liens, claims, and encumbrances on and against the Property, including the liens of the Secured Parties and Civil Engineering, shall attach to the Proceeds with the same priority that existed immediately prior to the Closing.

9.      Nothing in this Order or the Purchase Agreement releases or nullifies any liability to a governmental agency under any environmental laws or regulations that any entity would be subject to as owner or operator of the Property after the date of entry of this Order.  Nothing in this Order or the Purchase Agreement bars, estops, or enjoins any governmental agency from asserting or enforcing, outside the Court, any liability described in the preceding sentence. Notwithstanding the above, nothing herein shall be construed to permit a governmental agency to obtain penalties from Crystal Springs for days of violation of environmental laws and regulations prior to the entry of this Order.

10.     A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any of the liens and other claims, interests, or encumbrances of record on or against the Property; <u>provided</u> that such liens, claims, and encumbrances on and against the Property, including the liens and interests of the Secured Parties and Civil Engineering (as more particularly described in the attached **<u>Exhibit 1</u>**), shall attach to the Proceeds with the same priority that existed immediately prior to the Closing.

11.     If any person or entity which has filed statements or other documents or agreements evidencing liens, claims, interests, or encumbrances on or against the Property shall

6

not have delivered to the Debtors prior to the Closing in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of liens, claims, interests, or encumbrances which the person or entity has or may assert with respect to the Property, the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Property.

12.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents, deeds, and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

### Other Provisions

13.     Crystal Springs is entitled to the protection afforded by section 363(m) of the Bankruptcy Code as a good faith purchaser of the Property.

14.     Neither the Debtors nor Crystal Springs have engaged in any conduct that would cause or permit the transaction to be avoided under section 363(n) of the Bankruptcy Code.

15.     The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision.

16.     The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates or the rights of any party holding a lien, claim, interest, or encumbrance on or against the Property.

17.     All time periods set forth in this Order and the Purchase Agreement shall be calculated in accordance with Bankruptcy Rule 9006(a).

18.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of the Order and the Purchase Agreement, all amendments thereto, and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

**<u>Exhibit 1 to the Order</u>**

**Third-Party Liens**

(a)    A deed of trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby.

Amount:              $3,740,000,000.00
Dated:               July 5, 2007
Trustor:             Thomson Learning Inc
Trustee:             Commonwealth Land Title Company
Beneficiary:        The Royal Bank of Scotland PLC
Loan No.:           none shown
Recorded:         August 3, 2007, Instrument No. 2007-117026

An assignment of the beneficial interest under said deed of trust which names

As Assignee:       JPMorgan Chase Bank, N.A.
Recorded:         June 7, 2012, Instrument No. 2012 79789, Official Records

An agreement to modify the terms and provisions of said deed of trust as therein provided

Executed by:       JPMorgan Chase Bank, N.A.
Recorded:         June 7, 2012, Instrument No. 2012-79790, Official Records

An agreement to modify the terms and provisions of said deed of trust as therein provided

Executed by:       JPMorgan Chase Bank, N.A.
Recorded:         June 11, 2013, Instrument No. 2013-87049, Official Records

(b)    A Financing Statement given as additional security for the payment of the indebtedness secured by the deed of trust.

Shown in:         Subparagraph (a), above (Item 5 in the Preliminary Title Report Issued by Commonwealth Land Title Insurance Company, effective 9/17/13, File No. 99770479)
Debtor:            Thomson Learning Inc
Secured Party:     The Royal Bank of Scotland PLC
Recorded:         August 3, 2007, Instrument No. 2007-117027

A change to the above financing statement was filed

Recorded:         September 19, 2007, Instrument No. 2007-139241, Official Records
Nature of Change:  Change of Name to "Cengage Learning, Inc."

A change to the above financing statement was filed

Recorded:         October 5, 2007, Instrument No. 2007-146611, Official Records
Nature of Change:  Change of Name to "Cengage Learning, Inc."

A change to the above financing statement was filed

Recorded:         June 7, 2012, Instrument No. 2012-79819, Official Records
Nature of Change:  Assignment in favor of JPMorgan Chase Bank, N.A.

A Transition Continuation Statement referring to the above was

Recorded:         July 24, 2012, Instrument No. 2012-103935, Official Records

A change to the above financing statement was filed
Recorded:                May 20, 2013, Instrument No. 2013-75319, Official
                         Records
Nature of Change:        change of legal description

(c)    A Financing Statement given as additional security for the payment of the
       indebtedness secured by the deed of trust.
       Shown in:                Subparagraph (a), above (Item 5 in the Preliminary Title
                                Report Issued by Commonwealth Land Title Insurance
                                Company, effective 9/17/13, File No. 99770479)
       Debtor:                  Cengage Learning, Inc.
       Secured Party:           JPMorgan Chase Bank, N.A.
       Recorded:                October 25, 2012, Instrument No. 2012-157520,
                                Official Records

       A change to the above financing statement was filed
       Recorded:                May 20, 2013, Instrument No. 2013-75330, Official
                                Records
       Nature of Change:        change of legal description

(d)    A deed of trust to secure an indebtedness in the amount shown below, and any
       other obligations secured thereby.
       Amount:                  $725,000.00
       Dated:                   February 25, 2013
       Trustor:                 Cengage Learning, Inc.
       Trustee:                 Commonwealth Land Title Insurance Company
       Beneficiary:             The Bank of New York Mellon
       Loan No.:                none shown
       Recorded:                February 27, 2013, Instrument No. 2013-32094, Official
                                Records

(e)    A deed of trust to secure performance under an agreement referred to therein, and
       any other obligations secured thereby
       Dated:                   February 25, 2013
       Trustor:                 Cengage Learning, Inc.
       Trustee:                 Commonwealth Land Title Insurance Company
       Beneficiary:             The Bank of New York Mellon
       Loan No.:                none shown
       Recorded:                February 27, 2013, Instrument No. 2013-32095, Official
                                Records

       An assignment of the beneficial interest under said deed of trust which names
       As Assignee:             CSC Trust Company of Delaware
       Recorded:                August 1, 2013, Instrument No. 2013-112292, Official
                                Records

(f)    A claim of mechanic's lien
       Amount:                  $12,603.30
       Claimant:                Civil Engineering Associates
       Recorded:                August 2, 2013, Instrument No. 2013-113173, Official
                                Records

(g)    Liens, claims, interests, and/or encumbrances, if any, recorded against the Property after September 17, 2013.