Dennis F. Dunne (admitted *pro hac vice*)
Linda Dakin-Grimm
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

- and -

Gregory A. Bray (admitted *pro hac vice*)
Mark Shinderman (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
601 S. Figueroa St., 30th Floor
Los Angeles, California 90017
Telephone:    (213) 892-4000
Facsimile:    (213) 892-5063

*Attorneys for First Lien Group*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CENGAGE LEARNING, INC., *et al.*,<br><br>        Debtors.<br>_____<br><br>THE FIRST LIEN GROUP comprised of senior secured holders of claims under that certain credit agreement dated July 5, 2007, and as amended,<br><br>        Plaintiff,<br>  v.<br><br>CENGAGE LEARNING, INC., CENGAGE LEARNING ACQUISITIONS, INC., CENGAGE LEARNING HOLDINGS II, L.P., and CENGAGE LEARNING HOLDCO, INC.,<br><br>        Defendants.<br>_____ | Chapter 11<br><br>Case No. 13-44106 (ESS)<br>Case No. 13-44105 (ESS)<br>Case No. 13-44107 (ESS)<br>Case No. 13-44108 (ESS)<br>(Jointly Administered)<br><br><br>Adversary Proceeding No. 13-____ |

## COMPLAINT

In support of its Complaint, the First Lien Group of senior secured holders of claims under that certain credit agreement dated July 5, 2007, comprised of BlackRock Financial Management, Inc., Deutsche Bank Trust Company Americas, Franklin Mutual Advisers LLC, Kohlberg Kravis Roberts & Co., Oak Hill Advisors, L.P., Oaktree Capital Management, L.P., and Searchlight Capital Partners (the "First Lien Group," or "Plaintiff"), states as follows:

## INTRODUCTION

1. On July 2, 2013, (the "Petition Date"), the Defendants filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Defendants continue to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this matter.

2. Prior to the Petition Date, the Defendants orchestrated a scheme to mislead those lenders with revolving loan commitments under the credit agreement into funding a $430 million draw down of the First Lien Credit Facility Agreement so that the funds could be wrongly set aside for the benefit of Defendants and their unsecured creditors. Defendants improperly obtained the Disputed Cash (as defined below) in violation of fiduciary duties owed to Plaintiff and have been unjustly enriched by retaining possession of the Disputed Cash. Plaintiff commences this adversary proceeding to seek the imposition of a constructive trust over the Disputed Cash and such further equitable relief as the Court deems just and proper.

## JURISDICTION AND VENUE

3. This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

5.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

6.      Plaintiff First Lien Group consists of certain of the holders of obligations arising from the First Lien Credit Facility Agreement, as set forth in the *Verified Statement Pursuant to Bankruptcy Rule 2019*, filed August 9, 2013 [ECF No. 248].

7.      Defendant Cengage Learning, Inc. ("CLI") is a Delaware corporation with its principal place of business in Fairfield County, Connecticut.

8.      Defendant Cengage Learning Acquisitions, Inc. ("CLAI") is a Delaware corporation with its principal place of business in Fairfield County, Connecticut.

9.      Defendant Cengage Learning Holdings II, L.P. ("CL Holdings") is a Delaware limited partnership with its principal place of business in Fairfield County, Connecticut.

10.      Defendant Cengage Learning Holdco, Inc. ("CL Holdco," and collectively with CLI, CLAI, and CL Holdings, the "Debtors," "Defendants," or the "Company") is a Delaware corporation with its principal place of business in Fairfield County, Connecticut.

## GENERAL ALLEGATIONS

**A.    Background**

11.      Defendants' first lien secured facilities consist of approximately $3,867.9 million in principal amounts outstanding of first lien loans (the "First Lien Loans").[1] The First Lien Group is comprised of certain holders of the First Lien Loans.

---

[1] The terms of the First Lien Loans are set forth in that certain Credit Agreement, dated as of July 5, 2007, as amended by the Incremental Amendment, dated as of May 30, 2008, and the Amendment Agreement, dated as of April 10, 2012, among certain of the Debtors, JPMorgan Chase Bank, N.A. ("JPMorgan") as administrative agent and collateral agent, and the other lenders party thereto (the "First Lien Credit Facility Agreement"), attached hereto as

12. The Defendants granted security interests to the collateral agents for the benefit of the lenders under the First Lien Loans through, inter alia, a Security Agreement[2] executed in connection with the First Lien Credit Facility Agreement.[3]

**B. Defendants Draw Down All Availability Under the First Lien Credit Facility Agreement**

13. On March 15, 2013, CLAI transmitted a Committed Loan Notice to JPMorgan requesting a draw down of $430 million under the First Lien Credit Facility Agreement.

14. At this time, Defendants were insolvent or in the zone of insolvency, and owed fiduciary duties to Plaintiff to act in good faith and not prefer one creditor group over another.

15. On March 20, 2013, CLAI received approximately $430 million in proceeds from the draw down, which was substantially all of the remaining availability under its first lien revolving credit facilities. CLAI invested $300 million in a Federated money market fund that invests in treasury securities (the "Federated Fund").[4] The Federated Fund is publicly traded on the

---

Exhibit A, Exhibit B and Exhibit C, respectively.

The Defendants also have outstanding debt obligations of approximately: (i) $725.0 million in principal amounts outstanding of First Lien Notes; (ii) $13.3 million owed under certain of the Company's Swaps; and (iii) $710.0 million in principal amounts outstanding of Second Lien Notes. The terms "First Lien Notes," "Swaps," "Second Lien Notes," and other terms not defined herein, shall have the meanings ascribed to them in the *Declaration of Dean D. Durbin, Chief Financial Officer of Cengage Learning GP I LLC, in Support of Chapter 11 Petitions and First Day Motions*, filed July 2, 2013 [ECF No. 15].

[2] "Security Agreement" means the Security Agreement executed in connection with the First Lien Credit Facility Agreement, dated as of July 5, 2007, among TL Acquisitions, Inc., as Borrower, TL Holdings II L.P., as Parent, TL US Holdco, Inc., as Holdings, Certain Subsidiaries Identified Herein and The Royal Bank of Scotland Plc, as Collateral Agent ("First Lien Loans Security Agreement"), attached hereto as Exhibit D.

[3] The holders of First Lien Notes, the counterparties under the Swaps, and the holders of Second Lien Notes (collectively with the collateral agents for the benefit of the lenders under the First Lien Loans, the "Prepetition Secured Parties") also received security interests through Security Agreements executed in connection with the First Lien Notes Indenture and the Second Lien Notes Indenture (collectively with the First Lien Loans Security Agreement, the "Collateral Package"). The relevant provisions of the Security Agreements describing the Prepetition Secured Parties' security interests are substantially identical. (First Lien Loans Security Agreement, §§ 2.01, 3.01; First Lien Notes Security Agreement, §§ 2.01, 3.01; Second Lien Notes Security Agreement, §§ 2.01, 3.01).

[4] The remaining $130.0 million was swept that day from the Debtors' primary cash concentration account and invested in shares of a different Federated money market fund, the Government Obligations Fund Institutional Shares (money market fund #5, ticker: GOIXX), in accordance with the Debtors' ordinary course cash management procedures. On information and belief, these funds allegedly were used by the Defendants in the ordinary course of business.

NASDAQ exchange (ticker: TOIXX).  As of August 31, 2013, the balance of the Federated Fund was $273,896,900.93 (the "Disputed Cash").

16.     The Disputed Cash is encumbered by, among others, the Plaintiff's perfected security interest in investment properties of the Defendants and pledged to Plaintiff (*i.e.*, the mutual funds held at Federated).  These encumbered funds are secured by, among others, the Plaintiff's lien on and security interests in "Investment Property" pursuant to Section 3.01 of Plaintiff's Security Agreements.  An investment in a mutual fund is a form of Investment Property.

17.     The Defendants assert that the Disputed Cash is not part of the Prepetition Secured Parties' Collateral Package, and they commenced an adversary proceeding seeking a declaratory judgment to that effect.[5]

### C.  Defendants Knowingly Made False Representations and Breached Warranties in Order to Obtain the Disputed Cash

18.     Defendants' draw down on the First Lien Credit Facility Agreement was obtained through false representations and breaches of a series of warranties and covenants in the First Lien Credit Facility Agreement.  As the Defendants have since admitted, their intent in making the draw down request was to obtain the Disputed Cash and set it aside for the benefit of the Defendants and their unsecured creditors.  The First Lien Credit Facility Agreement prohibits such funding, and the Company violated its fiduciary duties to Plaintiff by wrongly inducing lenders with revolving loan commitments into funding the draw down request so that the Company could use the proceeds solely for the benefit of its unsecured creditors.

---

[5] *Complaint for Declaratory Judgment*, filed September 20, 2013 [ECF No. 500], Adv. Pro. No. 13-01461 (ESS) [ECF No. 1].

19. Section 4.02 of the First Lien Credit Facility Agreement provides the obligation of each Lender to honor any request for a credit extension, such as CLAI's March 15, 2013 draw down request, subject to the following conditions precedent:

> (a) The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document…shall be true and correct in all material respects on and as of the date of such Credit Extension.
>
> (b) Except in the case of the initial Credit Extensions, no Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.
>
> (c) The Administrative Agent…shall have received a Request for Credit Extension in accordance with the requirements hereof.

20. Under Section 4.02, "[e]ach Request for Credit Extension … submitted by a Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension." CLAI's March 15, 2013 transmission of the Committed Loan Notice to JPMorgan constituted a representation and warranty that the conditions precedent specified in Sections 4.02(a) and (b) had been satisfied.

21. The Defendants represented that no Default would result from their borrowing request or from the application of the proceeds therefrom. (First Lien Credit Facility Agreement, Section 4.02(b).) "Default" is defined as "any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default." Section 8.01(c) provides that it is an Event of Default if "[a]ny Loan Party fails to perform or observe any other covenant or agreement…contained in any Loan Document on its

part to be performed or observed and such failure continues for thirty (30) days after receipt by the Borrower of written notice thereof by the Administrative Agent or the Required Lenders."

22. One such covenant that must be observed in order to prevent an Event of Default is that "[The Company shall] use the proceeds of any Credit Extension, whether directly or indirectly, in a manner consistent with the uses set forth in the preliminary statements to this Agreement." (First Lien Credit Facility Agreement, Section 6.12.) The preliminary statements to the First Lien Credit Facility Agreement provide, among others, that "[t]he proceeds of Revolving Credit Loans made after the Closing Date will be used for working capital and other general corporate purposes of the Borrower and its Subsidiaries, including the financing of Permitted Acquisitions."

23. Defendants failed to observe this covenant by falsely representing that they would use the proceeds of the draw for working capital or other general corporate purposes when they secretly intended to invest the proceeds in the Federated Fund for the benefit of their unsecured creditors, which is not a permissible use of proceeds under Section 6.12. This misrepresentation triggered a Default, and thereby constitutes a breach of warranty under Section 4.02(b) that no Default would result from the application of the proceeds of the draw request.

24. In fact, Defendants admit that they never intended to use the draw proceeds for a proper purpose, and have acknowledged that the entire purpose of the draw on the revolver was to use these funds solely to create value for the Defendants' unsecured creditors instead of using them for working capital or other general corporate purposes. For example, at a hearing on July 3, 2013, counsel explained:

> [T]he company drew down the entire revolver it had . . . . Because we drew down on the revolver, the entire revolver, and because we didn't make it part of the collateral package, we, in essence, created value for our unsecured creditors. It wouldn't have been there otherwise, but we created the value for them. (July 3, 2013 Hearing Transcript at 27.)[6]

25. At the time of the March 20, 2013 draw down, Defendants were also in breach of covenants under the Intellectual Property Security Agreement.[7] Defendants agreed under the IPSA to (i) to "pursue the registration and maintenance of each . . . Copyright registration or application, now or hereafter included in such Collateral" (IPSA, Section 2.04(a)); (ii) on a quarterly basis, "deliver to [JPMorgan] an appropriate supplement to [the IPSA] . . . with respect to all such Intellectual Property owned by it as of the last day of such period, to the extent that such Intellectual Property is not covered by any previous [supplement] . . .," (IPSA, Section 2.04(e)); and (iii) "cooperate as reasonably necessary to enable [JPMorgan] to make any necessary or reasonably desirable recordations with the U.S. Copyright Office . . . ." (*Id.*).

26. Defendants took title to approximately 14,000 copyrights in 2007, as a result of an acquisition of another entity, but these were not disclosed to Plaintiff or JPMorgan until within the 90-day preference period prior to the Petition Date. Moreover, since mid-2012, the Defendants registered approximately 1,800 additional copyrights with the Copyright Office, and failed to provide to JPMorgan, as required under the IPSA, the supplements and appendices disclosing these copyrights until within the preference period. Not only have Defendants failed to comply with the covenants in the IPSA, they now use their very failure to comply as the basis to

---

[6] Defendants' improper use of the draw proceeds is also consistent with their acknowledgment that they "took extreme care to advance and protect the interests of unsecured creditors" before filing chapter 11 petitions. *See Disclosure Statement for Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, filed October 3, 2013 [ECF No. 553].

[7] The Intellectual Property Security Agreement, dated as of July 5, 2007, as amended, among certain of the Debtors and JPMorgan as collateral agent, (the "IPSA"), attached hereto as Exhibit E.

assert that certain copyrights should not be included in the Prepetition Secured Parties' Collateral Package.[8]

27.     Defendants also made multiple misrepresentations that there were no circumstances that could reasonably be expected to have a material adverse effect on the Defendants' payment obligations or the Plaintiff's rights.  Pursuant to Article V of the First Lien Credit Facility Agreement (which Defendants represented and warranted to be true under Section 4.02(a)), to draw down on the first lien credit facility the Borrower must represent and warrant that "[s]ince the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect."  (First Lien Credit Facility Agreement, Section 5.05(b).)  "Material Adverse Effect" is defined as "(a) a material adverse effect on the business, operations, assets, liabilities (actual or contingent) or financial condition of the Company and its Subsidiaries, taken as a whole, (b) a material adverse effect on the ability of the Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Document to which any of the Loan Parties is a party or (c) a material adverse effect on the rights and remedies of the Lenders or the Agents under any Loan Document."

28.     Defendants falsely represented that there were no circumstances that could reasonably be expected to have a Material Adverse Effect on (i) their ability to perform their payment obligations and (ii) the rights and remedies afforded to Plaintiff under the First Lien Credit Facility Agreement.  At the time of their draw down, Defendants were insolvent or in the zone of insolvency, and plainly contemplating their chapter 11 cases.  The Defendants reasonably could expect their chapter 11 filings to have a material adverse effect on their ability to perform their payment obligations with respect to the draw down.  Furthermore, Defendants drew down the funds

---

[8] In addition, on information and belief, Defendants intentionally waited until after the draw request was funded to engage in the review of the Copyrights as required under the IPSA.

with the express intent to place the proceeds out of the reach of Plaintiff in order to adversely effect their ability to exercise their rights and remedies with respect to the Disputed Cash.

29. Defendants also falsely represented that "no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Restricted Subsidiary or against any of their properties or revenues that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect." (First Lien Credit Facility Agreement, Section 5.06.) Yet again, at the time of the draw the Defendants were not only contemplating filing chapter 11 cases that reasonably could be expected to have a material adverse effect on their ability to fulfill their payment obligations, but they were actively orchestrating a scheme to deprive Plaintiff of its rights and remedies under the First Lien Credit Facility.

## COUNT I – CONSTRUCTIVE TRUST

30. Plaintiff repeats and realleges each and every allegation in paragraphs 1 through 29 above as if fully set forth herein.

31. Defendants owed fiduciary duties to Plaintiff, and violated those duties by wrongfully drawing down the First Lien Credit Facility Agreement and using the proceeds for the benefit of its unsecured creditors.

32. In reliance on Defendants' representations and warranties, lenders with revolving loan commitments funded Defendants' $430 million draw down on the First Lien Credit Facility Agreement.

9

33. Defendants made false representations and knowingly breached representations and warranties made in the First Lien Credit Facility Agreement in order to wrongfully obtain the $430 million draw down.

34. Defendants wrongfully invested the Disputed Cash proceeds in the Federated Fund for the benefit of the Defendants and their unsecured creditors.

35. Defendants' retention of the Disputed Cash would result in unjust enrichment.

36. Plaintiff has no adequate remedy at law.

37. Accordingly, based on the wrongful conduct of Defendants in obtaining and retaining the Disputed Cash, a constructive trust should be imposed over the Disputed Cash.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant judgment in favor of Plaintiff and against Defendants, and enter an order granting the following relief:

(a) The imposition of a constructive trust over the Disputed Cash;

(b) Costs;

(c) Attorney's fees; and

(d) Such other and further equitable relief as the Court deems just and proper.

New York, New York  /s/ Linda Dakin-Grimm
Dated: October 23, 2013  
Dennis F. Dunne (admitted *pro hac vice*)
Linda Dakin-Grimm
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

- and -

Gregory A. Bray (admitted *pro hac vice*)
Mark Shinderman (admitted *pro hac vice*)

          MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
          601 S. Figueroa St., 30th Floor
          Los Angeles, California 90017
          Telephone:    (213) 892-4000
          Facsimile:    (213) 892-5063

*Attorneys for First Lien Group*