**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| CENGAGE LEARNING, INC., *et al.*, | Case No. 13-44106 (ESS) |
| | Case No. 13-44105 (ESS) |
| | Case No. 13-44107 (ESS) |
| | Case No. 13-44108 (ESS) |
| Debtors. | (Jointly Administered) |

**SUPPLEMENTAL DISCLOSURE STATEMENT RELATED TO DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

## Important Dates

- Date by which Ballots must be received by the Notice, Claims, and Solicitation Agent: March 10, 2014
- Date by which objections to the Plan must be filed and served:  March 10, 2014

---

Jonathan S. Henes
Christopher J. Marcus
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*

# TABLE OF CONTENTS

Page

I.  EXECUTIVE SUMMARY ...........................................................................................5

II.  SUMMARY OF TREATMENT UNDER THE PLAN AND EXPECTED RECOVERIES...................9

III.  REVISED SOLICITATION AND VOTING PROCEDURES ................................21

IV.  SUMMARY OF PLAN MODIFICATIONS .........................................................23

    A.  Settlement of Disputed Issues and Cases and Controversies .........................................23

    B.  Revised Treatment of Claims.........................................................................................24

    C.  Restrictions on New Equity Distributed as Part of the Other Unsecured Creditor Distribution ....................................................................................................................24

    D.  Withheld Apax Distribution ...........................................................................................25

    E.  Apax Fees and Releases.................................................................................................26

    F.  PIK Notes Settlement.....................................................................................................26

    G.  Post-Effective Date Role of the Committee ...................................................................27

    H.  Release & Exculpation...................................................................................................27

        (i)  Release....................................................................................................28
        (ii)  Third-Party Release ...............................................................................28
        (iii)  Exculpation............................................................................................29

    I.  Payment of Certain Professional Fees...........................................................................30

        (i)  First Lien Holders' Fees .........................................................................30
        (ii)  Other Parties' Fees.................................................................................30

    J.  Post-Effective Date Corporate Structure........................................................................31

    K.  New Shareholders Agreement and New Corporate Governance Documents ...................31

    L.  Total Enterprise Value and Issuance of New Equity.......................................................32

    M.  Non-Reporting Company ...............................................................................................32

    N.  Limited Reporting Obligations Under the Plan...............................................................32

    O.  Risks Related to the New Equity Issued Under the Plan..................................................32

        (i)  A Liquid Trading Market for Shares of New Equity May Not Develop ..........................33
        (ii)  New Corporate Governance Documents and New Equity Will Affect Holders of Shares of New Equity ............................................................................33
        (iii)  Total Enterprise Value and Price of Shares of New Equity Does Not Necessarily Reflect Value of the Reorganized Debtors ......................................33
        (iv)  Other Factors May Affect the Total Enterprise Value and the Price of the New Equity...............................................................................................33

    P.  Management Incentive Plan ...........................................................................................34

    Q.  Adversary Proceedings ..................................................................................................34

    R.  Intercompany Obligations..............................................................................................35

V.      APPROVAL OF THE GLOBAL SETTLEMENT PURSUANT TO SECTION 9019 OF THE BANKRUPTCY CODE ................................................................................................ **36**

VI.     VALUATION OF COPYRIGHTS ............................................................................................ **36**

VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......................................................................................................................................... **36**

    A.      Introduction ........................................................................................................... 36

    B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors ............................................................................................... 37

    C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims ..................................................................................................................... 37

        (i)      Consequences to Holders of Allowed First Lien Claims (Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29, Class 30) ...................... 38

        (ii)     Consequences to Holders of Allowed Second Lien Claims (Class 5, Class 14, Class 23, Class 31) ...................................................................................... 38

        (iii)    Consequences to Holders of Allowed Senior Notes Claims (Class 6, Class 15, Class 24, Class 32) ...................................................................................... 38

        (iv)     Consequences to Holders of Allowed PIK Notes Claims (Class 7, Class 16) .................. 39

        (v)      Consequences to Holders of Allowed General Unsecured Claims Against CLAI (Class 26) ................................................................................................... 39

        (vi)     Consequences to Holders of Allowed General Unsecured Claims Against CLI (Class 34) ................................................................................................... 39

    D.      Limitations on Use of Capital Losses ..................................................................... 39

    E.      Withholding and Reporting ..................................................................................... 39

VIII.   CONCLUSION AND RECOMMENDATION ......................................................................... **41**

EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Disclosure Statement Supplement Order

EXHIBIT C    Committee Letter in Support of Debtors' Plan

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

I.    **EXECUTIVE SUMMARY**

ON NOVEMBER 25, 2013, THE COURT ENTERED AN ORDER APPROVING THE DISCLOSURE STATEMENT [DOCKET NO. 778]. EXCEPT AS MODIFIED BY THIS SUPPLEMENTAL DISCLOSURE STATEMENT RELATED TO DEBTORS' AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE (THE "***DISCLOSURE STATEMENT SUPPLEMENT***"), THE APPROVED DISCLOSURE STATEMENT [DOCKET NO. 782] (THE "***DISCLOSURE STATEMENT***") IS ADOPTED AND INCORPORATED HEREIN.

HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THIS DISCLOSURE STATEMENT SUPPLEMENT IN CONJUNCTION WITH THE DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT SUPPLEMENT MAY NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE. THE DEBTORS URGE ANY HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS FOR ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT SUPPLEMENT, THE DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE DISCLOSURE CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN. THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT SUPPLEMENT AND THE DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT SUPPLEMENT AND THE DISCLOSURE STATEMENT.

**IN THE EVENT OF ANY CONFLICT, THE CONTENT OF THE DISCLOSURE STATEMENT SUPPLEMENT SUPERSEDES THE CONTENT OF THE DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO READ THE DISCLOSURE STATEMENT SUPPLEMENT, THE DISCLOSURE STATEMENT, AND THE PLAN IN THEIR ENTIRETY, INCLUDING ALL EXHIBITS ATTACHED THERETO.**

Cengage Learning, Inc. ("**Cengage**") and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), are providing the information in this Disclosure Statement Supplement for the *Debtors' Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 12, 2014 (as may be amended, modified or supplemented from time to time, the "**Plan**")[1] to holders of Claims entitled to vote on the Plan for the purpose of soliciting votes to accept the Plan. A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. Nothing in this Disclosure Statement Supplement may be relied upon or used by any entity for any other purpose.

Since the inception of these Chapter 11 Cases, the Debtors have stressed their need to emerge from chapter 11 as expeditiously and seamlessly as possible in order to maximize the value of their estates and position their business for future success and stability. Given the numerous complex, and likely time-consuming, issues at play, the Debtors believe that the most effective way to expeditiously emerge from chapter 11 is to pursue a plan of reorganization reflecting a global settlement that is supported by the majority of their most significant secured and

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement Supplement will have the meaning ascribed to such terms in the Plan or the Disclosure Statement, as applicable, and in the event of any inconsistency, the Plan shall control. The summary of the Plan provided herein is qualified in its entirety by to the Plan. In the case of any inconsistency between this Disclosure Statement Supplement and the Plan, the Plan will govern. The "***November Plan***," refers to the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 780] filed prior to the Debtors' and the Supporting Parties' (as defined herein) entry into the Plan Support Agreement (as defined herein).

unsecured creditor constituencies and the Committee (the "*Global Settlement*").    The Plan incorporates and implements the Global Settlement, which compromises and settles pending and anticipated litigation and numerous inter-Debtor, Debtor-creditor, and inter-creditor issues and disputes, as described in the Plan.  The Plan is designed to achieve an economic settlement of Claims against the Debtors and an effective resolution of the Chapter 11 Cases.

As described in the Disclosure Statement, in an effort to reach a fully consensual plan, the Debtors, the Committee, and other parties in interest agreed to participate in mediation (the "*Mediation*") before the Honorable Robert D. Drain, Bankruptcy Judge for the United States Bankruptcy Court for the Southern District of New York. Prior to the Disclosure Statement hearing, the Debtors continued to engage with parties in interest, including both secured and unsecured creditor constituencies, as well as the Committee.   Mediation sessions and informal discussions continued, even after the approval of the Disclosure Statement, in hopes of presenting to the Court a fully consensual plan.  In total, the Debtors, the Committee, and other major stakeholders have participated in four formal mediation sessions with the assistance of Judge Drain in addition to numerous telephone conferences and email exchanges and hundreds of hours of good-faith, arms-length negotiation discussions outside of mediation.

The Debtors are pleased to report that, as a result of their continued efforts and the efforts of all participants during the Mediation, the Debtors have achieved a comprehensive agreement with the participants in the Mediation, which agreement was memorialized in the Plan Support Agreement, dated February 1, 2014 (the "*Plan Support Agreement*").  The Plan Support Agreement was executed by: (a) the Debtors; (b) the Committee; (c) certain consenting Holders of First Lien Claims; (d) the First Lien Credit Facility Administrative Agent; (e) Apax; (f) certain consenting Holders of Second Lien Claims; (g) Centerbridge; (h) the Second Lien Indenture Trustee; (i) the Senior Notes Indenture Trustee; and (j) the PIK Notes Indenture Trustee (collectively, the "*Supporting Parties*").[2]

The Global Settlement implemented under the Plan, including the Other Unsecured Creditors' Distribution, substantially improves the recoveries to unsecured creditors from the potential limited recoveries contemplated under the November Plan and removes the uncertainty and delay under the terms of the November Plan. Specifically, and as described in the Disclosure Statement, under the November Plan, distributions to unsecured creditors were uncertain, contingent and subject to the resolution of various complex disputes, which disputes would not have been considered or resolved until after the Effective Date.  Further, under the November Plan, the potential distributions to unsecured creditors (if any) could have been no greater than to $111.9 million, with the First Lien Secured Parties asserting that such distributions should be no more than $3 million and the Debtors asserting such distributions should be approximately $72 million.  Therefore, resolution of certain disputed issues in the Chapter 11 Cases and the resulting Other Unsecured Creditor Distribution provided for under the Plan, which provides unsecured creditors with significantly higher, more certain recoveries in comparison with those recoveries contemplated by the November Plan.

As a result of the Mediation, and as embodied by the agreements set forth in the Plan Support Agreement and the Plan Term Sheet (and subject to the terms thereof), the Debtors and the mediation parties have agreed to the terms of the Plan.  The Plan reflects a consensual settlement of all issues in the Chapter 11 Cases, including, but not limited to:[3]

- issues related to the Debtors' draw on the revolver in March 2013 and use of proceeds thereof;

- the Debtors' total enterprise value and the value of the domestic and foreign direct and indirect subsidiaries and affiliates;

---

[2]    The First Lien Indenture Trustee was a mediation party and participated in the Mediation but was not a signatory to the Plan Support Agreement.

[3]    To the extent the Plan contemplated by the Global Settlement is not consummated, all parties reserve all rights, including, for the avoidance of doubt, with respect to the disputed issues.

- whether the Disputed Cash constitutes unencumbered cash available for distribution to unsecured creditors;

- the number and value of the Disputed Copyrights and avoidability, validity, and perfection of the liens on Disputed Copyrights;

- whether some or all of the Debtors should be substantively consolidated;

- whether Holders of certain Claims can assert the full amount of their claims against each Debtor that is an obligor pursuant to the various funded debt agreements without having to reduce the recovery on account of such claims asserted against the other Debtor entities;

- allocation of value and assets of the Estates;

- whether the November Plan violated certain sharing and waterfall provisions of the applicable debt documents;

- issues related to the turnover provisions in the Second Lien Intercreditor Agreement and whether certain parties violated the Second Lien Intercreditor Agreement;

- release of any and all claims that may be asserted by or on behalf of the Debtors against Apax, including with respect to Apax's prepetition debt purchases, the payment of management fees, and/or the 2007 leveraged buyout;

- the validity, classification, and/or allowance of the Intercompany Obligations;

- whether the November Plan complies with the absolute priority rule and section 1129(a)(10) of the Bankruptcy Code;

- issues related to the release and exculpation provisions; and

- issues related to the Disputed Escrow provided for in the November Plan.

The disputed issues, among others, are settled pursuant to the Plan. Among other things, on account of the consensual settlement of the various disputed issues, the November Plan has been modified (the "***Plan Modifications***") to provide that:

- the total enterprise value of the Debtors will be $3.6 billion for all purposes under the Plan;

- Holders of Allowed Second Lien Claims, Senior Notes Claims, and General Unsecured Claims (including Apax, in respect of its Second Lien Claims and Senior Notes Claims) will receive recoveries consisting of New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form) in an aggregate amount of $225 million, which New Equity will be subject to certain terms and limitations, all as described more fully herein, which consideration will be allocated as set forth in the Plan and as described in the summary of expected recoveries set forth below (among other things, the allocation includes a requirement that an aggregate of $12.0 million of Cash (subject to the Withheld Apax Distribution Gross-Up) from the first Cash distributions that would be received by Apax in its capacity as a Holder of Allowed Second Lien Claims and Allowed Senior Notes Claims shall be withheld from Apax by the Debtors and distributed to non-Apax Holders of Allowed Second Lien Claims, Senior Notes Claims, PIK Notes Claims, and General Unsecured Claims, subject to Apax's right under the Plan

to elect to contribute such Cash to the Debtors in lieu of withholding such amounts from its distributions);[4]

- Holders of Allowed Second Lien Claims, Senior Notes Claims, PIK Notes Claims, and General Unsecured Claims other than Apax will receive amounts from the Withheld Apax Distribution (as further described below);

- Holders of First Lien Claims under the Plan, including Apax, will receive (a) 100% of the New Equity, reduced by the New Equity distributed as part of the Other Unsecured Creditor Distribution, and subject to dilution for the Management Incentive Plan, (b) the New Debt Facility Consideration; and (c) the Distributable Cash;

- the First Lien Claims, the Second Lien Claims, the Senior Notes Claims, and the Subordinated Notes Claims, in each case in respect of principal and interest, held by Apax (the "**Apax Debt Claims**"), shall be permanently Allowed under the Plan, not subject to challenge, reduction, recharacterization, defense, offset, or counterclaims, and paid according to the terms thereof and, except as provided in the Plan, Apax shall be deemed to waive and release any and all other claims against the Debtors;

- Intercompany Claims shall be separately classified and removed from the definition of General Unsecured Claims  and no distribution shall be made on account of Intercompany Claims and such Intercompany Claims shall be Reinstated or cancelled as of the Effective Date at the election of the Debtors; provided that such cancellation or reinstatement, as applicable, shall have no adverse effect on the distributions to the Holders of First Lien Claims or Holders of Second Lien Claims, Senior Notes Claims, Subordinated Notes Claims, PIK Notes Claims, or General Unsecured Claims, and any such cancellation or reinstatement that has such an adverse effect shall be null and void *ab initio;*

- the Disputed Unsecured Escrow and all related provisions shall be eliminated;

- certain fees and expenses of Apax, the Second Lien Indenture Trustee, the Consenting Second Lien Noteholders (solely with respect to such Holders' professional fees and expenses), the Senior Notes Indenture Trustee, the Subordinated Notes Indenture Trustee, the PIK Notes Indenture Trustee, and Centerbridge (solely with respect to such Holders' professional fees and expenses) shall be paid, subject to certain caps and other terms set forth in the Plan;

- all intercreditor disputes in connection with the Chapter 11 Cases, including claims and causes of action arising under or in connection with the Second Lien Intercreditor Agreement shall be released and waived;

- all Avoidance Actions against all persons and entities, including creditors of the Debtors or other entities who have received a voidable transfer under chapter 5 of the Bankruptcy Code, shall be released;

---

[4]    In addition, to the extent that the Class of Holders of PIK Notes Claims votes to accept the Plan and the PIK Notes Indenture Trustee does not take any action in the Chapter 11 Cases on or after the PIK Settlement Date, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support Agreement, Holders of PIK Notes Claims will receive a distribution in the aggregate of $856,344.09 in Cash from the Other Unsecured Creditor Distribution as provided for in the Plan, which amount shall be shared Pro Rata amongst all Holders of Allowed PIK Notes Claims in accordance with and subject to the terms of the PIK Notes Indenture and shall not be subject to any subordination right or obligation.

- the Adversary Proceedings (as defined herein) shall be dismissed with prejudice as of the Effective Date of the Plan;

- the terms applicable to the New Shareholders Agreement and the other New Corporate Governance Documents shall be modified in certain respects;

- the terms of the Management Incentive Plan shall be modified in certain respects (an amended term sheet for the Management Incentive Plan is attached to the Plan Support Agreement and the Management Incentive Plan will be included in the Plan Supplement); and

- Holders of Allowed Second Lien Claims, Senior Notes Claims, and General Unsecured Claims may elect (in whole or in part) to receive New Equity, subject to dilution for the Management Incentive Plan, and/or Cash, which election must be made on Distribution Election Form. The issuance of New Equity is subject to certain restrictions described herein and set forth in the Plan.

**THE DEBTORS AND THE COMMITTEE, THE AD HOC FIRST LIEN GROUP, THE FIRST LIEN CREDIT FACILITY ADMINISTRATIVE AGENT, CERTAIN CONSENTING HOLDERS OF FIRST LIEN NOTES CLAIMS, THE CONSENTING SECOND LIEN NOTEHOLDERS, THE SECOND LIEN INDENTURE TRUSTEE, CENTERBRIDGE, THE SENIOR NOTES INDENTURE TRUSTEE, AND THE PIK NOTES INDENTURE TRUSTEE RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

II.    **SUMMARY OF TREATMENT UNDER THE PLAN AND EXPECTED RECOVERIES**

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to Holders of Allowed Claims and Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE BASED ON THE GLOBAL SETTLEMENT AND ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE BASED UPON FACTORS RELATED TO THE DEBTORS' BUSINESS OPERATIONS AND GENERAL ECONOMIC CONDITIONS, AND, SOLELY FOR HOLDERS OF GENERAL UNSECURED CLAIMS, THE AMOUNT OF GENERAL UNSECURED CLAIMS THAT ARE ALLOWED. ACTUAL RECOVERIES FOR ALL CREDITORS ARE SUBJECT TO MATERIAL CHANGE FROM THOSE PRESENTED.[5]**

**RECOVERIES FOR SECOND LIEN CLAIMS AND SENIOR NOTES CLAIMS ARE PRESENTED ON THE BASIS THAT HOLDERS ARE NOT APAX AND SUCH RECOVERIES TAKE INTO ACCOUNT THE APPLICATION OF THE WITHHELD APAX DISTRIBUTION.**

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| 1 | Other Priority | Except to the extent that a Holder of an Allowed | 100.0% | 100.0% |

---

[5]    Recovery percentages are presented for each Class of Claims on an aggregate basis across all four Debtors. In addition, recovery percentages are presented without distinguishing between First Lien Secured Claims and First Lien Deficiency Claims. For purposes of the Plan and the Global Settlement, First Lien Claims are treated as if they are under-secured and are not receiving post-petition interest. For purposes of the Plan and the Global Settlement, Second Lien Claims are treated as if they are unsecured and are not receiving post-petition interest.

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | Claims | Other Priority Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall be paid in full in Cash on (i) the Effective Date or as soon as practicable thereafter, (ii) if after the Effective Date, the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or (iii) such other date as may be ordered by the Bankruptcy Court. | | |
| 2 | Other Secured Claims | Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall be paid in full in Cash on (i) the Effective Date or as soon as practicable thereafter, (ii) if after the Effective Date, the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) such other date as may be ordered by the Bankruptcy Court. | 100.0% | 100.0% |
| 3, 12, 21, and 29 | First Lien Secured Claims | **First Lien Secured Claims against CL Holdings (Class 3):** Except to the extent that a Holder of an Allowed First Lien Secured Claim against CL Holdings agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CL Holdings, each Holder of an Allowed First Lien Secured Claim against CL Holdings, including Apax, shall receive its Pro Rata share of (i) the First Lien Claim Distribution allocable to CL Holdings on account of their Secured Claims against CL Holdings and (ii) subject to Article III.B.20 of the Plan, the CL Holdco Interests that are the collateral of the Holders of First Lien Secured Claims against CL Holdings, in each case as allocable to Holders of Allowed First Lien Secured Claims against CL Holdings. Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Secured Claims held by such Holder against CL Holdings shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.<br><br>**First Lien Secured Claims against CL Holdco (Class 12):** Except to the extent that a Holder of an | 84.1% | 84.1% |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | | Allowed First Lien Secured Claim against CL Holdco agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CL Holdco, each Holder of an Allowed First Lien Secured Claim against CL Holdco, including Apax, shall receive its Pro Rata share of (i) the First Lien Claim Distribution allocable to CL Holdco on account of their Secured Claims against CL Holdco and (ii) subject to Article III.B.28 of the Plan, the CLAI Interests that are the collateral of the Holders of First Lien Secured Claims against CL Holdco, in each case as allocable to Holders of Allowed First Lien Secured Claims against CL Holdco.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Claims held by such Holder against CL Holdco shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.<br><br>**First Lien Secured Claims Against CLAI (Class 21)**:  Except to the extent that a Holder of an Allowed First Lien Secured Claim against CLAI agrees to less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CLAI, each Holder of an Allowed First Lien Secured Claim against CLAI, including Apax, shall receive its Pro Rata share of (i) the First Lien Claim Distribution allocable to the Secured Claims against CLAI and (ii) subject to Article III.B.36 of the Plan, the CLI Interests that are the collateral of the Holders of First Lien Secured Claims against CLAI, in each case as allocable to Holders of Allowed First Lien Secured Claims against CLAI.  Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Notes Claims held by such Holder against CLAI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.<br><br>**First Lien Secured Claims Against CLI (Class 29)**: Except to the extent that a Holder of an Allowed First Lien Secured Claim against CLI agrees to a less favorable treatment, in exchange for full and final | | |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | | satisfaction, settlement, release, and compromise of each and every Allowed First Lien Secured Claim against CLI, each Holder of an Allowed First Lien Secured Claim against CLI, including Apax, shall receive its Pro Rata share of the First Lien Claim Distribution allocable to Holders of Allowed First Lien Secured Claims against CLI.   Distributions received under the Plan by Holders of Allowed First Lien Secured Claims on account of First Lien Note Claims against CLI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | | |
| 4, 13, 22, and 30 | First Lien Deficiency Claims | **First Lien Deficiency Claims Against CL Holdings (Class 4)**:  No distribution.<br><br>**First Lien Deficiency Claims Against CL Holdco (Class 13)**:  No distribution.<br><br>**First Lien Deficiency Claims Against CL Holdco (Class 22)**:  Except to the extent that a Holder of an Allowed First Lien Deficiency Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Deficiency Claims against CLAI, each Holder of an Allowed First Lien Deficiency Claim against CLAI, including Apax, shall receive its Pro Rata share of the First Lien Claim Distribution allocable to Holders of Allowed First Lien Deficiency Claims against CLAI. Distributions received under the Plan by Holders of Allowed First Lien Deficiency Claims on account of First Lien Note Claims held by such Holder against CLAI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee.<br><br>**First Lien Deficiency Claims Against CL Holdco (Class 30)**:  Except to the extent that a Holder of an Allowed First Lien Deficiency Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed First Lien Deficiency Claim against CLI, each Holder of an Allowed First Lien Deficiency Claim against CLI, including Apax, shall receive its Pro Rata share of the First Lien Claim Distribution allocable to Holders of Allowed First Lien Deficiency Claims against CLI. | 84.1% | 84.1% |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | | Distributions received under the Plan by Holders of Allowed First Lien Deficiency Claims on account of the First Lien Note Claims against CLI shall be subject to the application of the Charging Lien of the First Lien Indenture Trustee for payment of unpaid fees and costs of the First Lien Indenture Trustee. | | |
| 5, 14, 23, and 31 | Second Lien Claims | **Second Lien Claims Against CL Holdings (Class 5)**: No distribution.<br><br>**Second Lien Claims Against CL Holdco (Class 14)**: No distribution.<br><br>**Second Lien Claims Against CL Holdco (Class 23)**: Except to the extent that a Holder of an Allowed Second Lien Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Claim against CLAI, each Holder of an Allowed Second Lien Claim against CLAI shall receive on the Effective Date from the Other Unsecured Creditor Distribution: (i) New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form and shall be subject to the terms set forth in Article IV.B of the Plan) in an aggregate amount of $140,625,000, which amount shall be shared Pro Rata amongst all Holders of Allowed Second Lien Claims, including Apax, against CLI and CLAI (subject to the withholding of $7,500,000 from the Withheld Apax Distribution); (ii) Cash in the amount of $7,500,000 from the Withheld Apax Distribution (subject to the Withheld Apax Distribution Gross-Up), which amount of Cash shall be shared Pro Rata amongst all Holders of Allowed Second Lien Claims against CLI and CLAI other than Apax; and (iii) Cash in the aggregate amount of $12,057,330.52 which amount shall be available for distribution, subject to the Charging Lien, on account of Allowed Second Lien Claims, including Apax, against CLI and CLAI; <u>provided</u>, such distributions shall be subject to the application of the Charging Lien of the Second Lien Indenture Trustee for payment of unpaid fees and costs of the Second Lien Indenture Trustee.<br><br>**Second Lien Claims Against CL Holdco (Class 31)**: Except to the extent that a Holder of an | 20.6% | 20.6% |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | | Allowed Second Lien Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Second Lien Claim against CLI, each Holder of an Allowed Second Lien Claim against CLI shall receive on the Effective Date from the Other Unsecured Creditor Distribution: (i) New Equity, subject to dilution for the Management Incentive Plan and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form and shall be subject to the terms set forth in Article IV.B of the Plan) in an aggregate amount of $140,625,000, which amount shall be shared Pro Rata amongst all Holders of Allowed Second Lien Claims, including Apax, against CLI and CLAI (subject to the withholding of $7,500,000 in Cash from the Withheld Apax Distribution); (ii) Cash in the amount of $7,500,000 from the Withheld Apax Distribution (subject to the Withheld Apax Distribution Gross-Up), which amount of Cash shall be shared Pro Rata amongst all Holders of Allowed Second Lien Claims against CLI and CLAI other than Apax; and (iii) Cash in the aggregate amount of $12,057,330.52 which amount shall be available for distribution, subject to the Charging Lien, on account of Allowed Second Lien Claims, including Apax, against CLI and CLAI; provided, such distributions shall be subject to the application of the Charging Lien of the Second Lien Indenture Trustee for payment of unpaid fees and costs of the Second Lien Indenture Trustee. | | |
| 6, 15, 24, and 32 | Senior Notes Claims | **Senior Notes Claims Against CL Holdings (Class 6)**: No distribution.<br><br>**Senior Notes Claims Against CL Holdco (Class 15)**: No distribution.<br><br>**Senior Notes Claims Against CLAI (Class 24)**: Except to the extent that a Holder of an Allowed Senior Notes Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim against CLAI, Holders of Allowed Senior Notes Claims against CLAI shall receive on the Effective Date from the Other Unsecured Creditor Distribution: (i) New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the | 25.3% | 25.7% |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|-------|----------------------|-----------------------------------|---------|---------|
| | | election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form and shall be subject to the terms set forth in Article IV.B of the Plan) in an aggregate amount of $72,137,796, which amount shall be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims, including Apax, against CLI and CLAI (subject to the withholding of $3,847,349 in Cash from the Withheld Apax Distribution); provided, that the aggregate amount to be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims, including Apax, shall be increased to $73,020,533 if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) of the Plan; (ii) Cash in the aggregate amount of $3,847,349 from the Withheld Apax Distribution (subject to the Withheld Apax Distribution Gross-Up), which amount of Cash shall be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims against CLI and CLAI other than Apax; provided, that such aggregate amount from the Withheld Apax Distribution shall be increased to $3,894,428 (subject to the Withheld Apax Distribution Gross-Up) if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) of the Plan; and (iii) Cash in the aggregate amount of $1,450,000.00, which amount shall be available for distribution, subject to the Charging Lien, on account of Allowed Senior Notes Claims, including Apax, against CLI and CLAI; provided, such distributions shall be subject to the application of the Charging Lien of the Senior Notes Indenture Trustee for payment of unpaid fees and costs of the Senior Notes Indenture Trustee. <br><br> **Senior Notes Claims Against CLI (Class 32)**: Except to the extent that a Holder of an Allowed Senior Notes Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Senior Notes Claim against CLI, Holders of Allowed Senior Notes Claims against CLI shall receive on the Effective Date from the Other Unsecured Creditor Distribution: (i) New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form and | | |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | | shall be subject to the terms set forth in Article IV.B of the Plan) in an aggregate amount of $72,137,796, which amount shall be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims (including Apax) against CLI and CLAI (subject to the withholding of $3,847,349 in Cash from the Withheld Apax Distribution); provided, that such aggregate amount to be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims against CLI, including Apax, shall be increased to $73,020,533 if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) of the Plan; (ii) Cash in the aggregate amount of $3,847,349 from the Withheld Apax Distribution (subject to the Withheld Apax Distribution Gross-Up), which amount of Cash shall be shared Pro Rata amongst all Holders of Allowed Senior Notes Claims against CLI and CLAI other than Apax; provided, that such aggregate amount from the Withheld Apax Distribution shall be increased to $3,894,428 (subject to the Withheld Apax Distribution Gross-Up) if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) of the Plan; and (iii) Cash in the aggregate amount of $1,450,000.00, which amount shall be available for distribution, subject to the Charging Lien, on account of Allowed Senior Notes Claims, including Apax, against CLI and CLAI; provided, such distributions shall be subject to the application of the Charging Lien of the Senior Notes Indenture Trustee for payment of unpaid fees and costs of the Senior Notes Indenture Trustee. | | |
| 7 and 16 | PIK Notes Claims | **PIK Notes Claims Against CL Holdings (Class 7)**: No distribution.<br><br>**PIK Notes Claims Against CL Holdco (Class 16)**: Except to the extent that a Holder of an Allowed PIK Notes Claim against CL Holdco agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and compromise of each and every Allowed PIK Notes Claim against CL Holdco, each Holder of an Allowed PIK Notes Claim against CL Holdco shall:  (i) to the extent that the Class of Holders of PIK Notes Claims votes to accept the Plan and the PIK Notes Indenture Trustee does not take any action on or after the PIK Settlement Date in the Chapter 11 Cases, including regarding the Plan, that | 1.3% | 0.0% |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | | is inconsistent with the Plan or any agreements under the Plan Support Agreement, receive, on the Effective Date, its share of the PIK Notes Settlement Recovery Amount, which amount shall be shared Pro Rata amongst all Holders of Allowed PIK Notes Claims in accordance with and subject to the terms of the PIK Notes Indenture and shall not be subject to any subordination right or obligation; provided, such distributions shall be subject to the application of the Charging Lien of the PIK Notes Indenture Trustee for payment of unpaid fees and costs of the PIK Notes Indenture Trustee; or (ii) to the extent that the Class of Holders of PIK Notes Claims does not vote to accept the Plan and/or the PIK Notes Indenture Trustee takes any action on or after the PIK Settlement Date in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support Agreement, not be entitled to and shall not receive any portion of the PIK Notes Settlement Recovery Amount or any other distribution on account of such Claims, and the PIK Notes Claims against CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date; provided that the PIK Notes Settlement Recovery Amount and the Apax Share Amount shall be added to and included in the Distributions of Holders of Senior Notes Claims, including Apax (other than with respect to any Withheld Apax Distribution), and General Unsecured Claims as provided under the Plan; provided that, in either case, Holders of PIK Notes Claims against CL Holdco shall receive Cash in the amount of $1,300,000.00, which shall be available for distribution, subject to the Charging Lien, on account of Allowed PIK Notes Claims against CL Holdco, provided, such distributions shall be subject to the application of the Charging Lien of the PIK Notes Indenture Trustee for payment of unpaid fees and costs of the PIK Notes Indenture Trustee; provided however that the Holders of PIK Notes Claims shall not be entitled to receive such Cash in the amount of $1,300,000.00 if the PIK Notes Indenture Trustee is directed by Holders of PIK Notes Claims to take action (and does take such action on or after the PIK Settlement Date) in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support Agreement. | | |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| 8, 17, 25, and 33 | Subordinated Notes Claims | **Subordinated Notes Claims Against CL Holdings (Class 8)**: No distribution.<br><br>**Subordinated Notes Claims Against CL Holdco (Class 17)**: No distribution.<br><br>**Subordinated Notes Claims Against CLAI (Class 25)**: No distribution.<br><br>**Subordinated Notes Claims Against CLI (Class 33)**: No distribution. | 0.0% | 0.0% |
| 9, 18, 26 and 34 | General Unsecured Claims | **General Unsecured Claims Against CL Holdings (Class 9)**: No distribution.<br><br>**General Unsecured Claims Against CL Holdco (Class 18)**: No distribution.<br><br>**General Unsecured Claims Against CLAI (Class 26)**: Except to the extent that a Holder of an Allowed General Unsecured Claim against CLAI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed General Unsecured Claim against CLAI, each Holder of an Allowed General Unsecured Claim against CLAI shall receive from the Other Unsecured Creditor Distribution: (i) New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form and shall be subject to the terms set forth in Article IV.B) in an aggregate amount of $11,217,204, which amount shall be shared Pro Rata amongst all Holders of Allowed General Unsecured Claims against CLAI and Allowed General Unsecured Claims against CLI; provided that the aggregate amount shall be increased to $11,354,467 if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) of the Plan; (ii) Cash in the amount of $598,251 from the Withheld Apax Distribution less the funding of the Post-Effective Date Committee Reserve plus any unspent amounts in the Post-Effective Date Committee Reserve Account, which aggregate amount of Cash shall be shared Pro Rata amongst all Holders of General Unsecured Claims against CLAI and General Unsecured Claims against CLI; provided that the aggregate amount from the Withheld Apax Distribution shall be increased to $605,572 less the funding of the Post-Effective Date | 7.2% | 7.2% |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | | Committee Reserve plus any unspent amounts in the Post-Effective Date Committee Reserve Account, if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) of the Plan; and provided, that to the extent that recoveries to Holders of Allowed General Unsecured Claims against CLAI would exceed 7.2%, any such excess in distributions shall be instead distributed Pro Rata amongst Holders of Allowed General Unsecured Claims against CLI.<br><br>**General Unsecured Claims Against CLI (Class 34)**:  Except to the extent that a Holder of an Allowed Class 34 General Unsecured Claim against CLI agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release, and compromise of each and every Allowed Class 34 General Unsecured Claim against CLI, each Holder of an Allowed Class 34 General Unsecured Claim against CLI shall receive on the Effective Date from the Other Unsecured Creditor Distribution: (i) New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form and shall be subject to the terms set forth in Article IV.B of the Plan) in an aggregate amount of $11,217,204, which amount shall be shared Pro Rata amongst all Holders of Allowed General Unsecured Claims against CLAI and Allowed General Unsecured Claims against CLI; provided, that such aggregate amount shall be increased to $11,354,467 if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) of the Plan; (ii) Cash in the amount of $598,251 from the Withheld Apax Distribution less the funding of the Post-Effective Date Committee Reserve plus any unspent amounts in the Post-Effective Date Committee Reserve Account, which aggregate amount of Cash shall be shared Pro Rata amongst all Holders of General Unsecured Claims against CLAI and General Unsecured Claims against CLI; provided, that such aggregate amount from the Withheld Apax Distribution shall be increased to $605,572 less the funding of the Post-Effective Date Committee Reserve plus any unspent amount in the Post-Effective Date Committee Reserve Account if the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article | | |

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Recovery Under the Plan with Distributions on Account of PIK Notes Claim | Projected Recovery Under the Plan without Distributions on Account of PIK Notes Claim |
|---|---|---|---|---|
| | | III.B(16)(ii) of the Plan; and <u>provided</u>, that to the extent that recoveries to Holders of Allowed General Unsecured Claims against CLAI would exceed 7.2%, any such excess in distributions shall be instead distributed Pro Rata amongst Holders of Allowed General Unsecured Claims against CLI. | | |
| 10, 19, 27, and 35 | Section 510(b) Claims | **Section 510(b) Claims Against CL Holdings (Class 10)**: No distribution.<br><br>**Section 510(b) Claims Against CL Holdco (Class 19)**: No distribution.<br><br>**Section 510(b) Claims Against CLAI (Class 27)**: No distribution.<br><br>**Section 510(b) Claims Against CLI (Class 35)**: No distribution. | 0.0% | 0.0% |
| 11 | CL Holdings Interests | No distribution. | 0.0% | 0.0% |
| 20 | CL Holdco Interests | To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CL Holdco Interests shall be Reinstated on the Effective Date. | 100.0% | 100.0% |
| 28 | CLAI Interests | To the extent not otherwise transferred by CL Holdings to Reorganized Cengage, CLAI Interests shall be Reinstated on the Effective Date. | 100.0% | 100.0% |
| 36 | CLI Interests | To the extent not otherwise transferred by CLAI to Reorganized Cengage, CLI Interests shall be reinstated on the Effective Date. | 100.0% | 100.0% |
| 37 | Intercompany Claims | Holders of Intercompany Claims shall not receive any distribution on account of such Claims, and the Intercompany Claims shall be Reinstated or cancelled as of the Effective Date at the election of the Debtors; <u>provided</u> that such cancellation or reinstatement, as applicable, shall have no adverse effect on the distributions to the Holders of First Lien Claims or Holders of Second Lien Claims, Senior Notes Claims, Subordinated Notes Claims, PIK Notes Claims, or General Unsecured Claims or on the PIK Notes Settlement Total Amount, the PIK Notes Settlement Recovery Amount, or the Apax Share Amount, and any such cancellation or reinstatement that has such an adverse effect shall be null and void *ab initio*. | N/A | N/A |

### III.    REVISED SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement Supplement, accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in Classes 3, 12, 16, 21-24, 26, 29-32, and 34.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Supplement Order, which is attached hereto as **Exhibit C**.

Pursuant to the Disclosure Statement Supplement Order, the following dates shall govern the Debtors' solicitation of the Plan:

- February 7, 2013 at 5:00 p.m. (prevailing Eastern Time):  Voting Record Date;

- February 13, 2014 at 4:00 p.m. (prevailing Eastern Time):  deadline for the Debtors to complete distribution of the Supplemental Solicitation Packages to the Holders of Claims entitled to vote on the Plan;

- February 14, 2014:  deadline for the Debtors to publish the Confirmation Hearing Notice;

- February 24, 2014:  deadline to file and serve the Plan Supplement;

- March 10, 2014 at 4:00 p.m. (prevailing Eastern Time):  deadline for Holders of Claims entitled to vote on the Plan to submit their Ballots voting for or against the Plan and, if applicable, making the election to receive New Equity;

- March 10, 2014 at 4:00 p.m. (prevailing Eastern Time):  deadline to file objections to confirmation of the Plan;

- March 12, 2014 at 4:00 p.m. (prevailing Eastern Time):   deadline for the Debtors to reply to objections to the Plan;

- March 12, 2014:  deadline to file voting certification

- March 13, 2014 at 8:30 a.m. (prevailing Eastern Time):  Confirmation Hearing and hearing on Global Settlement Motion (as defined below).

This Disclosure Statement, accompanied by the Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims entitled to vote on the Plan.  If you are a Holder of one or more Claims in the following Class, you may vote for or against the Plan by completing the Ballot and returning it in the envelope provided:

- **Class 3 (First Lien Secured Claims against CL Holdings)**

- **Class 12 (First Lien Secured Claims against CL Holdco)**

- **Class 16 (PIK Notes against CL Holdco)**

- **Class 21 (First Lien Secured Claims against CLAI)**

- **Class 22 (First Lien Deficiency Claims against CLAI)**

- **Class 23 (Second Lien Claims against CLAI)**

- **Class 24 (Senior Notes Claims against CLAI)**

- **Class 26 (General Unsecured Claims against CLAI)**

- **Class 29 (First Lien Secured Claims against CLI)**

- **Class 30 (First Lien Deficiency Claims against CLI)**

- **Class 31 (Second Lien Claims against CLI)**

- **Class 32 (Senior Notes Claims against CLI)**

- **Class 34 (General Unsecured Claims against CLI)**

The Debtors, with the approval of the Bankruptcy Court, have engaged Donlin, Recano & Company, Inc. 419 Park Avenue South, New York, NY 10016, to serve as the voting agent for all Claims and generally oversee the voting process (the "***Notice, Claims, and Solicitation Agent***").  The Notice, Claims, and Solicitation Agent will process and tabulate Ballots for Classes 3, 12, 16, 21-24, 26, 29-32, and 34.

> **PLEASE NOTE THAT IF YOU ALREADY HAVE SUBMITTED A BALLOT, YOU WILL NEED TO SUBMIT A NEW BALLOT FOR YOUR VOTE TO BE COUNTED.  THE NEW BALLOT WILL BE DEEMED TO SUPERSEDE AND REVOKE ANY EARLIER BALLOT SUBMITTED.**

Holders of Second Lien Claims, Senior Notes Claims, and General Unsecured Claims will be entitled to make an election regarding whether to receive their distribution in Cash, New Equity, or a combination of both (the "*Distribution Election*") but are not required to make said Distribution Election on their Ballot. The Distribution Election will be made on the Distribution Election Form, which will be distributed in a separate mailing from the Ballots pursuant to procedures agreed to by the Supporting Parties and approved by Order of the Bankruptcy Court. Article IV of this Disclosure Statement Supplement contains information on certain restrictions and other relevant considerations related to this election.

The deadline to vote on the Plan is 4:00 p.m. (prevailing Eastern Time), on March 10, 2014.

| **BALLOTS** |
|---|
| Ballots and Master Ballots must be actually received by the Notice, Claims, and Solicitation Agent by the voting deadline of 4:00 p.m. (prevailing Eastern Time) on March 10, 2014 at the following address: |
| **Donlin, Recano & Company, Inc.**<br>**Notice, Claims, and Solicitation Agent for Cengage Learning, Inc., et al**<br>**Attn: Cengage Learning, Inc. Ballot Processing**<br>**P.O. Box 899 Madison Square Station**<br>**New York, New York 10010** |
| If you received an envelope addressed to your nominee, please allow enough time when you return your Ballot for your nominee to cast your vote on a Master Ballot before the voting deadline. |
| If you have any questions on the procedure for voting on the Plan, please call the Notice, Claims, and Solicitation Agent at the following telephone number: |
| **(800) 654-4131** (within the U.S.) |
| **(646) 378-4198** (outside the U.S.) |

More detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims that are entitled to vote on the Plan. For your vote to be counted, your Ballot must be completed, signed and received by **4:00 p.m. (prevailing Eastern Time), on March 10, 2014**.

Any Ballot that is properly executed by a Holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

All Ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each Ballot.

## IV.     SUMMARY OF PLAN MODIFICATIONS

### A.     Settlement of Disputed Issues and Cases and Controversies

The Plan provides for a good-faith compromise and settlement of various issues and disputes. Accordingly, consistent with the terms of the Plan Support Agreement, the Debtors modified and amended the November Plan and are seeking to implement a restructuring process consistent with the Plan Term Sheet in order to consummate a plan that the Debtors will seek to have confirmed pursuant to section 1123 and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019.

**To the extent the Plan contemplated by the Global Settlement is not consummated, all parties reserve all rights.**

### B. Revised Treatment of Claims

As set forth in Article II above, the treatment of First Lien Claims, Second Lien Claims, Senior Notes Claims, General Unsecured Claims, PIK Notes Claims, Subordinated Notes Claims, and Intercompany Claims has been modified to eliminate the Disputed Unsecured Escrow and to provide for the distribution of the Other Unsecured Creditor Distribution. The Other Unsecured Creditor Distribution means (a) on the Effective Date, New Equity, subject to dilution for the Management Incentive Plan, and/or Cash (at the election (in whole or in part) of each Holder, which election shall be made pursuant to a Distribution Election Form) in an aggregate amount of $225 million, which is subject to the terms set forth in Article IV.B and Article IV.C of the Plan and (b) the Withheld Apax Distribution; provided, that for the avoidance of doubt, Holders of other Classes of Claims, including Priority Tax Claims, Administrative Claims, Secured Claims, First Lien Deficiency Claims, Intercompany Claims, Section 510(b) Claims, and Other Priority Claims shall not be entitled to any recovery from the Other Unsecured Creditor Distribution; provided further, that for the avoidance of doubt, (x) the distribution of the Other Unsecured Creditor Distribution to the Holders of Second Lien Claims shall not be subject to any subordination or turnover under the Second Lien Intercreditor Agreement and the distribution of Other Unsecured Creditor Distribution pursuant to Article III.B of the Plan shall not be subject to any subordination or turnover to the Holders of First Lien Claims and (y) the allocation of the Other Unsecured Creditor Distribution pursuant to Article III.B of the Plan gives effect to the subordination and turnover rights of the Holders of the Second Lien Claims and Senior Notes Claims against Holders of Subordinated Notes Claims.

Holders of Allowed Second Lien Claims, Senior Notes Claims, and General Unsecured Claims who elect to receive New Equity, subject to dilution for the Management Incentive Plan must make such election on the Distribution Election Form. The issuance of New Equity is subject to certain restrictions described herein and set forth in the Plan.

The Global Settlement and the allowance, classification, and treatment of Allowed Claims and the respective distribution and treatment of such Allowed Claims under the Plan take into account the relative priority and rights of the Claims in each Class in connection with any contractual, legal, or equitable subordination and turnover rights relating thereto, and the Plan provides for such subordination or turnover except as specifically provided for under the Plan (and in each case, such subordination or turnover rights are waived, released, or settled as provided under the Plan).

### C. Restrictions on New Equity Distributed as Part of the Other Unsecured Creditor Distribution

The New Equity to be distributed to certain creditors as part of the Other Unsecured Creditor Distribution is subject to the following terms:

(1) the calculation of the value of New Equity for the purpose of such distribution shall be based on a $3.6 billion total enterprise value for the Reorganized Debtors less the amount of the New Debt Facility (which shall be in an amount between $1.5 billion and $1.75 billion as set forth in the November Plan) plus Balance Sheet Cash;

(2) an election of New Equity shall only be permitted if after giving effect to the election such Holder (on the Effective Date) would not have more than 14.9% of the New Equity first taking into account other New Equity such Holder would receive under the Plan (the "*Equity Election Cap*") and any amounts exceeding the Equity Election Cap as a result of such election will be paid in Cash;

(3) notwithstanding any election to receive New Equity by a Holder of a General Unsecured Claim, to the extent determined by the Debtors or the Reorganized Debtors, as applicable, in consultation with the Committee, to be necessary to ensure that the total number of recipients of New Equity pursuant to the Plan does not cause the Reorganized Debtors to become subject to the Reporting Requirements, the Debtors or the Reorganized Debtors, as applicable, shall be permitted to make Cash distributions to Holders of General Unsecured Claims that elected to receive New Equity to the extent necessary to ensure that the Reorganized Debtors do not become subject to the Reporting Requirements, which Cash distribution shall start with the smallest Allowed General Unsecured Claim

that elected to receive New Equity and will proceed in ascending size of Allowed General Unsecured Claims as necessary to ensure that the Reorganized Debtors do not become subject to the Reporting Requirements; and

(4) to the extent that a Holder is entitled to make an election of either Cash and/or New Equity and such Holders fails to timely return a Distribution Election Form or fails to make an election of New Equity or Cash on the Distribution Election Form that was timely submitted, the Holder shall be deemed to have elected Cash.

### D.    Withheld Apax Distribution

The Withheld Apax Distribution means an aggregate of $12.0 million of Cash (subject to increase as set forth in this paragraph for the benefit solely of non-Apax Holders of Allowed Second Lien Claims and/or non-Apax Holders of Allowed Senior Notes Claims as set forth below) funded at Apax's election immediately prior to the Effective Date either (a) from the first Cash distributions that would be received by Apax in its capacity as a Holder of Allowed Second Lien Claims and Allowed Senior Notes Claims, which shall be withheld from Apax by the Debtors or (b) Cash contributed by Apax to the Debtors  and, in either case, distributed to all non-Apax Holders of Allowed Second Lien Claims, Allowed Senior Notes Claims, Allowed General Unsecured Claims, and Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution as set forth in Article III.B of the Plan and subject to the terms set forth in Article IV.C of the Plan. If as of the Distribution Record Date, Apax shall have effected any sale, transfer, or assignment of any of its Allowed Second Lien Claims or Allowed Senior Notes Claims to any Person in accordance with the Plan Support Agreement (each such Person, an "***Apax Transferee***"), then immediately prior to the Effective Date Apax shall, by payment to the Debtors, increase in Cash the portion of the Withheld Apax Distribution allocable under the Plan solely to all non-Apax Holders of Allowed Second Lien Claims and/or non-Apax Holders of Allowed Senior Notes Claims, as applicable, the Withheld Apax Distribution Gross-Up.  For the avoidance of doubt, each Apax Transferee and each of its direct and indirect successors, transferees, and assigns shall be deemed a "non-Apax Holder" and, accordingly, shall be entitled to share in the Withheld Apax Distribution, as increased in accordance with the foregoing.

The Withheld Apax Distribution Gross-Up means the increase in the amount of the Withheld Apax Distribution for the benefit solely of non-Apax Holders of Allowed Second Lien Claims and/or non-Apax Holders of Allowed Senior Notes Claims to ensure that the incremental percentage recovery to non-Apax Holders (prior to giving effect to any PIK Notes recovery hereunder), calculated as of the entry of the Approval Order based upon the greater of (a) the Second Lien Claims and Senior Notes Claims held by Apax as of the Petition Date or (b) the amount of the Allowed Apax Claims set forth in Article III.D of the Plan, attributable to their allocable portion of the Withheld Apax Distribution, remains the same and is not reduced as a result of any sale, transfer, or assignment to an Apax Transferee (as defined in the definition of the "Withheld Apax Distribution"), which amount shall be expressed as a percentage of the amount of transferred Allowed Second Lien Claims and transferred Allowed Senior Notes Claims, as applicable, and will be filed as part of the Plan Supplement.

The Withheld Apax Distribution will be $12.0 million in Cash (subject to increase by the amount of any Withheld Apax Distribution Gross-Up) and will be distributed to all non-Apax Holders of Allowed Second Lien Claims (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), Allowed Senior Notes Claims (subject to increase by the amount of any Withheld Apax Distribution Gross-Up), Allowed General Unsecured Claims, and Allowed PIK Notes Claims as part of the Other Unsecured Creditor Distribution as set forth in Article III.B of the Plan.

Apax agrees that, notwithstanding any transfer of an Other Unsecured Claim held by Apax, Apax shall cause the Withheld Apax Distribution to be $12.0 million in Cash plus the amount of any Withheld Apax Distribution Gross-Up (if any) to be paid in Cash, including, in each case to the extent necessary (or if Apax so elects), through the payment of Cash by Apax to the Debtors on or prior to the Effective Date.

For the avoidance of doubt, the applicability of the Equity Election Cap (as described in Article IV.B and including as to any election made by Apax) shall be determined based solely on the identity and holdings of the Holder that would be entitled to receive a distribution of New Equity and/or Cash in respect of such election as of the Distribution Record Date and, so long as such Holder is not Apax (or an Affiliate thereof), such determination shall be made without any regard to Apax's holdings at any time.

E.    **Apax Fees and Releases**

As described above, the Apax Debt Claims shall be Allowed and receive the treatment under the plan described above. In addition, on the Effective Date, the Debtors shall pay Apax $8 million in Cash in respect of its Claim for accrued fees and expenses in full and final satisfaction of all of Apax's Claims against the Debtors for accrued fees and expenses. Subject to and in exchange for the foregoing, the treatment under the Plan contemplated of the Allowed Apax Debt Claims and Apax's other treatment under the Plan, on the Effective Date, Apax shall irrevocably waive any and all other Claims against the Debtors, including without limitation any Claims against the Debtors for fees, expenses or indemnification under the First Lien Documents, including under Section 11.04 or 11.05 of the First Lien Credit Facility Agreement, the First Lien Intercreditor Agreement, the First Lien Indenture or the Second Lien Intercreditor Agreement.

In addition, subject to and in exchange for the treatment of the Apax Debt Claims under the Plan, Apax shall not be entitled to, and shall be deemed to have waived on the Effective Date of the Plan, any distribution, recovery, reimbursement, claim, or other payment (i) under Sections 2.12 and 2.13 of the First Lien Credit Facility Agreement for any pre-Effective Date actions, (ii) under clause "Second" of Section 8.04 of the First Lien Credit Facility Agreement, (iii) under Section 6.06 or 6.13 of the First Lien Indenture for any pre-Effective Date actions, or (iv) from or related to any pre-Effective Date breach or alleged breach of the First Lien Intercreditor Agreement, including, without limitation, Sections 2.01, 2.02(d), 2.03(a) and 2.03(b) of the First Lien Intercreditor Agreement, or the Second Lien Intercreditor Agreement, and in each case Apax shall irrevocably release, on the Effective Date, the First Lien Credit Facility Agents, the First Lien Trustee and each Holder of a First Lien Claim in connection with any (a) pre-Effective Date claim or cause of action solely with respect to clauses (i), (iii) and (iv) and (b) any claim or cause of action solely with respect to clause (ii); provided that the foregoing release and waiver (1) shall not apply to any payments or distributions from the Debtors to or for the benefit of a Holder of a First Lien Claim made prior to the Effective Date that are not provided for in the Cash Collateral Order (as amended to date and hereafter solely for the purposes described in Section 4.01(c) of the Plan Support Agreement) and (2) shall not apply to Apax's rights to share in any excess payments solely of principal or interest (but in no case to recover any portion of the Withheld Apax Distribution) under Section 2.13 of the First Lien Credit Facility Agreement or any similar sharing provision in any other agreement, all of which rights are and shall be fully preserved.

Upon the Effective Date, Apax's proofs of claim for unpaid management fees and other obligations [Claim Nos. 3312-3324] shall, to the extent not otherwise withdrawn, be disallowed in their entirety.

Other than the distribution on account of the Apax Fees, the Apax Debt Claims (*i.e.* the First Lien Claims, the Second Lien Claims, the Senior Notes Claims and the Subordinated Notes Claims, in each case in respect of principal and interest held by Apax), and the Apax Share Amount, Apax will not assert any other Claims against the Debtors or the Estates and shall receive no further payments or distributions.

F.    **PIK Notes Settlement**

As described in Articles IV.A and VIII.A of the Plan, the Plan reflects a global settlement of certain Claims and Causes of Action. The PIK Notes Settlement Total Amount reflects the settlement of certain Claims and Causes of Action asserted or that the PIK Notes Indenture Trustee believes could be asserted by CL Holdco for the benefit of the Holders of PIK Notes Claims. As part of the global settlement reflected by the Plan, to the extent that the Class of Holders of PIK Notes Claims votes to accept the Plan and the PIK Notes Indenture Trustee does not take any action on or after the PIK Settlement Date in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any agreements under the Plan Support Agreement, the Holders of PIK Notes Claims will receive the PIK Notes Settlement Recovery Amount and Apax will receive the Apax Share Amount (provided that, for the avoidance of doubt, Apax shall receive the Apax Share Amount directly from the Debtors and not subject to any Charging Lien). To the extent that the Holders of PIK Notes Claims are not entitled to receive a distribution in accordance with Article III.B(16)(ii) of the Plan, however, the PIK Notes Settlement Total Amount will be distributed to Holders of Senior Notes Claims and General Unsecured Claims, as set forth in Article III.B of the Plan.

### G.        Post-Effective Date Role of the Committee

On the thirtieth (30th) day after the Effective Date, except with respect to (a) fee applications and Non-Estate Fees; (b) appealing and taking any action concerning an appeal in any court that is pending as of the Effective Date; (c) any pending litigation or contested matters to which the Committee is a party (excluding any such litigation or contested matter as to any Causes of Action released by the Plan); (d) interpretation, enforcement, or implementation of the Plan, in each case to the extent there is a dispute, disagreement, controversy or issue, including, but not limited to, a contested matter or adversary proceeding or other litigation and as it relates to or otherwise affects the Other Unsecured Creditor Distributions or the classification or treatment of Second Lien Claims, Senior Notes Claims, PIK Notes Claims, Subordinated Notes Claims, and General Unsecured Claims or otherwise relates to or affects unsecured creditors of the Debtors; and (e) consulting with the Debtors or Reorganized Debtors with respect to the reconciliation of claims and the adjudication, objection, settlement and resolution of General Unsecured Claims or other Claims reclassified or being reclassified as General Unsecured Claims, the Committee shall dissolve for purposes of these Chapter 11 Cases.

The Reorganized Debtors shall promptly pay the reasonable and documented post-Effective Date fees and expenses of the Committee's professionals; provided, however, the Reorganized Debtors' obligation to pay the fees and expenses of the professionals of the Committee, including but not limited to the Committee's attorneys and financial advisors, with respect to (e) above, shall not exceed $250,000, and thereafter such fees and expenses will otherwise be satisfied and paid from the Post-Effective Date Committee Reserve Account.

The Reorganized Debtors shall consult with the Committee and its professionals after the Effective Date regarding the reconciliation, resolution, objection to, and settlement of, General Unsecured Claims or other Claims reclassified or being reclassified as General Unsecured Claims; provided further that the Committee's consent is required, which consent shall not be unreasonably withheld, to compromise, settle, or otherwise resolve Claims that are (i) filed or scheduled or asserted in excess of $1 million as General Unsecured Claims or (ii) proposed to be compromised, settled, or resolved by the Debtors or Reorganized Debtors by allowing such claim as a General Unsecured Claim in excess of $1 million.  On the Effective Date the Committee will use its best efforts to form a subcommittee consisting of not less than two members and not more than three members.  The Committee will use its best efforts to first permit trade or other non-funded debt committee members, and for the avoidance of doubt, excluding indenture trustees, to serve on such subcommittee.  The subcommittee shall be delegated the responsibility and authority with respect to those matters set forth in (e) above.

On the Effective Date, the Post-Effective Date Committee Reserve Account will be funded with Cash in the amount of $150,000 from the Apax Withheld Distribution portion of the GUC Distribution.  For the avoidance of doubt, for purposes of this paragraph, the GUC Distribution shall not include distributions to the Holders of Second Lien Claims, Senior Notes Claims, or PIK Notes Claims.  The Post-Effective Date Committee Reserve Account shall be maintained in trust solely for the post-Effective Date fees and expenses of the Committee and sub-committee with respect to clause (e) above.  Such funds shall not be considered property of the Debtors' Estates or of the Reorganized Debtors.

All funds in the Post-Effective Date Committee Reserve Account will be released and distributed to Holders of General Unsecured Claims pursuant to Article III.B of the Plan with the consent of the Committee or upon the resolution of all Disputed Claims.

### H.        Release & Exculpation

The November Plan was amended to add the Second Lien Indenture Trustee, the Consenting Second Lien Noteholders, the Senior Notes Indenture Trustee, the Subordinated Notes Indenture Trustee, the PIK Notes Indenture Trustee, and Centerbridge to the definitions of Releasee, Releasing Parties, and Exculpated Parties.

As described in Article VIII.I of the Plan, the PIK Notes Indenture Trustee will be removed from the definitions of Releasee, Releasing Parties, and Exculpated Parties if the PIK Notes Indenture Trustee is directed by Holders of PIK Notes Claims to take action (and does take such action on or after the PIK Settlement Date) in the Chapter 11 Cases, including regarding the Plan, that is inconsistent with the Plan or any of its agreements under the PSA.  Similarly, the Subordinated Notes Indenture Trustee will be removed from the definitions of Releasee,

Releasing Parties, and Exculpated Parties if the Subordinated Notes Trustee objects to or challenges confirmation of the Plan or seeks to delay Confirmation of the Plan.

The revised release and exculpation provisions, as included in the Plan, are set forth below.

*(i)*     ***Release***

(a)     Debtor Release

**Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Releasees, the adequacy of which is hereby confirmed, each of the Debtors, the Reorganized Debtors, and the Debtors' Estates conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release and shall be deemed to have provided a full discharge and release to each Releasee (and each such Releasee so released shall be deemed fully released and discharged by the Debtors, the Reorganized Debtors, and the Debtors' Estates) and their respective property from any and all Claims, obligations, debts, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims asserted or which could be asserted on behalf of the Debtors and/or the Reorganized Debtors, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, their Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring Transactions, these Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasee, the restructuring of Claims and Interests prior to or in these Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement (and the term sheets attached thereto), the Plan Support Agreement (and the term sheets attached thereto), the Term Sheets, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; _provided_, that the foregoing "Debtor Release" shall not operate to waive or release any Claims, obligations, debts, rights, suits, damages remedies, Causes of Action, and liabilities of any Debtor:  (1) arising under the Exit Revolver Facility Documents or any other agreements entered into pursuant to the Plan, or (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents; _provided further_, that the foregoing "Debtor Release" shall be deemed to include any and all pre-Effective Date Claims and Causes of Action which may be asserted against Apax  or any other Releasee and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, _and further_, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors, their Estates, and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

*(ii)*     ***Third-Party Release***

**Notwithstanding anything contained in the Plan to the contrary, on the Confirmation Date and effective as of the Effective Date, each Releasing Party shall, to the maximum extent permitted by applicable law, conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each Entity**

so discharged and released shall be deemed discharged and released by the Releasing Parties) the Releasees and their respective property from any and all Claims, interests, obligations, debts, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, including any derivative Claims asserted or which could be asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring Transactions, these Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Releasee, the restructuring of Claims and Interests prior to or in these Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Support Agreement (and the term sheets attached thereto), the Plan Support Agreement (and the term sheets attached thereto), the Term Sheets, the Plan, the Disclosure Statement, the Plan Supplement, or related agreements, instruments, or other documents; provided, that the foregoing "Third-Party Release" shall not operate to waive or Release any Claims, obligations, debts, rights, suits, damages, remedies, causes of action, and liabilities of any Releasing Party:  (1) against a Releasee arising under the Exit Revolver Facility Agreement or any other agreements entered into pursuant to the Plan; (2) expressly set forth in and preserved by the Plan, the Plan Supplement, or related documents; (3) with respect to Professionals' final fee applications or Accrued Professional Compensation Claims in these Chapter 11 Cases; or (4) solely arising out of or relating to acts or omissions occurring after the Confirmation Date other than for acts or omissions in connection with distributions made consistent with the terms of the Plan by the Disbursing Agent or another party authorized by this Plan to make distributions; provided further, that any Holder of a Claim that is entitled to vote on the Plan and elects to opt out of the Third-Party Release or does not vote on the Plan shall not receive the benefit of or be deemed to have granted the Third-Party Release; provided further, that the foregoing "Third Party Release" shall be deemed to include any and all pre-Effective Date Claims and Causes of Action which may be asserted against Apax or any other Releasee and their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Releasees; (2) a good faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

(iii)     *Exculpation*

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Entity for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, implementing , or consummating the Plan, the transactions contemplated by the Restructuring Support Agreement (and the term sheets attached thereto), the Plan Support Agreement (and the term sheets attached thereto), the Term Sheets, the Disclosure Statement, the New Corporate Governance Documents, the Restructuring Transactions, the issuance, distribution, and/or sale of any shares of the New Equity or any other security offered, issued, or distributed in connection with the Plan, these Chapter 11 Cases or any contract, instrument, release or other agreement, or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors; provided, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement; provided, further, that the foregoing "Exculpation" shall have no effect on the liability of any Entity that results from any such act or omission

that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct; provided, further, that the foregoing "Exculpation" shall have no effect on the liability of any Entity for acts or omissions occurring after the Effective Date other than acts or omissions in connection with distributions made consistent with the Plan by the Disbursing Agent or another party authorized by the Plan to make distributions; provided, further, that the foregoing "Exculpation" shall be deemed to include any and all Claims and Causes of Action arising before the Effective Date which may be asserted against Apax or any other Exculpated Party or their respective predecessors, successors and assigns, and current and former shareholders, affiliates, subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, in each case in their capacity as such, at any time, including (without limitation) arising from, related to, or in connection with any prepetition debt purchases by Apax or the Debtors or any prepetition management fees paid to Apax; provided, further, that the foregoing "Exculpation" shall have no effect on the liability of (1) any Entity that results from any such act or omission that is determined in a Final Order to have constituted fraud, gross negligence, or willful misconduct and (2) the Professionals to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. Tit. 22 § 1200.8, Rule 1.8(h)(1)(2009); provided, further, that any party seeking to bring such a claim against any of the Professionals must first seek relief, on proper notice, from this Court.

Notwithstanding anything to the contrary in the Plan, including, without limitation, the "Debtor Release," "Third Party Release," or "Exculpation" shall not have any effect on the liability of any Entity that results from any act or omission taken in connection with or related to the Plan Support Agreement, the Plan Term Sheet, or the Plan that is determined by Final Order to have constituted fraud, gross negligence, or willful misconduct.

### I.    Payment of Certain Professional Fees

#### (i)    First Lien Holders' Fees

Pursuant to Article XII.D.1 of the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court, the Reorganized Debtors shall pay and shall continue to pay post-Effective Date, when due and payable, all (a) reasonable and documented fees and expenses incurred by the Ad Hoc First Lien Group related to the Debtors, the Reorganized Debtors, or the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses incurred by Milbank Tweed, Hadley & McCloy LLP, as counsel to the Ad Hoc First Lien Group, and Houlihan Lokey Capital, Inc., as financial advisors to the Ad Hoc First Lien Group, (b) reasonable and documented fees and expenses incurred by the First Lien Credit Facility Administrative Agent related to the Debtors, the Reorganized Debtors, or the Chapter 11 Cases, including counsel to the First Lien Credit Facility Administrative Agent, Davis Polk & Wardwell LLP and the financial advisor to the First Lien Credit Facility Administrative Agent, Blackstone Advisory Partners, L.P., and (c) reasonable and documented fees and expenses of the First Lien Indenture Trustee related to the Debtors, the Reorganized Debtors, or the Chapter 11 Cases, including counsel to the First Lien Indenture Trustee, Katten Muchin Rosenman LLP. Any pre-Effective Date fees and expenses of the Ad Hoc First Lien Group, the First Lien Credit Facility Administrative Agent, and the First Lien Indenture Trustee shall be paid pursuant to the Cash Collateral Order. Any fees and expenses paid by the Debtors pursuant to the Cash Collateral Order prior to the Effective Date shall be subject to challenge, solely to the extent set forth in the Cash Collateral Order but shall not be subject to recharacterization or reallocation pursuant to section 506(b) of the Bankruptcy Code.

#### (ii)    Other Parties' Fees

Pursuant to Article XII.D.2 of the Plan, the Debtors shall pay in full all of the Non-Estate Fees, collectively up to an amount of $5,192,669.48 in the aggregate (the "Non-Estate Professional Fee Cap"); provided that such Non-Estate Professional Fee Cap shall be allocated up to $2,942,669.48 (which is the result of reducing the $15 million Non-Estate Professional Fee Cap for the distributions being made to Holders of Second Lien Claims on account of the reasonable and documented fees and expenses of the Second Lien Indenture Trustee as set forth in Article III.B.23 and Article III.B.31 of the Plan) to the fees incurred by the Consenting Second Lien Noteholders and up to $2,250,000 (which is the result of reducing the $5 million Non-Estate Professional Fee Cap for the distributions being made to Holders of Senior Notes Claims and PIK Notes Claims on account of the reasonable and documented fees and expenses of such parties as set forth in Articles III.B.16, III.B.24, and III.B.32) in the aggregate to the Subordinated Notes Trustee and Centerbridge; provided further that the Subordinated Notes

Indenture Trustee shall not be entitled to any payment of fees and expenses from the Non-Estate Professional Fee Cap if the Subordinated Notes Indenture Trustee objects to or challenges confirmation of the Plan or seeks to delay confirmation of the Plan.  For the avoidance of doubt, to the extent the Non-Estate Fees are less than $5,192,669.48, the Reorganized Debtors shall retain such difference.  To the extent that Non-Estate Fees of the Consenting Second Lien Noteholders will exceed the $2,942,669.48 portion of the Non-Estate Professional Fee Cap, the Debtors or the Reorganized Debtors, as applicable, will make reasonable efforts to ensure that, subject to the Non-Estate Professional Fee Cap, accrued and unpaid Non-Estate Fees of the Consenting Second Lien Noteholders will share Pro Rata from the applicable $2,942,669.48 portion of the Non-Estate Professional Fee Cap, based on the reasonable and documented fees and expenses requested pursuant to this Article XII.D.2.  To the extent that Non-Estate Fees of the Subordinated Notes Trustee and Centerbridge will exceed the  $2,250,000 portion of the Non-Estate Professional Fee Cap, the Debtors or the Reorganized Debtors, as applicable, will make reasonable efforts to ensure that, subject to the Non-Estate Professional Fee Cap, accrued and unpaid Non-Estate Fees of the Subordinated Notes Trustee and Centerbridge will share Pro Rata from the applicable $2,250,000 portion of the Non-Estate Professional Fee Cap, based on the reasonable and documented fees and expenses requested pursuant to this Article XII.D.2.

Non-Estate Fees shall be paid (a) on the later of (i) the Effective Date of the Plan or (ii) ten days after receipt by the Debtors or the Reorganized Debtors, as applicable, of invoices for such amounts; and (b) with respect to any reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases after the Effective Date in connection with supporting the Plan in any appeal of confirmation that continued after the Effective Date or with respect to performance of any of such parties' obligations under the Plan, within ten days after the receipt by the Reorganized Debtors of invoices for such amounts; provided, however, that the Bankruptcy Court shall retain jurisdiction over any disputes regarding the reasonableness of the Non-Estate Fees.  If the Debtors or the Reorganized Debtors dispute any requested Non-Estate Fees, the Debtor or the Reorganized Debtors shall (i) timely pay the undisputed portion of the Non-Estate Fees and (ii) notify the Subordinated Notes Indenture Trustee or such other party requesting payment of Non-Estate Fees of such dispute within ten days after presentation of the invoices by the Subordinated Notes Indenture Trustee or other party, and upon such notification, the party requesting payment may submit such dispute for resolution to the Bankruptcy Court; provided, however, that the Bankruptcy Court's review shall be limited to a reasonableness determination as provided under the Prepetition Indentures or applicable law.  Nothing in the Plan shall be deemed to impair, waive, discharge, or negatively affect the Charging Lien of the Prepetition Indenture Trustees.

### J.        Post-Effective Date Corporate Structure

Changes to the Debtors' post-Effective Date corporate structure, if any, will be set forth in the description of Transaction Steps in the Plan Supplement.

### K.        New Shareholders Agreement and New Corporate Governance Documents

On the Effective Date, Reorganized Cengage and the Reorganized Debtors, as applicable, shall enter into the New Corporate Governance Documents.  The New Corporate Governance Documents, other than the New Shareholders Agreement and the New Registration Rights Agreement, shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of New Equity shall be deemed to be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Cengage, and such other Reorganized Debtors as applicable.  The New Corporate Governance Documents will be included as part of the Plan Supplement.

On the Effective Date, Reorganized Cengage shall enter into and deliver the New Shareholders Agreement and the New Registration Rights Agreement in substantially the forms included in the Plan Supplement.  The New Shareholders Agreement and the new Registration Rights Agreement each shall be deemed to be valid, binding, and enforceable in accordance with its terms on those parties set forth in each such agreement filed with the Plan Supplement.

The New Shareholders Agreement shall provide that any shareholder protections in the New Shareholders Agreement shall apply to all minority Holders of New Equity on an equal basis; provided, however, that the foregoing does not mean that all minority shareholders will have the same protections regardless of percentage holdings.  The New Shareholders Agreement and the other New Corporate Governance Documents shall be

reasonably acceptable to the Required Consenting Lenders and shall not unreasonably and adversely affect any Holder of New Equity in the exercise of its rights as a Holder of New Equity.  Notwithstanding anything to the contrary in the Equity Term Sheet, preemptive rights will be governed by the New Shareholders Agreement.

The New Shareholders Agreement shall expressly identify Apax as the "15%" holder entitled to nominate and have elected one director and one board observer on the Effective Date, so long as Apax is entitled to at least 15% of the New Equity on account of its First Lien Claims as of the Effective Date.

### L.    Total Enterprise Value and Issuance of New Equity

As part of the Global Settlement, the Debtors and the Supporting Parties have agreed to support a $3.6 billion total enterprise valuation for all purposes under the Plan (including the Management Incentive Plan). The implied price per share under the Plan for the New Equity to be issued will be set forth in the Plan Supplement.

Cengage Interests will be cancelled and Reorganized Cengage shall issue the New Equity for distribution to Holders of Claims entitled to receive the New Equity pursuant to the Plan.  New Equity will also be reserved for the Management Incentive Plan in accordance with Article IV.Y of the Plan.

The New Equity will be common stock of Reorganized Cengage, which will be a corporation.  Each share of the New Equity issued and distributed pursuant to the Plan shall be duly authorized, validly issued, and fully paid and non-assessable.  Each distribution and issuance referred to in Article VI of the Plan will be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, and which shall be in form and substance acceptable to the Required Consenting Lenders and consistent with the terms of the Plan Support Agreement, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### M.    Non-Reporting Company

On the Effective Date, the issuer of the New Equity of the Reorganized Debtors will not be required to file periodic reports under the Securities Exchange Act (as the Plan requires that the number of holders of New Equity not trigger reporting obligations under applicable securities laws) and will not seek to list the New Equity of the Reorganized Debtors for trading on a national securities exchange. The Reorganized Debtors expect to maintain their status as a non-reporting company after the Effective Date.  In order to prevent the Reorganized Debtors from becoming subject to the reporting requirements of the Securities Exchange Act, except in connection with a public offering, the New Corporate Governance Documents and New Shareholder Agreements may impose certain trading restrictions, and the New Equity will be subject to certain transfer and other restrictions pursuant to the New Corporate Governance Documents.

### N.    Limited Reporting Obligations Under the Plan

The Reorganized Debtors shall post publicly annual and quarterly financial statements (with management, discussion and analysis being posted at least annually, and with any other management, discussion and analysis provided to any lender or other entity being posted as well), provided, however, the Reorganized Debtors shall be entitled to withhold commercially sensitive information in their reasonable discretion (provided that the deletion of the withheld information from the financial statements does not make the redacted statements not compliant with Generally Accepted Accounting Principles).  Other reporting obligations will be as set forth in the New Corporate Governance Documents and filed as part of the Plan Supplement.

### O.    Risks Related to the New Equity Issued Under the Plan

The following discussion supplements the discussion of certain risk factors found in Article X of the Disclosure Statement and certain securities law matters found in Section XIV of the Disclosure Statement (collectively, the "***Previous Securities Disclosure***").  All Holders of Claims are urged to review the Previous Securities Disclosure in addition to reviewing the discussion herein.

### (i)    *A Liquid Trading Market for Shares of New Equity May Not Develop*

As of the Effective Date, there will have been no public market for the shares of New Equity and there may not be such a public market after the Effective Date.  The Debtors and Reorganized Debtors cannot predict whether an active trading market may develop or how liquid that market may become.  A market for the New Equity may develop on the pink sheets bulletin board.  An active trading market for the New Equity may never develop or be sustained following the Effective Date.  If an active market for the New Equity does not develop, it may be difficult to sell New Equity issued pursuant to the Plan.

### (ii)    *New Corporate Governance Documents and New Equity Will Affect Holders of Shares of New Equity*

As part of the issuance of the New Equity and in accordance with the terms of the Plan, the Debtors and Reorganized Debtor, as applicable, will enter into various agreements and documents, including, but not limited to, the New Shareholders Agreement and the other New Corporate Governance Documents.  The terms and conditions contained in such agreements may impact or impair the ability to freely trade, sell or transfer the New Equity.  For example, some provisions in the New Corporate Governance Documents, as well as Delaware statutes, may have the effect of delaying, deferring or preventing a change in control. These provisions may make it more difficult for other persons, without the approval of the New Board, to make a tender offer or otherwise acquire a substantial number of shares of the New Equity or to launch other takeover attempts that a stockholder might consider to be in his or her best interest. These provisions could limit the price that some investors might be willing to pay in the future for shares of New Equity.

### (iii)    *Total Enterprise Value and Price of Shares of New Equity Does Not Necessarily Reflect Value of the Reorganized Debtors*

The total enterprise value and implied price per share of New Equity reflects the results of negotiations and the Global Settlement among the Debtors and the Supporting Parties, is based on certain assumptions, and does not necessarily reflect the Debtors' past operations, cash flows, net income or current financial condition, the book value of the Debtors' assets, the projected operations, cash flows, net income or financial condition of the Reorganized Debtors, the book value of the Reorganized Debtors' assets, or other established criteria for value.  As a result, the total enterprise value and the implied per share price of New Equity should not be relied upon as an indication of the actual value of Reorganized Cengage or the future trading price of the shares of the New Equity.

### (iv)    *Other Factors May Affect the Total Enterprise Value and the Price of the New Equity*

In addition to the risk factors noted in Article X of the Disclosure Statement, the total enterprise value and the price of the New Equity may be influenced by other factors, including:

- regulatory developments;

- developments or disputes concerning copyrights or other intellectual property used by the Reorganized Debtors;

- the recruitment or departure of key personnel;

- quarterly or annual variations in the Reorganized Debtors' financial results or those of companies that are perceived to be similar to the Reorganized Debtors;

- market conditions in the industries in which the Reorganized Debtors will compete and the issuance of new or changed securities analysts' reports  or recommendations;

- the failure of securities analysts to cover the New Equity after the Effective Date;

- the inability to meet the financial estimates of analysts who will follow the Reorganized Debtors;

- investor perception of the Reorganized Debtors and of the industry in which it will compete; and

- general economic, political and market conditions.

P.      **Management Incentive Plan**

The terms of the Management Incentive Plan have been revised, which revised terms are reflected in the term sheet attached as **Exhibit A** to the Plan.

Q.      **Adversary Proceedings**

As discussed in greater detail in the Disclosure Statement, certain ongoing litigations, including contested matters and adversary proceedings are pending in the Chapter 11 Cases.  To facilitate the Mediation, and in an effort to reach a global settlement, the Supporting Parties, to a large extent, suspended these ongoing litigations, including contested matters and adversary proceedings while the Mediation was ongoing.  That said, in order to avoid unnecessary delay in the event a global settlement was not reached, the Supporting Parties continued depositions and produced a significant volume of documents in connection with (i) issues and contested matters relating to Confirmation and (ii) various adversary proceedings.  The Debtors and the Supporting Parties have been successful in reaching the Global Settlement, the terms of which are incorporated in the Plan.  Should the Plan receive the necessary votes of acceptance and be approved by the Bankruptcy Court, the following adversary proceedings will be rendered moot and dismissed with prejudice (collectively, the "***Adversary Proceedings***"):

- On September 10, 2013, Apax filed a complaint [Adversary Case No. 1-13-01453; Docket No. 437] seeking a declaration that it is entitled to share in all distributions under the Plan made to the First Lien Secured Parties in accordance with the terms of the First Lien Intercreditor Agreement governing the respective rights and obligations of holders of the First Lien Notes and the First Lien Credit Agreement;

- On September 20, 2013, the Debtors filed a declaratory judgment action seeking a determination by final order of the Court that the Disputed Cash is not part of the Prepetition Secured Parties' collateral package and that no Prepetition Secured Party or entity acting as their agent has a security interest in the Disputed Cash.   [Adversary Case 1-13-0146, Docket No. 500] (the "***Disputed Cash Declaratory Judgment Action***").   By a stipulation dated, November 11, 2013, the Committee intervened in the Disputed Cash Declaratory Judgment Action [Adversary Case 1-13-0146, Docket No. 22];

- On October 23, 2013, the First Lien Group filed an adversary proceeding against the Debtors seeking to impose a constructive trust over the Disputed Cash [Adversary Case No. 1-13-01487, Docket No. 622];

- On November 1, 2013, the First Lien Credit Facility Administrative Agent filed an adversary proceeding  seeking specific performance of the Second Lien Intercreditor Agreement and damages on account of violations of the Second Lien Intercreditor Agreement by the Second Lien Indenture Trustee [Adversary Case No. 1-13-01505; Docket No. 659];

- On October 5, 2013, the Debtors filed a complaint under sections 544, 547 550, and 551 of the Bankruptcy Code seeking to avoid the liens in the Disputed Copyrights and the liens in the inventory, revenues, and other documents pertaining to such copyrights, and preserving such liens for the benefit of the Debtors' Estates [Adversary Case No. 1-13-01487, Docket No. 563] (the "***Copyright Adversary Proceeding***"); and

- On November 11, 2013, the Committee filed a motion (i) to obtain standing to pursue additional claims to avoid liens in the Debtors' registered copyrights and the liens in the inventory, revenues, and other documents pertaining to the registered copyrights, and preserving such liens for the benefit of the Debtors' Estates, which additional claims were not asserted by the Debtors, and (ii)

to intervene in the Copyright Adversary Proceeding [Docket No. 712] (the "**Committee Standing and Intervention Motion**").  On December 20, 2013, the Bankruptcy Court entered an Order permitting the Committee to intervene in the Copyright Adversary Proceeding.  During the Mediation, the Bankruptcy Court adjourned its ruling on the remaining relief sought in the Committee Standing and Intervention Motion and, as of the date hereof, has not issued a ruling.

Pursuant to the Third Supplemental Stipulation and Consent Order filed on February 3, 2014  [Docket No. 1049], all pending investigation, discovery, litigation, and contested matters, including any pending adversary proceedings and contested matters, and, subject to the Plan Support Agreement, the investigation deadlines set forth in the Cash Collateral Orders were stayed, and all deadlines with respect to the foregoing were tolled for all purposes until the earlier of (i) the termination of the Plan Support Agreement in accordance with its provisions and/or (ii) the consummation of the Plan

Upon the Effective Date of the Plan, all ongoing litigation, including any adversary proceedings and contested matters in the Chapter 11 Cases (and related motions) pending as of the Confirmation Date shall be deemed dismissed with prejudice.  For the avoidance of doubt and except as expressly set forth in the Plan, any and all inter-creditor disputes that either have been asserted or could have been asserted by any person or Entity with respect to the Debtors or the Chapter 11 Cases prior to the Effective Date, including those arising in connection with or otherwise related to the Second Lien Intercreditor Agreement, shall be waived and released by each such person or entity and the pending adversary proceeding relating thereto shall be dismissed with prejudice in the Confirmation Order, effective on the Effective Date of the Plan; provided that, other than with respect to the Second Lien Intercreditor Agreement, the foregoing shall not be deemed to waive or release any intercreditor disputes not related to the Debtors or the Chapter 11 Cases or as otherwise set forth in Article VIII.D or Article VIII.E of the Plan; provided further that, notwithstanding anything to the contrary in the Plan, the distributions and other consideration received by Holders of First Lien Claims and Holders of Second Lien Claims under the Plan shall be deemed sufficient under Bankruptcy Rule 9019 to support the binding waivers and releases of any and all claims and causes of action that have been asserted or could have been asserted prior to the Effective Date with respect to any disputes arising in connection with or otherwise related to the Second Lien Intercreditor Agreement:  (a) against the Second Lien Indenture Trustee and/or any Holder of Second Lien Claims by the First Lien Credit Facility Agents, First Lien Indenture Trustee, and each Holder of First Lien Claims (and for each of the foregoing, their respective successors or assigns); or (b) against the First Lien Credit Facility Agents, First Lien Indenture Trustee, and/or any Holder of First Lien Claims by the Second Lien Indenture Trustee and/or any Holder of Second Lien Claims (and for each of the foregoing, their respective successors or assigns).

The Adversary Proceedings, should they continue to be prosecuted, would result in a tremendous financial expense to the the Debtors' estates and create unnecessary distractions to the Debtors' management as they work to implement the Debtors' new business plan to position the Debtors for future success and stability.  The Global Settlement consensually resolves the Adversary Proceedings, eliminating the cost and burden associated therewith.  Moreover, should the Plan not receive the necessary votes and/or not be approved, additional litigation may be necessary to resolve the disputed issues, including issues for which an adversary proceeding is not yet pending, potentially further delaying the Debtors' emergence from chapter 11 and incurring additional costs to the Debtors' estate.  The Debtors, the Committee, and the other Supporting Parties believe that the settlements embodied in the Plan with respect to the issues in the Adversary Proceedings is the most productive outcome and will benefit the Debtors' estates and creditors.

**R.**     **Intercompany Obligations**

As explained in detail in the Disclosure Statement, various intercompany obligations are owed between two Debtors or between a Debtor and a non-Debtor affiliate, totaling over $4 billion.  The Committee and certain other stakeholders contested that certain Intercompany Claims are invalid or should be recharacterized or equitably subordinated.  Pursuant to the Plan, Holders of Intercompany Claims shall not receive any distribution on account of such Claims, and the Intercompany Claims shall be Reinstated or cancelled as of the Effective Date at the election of the Debtors; provided further that such cancellation or reinstatement, as applicable, shall have no adverse effect on the distributions to the Holders of First Lien Claims or Holders of Second Lien Claims, Senior Notes Claims, Subordinated Notes Claims, PIK Notes Claims, or General Unsecured Claims or on the PIK Notes Settlement Total

Amount, the PIK Notes Settlement Recovery Amount, or the Apax Share Amount, and any such cancellation or reinstatement that has such an adverse effect shall be null and void *ab initio*.[6]

## V.    APPROVAL OF THE GLOBAL SETTLEMENT PURSUANT TO SECTION 9019 OF THE BANKRUPTCY CODE

In advance of the Confirmation Hearing, the Debtors will file the *Debtors' Motion For Entry Of An Order, Pursuant to Federal Rule of Bankruptcy Procedure 9019, Approving The Global Settlement Among the Debtors and the Supporting Parties* (the "**Global Settlement Motion**").  The Global Settlement Motion will seek Court approval of the Global Settlement as part of the Confirmation Order, which settlement consensually resolves the outstanding disputes in the Chapter 11 Cases necessary for plan confirmation, provides the framework of the Plan, and enables the Debtors to emerge from chapter 11 expeditiously.  The Global Settlement is evidence of the parties' extensive good-faith, arm's-length negotiations and is memorialized in the Plan Support Agreement.

Among other things, the Global Settlement will allow the Debtors' estates to avoid incurring millions of dollars in fees and expenses litigating the disputed issues in the Chapter 11 Cases and put the Debtors in a position to seek a swift, consensual exit from chapter 11.  Such a result inures not only to the Debtors' benefit, but also to the benefit of all of their creditors by, among other things, avoiding the significant risk, delay, and uncertainty of litigation and increasing the value available for distributions to the Debtors' creditors.  The Global Settlement represents a series of linked concessions by all parties and will be implemented through the recoveries and allocations provided for in the Plan.  The Global Settlement does not seek to adjudicate the issues that were disputed, but rather the Global Settlement removes risk, provides certainty, and avoids the massive costs and delays of litigating such disputed.  The Debtors, the Committee, and the other Supporting Parties believe that the Global Settlement is well within the range of reasonableness, as required by Section 9019 of the Bankruptcy Code, and is in the best interests of the Debtors, their estates, and all parties in interest.

The Global Settlement Motion will be considered at the Confirmation Hearing.

## VI.    VALUATION OF COPYRIGHTS

The Mediation parties had different views of the valuation of the Debtors' copyrights.  The differences in valuation were resolved in the Global Settlement.

## VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion supplements the discussion of certain U.S. federal income tax consequences of the Plan to the Debtors, the Reorganized Debtors and to certain Holders of Claims found in Section XV of the Disclosure Statement (the "**Previous Tax Disclosure**").  This discussion is meant to update and be read together with the Previous Tax Disclosure, and accordingly all Holders of Claims are urged to review the Previous Tax Disclosure in addition to reviewing the discussion herein.

The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan.  This summary is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "**IRS**") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing

---

[6]    Based on the totality of the circumstances, including the Global Settlement, the Debtors believe that all of the Intercompany Obligations described in the Disclosure Statement are valid debt claims, are subject to reinstatement on and after the Effective Date, and cannot and should not be characterized as anything other than valid debt.  All parties reserve their right to assert otherwise to the extent the Effective Date under the Plan does not occur.

interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This summary does not apply to Holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC). This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, Persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, the New Debt Rollover Facility, the New Debt Alternative Facility or New Equity, as part of a hedge, straddle, conversion or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of Section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors**

As discussed in the Previous Tax Disclosure, the Debtors expect to realize significant COD Income, which is expected to eliminate all of the Debtors NOLs allocable to periods prior to the Effective Date. The Plan permits the Reorganized Debtors to reinstate Intercompany Claims. The Debtors expect that they will elect to reinstate most of the Intercompany Claims and therefore the "asset tax basis floor" created by continuing indebtedness will likely be higher than previously expected. As a result, the Debtors expect little to no reduction in the tax basis in their operating assets. As a result of this and various other changes, the Debtors now estimate that their cash taxes payable during the period from fiscal 2014 through fiscal 2018 will be approximately $125 million to $175 million which is approximately $150 to $200 million less than originally projected.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims**

The expected federal income tax consequences of the Plan to the Holders of Allowed Claims entitled to vote depend on a number of considerations that cannot be known at this time, including without limitation the following: (1) the classification (for U.S. federal income tax purposes) of the primary obligor or borrower with respect to each Class of Allowed Claims, (2) whether or not the Restructuring Transactions are structured (in whole or part) as a Taxable Transaction, (3) whether the Reorganized Debtors enter into the New Debt Alternative Facility

or the New Debt Rollover Facility, (4) if the Reorganized Debtors enter the New Debt Rollover Facility, (a) whether the New Debt Rollover Facility is treated as a "security" within the meaning of applicable tax rules and (b) whether or not the entity treated as the borrower of the New Debt Rollover Facility for tax purposes is the same entity and/or the successor (for tax purposes) to the entity treated as the borrower for tax purposes with respect to the First Lien Claims for which it is exchanged, and (5) whether (a) the issuer of the New Equity is treated as the same entity or successor entity (for tax purposes) as the borrower with respect to the Allowed Claims for which it is exchanged and (b) such Allowed Claim is a security under applicable tax law..

The Debtors expect to take the position, and this discussion assumes, that each of the First Lien Credit Facility Claims, First Lien Notes Claims, First Lien Swap Claims, Second Lien Claims, Senior Notes Claims, and Subordinated Notes Claims consist of claims with respect to debt for which solely CLAI is treated as the borrower or debtor for federal income tax purposes. Similarly, the Debtors expect to take the position, and this discussion assumes, that the PIK Notes Claims consist of claims with respect to debt for which solely CL Holdco is treated as the borrower for federal income tax purposes. The Debtors expect to take the position, and this discussion assumes, that all Claims of a Holder with respect to the First Lien Credit Facility (e.g., Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29 and Class 30 Claims of a Holder arising from an interest in the First Lien Credit Facility) are treated as arising from a single debt of CLAI for federal income tax purposes. Likewise, all Claims of a Holder against the Debtors with respect to each of the First Lien Notes, the First Lien Swaps, the Second Lien Notes and the Senior Notes are treated, in each case, as arising from a single debt of CLAI for federal income tax purposes.

### *(i)      Consequences to Holders of Allowed First Lien Claims (Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29, Class 30)*

The expected tax consequences from the Plan to Holders of Allowed First Lien Claims are set forth in the discussion under "Consequences to Holders of Allowed First Lien Claims (Class 3, Class 4, Class 12, Class 13, Class 21, Class 22, Class 29, Class 30)" in the Previous Tax Disclosure.

**The tax consequences of the Plan and to the Holders of Allowed First Lien Claims against CLAI are highly uncertain. Holders of Allowed First Lien Secured Claims against CLAI should consult their tax advisors regarding whether such Claims or the New Debt Facility could be treated as a "security" for U.S. federal income tax purposes.**

### *(ii)      Consequences to Holders of Allowed Second Lien Claims (Class 5, Class 14, Class 23, Class 31)*

Pursuant to the Plan, each Holder of an Allowed Second Lien Claim against CL Holdings and CL Holdco shall not receive any distribution on account of such Claims, and Second Lien Claims against CL Holdings and CL Holdco shall be discharged, cancelled, released, and extinguished as of the Effective Date. Pursuant to the Plan, each Holder of an Allowed Second Lien Claim against CLI and CLAI shall receive certain amounts of a combination of New Equity and/or Cash, with the mix determined by the Holder's election (subject to certain terms set forth in the Plan).

The expected tax treatment of Holders of Allowed Second Lien Claims will generally be as described in the Previous Tax Disclosure, provided that the previously defined terms "Junior CLAI Recovery" and "Unsecured CLAI Recovery" should instead be read to refer to the combination of New Equity and/or Cash (including Cash received with respect to the Withheld Apax Distribution) received by such Holder with respect to its Allowed Second Lien Claim. Additionally, the discussion of "Post-Effective Date Distributions" may be omitted.

### *(iii)      Consequences to Holders of Allowed Senior Notes Claims (Class 6, Class 15, Class 24, Class 32)*

Pursuant to the Plan, each Holder of an Allowed Senior Notes Claim shall receive certain amounts of a combination of New Equity and/or Cash, with the mix determined by the Holder's election (subject to certain terms set forth in the Plan).

The expected tax treatment of Holders of an Allowed Senior Notes Claim will generally be as described in the Previous Tax Disclosure, provided that the previously defined terms "Unsecured CLAI Recovery" and "Unsecured CLI Recovery" should instead be read to refer to the combination of New Equity and/or Cash (including

Cash received with respect to the Withheld Apax Distribution) received by such Holder with respect to its Allowed Senior Notes Claim.  Additionally, the discussion of "Post-Effective Date Distributions" may be omitted.

     *(iv)*     ***Consequences to Holders of Allowed PIK Notes Claims (Class 7, Class 16)***

     Pursuant to the Plan, each Holder of an Allowed PIK Notes Claim against CL Holdco, to the extent such Holder votes to accept the Plan and the PIK Notes Indenture Trustee does not take any action inconsistent with the Plan, shall receive an amount of Cash.  Each Holder of an Allowed PIK Notes Claim against CL Holdco for which the conditions in the preceding sentence are not met will have its Claim cancelled in exchange for no recovery.

     The Holder of an Allowed PIK Notes Claim should recognize gain or loss equal to the difference between (i) the sum of the total amount of cash received by such Holder in the exchange (except to the extent allocable to accrued but untaxed interest -- see the discussion of "Accrued Interest" in the Previous Tax Disclosure), and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered Allowed PIK Notes Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  See the discussions of "Accrued Interest" and "Market Discount" in the Previous Tax Disclosure. A Holder's tax basis in any assets received should equal their fair market value.  A Holder's holding period for any assets received on the Effective Date should begin on the day following the Effective Date.

     *(v)*     ***Consequences to Holders of Allowed General Unsecured Claims Against CLAI (Class 26)***

     Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim against CLAI shall receive certain amounts of a combination of New Equity and/or Cash, with the mix determined by the Holder's election (subject to certain terms set forth in the Plan).

     The expected tax treatment of Holders of an Allowed General Unsecured Claim against CLAI will generally be as described in the Previous Tax Disclosure, provided that the previously defined term "Unsecured CLAI Recovery" should instead be read to refer to the combination of New Equity and/or Cash (including Cash received with respect to the Withheld Apax Distribution) received by such Holder with respect to its Allowed General Unsecured Claim.

     *(vi)*     ***Consequences to Holders of Allowed General Unsecured Claims Against CLI (Class 34)***

     Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim against CLI shall receive certain amounts of a combination of New Equity and/or Cash, with the mix determined by the Holder's election (subject to certain terms set forth in the Plan).

     The expected tax treatment of Holders of an Allowed General Unsecured Claim against CLI will generally be as described in the Previous Tax Disclosure, provided that the previously defined term "Unsecured CLI Recovery" should instead be read to refer to the combination of New Equity and/or Cash (including Cash received with respect to the Withheld Apax Distribution) received by such Holder with respect to its Allowed General Unsecured Claim.

**D.**     **Limitations on Use of Capital Losses**

     Please see the Previous Tax Disclosure for a discussion of certain limits on the use of capital losses to offset taxable income.

**E.**     **Withholding and Reporting**

     Please see the Previous Tax Disclosure for a discussion of certain applicable withholding and reporting requirements.

     **THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION**

**THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## VIII.    CONCLUSION AND RECOMMENDATION

In the opinion of the Debtors, the Committee, and and the other Supporting Parties, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  February 12, 2014

Respectfully submitted,

Cengage Learning, Inc.
(on behalf of itself and each of the Debtors)

By: */s/ Dean D. Durbin*
    Dean D. Durbin
    Chief Financial Officer
    Cengage Learning Holdings II, L.P.

Prepared by:

*/s/ Jonathan S. Henes*
Jonathan S. Henes
Christopher J. Marcus
Christopher T. Greco
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
601 Lexington Avenue
New York, New York  10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

James H.M. Sprayregen
Ross M. Kwasteniet (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

*Counsel to the Debtors and Debtors in Possession*